IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF TEXAS

MARSHALL DIVISION

UNITED SERVICES AUTOMOBILE )(
ASSOCIATION, )(
PLAINTIFF, )( CIVIL ACTION NO.
)( 2:20-CV-319-JRG-RSP
VS. )( MARSHALL, TEXAS
)(
PNC BANK N.A., )( MARCH 24, 2022
DEFENDANT. )( 9:02 A.M.

PRETRIAL HEARING

BEFORE THE HONORABLE JUDGE ROY S. PAYNE

UNITED STATES MAGISTRATE JUDGE

FOR PLAINTIFF: Mr. Jason G. Sheasby
Irell & Manella, LLP
1800 Avenue of the Stars
Suite 900
Los Angeles, CA 90067

COURT REPORTER: Ms. Shelly Holmes, CSR, TCRR
Official Court Reporter
United States District Court
Eastern District of Texas
Texarkana Division
500 N. State Line Avenue
Texarkana, TX 75501
(903) 720-6009
shelly_holmes@txed.uscourts.gov

(Proceedings recorded by mechanical stenography, transcript produced on a CAT system.)

FOR PLAINTIFF: Ms. Lisa S. Glasser
Irell & Manella
840 Newport Center Drive
Suite 400
Newport Beach, CA 92660

Mr. Chris Bunt
Parker Ainsworth & Bunt
100 E Ferguson
Suite 418
Tyler, TX 75702

FOR DEFENDANT: Mr. Gregory P. Stone
Ms. Sarah S. Lee
Munger Tolles & Olson, LLP
350 S Grande Avenue
50th Floor
Los Angeles, CA 90071-3426

Mr. Gregory H. Lantier
WilmerHale
1875 Pennsylvania Avenue, NW
Washington, DC 20006

Ms. Blanca F. Young
Munger Tolles & Olson, LLP
560 Mission Street
27th Floor
San Francisco, CA 94105

Ms. Jeannette P. Leopold
WilmerHale
60 State Street
Boston, MA 02109

Ms. Melissa Smith
Gillam & Smith, LLP
303 South Washington
Marshall, TX 75670

COURT SECURITY OFFICER: All rise.

THE COURT: Good morning. Please be seated.

For the record, we're here for the pretrial conference in USAA versus PNC Bank, which is Case No. 2:20-319 on our docket.

Would counsel state their appearances for the record?

MR. BUNT: Good morning, Your Honor. Chris Bunt for USAA. Also with me is Mr. Jason Sheasby and Ms. Lisa Glasser from the Irell firm.

With us at the counsel table is Mr. David Brodsky, our expert graphics coordinator.

And we also have our USAA representatives. We have Mr. Bill Foster, who is the executive director of enterprise litigation, and Mr. Daniel Wybenga, senior intellectual property counsel.

THE COURT: All right.

MR. BUNT: And we're ready to proceed.

THE COURT: Thank you, Mr. Bunt.

MR. BUNT: Thank you.

MS. SMITH: Good morning, Your Honor. Melissa Smith on behalf of PNC. I'm joined by Mr. Greg Stone, Mr. Greg Lantier, Ms. Blanca Young, Ms. Sarah Lee, and Mr. Janette Leopold there in back.

Your Honor, we also have a few client

representatives with us today, Mr. Joe Wicker.

MR. WICKER: Good morning, Your Honor.

MS. SMITH: And Ms. Natalie Morris.

And we're ready to proceed, Your Honor.

THE COURT: All right. Thank you, Ms. Smith.

As everyone knows, this case is currently set for jury selection on April the 18th. I think counsel are probably aware there are a number of cases also set on April the 4th for jury selection.

I am informed that there is a possibility that if there are cases on the April 4 docket that are not reached, they might be moved to this docket. That's something I'll get more information about as we get closer to it. But that is at this point currently a possibility.

I have reviewed the pretrial order. I want to go over a few things in connection with it, but I want to start by addressing whether the Plaintiff intends to make any further reduction in the patents and claims asserted, and then go on to what effect, if any, that has on the Defendant's prior art references.

So if I could hear from counsel for Plaintiff on that issue first.

Good morning, Mr. Sheasby.

MR. SHEASBY: Good morning, Your Honor. May it please the Court.

I do think there is going to be a reduction in claims. I don't think it will have any impact on any pending motions or any issues of prior art references.

THE COURT: And let's talk about when that reduction is going to occur.

MR. SHEASBY: I think that the driver of that reduction is likely going to be the Court's rulings on the substantive motions.

THE COURT: And are there particular rulings that you think will most affect that decision by the Plaintiff?

MR. SHEASBY: I think the motions to strike the -- the infringement opinions of Dr. Bovik will drive a lot of the decision-making, Your Honor.

THE COURT: All right.

MR. SHEASBY: Thank you, Your Honor.

THE COURT: Thank you, Mr. Sheasby.

MR. STONE: Your Honor, Gregory Stone for PNC.

Might I just inquire if the Court would set a deadline, perhaps, for the determinations for whether or not there will be any reduction in the claims following the issuance of the order on the motion to strike portions of Dr. Bovik's opinions.

It would be helpful to us for trial preparation purposes, as I'm sure the Court understands, to know when those claims will be reduced.

THE COURT: And I agree with you that I think it will be important to have some schedule established.

Mr. Stone, talk to me about whether you have provided what you consider your actual list of prior art references that will be relied upon by your witnesses at trial.

MR. STONE: I think based upon where we stand right now, Your Honor, yes, we have. I think we've narrowed that list some from the earlier contentions that we provided to the Plaintiff, and I think our current list is the list. Obviously, it could also be affected by any rulings on the substantive motions, but I think as of right now, we have narrowed that list.

THE COURT: All right. Thank you, Mr. Stone.

MR. SHEASBY: Judge, we negotiated in the narrowing process. We have satisfied the -- Judge Gilstrap's order on narrowing. We do likely intend to narrow more, but there was no agreement or requirement for there to be an initial narrowing. They have a significant number of invalidity defenses and a significant number of prior art references, more than they could ever possibly try. And so if the parties want to meet and confer about another round of narrowing, we can do so, but we have already negotiated this. The Court has already ordered the narrowing. Anything else would be prudential, and we would

not -- we would not believe it would be equitable for there to be a forced additional narrowing on Plaintiff's side.

THE COURT: Well, I'll take a look at the order that has already been entered that you've referred to and address that further if it looks like we need to, but I do appreciate your indication of the pending motion that you think has the greatest effect on that, and we'll try to give some priority to that decision.

MR. SHEASBY: Thank you, Your Honor.

THE COURT: Thank you.

An initial matter that I also wanted to take up has to do with the counterclaims that were severed. We did not establish, I don't believe, a schedule for the disposition of those, and I wanted to raise with counsel whether both sides thought that waiting until after the outcome of this case would be helpful or whether we should just go ahead and take that up.

MR. SHEASBY: Your Honor, we had an exchange with counsel about this. Counsel in a previous version of the PTC was going to request that the trial on the counterclaims for PNC be set at the next trial dates that's scheduled for the subsequent trial of the USAA patents.

We objected to that. We thought that that was not proper, and our view is that the parties should meet and confer to find a date that -- or a window when -- when it's

appropriate to -- to try the case when -- when the schedules will align. But I don't necessarily think that we've gone so far as to say that -- that's just not -- we haven't discussed the idea of waiting until after this trial. That's the only exchange we have to date on the subject.

THE COURT: All right. Thank you, Mr. Sheasby.

Mr. Lantier?

MR. LANTIER: Thank you, Your Honor. Greg Lantier on behalf of PNC.

I did have a couple of slides on this, Your Honor, which I can walk through if it's helpful. But to answer Your Honor's question, PNC would like to have trial on those counterclaims set for the earliest available date. We don't think that it's necessary to wait for resolution of the first trial before setting that date.

And we did ask counsel for USAA to meet and confer on this so that we could come with a schedule that would work for everyone, but when we got on the meet and confer telephone call, they didn't -- they didn't come prepared with any times that they were able to participate in the trial.

We would like the trial to occur well before August of this year, but it is true that these parties have a trial date scheduled in August, and given that everything

is done on the counterclaims and they're ready for trial with just the resolution of a few motions and a few more submissions, whereas the case that's proceeding to trial or scheduled for trial in August still has not begun expert discovery, we do think it would be inequitable given that the counterclaims were filed five months earlier to move forward with the scheduled August trial before there's been a trial on PNC's counterclaims.

And if Your Honor is able to set a date today or orders the parties to meet and confer and find a date, that would be PNC's respectful request.

THE COURT: What I think I'll do then, Mr. Stone, is to direct that the parties meet and confer. And I understand that a full agreement may be unlikely, but if I get a notice, then, that states the position of both sides, I'll go ahead and act on that and get some schedule entered.

It was not the intent of the Court to impose any particular delay on the trial on the counterclaims. The intent was to separate the two into different trials. And so I -- I understand what you're saying about whether your counterclaims should be set for trial before the second case filed by USAA, and I'm happy to consider that. A major part of the decision for me will have to do with what remains to be done with respect to getting the

counterclaims ready for trial.

So if you can address that, and as you just have, in the notice that follows your meet and confer with counsel for the Plaintiffs, that would be helpful.

Is there any particular amount of time that you think is necessary to accomplish the conferring and the filing of the notice?

MR. LANTIER: From the PNC perspective, Your Honor, I think we could meet and confer later today and be ready. So if Your Honor, for example, ordered us to file a notice within five days, I don't think that that would be an issue. It would allow USAA to chase down any scheduling information that it needs to chase down.

THE COURT: All right. Well, thank you, Mr. Stone (sic). I'll hear from Plaintiff on that same issue.

MR. SHEASBY: Everyone is entitled to --

THE COURT: Oh, I said, Stone. I meant Mr. Lantier. I apologize.

MR. LANTIER: It was a compliment. Thank you, Your Honor.

THE COURT: I noticed the court reporter grimacing when I did that. That's my clue.

But anyway, Mr. Sheasby, go ahead.

MR. SHEASBY: So fair is fair. Everyone is entitled to prompt justice on their claims. I do think

this is an issue where the chickens have come home to roost.

When these counterclaims were filed, we moved to sever them. We were very clear that they thought they had no connection to their claims. We committed in our filings to Judge Gilstrap for there to be a prompt trial. PNC rolled the dice and gambled because they thought they were going to keep them together.

That strategic ploy did not work, and the issue is there'll be no sort of sandbagging or trying to roll, but I can flag that there's going to be significant issues with getting the schedules aligned for these people. And that's going to drive this.

But I think that there was a strategic decision made, and there are consequences associated with strategic decisions.

THE COURT: Well, I guess we'll have to determine what the consequences are.

But what I guess I need is, is there any reason you can't confer today or tomorrow and file a notice some time next week?

MR. SHEASBY: No, there's no reason whatsoever.

THE COURT: Okay. Then I will just direct that the counsel engage in that process by the close of business tomorrow -- or forget the close of business -- by tomorrow,

and then file a notice by Thursday of next week that lays out both sides' positions.

MR. SHEASBY: Sure. And then the other issue is they've actually moved to stay their counterclaims, and I just want to confirm whether that is now moot and request for a prompt trial date.

THE COURT: Mr. Lantier?

MR. LANTIER: Your Honor, we have not moved to stay our counterclaims. As you know, we did file a motion to stay the action entirely in light of the issued IPRs, which the Patent Office has described as strong and which would take care of the majority of the liability alleged in this case.

So I -- I'm not sure if that was Mr. Sheasby trying to stretch it a little bit and suggest that we have moved to stay the counterclaims, but we haven't done so.

THE COURT: I assume he's making the point that your motion, if granted, would have the effect of staying the counterclaims but --

MR. LANTIER: Yes, Your Honor.

THE COURT: -- it would also stay the main demand. I understand that.

And I guess while we're on that subject, we should probably go ahead and take up that motion to stay. We did notice it for argument here, and I guess, Mr. Lantier,

while you're up there, you can address the issues.

As you know, our practice on those is that a -- a stay is rarely granted based on institution of an IPR unless it would resolve or address all of the pending -- all of the asserted claims.

And my understanding from the record is that that is not the case at this point, but I wanted to give you a chance to respond to that.

MR. LANTIER: Thank you, Your Honor.

And on this, if I could use a few slides to help explain the issues, I would appreciate it.

So if we could use the --

THE COURT: That's fine.

MR. LANTIER: -- slides.

Your Honor, we do know that -- that it's rare that a case is stayed pending instituted IPR and that the fact that fewer than all claims here are instituted is -- is something that the Court will consider.

But I think that there are some special facts here that warrant a stay when we look at the three factors and balance them, as the Court has consistently done throughout the post-AIA period.

And I start at Slide 3. We do have an unusual situation from the Patent Office perspective in that the Patent Office for each of the instituted IPRs has described

them as strong.

In my IPR practice, I can't remember another situation in which the Patent Office has described in a decision on institution grounds as being strong. Usually, the Patent Office tends to keep it a bit closer to the -- the vest and not tip its hand one way or the other as to whether it thinks the arguments are relatively strong or not compared to other times that they have instituted an IPR review.

So if we look at the three factors that the Court will consider, I think the long and short of it, Your Honor, is that on the prejudice and simplification factors, those weigh strongly in favor of a stay. And, clearly, we are close in time to trial, and that factor would weigh against granting a stay on its own. But as Your Honor has held previously, and I'm thinking here of the Ericsson versus TCL Communication Tech Holdings case on Slide 5, that standing alone is not sufficient to deny a stay.

And so let me talk just very quickly about the specific unique circumstances on prejudice.

This is a case where there are no alleged ongoing damages for the accused product and the patents that are at issue in this case. The damages period ended in July of 2021, and there -- and that's because PNC had removed the accused features from its current mobile app, and there's

no judgment being sought in this trial of liability as to the current mobile app.

So that's unusual. Normally, one of the reasons why there's prejudice to the Plaintiff is if we don't get to a trial, there won't be a finding of whether ongoing infringement is occurring.

The second is that there's no competition between USAA and PNC on the accused features because PNC has removed them.

And this is on Slide 4 for record purposes.

So in effect, Your Honor, PNC has already self-imposed any injunction that could be entered in this case because it has removed the accused features, and it has committed not to enable them, if ever, until after there's a resolution of these allegations.

And then the third thing that I think is unique, the Plaintiff here is a very, very large profitable organization. It had revenues of $36.3 billion in 2020 -- 2020 based on its 10-K. So the hardship on the Plaintiff is not similar to many of the motions to stay that this Court considers, because, yes, there's been expenditures to date on this litigation, but this is not an organization that can't wait a small amount of time to recover those monetary damages. It's doing just fine.

The main argument that has been made for prejudice

is that we're close in time to trial. Your Honor has indicated that that's not a proper consideration under the first factor. That's a -- that's a consideration under the second factor of the NFC Tech's framework.

And so then if I turn to simplification of the issues, Your Honor is correct that not all claims are subject to instituted IPRs. However, all of the asserted autocapture patents, which is over half the case in terms of the damages being sought, those are all subject to instituted IPRs.

And so what we have in this case is one set of patents with a claimed priority date of 2006 that are referred to as the MRDC patents, and then a set of patents that present different issues with a claimed priority date of 2009, and those are -- those are the autocapture patents. And if the IPRs are successful, that half of the case will be wiped away.

And so we're not talking about a circumstance where -- now, there are a few claims here and there, but it's not going to affect the overall shape of the case. If the autocapture IPRs are successful, over half of the case from a liability perspective goes away, and there are a number of different -- all of the invalidity issues, of course, for those autocapture patents wouldn't have to be tried, the infringement issues for those autocapture

patents wouldn't have to be tried, and there would be a very significant simplification of the issues.

THE COURT: In the way you expect this case to be presented, is there any difficulty in having the jury separate the autocapture damages from the other damages sought?

MR. LANTIER: I think it -- it largely depends on how the Plaintiff's damages expert puts the evidence in and on what the verdict form is that's ultimately ordered. Of course, if we have a verdict form that just has a single line for damages, then there wouldn't be any separation between damages on the autocapture patents and the non-autocapture patents. They have --

THE COURT: How have you proposed the verdict form be structured?

MR. LANTIER: I'm testing my memory, Your Honor. I believe that we have asked for the -- the damages to be spelled out patent-by-patent and that the Plaintiff has asked for there to be one line for an award of damages.

THE COURT: So if they are split out in a way that would allow the autocapture patent damages to be separated from the earlier patent damages, that would allow the verdict to survive any final action invalidating those claims?

MR. LANTIER: Your Honor, I don't know if it would

allow the verdict to survive any -- any final action, but I do agree with Your Honor's point, which is I think that if the verdict form is split out in that way, we wouldn't have the specific issue of separating out what damages the jury awarded based on the autocapture patents or one of the autocapture patents or another autocapture patent and then other patents.

I do think that we would likely still have a similar but somewhat different issue, which is, as Your Honor has already mentioned, we have 32 asserted claims here. And so if, for example, the Patent Office were to invalidate some of the claims but not all in the IPRs, under the current proposed verdict form by the Plaintiff, we would -- we would have to -- we would think it would be prudent to have a re-trial because we wouldn't know whether the infringement verdict was based on a claim that had been invalidated or not.

So it does -- it does certainly simplify issues if we wait to see which claims survive the IPRs, and it's in a very meaningful way because over half of the liability judgment demanded is based on the patents that are subject to strong instituted IPR proceedings.

The -- not officially a factor, Your Honor, but I did think it was worth mentioning the burden on the Court and on the jury here of moving forward at this point in

time. As Your Honor knows, there's a tremendous amount of paper outstanding in this case for pretrial purposes. We have eight pending motions for summary judgment, the majority of which were filed by USAA, nine pending Daubert motions, the majority of which were filed by USAA, thousands of disputed trial exhibits, and a really complex case for the jury to hear with 6 patents and 32 claims.

And one issue with moving forward with the trial not knowing whether autocapture patents will remain valid or not is, of course, a lot of the trial time will be consumed on those patents given that they account for the majority of Plaintiff's damages case, and that time could otherwise be spent by both parties, but in particular by the Defendant in explaining its defenses to infringement of the patents that survive an IPR proceeding.

And, finally, Your Honor, we understand the state of the proceedings is going to weigh against granting a stay. Now, we are very close to trial and understand that that's a factor the Court considers. But it's not dispositive standing alone.

And what Judge Gilstrap and Your Honor have consistently stated, and I think applied in ruling on motions to stay, is that it's a very individualized analysis based on the particular facts of the particular lawsuits that are pending.

And in the Image Processing case, Judge Gilstrap stayed, notwithstanding that the case was three weeks before trial. Your Honor, in the Ericsson/TCL case that I mentioned earlier, and these are on Slide 11 as well as in our papers, also granted the stay very late in the proceedings, and it was based on the weight of the other factors.

We would suggest that those two cases are the most analogous to the facts before Your Honor.

THE COURT: Weren't those cases where the IPRs were instituted on all asserted claims?

MR. LANTIER: No, Your Honor. In the Image Processing Tech's case, the IPRs were instituted on fewer than all claims.

You're correct that in the Ericsson case IPRs were instituted on all of the claims.

But I do think for the unique reasons presented here with the sort of two branches of the case, the MRDC branch and the autocapture branch, this is similar to a case in which there's been IPRs instituted on all asserted claims, because for autocapture, that is true.

THE COURT: All right.

MR. LANTIER: Thank you, Your Honor.

THE COURT: Thank you, Mr. Lantier.

Ms. Glasser?

MS. GLASSER: Thank you, Your Honor. May I proceed?

THE COURT: Yes.

MS. GLASSER: I'll try to keep this brief since I think the parties have extensively briefed the issues on the points that were raised by opposing counsel.

I'll start where opposing counsel left off, though, and briefly touch on the point.

This case is -- is markedly different from the Ericsson case or the other cases where stays have been instituted. As Your Honor is familiar, Ericsson involves 17 IPR petitions all instituted across all asserted claims.

The other case that was cited, I think there was one straggler claim that wasn't instituted, and all of the other considerations were extremely different from in this case.

In this case, we have just a third of the asserted claims instituted. We've had more than half of the IPR petitions denied. It's very, very different from any of those other cases.

I wanted to address the point that Your Honor raised about how we could deal with the two sets of claims. I think there's two important things to mention that haven't been touched on already. One is Mr. Lantier's suggestion that there's something incredibly unique about

these IPR petitions on the autocapture patents is just not at all supported by the record or the history.

Your Honor may recall actually that IPR petitions were instituted on exactly those same two patents in the Wells Fargo case. We proceeded to trial in the Wells Fargo case with those IPR petitions pending on almost exactly the same combination of references here. Obviously, it didn't cause any problem at all whatsoever. These are heavily fact-intensive issues is the reason why that the petition was instituted. Final written decision came out confirming the validity of all claims.

And there's all kinds of easy ways to deal with it to even provide a backstop in the unlikely event that the final written decision came out differently this way. It's not difficult, for example, to split two damages questions on a verdict form.

But this idea that there's something unusual or unique or special about these two petitions, they're extremely similar to the two that were pending at the time of the Wells Fargo case, as well.

THE COURT: Does Plaintiff have any opposition to structuring the verdict form in a manner that would allow an easy determination about which damages were attributable to which set of claims?

MS. GLASSER: No, and that's absolutely within the

Court's discretion.

THE COURT: I understand that we have discretion, but I'm just asking does the Plaintiff oppose it?

MS. GLASSER: No. And having two damages questions and two separate liability would -- would be perfectly fine with us, Your Honor.

THE COURT: All right. Thank you, Ms. Glasser.

And as far as the statements by the PTAB about the claims being presented by PNC being strong, what is your response to that?

MS. GLASSER: Yeah, I think he took that out of context. That's not something particularly unusual in the PTAB at all. He, I think, maybe suggested that that was part of the merits's discussion on institution, and it wasn't.

The reason those statements came up is there's a lot of procedural issues in this case because there have been so many petitions in the past, and these are follow-on petitions.

And so if I recall correctly, that was all in the discussion of the procedural issues. Either Fintiv or one of the other barriers in the PTAB under the consideration of those factors has to make some kind of finding that there's something new and different here in order to be able to proceed with the petition.

So my reading of those, it was merely complying with walking through the factors as they need to do so. There's no suggestion -- again, if I'm remembering correctly, no suggestion at all on the actual merits discussion that there was something particularly special about these petitions. They're very, very similar to the ones before that went through final written decision.

THE COURT: All right.

MS. GLASSER: So unless Your Honor has any further questions, I think all of the other points raised, we obviously disagree strenuously with the points made on the slides, but we have gone through that in fairly great detail in our brief, particularly on the issue around PNC's position is that they've stopped infringing. Of course, our position is that they have not.

That's heavily briefed both here and in some of the other pending motions before the Court. There's all sorts of immediate remedies that might be sought here, and the parties are obviously in direct competition. USAA does not agree with the idea that somehow the parties are not in competition. They're both being -- PNC is out there every day trying to take the military-focused customer base of USAA, and we absolutely don't think it makes sense for us to literally basically turn our truck around and take the trial supplies home and wait some period of time to be able

to return those funds to our members.

THE COURT: Ms. Glasser, I don't see a flag pin on your lapel. I'm surprised, but...

MS. GLASSER: We have one in the courtroom, so...

THE COURT: I understand the argument.

All right. Thank you, Ms. Glasser.

Mr. Lantier, if you have any rebuttal, I'll give you an opportunity.

MR. LANTIER: Just I think I have one point, Your Honor -- two points.

First point is there's this continuing suggestion that there's ongoing infringement. I want to make sure that the Court understands that in this case, there is no liability judgment being sought on PNC's current mobile app.

So all the allegations that there's ongoing infringement, they're talking about either a stray damages argument that they're making in this case, but they're not seeking any damages on PNC's current mobile app, or they're talking about another lawsuit. So not really relevant to whether this lawsuit should be stayed or not.

The second point I'd make, if we could just call up our slides just for one moment. I just wanted to reference Slide No. 9.

Ms. Glasser's suggestion that the statements about

the -- the petitions being strong were taken out of context, I think actually shows why what USAA is saying here doesn't reflect the record.

Ms. Glasser suggested and the papers suggest that PNC's IPRs are very similar to the Wells Fargo IPRs. And the Patent Office specifically addressed that, and that's where they said, no, PNCs are stronger. So that was in a section where what USAA was saying to the PTAB was you've already decided these things. These are cumulative. These are the same arguments that were already raised and then rejected.

And the PTAB looked at PNC's IPRs and said, no, that's not true. These are better. These are strong.

And that's -- that's the context of this, Your Honor.

Thank you.

THE COURT: All right.

MS. GLASSER: May I respond very briefly, Your Honor?

THE COURT: All right. Ms. Glasser, go ahead.

MS. GLASSER: I wanted to clarify the first point. It's not the case that these would be handled in some separate lawsuit or somehow outside this case.

The fact that PNC is continuing to infringe right now is something that absolutely could be subject to

equitable remedies post trial or to a supplemental complaint in this action. That -- those are perfectly likely avenues if PNC persists in its conduct after this trial.

And so I did want to disabuse the Court of any notion that we would only be handling those kind of issues somehow outside of this case and that the trial in this case wouldn't be relevant.

And then I also wanted to just briefly point, Your Honor -- Mr. Lantier earlier had made a comment that the motion to stay wasn't really relevant to the counterclaims and the counterclaims themselves are totally ready for trial, something to that effect. I did want to direct Your Honor to Page 9 of the PNC stay motion.

The PNC stay motion is very explicit in PNC's position not just for the USAA claims but equally so and even more so because now the USAA claims are further advanced that the state of these proceedings, according to PNC, there's a huge amount of work that needs to be done on those counterclaims.

And so that discussion on Page 9 is just kind of the opposite of what we're hearing this morning about somehow we should rush to trial on the counterclaims, and those are ready to go.

Thank you for that, Your Honor.

THE COURT: All right, Ms. Glasser.

MR. LANTIER: May I just...

THE COURT: Go ahead, Mr. Lantier.

MR. LANTIER: I hesitate, Your Honor, and you -- I won't address the comment about Page 9. Your Honor can read that, of course, yourself.

USAA has gone to great lengths to say that the current version of PNC's mobile app is not an accused product in this case. So I don't know how there could be an equitable remedy applied against that product. That would be an inappropriate remedy in this case.

Thank you.

THE COURT: All right. Having considered the arguments on this issue, the motion to stay is denied. I find that the simplification of issues to be gained is something that does not in this instance outweigh the very significant delay that would be involved in waiting on final decisions from the PTAB and appeals of those matters through the Circuit and that the benefits of that simplification of issues can be to some extent obtained by structuring the verdict form in this case such that if there is an elimination of any of the asserted claims, that that can still be handled without requiring a new trial.

Before we return to the other issues, I'm going to take a break. I know it's early, but I'm having a

technological issue here that I need to get IT to address. So we'll just be in recess for a few minutes.

Thank you.

MR. SHEASBY: Thank you, Your Honor.

COURT SECURITY OFFICER: All rise.

(Recess.)

LAW CLERK: All rise.

THE COURT: Thank you again. Please be seated.

At this point, I want to turn to the other issues in the pretrial order that I think we need to address.

First off, I think that the 12 hours per side that the parties have requested makes sense, and so we'll go with that.

And I think counsel are aware of Judge Gilstrap's preferences or practices with respect to voir dire, but we'll go with 30 minutes per side for voir dire and 30 minutes per side for opening statements.

Does either side have any questions about the protocols with respect to voir dire/jury selection that we need to take up? Otherwise, I'll just assume you are familiar.

MS. SMITH: We're familiar. No questions, Your Honor.

MR. BUNT: The only question I have is will the jury questionnaire forms be ready on Thursday before the

trial?

THE COURT: Yes.

MR. BUNT: Thank you, Judge.

THE COURT: They will be available afternoon on the Thursday before.

And I guess the parties in this case have requested a jury questionnaire; is that right?

MR. BUNT: Yes, Your Honor, we agreed to one.

THE COURT: Okay.

MS. SMITH: Yes, Your Honor.

THE COURT: Good. Thank you.

I am assuming that the parties would at this point prefer to defer the exhibit hearing until a date closer to trial, but if that's not the case, then I am prepared to launch into that today. I don't know if the parties have got their exhibits down close to what they think they will actually use at trial.

MR. SHEASBY: Your Honor, we -- we have bucketized the disputes. We are prepared. I will note, though, that a lot of the rulings in the motion in limine are going to impact the exhibit list. So my expectation is after rulings on the motions in limine, there will be significant resolution of objections to exhibits.

THE COURT: All right. And does that indicate to you, Mr. Sheasby, that you think some time to digest the

motion in limine rulings would help, or are you suggesting that we can take up the exhibits immediately after?

MR. SHEASBY: I was not as responsive as I should have been. I think some digestion would be salubrious, sir.

THE COURT: All right. Thank you, Mr. Sheasby.

Does the Plaintiff (sic) have a different issue on that, Mr. Stone?

MR. STONE: No, Your Honor, we do not. We think it would be much more efficient to have some time to consider the rulings before we, you know, revisit the issue of the exhibits.

THE COURT: All right. Then whenever we do break for the day, I would ask counsel to get with Ms. Andrews and see if you can agree upon a date closer to the April 18 jury selection for us to get together and resolve exhibit issues.

But I'm willing to do that as much before the trial date as the parties think is necessary. Typically, it's to counsel's benefit to have it closer to trial, but I'm willing to do it whenever the parties think.

I wanted to go ahead -- there are it looks like a lot of agreements that have been reached on the trial management issues. I see, though, that there are some disputes. So I want to take those up and resolve those.

The one thing that I think needs to be added to all of them, and it may be contemplated in here, and I just didn't see it, but it is important that we get some email notice to the Court through the law clerks at the end of any meet and confer process that you have built in here if there are unresolved disputes. And I -- I didn't pick up on that being part of it, so I just wanted to say that that needs to be understood.

Of course, the purpose of that is to allow the Court to be aware of how much time will be necessary before the jury is told to report in the morning to resolve those issues.

I saw that there is I think one stipulation -- one uncontested fact, and then there are a variety of other contested stipulations. That's an oxymoron in my vocabulary.

If you can agree on these things, then what we can do if there are issues about that is just take that up at the exhibit hearing. Whatever stipulations you actually do reach, we can include in the jury notebooks, and that certainly makes it easier for both sides to convey those to the jury as opposed to expecting the Court to read those and the jury to write them down. But if they're not actually agreed to, then we will not include them in that fashion.

But turning now to the trial management issues, what I'd like to do is to just hear what the disagreements are and see if we can get those resolved. And I will turn it over first to Plaintiff in that connection.

MS. GLASSER: Thank you, Your Honor.

I think that the first issue -- and in part this seems to me to have just been an disagreement between the folks exchanging the final drafts of this late in the evening -- USAA had proposed what we thought was a pretty uncontroversial statement that a party can use in a demonstrative, for example, in a closing slide, deposition testimony that's been designated for playing, that they could do that in their opening, or they could do that in other witness presentations in order to avoid sequencing issues. And that would be, again, only with prior disclosure, an opportunity for the other side to object.

It's not clear to us whether there is actually an objection to that. I can't think why there would be one. The footnote that PNC added in it -- and this was, again, very late in the process, the parties probably could have done a better job meeting and conferring on this -- was that they didn't want the video to be played multiple times, and we've never been proposing that we would play the video as part of the demonstrative. It would just be the normal type of a demonstrative with the quoted

testimony on the slide.

