IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
MARSHALL DIVISION

| | | |
|---|---|---|
| UNITED SERVICES AUTOMOBILE ASSOCIATION, | § § § | |
| *Plaintiff,* | § § | |
| v. | § § § | Case No. 2:20-cv-00319-JRG-RSP (LEAD CASE) |
| PNC BANK N.A., | § § § | |
| *Defendant.* | § § § | |

## MEMORANDUM OPINION

Before the Court is the Motion to Exclude Opinions of USAA Damages Expert David Kennedy ("Motion"), filed by Defendant PNC Bank N.A. ("PNC"). Dkt. No. 330. PNC moves the Court to strike certain opinions of Mr. David Kennedy, who is Plaintiff's damages expert. The Motion is **GRANTED-IN-PART** and **DENIED-IN-PART**.

## I.    BACKGROUND

Plaintiff United Services Automobile Association ("USAA") alleges that PNC infringes six patents: U.S. Patent Nos. 10,482,432 ("'432 Patent"), 10,621,559 ("'559 Patent"), 10,013,681 ("'681 Patent"), 10,013,605 ("'605 Patent"), 8,977,571 ("'571 Patent"), and 8,699,779 ("'779 Patent") (collectively, the "Asserted Patents").

On December 2, 2021, USAA served Mr. David Kennedy's expert report on damages. *See* Dkt. No. 331-1. PNC seeks to strike certain opinions.

## II.    LEGAL STANDARD

### A.    *Daubert*

An expert witness may provide opinion testimony if "(a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine

a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case." Fed. R. Evid. 702.

Federal Rule of Evidence 702 requires a district court to make a preliminary determination, when requested, as to whether the requirements of the rule are satisfied with regard to a particular expert's proposed testimony. *See Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 149 (1999); *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 592–93 (1993). District courts are accorded broad discretion in making Rule 702 determinations of admissibility. *Kumho Tire*, 526 U.S. at 152 ("the trial judge must have considerable leeway in deciding in a particular case how to go about determining whether particular expert testimony is reliable"). Although the Fifth Circuit and other courts have identified various factors that the district court may consider in determining whether an expert's testimony should be admitted, the nature of the factors that are appropriate for the court to consider is dictated by the ultimate inquiry—whether the expert's testimony is sufficiently reliable and relevant to be helpful to the finder of fact and thus to warrant admission at trial. *United States v. Valencia*, 600 F.3d 389, 424 (5th Cir. 2010).

Importantly, in a jury trial setting, the Court's role under *Daubert* is not to weigh the expert testimony to the point of supplanting the jury's fact-finding role; instead, the Court's role is limited to that of a gatekeeper, ensuring that the evidence in dispute is at least sufficiently reliable and relevant to the issue before the jury that it is appropriate for the jury's consideration. *See Micro Chem., Inc. v. Lextron, Inc.*, 317 F.3d 1387, 1391–92 (Fed. Cir. 2003) (applying Fifth Circuit law) ("When, as here, the parties' experts rely on conflicting sets of facts, it is not the role of the trial court to evaluate the correctness of facts underlying one expert's testimony."); *Pipitone v. Biomatrix, Inc.*, 288 F.3d 239, 249–50 (5th Cir. 2002) ("'[t]he trial court's role as gatekeeper

[under Daubert] is not intended to serve as a replacement for the adversary system.' . . . Thus, while exercising its role as a gate-keeper, a trial court must take care not to transform a *Daubert* hearing into a trial on the merits," quoting Fed. R. Evid. 702 advisory committee note). Accordingly, "a district court may exclude evidence that is based upon unreliable principles or methods, legally insufficient facts and data, or where the reasoning or methodology is not sufficiently tied to the facts of the case." *Summit 6, LLC v. Samsung Elecs. Co.*, 802 F.3d 1283, 1295 (Fed. Cir. 2015).

As the Supreme Court explained in *Daubert*, 509 U.S. at 596, "Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *See Mathis v. Exxon Corp.*, 302 F.3d 448, 461 (5th Cir. 2002).

### B.   Federal Rule of Evidence 403

Federal Rule of Evidence 403 allows the exclusion of relevant evidence when its probative value is substantially outweighed by danger of "unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly cumulative evidence." Fed. R. Evid. 403.

## III.   ANALYSIS

### A.   Mr. Kennedy's Higher Profitability Opinion

PNC asserts there is an insufficient basis for Mr. Kennedy to conclude that the high profitability associated with PNC's mobile remote deposit capture ("MRDC") accounts is actually attributable to MRDC. *See* Dkt. No. 330 at 6[1] ("There is no proof whatsoever that the 'presence of [MRDC] functionality is what motivates consumers to' use debit cards, overdraw their accounts, or use other services for which PNC charges fees." (citing *LaserDynaminc, Inc. v. Quanta*

---

[1] Citations are document numbers and page numbers assigned through ECF.