So that's one thing that we really would like to get resolution on, and if PNC does actually have an objection to the -- the testimony as opposed to the playing of the video for us to be able to argue whatever their objection may be.

THE COURT: And which of the footnotes is that in?

MS. GLASSER: This is Footnote 3 and 4 --

THE COURT: All right.

MS. GLASSER: -- on Page 12.

THE COURT: Okay. All right. Well, thank you, Ms. Glasser.

Let me hear from defense counsel on that issue.

MR. STONE: Thank you, Your Honor. Gregory Stone on behalf of PNC.

We appreciate being advised that USAA does not have any intention of playing deposition videos during their opening. That resolves a part of the issue.

The issue that does remain, though, is whether they can present to the jury actual deposition testimony in written form in their opening.

And our position is set out in the footnote, albeit briefly, is that they should not be permitted to because that gives undue weight to deposition testimony that will then be seen and heard, in a sense, at least seen

and read by counsel on as many as three different occasions, as distinct from live testimony where the jury will hear the testimony one time, and it will otherwise be referenced as what the witness said.

So here, they will put up and say, question was asked, answer was given, question was asked, answer was given, in their opening giving undue weight to that deposition testimony, whereas with respect to a live witness, they would simply say, we anticipate that you will hear from Mr. Smith or Ms. Jones, and that their testimony will be X, Y, or Z, in which they will be predicting for the jury or presenting the jury with what they expect the evidence will show, rather than starting to put in the evidence at that time in terms of the depo testimony.

So we do object to the use of the deposition testimony during the opening, whether it is in written form or the videotape playing, but we appreciate very much that they've told us today that they have no intention of playing the video.

THE COURT: All right. Thank you, Mr. Stone.

I think that what USAA is proposing is within our normal practices, and I will allow them, if the deposition testimony has gone through the process of being designated and any objections to it have been resolved and it's going to be admitted at trial, then they can use it in the

opening.

And, Ms. Glasser, I'm assuming that this will be testimony that you are intending to offer during the evidence portion of the trial?

MS. GLASSER: Correct, Your Honor.

THE COURT: All right. That -- I would look differently upon it if it was not being offered during the evidence portion.

Mr. Stone?

MR. STONE: Your Honor, might I ask, that gives -- as I'm -- as I'm sure the Court recognizes, that gives the Plaintiff the opportunity, as they have suggested we might take up today, of getting prior rulings on deposition testimony that they propose to offer.

And with respect to that issue, we should talk about the timing on the deposition designations that I think were submitted to Your Honor this morning in terms of when you might rule on those because they have designated as what they would play on the first day of trial about four and a quarter hours of testimony.

MS. GLASSER: No.

MR. STONE: That's the runtime cumulative of the four depositions that have been presented to Your Honor. I think it's 4 hours and 16 minutes.

And obviously that would mean no live witnesses on

the first day, which seems unusual. But if that's the case, and we don't think they're playing games here, we think they're -- they must be -- we should take them at their word that they're serious that they would want to play all that deposition testimony on the first day.

But what I was going to say about that, and I'll get back to my point if the Court will indulge me, many of the objections to some of that deposition testimony are also going to be resolved by some of the motions in limine, and perhaps even to some extent by the substantive motions when they're decided.

So we may want to hear the deposition designation objections at the conference on exhibits rather than today, just for efficiency purposes, but --

THE COURT: I agree with that point, Mr. Stone. I don't expect to reach the admissibility of that testimony -- deposition testimony today, but I will -- if your concern is that there may be deposition testimony that the Defendant would like to have the ability to use during openings, I don't have a problem with taking up those issues at the exhibit hearing when we take up the other issues, as well.

MR. STONE: Thank you, Your Honor. I appreciate it. You got to the point I was going to come back to before I got to it, and I appreciate it.

That was my concern.

THE COURT: All right.

MR. STONE: And we would appreciate the opportunity to present some of that to you at the conference on the exhibits.

THE COURT: Then what -- I will amend what we'll take up then to be deposition testimony that the Plaintiff intends to use on the first day and deposition testimony that either side wants to be able to take up during openings or voir dire.

MR. STONE: Thank you very much, Your Honor.

THE COURT: Okay. All right. Ms. Glasser, what's next?

MS. GLASSER: The next issue is on Page 13 and Footnotes 5 and 6.

The issue here -- I think the parties are in agreement about the big picture item sometimes people fight about, which is should they exchange their closing demonstratives, and the parties are in agreement that they should, and they should work that out and present a submission, as I understand Judge Gilstrap would prefer to avoid objections during closing.

But the question is just, you know, our experience with these teams and our experience in this court is that you want to be able to get the objection and exchange

process done as early as possible so that you can have the meet and confer be meaningful and get something to the Court.

But not knowing quite what time the cases are going to submit their cases to the jury -- the parties are going to submit their cases to the jury and the charge conference and things like that, it's difficult to pick in advance the exact time, and it oftentimes makes more sense for the parties to do that when the trial is underway as long as they're in the same ballpark about what's expected. So that's our position.

And then the other part of it is PNC's proposal just absolutely doesn't work at all. They want to have a meet and confer at 11:30 p.m. at night. That's just way, way too late. Hopefully some folks are in bed, the law clerks, hopefully some of the lawyers even, just that part didn't work at all in our view.

THE COURT: All right. So there are two issues that are in dispute. One is whether we need to set a date before the trial starts for exchange of closing argument demonstratives?

MS. GLASSER: I don't think either party wants to do it before the trial. But both sides would like to do it in the normal course. So most likely would be the evening before the closing, as you'd expect a 12-hour trial to go.

The only question is, A, PNC wants to set the exact time now, and we think it would be better to wait and see what the schedule is actually like; and, B, if the Court were to agree with PNC, we -- we certainly disagree that we should be having a meet and confer basically at midnight.

THE COURT: All right. I do think that it makes sense to set a time now with the understanding that if something comes up and either side wants the Court to revisit that, that we can do that, but it makes sense to me to have a time going in.

I also agree with you that that's on the late side to be helpful.

Do you have a suggestion as to time?

MS. GLASSER: Maybe the parties could actually -- could meet and confer about that, and if it's okay with Your Honor even include some language there that would make clear that the parties could jointly submit a request for a new time if the trial progress warrants.

THE COURT: All right. So what you're saying is with the understanding that we're going to set a time before the trial starts, or at least a deadline for submission of those issues to the Court, that you want to be able to confer about what that time should be?

MS. GLASSER: Yeah, I think that would make

sense --

THE COURT: All right.

MS. GLASSER: -- with the guidance from Your Honor, because obviously Your Honor has been extremely helpful in sort of rejecting both sides' positions telling us we both need to pick something a little different, right? We don't want to do 11:30, and we don't want to just leave it open. And so with that guidance, I assume the parties have a good likelihood of reaching agreement.

THE COURT: All right. Does the Defendant have any issue with proceeding in that fashion?

MR. STONE: Your Honor, I think as you would note in our Footnote 6 in the pretrial order, our concern was not that the time for this exchange would be too late. It was -- our concern was that it would be pushed later than what we had proposed.

So USAA's suggestion that it be done at an earlier time is one that we are quite agreeable to and would suggest that in order to encourage the parties to meet and confer and come to an agreement as to an earlier time, which we are certainly amenable to, it would be helpful if the Court would say that the parties should do so no later than the times that we proposed, or if those are too late, and as Ms. Glasser suggests they might be or if the Court thinks they're too late, then let's move them all to an

hour earlier and suggest that the parties may reach an agreement to do so at an earlier date and time but no later than the time that we have proposed in our section of the pretrial order so that we have a deadline by which this has to occur.

Because our concern is not a desire not to do it earlier, our concern is that it may be pushed to later.

THE COURT: All right. Well, what I'm going to say is that the notification to the Court of any unresolved disputes and the delivery to the Court of the demonstratives at issue shall be no later than 10:00 p.m. on the night before the closing arguments, and if you agree upon something earlier, that is welcome but not required.

And when you start that process, I hope you can agree on it, but if you can't, let me know. But -- and we will take that up when we gather back for the exhibit hearing. But at this point, we'll just say that the notice to the Court is to be no later than 10:00 p.m. the night before.

MS. GLASSER: Understood, Your Honor.

MR. STONE: Thank you, Your Honor.

THE COURT: All right. Thank you.

Ms. Glasser, what's next?

MS. GLASSER: Next issue is on the following page, Page 14, Footnotes 7 and 8. The dispute here has to do

with counter-designations. There are quite a number of witnesses in this case who have multiple related depositions.

To give an example, most of USAA inventors were deposed in the Wells Fargo case, and PNC redeposed them here, and sometimes but not others sort of asked them questions about their prior depositions, but obviously the same subject matter at both depositions. Some witnesses also were deposed multiple days.

And so USAA's position is that if PNC is going to designate testimony from one of these witnesses, that the counter-designations appropriately include the rest of the depositions, as well as needed, of course, for context as counter-designations are normally limited to.

And PNC has taken the position that it should be rigidly limited to just the specific transcript, which we don't think makes sense, and this could result in some misleading instances where testimony is kept out that would shed light on the meaning of the designated testimony.

THE COURT: All right. Thank you, Ms. Glasser.

Mr. Lantier?

MR. LANTIER: Yes, Your Honor. Thank you.

The issue here is I think decided by Federal Rule of Civil Procedure 32, which states that if a party offers evidence of only part of a deposition, an adverse party may

require the offer and introduce other parts that in favor should be considered with the part introduced.

The rule is clearly talking about counter-designating testimony from a single deposition transcript. And what USAA is asking here is for permission to counter-designate testimony from deposition transcripts where PNC's counsel wasn't even present, right, counter-designating testimony from USAA versus Wells Fargo.

We weren't there. We weren't able to ask follow-up questions. We weren't able to object to the questions that were asked during those depositions. And it would be manifestly unfair to allow USAA to counter-designate from transcripts other than the transcript that we designated from.

The other issue, Your Honor, is they're -- they're proposing that they could counter-designate testimony from transcripts that were never affirmatively designated in the first place. I mean, it's just -- it's a free-for-all, and it's not fair given that US -- that PNC did not have the opportunity during those depositions to object and did not have the opportunity during those depositions to ask relevant questions.

THE COURT: Mr. Lantier, is PNC planning to use some of the depositions taken in other cases of USAA's witnesses?

MR. LANTIER: I think at present, we do have -- we have designated certain transcripts. Of course -- from the Wells Fargo litigation. Of course, it's -- it's a separate issue because USAA's counsel was present at those depositions, whereas PNC's counsel was not present at those depositions.

And we are not proposing, Your Honor, to counter-designate testimony from transcripts other than the transcript that was affirmatively designated.

THE COURT: I think there are two separate issues that are there. As far as whether a party can counter-designate from another deposition of the same witness, I think that that is permissible. Certainly, it has to be something that is a true counter-designation that the counter-designating party can show is related to the testimony that was designated.

A different issue, though, is raised about whether USAA can even use the testimony that was taken in another proceeding to which PNC was not a party.

And I see those two as -- I don't know if they're necessarily unrelated, but as different. And I understand that there are different rules that govern the situation in which former testimony can be used in terms of whether the side that it's going to be used against was a party or was aligned with. I can't remember exactly what the language

of Rule 804 is on that, but those are issues that we can take up separately.

But if -- in this case, I'm going to call it USAA just because that's the way it's coming up, but if USAA can show that a prior deposition of the same witness is relevant to the -- to understand the testimony that has been designated, then that's something that I don't think is prohibited by the rules.

The Court might or might not sustain an objection to it. I don't know. But I'm not going to say that they can't counter-designate from a different deposition. But the separate issue about whether they can use depositions that PNC wasn't a party to, that we can take up in the event that they do try to counter-designate something from one of those depositions that PNC is not proposing to use.

I think obviously if PNC is proposing to use former testimony given by USAA's witnesses, that obviously counter-designations from that deposition are going to be allowed, assuming they meet the other requirements.

But if you have argument that I haven't really addressed, please feel free to point that out.

MR. LANTIER: Your Honor, if I may just state what I believe Your Honor has -- has held.

It's that a party may counter-designate testimony from the same witness from a different deposition

transcript where counsel for both parties were present at the deposition.

THE COURT: And I think that's right. It doesn't have to be the same counsel, necessarily, but, yes, if both parties are represented, then the fact that it was a separate deposition I don't think bars a counter-designation. And I think that Rule 32 is really talking about the simple situation in which we're just dealing with a single deposition.

MR. LANTIER: Yes, Your Honor.

The second thing is --

MS. GLASSER: Can I --

MR. LANTIER: -- that if -- if I can just finish --

MS. GLASSER: Your Honor, we can come back to it if that's easier, but I didn't understand the clarification, if it's helpful to -- before we move on to the next topic. Would that be acceptable, Your Honor?

THE COURT: Well, Ms. -- I will return, Ms. Glasser, to it when you get up.

But go ahead.

MR. LANTIER: Your Honor, the second thing I believe Your Honor ruled is if PNC elects to designate and submit a designation played for the jury of a deposition from the Wells Fargo or some other case where PNC was not a

party, that USAA may counter-designate other testimony from that same deposition transcript.

THE COURT: I am definitely saying that, as well.

Now, the other scenario that I guess is not addressed in your argument there is under what circumstances can a party use testimony from a deposition to which the other side was not a party, and that is something that is addressed by Rule 804, I guess, deals with unavailability of witnesses, all kinds of other considerations.

And I'm not ruling anything on those. We'll take those up on a case-by-case basis.

MR. LANTIER: Yes, Your Honor. That's what I understood, that if there's a situation where USAA designates -- excuse me, counter-designates testimony from a, for example, Wells Fargo transcript or transcript from another proceeding where PNC was not present in response to PNC designating testimony from a deposition taken in this case, that Your Honor is not resolving that at this time and will take that up on a case-by-case basis.

THE COURT: That -- that is true.

MR. LANTIER: Thank you, Your Honor.

THE COURT: All right. Thank you, Mr. Lantier.

Ms. Glasser?

MS. GLASSER: So for me, that sort of confused

rather than clarified in the sense that I thought I had understood what Your Honor was saying, and Mr. Lantier then sort of restated it to be almost the opposite.

And so I do want to not only clarify but to the extent that Mr. Lantier's understanding, if any of it were correct, engage in legal argument on it, the -- I guess I'll start at the beginning.

So there's two questions, as Your Honor said, which is, first, should parties be able to put in evidence to contextualize for counter-designations, and it sounds like the threshold response to that was yes.

Mr. Lantier, though, as I understood it to say, was trying to basically claw that back by saying, except in -- if PNC's counsel was present, then we can't. And I did not understand that at all to be what Your Honor was saying, nor would that be consistent with the federal rules. It's also something that hasn't even been briefed at this point.

THE COURT: And what is the situation that you're addressing now?

MS. GLASSER: So the part that I understood to be settled when Your Honor was speaking was that if PNC is designating testimony, UNC -- USAA is permitted to counter-designate any other testimony from that same witness that is a proper counter.

THE COURT: That is true if we're talking about any other testimony given in this case, yes. And I -- the exception would be that if what you're wanting to counter-designate is testimony that the USAA witness gave in a case in which PNC was not a party, then we would have to address the way Rule 804, and perhaps Rule 32 of civil procedure, though -- the way that situation is addressed by those rules.

MS. GLASSER: Okay. And so I think Mr. Lantier was restating it as though that had been decided against USAA, and so that was sort of where I got concerned because not only have we not addressed that in -- in briefing, I think that would be an incorrect result under Rule 106 and Rule 804.

And so if the ruling today is just that's something the parties will need to brief if and when it arises, that's okay from our perspective. I just got concerned about the way he was summarizing the record, it sounded as if Your Honor was making a ruling on the issue.

THE COURT: Okay. I think we're all on the same page now.

MS. GLASSER: Thank you, Your Honor.

THE COURT: All right. Thank you, Ms. Glasser.

And that takes us to the next dispute, whatever that might be.

MS. GLASSER: And I think that's actually it in terms of the pretrial order.

The -- the other footnotes were all having to do with the stipulated facts, as Your Honor put it, sort of an oxymoron, the unstipulated, uncontroverted facts. So I don't think we need to address any of that today necessarily.

THE COURT: All right. Mr. Stone?

MR. STONE: There's one other issue, Your Honor, that I think is in the same nature as those that you've heard but was not called out in the pretrial order because it sort of falls out of -- outside the ambit of that, and that is the question of whether or not it would be permissible, and I think the Court's permission is required, which is why we're raising it, to have a live feed, that is the real-time transcript from the court reporter, go outside of the courthouse to our war room, where others in the case will be working and will be able to follow the proceedings in real time rather than having to sit in court to see it.

There's been an objection to that raised by USAA, but I don't think there's any reason for us not to be permitted to do that because it will allow more efficient on both sides because obviously if we obtain that feed, so would USAA's counsel be able to obtain it.

So our request is for the Court's permission to have the court reporter provide her real-time transcript to our war room outside of the courthouse.

THE COURT: All right.

MR. SHEASBY: One second, Your Honor.

Mr. Bunt.

Your Honor, I think this issue is resolved pretty quickly, which is there's a protective order in place. It governs confidential information of third parties. No third parties have given permission for this. We have no way of policing who's going to see that real -- it's not just the real-time transcript. I believe they want voice, for example. We have no way of policing who's going to look at that real-time transcript. We have no way of policing whether it's going to be people under the protective order, and we're not going to agree to that.

In other words, during the height of COVID when prophylactics needed to be put in place, that was one thing. But given the amount of third-party confidential information, I don't think this accommodation is appropriate.

THE COURT: And I'm -- I'm not sure that they're asking for a live audio, in other words, voice as opposed to access to the transcript.

MR. SHEASBY: Right. The answer is the same

either way.

THE COURT: All right. Let me just --

MR. BUNT: And if I could just add, Your Honor, during the meet and confer, it was mentioned that there would be an oral feed, also. So I don't know if that's changed or not, but that was my understanding.

MR. SHEASBY: Your Honor, so you shouldn't do things to intentionally make things harder for the other side, but you should do things that are necessary to protect confidentiality.

And a live feed that's uncontrolled is not something that the third parties who have produced their confidential information have agreed to in this case.

THE COURT: Well -- Mr. Stone?

MR. STONE: Thank you, Your Honor.

Our request was only for the feed of the transcript and not for an oral feed. Your Honor is correct on that.

With respect to the latter point, obviously it's incumbent upon all counsel to ensure that access to information that has been designated under a protective order is properly restricted. We understand that and would take on that obligation.

The obligation would also be true for those in the courtroom during the time the testimony is being presented.

So if there's going to be a presentation of information that is AEO or otherwise subject to the protective order in the courtroom, obviously the Court would be notified, and that would restrict access to people who were here in the courtroom, and we would similarly restrict access to any of those who could see it.

Similarly, as the Court I know is aware, we would obtain a transcript at the end of the day and would restrict access to the transcript at the end of the day in the same way we would restrict access to a live feed.

So what -- what USAA's position would do is unnecessarily impose a burden on us and prevent us from working on what's happening in court until the end of the day when the transcript is available for no countervailing benefit because the protections of the protective order would be fully respected, both with respect to people who are present in the courtroom, people who are in our war room, whether the transcript is received in real-time or at the end of the day.

Thank you, Your Honor.

THE COURT: All right. Mr. Sheasby, understanding that the request deals only with the actual transcript, not with any audio feed, what is your concern if the Defendant ensures that only persons who would be subject to the protective order would have access to that feed?

And I'm not -- frankly, this is something that I'm not going to rule on at this time. I -- there are other regulations about transcripts that I'm going to have to consult, but I'm -- I want to make sure when I leave here I know what the concerns of both sides are. So I'm -- that's why I'm asking you to respond to this issue now.

MR. SHEASBY: Yeah, and I'll give you some context, which is one of their experts had a -- had a malicious data breach, and it wasn't disclosed to us until approximately two weeks after it occurred, and so there's a lot of sensitivity with confidential information at USAA being sort of uncontrolled.

We're a regulated business, and if -- when it goes -- when it -- when the courtroom is sealed, we look at everyone, we see that the people who aren't supposed to see it leave, and we see that everyone else stays. It's a controlled environment.

A live feed on how many video screens, we don't know how many going back to some office somewhere, we don't even know what office that is, it's not a controlled environment.

Listen, we would benefit from this, as well. It has nothing to do with -- we have a team, too. It has nothing to do with trying to hurt them and help us. It's the -- the protection -- we need to have a controlled

environment for third-party confidential information and our confidential information, and streaming it to as many computers as they want and, you know, having to be on an honor system that people aren't accidentally looking at something they shouldn't be or a fact witness who was subject to the rule happens to be wandering in and sees testimony come up on the screen, it's just not a controlled environment. It's not something we're comfortable with. It would help us, but that's not really the issue.

THE COURT: And so the only difference, though, if that is allowed versus not allowed is that the access by the people in the war room would occur when the transcript is made available at the end of the day rather than on a live basis?

MR. SHEASBY: Well, the difference is there has to be -- the transcripts would be split into two, so the court reporter will have a live -- a public transcript and will have the sealed transcript that will come across as PDFs. You have to make a conscious decision to open the sealed PDF, and so there's a sense of the additional added protection of making everyone know and, yes, this is the sealed part. You should not be looking at it.

We have a long day ahead of us. I don't want to belabor this. They're -- what they're proposing is convenient. It's not appropriate given the sensitivity of

the client and the third party.

THE COURT: All right. Well, I'm -- I am going to take that request under advisement, and there are issues involved that I'm simply not familiar with from past cases. So I'll look at that, Mr. Stone, and be sure to let counsel know.

MR. STONE: Thank you, Your Honor. And -- and I know that this is something that Judge Gilstrap has on at least some prior occasions permitted, and he may be fully versed in some of the other issues that come up. I don't know. But that may be an efficient way also to consider this issue.

THE COURT: All right. I will definitely talk to the chief about it.

Let me see, so I think we can move on now to the motions in limine, unless either side has another issue on trial management that we need to take up now.

All right. Well, then let's start with the Plaintiff's motions in limine.

MR. SHEASBY: Your Honor, the -- the first motion in limine, USAA Motion in Limine No. 1, relates to the extent to which PNC is going to be able to present testimony regarding the state of mind of its witnesses as to whether they believe they were infringing or had a reasonable belief that they weren't infringing.

And just to put a nub on it, the genesis was that PNC's executives received an article in 2017 in which they were -- in which USAA announced that it was going to start a licensing program and that it felt certain designs of MRDC were required to take a license.

PNC was not one of those banks that was -- that received the letter, but it did read the article.

And we explored what was the implications of this article on PNC employees, and there was repeated instructions not to answer by corporate representatives on the subject.

So Mr. Pugh was a corporate representative, and we asked him point blank if in light of this article and then in light of an exchange that was had between NCR and PNC in which NCR talked about the type of indemnification it was providing, the question was asked, you know, did you have some sort of state of mind that you didn't infringe?

And there was repeated instructions not to answer. You can see them on Slide 4 from Mr. Pugh, and it wasn't once. We gave them multiple times an opportunity to answer the question on Slide 5.

The corporate representative who was responsible for launching MRDC was instructed not to answer as to whether he had a personal belief that they were non-infringing.

The individual, Mr. Goodstein, who received the communication from NCR regarding indemnification was repeatedly instructed not to consider as to whether he believed there was non-infringement.

I could throw up slides repeatedly again and again and again of them instructing not to answer from each of their representatives as to what their state of mind was after they read the 2017 article, what their state of mind was after communicating with NCR, what their views were of patent infringement.

So this is another issue where strategic decisions, the chickens come home to roost. There is aggressive use of the privilege as to individuals' mindsets. We should hear nothing from any PNC witness at trial saying, oh, we believe we didn't infringe, we believe we were okay, because that goes to mindset.

Each of these individuals were advised by counsel. We know they were advised by counsel at this time because we see it on the privilege log, and they shouldn't be allowed to trod out any type of mindset or we didn't believe defense based on the aggressive instructions not to answer.

THE COURT: How do you square that with asserting a claim for willful infringement?

MR. SHEASBY: Yeah, so it's -- it's a really valid

question, which is when we asserted the claim for willful infringement, they had a decision that they could make, and there were two ways that they could proceed. One was to waive privilege and show what the advice was that they received from counsel as to what they actually believed and what their state of mind was regarding that advice.

The second way of proceeding was the way they did proceed, which is aggressive instructions not to answer.

And so the evidence as to whether or not a willful infringer cannot come from their state of mind because they chose to aggressively assert the privilege and refuse to answer questions as to what their belief was at the time.

THE COURT: Mr. Sheasby, typically, the consequence of that would be that they cannot assert an opinion of counsel defense, not that they can't assert any subjective belief defense.

MR. SHEASBY: Well, Your Honor, that would have been the consequence before they're instructed not to answer as to their subjective belief.

So if you look at this slide from Mr. Pugh, which is: Did PNC believe that because it wasn't one of the banks that received a letter from USAA that means it didn't need a license to USAA's patents?

I'm instructed not to answer, and I won't.

And so I don't know how to square this, Your

Honor, which is -- you're right. Could they have cut the onion thinner and said we're not going to assert an advice of counsel defense, but we are going to allow witnesses to discuss their state of mind and what their belief was, that ship had sailed in the aggressive instructions not to answer.

Now, Mr. Pugh was a lawyer, and so the question was would a different answer happen from some of their other witnesses who are not lawyers?

But if you look at Alex Goodstein's testimony, if you look at Mr. Trebilcock's testimony, all of them were repeatedly instructed not to answer as to -- this is Thomas Trebilcock. Are prepared to offer about whether USAA's claims have merit? And he was instructed not to answer as to what his beliefs were of those merits.

And so I agree with you that there is a middle ground between waiving privilege and talking about your mindset. The problem is, is that the aggressive instructions not to answer have caused that ship to sail.

I don't know how we are allowed -- how can Thomas Trebilcock get on the stand and say, oh, I believe we didn't need a patent, when we asked him about his views on the merits, he was instructed not to answer.

THE COURT: The typical way the Court would handle that is the party, in this case the Defendant, would not be

allowed to adduce any testimony as to which they asserted a privilege during discovery.

MR. SHEASBY: That's exactly the ruling that we're seeking here.

THE COURT: Although what you're seeking is that that not just be limited to whatever a particular question was but that it exclude the entire field of -- of their state of mind.

MR. SHEASBY: Well, Your Honor, the reason why we stated it the way we did is because these were not individual fact witnesses. These were corporate 30(b)(6) witnesses, as well, speaking about the state of mind of the company as a whole.

For instance, Mr. Kunz was a corporate representative of PNC. In fact, he was being designated on this topic.

And so we are fine with the rule that they cannot adduce any testimony that was subject to an instruction not to answer by an individual witness or by their corporate representative.

THE COURT: All right. Let me hear from the Defendant on that.

MR. STONE: Thank you, Your Honor.

I think the Court is well aware, and you've already discussed the issue with us of the import of

Section 298, and the fact that culpability, particularly with respect to an allegation of willfulness cannot be inferred from either the obtaining of an opinion of counsel and not disclosing it or the decision not to obtain an opinion of counsel.

But to the extent, of course, that a company individuals, employees obtained attorney-client privileged advice about the case, that advice and that privilege may continue to be asserted.

Mr. Pugh was a lawyer and was being asked about things that he did during the time that he was a lawyer -- an in-house lawyer at PNC, and obviously he not only would have received legal advice counsel from outside counsel, but he would have provided legal advice.

So the privilege in the course of these depositions was protected to ensure that advice that had been received by these individuals that was privileged that the privilege was not waived.

And indeed at the deposition of Mr. Pugh that was referenced by -- on one of the slides by Mr. Sheasby, Mr. Lantier, who was defending that deposition, offered to allow the witness to answer if there was an agreement that that would not be a waiver of the privilege with respect to any other questions, and that proposed stipulation was declined.

But there were a number of other witnesses who were asked similar questions about their state of mind independent of any legal advice that they were provided, and they answered those questions.

Mr. Goodstein answered a series of questions, including about the redesign, which we often refer to as 420.1, as to why that didn't infringe, and he explained his own understanding because he was able to distinguish his understanding and belief from the legal advice that he had received.

And he also --

THE COURT: Mr. Stone, are you indicating that the instructions not to answer were made clear that the witness was not to answer as to any knowledge obtained through counsel, but if they had knowledge obtained independently of counsel, that they should answer?

MR. STONE: I am, Your Honor. In fact, the slide that's on the screen, which I think is Slide 6 that Mr. Sheasby used, makes that quite clear.

Ms. Young, who was defending that deposition, said the question appears to call for attorney-client advice and work product. And if you cannot answer that question without revealing attorney advice or work product, you should not answer that.

And he said: On that basis, I'm declining to

answer.

There were other instances of Mr. Goodstein where he separated out the information and provided answers. Mr. Kunz testified to his own awareness that is independent of legal advice that he received. We set out in Exhibits 1, 2, and 3 to our opposition to this particular motion in limine examples of testimony, not exhaustive, but examples of the testimony by each of those three witnesses where they were answered as to their state of mind, independent of the attorney-client privilege advice that they had received.

So one group of testimony that clearly should be permitted is the testimony that was given that reflects the state of mind of these individuals.

There's a whole other set, you can think of it as the third set, the first being where privilege was asserted because they knew these answers only from advice they'd received; the second where they've given us that information as to their state of mind or subjective beliefs; and the third is those witnesses who hold subjective beliefs or had a state of mind about which they were not asked and a privilege was never asserted.

The latter two should be permitted to testify to their state of mind or their subjective beliefs.

In addition, a separate point that I want to make

is Mr. Sheasby repeatedly referred to the aggressive assertion of the attorney-client privilege as if at some point it was improperly asserted. And, in fact, when there was a request that they agree that it wouldn't constitute a waiver, they declined that request.

But if they thought the attorney-client privilege in the instructions were being improperly imposed, the remedy for them is to bring a motion to compel under Rule 37. And the law is quite clear that that's your remedy. Your remedy is not to then come in and try to preclude testimony to which an instruction not to answer was not given.

And so here, they should have pursued Rule 37 if they had a problem with the instructions. They didn't do that. Testimony as to state of mind should be permitted from witnesses, including testimony they gave in their depositions, as well as testimony from witnesses who weren't asked questions at their deposition to which any instructions not to answer were given.

I agree that we should not now be permitted to -- to waive the privilege that we previously asserted, but we don't intend to do that. We intend to go forward consistent with the privilege being asserted as it was during the deposition.

THE COURT: All right. Thank you, Mr. Stone.

MR. STONE: Thank you, Your Honor.

MR. SHEASBY: So just two clarifying points because it's a long day.

If we go to Slide 8. Slide 8.

Slide 8 is the testimony of Mr. Trebilcock. This representation that witnesses were told to separate out their personal knowledge from the knowledge of the Court is just lawyer fiction. This is a perfect example of the aggressive use of the privilege.

And to be clear, I don't need to move to compel because I'm perfectly happy for them to aggressively assert the privilege because the chickens come home to roost at the time of trial.

And so for anyone to get up and say, oh, yes, we believe we weren't infringing, when Thomas Trebilcock, who was one of their corporate representatives, stands up and under oath is blocked from answering that question, that has consequences. It has real consequences. And they didn't go through and separate out privilege from non-privileged information.

And by the way, if you go to Slide 6, Mr. Stone's -- my brother's reference to the testimony of Thomas Kunz of some type of shining light of how there is some ground between personal belief and lawyer belief shows the opposite.