*Computer, Inc.*, 694 F.3d 51, 68 (Fed. Cir. 2012)); Dkt. No. 331-1 ¶¶ 147-54, 170, 462-63. PNC alleges "it is undisputed that this difference in profits is caused by higher debit card, overdraft, and personal service fees associated with accounts that use MRDC, and that these products are not covered by the asserted patents and exist independent of MRDC." Dkt. No. 330 at 5 (emphasis omitted). PNC argues that Mr. Kennedy improperly included certain fees into his royalty base without corroborating evidence that the MRDC features are "the basis for customer demand"—in other words, satisfy the entire market rule. *See* Dkt. No. 330 at 6. PNC also argues that USAA should not permitted to consider these fees as convoyed sales because, allegedly, there is no functional relationship between MRDC and the associated higher profitability. *See id*. at 7.

USAA counters that "PNC's belief that MRDC is not responsible for the profit differential is not a proper basis for exclusion. Instead, it reflects a factual dispute for the jury to decide." Dkt. No. 386 at 5. USAA contends that the Federal Circuit has approved of damages models similar to Mr. Kennedy's well-supported opinions asserted in this case. *See id*. at 5–6 (citing *Powell v. Home Depot U.S.A., Inc.*, 663 F.3d 1221 (Fed. Cir. 2011)).

Mr. Kennedy's use-based reasonable royalty theory is not legally flawed. Mr. Kennedy opines that PNC reaps several benefits as a direct consequence of using MRDC. *See e.g.* Dkt. No. 331-1 ¶¶ 147–54. One of the opined benefits is higher profitability. *See id*. ¶¶ 147–48. Mr. Kennedy explains that offering MRDC attracts younger customers, he further opines that these younger customers are more profitable than other types of customers because younger customers are more likely to use high profit non-infringing services. Dkt. No. 331-1 ¶¶ 148–49. In other words, the accused technology allegedly keeps PNC's platform competitive with a specific demographic group, and by acquiring (or holding onto) these younger customers PNC can then sell those younger customers highly profitable non-infringing services (such as Express Funds). *See id*. ¶

4

149. Mr. Kennedy states that the ability of PNC to use the MRDC platform to sell Express Funds is "a significant portion of the incremental profit from accounts using mobile deposits". *Id*. Mr. Kennedy is permitted to consider "the value of the benefit conferred to the infringer by use of the patented technology," and his opinions are not much different than those espoused in *Powell*. 663 F.3d at 1240. The *Powell* Court permitted the jury to consider and award damages for "follow-on purchases of nails, hinges, and other goods." *Id*. These additional sales were the result of The Home Depot's use of the patented technology. *Id*. Much like *Powell*, offering the service (custom-cut lumber or mobile check deposit) generates the opportunity to sell additional goods or services (nails or Express Funds) and need not necessarily be the basis for customer demand. *Id*. Further, Mr. Kennedy has adequately supported these opinions.

Although PNC argues there are a number of other factors that may contribute to the higher profitability associated with the MRDC accounts, that is no basis to exclude Mr. Kennedy's testimony. Rather, that is a topic for cross-examination.

### B. Mr. Kennedy's Ecosystem Benefits Opinion

PNC contends that the "ecosystem benefits" factor should not contribute to the royalty base of Mr. Kennedy's damages model. Dkt. No. 330 at 8; Dkt. No. 330-1 ¶¶ 155-166, 171. PNC argues it is irrelevant whether the MRDC technology platform provides additional opportunities for PNC to sell other non-infringing products. Dkt. No. 330 at 8. PNC argues that "ecosystem benefits" can similarly be viewed as outside the scope of convoyed sales because the "ecosystem benefits" are not sold together nor otherwise function as single unit with MRDC. *Id*. (citing *Juicy Whip, Inc. v. Orange Bang, Inc.*, 382 F.3d 1367, 1372 (Fed. Cir. 2004)).

USAA counters that "it is proper [for Mr. Kennedy] to consider the value of this 'advertising' benefit PNC obtains through its use of the infringing MRDC system." Dkt. No. 386 at 8.

The "ecosystem benefits" considered by Mr. Kennedy follow a line of thinking very similar to his theory on higher profitability. Mr. Kennedy's opinion is admissible for the same reasons discussed above. Namely, use-base royalties may consider "follow-on purchases" in the royalty base. Again, Mr. Kennedy opines that MRDC attracts certain types of customers to PNC's platform and opines that these customers are more willing to buy follow-on purchases. *Powell*, 663 F.3d at 1240. These opinions will not be stricken.