He was a corporate representative. He has no belief about infringement separate from what his -- the advice that was given by his attorneys.

And so this fiction that these people are going to thread a needle, their corporate representatives gave that away by being -- refusing to answer.

This shows why what Mr. Stone said is a fiction. He has no knowledge separate from what other lawyers supplied.

And Slide 8 from Mr. Trebilcock shows the same.

THE COURT: And was Mr. Kunz designated as a 30(b)(6) witness on the topic of knowledge of infringement?

MR. SHEASBY: It was Mr. Kunz or Mr. Trebilcock. One of those two were designated on the subject, Your Honor.

THE COURT: Well, if a 30(b)(6) witness who was designated on that specific topic responded that he had no non-privileged knowledge on that topic, then I think that would be binding on the party -- on the corporation, and they would not be entitled to offer individual witnesses with knowledge on that topic.

MR. SHEASBY: We're fine with that rule, Your Honor.

THE COURT: But I'll give Mr. Stone a chance to respond in a moment, but before that, you know, there are

two sides to this issue, and I think the likely ruling is going to be that the Plaintiff will not be permitted to ask questions that the Plaintiff knows will invoke an attorney-client privilege response.

MR. SHEASBY: That could be reasonable.

THE COURT: But it will also be that the Defendant won't be entitled to seek affirmative testimony on issues as to which it gave an instruction not to answer.

And -- but I just want to make sure that our goal is to keep both sides from putting that issue into the jury box where privilege has been invoked.

MR. SHEASBY: We completely agree. We're absolutely comfortable with that ruling.

THE COURT: All right. Well, then let me hear from Mr. Stone.

MR. STONE: Thank you, Your Honor.

With respect to Slide 8, if you go back to the transcript earlier than what was quoted on the slide, you would see the instruction was articulated and indicated that the witness should not reveal attorney-client communications but should otherwise testify to any of their personal knowledge separate and apart from that. No instructions are shown on the portion of the transcript that has been presented on Slide 8.

With respect to Mr. Kunz and Mr. Trebilcock,

neither one was designated as a 30(b)(6) witness to testify as to the beliefs of PNC with respect to whether or not it infringed. We objected to that category in their Notice of Deposition and did not produce a witness to testify to that issue. We took the position, and it was not challenged that that was a proper subject for expert testimony and the experts would address the bases for non-infringement.

Rather, Mr. Trebilcock and Mr. Kunz, between them, testified with respect to their knowledge of how PNC's product actually operated, and they talked about the operation of the product but not about any belief as to whether or not the product as it operated infringed.

And they also talked about non-infringing alternatives and how those would operate. And Mr. Goodstein, in fact, testified that he believed that the redesign -- the 420.1 redesign did not infringe, and he gave the basis for his understanding of that and the reason for his belief.

So these are all topics we have -- the witnesses have not in any way evidenced that the corporation does not have some witnesses with knowledge or personal knowledge or subjective beliefs about whether or not they infringe.

Indeed, there was testimony by Mr. Goodstein and others that when they read about the article that Mr. Sheasby talked about earlier, when they read about the

article that USAA was undertaking a licensing campaign and sending out 200 or more letters, that they had not received such a letter, and that informed their belief that they must not be somebody that USAA thought infringed their patents.

They conferred with their vendor who supplied the product to them, including NCR. This is the subject of a motion in limine, as I know you know, conferred with them, and that information and conversation further informed their subjective belief that there was no reason to think that they were infringing or that USAA thought they were infringing on any of USAA's patents.

So there's a lot of evidence out there that should be permitted to establish the lack of any willful infringement.

THE COURT: All right. Thank you, Mr. Stone.

MR. SHEASBY: Your Honor, just two brief clarifications because it's important for there to be precision, and when you don't show evidence to the Court, sometimes things get lost.

Slide 5.

Mr. Pugh was the corporate representative on the subject of the article that Mr. Stone was just talking about, and he was instructed not to answer on the article.

Mr. Kunz and Mr. Trebilcock were corporate

representatives. For counsel just to say they refused to designate anyone on the subject of PNC's belief as to non-infringement, that's not a vote in their favor. It just further shows why that would be forbidden and inappropriate testimony since they didn't offer a corporate representative on the subject.

Thank you, Your Honor.

THE COURT: I -- Mr. Sheasby, I think there's an issue that I'm going to have to resolve based on additional information, and that is, if USAA has corporate or 30(b)(6) testimony that it believes bars any individual witness testimony, I think that's something that we're going to have to get cleared up and see.

I'm gathering from Mr. Stone's statement that they'll take the position that at least on some of these topics, they objected to the topic, and therefore did not under Rule 30(b)(6) present a witness on it, and there may be, you know, a back and forth that has to be looked at in order to determine whether that's true.

I'm -- I'm not going to try to resolve that now, but I do want to have the parties confer about that and let me know if there are situations where you believe that under Rule 30(b)(6), they are barred from contesting statements made by the corporate witnesses on this topic, which is their state of mind.

MR. SHEASBY: We're happy to live and die by that rule, Your Honor, and we'll make a proffer on those issues.

THE COURT: All right. I -- and then if the -- the Defendant believes that they properly objected or in some other manner kept that topic from being binding on them, then they can present that in response to what you're offering.

MR. SHEASBY: And I think Ms. Glasser made a good point, which is there are two issues here. One is it would be helpful to know who the witnesses are going to be, because whoever is the witness would be -- there would be two sets of bars to who's going to testify. There would be bar as to their denial of personal knowledge based on the instruction to answer, even if they weren't a 30(b)(6), and there's a denial based on 30(b)(6). So it would be helpful to have some clarification on who they're going to bring for this purpose. That would make things efficient.

And the second issue is, there's two tiers to this, which is if you instruct a witness not to answer on a subject, obviously that has consequences. If you refuse to provide corporate representative testimony on a subject, that has consequences as well. You can't refuse to provide a corporate representative on a topic and then seek to provide corporate testimony.

THE COURT: There's a difference between refusing

to provide one and objecting to the topic.

MR. SHEASBY: Completely agree.

THE COURT: And -- but I agree with you that simply acknowledging a topic and saying we're not going to present a witness on it presents another set of issues.

MR. SHEASBY: So it sounds like we should do a proffer on this, Your Honor, with the guidance that you've given us.

THE COURT: I think that is -- with the understanding that before you actually file a proffer, that you'll see what you can work out.

MR. SHEASBY: Absolutely, Your Honor.

THE COURT: Okay. And I think that what needs to happen is that you need to accomplish that proffer enough before whatever date the exhibit hearing is set on such that the Defendant will have an opportunity of at least a few days to respond to it, and then we can take it up at the exhibit hearing.

MR. SHEASBY: Yes, Your Honor. I agree.

THE COURT: All right. Mr. Stone, are there issues that you think need clarifying before we go through that process?

MR. STONE: I don't believe so, Your Honor. I think we -- I understood what the issue was, as you articulated it, and we'll be prepared once we receive --

after we meet and confer with them, if there's open issues, we'll receive their proposed proffer and prepare a response that I think will address the concerns the Court has raised.

THE COURT: Do you have any objection to identifying the witnesses -- and I'm not saying at this point identifying the particular testimony, but identifying the witnesses through whom you want to offer state of mind evidence?

MR. STONE: Your Honor, I do at this point in time because I'm not sure as to what we would do. We have noticed, for example, that USAA has indicated no will call witnesses on their witness list other than experts, and so everyone else is a may call. And I think we find ourselves in a similar situation not knowing at all what evidence they're going to present or what witnesses they're going to call and not knowing who our witnesses will be.

I think that we can safely assume that the witnesses would be some subset of the current PNC employees who are on our witness list who would testify to the state of mind that they had at various points in time.

I also understand that when witnesses are testifying at trial, they're testifying as to their own personal knowledge, that 30(b)(6) testimony is obtained through deposition and not at trial. So each of them will

testify to their personal knowledge. I think it will be some subset of those PNC employees who are on our current witness list, but I actually don't know which ones it will be that we will ultimately call because we're in part waiting to be informed by USAA as to who they actually will call among the many witnesses on their witness list.

THE COURT: And do you know roughly how many PNC employee witnesses you have on your current list?

MR. STONE: If you give me one minute, I think I can tell you exactly how many, and exact might be better than approximately.

THE COURT: That's fine by me.

MR. STONE: We have nine, Your Honor, but I know that we've identified one of them as someone -- that's Mr. Pajak, as someone who we would call only if there was disputes as to the authenticity of certain documents. So I think it's fair to say that the number is, for purposes of this issue, no greater than eight.

THE COURT: All right.

MR. SHEASBY: Your Honor, I think we -- we do need something, either the subject matters that they're looking to present state of mind on or some type of targeting of the witnesses who would give state of mind are at trial. That would be helpful.

THE COURT: Have you deposed all of the eight

witnesses that Mr. Stone is referring to?

MR. SHEASBY: Yes, Your Honor.

THE COURT: So you -- you know how state of mind evidence was approached in their depositions?

MR. SHEASBY: We do. We could actually brief it all for you if that would -- if you wanted that.

THE COURT: Well, I think that is the way we'll proceed unless you're willing to engage in some significant narrowing of your witness list, in which case I would expect them to do the same. If you don't want to open that issue up, then I don't have to go there.

MR. SHEASBY: I think that seems reasonable. May I have a break, and I will confer with my colleagues on that. But for right now, it seems like we'll brief everything, Your Honor.

THE COURT: All right. Well, after lunch, if you have determined that a different approach is available, then I'll let you bring that up then.

But with respect to Motion in Limine No. 1, I'm going to deny the motion in limine with respect to the global issue but take up particular instances of it in connection with the proffer that you're talking about now.

MR. SHEASBY: Thank you, Your Honor.

THE COURT: And that takes us to the next motion in limine.

MR. SHEASBY: So the motion in limine -- the second motion in limine relates to the injection of third-party patents into the case. And I want to separate out two issues because I think there's some confusion.

Motions in limine are not replacements for motions to strike expert reports. So the issues about what experts can and cannot discuss should be dealt with properly through the motions to strike.

The motions in limine in my mind are focused on PNC's attempt to elicit testimony regarding third-party patents from either their own fact witnesses or from our fact witnesses. And the -- the -- the issues in my mind are -- are relatively clear.

If you look at the briefing, they say, well, the -- the existence of third-party patents are relevant to willfulness. And they have to go there for the following reasons. They don't identify any reasons why they're relevant to infringement, and they don't identify any third-party patents that are used by PNC's system, and so those third-party patents aren't relevant to damages or -- relevant to damages.

The Advanced Cardiovascular case from the Federal Circuit in 2001 makes clear that the existence of third-party patents is also irrelevant to infringement. If you go to Slide 21 -- sorry, to willfulness.

If you go to Slide 21, in their opposition to the motion in limine, they made some statement about the fact that the existence of Mitek patents is somehow relevant to willfulness.

Well, you can look at Interrogatory No. 8, which relates to willfulness, you will see not one reference to a Mitek patent in Interrogatory No. 8 by number.

What they do flag in Interrogatory No. 8 is some stuff about the fact that they had indemnification or that there was a requiem warranty that they had right to receive that they -- that the software they were receiving was owned by PNC.

Whatever is in their interrogatory response subject to instructions not to answer is not the subject of this MIL. This MIL is very, very targeted, which is they don't identify any patents as a defense to willfulness in their interrogatory response.

If you go to Slide 15.

They don't identify any patents that cover the PNC system. That's Alan Bovik, who's their infringement expert. Mr. Vellturo doesn't identify any patents that are covered by PNC's system that are relevant to damages -- relevant to damages.

There is -- this is not about what experts can and can't discuss. This is about what fact witnesses can and

cannot discuss.

The really outstanding issue besides the Mitek patents, which come out of nowhere in their opposition brief, is these patents that are associated with a license agreement called Northwest IP.

This is testimony from PNC's witness who they were ordered to provide on the negotiation relating to the Northwest IP patents. Those patents were not used by PNC. PNC was instructed not to answer as to whether -- plans to use them.

And so what we're -- we're -- what we're looking for is something very focused. Third-party patents should not be adduced by fact witnesses because they were not a defense to willfulness. PNC does not have their own patents that cover their systems that could be relevant, for example, to Doctrine of Equivalents, and the Northwest IP patents, which are a set of patents that were licensed, whether the license comes in through a jury -- through the expert or not is a secondary question. PNC should have no business talking about those patents because they were instructed not to answer regarding those patents at deposition testimony.

THE COURT: All right. You're saying they were instructed not to answer any questions about those patents, which --

MR. SHEASBY: They were instruct --

THE COURT: -- or this particular patent?

MR. SHEASBY: So the Northwest IP patents. My understanding is we said no third-party patents should be adduced by fact witnesses. That was our motion in limine.

Their response were, oh, what about these Mitek patents, and what about these Northwest IP patents?

The Mitek patents, that ship has sailed. There's no Mitek patents listed in their interrogatory response. No witness has testified Mitek had its own patents, and, therefore, we don't -- we don't worry about our patents. That's just a lawyer fiction.

The other patents that they bring up are the Northwest IP patents. Northwest IP patents, whether the agreement comes in, the underlying patents have no role to come in through fact witnesses because they were instructed not to answer on anything relating to the analysis of the Northwest IP patents, Your Honor.

Now, in their interrogatory response, what they do say is we believe that we -- we're okay because we had an indemnification and because the people who gave us our software said they had good title to the software. That's a separate animal. That's not the subject of this motion in limine.

This motion in limine is solely targeted on

third-party patents that they would attempt to use for some -- their fact witnesses would be attempting to use for some improper purpose.

THE COURT: Mr. Sheasby, I want to react to one thing you said at the outset that I don't agree with fully, and that is that motions in limine cannot affect experts.

I understand that there are a lot of issues about expert testimony that are properly the subject and solely the subject of Daubert motions or motions to strike. But there is a lot of information in these long expert reports that is not essential to the opinions that they're actually offering, and I do think that some of the motions in limine are appropriately reaching that.

But --

MR. SHEASBY: And that wasn't a bait and switch on my part. The point is that their response to this motion in limine is, oh, what about what's in our expert reports?

And my point is we've dealt with -- with what's in their expert reports in the expert reports. This motion in limine is focused on fact witnesses presenting third-party patents, in particular the Mitek and Northwest patents.

THE COURT: All right. And -- and I guess I think you've addressed that you want this motion to even include discussion of patents that have licenses that will be at issue on the royalty.

MR. SHEASBY: The admission of the underlying patents would be forbidden by this motion in limine. Whether the license comes in would be a separate question, Your Honor.

THE COURT: All right. Thank you.

Mr. Stone?

MR. STONE: Thank you.

MR. SHEASBY: Oh, and just flag one more thing, and this would be for fact witnesses, not for expert witnesses.

THE COURT: Okay. And, Mr. Stone, I think -- I know I have kind of cut the court reporter out of a break by just taking that one early break. I'm going to take a 10-minute recess now and come back and hear your response to Motion in Limine No. 2.

MR. STONE: Thank you, Your Honor.

THE COURT: Thank you.

COURT SECURITY OFFICER: All rise.

(Recess.)

COURT SECURITY OFFICER: All rise.

THE COURT: Good morning. Please be seated.

Except for you, Mr. Stone.

MR. STONE: Thank you, Your Honor.

It's helpful to have been advised by USAA's counsel that their Motion in Limine No. 2 only goes to fact

witness testimony and not to experts. And with respect to fact witnesses, I understand there to be two issues raised by their motion in limine, and -- and the language of the motion itself seems to make that clear, that they're seeking to prevent any fact witness from testifying with respect to knowledge they might have had as to whether either USAA or PNC's mobile deposit features were covered by the patents of any third party.

And then the second part seems to be to prevent any fact witness from testifying as to any patent, other than 102 art.

And let me address those two separately if I might.

As to the first issue, the knowledge as to whether or not either USAA or PNC's products were covered by the patents of others, there are documents about which PNC witnesses were examined and which PNC, in considering which vendor of the various vendors that were available to supply it with the software that it would need to offer a remote deposit functionality had patents.

Mitek was represented in the materials that were considered by PNC to have industry-leading patents, five or six at least that had issued at the time, and consideration was given by PNC in selecting vendors as the documents and the testimony of its witnesses made clear, that they gave

consideration to the fact that the product that they were ultimately going to license would use software that was obtained from Mitek and that Mitek had what were described as industry-leading patents at the time. So that testimony is in the record, both documentary and oral, and should be permitted and should not be restricted.

It goes to willfulness, and that's the point of that, that PNC acted reasonably in thinking that. In Interrogatory No. 8, in response to that, PNC made the point that in its license agreement, it was assured that the party from whom it was obtaining the software had the right to license that software, and it was free from any infringement of patents of others.

So, again, that evidence goes to show not only that PNC thought that there were Mitek patents that would cover the software it was receiving but that it was assured that there were -- they had the right to license that software. That all goes to the good faith of PNC.

With respect to --

THE COURT: Mr. Stone, before you move on to the next, are you representing that your witnesses would testify that that were, for instance, Mitek patents that they were informed about as opposed to testifying about specific patents and what those patents cover?

MR. STONE: Yes, Your Honor. I don't think any of

the witnesses are going to be able to identify by patent number a Mitek patent and say that they looked to see what aspects of the code that would cover.

I think their subjective belief as to the reasonableness of what they did in licensing this software was based upon the more general understanding they had that there were a number of patents that had been issued to Mitek that related to this particular functionality, and that gave them comfort that the functionality would be consistent with the representation free and clear of any claim by others.

THE COURT: All right. I understand that.

Go ahead.

MR. STONE: My second point relates to the Northwest IP, the -- and the second part of the motion, which goes to any evidence by fact witnesses about other patents. As the full testimony from the witnesses established, Ms. Moriz was the one who negotiated on behalf of PNC for the Northwest IP license, and she's the one who negotiated with respect to, for example, how much the fee would be to require a license to use that patent.

And so testimony about that particular patent and the extent to which it may be found to be a comparable license or the license rate which one would pay for it would be relevant to the consideration of a reasonable

royalty, all of that evidence should be permitted, including the specific patents that are covered by the license agreement that she negotiated and that was entered into on behalf of PNC. So that evidence should be permitted.

With respect to other fact witnesses, we have one fact witness who lives outside the country, and we don't control. That's Mr. Olson. He's the subject of another motion in limine that we may get to. But Mr. Olson is familiar with both the Garcia-Verdugo patent application, as well as the functioning of the Movilcheck product that was offered or service that was offered to its customers, and obviously, he should be able to testify with respect to at least that patent application. It did not ultimately result in a patent.

So I think there's fact witnesses who should be able to testify to their knowledge about third-party patents. They may be particularly relevant in this instance to two topics. One I've touched on, which is willfulness. They may be also relevant to establish what the incremental value is of anything that USAA's claimed inventions might have added to the field. So they establish the state of the art, and so it should be permissible for fact witnesses who have that knowledge.

Two Mitek witnesses are also on our exhibit list.

Should they testify to that, they should be permitted to do so as well.

This is not the first part of their motion in limine which goes to the extent in which they cover the product that is either offered by PNC to its customers or the product that is offered by USAA to its customers, but rather go to the more general and I think far too broad portion of this motion in limine, which as they have said in their motion in limine is -- there should be no suggestion or reference to any specific third-party patent unless it is Section 102 art, and that is just too broad given the need to describe both the state of the field as of the time, particularly as it relates to both willfulness and incremental value of any of USAA's claimed inventions.

Thank you, Your Honor.

THE COURT: All right. Thank you, Mr. Stone.

MR. SHEASBY: Your Honor, I think I can make this quick.

If I could have Slide 14.

I know very few things with moral certainty, but what I know with moral certainty is the existence of patents that cover your product has absolutely no relevance whatsoever to willfulness. The Federal Circuit has spoken absolutely clear about that.

So any sort of testimony, oh, we thought Mitek had

patents and, therefore, we're good to go or we had good faith is wrong as a matter of law, and it's not in their interrogatory response.

So on both bases, they're out of the game.

The second issue, which is whether any third-party patent covers USAA or PNC's system. There is not a single witness who's testified as to any third-party patent that covers either system, because that requires expert testimony, and there's been no expert testimony on this subject.

Likewise, the state of the art, which is relevant potentially for 101 as well as damages is also governed by expert testimony. The expert testimony on the subject is the subject of motions to strike.

Reference to some random witness who may show up that they don't control from Europe when they fail to disclose any communications they've had with this witness, that witness of all people should not be permitted to come and testify because the testimony of that witness would relate to solely validity, and, of course, validity is an expert issue.

In addition, what a patent or patent application discloses to a person of ordinary skill in the art is not glossed based on what some person who shows up from Europe randomly to say, it's based on the reference.

THE COURT: All right. Mr. Sheasby, is PNC contending that the Northwest IP patents are relevant to the royalty analysis?

MR. SHEASBY: So that is a very, very complicated question. And the answer is that they reference the PNC -- the Northwest IP patents. They are referenced by Dr. Bovik as being comparable patents to the patents-in-suit. But he doesn't do analysis to whether they're used by PNC. And they're not 102 art.

So that -- that's not implicated by the MIL. In other words, the MIL says they can't say any third-party patent is used by PNC or USAA. The Northwest IP patents, no one is asserting they're used by PNC or USAA.

THE COURT: But why would testimony about those patents not be allowed for fact witnesses if the Defendant is claiming that they are comparable in some way for the royalty analysis?

MR. SHEASBY: Right. So although that's not -- that's not within the MIL because I don't -- I don't understand Mr. -- there's two reasons for this. One is that the Northwest IP agreement is not identified as comparable by Mr. Vellturo. He said none of the agreements are suitably comparable for the basis of royalty.

And so this would be -- injecting the Northwest IP patents in front of a jury would be no different than

throwing up a non-comparable number. If the agreement is not comparable for a royalty rate, the agreement is not relevant, and the underlying patents are not relevant.

THE COURT: So do you understand that Mr. Vellturo does not use the Northwest IP patents in his analysis in any way?

MR. SHEASBY: He does attempt to use it in -- in some ways, Your Honor, and that's the subject of a motion to strike, and we will deal with that in the motion to strike.

As to -- I want to be very precise about the ruling we seek, and I don't think there's -- there's areas of disagreement, there's areas of agreement.

No one is contending that any third-party practicing patent is used by a USAA or PNC system, because that would be -- require expert testimony, and no one has given expert testimony on this subject. That part should be granted.

This idea that some random Mitek patents are a defense to willfulness, that's a non-starter as a matter of law.

Slide 14.

The third issue is any patent that's not 102 art, that should be uncontroversial because it would exclude everything -- the only dispute I hear from them about that

is Northwest IP. And Northwest IP shouldn't come in because under the motion to strike, it was not identified as a comparable agreement by Mr. Vellturo -- Dr. Vellturo.

THE COURT: You've got the Advanced Cardiovascular quote up there, how does that relate to the issue that we're dealing with here?

MR. SHEASBY: I'm sorry. Your Honor, I didn't hear your last phrase.

THE COURT: I say how does the Advanced Cardiovascular statement relate to this issue that we have?

MR. SHEASBY: So the issue is whether the existence of other patents is ever a defense to willfulness. And the existence of other patents is never a defense to willfulness.

THE COURT: I mean, this statement is not as broad as what you're saying. This is saying that the fact that a different patent might read on the accused product is irrelevant to infringement of the Plaintiff's patents.

MR. SHEASBY: Right. So the -- what the Federal Circuit is saying, as I understand the case, is that the presence of other patents that may cover a product doesn't -- so in this situation, Medtronic is being sued for infringement. Medtronic has a Falcon catheter. Medtronic is saying we have our own patent that covers the Falcon catheter, and the Federal Circuit is saying that is

irrelevant for willfulness.

And that is pretty settled law in the Federal Circuit. It's also consistent with their interrogatory response.

So the fact that Mitek has patents that -- no one's saying -- there's no evidence that those Mitek patents even cover the patent. No expert has presented -- covered the product. No expert has presented the analysis. But the miasma of Mitek patents, that is a non-starter as a defense to willfulness under Advanced Cardiovascular. And that's exactly what it's saying here.

Medtronic is making the exact same argument Mr. Stone has. Oh, we have some -- Mitek has their own patents, so everything is good. We're not willful.

This is not a defense for willfulness under Federal Circuit precedence.

THE COURT: And there's going to be a later motion in limine I know about whether some IP assurance that Mitek provided is admissible by PNC on willfulness. And if that IP assurance is admissible, I think an argument can be made that that should extend to Mitek's representation that its technology was patented.

MR. SHEASBY: So luckily, we don't have to deal with that issue because the IP assurance was given by NCR, it wasn't given by Mitek.

THE COURT: All right.

MR. SHEASBY: And so they -- the -- so that's not the issue.

The issue is purely whether they can say, oh, Mitek had their own patents, therefore, we were confident we weren't willfully infringing.

That is violating black letter Advanced Cardiovascular law here. And it's not in their interrogatory response. So at a minimum, the Mitek patents are out.

And this confusion -- and I think, of course, something is in the factual record. That's why we're moving in limine. The purpose of motion in limine is to exclude that which is not relevant to the jury.

Whether Mitek has patents is utterly irrelevant to the jury.

THE COURT: I do know what the purpose of a motion in limine is.

MR. SHEASBY: I don't know if Mr. Stone does because the argument that -- that the fact that it's in evidence means that it's okay. I get it, they have documents that say Mitek has patents. The purpose of the motion in limine is to exclude those documents because it's not relevant under Advanced Cardiovascular for willfulness.

THE COURT: All right. Thank you, Mr. Sheasby.

MR. STONE: Thank you, Your Honor.

Advanced Cardiovascular is an interesting case, and did it stand for the proposition that Mr. Sheasby has argued it stood for, you would have thought it would have been cited in their motion in limine, but it was not.

And it stands for the proposition that the fact that a product is also covered by another patent may not constitute a defense to a claim of willful infringement.

That's not what we're saying here with respect to the Mitek patents. Rather, we're saying that PNC acted reasonably and did not act by -- in complete disregard of rights or otherwise when it entered into license agreements not first with NCR but first with another company that supplied Mitek software and then later with NCR in which it was informed of several facts.

One, the parties supplying the software said we can represent that we have the right to license you this software; and, two -- and you'll see this was a fact that was considered by PNC -- the software comes at least in part from Mitek, which is an industry-leading purveyor with many patents that cover their product. And that informed the reasonableness of PNC's thinking that it was licensing a product that would be free and clear from claims by others. It received both that assurance, and it understood that the product was covered by patents from others.

We're not asserting through a fact witness or through an expert witness that a specific Mitek patent covered particular features of the product that PNC ultimately made available to its customers. That's not the issue.

The issue here is whether these facts about what they knew about Mitek are appropriate for the jury to consider in considering whether or not they acted properly or could be found to be willful infringers. Very different than the issue presented in Advanced Cardiovascular.

With respect to the -- one other issue with respect to Northwest IP. I think Northwest IP, Mr. Vellturo does -- or Dr. Vellturo does use the Northwest IP license for purposes of his overall computation of what would be a reasonable royalty. So he does make use of it, and it's appropriate to consider the extent to which there is that IP and that it's relevant IP according to our expert, Dr. Bovik.

So we have evidence to present in both respects where the Northwest IP IP and the specifics of it would be relevant to the considerations there.

The scope of this motion in limine is the last thing I want to go back to because what they say in their motion in limine is there should not be any reference to any specific third-party patent unless it is Section 102

art. That doesn't go to whether it covers PNC's product. That doesn't go to whether it covers USAA's product. That goes to any patent at all.

And the other patents, specific third-party patents are particularly important, even if they aren't 102 art, both to establish the state of the art within the field at the time, to establish what's ordinary and reasonable, and to establish incremental value.

So whichever of those various patents may be relevant to that, there should be permitted to be testimony about them.

Thank you, Your Honor.

THE COURT: And, Mr. Stone, while you're up --

MR. STONE: Yes.

THE COURT: -- the state of the art evidence, that's going to come from your experts, I assume?

MR. STONE: It's going to come from our experts for sure, Your Honor. Whether there's fact witnesses who also will lay foundation for what the state of the art evidence is or not depends on which ones ultimately are called.

THE COURT: I think that in order for a witness to testify that a patent constitutes part of the state of the art, I think that has to be opinion testimony because it calls for the conclusion that that patent has identified a

particular invention, and that's part of the relevant background.

So, in other words, state of the art is not going to be covered by this to the extent it comes from the expert witnesses. They -- they will not be restricted by this motion in limine.

But I think that the Mitek patents are properly subject to exclusion to the extent that fact witnesses would testify.

I understand that what the Court was pointing out in the Advanced Cardiovascular case is a simple statement of fact that the existence of one patent that covers a product does not provide any relevant information about whether another patent, in this case the asserted patent, covers the product.

And so there's no actual probative value to weigh against the prejudicial effect.

Now, on willfulness, your suggestion is that PNC's witnesses may have thought it had some probative value, but the concern is that the jury might think that, as well.

And I do think that it would be an easy conclusion for a lay witness to draw that if there's a patent that covers it, then this other patent likely doesn't cover it. And that's the reason why we typically exclude testimony and evidence about those patents.

And I can tell you have a response. Go ahead. But that's where I'm leaning.

MR. STONE: Thank you, Your Honor.

I think here, there's a difference, which is here the subjective belief of the individuals at PNC who entered into these licenses is at issue. Their subjective belief was informed by the fact that they were obtaining software that was developed -- at least a large portion of the software that they obtained was developed by an industry-leading company as evidenced by the fact that it had the industry-leading patents as described at the time.

They're not offering testimony that they understood that the product they were getting or specific features of it were covered by particular patents. Rather, they're trying to explain why they thought they acted completely reasonably and not in willful disregard of the rights of USAA or any others when they entered into that.

If the Court feels -- and -- and based upon the questioning at depositions, we anticipate that these witnesses are going to be challenged as to whether they acted properly, reasonably, or with conscious disregard.

If the Court is concerned that there is some indication that the jury might draw from that, some inference that you can't infringe Patent A if your product is already covered by Patent B, then a limiting instruction

could be given with respect to that at the time, because we know that there's many instances where products are covered by multiple patents.

But, here, the issue is the state of the mind of the individuals at PNC when they entered into this, and this was a fact that very much informed their state of mind, and to not allow them to present both their state of mind and the rationale is unfair to them and hamstrings their ability to explain to the jury that they acted reasonable.

THE COURT: And did they receive a representation from Mitek that the technology that PNC was licensing was covered by Mitek's patents?

MR. STONE: No, they did not receive any direct representation from Mitek to that effect, and we're not going to contend that.

Rather, they understood that Mitek was an industry-leading provider of these kinds of products and software.

THE COURT: And that's a fact that I think this does not implicate, that this would not prevent your witnesses from saying that they licensed this technology from an industry-leading company.

But the reference to the Mitek patents I think has minimal probative value, even on a subjective basis,

because it's an unreasonable conclusion to draw, especially when Mitek didn't even represent that its patents covered what they were licensing. And I think there is a significant prejudice that would exist despite a limiting instruction.

I'm going to grant the motion in limine regarding fact testimony about the Mitek patents.

As to the Northwest IP patents, I'm going to deny the motion. I think that they are going to be involved already. And there may be other limitations on what use can be made of them, but I don't think it's appropriate to grant a motion in limine regarding reference to them.

As to other third-party patents, Mr. Stone, what other third-party patents does PNC want to be able to talk about through its fact witnesses?