## C.    Mr. Kennedy's Channel Cost Savings Opinion and Branch Closure Cost Savings Opinion

PNC claims the benefits Mr. Kennedy opined it received through "channel cost savings" and "cost savings from branch closure" are identical; thus, allowing Mr. Kennedy to consider both as part of the royalty base would be a "double-recovery." Dkt. No. 330 at 8–9; Dkt. No. 330-1 ¶¶ 119-146. PNC argues that the Mr. Kennedy used the virtually identical method calculate the contribution of each benefit and is therefore unreliable. Dkt. No. 330 at 9. PNC submits that Mr. Kennedy's failure to "study how many additional deposits would…have to be diverted away from the branch before PNC would be able to close a branch" is further proof of his allegedly unreliable methods. *Id*. (internal quotations omitted).

USAA argues that Mr. Kennedy properly calculated the "channel cost savings" and "cost savings from branch closure" benefits. Dkt. No. 386 at 9. USAA asserts that Mr. Kennedy took precautions to avoid double-counting damages in his "branch closure" benefit by "deduct[ing] all channel cost savings from the total [of the branch closure amount], and further limited costs based

on the share of branch transactions that are check deposits." Dkt. No. 386 at 9 (citing Dkt. No. 331-1 ¶ 146).

Based on PNC's arguments, the Court does not find that there is a basis to conclude Mr. Kennedy is double counting the "channel cost savings" and "cost savings from branch closure" amounts. The "channel cost savings" are cost savings PNC allegedly gains for every MRDC transaction that PNC processed, over those processed through traditional means. Whereas the "cost savings from branch closure" benefit is related to savings PNC enjoys by reducing banking branches, yet not losing accounts because of those closures. PNC's argument that there is a "double recovery" is severely undercut by Mr. Kennedy's attempt to excise any "double counting." Dkt. No. 331-1 at Ex. 4C, [N].

The calculations and documents that PNC alleges are duplicative are different calculations altogether. Mr. Kennedy relies on certain documents to calculate costs per check, while other documents are used to show operational costs associated with a bank branch as a whole. Mr. Kennedy uses these differing figures for different calculations to analyze different benefits PNC allegedly receives. Moreover, Mr. Kennedy's alleged failure to consider whether there is a sufficient critical mass of diverted checks to trigger a bank closure does not render his opinion inadmissible, these concerns are of weight not admissibility.

### D.    Mr. Kennedy's NPS Apportionment Analysis

PNC moves to exclude part of Mr. Kennedy's apportionment theory, the portion based on his reliance on the "Bain & Co.'s Net Promoter System" ("NPS"). Dkt. No. 330 at 11. PNC contends that Mr. Kennedy's NPS apportionment analysis is not supported by sufficient facts or data, uses an unreliable methodology, and does not correctly apply the facts of the case. *Id*. at 10–11.

### 1.    Mr. Kennedy's Facts or Data

PNC argues that Mr. Kennedy's association between PNC's allegedly non-infringing alternative ("NIA") and an increase in error rate and customer complaints is too tenuous to support his reduced growth rate conclusion. *See id*. at 11. Further, PNC argues that the evidence Mr. Kennedy relies upon to draw his opinion is insufficient to support his opinion. *Id*.

USAA argues there are sufficient facts for Mr. Kennedy to draw his conclusions. USAA points to other experts who opine that PNC's alleged NIA would not be commercially acceptable. Dkt. No. 386 at 12 (citing Dkt. No. 386-23 ⁋ 155). USAA argues that NPS directly links the NPS report and NPS leader growth. *Id*. at 11.

Mr. Kennedy's opinions are sufficiently supported to withstand *Daubert* review. Each of the opinions offered by Mr. Kennedy cites to relevant evidence that supports his conclusions.

### 2.    Mr. Kennedy's Methodology

PNC submits that Mr. Kennedy's reliance on the NPS report is unreliable. Dkt. No. 330 at 11. In particular, PNC alleges "Mr. Kennedy seizes on a statement from Bain's website. . . and illogically leaps from there to the conclusion that PNC's growth rate for MRDC would have been half as robust had it implemented 4.20.1 in 2016." *Id*. (citing Dkt. No. 331-1 ⁋ 268). PNC asserts Mr. Kennedy's "theory is unverifiable" and generally attacks the NPS report as unclear. *Id*. at 12 ("The Bain website on which Mr. Kennedy relies provides no guidance either—it does not explain the data, methodology, or analysis supporting Bain's conclusion that there is a relationship between a company's NPS score and its growth, or even define with any clarity what it means by 'growth.'" (footnote omitted)). PNC contends there is "an unbridgeable 'analytical gap between the [study] and the opinion [Mr. Kennedy] proffered.'" *Id*. (citing *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997)). PNC further asserts that "[b]ecause Mr. Kennedy has not attempted to

explain why the Bain correlation can be transposed to other situations, his opinion is nothing more than 'unsupported speculation.'" Dkt. No. 330 at 14 (citing *Barrett v. Atl. Richfield Co.*, 95 F.3d 375, 382 (5th Cir. 1996)).