MR. STONE: I don't think there are any other patents. There is only the Garcia-Verdugo patent application that might come in through a fact witness as well as through experts. I don't believe there's any other patents that would be talked about.

THE COURT: Well, then, I'm going to grant this as to other third-party patents. And the effect of that is that if you develop a need to address one through a fact witness, then you can seek leave out of the presence of the jury or at the bench --

MR. STONE: Yes.

THE COURT: -- and do that.

As to the application you're talking about, remind me in what connection you're going to offer evidence about that?

MR. STONE: Well, that is -- that's descriptive of how a product worked that was offered by the Spanish company -- Spanish bank, Bankinter, and it's also offered as prior art to the application.

THE COURT: It is elected prior art?

MR. STONE: Yes.

THE COURT: All right. Then I don't see how it would be the subject of this, so I will grant this as to any third-party patents or as to any fact witness testimony about third-party patents, including Mitek, but deny as to Northwest IP and also as to any elected prior art.

MR. STONE: And, Your Honor, with respect to Mitek, and I don't mean to belabor the issue, I just want to be clear, and I think this is my understanding, should the door be opened by testimony or arguments, we can raise that with Judge Gilstrap at the time and seek leave?

THE COURT: Absolutely, and that's true on any of these --

MR. STONE: Thank you.

THE COURT: -- motion in limine rulings.

MR. STONE: Thank you.

THE COURT: All right. All right. Let's go on to the next one, Ms. Glasser.

MS. GLASSER: Thank you, Your Honor.

So Motion in Limine No. 3 seeks to preclude PNC from asking USAA witnesses about USAA's freedom to operate practices.

Questions were asked of USAA witnesses about that topic at their depositions, and when this motion in limine was filed, the counterclaims were still in the case, and we were arguing about -- back and forth with PNC about whether or not that was proper evidence with respect to the PNC counterclaim patents. It wasn't even in that instance since there was no pre-suit willfulness.

But now that the USAA issue of willfulness is just not even in this case at all, we only have the USAA patents being asserted against PNC, it should be abundantly clear for whatever reason PNC has not withdrawn their opposition that there should not be a sideshow in this case about what USAA's own freedom to operate practices are, what USAA has done with respect to the release of all its various products over the years. That just has no place whatsoever in this trial.

PNC's explanation for what it wants to do with this evidence indicates just how prejudicial and irrelevant

it is. P -- PNC says that it wants to have an exploration of what not only USAA actually but now they say the entire industry does with respect to freedom to operate.

And, obviously, there's no what do others do defense to willful infringement, whether or not people do freedom to operate, whether there's an even reason to do it, what sort of protocols USAA and every other bank have in place --

THE COURT: How is it relevant to your willfulness claim if it's not relevant what the industry practice is?

MS. GLASSER: Correct, Your Honor. It's not relevant to willfulness whether this is a particularly careful industry or whether this is an industry that -- that has a lot of infringement going on. None of that has any bearing on PNC's own state of mind and its own conduct.

THE COURT: Well, are you going to be offering evidence about PNC's freedom to operate analysis in support of your willful claim?

MS. GLASSER: So PNC performed a freedom to operate analysis, but we do not have it. They withheld that on the basis of privilege. And so we will not be making a representation about what PNC's freedom to operate analysis was or was not because they -- they did not produce that to us.

We will be obviously introducing general evidence

in the case about PNC's overall policies and practices with respect to the patents-in-suit, but we do not have a copy of their freedom to operate analysis because they withheld that on the basis of privilege.

THE COURT: Well, I guess all I'm trying to get at is if you're going to be arguing that they did or failed to do something that indicates willfulness, then it seems that they should be able to put that in context of what reasonable procedures are.

So I'm -- is this issue going to come up on your side of the case at all?

MS. GLASSER: So let me break that into two pieces because I want to be clear about what we're talking about.

There will absolutely be evidence of PNC's willfulness. There will be evidence that PNC knew about these patents. There will be evidence about PNC, despite knowledge of the patents, proceeding either with utter willful blindness or with actual knowledge of infringement. That will all be in the case.

But this question of what is the industry norm with respect to performing freedom to operate, that is not going to be in the case from USAA's side at all. I think that's what Your Honor was driving at.

We're not going to be presenting the argument that PNC did something that violated an industry average or

something like that such that it would come into play to talk about what does USAA or what do the other thousands of banks in the country, how do people perform freedom to operate. We are not planning to open the door to that at all, and that would obviously be a very detailed sideshow looking at the different ways different banks do freedom to operate and why.

THE COURT: All right. Let me hear the response, and I'll give you a chance to reply.

MR. LANTIER: If we could please change over to the PNC slides. Thank you very much.

Your Honor, I think you've got your thumb on the pulse here. If we look at Slide 19, we can see where USAA is heading with its willfulness assertions against PNC.

And it says in its interrogatory response that -- and I suppose I won't read it because it is -- they did designate it as confidential, but Your Honor can see that in the second highlighted section, they're making the very argument that -- that PNC's actions were unreasonable, and they're making the assertion that not -- when they asked non-lawyers what they did to evaluate patent risks and the non-lawyers said, well, that wasn't my role or that wasn't something that I did, that that's somehow an indication of willfulness.

If they are permitted to -- we don't believe that

that's a valid argument, and we have moved in limine -- in Motion in Limine No. 6 to exclude that testimony from both sides, but if USAA is allowed to seek to convince the jury that PNC behaved unreasonably because it did not have non-lawyers out looking to see whether there were patents on products, then as we turn to Slide 20, clearly the testimony of USAA's own witnesses to the same effect is relevant to whether PNC's activities were reasonable or not.

And so the motion in limine should be denied for that reason.

If we could -- if we go back to USAA's slides, I just want to look at Slide 23 for a moment, just to make sure that the record -- and there's no confusion on this.

The suggestion was made that -- and it's on the heading here, PNC did investigate patents before litigation. I'd just note, Your Honor, that you can see the dates on the documents. Those dates are well before most of the patents in this case even issued, and you can see the privilege description, and it doesn't match what counsel for USAA represented.

So I just wouldn't want Your Honor to be confused or misled by -- by these privilege log entries. The bottom line on this, as well as MIL -- Motion in Limine No. 4 and No. 5 is if USAA is going to make -- to advance a position

that PNC's activities were not reasonable or were willful, then PNC has to be permitted to show the jury that USAA and its inventors acted in the exact same way.

Thank you, Your Honor.

THE COURT: All right. Ms. Glasser, do you agree that these same issues come up the Defendant's Motion in Limine No. 6?

MS. GLASSER: I don't entirely, Your Honor, no. I think they're trying to mush them together in a way that is misleading instead of indicative of what we're trying to address here through Motion in Limine No. 3.

Motion in Limine No. 3 is a limited issue. This isn't a question about should we be able to talk about whether PNC was reasonable in the big picture. This is simply directed to one particular inappropriate argument by PNC, which is that PNC wants to insinuate that USAA or some unidentified third-party banks either don't do a good freedom to operate analysis or don't always do a freedom to operate analysis and that that fact -- alleged fact, there's not a lot of evidence about it at all in the record, other than this one question they asked of a retired person from USAA -- but that that somehow makes PNC's conduct with respect to the patents-in-suit non-willful.

And that's all this motion is about. This motion

is simply saying not only is it irrelevant if this particular industry does a lot of freedom to operate or doesn't do a lot of freedom to operate, but it's just an absolute 403 mess. Not only would we then open the door to a bunch of questions about why USAA did this or that for whatever product, but we also then get into this really messy situation of talking about, well, did PNC do a freedom to operate at all, and they shielded that under privilege.

So I do want to clarify a little bit there, too. There is a Slide 19.

Actually, Mr. Lantier, do you mind putting back up your Slide 19?

He suggested that USAA tried to inject some -- some issue -- that's 20, actually, one more back -- that USAA injected this issue in Mr. Webster's deposition, but this is -- Mr. Webster's opinion is exactly the problem.

Mr. Webster is PNC's expert. He put in this little odd insert in his expert report about saying something about how freedom to operate was performed. And so, obviously, Mr. Sheasby then asked him questions about it at his deposition. It's not up on the slide here, but actually what he ultimately said is: I never heard of freedom to operate. I don't know what freedom to operate is. Could you tell me?

And so this is just yet another sort of odd sideshow going on here, but USAA is not trying to ask Mr. Webster about freedom to operate. The only reason this question was asked at the deposition is we're trying to explore this little insert in his expert report, which ultimately he entirely disclaimed saying he never even heard of the term.

So just trying to take it back to the big picture. This isn't about should PNC be able to say it thought it was reasonable. Should we be able to say they are unreasonable? For the most part, there's lots of arguments both sides can make about reasonableness with respect to the USAA patents.

What people should not be allowed to do is start talking about, well, does USAA do a detailed freedom to operate for all of its own products? Does, I don't know, Chase Bank or BBVA or whatever bank down the street? That's just a complete sideshow.

THE COURT: I guess where I am hanging up is that I don't understand well enough what the evidence is going to look like. But if USAA wants to rely on a fact to support willful infringement and that fact is that PNC does or doesn't do something, that USAA itself takes the same approach on, I -- my inclination is that it would be relevant to the jury to know that fact in evaluating how

much the USAA evidence shows willfulness on the part of PNC.

MS. GLASSER: So I think it's an interesting hypothetical if we actually had a fact like that where PNC did not do some specific thing and USAA has a policy of not doing that same exact thing under the circumstances.

There's absolutely nothing like that in this record. I think in a lot of ways that would still end up being pretty confusing and not relevant. But we really don't have that. That's -- that's purely an absolute hypothetical.

All we're talking about here is that somebody wants to ask USAA a bunch of questions about when you released this product or that, did you do a freedom to operate analysis?

And that is just a whole host of issues. Why would USAA have done it? Was there a patent issue there? Was there not? Was there any known interest going on? Are we going to start talking about a bunch of third-party patents? Is USAA supposed to be waiving privilege on the fly on the stand trying to talk about whether they did that or not?

THE COURT: Well --

MS. GLASSER: That's sort of --

THE COURT: Let me -- let me just ask you,

Ms. Glasser, are you saying you're not going to be mentioning whether PNC did or didn't perform any freedom to operate analysis themselves?

MS. GLASSER: If PNC isn't allowed to talk about the words "freedom to operate," we don't have any intention of using those words ourselves either or in any way suggesting they should have gotten a legal write-up on this, that they -- that they didn't -- you know, we're not going to do what Section 298 prohibits, right? We're not going to say where is their opinion of counsel? That's not supposed to be part of what we're presenting here under what the parties' disclosures have been.

But we're absolutely entitled, of course, to talk about their views of infringement, their knowledge of the patents, all of that, but none of that has anything to do with whether USAA did a freedom to operate analysis when they released -- I think he asked about the JTwain. JTwain, nothing to do with any of the issues in this case at all.

THE COURT: Are you saying you would have no problem with this MIL being granted but made mutual?

MS. GLASSER: I guess I'm trying to think how it would work applied -- yeah, neither side can ask each -- each other whether they performed freedom to operate I think is fine.

Obviously, USAA can and should be allowed to talk to the designers of the PNC product about whether they knew about the patents, whether they did anything to avoid the patents, et cetera, but in terms of eliciting some sort of opinion about a freedom to operate, that's not something I think either side should be injecting.

THE COURT: All right. Thank you, Ms. Glasser.

MR. LANTIER: Your Honor, this has gotten awfully confusing, and I hope we can impart some clarity here.

The only deposition transcript that USAA has sought to exclude in Motion in Limine 3 is the testimony of Mr. Morris. And Your Honor can see that the testimony on the screen doesn't use the words "freedom to operate."

Now, it seems that things have morphed towards a motion in limine that would say nobody can utter the words "freedom to operate." And I don't -- I think that would be fine from PNC's perspective, but it's not what the strategy is here from USAA.

If we go back to Slide 19.

You can see what they're -- what they're going to do is they're going to say that PNC took no steps to assess or avoid infringement of the USAA patents, and they're going to cite to deposition testimony where they asked non-attorneys at PNC, now, at the time you launched the product, what did you do to determine whether you were

infringing USAA's patents or not?

That's the exact same question that was posed to Mr. Morris, and he gave his answer. And we can't be in a position where they can put in that type of evidence, and we can't. That would be a fundamental due process issue.

MS. GLASSER: If I could briefly address that, Your Honor.

THE COURT: All right.

MS. GLASSER: Mr. Lantier said he's concerned about USAA presenting evidence that PNC didn't take any steps to avoid infringement. Steps to avoid infringement is dead-on relevant to whether PNC acted with willful blindness with respect to USAA's patents.

THE COURT: And --

MS. GLASSER: Some question about whether USAA took steps to avoid infringement of some patents nobody has even mentioned of some third parties who knows who they even are with respect to some other products has absolutely nothing to do with that.

Even if we assumed, which is not a correct fact, but even if we assumed USAA had acted horribly with respect to some other product or some patents, that wouldn't get PNC off the hook in any way, shape, or form for a host of reasons, including we're talking about a completely different case, and PNC would have had absolutely no way to

know what USAA was doing.

THE COURT: The question is really what inference the jury should draw from whatever steps it is that PNC didn't take. And those are steps that USAA doesn't take when it launches products, then the jury, I think, would be entitled to conclude that those probably don't show willful infringement. That's just the way companies do business.

MS. GLASSER: I think I understand sort of where the Court and the two parties are maybe not intersecting each other completely.

USAA is not intending to offer evidence that PNC has some general procedure with respect to introduction of products that is violative of an industry norm or somehow wrong in and of itself. If that was our willfulness theory, I think this might have some teeth. I think it still would be sort of a rabbit hole under 403 and inadmissible, but I can understand where they're going with it.

USAA's evidence is specific to the USAA patents. USAA patents were known to PNC. The evidence in this case is about what did PNC do knowing of the USAA product, actually copying the USAA product and the USAA patents. There's no parallel situation going on where they could say, well, we thought that was okay. That was industry

norm. USAA did the same thing in a similar situation.

In my view not relevant anyway, but that's -- there's just not a parallel at all in the record. Our evidence is fixated on PNC itself literally not only knowing about the patents but actually copying and like directly accessing the USAA application and under that circumstance, what did they do.

I don't know if that clarifies it for you, Your Honor, but I guess I would say this, too, I think the motion in limine should be granted. If there's a scenario at trial, obviously where USAA is opening the door by somehow saying something that USAA itself did is -- is, you know, unethical or inconsistent with industry norm, that's opening the door to this issue. But that's really not something that I think anyone anticipates happening at all.

To the contrary, we know what they're going to try to do with this. They're just going to try to point the finger kind of everywhere other than their actual conduct to suggest there's something going on or USAA has infringed somebody else's patents or something like that.

THE COURT: I'm -- I'm going to carry No. 3 and 4, Plaintiff's MILs 3 and 4 until the end of the process of ruling on these because I want to get a better understanding about the issues that the Defendant raises in its MILs, but we'll come back to 3 and 4 then at the end of

this process.

And at this point, we will take a recess for lunch until 1:15, and come back and take up with Plaintiff's Motion in Limine No. 5.

MR. LANTIER: Your Honor, just -- if it would be helpful, I think No. 5 probably falls into the same category as 3 and 4. Of course, happy to discuss it if Your Honor is --

THE COURT: All right. I will look at that. We'll start off with that issue. Thank you.

MR. LANTIER: Thank you, Your Honor.

COURT SECURITY OFFICER: All rise.

(Recess.)

COURT SECURITY OFFICER: All rise.

THE COURT: Let's see, I think we left off on the Plaintiff's Motion in Limine No. 5.

Ms. Glasser.

MS. GLASSER: Thank you, Your Honor.

This is a pretty narrow motion in limine. This relates to particular questioning of Mr. Bueche, who's a former USAA employee and an inventor on the '571 patent. At his deposition, PNC questioned him about whether his new employer, a different bank, Silicon Valley Bank, uses USAA patents.

And Mr. Bueche was very clear that that wasn't

something within his knowledge. He doesn't actually have any role in mobile deposit at all in his new job. He's never discussed it with anyone at his new employer, Silicon Valley Bank.

Also, the questions they asked were not even about his particular patent he's an inventor on or the group of patents but rather just USAA patents generally.

The only possible reason to be playing this testimony, if you're PNC, is to sort of insinuate somehow everybody must be infringing or somehow PNC is being treated unfairly, none of this having any relevance at all to the actual question of whether PNC is infringing and what damages that it should pay.

THE COURT: All right.

MS. GLASSER: I'll also mention just briefly --

THE COURT: I think I understand the -- the issue on this.

Let me hear the response.

And I'll give you a chance to reply, Ms. Glasser.

MR. LANTIER: Thank you, Your Honor.

I think this is similar to the issue that we were discussing before lunch. If we look at Slide 26, we can see that USAA intends to put forth an argument at the trial that certain non-lawyers at PNC's failure to ask whether there was infringement of patents at the time that they

were working on technologies is an indication of willfulness.

If we -- we can see that from the complaint. We can see that from the opposition to the motion -- motion for partial summary judgment of no willful infringement.

And on Slide 27, we can also see it in the infringement and damages reports that USAA's experts have submitted.

And what they're quoting here is testimony from Mr. Goodstein, who's not a lawyer, Mr. Kunz, who's not a lawyer. And the questions to those witnesses are to the effect of at the time you were putting this in place, did you investigate whether it would infringe USAA's patents or whether it would infringe the patents?

And they gave their testimony on that topic, and now USAA is going to argue that PNC's alleged infringement is willful on the basis of those answers. And all we're trying to do, Your Honor, is put in exculpatory evidence that indicates that that type of conduct is not unreasonable or extraordinary or unusual.

If we look at what the -- this is on Slide 28, the Bueche deposition, Page 17, Line 18, to 18, Line 16. But when the inventor went to a different bank and different employment, he -- his testimony is that he, too, as an -- as an engineer didn't set out to perform a specific

investigation as to whether that product would be infringing other people's patents.

So our -- our position, Your Honor, is that none of this should come in on either side to -- to demonstrate willfulness, but if USAA is permitted to make an argument, that the testimony of PNC's witnesses evidences that PNC was willfully infringing, then PNC must have the opportunity to submit this type of evidence in order to demonstrate that it's not unreasonable that the PNC witnesses acted the way they did.

THE COURT: You know, I see a lot of problems with this, but one of them is why would Mr. Bueche investigate Silicon Valley Bank's products and whether they infringe?

Have you established that he had some role in terms of rolling out this -- some new application at Silicon Valley Bank?

MR. LANTIER: Your Honor, I think he was responsible for the technology when he got to Silicon Valley Bank. I don't know that we have testimony that he originated it. But that -- that doesn't make him different from the PNC witnesses that we're talking about here.

THE COURT: I think that this is clearly something where the confusion and risk of unfair prejudice far outweighs any probative value that Silicon Valley Bank's practices might have.

So I'll grant Motion in Limine No. 5.

MR. LANTIER: Your Honor, and we -- we agree with you on that point but do think it should apply equally to both parties when -- when we get to PNC's Motion in Limine No. 6.

THE COURT: All right. Well, I look forward to getting there.

That takes us to Plaintiff's MIL No. 6.

MS. GLASSER: Plaintiff's MIL No. 6, Your Honor, is to preclude PNC from making argument to the jury or presenting evidence that USAA allegedly did not preserve documents.

As background for this issue, PNC preserved in an interrogatory response and then ultimately in a motion for sanctions particular arguments about alleged loss of evidence.

Those motion -- that motion was fully briefed. It was heard. Judge Gilstrap conducted a lengthy hearing on the issue back on -- I think it was November 23rd. He carefully went through the issues and issued an order denying the motion. He found that there was no anticipation of litigation during the time period at issue, and further, that as to the earlier time period, 2012 through 2024, the witnesses that PNC had raised in its motion were folks who were not working in the relevant area

such that it was reasonable to not include them on a litigation hold.

This issue is sort of over and done with, and the idea that PNC can now inject the same issue before the jury is inappropriate.

Now, PNC raises, as I understand it, basically one rejoinder to this, which is they say, okay, well, there's no bad faith, and so we can't get an adverse inference. And they say, but, citing the advisory committee note, that Subsection (e)(2) on adverse inference, that doesn't preclude us from getting other remedies under Section (e)(1).

Your Honor, that ship has already sailed as well. They brought their motion under Rule 37(e) generally. They had the opportunity to seek any and all remedies that they wanted to seek under Rule 37. Judge Gilstrap spent quite a bit of time going through the motion, going through the issues. He found that none of the relief they were seeking was appropriate.

THE COURT: They're not asking for any remedy, right?

MS. GLASSER: They are asking in their opposition, as I understand it, to be able to tell the jury that the jury should be permitted to weigh in the balance this alleged loss of evidence. And the problem with that --

that could theoretically be a 37(e)(1) remedy. But the Court already found that there was no 37(e) violation. And so there's no loss of evidence as Judge Gilstrap already found. It would be utterly inappropriate to inject this into the case now.

THE COURT: Did Judge Gilstrap find there was no loss of evidence or that there simply was no sanction or other remedy required for a loss of evidence?

MS. GLASSER: So he never got to the second question of delving into like what is the unknown, right? But he got to the first step of it saying I'm going to look at the time periods where there was a preservation obligation.

And he went through that and he said there's no evidence of any -- or I can get the exact quote. But the gist of it is that he went through it and said that there's no indication that at any point when there is a duty to preserve in place that anything was lost. So there's no spoliation.

THE COURT: Well, how does that keep them from, if it's relevant, pointing out that there may have been emails that were not preserved?

MS. GLASSER: Judge Gilstrap has already found that there was no violation of any preservation obligation.

THE COURT: I understand that. But I -- if all

you're after is that they not be allowed to suggest to the jury that -- that USAA did anything wrongful, that's one thing. But if, in fact, USAA did not preserve emails, the absence of those emails could have some relevance.

Why would they not be able to point that out if it is relevant?

MS. GLASSER: Well, so I'll take the second point. The second point I think is dispositive on its own. There is absolutely no evidence that USAA failed to preserve any relevant emails, and that was part and parcel of Judge Gilstrap's finding in the sense he went through and he looked at every time period where there was a preservation obligation, and he said no violation.

THE COURT: Well, I --

MS. GLASSER: PNC has never pointed to any evidence that was missing. Their entire argument in front of Judge Gilstrap --

THE COURT: I'm not talking about whether an obligation to preserve was violated. I'm talking about whether there were emails that were not preserved.

MS. GLASSER: And I want to address that because I understand what you're getting at, Your Honor.

So PNC has never identified any relevant evidence that was allegedly missing. Their entire argument before Judge Gilstrap is we should presume that something relevant

was destroyed because allegedly there weren't proper preservation procedures in place during the relevant time period. Judge Gilstrap found that part was incorrect.

So this isn't a situation where -- you do have that in lots of cases, right, where somebody points to some piece of evidence, and it's missing, and then there's this big fight about, well, is it missing through some improper reason or something like that?

Here, PNC never had any relevant evidence it said has gone missing. They simply said, well, something could have gone missing that was relevant. We'll never know because allegedly the preservation was inappropriate.

Judge Gilstrap rejected that predicate notion there. So, again, if there was some document, you know, some special memo or something like that that was important and it's missing, that might present a different issue.

But here, all they want to do is they want to say we don't know. Maybe there were some things that were relevant that were gone.

THE COURT: Well, what they say in their opposition is that it, the failure to disable auto-delete, caused a loss of information regarding USAA's development of autocapture. And you're saying that that's not true?

MS. GLASSER: Correct. And they've never pointed to anything relevant that's missing.

The argument before Judge Gilstrap was first they said during 2012 and 2014, there was preservation policy in place. I don't remember the exact number of people, 50 or 60 people or something were subject to it. And they said, well, there should have been three other people on their preservation, and they weren't, and so therefore something must have gone missing.

And Judge Gilstrap said it was perfectly appropriate not to include those three people, or at least it wasn't inappropriate to exclude them.

So, again, they're making the argument that somehow something must be missing, but they're not actually pointing to anything relevant at all. So you can see how incendiary and also impossible for us to rebut this would be if they're going to stand in front of the jury and say that somehow things went missing --

THE COURT: All right.

MS. GLASSER: -- when there's no evidence that anything that has been missing and the predicate has been rejected.

THE COURT: Let me -- let me hear from them as to what it is they think they could show, and I'll give you a chance to reply.

MR. STONE: Thank you, Your Honor.

This is not a question about whether or not there

was a duty to preserve that was not satisfied by the conduct of USAA. Rather, it's a question about whether we can present factual testimony to explain the absence of certain evidence.

And the evidence -- and let me give you some examples. We -- at Judge Gilstrap's direction, we were entitled to take the deposition of a 30(b)(6) witness on the preservation of source code, and that was Mr. Backlund who was presented for deposition. And he was presented for deposition on January 14th.

And at his deposition, he said that USAA did not collect development source code that would show the work they did during the development of their various products and that would reflect when they got to certain stages of the development and that such code was likely not preserved because their engineers had a practice of storing development code on local machines.

That's Exhibit A to our motion for summary judgment, Docket 321, and at Pages 29 through -- Line 24, through 30, Line 17.

And he testified that the typical practice for development source code was for the developer to store it on their own computer and then delete those versions when it was ultimately put into a server as a released version.

So there's no development code, and we haven't

seen any development code. That's one example of something that's missing.

One of the inventors, Mr. Prasad, testified at his deposition that he wasn't able to answer certain questions because certain design documents were not shown to him, and he would need to see them. And we don't have those design documents.

He testified, for example, that USAA created a wide variety of autocapture design documents, including architectural diagrams and developer notes, that's in his deposition at Pages 225 and 226, but USAA has produced only one architectural diagram. Not many.

He also testified that there were design documents missing, and we expect that he'll say, again, I can't answer your questions and tell you about the details. I don't have a good enough recollection to do so.

Have -- if we had those documents, we'd be able to refresh his recollection or perhaps have the documents admitted for evidence of the contents of those documents.

So there's a series of witnesses whose testimony about the development of the products, for example, will be, I really don't remember, I can't tell you exactly when we did that, or this is my recollection, but we won't be able to test the recollection because the documents that would either corroborate it or contradict it are not

available to us.

We should be entitled to present evidence that those documents did once exist and no longer exist in the explanation --

THE COURT: And why -- why would you present evidence that they did exist other than to seek some inference by the jury that they were wrongfully deleted?

MR. STONE: Because in many instances, when you talk about source code, you know it existed. The whole story of the development is they created the source code that would show the progress at various points in time.

So how are we to explain to the jury that we can't show them that source code that would show the development of various points in time?

The jury should not blame us for our inability to prove that because the witnesses don't recall it. They should understand that it's not our fault. It's that the code no longer exists, that it wasn't retained.

It's not an effort to retain any adverse inference about what the contents of the code would be, it's to explain that that no longer exists.

THE COURT: Why can't you achieve any appropriate fact that you want to prove just by asking if the witness has documents that support the witness's testimony?

MR. STONE: Because those on the jury will know

and the whole line of testimony will be that surely there were such documents. We will have people on the jury who understand that when you develop code, you develop code. You go through a series of drafts.

THE COURT: And what do you base that belief on?

MR. STONE: My experience is -- nowadays my experience has been that on every jury, you have at least one person who has some understanding of software and development. So that's been my experience. I could be wrong. This could be a different jury, Your Honor, but I think we have to at least assume the possibility that one or more will have that level of knowledge.

THE COURT: Isn't all that matters to your argument now that you ask the witness if they have documents to support it and determine that they don't if you -- I don't know of any -- any proper basis for you to point out that the documents have been destroyed other than to create an inference that that was wrongful.

MR. STONE: Well, under Rule 37(e)(1), it's not a question of whether we're entitled to sanctions, but under Rule 37(e)(1), which was not an issue presented to Judge Gilstrap, we're entitled to have an instruction that you could at least draw an inference that such documents did exist.

We're entitled to either that or whatever other

steps Judge Gilstrap might think are appropriate to avoid or cure the prejudice that we would otherwise suffer. So we're entitled to present the evidence. Whether that gets us an instruction or not is ultimately an issue that is in Judge Gilstrap's discretion.

But he also invited us to come back to him if more evidence developed. And, of course, after the hearing on that, we took, among other things, Mr. Backlund's deposition. So additional evidence has developed. We're not going to go back and ask for the kinds of sanctions we asked for previously under 37(e)(2), but we are entitled to present evidence that would allow us to have an inference under 37(e)(1), although the more important point here is to allow us to explain to the jury in the event there would be some contrary evidence drawn that this -- these documents that did exist, they will have testified about what they did, that we're not able to show them to the jury because they no longer exist.

And that's the important point. The documents that everyone once knew existed no longer exist, and we're not able to present them.

THE COURT: And who is the "everyone" that will know the documents once existed?

MR. STONE: Because then if the witnesses testified to what they did during the course of the

development, their testimony will necessarily disclose or be based upon that they did work and created these documents. That's what they will say they were doing is writing code. Each of the inventors talked about they wrote the code or one of the other inventors wrote the code. So we will know there was this process of source code being written by the inventors. That's how they did their work.

And then the question will be -- or the jury may ask themselves a question, so where is that code that would show us what they did? We need to be able to explain it's not -- we are not the ones responsible for who they should doubt because the code hasn't been presented to them. The code was not maintained or preserved, and so we can't.

THE COURT: And if you ask the witness, do you have documents that show it and they answer, no, we don't, how would the jury conclude that it was your fault?

MR. STONE: Because they know the code -- they know the documents once existed. So we need to ask them, do the documents that you created back then, do they still exist? No.

They need to know the documents don't exist so that they don't hold us responsible for the lack of that evidence.

THE COURT: And I guess we're not going to

communicate on that. I am not saying you go can't ask them if the documents exist.

MR. STONE: Okay.

THE COURT: But you want to be able to say they don't exist any longer because they were destroyed.

MR. STONE: Well, I don't want to say they -- I don't mean to say they were destroyed. They weren't preserved. I think the jury will think there's a difference, perhaps, between those two scenarios.

But what we want to be able to say is simply tell them what is the truthful fact that, yes, documents did exist. That's what you've told the jury you were working on, creating these documents, and they no longer exist today.

THE COURT: Okay. Well, that second step, or maybe it's the first step, in any event, the fact that the documents once existed and no longer exist is something that you'll have to get leave of court to get into.

I'm going to grant this MIL with respect to the -- the destruction of documents or even the failure to preserve documents but deny it with respect to the present existence of the documents.

And if you think that you're entitled to link those up and that it -- it won't be an implication of wrongful behavior, that's something you should seek leave

from Judge Gilstrap about.
MR. STONE: Thank you, Your Honor.
THE COURT: Mr. Sheasby?
MR. SHEASBY: I'm just here for the next MIL, Your Honor.
THE COURT: All right.
MR. SHEASBY: I should also provide one other thing. It's a minor point, but I needed to make the record clear because the record is public. It's that Mr. Bueche actually had no role whatsoever in the development of mobile deposit at Silicon Valley Bank. I'm saying it only because this record is going to be unsealed, and I don't want that to go unanswered.
But we'll move on to MIL No. 8 with Your Honor's permission.
THE COURT: What about 7?
MR. SHEASBY: Sorry, MIL No. 7. That's what I meant, Your Honor.
THE COURT: All right.
MR. SHEASBY: So MIL No. 7 is partially resolved and partially unresolved.
So as to Mr. Gashel, they've withdrawn him as a witness, and so that part of the MIL should be granted.
The open issue is Mr. Carlos Olson. So Mr. Carlos Olson is one of the named inventors on the patent

application that is 102 -- alleged 102 art in the case. And the -- the -- sort of the machinations with Mr. Olson are a bit kooky.