USAA argues that PNC has taken Mr. Kennedy's opinions out of context and mischaracterizes them. *See* Dkt. No. 386 at 12. USAA also identifies the criteria used in the NPS report to give banks their NPS scores. *Id.*

 PNC's concerns go to the weight of Mr. Kennedy's opinions not their admissibility. Mr. Kennedy has sufficiently supported his opinion that PNC was a market leader and that switching to its alleged NIA could have curtailed PNC's growth. There is sufficient evidence to support Mr. Kennedy's apportionment theory using NPS. NPS is used by experts in the relevant field. Dkt. No. 383-27 at 4. Mr. Kennedy's opinions do not merit exclusion, PNC's remedy is vigorous cross-examination. Further, the NPS report is sufficiently clear and gives PNC a fair opportunity to cross-examine Mr. Kennedy on his reliance on it.

### E.     Mr. Kennedy's Discussion of *Wells Fargo* Litigation[2]

PNC moves the Court, under Federal Rule of Evidence 403, to preclude Mr. Kennedy from presenting the royalty amount of the settlement license between Wells Fargo and USAA ("Wells License"). Dkt. No. 330 at 18. PNC also argues that disclosure of the Wells License amount is unnecessary and does not provide a "reliable measure of damages." *Id*. PNC also asserts USAA should be precluded from offering opinions on an implied royalty rate because PNC was denied access to the expert reports in the underlying *Wells Fargo* litigation. *Id*. at 16.

---

[2] The Court has previously granted-in-part PNC's Motion *in Limine* No. 1A. *See* Dkt. No. 579 at 7–8. The Court precluded USAA from offering evidence of the jury verdict finding of infringement as well as the amount of damages awarded. The Court, however, denied without prejudice PNC's Motion *in Limine* No. 1A with respect to the settlement agreement. The Court will weigh whether the probative value of the settlement license amount is outweighed by the unfair prejudice to PNC.

USAA argues that the Wells License settlement amount provides highly probative evidence with respect to the implied per-check royalty. Dkt. No. 386 at 16. USAA states that the Wells License features very prominently in Mr. Kennedy's theory and that exclusion of the Wells License settlement amount would unfairly prejudice USAA. *See id*. at 15–16.

The Federal Circuit "has recognized that, depending on the circumstances, a license agreement entered into in settling an earlier patent suit sometimes is admissible in a later patent suit involving the value of the patented technology, and sometimes is not." *Prism Techs. LLC v. Sprint Spectrum L.P.*, 849 F.3d 1360, 1368-1369 (Fed. Cir. 2017). Evidence of prior verdicts "can be prejudicial and must be treated with great care," but "it is admissible if it is relevant to a material issue in the case and its use is limited to the purpose for which it is relevant." *Sprint Commc'ns Co., L.P. v. Time Warner Cable, Inc.*, 760 F. App'x 977, 980 (Fed. Cir. 2019).

In this case, the Court is particularly sensitive to the introduction of the previous *Wells Fargo* litigation. The Court, however, is persuaded that the Wells License is highly probative evidence, particularly given the post-trial nature of the Wells License. *See AstraZeneca AB v. Apotex Corp.*, 782 F.3d 1324, 1336 (Fed. Cir. 2015) ("The setting in which those events took place was therefore similar to the setting of a hypothetical negotiation in which infringement and patent validity are assumed."). However, the risk of unfair prejudice related to the settlement and its surrounding circumstances needs to be minimized. In the interest of limiting such prejudice, USAA will be precluded from disclosing the jury's finding of willfulness. USAA agreed at the pretrial conference that it did not need to introduce the verdict amounts. USAA, however, will not be precluded from eliciting the Wells License amount. Mr. Kennedy analyzes the Wells Settlement amount to determine whether there is upward or downward pressure on the implied per-check rate. *See e.g.* Dkt. No. 331-1 ¶¶ 315–17.  After review of Mr. Kennedy's damages report, the Court

10

finds that he discusses the settlement amount in a relevant manner that is sufficiently tied to the facts of the case and will be helpful to the jury in evaluating the hypothetical negotiation, and which does not unfairly prejudice PNC. *Id*. Thus, discussion of the Wells License amount is permissible.