So they claim not to represent him. They claim not to have any control over him. But they put him on their witness list. He is in Spain. We can't take his deposition in Spain. And they're keeping open that this man may suddenly appear.

Now, people don't just suddenly appear. They've obviously had some communications with Mr. Olson. The -- when we asked them for those communications, they ignored us. If they don't represent him and he doesn't work for them, those communications aren't privileged.

And so the issues are threefold. One, prior art speaks for itself. A witness coming to speak about their patent application has no proper role in a trial because the meaning of a patent application is an expert opinion.

The second issue is if they've had communications with this man, they should have disclosed them to us, and their failure to disclose them to us is totally improper and inconsistent with the representation that they don't -- that they don't work with them.

And the third is issue is that no one just randomly shows up at trial. They've obviously had some communications with him. And if the Court's not going to

grant the MIL, we at least need to know this guy is coming up so we can serve a deposition in advance of this trial testimony.

But this is, in my mind, hyper-gamesmanship to keep this person, this random inventor who they claim not to represent and won't disclose their communications with, live in the case, and the MIL should be granted.

THE COURT: All right.

MR. STONE: For months, Your Honor, we told lawyers for USAA that we do not represent Mr. Olson, that we cannot produce him for deposition, that if they wanted to take his deposition, just like we have done with third parties in this case, they needed to serve him with legal process, which under the Hague Convention they can do, and they have plenty of time to do it.

They chose never to do that. They sent a depo notice out at one point noticing his deposition for the United States. They never served it on him, so far as I know, they never went through the process of -- through the Hague Convention of taking his deposition. We can't produce him.

THE COURT: So is Mr. Olson going to come to trial?

MR. STONE: I don't know.

THE COURT: Are you requesting that he come --

MR. STONE: We have asked him if he would be available to come, yes.

THE COURT: And what has he responded?

MR. STONE: He has not committed to do that.

THE COURT: All right. And what is the basis to withhold any communications with him?

MR. STONE: Well, we haven't had any dispute over the communications in this case that I'm aware of. This has arisen in the other case where we had a meet and confer scheduled for earlier this week, and I thought it was going to be talked about, but at the point in the meet and confer when I thought we would switch to that issue, Mr. Sheasby said, we're finished, and concluded the call.

THE COURT: So --

MR. STONE: There -- but I want to respond further.

We don't have any communications with Mr. Olson. I am not aware of any emails back and forth from anybody at PNC or at our firm --

THE COURT: So how did you request him to come?

MR. STONE: By phone.

THE COURT: And that's all you've had is oral communications?

MR. STONE: That's all anybody that I'm aware of at our firm, and nobody at PNC has ever spoken to him so

far as I know, has had with him is oral.

THE COURT: Have you offered to pay his expenses to come?

MR. STONE: No. Not that I'm aware of.

THE COURT: So he would be coming from Spain at his own expense?

MR. STONE: Now, we may have offered that, so don't -- I don't know whether we offered it or not. So somebody might have. I have not offered, and I'm not aware that we've offered, but we might have. That's the best I can give you in terms of the communications.

THE COURT: Who might know?

MR. STONE: One of my colleagues might know.

THE COURT: Okay. I task you with finding out.

MR. STONE: I'm happy with finding out. I will.

THE COURT: All right. I also ask you to verify that your representation that there's been no written communication with him is correct.

MR. STONE: Okay.

THE COURT: All right. Thank you, Mr. Stone.

MR. STONE: Thank you, Your Honor.

MR. SHEASBY: Your Honor, just -- there are significant inaccuracies in the representation that -- that was made.

Mr. Olson, we expressly requested documents and

communications with him, and the fact that a communication was not written doesn't mean it hasn't been disclosed. So that they've been having communications with Mr. Olson has never been disclosed to us. And if we knew that they were having communications with him, we would have attempted to have served through the Hague process.

So what he -- what Mr. Stone said is extremely sharp practice.

THE COURT: Well, what is the obligation they have to disclose that they're -- they have spoken to a potential witness?

MR. SHEASBY: If it -- if it's not privileged and we ask them the question as about whether we're trying to communicate to determine whether we need take his deposition, the question about whether they've been in communication and requested him to come would motivate us to take his deposition.

And so if we --

THE COURT: And how did you ask that question in this case?

MR. SHEASBY: We said, we want all communications you've had with Mr. Olson.

THE COURT: And you said that in what --

MR. SHEASBY: This is -- in an email.

So this is the exchange we've had. They said, we

have no current plans to depose Mr. Olson.

So, clearly, they knew that he wasn't a witness.

We said, well, have you had any communications with Mr. Olson?

And they ignored us.

And so now we heard that it's not just that they don't have a plan -- it's not -- it's the exact opposite. Not only do they have a plan to depose him, they plan -- have a plan to call him at trial without disclosing -- disclosing the fact that they've been in communications with him coming.

And so I do think that there was significant deception on this issue that would have led us to a Hague Convention subpoena if we would have heard that they were in communication with him and contrary to the representative that they have no plan to depose him.

THE COURT: Well, I think you should have followed up on your request, but I don't think that there is any independent obligation for a lawyer to disclose that the lawyer has had an oral communication with a witness who is disclosed as a potential witness in the case.

MR. SHEASBY: What happens when they tell you we're not planning on deposing him?

THE COURT: I don't know. What is your question?

MR. SHEASBY: Well, they said, we're not planning

on deposing Mr. Olson.

THE COURT: Okay.

MR. SHEASBY: They're saying, we have no relationship with Mr. Olson.

They clearly have some relationship with him since they've -- they've communicated with him and asked him to show up.

THE COURT: The -- my understanding is that their communication with him has been limited to asking them -- him to come as a witness. I do find that surprising. I would not expect the Defendant to be asking a witness to come testify if they had not had any communication with the witness about what he might say if he came. But that's the representation I have now.

And I will direct that defense counsel confirm that that representation is accurate. But I don't see a basis to grant the motion in limine based on what I have before me.

But, Mr. Stone, how much time do you need to confirm to the Court the accuracy of your representation?

MR. STONE: Your Honor, I need to correct the Court's understanding of my representation, because -- let me start there.

THE COURT: All right.

MR. STONE: You -- we have had conversations with

Mr. Olson, as you might with any potential witness, about what facts he knows and what things he could testify to. That's our work product. I think people have that and interview many witnesses. We've had that conversation with him.

So we have that conversation about things he knows. So it's not just a conversation with him about his willingness to testify. There have been conversations about what he knows. I want to be clear about that. Those have been oral communications, just as you might when you interview a witness. So I want to correct that.

With respect to confirming whether or not we've offered to pay his travel expenses, I think I will know that before we conclude the hearing today.

THE COURT: All right.

MR. STONE: That's my expectation.

THE COURT: Then I will direct you to confirm that, and we'll get back to it, but I am not going to grant any MIL that they be precluded from calling Mr. Olson based on the record as it stands.

MR. STONE: Thank you, Your Honor.

MR. SHEASBY: Your Honor, I just have one request. If -- if you're going to allow -- if they're going to -- they're going to know if he shows up, and we would like the opportunity to take a deposition of him if he's in the

jurisdiction. We would like to -- the Court to order PNC to make us aware of when he's going to show up so we can take that deposition.

THE COURT: All right. That's -- Mr. Stone, what's your response to that?

MR. STONE: Your Honor, they had more than ample opportunity to take his deposition during the time period that discovery was open. We listed him as somebody who had knowledge. He was listed as a potential knowledgeable witness pursuant to the disclosure rules. He's been on our witness list since we first submitted a witness list, and they've had plenty of opportunity to take his deposition, and they chose not to.

And it's their choice not to have deposed him when they could have. We're -- it would be improper to reopen fact discovery at this late date to allow a deposition of him. They could have deposed him. They have listed witnesses on their witness list, for example, who were not previously listed on their witness list as somebody.

They've listed two patent prosecutors, for example, on their witness list who we have not had an opportunity to depose in this case, and they didn't -- they said to us, well, you should have known. You thought they were potentially relevant witnesses. You knew they were percipient patent prosecutors. You listed them as people

who might have knowledge. You should have gone out and deposed him.

I don't think we should start reopening discovery at this point.

THE COURT: Did either side take any foreign depositions in this case?

MR. STONE: No.

THE COURT: Well, that is the primary distinction, Mr. Stone, is that it is a major expense to go take the deposition of a foreign witness through the Hague for someone that you don't even know is going to come. And it's not unusual for the Court to order that when the witness gets stateside, that the party have an opportunity to depose him.

MR. STONE: Yes, Your Honor. I appreciate that.

But this is a case in which a key piece of art, which we learned late and had to move for leave to add to our prior art because we discovered it during the course of the case, this is a case in which a key piece of prior art was a patent application of which Mr. Olson was one of the inventors, and he was clearly an important witness on a clearly important piece of prior art which predates the patents-in-suit by years. They would have known of his importance.

We haven't heard from them whether they have made

efforts to contact him, which also, if we're going to have to disclose our contacts, their efforts to contact him or others at Bankinter who were involved in that patent application should also be disclosed. They haven't offered that information. That should be provided to us, as well.

But I think the key issue is whether having all the notice they knew about the importance of this patent application and this art and the product that was ultimately released by Bankinter, they had every reason to know that he would be an important witness, and if they wanted his deposition, they should have taken it.

Thank you, Your Honor.

THE COURT: All right. I will grant the Plaintiff's request that the Plaintiff be allowed to take the deposition of Mr. Olson when he arrives in this country before he testifies. And if there are issues about the logistics of that, I'll be available to take them up.

Mr. Sheasby, I would ask you to go ahead and make the same -- answer the same question. Has your side been in contact with Mr. Olson about this case?

MR. SHEASBY: Not at all, Your Honor.

THE COURT: All right.

MR. SHEASBY: And I can tell you if Mr. Stone would have said what he just said to your Court about inviting this man to come to trial and potentially offering

to pay him, we would have attempted to serve him.

The behavior relating to this deposition is not proper, Your Honor -- through this witness is not --

THE COURT: Well, whether something is proper or not is a determination the Court will make when and if the Court has to. But that's not what's before me right now.

But I will deny the motion to exclude Mr. Olson but direct the Defendant to confirm whether they are paying for his travel and to facilitate a deposition by the Plaintiff, which frankly the Defendant is free to join in when and if Mr. Olson arrives in this country.

Is there any further detail that's required about that, Mr. Stone?

MR. STONE: No, Your Honor.

THE COURT: Okay. Thank you.

MR. STONE: Thank you, Your Honor.

THE COURT: Go ahead, Mr. Sheasby.

MR. SHEASBY: So I think the next motion in limine is MIL No. 8.

So to give you some context, there -- at the time that the licensing program for USAA's patents were announced, there was a number of letters that were sent out to smaller banks inviting them to negotiate licenses. The letters don't have any rates in them and on that sense are not comparable license agreements.

And in the last trial, I'm on Slide 42, the Court considered this exact issue as to whether the licensing proposals that were made, the offer letters that were sent out to banks were admissible, and the Court said they weren't, Judge Gilstrap in the Wells Fargo trial.

They try to thread the needle why they're -- by the fact that Mr. Gerardi said that, well, they weren't comparable. Mr. Gerardi was the witness for Wells Fargo on the damages, but in this case, Mr. Vellturo does say some random letters were comparable.

And the relevant fact is in his expert report itself, none of the agreements provide a suitable comparable benchmark for a specific amount of royalties that would be agreed to at the hypothetical negotiation for a license to the USAA patents.

And so what this ultimately indicates to us is that the -- the attempt to inject licensing communications or offers where the amount is not comparable for some other purpose, the Federal Circuit has expressly forbade.

So I have a $12 license agreement and everyone agrees that is not comparable, but I'm going to get it in anyways for context. This context is sweeping in, non-comparable agreements or non-comparable offers in this sense, not only agreements, is inconsistent with Federal Circuit law.

We have Judge Gilstrap's ruling in the Wells Fargo case. We have Mr. Vellturo saying that none of the offers are comparable, and the same ruling should apply in this case.

Thank you, Your Honor.

THE COURT: All right. Thank you.

MS. YOUNG: Good afternoon, Your Honor. Blanca Young for PNC.

I want to be clear what's actually covered by this motion, and it's far broader than what Mr. Sheasby just said.

First of all, USAA went out on this licensing campaign to license its entire RDC portfolio that include the very patents that are at issue here. They approached a number of banks, PNC is also a bank. And they actually made concrete offers to two of those banks.

And I'm going to try not -- try not to give details so we don't have to seal the courtroom here, but they made concrete offers to two of those banks. And at the deposition of their licensing agent, he confirmed he was authorized to make those offers, and he confirmed that if the banks to whom he had made those offers had said, great, looks good to us, USAA would have accepted that deal, and those would have been licenses that USAA would have entered into on those precise terms.

THE COURT: And how is that relevant?

MS. YOUNG: Because it's for the very technology that is at issue here. This was an offer to license the entire portfolio of RDC patents that USAA has, and it was for -- I should probably ask for the courtroom to be sealed if we're going to get into the details of the license --

THE COURT: Well, did your expert find that those proposed licenses would have been comparable?

MS. YOUNG: Yes, he did. And it's -- the -- if we can pull back up the slide that we were just looking at, please, from the Plaintiff's presentation.

So this is Dr. Vellturo. He is the damages expert for PNC. And he has an entire section of his approach -- of his report called his market approach. And there he walks through in detail the offers I'm just talking about, as well as some of the licensing communications that we'll get into. And he explains how they are similar and how they are different and how they inform his analysis and how they would have informed the parties' analysis at the hypothetical negotiation. It's in an entire section of his report. This is also covered, by the way, in the motion to strike portions of his report.

And this is -- Paragraph 465 of his report is what USAA is focused on, and they just highlight the first part of this bullet point but ignore the rest which explains

what he's saying here. He said, none of the agreements provide a suitably comparable benchmark for a specific amount of royalties that would be agreed to at the hypothetical negotiation.

And then he goes on to say, but a lot of them inform what would have happened at the hypothetical negotiation, including how USAA was comporting itself when it was making offers to banks for licensing its RDC portfolio.

THE COURT: And so he did say that the two proposed licenses with the banks that you referred to earlier were something that he was relying upon in finding a reasonable royalty?

MS. YOUNG: Yes, he did. He said that they inform his opinion, and they inform a couple of things about how the parties would have approached the hypothetical negotiation.

First of all, he said this is telling about the amount that USAA would be willing to accept not just for six patents, which is all that are at issue here, but for their entire RDC portfolio.

And one of the reasons USAA is trying really hard to get this out of evidence is that amount is a lot lower than where their damages expert comes out. And this is for a license to the whole portfolio. So it's to put that into

perspective.

Second, he says, it informs the form that the parties would have taken a license for. And the experts disagree about whether that would be something in a, you know, pay per deposit or whether it would be a lump sum, and the form of those licenses that USAA was offering to other banks informs Dr. Vellturo's opinion about which one of those things it would be.

THE COURT: Of course, the form has nothing to do with the amount. I suspect there would not be objection to the form that was offered without a reference to the amount, but how does the amount inform Dr. Vellturo's conclusion?

MS. YOUNG: The amount informs his conclusion that what USAA is seeking has no bearing to reality at all, because when they were out in real life licensing these patents, what they were asking for for the entire portfolio of patents is still even higher than what they're asking for in this case.

THE COURT: All right. Other than the two proposed licenses that you've mentioned, is there anything else that you believe would be subject to this MIL that you're seeking to include in your case?

MS. YOUNG: Yes, Your Honor.

So there's a second category, which is what USAA

was going around and emphasizing to other banks when it was sending these letters out asking banks to take licenses. And when it was doing that, it was emphasizing only one of four things that its expert says are benefits that PNC and other banks receive from Mobile Remote Deposit Capture.

So their expert, David Kennedy, says that there are four benefits that PNC and all banks get from Mobile Remote Deposit Capture. One is cost savings, because it takes some number of deposits out of a branch channel that they say is more expensive, and it's cheaper to process that on a mobile phone, and so that, according to their expert, saves banks money.

Then they have a theory that banks can close branches because of this. So that's another way that they save money.

And then they say banks are more profitable because of Mobile Remote Deposit Capture, so that's a third benefit.

And then a fourth one is that there's some sort of ecosystem benefit where you can cross out a lot of their products.

Only one -- only one of those things was emphasized and discussed in the letters that they sent out to other banks, and so that bears directly on the credibility of their expert witness's opinions about what

the parties would have considered relevant and important in the hypothetical negotiation.

We can see what USAA is out doing in the real world when they're trying to license these patents.

THE COURT: So are you seeking for this point just to get USAA's letters, or is there some return correspondence from the banks that you're seeking to offer?

MS. YOUNG: This is -- this is about USAA's admissions. This is about USAA's offers. This is about what USAA said in letters when it was licensing a portion of -- when it was licensing the portfolio, a portion of which is at issue here.

And I want to -- I want to refer the Court to a Federal Circuit decision that speaks directly to this, which is -- it's a long German name, so I might mess it up, but Studie -- Studiengesellschaft case, it's 862 F.2d 564 (sic), and there the Court held that the patentee's usual licensing approach should be considered in assessing a reasonable royalty.

And that is what Dr. Vellturo is doing here, and that's why USAA's approach to licensing its portfolio of patents -- what it did in the real world is relevant to what it would have done in the hypothetical negotiation.

THE COURT: All right. Thank you, Ms. Young.

MR. SHEASBY: I want to separate this out into

sort of two issues, and one of these is dealt with in the Vellturo motion to strike. But what I found worth remarking on is -- is my opposing counsel's presentation was given without any citation or reference to any actual analysis in Dr. Vellturo's report.

What we have -- let's start with the SunTrust and Dollar Bank --

THE COURT: Well, let -- let me stop you, because, frankly, as you've mentioned, the motion to strike is a better place to take up whether or not Dr. Vellturo has an adequate basis to rely upon those proposed licenses.

Why shouldn't I just say that as to that issue, I'll defer to the motion to strike?

MR. SHEASBY: So the reason being is that separate from the motion to strike, they could still try to force it in through examining USAA's witnesses on the topic.

And so it -- there needs to be some motion in limine associated with it.

THE COURT: Well, tell me on what basis would I exclude communications from USAA about the patents-in-suit here?

MR. SHEASBY: So I think that Judge Gilstrap spoke to this in the Wells Fargo case, which is that the fact that a certain offer was made -- let's -- let's separate it into a couple of issues. There's offers or references to

amounts. If those amounts aren't comparable, they shouldn't come in.

Mr. -- Dr. Vellturo said in his report none of them were comparable, and he said, quote, did you -- we asked him whether he had performed an econometric analysis to determine if Dollar Bank and Suncoast were similarly situated to PNC.

Did you do an analysis of whether from an economic standpoint Dollar Bank and PNC are similarly situated in terms of the benefits they would derive from MRDC?

Answer: I didn't perform an econometric on data from Dollar Bank or from Suncoast. There wasn't any.

And so I want to focus on sort of the -- the precise issue. Non-comparable agreements can't be laundered in through fact witnesses. And so the record on this is no fact witnesses should be asked about offers made to Sun -- SunTrust and Dollar Bank.

There's the second issue which is the communications that we had with licensees. The -- obviously, their communications back to us are hearsay and don't come in.

In terms of the communications we had with them, the letters that we sent, they would have to lay some foundation that those letters relate to comparably-situated banks to establish their relevance.

THE COURT: You know, as long as the dollar amounts are not in those letters, what does it matter whether there's comparability?

MR. SHEASBY: Clearly, Your Honor, the most -- the most toxic issue is to have dollar amounts in the letters. That's the most -- that's where the prejudice is the greatest.

And I should also disclose the -- what Judge Gilstrap was concerned with was talking about a bunch of other banks, other than the bank that's at issue in this case, he was deeply uncomfortable with throughout the Wells Fargo trial. He didn't want us to talk about other banks.

And so talking about other banks or communications with other banks, if they're going to show -- what they're referring to is the fact that we flagged sort of cost savings in a communication. If they want to show one letter that talks about us announcing cost savings, that is a separate issue from going through each of the -- each of the banks that we've had licensing communications with. At that point, it becomes a distraction and the prejudice outweighs the --

THE COURT: What is the prejudice if the dollar amounts are not included?

MR. SHEASBY: So talking about the fact that lots of other banks have been offered licenses, that we decided

to sue PNC and not sue those other banks, the suggestion is that we're trying to treat PNC separately or hold them out to a stricter standard.

And so this sideshow about the number of other banks that have received these offers is -- is -- sort of leads to distractions. The actual substance of those communications, if they don't have the dollar amounts, I'm less concerned about.

Dollar amounts is my highest priority. My second priority is I don't want a list of, oh, they've asked a hundred banks to take a license, and they're all small banks, and they're only picking on us. It's that sort of dynamic that I think Judge Gilstrap was concerned about.

THE COURT: Well, that is an argument issue, and obviously, if they are making an argument that is intended to cause the jury to draw an inference of the sort you're concerned of, that would be something that we would prohibit.

But what I'm inclined to do now is to say that the dollar amounts in the two proposed licenses that the -- that Dr. Vellturo has talked about, that's something that we'll leave to the motion to strike to resolve. And if the Court allows Dr. Vellturo to talk about them, then they will be also exempt from this prohibition here.

If Dr. Vellturo is not allowed to talk about them,

then no one else will be either.

But I'm not going to grant this broad MIL that would cause there to be no reference to licensing negotiations or communications.

Now, obviously, we'll have an exhibit hearing, and if they're trying to offer what you consider hearsay, that's something we'll take up at that hearing on the exhibits.

MR. SHEASBY: And what about the concern about this argument that they -- we -- we are holding up PNC or holding them to a higher standard by not having pursued the other litigations?

THE COURT: Why would the jury conclude that the other banks didn't license it?

MR. SHEASBY: I think they're going to make that argument. I think that's what PNC is going to say about the other banks that are licensed.

THE COURT: That's something that I'll talk with them about.

MR. SHEASBY: I understand your instructions, Your Honor. Thank you.

THE COURT: All right. Ms. Young?

MS. YOUNG: Thank you, Your Honor.

So we'll table the issue of the amount for the motion to strike. I just wanted to respond to this idea

that we're going to come in and say, you know, we're being singled out.

That's not the intent of this, as I said. These are admissions about USAA about what is and isn't important and what matters and what they were trying to tell people in real life the value of the patents were, and that's why it ought to come in.

I do want to say, though, that there is an element of this that's relevant to another aspect of this case which is willfulness, and one of the things that's a fact in this case is USAA was going around, and they were approaching a lot of banks to ask for licenses to these patents, and they never did ask PNC to take a license to these patents, and that is a relevant fact.

And that also ought to come in. It doesn't have anything to do with the reasonable royalty, but it does have to do with PNC's state of mind.

The licensing campaign was something that was in -- was announced. It was part of an article that was circulated, and USAA said we're asking people for licenses. We're -- you know, we've sent letters to 200 banks.

PNC never got a letter. And we should not be precluded from bringing that back up at trial. So I want to make clear that, you know, what we're talking about here is a motion in limine that was framed as something having

to do with damages.

But what we just heard from Mr. Sheasby also does relate to willfulness issues that are in the case and that this type of evidence is also relevant to.

THE COURT: Is there another MIL or motion about whether PNC received a letter from USAA?

MS. YOUNG: That's an undisputed fact, Your Honor.

THE COURT: And I'm -- so has USAA done anything to try to prevent you from making that fact known?

MS. YOUNG: Well, that's sort of where I thought I heard Mr. Sheasby's argument going, and I just wanted to make clear that that is an undisputed fact in the record, and we think it's relevant to willfulness.

And so if we're going to be -- we should not be precluded, for example, from pointing out the fact that USAA said and announced it had sent letters to hundreds of banks and, in fact, did that and PNC didn't get one.

THE COURT: All right. Well, that is not an issue that I consider is properly raised in this MIL. And if -- if the Plaintiff thinks it is, they can point that out, and we'll talk about it.

But what I'm going to do on Motion in Limine No. 8 is to grant the motion as to the dollar amounts in those letters, defer to the motion to strike Vellturo whether the amount on those two banks that you've talked about is

admissible, and direct that the Defendant not make any argument as to whether other banks took licenses in response to those letters.

Is there any part of that that is unclear or needs further clarification?

MS. YOUNG: Yes, Your Honor, I'd like to clarify just the first part of it, which is the letters that were sent sort of en masse did not have any amount in them. So I think that may moot the first part.

The second part which relates to the offers that were made to the two banks, those were in the form of written correspondence. I don't know if technically it was a letter or email. I think it was a combination of those things. And so as I understand Your Honor's ruling, that -- to the extent an amount was in those types of communications, letters or otherwise, that's deferred on the motion to strike; is that correct?

THE COURT: That's right.

MS. YOUNG: Thank you.

THE COURT: It's my understanding that there were two of those, and those are both addressed in the motion to strike?

MS. YOUNG: Yes.

THE COURT: Okay. Yes.

MS. YOUNG: Thank you, Your Honor.

THE COURT: Take those up later.

Is -- Mr. Sheasby, is USAA seeking to exclude the apparent fact that no such letter was sent to PNC?

MR. SHEASBY: We are, Your Honor. That's MIL No. 1. It's one of the issues that goes to mindset. One of the questions where there was an instruction not to answer that we specified in MIL No. 1, does PNC believe that because it was not on the banks that received a letter from USAA, that means it didn't need a license to USAA's patents, correct?

Go to Slide 3.

Mr. Pugh was the 30(b)(6) witness on the subject. He had received the article. They were not on the list of one of those banks that got the license letter.

And go to Slide 4.

We asked him if that fact led him to believe that -- led PNC to believe that it didn't have an issue regarding the system, and Mr. Lantier instructed him not to answer the question, and that is directly the subject of MIL No. 1.

In fact, we expressly flagged that question as one of the subjects of the state of mind that we're seeking to exclude in MIL No. 1, first paragraph, last question. 82 through 18.

I can put it up on the ELMO if you want, Your

Honor.

THE COURT: No, I have the brief in front of me. That is a fairly indirect way to raise this question.

MR. SHEASBY: So the issue is this is exactly what we're trying to do in MIL No. 1, is saying PNC can't say we didn't get a letter so, therefore, we believe we didn't infringe.

Because I asked him, well, what did you think when you didn't get a letter?

And he was instructed not to answer.

And so that would go -- what they thought when they didn't receive a letter would be a state of mind issue that we would forbid them from -- that we want to forbid them --

THE COURT: And why did you ask that question of Mr. Pugh?

MR. SHEASBY: He was the 30(b)(6) on the topic, Your Honor.

THE COURT: So he was identified as responding to that topic?

MR. SHEASBY: Yes, Your Honor. I can show that testimony where he designates -- he's designated as a 30(b)(6) witness.

THE COURT: Well, that's something I guess is going to be covered in your proffer?

MR. SHEASBY: It is, Your Honor.

THE COURT: Okay.

MR. SHEASBY: I just -- I didn't want it to -- I didn't want to suggest that I was asking for something that I hadn't brought before the Court.

THE COURT: Well, my -- frankly, what I was expecting was that this issue would be raised on relevance grounds if you thought it was not relevant. But you're just raising it on this privilege ground as -- so, in other words, if there's a finding that it should not be barred because of the instruction not to answer, it would otherwise come in.

MR. SHEASBY: Well, Your Honor, there's a motion in limine on the privilege issue. The question about we obviously -- if they try to elicit this testimony, we'd object as to relevance at the trial.

So my understanding is Your Honor is not -- we have a limited amount of space to do limines. We're certainly not conceding it's relevant, and we'd object at trial.

In our 15 pages, these are the issues we wanted to have decided before the trial. But I can tell you that if they do try to elicit the testimony on whether PNC received a letter, we would absolutely object as to relevance.

THE COURT: All right.

MR. LANTIER: Your Honor, it's Greg Lantier on behalf of PNC.

I just wanted to briefly address that last colloquy.

If we could put back up the last slide.

Your Honor asked Mr. Sheasby why he asked this question, and you'll notice that there's some missing content from the deposition here on this slide.

What's missing is that when -- I believe, and this is from recollection, Your Honor, so we can check the transcript, but I believe what happened was Mr. Sheasby asked this question, and I said, Mr. Sheasby, I'll let him answer the question if you'll agree that you're not -- that there's no broader waiver of privilege.

And then Mr. Sheasby declined to agree that there'd be no broader waiver of privilege, and that's why I said that I'm afraid I'd to have to instruct the witness not to answer that question.

So the reason that the question was asked was because he was trying to trigger a waiver of privilege, and, of course, I had to protect the client's privilege in that situation.

As we can see on the prior slide, when the witness was asked whether PNC -- Slide 3, if we can go there -- when -- when he was asked whether PNC was one of the banks

that received one of the letters, there was no privilege objection. He gave the answer. So this certainly is nothing tied up in the fact that USAA did not send PNC a letter in the privilege objection.

THE COURT: All right. Thank you, Mr. Lantier.

MR. STONE: Your Honor, I'm sure the Court does not appreciate tag teaming, and I just would ask the Court's indulgence since I argued MIL No. 1 to make one other comment.

THE COURT: Go ahead.

MR. STONE: Mr. Goodstein was asked the same line of questions: Did you see the American Banker article about the licensing campaign where it announced -- USAA announced it was sending out a lot of letters?

Yes, I did.

Did you -- do you know whether or not PNC received any letters?

I believe we did not receive such a letter.

Did that inform your views as to whether or not PNC was going to be accused of infringement or was infringing?

He said: My belief on the basis of that and further inquiries that he went on to testify that he did was that we were not.

So there is state of mind testimony from a

non-lawyer, obviously Mr. Pugh, as I know the Court's aware is a lawyer, but Mr. Goodstein's testimony went into this without objection on privilege grounds.

THE COURT: All right. Well, I'm going to go ahead and deny the MIL as to evidence about the fact that PNC did not receive one of the letters. I don't think that there's any basis to exclude that.

Now, what -- what that has to do with the state of mind we'll determine later after I've seen that proffer, but the simple fact that PNC did not receive one of the letters is not excluded.

That takes us to Motion in Limine No. 9.

MR. SHEASBY: Motion in Limine No. 9 seeks to exclude from the jury on all grounds any argument that NCR or Mitek is liable for PNC's infringement or that PNC is being indemnified by them.

PNC has not identified any entity that is indemnifying them. The Courts throughout the country consistently hold that the presence or absence of indemnification is not relevant to liability.

THE COURT: I don't think that it is opposed on the indemnification issue. But I'll tell you what, let me hear from the Defendants, and then I'll have a better understanding as to what is at issue on this MIL.

MR. STONE: Thank you, Your Honor. Greg Stone

again for PNC.

I don't think there's any daylight on this with one possible exception. We don't seek to offer any evidence that any company has agreed to indemnify PNC. We don't seek to offer any evidence that any company is liable for any liability that might be found with respect to PNC. So in that sense, I don't think there's any dispute here.

There's one document that I think we've raised in our opposition, which is a June 22nd, 2017 email that was identified as Exhibit 10 to Mr. Gazma's declaration that we submitted. It's from NCR's Bruce Timko to Mr. Goodstein at PNC, and it contains one sentence that I think might be implicated by this motion in limine, and that sentence is "NCR stands behind our solutions and the industry standard infringement indemnity we provide to customers who purchase solutions from us."