To be clear, the parties are not precluded from discussing that there was a previous litigation between USAA and Wells Fargo and the implied per-check rate (without any discussion of the jury verdict amounts). The Court has precluded the parties from offering the verdict finding of infringement, willfulness, and the jury damages awarded. The Court warns the parties to err on the side of caution with respect to issues surrounding the Wells License, and its underlying litigation, and to seek leave before broaching a topic that has not been affirmatively ruled upon.

The Court is unpersuaded PNC is unfairly prejudiced by its inability to receive the expert reports from the *Wells Fargo* litigation. Both parties' experts had access to transcripts of the *Wells Fargo* trial.[3]

### F.      Mr. Kennedy's Opinion on the Zelle, ATM, and Assurant Agreements

PNC moves to preclude certain opinions of Mr. Kennedy based on his reliance of certain opinions formulated by USAA's banking industry expert (Mr. Mott). The issues relate to whether Mr. Mott's opinions are reliable and admissible will be addressed in PNC's motion to strike Mr. Mott.

### G.      Supplemental Briefing[4]

PNC states:

---

[3] If PNC believes that discussing the verdict amounts and/or finding of willful infringement is necessary in order to properly address the settlement license amount, it may seek leave from the trial judge to do so.

[4] On February 14, 2022, PNC moved for leave to file supplemental briefing in view of *Apple, Inc. v. Wi-LAN Inc.*, 25 F.4th 960 (Fed. Cir. 2022). Dkt. No. 441. Supplemental briefing was granted. USAA was permitted an opportunity to respond to PNC's supplemental briefing. Dkt. No. 514.

> The Federal Circuit's new decision in *Apple, Inc. v. Wi-LAN Inc.*, --- F.4th ---, 2022 WL 333666, at *8-9 (Fed. Cir. 2022) holds that expert testimony that measures damages based on the royalty rate paid for a license to a portfolio that includes other patents in addition to those in suit is *inadmissible* where the expert fails to address the "extent to which these other patents contributed to the royalty rate." USAA's damages expert David Kennedy made that very error in *Wi-LAN*, and now repeats it here.

Dkt. No. 447 at 2. PNC also appears to argue that unless Mr. Kennedy specifically discusses each patent or patent family in a portfolio license then his opinion must be excluded. *See id*. at 4 ("Because Mr. Kennedy failed to 'address the extent to which' the dozens of other USAA patents licensed under the Wells Fargo, Bremer, and Assurant agreements 'contributed to the royalty rate' in those agreements his use of the royalty rates from those agreements to measure damages is unreliable and should be excluded." (internal citation omitted)).

USAA responds that PNC's blanket statements about the breadth of *Wi-LAN* are incorrect. Dkt. No. 514 at 2–3. USAA also asserts that the factual record in this case is significantly different than the fact pattern in *Wi-LAN Inc. Id*.

PNC's assessment of *Wi-LAN* is incorrect. The *Wi-LAN* Court critiqued the the sufficiency of the evidence the defendant's damages expert used to support the damages model. *See Apple Inc. v. Wi-LAN Inc.*, 25 F.4th 960, 973 (Fed. Cir. 2022) ("Mr. Kennedy's opinion that the asserted patents were key patents is untethered to the facts of this case. As a preliminary matter, all three licenses were obtained prior to any litigation. . . . More importantly, those licenses treated the asserted patents as chaff, not wheat."). The *Wi-LAN* Court found fault with the sufficiency of the evidence that supported the damages expert opinion that certain patents were "key patents." *Id*. ("There is no record evidence supporting Mr. Kennedy's assumption that the '757 patent was a key patent."). As USAA points out, the factual record of this case is significantly different. Here, not only is there evidence that the value of the licenses was driven by the Asserted Patents (or their patent families), there is *strong* evidence that indicates the Asserted Patent families were "key"

12

during licensing negotiations. Dkt. No. 330-1 ¶¶ 515–18; Dkt. No. 514-7 at 5; Dkt. No. 514-8 at 3–4. Thus, PNC's arguments are misplaced.

IV.     **CONCLUSION**

Accordingly, the Motion is **GRANTED-IN-PART**. USAA is precluded from disclosing the jury's willfulness finding. In all other respects, the Motion is **DENIED**.

**SIGNED this 19th day of April, 2022.**

ROY S. PAYNE
UNITED STATES MAGISTRATE JUDGE