And we would like if the Court prefers to either redact that sentence or be able to offer the document into evidence even with the sentence still there so long as we don't argue anything from that sentence. But it might be simplest if the document was simply admitted with that one sentence redacted.

THE COURT: All right. Let me hear the response on that document.

MR. SHEASBY: So let's pull up the document so we

can look at it.

And may I -- Your Honor with your permission, may I ask Mr. Stone a question just so I understand exactly what he's proposing?

THE COURT: All right. That will be a sidebar off the record. Go ahead.

(Off-the-record discussion.)

MR. SHEASBY: So -- yeah. So, Your Honor, this -- this email is not the subject of the -- for right now, this email should just stay the way it is. It's not the subject of the MIL.

THE COURT: So we'll take it up at the exhibit hearing?

MR. SHEASBY: Yes, Your Honor, because the email was hearsay, and I don't want to deal with it in any more particularized way. We'll deal with it in evidence that comes in.

THE COURT: Well, what I will say is that when we get to this, if it's otherwise admissible, I'll consider the redaction issue at that time as far as getting around this MIL goes.

MR. SHEASBY: I understand that. I agree.

THE COURT: All right.

MR. SHEASBY: Thank you, Your Honor.

THE COURT: Then I'm going to grant Motion in

Limine No. 9 as to its stated reasons of any statements that another party is liable for PNC's infringement or is identified -- indemnifying PNC.

That takes us to No. 10.

MS. GLASSER: Thank you, Your Honor.

And this is the motion where there ended up being a reply and sur-reply put in. The motion itself had intended to be fairly narrow. We weren't aware any of activity that PNC was intending to engage in other than that they had lobbed in a question or two at some depositions of former USAA employees asking them, hey, did anybody talk to you about regulatory problems? And so the motion at that point was focused on that.

PNC's opposition indicates -- there's actually quite a whole host of these issues that they intend to attempt to interject into the case. I'd like to walk through each of them. Each of them is clearly inappropriate. None other than the first are even alleged to have any relevance to the patent -- to the patents at all, and I'll walk through each of them.

The idea here is that PNC wants to interject into this trial the question of whether USAA has had any sort of regulatory issues, any consent decrees, any sort of audit reports identifying any kind of problem within USAA over the last, it turns out, 15 years or so.

On its face, that's a classic relevance and 403 issue. And each of the four documents that PNC identifies in its opposition and its sur-reply really confirm exactly what problems would result if this were to be allowed -- if any of it were allowed.

So the first document is actually the only one that PNC tries to link up to the patents at all. This is Exhibit 11 to their opposition. This is a -- sort of a document about -- I guess it's indirectly referencing a regulatory inquiry, and it's an internal audit report. It references the business decision about how many days to encompass within checks for duplicate deposits and some other business risks considerations, such as exactly which information goes through the duplicate check control.

On its face, this has absolutely nothing to do with the invention, which was 15 years earlier, or with the way either party -- whether PNC is infringing the patent, the prior art, or damages.

So PNC says the reason it's relevant is that it references duplicate detection, and duplicate detection is then mentioned twice in two dependent claims.

There's absolutely no connection at all between the fact USAA's invention and two dependent claims provides for duplicate detection to be performed on a mobile phone, and the question about whether or not USAA had the best

risk controls in place in 2020 regarding exactly what risk factors they would weigh and which things they would look at internally in deciding which of their own members' checks may be flagged as duplicates.

And I think the clearest proof that this has absolutely no relevance to anything in the case is the fact that PNC's own experts, none of them cite to any of these documents at all. None of them talk about any of these issues and -- nor did PNC disclose anything having to do with any of these regulatory or audit issues in any of its interrogatory responses.

I can pause there to see if Your Honor has questions about that, and then I'd like to briefly touch on the other three documents which I think are maybe even further attenuated from the issues in the case if that's possible.

THE COURT: It would probably be helpful for me to hear the Defendant's relevance argument on these and then give you a chance to respond if that succeeds.

MS. GLASSER: Thank you, Your Honor.

MS. YOUNG: Thank you, Your Honor.

This is directly relevant to an opinion that their expert gave. Their industry expert, Mr. Mott, in his opening report identified an opinion that, quote, The asserted patents provide the significant benefits of

reducing the risk of fraud, e.g., through the use of duplicate detection.

Deposit@Mobile is USAA's embodying system they say that practices these patents, and this is a finding through their own audit process that it's not doing duplicate detection very well at all.

And this would be swept into the broad scope of the MIL, which is why we raised it in opposition to the motion. The MIL is phrased extremely broadly to preclude all evidence regarding consent orders and regulatory inquiries, and the audit report happens to mention some regulatory findings that would not be the focus or the reason why we would introduce the evidence, but it would be within the sort of broad sweep of the way that they have worded the MIL.

And when their embodying product cannot do duplicate detection very well, that does go directly to the value of what the patents themselves add as opposed to all the work that would be needed to actually implement a solution so that you have duplicate detection functioning in a way that is actually valuable to the bank, which is why this finding is relevant even though it's a number of years after the patents were applied for, and in some ways the length of time actually is even more relevant because it shows that despite having had years to implement these

patents, USAA still can't do duplicate detection very well. So having that claim in the patent is not all that valuable, contrary to the opinion of USAA's own expert.

THE COURT: And which is the expert that you were saying rendered that opinion?

MS. YOUNG: His name is Stephen Mott. He's their banking industry expert who provided opinions on damages. This is in his opening damages report at Paragraph 49.

THE COURT: All right. Let me hear the response from the Plaintiff on that issue before we move on to the other issues in the MIL.

MS. GLASSER: Thank you, Your Honor.

So the report that was being referenced, as opposing counsel mentioned, it's from Mr. Mott. It's literally two words in one introductory section in one paragraph. He simply mentions that one of the many, many checking functions that can be done on the technical invention of the USAA product is duplicate deposit. It's said once in a list of many, many other things, and he moves on.

Telling of the fact that this has absolutely no relevance to anything is the fact that this is an opening report from USAA's expert, their industry expert, and not one of PNC's experts even addressed it in their rebuttal.

The -- to be very clear, neither party is

asserting a damages theory that has anything at all to do with how effective duplicate deposit is or fraud or any of these types of issues. The parties have different types of damages theories, but they're all based upon cost savings and financial benefits from other things, or in PNC's case they have one based on an alternative.

But this idea that duplicate detection has anything to do with the damages theories of either side, as indicated by the fact that it's mentioned in passing in one sentence in one report and not at all by the PNC folks I think is a strong indication that we can rely upon that it's not actually relevant to any issue.

THE COURT: Do you agree that if that point was made by Mr. Mott that that would open the door for the report?

MS. GLASSER: No, not -- not at all. I mean, so Mr. Mott literally said, you can -- the duplicate deposit is something -- or duplicate checking is something you can do on the device, on the mobile phone. And nobody is disputing at all that you, in fact, can do duplicate deposit checks on PNC's system, on USAA's system, probably in literally any modern banking system. None of that has anything to do with the audit document.

The audit document is not a technical issue. The audit document is a question of, well, when there's all

these different things you can look at, 60 days, 90 days, 120 days, you can check all the parts of the check, you can check another, there's obviously a lot of business risk evaluations that anybody can make, none of those have anything whatsoever to do with the technology or to that single sentence in Mr. Mott's report.

THE COURT: All right. Thank you, Ms. Glasser.

MS. YOUNG: Your Honor, if their expert takes the stand and says nothing about the value that duplicate fraud check detection brings and that the patents are not valuable because of duplicate detection, we would have no reason to offer this testimony.

But the way this works is that they have an expert report, and if the expert's got something in their report, they can stand up and testify about it at trial. And if they do, we should not be precluded from rebutting that, and that is where this element -- this evidence becomes relevant.

And the paragraph in the report is not just a passing mention to the fact that this is a feature of the patents or that it's in the patents. The quote from the expert report is that it provides the significant benefits of reducing the risk of fraud exampled through the use of duplicate detection.

And so if they're going to proffer an expert to

give that kind of evidence, we ought to be able to pull in evidence that the patents are not what enables that. And that's precisely what this goes to.

And -- and I also want to just say this audit report is more technical. It talked about how many days you ought to wait when you do duplicate detection, but it also said that part of problem with USAA's system is that technologically, it didn't review the check number, payee name, or date results, and that led to an ineffective duplicate detection system.

And the fact that that's happening years after these patents were invented, allegedly, shows that it's not the inventions that lead to an effective duplicate detection system. So we ought to be able to over that -- offer that evidence.

THE COURT: If you believe that they have opened the door, you can certainly seek leave. But I'll grant the MIL on that part.

What are the other documents that are excluded by this, that -- what is your relevance issues for those?

MS. YOUNG: I think the next one is very much the same. It has to do with a consent order that was entered very recently where USAA admitted to the facts and finding of that order which had -- which found that there was massive fraud happening where customers of USAA used

Deposit@Mobile over 15 months to deposit over 3,000 checks for which they were not payees.

And so, again, if USAA is going to come to trial and say a significant benefit of these patents in this system is that it reduces the risk of fraud, here we have a finding that they've admitted to that, in fact, that's not true.

And so, again, this is not something we would seek affirmatively to introduce in the case. But if they are going to come in and say that these patents enable systems that have fraud reduction benefits, it is relevant to rebut that argument.

THE COURT: All right. What else?

MS. YOUNG: And then finally -- and, again, in a very similar vein, USAA, we believe, is going to tell a story to the jury that they're technological innovators and that their technologies and their company is set up to develop technologies to benefit the military. And, unfortunately, that's proven not to be true as some of these consent orders have identified.

In particular, there have been findings by regulators that USAA has not sort of kept pace with its own growth and has not modernized its technologies in a way and that that actually has led to harm to service members in violations of federal statutes designed to protect service

members.

And so we are not trying to introduce this evidence affirmatively. But if USAA gets up and says, you know, we're set up and our whole brand and motto is that we develop technologies to benefit service members, we ought to be able to come in and say, well, that's not entirely true, and, in fact, regulators have found that that's not entirely true.

And so that's why this type of evidence is on our list.

THE COURT: All right. That doesn't relate directly to these patents. It's just you're saying that the regulators found that USAA was not doing a good job of protecting those customers.

MS. YOUNG: And specifically in the area of technological development.

And so, again, if USAA cabins their arguments to, you know, here's -- we developed Mobile Check Deposit and here's what it does, that's fine. We're not trying to preclude them from doing that.

But if it's something broader about how the company is inventive and they develop technologies to assist service members, if it goes beyond that, that also has nothing to do with the patents. We don't think that's appropriate. We have a MIL sort of directed to that. But

if they are allowed to do that, we should be allowed to come in and say, well, there's another side to that story.

THE COURT: All right. Well, I'm going to grant this MIL No. 10, and I'll note in doing so that if the Defendant believes they can show that the Plaintiff has gone too far in these things, the Defendant can seek leave.

MS. YOUNG: Thank you, Your Honor.

THE COURT: But at this point, it's granted.

Mr. Sheasby?

MR. SHEASBY: MIL No. 11 with your permission, Your Honor.

THE COURT: Yes.

MR. SHEASBY: MIL No. 11 focuses on fact witnesses, and it focuses on three pseudo prior art issues.

The first issue relates to West Virginia Credit Union. And some time after USAA announced that it was launching mobile deposit, but before it released it to its public, they found a blog post that refers to West Virginia Credit Union offering some type of downloaded app for devices.

To be clear, the West Virginia Credit Union system is not elected prior art, the West Virginia Credit Union is not identified as a non-infringing alternative in any PNC discovery response, and there's no evidence that -- regarding this system beyond this piece of hearsay from

this blog post.

The Federal Circuit is clear that hearsay documents that are not authenticated don't count as business records exceptions. Since this is not even prior art, it wouldn't fall into an exception of prior art, and there should be no fact witness testimony on the West Virginia Credit Union because of those issues. One, it's hearsay; two, there's no one who has factual -- factual knowledge on it from a fact witness standpoint; and, three, it's not prior art.

So maybe I'll stop there with Your Honor's permission since that's the first bucket.

THE COURT: All right.

MR. STONE: Thank you, Your Honor.

Our experts have testified that the West Virginia Credit Union evidence is admissible to show state of the art to rebut an inference which might be a secondary consideration evidence offered by USAA that its product was the first one on the market. For example --

THE COURT: How is it relevant to the state of the art?

MR. STONE: Because it shows that there were other people independently developing the same technology and that any developments that were done by USAA were in the realm of the same kinds of things that others were doing

and that the -- ultimately the patents claimed here have limited value above and beyond what others were doing in the industry already and prior to the time that USAA released theirs.

So Dr. -- or Mr. Webster has testified both in his report and in his deposition about how the West Virginia Credit Union product informs his opinions about the state of the art at the time, and he's also testified about how it rebuts praise for Deposit@Mobile being the first to market, which is a secondary consideration that we think USAA is likely to present.

And there's also -- that's the principal testimony to -- with respect to those by both Dr. Kia and Mr. Webster, and it also goes ultimately to any incremental value that might be afforded to the patents that are ultimately issued to USAA.

So the question of fact witnesses -- and I don't -- I understand that there's no effort to preclude here -- on this motion, there's no effort to preclude Mr. Webster or Dr. Kia from testifying about West Virginia Federal Credit Union's product and when it came out.

So what is at issue is whether fact witnesses, who would -- could perhaps provide additional information beyond, for example, the blog that Mr. Sheasby pointed to, whether there are additional evidence, factual evidence

that could be presented by fact witnesses.

And, of course, that evidence should be permitted, whether it's evidence from a PNC witness or evidence from a USAA witness. And they talk about it here in terms of what is known -- what could be asked of PNC witnesses. But we have to understand the MIL would go further and preclude asking USAA witnesses, do you know about this? You really weren't the first, were you, because West Virginia Federal credit Union was the first.

THE COURT: And is there any evidence so far that any other witness has personal knowledge about the West Virginia Credit Union system?

MR. STONE: Mr. Webster testified that he had personal knowledge. None of the PNC witnesses have testified about having personal knowledge. I don't believe very many, if any, of the USAA witnesses were asked about that.

So I think in that sense, that's an issue that we don't know. And we don't know whether they have knowledge of it or not. And not all of their potential witnesses have been deposed, so we have no basis for even having had the opportunity to learn that.

So I think that's -- it's a fair issue to inquire of witnesses if you have reason to think they have personal knowledge, the extent of their knowledge.

THE COURT: And Mr. Webster is your expert?

MR. STONE: Yes, he is.

THE COURT: And he has testified that he has knowledge independent of the hearsay brochure?

MR. STONE: He's testified he has knowledge because of his general knowledge about the industry of that, yes. Whether that knowledge was ultimately derived from things like that particular article, I'm not sure of. But he's testified that that's part of his general knowledge of the industry.

That's -- I think I can probably give you a site on that if you give me one second, Your Honor.

THE COURT: Well, as I understand it, this MIL is not directed at experts, so I don't know that we need to go into that. But there is no fact witness that you're aware of that has any personal knowledge about the West Virginia Credit Union?

MR. STONE: There is none that I'm aware of, but there may be some who do have such knowledge that I'm aware of.

THE COURT: So how would you intend to raise this with fact witnesses.

MR. STONE: Well, if I had reason to think that a fact witness was aware of it, suppose a fact witness testified, I looked at this, I looked around, I checked,

and I was sure that we were first because I couldn't find anybody else who was ahead of us, then we could ask that witness, well, when you checked, did you find this information that's publicly available about West Virginia Credit Union, yes or no?

Because if they make a claim they're first, they have to have a basis for making the claim, and we can certainly ask them whether they did an investigation to make that determination, whether they knew about it -- and they might say, yes, I did, but I decided we were first because ours was different or we were first because we had a pilot in place before they released theirs to their customers.

They might have very -- they might have explanations for why they still thought they were first, but we would be able to examine them on the reasonableness of their testimony that they thought they were first.

THE COURT: Of course, you would be telling the jury through your question that you think the West Virginia Credit Union was first.

MR. STONE: I would be telling the -- and I do because we have -- we have public evidence -- publicly-available evidence which announces the release of their product before any product was released by USAA. So, of course, I have more than a good-faith belief. It's a

fact, Your Honor. And that's what -- that's what Mr. Webster testifies to, as well. He -- he understands West Virginia Federal Credit Union was first.

So to prevent us from putting on evidence of a fact is very unfair.

THE COURT: If you had a witness who had personal knowledge, then I would agree with that, but what you want to do is just ask all of the Plaintiff's witnesses if they have knowledge of the fact you don't have a witness for.

MR. STONE: Your Honor, only if it's relevant to respond to the issues that they bring up on their direct examination. Only if they come up and say USAA was first, or words to that effect, only if it's relevant to the cross-examination, not to independently establish that.

But, yes, it's appropriate to cross-examine someone, when you say you think you were first, did you consider this? Did you consider this blog post?

And they can say, oh, I don't believe in blog posts or things that -- I never saw it.

THE COURT: Why didn't you elect this as prior art?

MR. STONE: Because I don't think it -- it falls within the category of the prior art that we -- ultimately, as we were looking at the various elements that we needed and the limitations, it was not one of the pieces of art

that we thought was most useful to us, and we had limitations on that, as I know Your Honor is aware.

THE COURT: Because it doesn't show that it meets all the limitations of the claims?

MR. STONE: I don't think -- I don't think I have any reason to think that it was in and of itself anticipatory, so it would meet some of the elements, certainly, but it wouldn't meet all of the elements, so far as I know.

THE COURT: How would that make it first?

MR. STONE: The product itself was the first product that offered the feature of remote deposit of checks, first in the United States, so far as I'm aware. The actual first was the one in Spain.

THE COURT: Well, the -- all right.

MR. SHEASBY: May I be heard briefly, Your Honor?

THE COURT: Pardon?

MR. SHEASBY: May I be heard briefly?

THE COURT: Before I'm done, yes.

All right. Thank you, Mr. Stone.

MR. STONE: Thank you, Your Honor.

THE COURT: Go ahead, Mr. Sheasby.

MR. SHEASBY: Your Honor, it's late in the day. But I think it's important when evidence is referenced but not actually put up --

Let's actually put up the blog post.

The reason why it's not cited as prior art is because the blog post is purportedly published on July 12th, 2009, which is almost three years after our patent applications were filed that were -- that are being claimed on MRDC.

So this suggestion that they didn't get the chance to do it or it has some relevance, first off, a document from three years later has no relevance to any issue relating to validity.

Second, the document is hearsay, and so there's not a fact in evidence that the West Virginia Credit Union was first because this is not a document that's sponsored by anyone who has knowledge of it or is admitting it as a business record.

They could have gone to West Virginia Credit Union and tried get this in, and they haven't.

And, third, I take very serious issue with the repeated representations about what is and is not in expert reports without showing it to Your Honor.

This is Mr. Webster's testimony under oath: Before you were paid and hired by the case, had you ever heard of the West Virginia Federal Credit Union?

Answer: Yes.

Have you ever used or been exposed to their mobile

deposit system?

Answer: I have never used their mobile deposit system, no.

Question: Did you examine it?

Answer: No.

Question: Did you investigate whether it was functional?

Answer: No.

So this -- and it's a repeated pattern throughout the day. Don't worry, Your Honor, it's in an expert report.

It's a fact, Your Honor, this document has no place in front of the jury, and the questioning that Mr. -- that Mr. Stone just proposed in which he's going to inject something that's not a fact through his question in front of the jury is improper cross-examination.

THE COURT: All right. Mr. Stone, I see a little better why you didn't elect this as prior art.

MR. STONE: Your Honor, the issue I want to respond to is Mr. Webster's report, and I was just looking for the cite on that because Mr. Webster did testify in his report that he thought that the West Virginia -- based upon his experience in the field, that he thought the West Virginia Credit Union product was the first to come to market or be offered to customers.

That was the key issue. That's where Mr. Sheasby is trying to challenge my credibility with the Court, and that's what I take umbrage at, Your Honor, because that is inappropriate.

The testimony that he read was testimony about how much he knew about it at the time, not whether or not he had a conclusion and testified that he was aware of it. That's --

THE COURT: And --

MR. STONE: I just want to respond on that point, Your Honor.

THE COURT: Did he offer any testimony as to how he was aware of the West Virginia Credit Union remote deposit system?

MR. STONE: I don't believe he explains that in his report, and I haven't reviewed every part of his deposition, so I can't respond to how he became aware of it, Your Honor.

MS. GLASSER: We do have that testimony if that'd be helpful.

THE COURT: That's fine.

MR. SHEASBY: Question: Before this case even started, you had never heard of the iPhone app that West Virginia Credit Union purported to launch, correct?

Answer: I don't recall when I first heard of it.

So I stand by my statement, there's no fact witness in this case who can testify that this was in existence or first, and something from three years after our priority date has no relevance in this case.

THE COURT: I'm going to grant Motion in Limine No. 11 as to the West Virginia Credit Union issue. I don't think it's appropriate for the Defendant to be raising before the jury something that has no factual predicate beyond a blog entry about something that happened three years before by someone who has not been demonstrated to have any personal knowledge of what he was writing about.

Obviously, if the Defendant believes that the Plaintiff has opened the door, they can seek leave, but I'll grant the MIL as to the West Virginia Credit Union.

That takes us to the mobile check system, and before we get to that, we'll take the afternoon recess.

MR. SHEASBY: Thank you, Your Honor.

COURT SECURITY OFFICER: All rise.

(Recess.)

COURT SECURITY OFFICER: All rise.

THE COURT: Thank you. Please be seated.

Yes, sir, Mr. Stone?

MR. STONE: Thank you, Your Honor.

You had asked me earlier to determine whether or not we had offered to pay Mr. Olson's expenses, and during

the break, I was able to confirm that we have offered to pay his expenses.

I believe I've now provided you with all the information that you requested me to provide, but Mr. Sheasby has suggested to me that you required me to provide him the content or the substance of all of our communications with Mr. Olson. I told Mr. Sheasby that I did not believe that was the case, but I wanted to confirm that with Your Honor because I --

THE COURT: You are right, Mr. Stone, I did not --

MR. STONE: Thank you, Your Honor.

THE COURT: -- require that.

I do think that your communications with them -- the witnesses in general are work product, but on the question of whether or not a particular witness is going to come to trial from out of the country, I do think that it's fair to require you to provide that knowledge when you have it.

MR. STONE: Yes, and I made that same inquiry during the break, as well, and I'm told that he has not said that he would come or that he would not come.

THE COURT: All right.

MR. STONE: He is uncommittal, in other words.

THE COURT: Well, here's my -- the next thing I'll say about that then is if and when Mr. Olson commits to

come, I would instruct you to let the Plaintiff know that your understanding is he is coming so that you can start the process of trying to facilitate a time when a deposition can be taken.

MR. STONE: Yes, Your Honor.

THE COURT: Thank you, Mr. Stone.

MR. STONE: Thank you.

MR. SHEASBY: Your Honor, if I may just be heard briefly on that. I had asked Mr. Stone for that information in advance at the break, and he declined to provide it to me.

I actually have a significant issue with any offer of payment to Mr. Olson, and I'd like to be heard briefly on that, Your Honor, which is --

THE COURT: I understand the rules about paying fact witnesses. I think that there's a generally-understood exception to that if all that's happening is reimbursement for travel-related expenses, as long as it's disclosed.

Do you have a different understanding?

MR. SHEASBY: So, Your Honor, I do in this situation, and I'm happy to do a supplemental brief on this subject, and maybe that will be best as opposed to taking up your time.

But the issue I have is he's not a consultant for

them. They claimed he's not a consultant for them, and so they have no contractual relationship with him. All they would be doing is paying him money, and I believe because the absence of a contractual relationship with him, the transfer of money to him is inappropriate, and I -- I'll just brief the issue. I won't argue it right now.

THE COURT: All right. I think what you'll find is that there is case law that indicates that a reimbursement for travel expenses, and there may be case law, and I've dealt with it, that requires approval by the Court before the payment is made, but that is a logistical detail.

But I agree with you that payment that went beyond that would be ethically questionable.

MR. SHEASBY: And I just -- because I think precision is important, this idea that they've disclosed this witness as soon as possible, they disclosed this witness a month before the close of fact discovery. It would have been impossible for us to have gone into the Hague within a month. And I flagged that because what we see repeatedly today is representations made that are not based on fact, and I -- and I want to flag that again for Your Honor.

THE COURT: Well, I'm not going to question Mr. Stone's representations, and if you want to file

something about it, you can feel free to do so. But at this point, I've done what I think I need to do based on what's before me.

MR. SHEASBY: I understand, Your Honor. Thank you, Your Honor.

MR. STONE: Thank you -- thank you, Your Honor. I won't respond further then on the timing of disclosures if the --

THE COURT: That -- that's fine.

MR. STONE: Thank you.

MR. SHEASBY: Your Honor, the next issue is Movilcheck, which is really a species of West Virginia Credit Union. Movilcheck is not elected prior art.

The primary document regarding Movilcheck, if we can go to Slide 61, is a blog post from Spain in Spanish. There are a couple of other blog posts, as well. There's no fact witness who's provided testimony that they are familiar with the system at the time it existed -- as -- as of the time of this document. It is not elected prior art. The document is hearsay. And just to cut to the chase, despite whatever representations Mr. -- may be made, Mr. Webster has no personal knowledge of it.

Question: Do you have a recollection as to whether the Bankinter system that you heard reference to was the one that was described in some way in this July

2005 article as opposed to some subsequent iteration they approved upon in 2006 or 2007?

Answer: I can't confirm it either way.

Question: Do you read Spanish?

Answer: No, I do not read Spanish.

This is, of course, relevant because the contemporaneous documents that they primarily relied on were in Spain.

Question: Do you know if that system -- this Bankinter reference with a digital camera implemented the Garcia-Verdugo patent?

Answer: That was my understanding that it implemented the Garcia-Verdugo patent.

Question: I understand that's your understanding. Did you actually investigate within the Bankinter system?

Answer: No, I did not.

And so what you see is really the same issue as the West Virginia Credit Union. It's not elected prior art. It's hearsay. It's impossible to be prior art because it's outside the United States. A system outside the United States, since it's not prior art, couldn't be relevant to what was known in the prior art before for damages or validity, and the same ruling should apply as applied to West Virginia Credit Union, Your Honor.

THE COURT: All right.

MR. STONE: Thank you, Your Honor.

What we do know is there's at least one witness who would have personal knowledge of this system, a fact witness, and that would be Mr. Olson were he to agree to appear at trial. So we do have one fact witness who we have reason to believe knows about it since he was one of the inventors on the Garcia-Verdugo patent application.

With respect to Mr. Webster, let me respond to that, there are portions of the deposition of Mr. Webster that Mr. Sheasby did not read, and let me give you the sites. I'm going to read from Page 30 of his deposition at Line 20, down to 31, Line 18, with the Court's permission.

And the first question asked by Mr. Sheasby at the deposition was: Bankinter Movilcheck system from Spain, were you aware of that system before you were paid to join this case?

Answer by Mr. Webster: I was aware that there was a mobile deposit capture being done in Spain. I believe I was aware that Bankinter was one of -- was the bank that was doing it, but I may not have at the time. I'm not sure.

Question: When were you aware that mobile deposit capture was being done in Spain?

10-plus years ago.

How were you aware of it?

I've been in the industry for 30-plus -- about 40-plus years.

You've read articles on it?

I've read articles on it, yes.

Do you speak Spanish?

No, I do not. Very little. Sorry, let me correct -- let me be correct, I speak a little Spanish.

Question: Do you read Spanish?

No, I do not read Spanish.

So he testified to personal knowledge from 10 years before of Bankinter. So, again, I understand this in limine only to be addressing fact witnesses of Mr. -- and Mr. Webster is an expert, but he does have fact testimony, as he was asked about at his deposition, as well as his expert testimony.

Other than Mr. Webster and Mr. Olson, I don't know of anyone else who's familiar with the Movilcheck product, M-o-v-i-l-c-h-e-c-k, that was offered by Bankinter some years before USAA offered theirs.

MR. SHEASBY: Your Honor, a couple of issues.

Ten years from when he took the -- we took the deposition of him was 2011, which is years and years and years after the priority dates of either of these patents.

So what Mr. Webster said at a deposition about what he knew in 2011 is just totally irrelevant.

The second issue is we don't know what Mr. Olson has knowledge of because Mr. Olson was not offered for deposition in advance of this case. So some promise about what some guy is going to say, that ship has sailed.

This document is hearsay, it's not elected prior art, no one has personal knowledge of it. Ten years ago was 2011, and it should be excluded.

Thank you, Your Honor.

THE COURT: And, frankly, this document only describes something at the 30,000-foot level. The fact that it says deposit your checks and payments without intermediaries, taking the dates with an automatic reader and transmitting them to Bankinter, that doesn't tell us a whole lot.

MR. SHEASBY: Your Honor, I think that there are other documents that have some more information, but it's the same issue, which is it's all hearsay, and there's no personal knowledge regarding it, and it's not elected prior art. I don't want to say this is the worst -- this is the best document for them, but they all are species, which is they're not elected prior art under hearsay.

MR. STONE: Your Honor, if I -- I understood this motion in limine to be addressing the question of fact witness testimony, so I didn't address the exhibit issue. I thought the exhibit issue would be one we might take up

at the hearing on exhibits.

But with respect to the facts, we have Mr. Webster's testimony that he was aware of it, and he was aware of it, he said, 10-plus years ago, and we offer it not as prior art. We offer it to show the state of the art and to rebut any inference or secondary consideration of validity. It that might be argued by PN -- by USAA because they claimed to have been the first to offer this product.

And with respect to the documents, there's also testimony that the patent application, which I think we'll get to next, describes the operation of the Movilcheck product, so there is further information in addition to the articles about how the product had actually operated.

THE COURT: All right. Well, I certainly agree with you that the question of the admissibility of DX-668 is something that we'll take up at the hearing on exhibits. And you're right, all this is talking about is whether there can be fact issue -- fact witness testimony elicited about the Movilcheck system.

And, frankly, I feel the same way about this that I did about the West Virginia one, that there's not enough of a basis to take -- to question the fact witnesses about their knowledge of this, which I think would be a backdoor way of getting something before the jury without evidence.

To simply ask all of USAA's witnesses: Did you know about the West Virginia Credit Union?

No.

Did you know about Movilcheck and, you know, the system that was operational in Spain 20 years ago?

I think you need an evidence basis. And so what I'm going to say is if you think that you have that, then you're free to seek leave, but that -- unless and until you get that, you are not to raise these issues with fact witnesses.

MR. STONE: Understood, Your Honor.

THE COURT: All right.

MR. SHEASBY: Your Honor, the Garcia-Verdugo application is the next issue. This, I think, is a relatively limited issue.

The role of the Garcia-Verdugo application that will play in front of experts is for the motions to strike. There's no PNC fact witness who said they were aware of Garcia-Verdugo. There's no USAA fact witness who said they were aware of Garcia-Verdugo. There should be no examination of fact witnesses regarding Garcia-Verdugo without --

THE COURT: And the issue as to whether or not the application is appropriately discussed by the expert is raised in a pending motion to strike?

MR. SHEASBY: It is, Your Honor.

THE COURT: All right. Then I'll defer this issue to the motion to strike.

That takes us to Plaintiff's Motion No. 12.

MS. GLASSER: May I proceed, Your Honor?

THE COURT: Yes, ma'am.

MS. GLASSER: So Motion in Limine No. 12 addresses a category of argument and to some extent evidence that PNC has made clear it intends to present unless there is preclusion ordered.

This all relates to the question of enablement. PNC hasn't told us yet which of their invalidity theories they're electing. They have a whole host of different non-enablement and written description and 102 and 103 arguments they're considering asserting, but one of them is non-enablement.

And the issue here -- I think there's going to be always some close calls that are for the trial court judge to make in real time as to what evidence is actually relevant under the standard for enablement. But here, there's a couple of categories of evidence that PNC is seeking to enter that are clearly far to the side of the line. They fit right within the Federal Circuit opinion that says the issue for enablement is never the amount of time or effort to perfect a commercial embodiment.

So I'll talk about the first one of those issues now.

And actually if the ELMO is on, it might be easiest -- we can switch.

Okay. Are you able to see that, Your Honor?

THE COURT: Yes.

MS. GLASSER: Okay. So this is sort of emblematic of the main argument that PNC wants to make, and they do it actually not only through argument about USAA, they even try to interject some argument about Mitek's internal development time as well.

The argument goes as follows: At a certain point in development of an embodiment, you're going to hit a level of first capture accuracy, and as you continue to refine your commercial embodiment and try out different things that you want to tweak and adjust for user satisfaction, it's going to increase.

And PNC wants to talk about all of the effort that Mitek, the third-party, has put into making their particular system hit a particular level of first capture accuracy.

And they in particular also want to focus on USAA, and they want to describe the effort that it took for USAA to ultimately get into -- up to a really extraordinary level of accuracy that they had later in time. All of that

they want to suggest should be considered under the bucket of enablement.

Now, that's not what the enablement standard is. The enablement standard is does the patent itself teach a POSITA at the time of the application to make and use the claimed system?

Work about how to make the claim system incredibly user friendly or in USAA's case award-winning is not part of the inquiry, and the CMFT case talks about that pretty extensively.

The document I have up on the screen here is one of the ones that they've cited most frequently. And it indicates I think really clearly this whole notion of why it is not part of how you make the invention but rather how do you absolutely perfect what you decide makes the most sense for your business and your customers.

So they've mentioned over and over this 25 percent rate that you see at the bottom of the slide on the bullet point. They mention that in this particular test, which was a test back in 2007 using an iPhone and other things, they were trying to test something very specific here. They had decided that they were considering using a particular vendor for a particular component, the particular vendor being All My Papers. That vendor had a disadvantage, which was that their system was limited to

accepting 200 DPI images, and they wanted to see what would happen if they did a particular work-around to force it to -- to a different DPI.

THE COURT: Ms. Glasser, let me interrupt. This is a pleaded defense, not enablement?

MS. GLASSER: Correct, Your Honor.

THE COURT: This sounds like a summary judgment that you're arguing here that they don't have sufficient evidence to support?

MS. GLASSER: I think we would agree that in the big picture, they don't have sufficient evidence, but I think there are some parts of it that they can try to offer to the jury. There's -- there's certain parts of their expert report, for example, that are a little bit more fixated on the question of what an actual person of ordinary skill in the art could have done at the time of the invention.

And so what we want to do here is have a clean record for the jury where we're focused just on that type of evidence as opposed to a lot of what we've seen from PNC in its expert report. But just generally, in their briefing and in their argument is they want to fixate the inquiry not on what would a POSITA have done in 2006 but rather what did USAA actually do in practice, what was all this extensive effort?

And I didn't mean to sort bore everyone in the court -- courtroom with this whole song and dance about getting All My Papers and DPI and exactly what was done and the nightmare, that that's sort of the point of it, the types of documents that they want to put before the jury don't have anything to do with how much effort would it be to just build a system for a POSITA reading the patent. They want to talk about the months and in some instances years of effort USAA going back and forth on exactly what would be best for their members, what was the right time to release it, what vendors should be used, how do you tweak the accuracy rates, what's the trade-off for these different things based upon the needs of their -- of their users.

And there is a Federal Circuit case that speaks directly to this evidence being just flat out irrelevant and inadmissible, which is CMFT. It's fair --

THE COURT: The part you've cited doesn't say it's inadmissible. It says it's not enough.

MS. GLASSER: So let me get the part of the --

THE COURT: It's on Page 8.

MS. GLASSER: Sorry. I've lost my page in the document. There is a part in the case that speaks directly to this.

Yeah, so it says here the District Court set the

enablement bar too high. Enablement does not require an inventor to meet lofty standards for success in the commercial marketplace. Title 35 does not require that a patent disclosure enable one of ordinary skill in the art to make and use a perfected commercially viable embodiment.

And that piece of it actually -- PNC in a separate briefing they have on their enablement motion for summary judgment, they actually concede that, that the enablement standard is not supposed to be about the amount of time that it takes to make and perfect a commercial embodiment.

THE COURT: And what that tells me is that this evidence may not be sufficient to carry the day on non-enablement, but that doesn't tell me that it's not something that they're entitled to put forward to see if -- along with other evidence they can support their defense.

MS. GLASSER: Your Honor, I think it's -- it's not only irrelevant, but ultimately very prejudicial and confusing for exactly the reason that you've just highlighted, which is that if PNC puts on extensive evidence about how much time USAA and then let's not even get to Mitek yet for a moment but some third party spent actually spent making their commercial system, then the inquiry appears to be to the jury they're going to have the impression it's somehow relevant how much time it took someone to do all of the perfecting and -- and tweaking of

the system.

And under clear Federal Circuit precedent, it's simply not relevant at all. It's not something that you weigh in the balance. It's not something that informs. It's literally the wrong inquiry to be looking at, and PNC is very intentionally I think trying to lead the jury down that path.

THE COURT: If it took no time to perfect it, that would be an indication that it's well enabled, wouldn't it?

MS. GLASSER: I think you just wouldn't even get to that question. But enablement really has nothing to do at all with how much time it took to make the commercial product. It really is fixated purely on how much time -- or how much experimentation is necessary to make a product at all.

THE COURT: That's right. After the disclosure, how much does it take to create it, right?

MS. GLASSER: Correct, Your Honor. Well, how much experimentation, and is that undue in the industry?

But in all instances, no matter what, even PNC acknowledged this in their opposition brief for the summary judgment, you're never, never, never talking about how long did it take to perfect or to commercialize. That is on one far side of the clearly irrelevant. You might have some stuff in the middle where you're talking about how much

time it took to actually make something, but the Federal Circuit has been clear. You are really not supposed to be considering at all the commercialization aspect and the perfection aspect.

THE COURT: Okay. Show me that language from the Federal Circuit.

MS. GLASSER: So -- right. So in addition to the part that I had cited a moment ago, starting at the end of Page 1338 of the CMFT case, enablement does not require an inventor to meet -- actually, I think we have a slide on this.

Is this Slide 69?

So there's two things going on here up to the second ellipse is that -- the point that Your Honor was just asking about, and then after the second ellipse is actually a completely separate independent basis for our motion that I'll get to in a moment.

The CMFT case was actually a direct parallel. In that case, the patent itself was talking about cleaning, just as in here, we're talking about obtaining sufficient check images for deposit.

In both instances, it was undisputed that you could make and use an invention that achieved some level of -- of what was being sought. In other words, nobody is disputing that USAA could -- or anyone else could build a

system that analyzes check images based on the teachings of the patent. The only question is how long did it take to get it to a particular level of accuracy.

And in the other case, it was the same issue. It was everyone agreed they could clean to some extent, but apparently it took them quite a lot of time and another patented invention to get it to a commercially viable level of cleanliness.

So I guess one way of looking at this, too, because in some sense, this is sort of a wide category of evidence on what can come in and what can come out. Some of it is just going to have to be made during the trial.

But this question of the accuracy rate of the first-time capture, the question of exactly what was USAA's accuracy rate or Mitek's or anyone else at a given point in time and how much work did it take them to increase that, that part should be just a redline or blackline on one side, because once they've been able to make the invention to do it at all, they've satisfied the making requirement. And so the idea of more time to make it even better, even more accurate to work even more often, that's the part that I think we're fixated on here because having that interjected into the case is going to be extremely confusing, and there is a very clear line drawn for that issue.

THE COURT: I don't see anything in the opinion that states that this evidence was irrelevant. What I see is that the District Court applied the wrong standard, required too high a standard for enablement. And the Court reversed that.

MS. GLASSER: Yeah, and that's why I say there's some middle category of information that I think we'll all debate and maybe we'll end up briefing.

The one thing that we know for sure is that it is inappropriate to rely on a standard based on commercially perfecting. And the particular evidence I am wanting to address here, because I know it's going to come up at the trial, is the evidence about exactly what was USAA's or Mitek's or anyone else's first-time capture accuracy rate.

They want to talk about how much time it took to improve that. And there, that's clearly on the other side of the line. That's clearly perfecting making something even better, making it for whatever reason somebody's doing it, but that's way beyond how much effort is required to actually just make the product in the first place.

So that's sort of the first bucket of issues. There's a couple of others I'd like to get to, as well, but I think that one is going to be probably the most significant in terms of giving the parties clarity because otherwise, Mitek and USAA, a bunch of these documents

about, well, we think it should be 80 percent, and we did this to get it to that, and at one point, we tried the All My Papers, and it was 25 because we were tweaking this and that and the other, that's going to become a big side show, and I don't think that there's any articulable relevance to it at all. It's extremely confusing.

THE COURT: All right.

MS. GLASSER: So I can stop there and have opposing counsel respond, or I can talk about the other buckets, whatever is Your Honor's preference.

THE COURT: Let me hear from the Defendant.

Thank you, Ms. Glasser.

MR. STONE: Thank you, Your Honor.

As the Court I know is aware, we have moved for summary judgment on our lack of enablement defense. And that issue is still pending, and I think we heard from opposing counsel what is largely an argument in favor or in support of their opposition to our motion for summary judgment. But I think the motion for summary judgment should be granted because the evidence that we presented does show that undue experimentation was required both with respect to the 2006 patents and with respect to the 2009 patents.

It was three years before USAA had a functioning system that incorporated the claimed features of their 2006

patents, and it was four years before they did that with respect to the 2009 patents. So we have a lengthy period of undue experimentation, which the Federal Circuit has said is the test, and the evidence that we offer is not limited to that in what is PX -- Plaintiff's Exhibit 1409 that was put up.

Indeed, Plaintiff's Exhibit 1409 doesn't relate to the product that Plaintiffs claims is the embodiment of their claimed inventions.

THE COURT: Well, Mr. Stone, I -- I understand this is an issue that we'll reach on the motion for summary judgment, but I'm going to deny Motion in Limine No. 12. This is just not in limine matter. This is a sufficiency of the evidence matter, and there is a motion for summary judgment on which we'll reach those issues.

MR. STONE: Thank you, Your Honor.

MS. GLASSER: And, Your Honor, just to clarify, that was only one part of the MIL. If there's -- if Your Honor has sort of already reviewed it and set on it, I won't go into the others, but the others do present unique issues all related around this enablement concept.

THE COURT: And I understand that, but there's no in limine issue there.

This is just whether there is sufficient evidence and whether the evidence has sufficient relevance, but I

don't -- if you think that you can identify something that has the kind of unfair prejudice and once the jury hears it they're not going to be able to get it out of their heads, tell me about it.

MS. GLASSER: Yeah, I mean, part of it is the cascading effect, too, because I think their intent is to sort of pile this on. But I will identify three different things that I think do have that effect.

First is the subpiece of what I was just talking about, which is Mitek. I think going into some side conversation about what -- how long it took Mitek to perfect certain parts of Mitek's system really has no place in any of this, and I didn't hear Mr. Stone even address that. So that's one thing that I think should be excluded even if Your Honor views the rest of it as sort of an overall bucket of weight of the evidence.

THE COURT: Anything else?

MS. GLASSER: Yes. So the second part of it -- and this goes to -- I said I would get back to this eventually, the last part of the quote on the screen, the other legal concept that we get from the Federal Circuit that's pretty explicit, it says, reliance on the TI data alone also betrays another error, namely this Court gauges enablement at the date of filing, not in light of later developments.

I mean, to some extent this really should in our view knock out all of the evidence we're talking about. You really should not be talking about what other people did later, two, three years at some other point in time. But certainly as to a couple of different subcategories, this has particular salience.

The Mitek work, for one.

And then also --

THE COURT: So you interpret that statement as meaning that no evidence after the date of the filing of the patent application can be considered on enablement?

MS. GLASSER: Not quite, Your Honor.

So what the Court is saying is that the enablement inquiry must be fixed exactly on the date of the filing. Now, there can be -- it's pretty unusual, but there can be situations where you absolutely have to look at some later evidence to understand the state of affairs on the date of filing.

That has come up once or twice in the Federal Circuit always in the complex chemical arts. So the issue comes up with -- with -- if the only evidence, for example, of the overall scope of some vast genus, if the overall scope of that, the only way to prove that up is through some evidence that was discovered later, the Court has allowed that in. There could also be some other outlier

situation, obviously.

But, typically, it is irrelevant, because as the Court said, the inquiry itself must be fixed as of the date of filing. You're not supposed to consider other things that weren't around at that time or that people were saying and doing later on instead.

And so that I think brings me to -- to another one of the subcategories that I think even if Your Honor is inclined to defer a lot of this for trial has sort of a unique capability to mislead the jury, which is that PNC repeatedly references -- and I think they're going to intend to argue in opening if they go with this enablement theory instead of some other prior art or written description theories -- is they repeatedly talk about the specific date that USAA reduced -- launched its commercial Deposit@Mobile product. They repeatedly state that they didn't launch the product until 2009 when they're talking about enablement.

Those two things have absolutely no connection to each other at all, and this is particularly nefarious, as I mentioned, because the jury I think naturally will not understand the concept of constructive reduction to practice. The jury -- that's something that's a lawyer concept, right?

And so when we hear PNC telling the jury

emphatically, or even repetitively, this is not enabled and we know that in part by looking at the fact that USAA didn't launch until three years later, four years later, as Mr. Stone just argued here, that fact is completely irrelevant as the Federal Circuit is mentioning here and as we all know because there's no requirement to ever physically reduce to practice.

So here, we have USAA could have decided it was never worthwhile to do it. They didn't have the funds or whatever reason. Here, they had particular reasons that they waited to launch this which had to do primarily with waiting until actually it was something that would be using devices affordable to its particular user base, but that's very distracting.

THE COURT: I think the problem I have with your argument is that you are mixing a question of whether something is sufficient evidence with whether it is relevant, and relevance is simply whether it makes the ultimate fact more or less likely.

And I think the fact that there's a delay of three years or four years in getting something to the marketplace does make it more likely that it wasn't enabled than if it was put out in the marketplace on the day the application was filed.

MS. GLASSER: So there's two different things that

can be in play. There can be evidence where somebody is trying and failing, and they get it out late. That is relevant. At least in most scenarios, that would be relevant. If you have somebody trying and trying, or even trying once, they can't do it, they finally get it out three years later.

That's not our situation. There's literally no relevance at all to the fact that USAA decided as a business matter to focus for a time on the product they had already out, and that's going to be really misleading I think to the jury.

THE COURT: And that's your side of this dispute. I understand that. You say the delay was for those reasons, which don't show non-enablement. They're not required to accept that. And whether they can produce enough evidence to get there is a question that we're not going to decide on a motion in limine.

MS. GLASSER: Understood, Your Honor. And I don't know if Your Honor had commented yet on the Mitek situation. I do think at an absolute minimum, they really should not be talking about how long a third party who didn't even have the patent disclosure in front of them at the time, as far as we know, took to increase a particular accuracy rate. I mean, that is just really nothing at all to do with the topic. It's just inflammatory.

THE COURT: All right. And where in your motion is that addressed?

MS. GLASSER: So, Your Honor, this is just one of the examples within the broader scope of the motion. This is discussed in detail in the summary judgment motion opposition.

However, we were trying to carve out some specific subexamples here for the argument to have Your Honor be able to appreciate what sort of the concrete evidence is, but that concrete evidence is discussed in their summary judgment motion and then our opposition to it.

THE COURT: But it's not in the motion in limine?

MS. GLASSER: It's in the scope of the motion in limine, but the motion in limine itself just talks broadly about the labor that was expended. So that's not called out here specifically.

THE COURT: It says, the labor USAA expended.

MS. GLASSER: Right. And I'm trying to look at their opposition. I'm mixing up in my mind potentially their summary judgment motion, but I think they raised this issue themselves.

THE COURT: Well, I will address the summary judgment motion separately. But at this point, I'm just going to deny Motion in Limine No. 12.

MS. GLASSER: Thank you, Your Honor.

THE COURT: Thank you.

Is Motion in Limine No. 13 simply based on the argument that certain exhibits are hearsay?

MR. SHEASBY: It's actually based on slightly more than that, Your Honor.

THE COURT: All right.

MR. SHEASBY: Which is that the -- there is sort of two categories of customer comments. There are customer comments that are, for instance, in business records, and they were analyzed as business records. And those will be dealt with on the evidentiary day.

But beyond that, what PNC has done is they've just collected a bunch of random customer comments that they've taken from -- about USAA's product. And I think that one of the things they attempt to do is to just potentially try to impeach USAA fact witnesses with hearsay comments about the -- their product that have nothing to do with USAA documents.

So it goes beyond just the issue of hearsay. And let me -- if I could just -- I just lost the page. I'll show you what I'm concerned about in particular.

So if I could have the ELMO.

So this is a part of Dr. Vellturo's report: Anecdotal examples of customer dissatisfaction with Mobile Deposit can be found in USAA's app ratings and customer

reviews. Sound bytes of customer complaints and a small number of written reviews are not particularly informative.

The reason why I'm showing you that is that there are -- there is this issue as to whether they can inject random hearsay comments that are not sponsored by experts or analyzed by experts through fact witness testimony.

And we want a motion in limine to stop that because the comments are hearsay, and based on their expert's own admission, they're anecdotal and sound bytes. And so if they're anecdotal and sound bytes, if there was no systemic attempt to analyze USAA customer comments, it's highly unreliable and on the weight of evidence is -- is outweighed by the prejudice.

THE COURT: And how would you expect that these issues would be presented other -- other than through exhibits?

MR. SHEASBY: So I would expect that my worthy opponent, Mr. Stone, or Ms. Young would -- would say, well, customers said blank, blank, blank about your product, didn't they? And that would be injecting the hearsay into the question, and then we would object and say that's irrelevant because random customer comments are not probative of anything, as Mr. -- Dr. Vellturo admits, and they basically injected hearsay through the question.

THE COURT: All right. Thank you.

Let me hear the response on that.

MS. LEE: Good afternoon, Your Honor. Sarah Lee, PNC Bank.

So I want to start where Mr. Sheasby ended, which is that random customer comments are not probative of anything. And so it's PNC's position that customer comments are hearsay, and they should be excluded in total.

But USAA's position in this motion is that USAA should be allowed to admit customer comments about PNC's app, but PNC cannot do the same for USAA's app, and that is completely one-sided and unfair.

PNC's expert did an analysis just like USAA's expert did of the customer comments on USAA's Deposit@Mobile and determined that these negative customer comments are not necessarily indicative of a system that is not viable. And that is what PNC's expert did.

And so -- I'm sorry, Your Honor?

THE COURT: Ms. Lee, did -- are you talking about a survey that USAA did or is -- are they comments that were picked up from blogs or the like?

MS. LEE: Both USAA's expert and PNC's experts went to publicly-available app stores and looked at negative customer comments. And USAA's expert, Dr. -- Mr. Kennedy, looked at anecdotal customer comments and said, here's a negative comment, here's a negative comment,

here's a negative comment about Version 4.20.1, and, therefore, this redesign that PNC implemented is not viable.

Dr. Vellturo, to respond fairly to that opinion, went to the publicly-available app store, the same app stores that USAA's experts are relying on, and -- and looked for comments that were similarly negative and determined that these anecdotal negative comments were not necessarily indicative of a non-viable system.

THE COURT: All right. So what I'm hearing from you is that your expert did the same thing their expert did, and you'd be satisfied with a rule that the comments being excluded from both sides?

MS. LEE: Yes, Your Honor.

THE COURT: All right.

MS. LEE: That is definitely my position.

THE COURT: Let me hear from them, and I'll give you a chance to respond. Thank you, Ms. Lee.

MS. LEE: Thank you, Your Honor.

MR. SHEASBY: Your Honor, there are two separate issues. There's an issue on what experts are properly allowed to speak about. That's based on the motion to strike and based on the report.

If you go to Slide 75, Mr. Brodsky.

It is accurate -- it is not accurate that there

was some random anecdotal analysis done by USAA's experts. Mr. Kennedy and Dr. Reed-Arthurs actually did a statistical survey and analysis of customer comments, have the data set and have the results.

THE COURT: You're saying they did a survey, meaning they generated questions, sent them out, and got people to answer them?

MR. SHEASBY: No, what they did is they -- they extracted the entire subset of comments from the Apple store and the Google Play Store, and they analyzed them statistically for specific comments. And I don't --

THE COURT: That's not really a survey.

MR. SHEASBY: Well, I -- it's not -- I actually think that is a survey, but it's not -- it's not a survey in which you -- you generate new data. It's based on a pre-existing data set, but it was a survey methodology in which there was a statistical process that was used to -- used for the full data set.

But to be clear, we are not talking about what experts can and cannot testify to. They actually did not oppose or move to strike the methodology used by Mr. Kennedy or Dr. Reed-Arthurs. This is solely about fact witnesses and what should be injected into fact witnesses' conversations. And if they're randomly selecting customer comments from a website and trying to

get in them -- get them in to the jury for cross-examination, that's improper.

If they wanted to move to strike Mr. Kennedy's analysis, that ship has sailed. As to what specific comments coming before the jury, that is dealt with. Obviously, underlying comments are hearsay, if it's just from the data set. Judge Gilstrap can make a decision as to whether for experts they should be able to publish the hearsay. This is not about evidentiary admission of these analyses. This is not about experts. It's purely a matter of injecting hearsay through questioning fact witnesses.

And I didn't hear any argument that that was somehow proper. And so given the scope and limits of the motion in limine, I think on that basis, it should be granted, purely on fact witnesses.

THE COURT: But you're not proposing to put before the jury any -- any customer comments of the sort that you're seeking to exclude here?

MR. SHEASBY: So not through fact witnesses. Not through randomly selecting them. We would only be doing it if it's in a business record of -- of Wells -- of PNC or as part of sponsored through the analysis that Dr. Reed-Arthurs and Mr. Kennedy did it.

THE COURT: Why should your expert be able to put before the jury a hearsay statement that a fact witness

cannot?

MR. SHEASBY: So Rule -- the Federal Rules of Evidence give leeway to publish hearsay -- documents that would otherwise be hearsay that are relied on by an expert.

THE COURT: If what?

MR. SHEASBY: If it's -- if it's the -- the helpfulness -- it's a balancing test that has to be done under rules -- FRE 703.

And they didn't move to strike any portion of our expert report. But I see the way this is going, and withdraw the motion in limine, Your Honor.

THE COURT: All right. Then Motion in Limine No. 13 is withdrawn.

With respect to No. 14, the question that came to mind when I read it was why isn't this something that we'll take up at the exhibit hearing when these documents are available for review?

MR. SHEASBY: Your Honor, the reason for that is that there's a lot of them, and we -- we're happy to do it on a document-by-document basis if Your Honor thinks that's more efficient.

THE COURT: I don't mind doing it as a bucket, but I'm just saying it sounds to me like it is just a question about discreet exhibits.

MR. SHEASBY: It is, Your Honor. And I think the

one that we flagged as the representative exhibit, that goes to all of these issues. There's one that's sort of engaged in the motion in limine.

THE COURT: All right. Well, go ahead and give me your argument on that one.

MR. SHEASBY: Sure.

So if you go to Slide 78.

So in the Fifth Circuit, there's actually very specific case law on the subject. And the case law basically says that something is likely not a business record if it was prepared for litigation.

And in particular -- and I want to get this quote.

With Your Honor's permission, may I -- may I grab a quote?

THE COURT: Yes, while you're grabbing it, I'll tell you, they represent in their opposition that all you're talking about is a particular group of data taken from a pre-existing database that is maintained in the regular course of business, even though the particular subset that they took out that you're now seeking to exclude is a subset that they pulled only for purposes of this litigation.

MR. SHEASBY: Yeah, that's right. And that's actually what the -- what the Fifth Circuit in U.S. versus Sanders forbids. And if you just -- I'm going to get the

quote up for you.

If you read U.S./Sanders, U.S./Sanders, it specifically says that when you just selected pieces of data from the dataset but you haven't included all the data, that that -- that is forbidden.

Give me one second, and I'll find it, Your Honor.

THE COURT: Okay.

MR. SHEASBY: Let's go to PNC Page 73 of our -- our opposition to their MILs. So it's a different deck, Mr. Brodsky.

THE TECHNICIAN: Different slide deck?

MR. SHEASBY: Yes, different slide deck.

74, excuse me.

THE TECHNICIAN: You said our opposition to their --

MR. SHEASBY: Yes. Our opposition to their MILs. So it's our slide deck that's in opposition to their MILs. It's the other major slide deck.

THE TECHNICIAN: Yes. 74.

MR. SHEASBY: Yes.

Thank you for your patience, Your Honor.

Slide 74. Ah-ha.

So what U.S. versus Sanders says is that records created for litigation are not reliable. And in particular, what they say is -- what U.S. versus Sanders

says is that when you select out particular subsets of documents for particular pieces of evidence, it's not a business record.

And in this -- in this situation, we know that they did select out different types of costs -- go back to the other slide deck now, Mr. -- I need to get the Sanders quote up. It's not -- it's not in the deck.

So they excluded some cost data from their calculation of costs, and the exclusion of cost data is what makes the documents non -- makes the documents not business records and hearsay.

So the issue is not that they have to produce every piece of data that may ever exist. The issue is if they're selectively producing cost data, which they admit to doing in a document, and they've excluded other cost data where a document is not a business record because it's not prepared in the ordinary course of -- of business, it's prepared for the purpose of litigation.

So this is not a situation in which we're saying, oh, they had to have -- they had to have produced every document that ever existed relating to all their costs. Particular issues relating to the cost of the cases were excluded -- particular pieces of information relating to costs were excluded.

And I'll -- I'll flag this particularly from the

Fifth Circuit, and I do believe this is -- obviously, it's Fifth Circuit so it's binding, Your Honor. Although the program used to retrieve the data was not introduced at trial, Ronny Wise, the custodian of the claims for TDHR, the sponsoring party, testified extensively about the manner of preparation of printouts. His testimony makes it clear that neither the payment registers nor the provider information were selective compilations of information. Rather, both contained all the information TDHR possessed covering the claim of Sanders.

They go on to emphasize later in the opinion that the provider was -- profile was simply a retrieval of data stored in a manner meeting the requirements for admission of business records. Quote, as discussed above, it was not a selected compilation of random pieces of data.

So the issue is very precise. In this document, they cherry-picked the categories of branch cost information that they provided and they excluded others, and they admitted that. Whether that data can be used by an expert is a separate question. That data is not a business record.

So when there was a cherry-picking of information on a subset of the relevant category of information that the document is directed through, that's not a business record, because, quote, under U.S. versus Sanders, it's a

selective compilation of opinion.

THE COURT: You know, I'm looking at the Sanders opinion, and the Sanders opinion affirmed the District Court's admission of the documents. It doesn't say anything about documents that wouldn't be admitted.

MR. SHEASBY: It says documents prepared for litigation are -- are a category that may not be business records, and it emphasizes that the business record in Sanders was not a, quote, selective compilation of information.

THE COURT: You know, what Judge Higginbotham said is as for the second element, Sanders' arguments that the printouts were records prepared for litigation are misplaced.

The printouts themselves may have been made in preparation for litigation, but the data contained in the printouts was not so prepared. That information was recorded in Medicaid claim forms by Sanders or his employees shortly after Sanders supposedly filled the prescriptions. And Southwestern promptly recorded the information in a form acceptable to the TDHR computers.

MR. SHEASBY: Judge Higginbotham also says computer business records are admissible if, one, they're kept pursuant to a routine procedure designed to assure their accuracy; they're created from motives that tend to

assure accuracy, e.g., not including those prepared for litigation; and, three, they're not themselves hearsay.

So I believe Judge Higginbotham flagged documents prepared for -- computer records that are prepared for litigation as a category of documents that would not fall into the business record exception.

THE COURT: You know, he -- this opinion was affirming the admission of a portion of a database.

MR. SHEASBY: That's true, Your Honor.

THE COURT: So how are you saying that it stands for the proposition that you can't offer a subset of a database?

MR. SHEASBY: So you can offer a subset of the database. You just can't offer a selective subset of the database, which is --

THE COURT: So if it's not selective, it's random?

MR. SHEASBY: So that's exactly right, Your Honor.

THE COURT: I've never heard of somebody just taking random portions of the database and that being okay, but if they picked them --

MR. SHEASBY: No, no, to be clear, if you just randomly select portions of the data relating to the subject matter. Judge Higginbotham was comfortable because he had emphasized all the information covering the claims that Sanders submitted was included in the compilation.

That's what he said in Footnote 4 was the critical issue.

I can actually -- if Your Honor would like, I can put it on the ELMO.

THE COURT: You're saying that Judge Higginbotham put the critical issue in a footnote?

MR. SHEASBY: No. He also discussed it on the next column, which he says, the provider profile was simply a retrieval of data stored in the manner meeting the requirements for the admission of business records.

As discussed above, it was not a selective compilation of random pieces of data. It was actually in the express ruling that was basis on Page 199 for his ruling. It's not just a footnote.

And this is -- Your Honor, I know I'm going to lose you in one minute on this, but this is actually -- there's a deep issue here so let me try one more time.

THE COURT: It sounds to me like you're arguing about a completeness issue. You want other parts of the database included?

MR. SHEASBY: No. So that -- it's not a completeness issue.

It's slightly different, which is what Judge Higginbotham said is all of Sanders' data was given. There was no cherry-picking, there was no selection.

THE COURT: No, that's not what he's saying at

all. He's said that they -- all of the information that was admitted came from a database that was maintained in the ordinary course of business.

MR. SHEASBY: And he's saying it was not a selective compilation of random pieces of data stored in the TDHR but was instead a complete list of all information TDR (sic) possessed, all information TDR (sic) possessed.

I can -- let's put it on the ELMO.

It's right there, Your Honor.

THE COURT: Yeah, that's talking about 1006, which is a different issue than hearsay.

Whether something is a summary under 1006 depends upon whether everything that is in the alleged summary is drawn from the business records.

A summary is something that was separately or is separately prepared for purposes of litigation.

MR. SHEASBY: Yeah, so, Your Honor, our motion in limine is not limited to whether it's hearsay or whether it's a proper compilation. Our motion in limine is -- let's go back to the slides -- is -- is that --

THE COURT: Here, Judge Higginbotham is saying these are not summaries, and, therefore, they're not subject to the requirements of 1006.

MR. SHEASBY: Well, I think what Judge Higginbotham is saying is he does the hearsay -- I

understand, so you're interpreting that as saying the fact that it's selective doesn't matter because it's not a summary. That's -- that's how you're interpreting it?

THE COURT: Yes. He's saying that as long as it's drawn from a database maintained in the ordinary course of business, it's not hearsay.

MR. SHEASBY: Yeah, so the -- he makes the same analysis under his FRE Evidence 803 Column 6 analysis where he says -- this is where Footnote 4 comes in. He says, thus, while the data was summoned in a readable form shortly before trial, it -- entered into the TDR (sic) computers at or near the time of the evidence recorded. It is not necessary the printout itself being in the ordinary course of business, at least when the program calls for data only orders it out rather than sorting, compiling, or summarizing information.

Let me show you that, Your Honor. This is an 803 analysis. He talks about the fact that when he -- it is a business record when you're not sorting, compiling, or summarizing the information.

And then he particularly, in Footnote 4, calls out that it wasn't selective. That Footnote 4 is the footnote that I just showed you previously.

And so to be clear, I'm not being picky about this just to be picky or to be difficult. To put it precisely,

there is cost information on branches that they have in their database. They admittedly selected some categories of cost information from branches and produced it in a business record, what they purport to be a business record for this litigation, and they excluded other cost information.

That may be a demonstrative, that may be something that an expert can rely on, but that is not evidence, and I think if you read Judge Higginbotham's section, he emphasizes in the 803 section that the selection of only a subset of data that was at issue would be a problem.

THE COURT: You know, I agree with you that there's -- he is saying it's not certain things, but that doesn't mean that he's holding that unless all of that is present, it's excludable.

But in any event, if you're saying that they should have included the cost information in order for it to be an accurate representation of their business records, then let's talk about that.

But as long as the -- all of this data was drawn from the database that was maintained in the ordinary course of business and they have some custodian who will so testify, then there's no reason why it won't qualify under 803.6 as a business records exception to the hearsay rule.

MR. SHEASBY: Your Honor, whether you assess it under business record, as I think Judge Higginbotham did about selective data in Footnote 4, whether you assess it under improper compilation or you assess it under rule of completeness, the issue is the same.

Let's go to the slide -- the slide that we were previously on.

THE COURT: Well, the difference is if it's under the rule of completeness, then the remedy is to add to it, not to exclude it.

MR. SHEASBY: Your Honor, that is fine with us.

THE COURT: All right. Then let me hear from the Defendant.

MS. YOUNG: Thank you, Your Honor.

This is a business record. The document we're coming about, as Ms. Mitchell testified, has information that was pulled literally straight out of systems PNC maintains in its ordinary course of business, out of tools it developed to run its business so it can keep track of how costs are being incurred and allocated to different accounts.

That has precisely the indicia of reliability that the business records exception is looking for.

And we have a witness who has attested to that. She testified precisely to this at her deposition.

And if we can pull up our slides, if you wouldn't mind.

THE COURT: I will also say while I'm looking at Judge Higginbotham's Footnote 4, that what he's talking about there is that the two databases from which this information was pulled were kept in the ordinary course and that those two databases were not selective compilations of information, rather, both of them contained all the information that was received by the company.

He is not talking there about what was admitted and what was the subject of the appeal.

But anyway, I'm sorry. Go ahead.

MS. YOUNG: So we have multiple instances of testimony from Jessica Mitchell, who is the chief financial officer of the retail bank at PNC. She helped to develop the retail profitability tool out of which this data was pulled in the ordinary course.

THE COURT: I'm okay with the showing you've made on the hearsay exception.

What about the Plaintiff's objection that under 104, the cost information needs to be part of this in order for it not to be misleading to the jury?

MS. YOUNG: Well, it's an interesting objection because this data was pulled in response to a very specific request we got from USAA. When this litigation started,

very early on, they said tell us what the cost is to process a check deposit in your branches. Tell us what the cost is to process a check deposit in your ATMs.

And we went to PNC, and we said where do you keep this information, and that's how this document was pulled together. They went and pulled literally out of their databases information about the number of transactions that happen in their branches and what they in the ordinary course of their business allocate to the cost of a check deposit so that we could give USAA the precise information that they had asked for.

That is what is on this document. This document was responsive to this request we got from USAA about what is the cost of a check deposit in the branch? And there are other costs of operating a branch, and there are different ways that PNC allocates those costs, but this is how they do it in that tool.

And Ms. Mitchell described the methodology about how they do that. You're actually seeing that here on the screen. We produced ordinary course business documents that explain to them the methodology that was developed in the ordinary course of PNC's business about how those branch costs are taken and allocated. So they have that. They have that information. We gave it all to them. There's nothing missing from any of this, and the

underlying data is the business record.

THE COURT: All right. Thank you, Ms. Young.

MR. SHEASBY: Your Honor, just two corrections.

Slide 82.

So the data was not ordinary course of business data. To the contrary, she admitted that the data was not ordinary course of business data.

THE COURT: She's saying the spreadsheet was not. The spreadsheet is what she pulled from the database. The database is what was kept in the ordinary course of business.

MR. SHEASBY: Right. But the calculation, we don't look at the cost of a transaction in the regular course of business.

So what they did -- and I have to admit, it is -- it was very clever, is we said give us your data on cost calculations. Ms. Mitchell said, we don't prepare one in the ordinary course of business. And so presumably they asked her to theorize one. And what she did is she removed some of the cost data they keep in the ordinary course of business relating to branch and excluded others.

And that's the issue we have. So whether it's -- I'm never going to convince you about what Judge Higginbotham meant. I know that.

THE COURT: Because you're wrong.

MR. SHEASBY: Your Honor, I actually have to tell you objectively I'm probably wrong as between you and I talking about evidence, I concede that.

One thing I do have an instinct for is shenanigans. And I don't think it's a bridge too far to say, you know what, produce all the cost data for the branch. You can't just selectively produce it, because if you selectively produce it there's a rule of completeness issue.

And this is not about them having to produce a thousand million gigabytes of information. This is about selected data that they consciously said, we didn't include that existed in the database.

THE COURT: What I'm going to do is to deny the motion in limine at this point. But I'm going to tell you to confer with defense counsel, and if you can describe for me what it is that you contend is missing from this, under Rule 106, in a way that is a doable way to include that information, then I'll reconsider this under the Rule 106 completeness issue. But I am not going to find that it is hearsay and inadmissible.

MS. YOUNG: Your Honor, may I make one comment on that?

THE COURT: You may.

MS. YOUNG: We had months and months and months of

discovery and meet and confers where they could have asked for this data if they wanted it or if they thought it was incomplete. We gave them what they asked for, which was the cost that gets allocated to a check deposit in the branch, and we pulled that right out of our records.

THE COURT: And how does that answer the completeness issue?

MS. YOUNG: Well, what we gave them was a complete -- complete information of what is in the PNC systems about this, and I can show Your Honor what I'm talking about here. This is the document that we're discussing.

THE COURT: I understand that you're representing and they're not denying that this is what they asked for. But I don't think that means that that's what comes in at trial and nothing else. It still has to survive the Rules of Evidence.

And one of those rules is that if the other side can show that there is something missing from the selection -- and this clearly is just a portion of the database, and Rule 106 is about the remainder of it, and if they can show that in fairness, and that's the -- what the rule says -- in fairness, ought to be considered at the same time.

That's what I'm giving them the opportunity to do,

and admittedly, it might have been better if this had been done earlier, but I didn't get the issue until now.

MS. YOUNG: I just -- I'm having trouble understanding what more we could provide to be more complete on this issue because this is --

THE COURT: I understand that. And that's what I'm putting on the Plaintiff.

MS. YOUNG: Okay.

THE COURT: And if they don't describe it in a way that can be done, then they lose. But I'm going to give them a chance to do that.

MS. YOUNG: Thank you, Your Honor.

MR. SHEASBY: Your Honor, I just want to thank the Court's indulgence for this extended argument about Judge Higginbotham earlier.

THE COURT: Judge Higginbotham is one of the brightest and most likeable judges that I've ever met, so his opinion is entitled to it.

MR. SHEASBY: And I'm calling him as soon as this hearing is over, and I'm telling him everything that was said.

THE COURT: All right. That takes us to -- all right. We're on to No. 15.

MR. SHEASBY: Yes, Your Honor.

So if we could have the slides.

The -- there is no dispute that the PTO was presented with the issue of whether the '605 and '681 patents can claim priority back to the 2006 application. It's subject to the motion for summary judgment that you have denied.

I don't think it's proper for them to deny it in front of the jury or to dispute it in front of the jury given that they don't deny it in a motion for summary judgment. And I think that what we don't want to have is attorney argument on a fact that their experts ignored but that is undisputed. And so that's the basis of the motion in limine.

I don't -- I don't think it's proper for anyone to even suggest or argue to the jury that the PTO did not consider the priority date issue in the prosecution of the '605 and '681 patents. I mean, it's a narrow MIL, Your Honor.

THE COURT: You know, the MIL appeared to be based on a waiver argument. I looked at that opinion, and that opinion is about waiver on appeal because of an issue that was not raised in the District Court. It's not about waiver in the District Court of an issue not raised in opposition to a motion for summary judgment.

MR. SHEASBY: Yeah, so I agree that it actually is not the best citation. The Fifth Circuit case is

definitely about waiving something for appeal. I think the basic argument is the following.

There is no disputed fact as to whether the PTO considered the priority date issue for these two patents. It's not disputed. They haven't presented any evidence disputing it. And so for them to use attorney argument to inject some question about an undisputed fact is improper on a motion in limine -- is improper as a matter of law, and that's why we're bringing the motion in limine.

THE COURT: All right. Thank you, Mr. Sheasby.

MR. LANTIER: Thank you, Your Honor.

As Mr. Sheasby just noted, there is the pending motion in limine, Docket No. 384, that I think that entirely overlaps with this motion in limine, and I'm -- I'm not sure I understand what the requested relief is.

As you can see on this slide, we don't dispute -- we said you didn't have any typos in what you quoted from the prosecution histories of the '605 and '681 patents, and assuming that the Court allows that type of evidence to go before the jury, which I think is the subject of other motions in limine, we, again, wouldn't dispute that there are correct quotes.

I think what's actually going on here is that the Plaintiff is asking for the Court to issue some kind of an order here so that it can effectively put that order in

front of the jury and argue that there's some sort of super presumption of validity for these patents on the written description issue, and that I think would be improper, Your Honor.

Now, we don't dispute that every patent is entitled to a presumption of validity under the law, that we have to meet our burden by clear and convincing evidence, but I think it would be improper for the Court to issue an order in connection with the motion in limine that doesn't seek to actually exclude any evidence or anything but that could be used by the Plaintiff to suggest to the jury that somehow the Court has already concluded that these patents satisfy the written description requirement.

THE COURT: Well, I can answer part of that easily, and that is that no motion in limine order will be presented to the jury.

But what I understand this motion to be seeking is an order that PNC, not in front of the jury, dispute the priority date or that the USPTO allowed a certain priority date.

MR. LANTIER: And, Your Honor, there's no dispute that the USPTO allowed the patents, and there's no dispute that they claim a priority date. It's on the face of the patent -- the patents back to 2006.

If the Court determines that statements from the prosecution come into evidence, then certainly we will not dispute what the statements from the prosecution history are.

But I'm not sure what, then, the requested relief is on this motion in limine.

THE COURT: You know, and maybe to clear up one thing, this is not an order that would prevent you from disputing it in front of the Court. It would only prevent you from disputing it in front of the jury.

MR. LANTIER: And what is "it," Your Honor?

THE COURT: The -- that the USPTO allowed the '608 (sic) and '681 patents to claim a priority of October 31, 2006.

MR. LANTIER: The USPTO wouldn't have -- I think that the request there is after considering the issue, right? That -- that's the requested relief in the motion. It says, to claim a priority date of October 31st, 2006 after considering the issue.

And so I'm not sure -- we're certainly not going to say that a statement wasn't made if it was made in the prosecution history. But what's the import of an order from this Court that -- that allows the relief -- or that -- that awards the relief that USAA is seeking here?

THE COURT: It would be that you not be permitted

to make that argument or statement in front of the jury.

MR. LANTIER: So is that -- is that a summary -- effectively a summary judgment ruling that the -- that the patents are entitled to the earlier priority date?

THE COURT: No, it -- all it does is prevent you from making an argument to the jury, and if you believe you're entitled to make that argument, talk to me about it.

MR. LANTIER: And I'm not trying to be difficult, Your Honor. I -- we are not going to argue that the Patent Office didn't make any statements that it made during prosecution of these patents. We are not going to argue that the patents are not entitled to a presumption of validity. And we're not going to argue that the patents on their face claim priority back to October 31st of 2006.

THE COURT: Okay. Are you going to argue or are you going to dispute in front of the jury, I guess -- maybe disputing is part of the reason. Are you -- is your concern that you may take positions that would result in undermining that statement without actually directly saying that?

MR. LANTIER: I'm -- and, again, Your Honor, I'm not trying to be difficult. Our position is that the patents are not entitled to -- the prior -- that there's -- the written description requirement is not satisfied. That the specification as -- as it existed on October 31st, 2006

does not demonstrate that the inventor had possession of the claims that issued in these much later patents.

THE COURT: And if you succeed with that argument, then the patents would not be entitled to -- oh, I guess that would invalidate the patent, is that your argument?

MR. LANTIER: That is correct, Your Honor. That would invalidate the patents under Section 1 -- 35 U.S.C. Section 112.

THE COURT: It wouldn't really change the priority date. It would just moot that issue, I guess.

MR. LANTIER: I suppose that's true, Your Honor.

THE COURT: All right. Mr. Sheasby, are you considering that if you are granted the relief that you're seeking in this motion in limine, that that would somehow affect their written description defense?

MR. SHEASBY: So, Your Honor, there is a question of a relevance of the fact and the weight given to that fact.

Let's put up the slides.

THE COURT: I'm sorry, what was that?

MR. SHEASBY: There's a question between the relevance of a fact and the weight given that fact.

So obviously the fact that the PTO considered expressly the issue of priority would be relevant to the issue of written description, but they would still have the

written description argument.

To put some more context on it, for the '605 and '681 patents, they were originally filed without claiming priority to the 2006 application.

We then got a rejection based on prior art that post-dated the 2006 date, and what we did is we claimed priority -- we said then wait a minute, we want to claim priority back to 2006, and the rejections were withdrawn based on that fact.

That is undisputed. They don't dispute that those facts occurred. They don't dispute any issues associated with -- any facts associated with that, that that set of events happened in front of the USPTO.

And the purpose of the motion in limine is to stop them from disputing the factual matter that the PTO considered the question of whether we had claimed priority back to 2006 and agreed we could.

Now, the impact of that on the validity defense is for the jury to decide, but what we don't want to do is have a situation in which the -- the -- they're getting up and saying the Patent Office didn't consider this issue when the Patent Office expressly considered this issue. That's the -- that's the -- the nub of the motion in limine.

And so this issue is we don't dispute the

individual words in their quotes. That's not engaging -- fairly engaging the issue. The issue is -- this is the issue that's joined. The PTO considered priority date expressly. They don't dispute that. And somehow they're going to try to contradict that fact or -- or subvert that fact through attorney argument. And the point of the motion in limine is prevent them from doing that.

This is an undisputed fact that the PTO said there was -- that the 2006 priority date was proper. And we shouldn't be having any games about that in front of the jury.

As to how the jury weighs that issue, they can have at it. But the fact that it was -- occurred is not something they should be disputing.

And -- and this issue of we don't -- we don't disagree with the quotes there, it's not about them disagreeing with the quotes there. There's a deeper issue here.

THE COURT: All right. Thank you, Mr. Sheasby.

MR. LANTIER: If the only scope of a motion in limine is that we can't in the opening statement or in the closing statement or during the presentation of an expert make the broad statement that the Patent and Trademark Office never considered the priority date issue, I -- I don't think that there's any real debate here. We're not

going to make a statement that is inconsistent with the record.

But what's been sought in the motion in limine is something I think intended to be broader, which is to try to establish the fact that somehow the patent and -- what happened in the Patent and Trademark Office, which was an Office Action and a rejection and then an amendment after submission from -- from USAA, creates some kind of super presumption of validity here. And it doesn't.

So, Your Honor, if all we're talking about is during the opening or during the closing not making a broad statement that the Patent Office never considered the 2006 priority date, we can agree that we won't make that kind of a broad statement.

THE COURT: You know, the jury is not going to be told about this order, therefore, there's no risk that the jury will think it creates some super presumption of validity.

The effect of the order would be that the Defendant will be prohibited from arguing in front of the jury that the USPTO did not allow the priority date of October 31, 2006 after considering the issue.

And I understand that you don't plan to offer -- to argue any different priority date or at least -- well, first, do you plan to argue for a different priority date?

MR. LANTIER: Yes, Your Honor. We believe that the -- the claims at issue here are not supported in 2006 and that, in fact, there -- they were not supported by anything in the file histories of these patents prior to 2017.

THE COURT: All right. Well, and certainly you're entitled to do that as long as in the course of that, you don't dispute that the PTO allowed that priority date after considering the issue.

MR. LANTIER: Yes, Your Honor. And just to be clear, I think that the only issue would be if -- if USAA makes a contrary statement that's overly broad to the jury that we don't believe is reflective of the actual record, I don't understand Your Honor's ruling to preclude us from responding to that type of statement.

THE COURT: The -- what the ruling would require is that before you conclude the door has been opened, that you seek leave from Judge Gilstrap.

MR. LANTIER: Yes, Your Honor.

THE COURT: All right. Well, I'll grant Motion in Limine No. 15 on that basis.

That takes us to 16.

MR. SHEASBY: Slide 88.

So Slide -- MIL 16 is actually pretty meaty, Your Honor, and we probably shouldn't have put it so far down on

the list. It relates to a pretty significant issue.

So there are a small number of patents for which an IPR has been granted, and I think that we heard from PNC that they feel very good about that fact earlier today. But there are consequences of that initiation.

And for each of the three patents, they made a very explicit representation to the PTAB, and that representation to the PTAB -- if you go to Slide 87 -- was that they will not raise any issue that was raised or could have been raised, very, very broad. In fact, they use this as a reason to initiate those collateral proceedings.

And there was actually colloquy back and forth where we told the PTAB we don't think they're really go to live up to this. And the PTAB said, well, that's for the judge to engage with.

But what we do know is that they made what in my mind is a pretty striking, strategic decision. So all of their prior art quote references that they've elected, every single one of them, their evidence of it is a printed publication.

So for VX980 (sic), no source code; KNFB Reader, no source code; BankServ Electric Deposit, no source code; iPAQ, no source code; CAM, no source code; Desktop Deposit, no source code. You go on and on and on. ImageNet, the famous ImageNet, which is a Mitek product in which Mitek's

corporate representative openly admitted that they had the source code, and they didn't produce it in response to a subpoena from PNC.

So what they've ended up doing is that every single one of their prior art combinations is based on a printed publication. Under their representation to the PTAB, they're forbidden from using any of these as prior art references.

Now, to be clear, if they were to lay a foundation that the evidence they're relying on for a particular reference was not a printed publication, was not subject to an IPR, they could seek leave. But as a present rule, enforcing the MIL, the MIL is simply enforcing the commitment that was made by the PTAB, which is anything that was raised or could have been raised.

112 could have been raised. The Federal Circuit has made that clear just recently in Indivior, and the -- all of these printed materials they claim they're publications that were publically available. So printed materials that they claim are publicly available are useable in front of the PTAB.

So they should be held to their representation to the PTAB, Your Honor.

THE COURT: They contend that you are giving too broad an interpretation to the stipulation they made in the

IPR. What is your answer to that?

MR. SHEASBY: Yeah, so the stipulation is neither broad nor narrow, it is what it is. Any ground that was raised or reasonably could have been raised.

The online reviews of the VX980 (sic) Reader could have been presented to the PTO. They don't dispute it. The ImageNet online articles and videos and press releases and user guides could have been presented to the PTO. They don't dispute it. So I'm not giving an overly broad or overly narrow one. I'm focused on what they did.

They didn't use source code for any of their prior art. Because they didn't use source code for any of their prior art, all they used is material that could have been in front of the PTAB, and there's consequences to that.

THE COURT: Now, there -- the PTAB did not institute on some of these patents, right?

MR. SHEASBY: That's correct, Your Honor. And to be clear, we're not looking to exclude them completely from presenting these arguments. We're looking to exclude them from presenting on the arguments as to the patents on which they initiated.

THE COURT: All right.

MR. LANTIER: Your Honor, before he sits down, he just used the word "initiated." Does he mean that only as to the patents on which the PTAB instituted?

THE COURT: I assume you meant "instituted." Is that right?

MR. SHEASBY: Yes, I'm sorry, if that was unclear for counsel.

THE COURT: All right. Thank you, Mr. Sheasby.

MR. LANTIER: Thank you, Your Honor.

And if we could go to Slide 46 of the PNC presentation.

So, Your Honor, this is not a motion in limine. This is a motion for summary judgment. What USAA is asking you to do is to preclude -- and their MIL wasn't clear on this, but Mr. Sheasby has been clear today. It's only with respect to the three patents that are the subject of instituted IPRs.

But they're asking Your Honor to preclude PNC from raising Section 112 invalidity defenses and non-printed publication Section 102 and 103 defenses.

THE COURT: I understand that they're seeking to exclude what they contend is precluded by the stipulation. Do you understand it to be broader than that?

MR. LANTIER: I do, Your Honor. The stipulation read as follows: Petitioner stipulates that if this IPR is instituted, it will not advance the grounds that are raised or reasonably could have been raised in this IPR in the co-pending District Court proceeding.

That was the stipulation. And it focused on PNC agreeing that it would not raise the grounds that were raised or reasonably could have been raised.

And as I show on Slide 47, and this is 35 U.S.C. Section 311(b), the only grounds that can be raised in an IPR are grounds on the basis of prior art -- sorry, are grounds under Section 102 or 103 and only on the basis of prior art consisting of patents or printed publications.

So what does that mean? That means you cannot raise in an IPR a argument that the patent is invalid because it lacks written description. That is not a ground that the Court will recognize.

You cannot raise in an IPR a ground based on your examination of a physical product because that's not a printed publication. We are not going to present at this trial the grounds that we elected in our election of prior art that was based on Section 102 or 103 and on a printed publication, that's the Nepomn- -- sorry for butchering the name, but it's the Nepomniachtchi ground, and we won't be pursuing that.

However, in no way did the stipulation prevent us from raising Section 112 defenses because those are not cognizable grounds in an IPR. And, likewise, they don't prevent us from presenting Section 102 or 103 arguments based on product prior art, based on the examination of a

product.

And I just want to make clear what a broad amount of relief they're asking from Your Honor based on one page of briefing in a motion in limine in which they don't perform any analysis to compare what's in the publications with what's in the product.

And I do think that it's relevant to look at Dr. Kia, he's the invalidity expert for PNC, and look at what he presents in his expert report.

And so if we could have the ELMO.

You heard Mr. Sheasby talking about the VX9800, and these -- this is the relevant portions of Dr. Kia's expert report on that product. And what we can see is where I've highlighted that he used a working VX9800 and explored the functionality.

And I know it's hard to see, Your Honor, but if we cycle then through his report, his report is based on his actual physical examination of the VX9800. These are pictures that he took of the working product.

And so that ground could never be presented to the Patent Office in an IPR because it's not based on a printed publication.

THE COURT: Is it in -- are those same grounds in a printed publication?

MR. LANTIER: No. And, Your Honor -- and this is

the problem with the very sweeping relief they asked for without an analysis. No. And if you review Dr. Kia's report, and we can walk through it in more detail, he explains repeatedly, for example, that he -- he spoke to a developer of certain products and learned things that weren't readily apparent from the printed publications. He relies for the VX9800 on his actual operation of the product rather than what he sees in the user guide.

And so, no, there is a delta between what was available in the printed publications and what is being relied upon from the product prior art.

THE COURT: So is that the only such example?

MR. LANTIER: No, Your Honor, it's not. That was one example I was using.

But I will note that the motion in limine itself does not even attempt to show that everything that was in the -- that is being relied on from the product prior art or from discussions with developers of that prior art is already in the printed publication. So it's asking to make a very broad factual finding that everything is there without any record or support of that finding.

THE COURT: Well, the more simple level on which I read this motion in limine operating is that we simply strike all of the printed publications and patents that you would seek to use on 102 or 103 grounds for the patents

that had IPRs instituted.

MR. LANTIER: So if Your Honor is saying, for example, with the VX9800 what Dr. Kia can talk about is his analysis of the product but he cannot talk about a publication -- you know, a publication that relates to that product, I understand -- I understand that, and I understand where Your Honor is coming from.

There is a separate issue of there are sometimes combinations for dependent claims and some independent claims where a piece of product prior art is being combined with publication prior art, and that's a different situation because you can't raise that ground in the PTAB.

And Judge Schroeder decided that issue in a -- in a case as to whether that would be barred by -- by an IPR estoppel, and that's the General Access Solutions case at 2021 WL 5154085.

And I know that it's a different judge than this Court, Your Honor, but his determination was that those would not be subject to an estoppel.

THE COURT: I understand that. And, frankly, there may be a question of fact that would have to be determined at trial about whether the experts' analysis of the product that is relied upon could have been presented to the PTAB based on the printed publications.

And that's an issue obviously I'm not going to be

able to decide on a motion in limine. But are -- are you proposing that there should be no effect given to that stipulation entered in the PTAB?

MR. LANTIER: No, not at all, Your Honor. And as I said previously, there are certain -- there are certain grounds that we elected as our prior art election that we -- we cannot pursue any longer, and we acknowledge that we can't pursue them because they are based solely on printed publication prior art, and we -- the stipulation means we can't pursue those.

THE COURT: Okay. And have you in some way withdrawn those in this case?

MR. LANTIER: I don't know that we've formally withdrawn them, Your Honor. We can. I do believe that -- we did in response to the -- the motion in limine indicate that we wouldn't be pursuing those grounds.

THE COURT: All right.

MR. LANTIER: But also happy to -- to file that stipulation. But certainly, we are honoring the stipulation that we made in the PTAB and absolutely will not present any grounds that we raised or reasonably could have raised in the IPRs with respect to the patents on which the IPRs were instituted.

THE COURT: All right. Thank you, Mr. Lantier.

MR. SHEASBY: Can we have the slides, please?

So I want to do two issues. The first is I want to create -- just correct what is a basic misstatement of the law.

THE COURT: Maybe -- you're a little taller than some of our people. If you could pull the mic up a little toward you, I'll hear you better. Thank you.

MR. SHEASBY: It's late in the day. I'm running out of gas for the Honorable Court here.

THE COURT: Well, this is the time to do that.

MR. SHEASBY: Your Honor, this is just basic -- the Federal Circuit has ruled on this issue.

In 2021, the Federal Circuit said that written description could have been raised -- can be raised in the context of a PTAB petition, and they actually attempted to do it in a number of PTAB petitions that were denied. And they do it by saying the claims are prior art to themselves because they don't have priority all the way back.

I've heard no dispute regarding this case law. So as to the patents on which there's been initiation, there can be no probability beyond any written description argument based on Indivior. As to -- and that's Indivior vs. Dr. Reddy's 18 F.4th 1323, Fed Circuit 2021 at Pages 26 to 27.

As to this other issue, this VX90 (sic), I can tell you the version that -- that was being used was not

one that was established as having been available as of the priority date. The reference to discussions with an individual was a reference to a discussion with a Mr. Gashel, I believe, with -- with an individual who is not being offered as a witness, whose testimony is not coming in, and they've conceded that Mr. Kia -- Dr. Kia is not allowed to talk about what he said to this -- to this hearsay individual who's not coming to trial.

And to be clear, if they have something that goes beyond a printed publication, they can make a proffer, and we can fight about it. But the stipulation is clear. If they're relying on a printed publication, they're out of the game based on the stip.

The MIL should be granted, and if they want to seek leave, they should make a proffer that they've gone beyond something beyond the printed publication.

THE COURT: Well, if they're contending that the grounds that they asserted or are asserting here, I guess, through their expert report are not based on printed publications, why should I investigate that?

MR. SHEASBY: Well, I -- because there was a contract signed with the PTAB based on the representation that was made about what would and would not be presented in this case, and the Court I think properly enforces contracts.

The second issue is -- I mean, I --

THE COURT: Why is this being raised as a motion in limine?

MR. SHEASBY: As opposed to a motion to strike, for example, Your Honor?

THE COURT: As opposed to a motion that would allow a fuller development of a record and briefing?

MR. SHEASBY: Yeah, so the institutions came out after the motions to strike was presented. So this was the vehicle which we could properly do it. If it would come out earlier, there would have been more robust briefing.

But I actually don't think -- we're very conscious of this case is going to go up on appeal to the Federal Circuit. God willing, it will be based on a Plaintiff's verdict. We understand that playing shenanigans with this is going to cause us a lot of problems if we're being greedy or piggish on this. These are all printed -- we in good faith identified the fact that they're relying on stuff they claim is printed publications for each of their current grounds.

If they want to establish that they're relying on something beyond their printed publications, they should be entitled to do that. But granting the relief that if it's a printed publication, you're out, is just a direct and rote application of the stipulation that was made in front

of the PTAB.

THE COURT: I understand that, but unfortunately, that doesn't resolve all of the issues.

What you're in effect asking is for the Court to decide which of these various challenges are barred by this stipulation.

And in a normal motion, you'd have to set out the precise relief you're seeking. And I'm not saying that you're not entitled to get some ruling on that, but this is a very awkward way to do it.

MR. SHEASBY: So it's a chicken and the egg issue. I think it's very clear that because of the delicateness of this, it's going to have to be further briefed. The question is do you grant the motion in limine and then make them do a proffer, or do you want supplemental briefing for us in which we sort of go through each of these?

And there's a lot of them. We don't even know which ones they're going to actually try. I know there was this representation that they've narrowed the list of prior art. This is all the prior art references, and they have multiple combinations of each of them. So there's an immense amount of prior art combinations out there still.

And so I think the stipulation is clear. I think its application to any one combination requires some type of proffer. We felt it was appropriate to limine it out so

that they make the proffer. But if they want to tell us which ones they're actually going to run with, we'll make the proffer as to why it's out, but somehow the stipulation has to be given effect, Your Honor.

THE COURT: Well, here's what I'm going to do. I understand we're going to resume tomorrow morning.

MR. SHEASBY: Yes.

THE COURT: Between now and tomorrow morning, I'm going to ask that your side meet with their side and figure out what -- if you can agree on a way, that would be very nice. If you can't agree, at least both prepare a position and we'll see.

Because what I'm hearing is both sides agree that this stipulation should be enforced. There is fuzziness about exactly how it can be enforced or should be enforced at the edges, and we're going to have to have a way to resolve those issues short of having a fight in front of the jury on what can come in and what can't.

And so given that it's after 5:00, we'll break, and I'll ask you to come in the morning prepared with some specific approach that each side thinks can be taken to resolve this. And if it requires briefing, so be it. If it requires a further hearing, whatever you think is necessary, come prepared to put it out there, and we'll pick up tomorrow morning at 9:00 o'clock.

MR. SHEASBY: Thank you for your patience, Your Honor, and your time today.

THE COURT: All right.

MR. LANTIER: Thank you, Your Honor.

THE COURT: Thank you and we're adjourned.

COURT SECURITY OFFICER: All rise.

(Hearing concluded at 5:07 p.m.)

CERTIFICATION

I HEREBY CERTIFY that the foregoing is a true and correct transcript from the stenographic notes of the proceedings in the above-entitled matter to the best of my ability.

/S/ Shelly Holmes    4/14/2022
SHELLY HOLMES, CSR, TCRR    Date
CERTIFIED SHORTHAND REPORTER
State of Texas No.: 7804
Expiration Date: 10/31/2023