```
1                  IN THE UNITED STATES DISTRICT COURT
                   FOR THE EASTERN DISTRICT OF TEXAS
2                            MARSHALL DIVISION

3    UNITED SERVICES AUTOMOBILE      (   CAUSE NO. 2:20-CV-319-JRG
                                     )   (Lead)
4    ASSOCIATION,                    (   CAUSE NO. 2:21-CV-110-JRG
                                     )
5             Plaintiff,             (
                                     )
6    vs.                             (
                                     )
7    PNC BANK, N.A.,                 (   MAY 9, 2022
                                     )   MARSHALL, TEXAS
8             Defendant.             (   9:00 A.M.

9    _____

10

11

12                            VOLUME 1

13

14   _____

15                       TRIAL ON THE MERITS

16           BEFORE THE HONORABLE RODNEY GILSTRAP
                UNITED STATES CHIEF DISTRICT JUDGE
17

18   _____

19

20

21

22
                      SHAWN M. McROBERTS, RMR, CRR
23                        100 E. HOUSTON STREET
                         MARSHALL, TEXAS  75670
24                          (903) 237-8546
                     shawn_mcroberts@txed.uscourts.gov
25
```

```
 1                    A P P E A R A N C E S

 2         FOR PLAINTIFF:        IRELL & MANELLA, LLP -
                                 LOS ANGELES
 3                               1800 AVENUE OF THE STARS
                                 Suite 900
 4                               LOS ANGELES, CALIFORNIA  90067
                                 (310) 277-1010
 5                               BY:  MR. JASON SHEASBY

 6                               IRELL & MANELLA - NEWPORT BEACH
                                 840 NEWPORT CENTER DRIVE
 7                               SUITE 400
                                 NEWPORT BEACH, CALIFORNIA 92660
 8                               (949) 760-0991
                                 BY:  MS. LISA GLASSER
 9                                    MS. REBECCA CARSON

10                               PARKER BUNT & AINSWORTH
                                 100 E. FERGUSON, SUITE 418
11                               TYLER, TEXAS  75702
                                 (903) 531-3535
12                               BY:  MR. ROBERT BUNT

13         FOR DEFENDANT:        MUNGER TOLLES & OLSON LLP - LA
                                 350 S. GRANDE AVE., 50TH FLOOR
14                               LOS ANGELES, CALIFORNIA  90071
                                 (213) 683-9255
15                               BY:  MR. GREG STONE

16                               WILMER CUTLER PICKERING HALE &
                                 DORR - WASHINGTON DC
17                               1875 PENNSYLVANIA AVENUE NW
                                 WASHINGTON, DC 20006
18                               (202) 663-6000
                                 BY:  MR. GREGORY LANTIER
19
                                 GILLAM & SMITH, LLP
20                               303 SOUTH WASHINGTON AVENUE
                                 MARSHALL, TEXAS  75670
21                               (903) 934-8450
                                 BY:  MS. MELISSA SMITH
22
           OFFICIAL REPORTER:    SHAWN M. McROBERTS, RMR, CRR
23                               100 E. HOUSTON STREET
                                 MARSHALL, TEXAS  75670
24                               (903) 923-8546

25
```

## INDEX

**EXAMINATION**

| Witness Name | Page |
|---|---|
| CHRISTOPHER WILKINSON | |
| Direct By MR. SHEASBY............................................. | 176 |
| Cross By MS. SMITH................................................ | 200 |
| Redirect By MR. SHEASBY.......................................... | 247 |

1          THE COURT:  Thank you.  Be seated, please.

2      Good morning, ladies and gentlemen.  Thank you for being

3  here.

4      My name is Rodney Gilstrap, and I am the chief United

5  States district judge for the U.S. District Court for the

6  Eastern District of Texas.  I have lived in Marshall since

7  1981.  I practiced law in this community and in the

8  surrounding area here in east Texas for 30 years before I was

9  appointed to the bench.  I've been a U.S. District Judge since

10  2011.  And they say confession is good for the soul so I'll

11  start out with a confession.  I was not born in Texas, but I

12  got here as quick as I could.

13      I came to Texas at the ripe old age of 18 to enroll as a

14  freshman at Baylor University.  I graduated there and then

15  entered and graduated from Baylor Law School.  I am married.

16  I have two grown children.  And my wife owns and operates a

17  retail floral business here in Marshall, and she did survive

18  the Mother's Day weekend.  It was touch and go for a while,

19  but she did survive.

20      Now I tell you those things about myself because in a few

21  minutes I'm going to ask each of you to give me the same kind

22  of information about each of you, and I think you're entitled

23  to know as much about me as I'm going to find out about you in

24  a few minutes.

25      Now, we're about to engage in the selection of a jury in

1  a civil case involving allegations of patent infringement.

2  And if you'll indulge me for a minute, ladies and gentlemen,

3  I'd like to talk with you briefly about how we came to have

4  our American civil jury trial system.

5      If you go back in ancient history and if you begin with

6  the first five books of the Old Testament called, the

7  Pentateuch, you'll find that the ancient Hebrew nation

8  impaneled juries to decide issues of property ownership and

9  property value.

10     The ancient Greeks began using a jury system about 1500

11 BC.  And the ancient Romans, as they did with many other

12 things, copied the jury system from the ancient Greeks.  And

13 it was the Romans who brought the jury system across Europe

14 and across the English channel into what we know today to be

15 Great Britain when they conquered that island in the fourth

16 century AD.

17     And having brought the jury trial system to England, it

18 flourished there for hundreds of years for about 800 years,

19 until in the 12th century a tyrannical king became the king of

20 England named King John.  And he became embroiled with his

21 nobles in regard to many different issues, and they eventually

22 got right up to the edge of a civil war.  And one of the

23 issues that the king and his nobles were at cross purposes

24 about was the king's efforts to restrain and limit the right

25 to trial by jury.

1       They did not, however, have a civil war because they were

2   able to resolve all their differences, including that issue,

3   by entering into a written document which was signed at a

4   place in England called Runnymede.  And that document which

5   resolved all of those differences and established certain

6   guaranteed rights in England is called the Magna Carta.  And

7   from that time the ordinary Englishman had the right to a

8   trial by jury in a civil case.

9       And so you can see that that right followed those English

10  men and women across the Atlantic ocean when they came to

11  North America as British colonists.  They brought the jury

12  trial system with them.  And the jury trial system flourished

13  for over a hundred years in colonial North America until

14  another tyrannical king came to the throne of Great Britain,

15  and this time his name was King George III.  And as you know

16  from having taken American history back in high school, King

17  George III and his American colonists developed many disputes

18  among them.

19      We're not going to talk about the Boston tea party and

20  all those things, but you know there were many, many disputes

21  between King George III and his colonists here in America.

22  Those disputes multiplied until it got to the point that the

23  colonists here in North America decided they must separate

24  from England and form their own independent nation.

25      And to put King George on notice of that and to explain

1    to him all the disputes and reasons which led them to the

2    conclusion that they must separate from the mother country and

3    become their own independent nation, a gentleman by the name

4    of Thomas Jefferson sat down and wrote a document called the

5    Declaration of Independence.

6         And in the Declaration of Independence, Thomas Jefferson

7    spelled out all those various disputes and reasons why the

8    king, the crown, and the colonists in North America could no

9    longer live together and why the American colonists felt

10   compelled to separate and form their own independent nation.

11   One of those specific reasons set out by Thomas Jefferson in

12   the Declaration of Independence is King George's efforts to

13   restrict and restrain the right to trial by jury in a civil

14   case.

15        And as you all know, we did gain our independence, we did

16   form our own independent American nation, and shortly after we

17   won our independence from Great Britain, we developed what is

18   and has been the supreme governing law of the United States of

19   America--the Constitution.

20        And shortly after the Constitution was adopted, there

21   were 10 additional amendments that were added to it.  In fact,

22   most historians will tell you that the Constitution would have

23   never been ratified by the 13 original states if they had not

24   been promised that they would immediately add these very

25   important 10 amendments.  And you know those 10 amendments as

1    the Bill of Rights.  And those were added to our Constitution,

2    they were all ratified and adopted in 1791.

3         And among those 10 amendments is the Seventh Amendment.

4    And the Seventh Amendment to the Constitution guarantees the

5    right of every American to resolve their civil disputes

6    through a trial by jury.  So since 1791, every American

7    citizen has had a constitutionally-guaranteed right to submit

8    their civil disputes to a jury of their peers to be resolved.

9         So by being here this morning, ladies and gentlemen, in a

10   very real way I want you to understand that you are doing your

11   part to preserve, protect, and defend the Constitution of the

12   United States and the rights guaranteed to all of us as a part

13   of that supreme law of the land, including the right to trial

14   by jury.

15        I always tell citizens who appear for jury duty, as you

16   have this morning, that in my opinion, jury service is the

17   second highest form of public service that any American can

18   render for their country.  In my personal opinion, the highest

19   form of public service are those young men and women that

20   serve in our armed forces.

21        Now, when the lawyers address you later this morning,

22   they're going to ask you various questions, and I want you to

23   understand they will not be seeking to inquire into your

24   personal affairs unduly.  Let me say that another way.

25   They're not trying to be nosy and ask about your personal and

1    private business.  They are simply trying to secure relevant

2    information to assist the Court in securing and seating a fair

3    and impartial jury to hear the evidence in this case.

4         And the important thing for each of you to remember,

5    ladies and gentlemen, is that when you're asked any question

6    by the lawyers as a part of this jury selection process, as

7    long as the answers that you give are full, complete, and

8    truthful, then there are no wrong answers.  As long as your

9    responses are full, complete, and truthful, then you have

10   given the correct answer to the question that's been asked.

11        Now, I don't know if it will happen this morning, it

12   rarely does, but I want you to understand if you are asked a

13   question by any of the lawyers that you believe is so personal

14   and so private that you are not comfortable answering it in

15   front of everyone else in the room, you always have the right

16   to say, I'd like to discuss that with Judge Gilstrap.  And if

17   that's your answer, I'll provide an opportunity where you can

18   answer that outside of the presence of everyone else on the

19   panel.  But I want to remind you, this doesn't come up very

20   often, but it is within the realm of possibility, so I want to

21   let you know that that option does exist.

22        Now,  the trial in this case is going to begin today, and

23   it's going to run through what I anticipate will be the

24   entirety of this week.  Today is May the 9th.  I think we will

25   be through -- and I say think.  This is not a guarantee.  But

1    my best belief based on experience is that we'll be through

2    with this trial sometime on Friday of this week, which unless

3    you're superstitious, you won't notice that it's Friday the

4    13th.  So you-all need to understand that if you're selected

5    for jury service, you'll need to be available each day between

6    now and the end of this week.

7         Now, if there are any of you who could not be available

8    each day of this week if you were selected to serve, and by

9    could not, I don't mean inconvenient because jury service is

10   by definition inconvenient.  There's no getting around that.

11   That's why it is public service.  It is a sacrifice.

12        But if there's something that would prohibit you from

13   being able to be here, and let me give you an example, say you

14   have an elderly parent that's scheduled to have an important

15   surgical procedure this week and you're the only one that can

16   be there with them and take them back and forth to the

17   hospital.  That's the kind of serious impediment to you being

18   able to be here all week that I'm talking about.

19        So if any of you have any of those kinds of serious

20   impediments that would keep you from being able to be here all

21   week if you were selected, I need to know about that.  If

22   there's anybody that falls in that category, would you raise

23   your hands and let me make a note of it?  Anybody in the jury

24   box?  Anybody in the gallery?

25        I don't see any hands.  Okay.  Thank you, ladies and

1    gentlemen.

2         Now, at this time I'm going to call for announcements in

3    the case of United Services Automobile Association versus PNC

4    Bank NA.  This is Civil Case No. 2:20-CV-319 on the Court's

5    docket.

6         Counsel, as you offer your announcements into the record,

7    please identify yourselves, the members of your trial team,

8    and any corporate representative that you may have with you.

9         We'll begin with the Plaintiff.  What says the Plaintiff?

10         MR. SHEASBY:  May it please the Court, on behalf of

11    USAA, my name is Jason Sheasby.  My co-counsel are Christopher

12    Bunt, Lisa Glasser, Rebecca Carson.

13         The corporate representative of USAA is Mr. Christopher

14    Wilkinson.

15    Thank you, Your Honor.

16         THE COURT:  You're ready to proceed.

17         MR. SHEASBY:  We are ready to proceed, Your Honor.

18         THE COURT:  All right.  What says the Defendant?

19         MR. STONE:  Thank you, Your Honor.

20    May it please the Court, my name is Greg Stone.  My

21    co-counsel are Ms. Melissa Smith, Mr. Greg Lantier, and our

22    corporate representative is Ms. Karen Larrimer.

23         Thank you, Your Honor, and we're ready to proceed.

24         THE COURT:  Thank you, counsel.

25         As I've told you, ladies and gentlemen, this is a case

1    arising under the patent laws of the United States.  And what

2    the Plaintiff USAA is claiming is that certain of its patents

3    have been infringed by the Defendant PNC Bank.  Now, the

4    Defendant PNC Bank denies that it infringes any of the patents

5    of the plaintiff, and it alleges that the Plaintiff's patents

6    are invalid.

7         Now, what I've just told you is a very shorthand informal

8    way of describing the dispute between these parties.  And I

9    know you've all seen this morning the video prepared by the

10   Federal Judicial Center about patent cases.  And having seen

11   that, you already know more about patent cases than most

12   citizens do when they appear for jury duty.

13        As I mentioned earlier, the lawyers from both sides of

14   the case are going to question the panel in a few minutes, and

15   they're going to work together and with the Court to help

16   secure a fair and impartial jury to hear the evidence in this

17   case.

18        Let me remind you, as long as your responses to any of

19   their questions are fair, complete, and truthful, then there

20   are no wrong answers.  If for any reason, ladies and

21   gentlemen, one of these lawyers asks a question that I think

22   is improper, I will not hesitate to stop them.  But I want you

23   to understand these are very experienced trial lawyers and

24   they are certainly familiar with the rules of the Court, the

25   Rules of Civil Procedure, and I don't expect that to happen.

1         One thing I do want to talk with you about briefly and

2    call your attention to, because it's quite possible the

3    lawyers in the case may ask you about your ability to comply

4    with this, is what's called the burden of proof.  In a patent

5    case such as this one, the jury may be called upon to apply

6    two different burdens of proof.

7         The jury may apply a burden of proof known as the

8    preponderance of the evidence, and a second burden of proof

9    known as clear and convincing evidence.  Let me identify those

10   again for you--the preponderance of the evidence and clear and

11   convincing evidence.

12        Now, when you're responding to questions from the lawyers

13   about the burden of proof, I need you to understand and I need

14   to instruct you that when a party has the burden of proof on

15   any claim or defense by a preponderance of the evidence, that

16   means that you, the jury, must be persuaded by the credible or

17   believable evidence that that claim or defense is more

18   probably true than not true.  Let me say that again--more

19   probably true than not true.  This is sometimes talked about

20   as being the greater weight and degree of credible testimony.

21        Let me give you an example that I hope will be helpful to

22   you.  In front of me is Mr. McRoberts, our court reporter.  In

23   front of him, you should all be able to see a bronze statue of

24   the Lady of Justice.  She's blindfolded.  She holds lowered at

25   her right side the unsheathed sword of justice.  She holds

1    raised on her left side the balanced and equal scales of

2    justice.

3         Think of it this way.  Both of these parties, the

4    Plaintiff and the Defendant, start out this case at the same

5    place.  They're balanced, and they're in equal position.  And

6    over the course of the trial, as testimony is given and

7    exhibits are used and evidence is produced, the Plaintiff's

8    evidence will go on one side of those scales and the

9    Defendant's evidence will go on the other side of those

10   scales.

11        And then when all the evidence is in, if the party who

12   has the burden of proof on an issue by the preponderance of

13   the evidence, considering all the evidence, has those scales

14   tip in their favor, even if they tip ever so slightly, then

15   that party has met its burden of proof by a preponderance of

16   the evidence.  Again, more probably true than not true.

17        On the other hand, where a party has the burden of

18   proving any issue by this second burden of proof, clear and

19   convincing evidence, clear and convincing evidence means that

20   you, the jury, must have an abiding conviction that the truth

21   of the party's factual contentions are highly probable.  Let

22   me say that again--an abiding conviction that the truth of the

23   party's factual contentions are highly probable.  This is a

24   higher standard.  This is a higher burden of proof than the

25   preponderance of the evidence.

1       If we go back to the earlier example I gave you with the

2   statue, the Lady of Justice, both parties start out equally.

3   During the course of the trial, the Plaintiff's evidence goes

4   on one side of the scales, the Defendant's evidence goes on

5   the other side of those scales.  Then when all the evidence is

6   in and all the evidence is on one side or the other of those

7   scales, if the party who has the burden of proof on any issue

8   by clear and convincing evidence has those scales tip in their

9   favor -- and they must definitely tip.  It's not enough that

10  they tip ever so slightly.  But if they definitely tip in that

11  party's favor, then that party has met its burden of proof by

12  clear and convincing evidence.

13      Now, neither of these two burdens of proof that I've just

14  mentioned to you should be confused with a third and

15  altogether different burden of proof that you've probably all

16  heard about in the movies, on television, in the media, and

17  that third burden of proof is called beyond a reasonable

18  doubt.  Beyond a reasonable doubt is the burden of proof

19  applied in a criminal case.  It has no application whatsoever

20  in a civil case such as this.  You should not confuse clear

21  and convincing evidence with beyond a reasonable doubt.  It is

22  not as high a burden of proof as beyond a reasonable doubt,

23  but it is a higher burden of proof than the preponderance of

24  the evidence.

25      Now, I give you these instructions in case some of the

16

1    lawyers for either or both sides ask about your ability to

2    apply these, these burdens of proofs to the evidence that will

3    be presented to you if you're selected to serve on this jury.

4         Now, before I allow the lawyers to address the panel, I'm

5    going to ask at this point for each of you to give me the same

6    kind of information about yourselves that I gave you about

7    myself when we started this morning.

8         All of you have either printed copies or you should see

9    on the monitors in front of you nine standard questions.

10   We're going to start with the first member of the panel, and

11   we're going to go through one at a time everybody on the panel

12   and let each of you answer these nine questions for us.  And I

13   need to explain to you how we're going to do that.

14        We have our two court security officers, Ms. Denton and

15   Mr. Fitzpatrick, in the courtroom.  They both have a separate

16   handheld microphone.  When it is your turn to answer these

17   questions, they will bring you that microphone.  At that point

18   I'm going to ask you to stand up, take the microphone, don't

19   hold it down at your waist where it won't do any good, hold it

20   up near your mouth where it will amplify your voice in this

21   big room, and then answer those nine questions.

22        And when you're finished, hand the microphone back to the

23   Court Security Officer, have a seat, and then he or she will

24   take it to the next member of the panel and they will stand,

25   use the microphone, answer the nine questions, and we'll

1    proceed on that basis throughout everyone on the panel.

2        Also, after we've gone through these nine questions and

3    we get to the part of the process where the lawyers are

4    actually speaking to you directly from the podium and asking

5    you questions, if they ask you a specific question, don't

6    answer it until the Court Security Officer brings you a

7    microphone, take it, stand up, hold it near your mouth, answer

8    the question, then hand it back to the Court Security Officer.

9        Let me remind you, ladies and gentlemen, this is a big

10   room.  We have a lot of people in here.  It's very important

11   that we hear everybody's answers clearly.  So please follow

12   this procedure in answering these questions and any other

13   questions that you may be asked this morning.

14       And, please, I can't tell you how many very sweet East

15   Texans take that microphone and hold it in the middle of their

16   waist and it doesn't do a bit of good.  Hold it up near your

17   mouth where we can hear you.  Some folks are just soft-spoken,

18   and it's important that the lawyers for both sides and all of

19   their trial teams that are here as well as the Court hears

20   your answers.  So we'll follow that procedure in answering

21   these nine questions and any other specific questions that you

22   may be asked during the process.

23       So with that, we'll begin with Panel Member No. 1, Mr.

24   Scott (sic).  If you'll stand up and give us your answers to

25   those nine questions, please, sir.

1        THE PANEL MEMBER:  My name is Scott Smith.  I live

2   in Pittsburg, Texas.  I have two boys.

3        I work for Holt Caterpillar.  I've worked there for 10

4   years.  Education is high school.

5        My spouse's name is Stephanie.  She is office worker for

6   Welts Construction.  She's worked there seven years.

7        This is my first time as a juror.

8        THE COURT:  And let me apologize, Mr. Smith.  I saw

9   your first name and called you Mr. Scott.

10        THE PANEL MEMBER:  That's okay.

11        THE COURT:  All right.  Thank you, sir.

12   If you'll hand the microphone back to Ms. Denton, she'll

13   carry it to Mrs. Ray, Panel Member No. 2.

14        THE PANEL MEMBER:  Good morning.  My name is Karen

15   Ray.  I live in Leesburg, Texas, which is between Pittsburg

16   and Winnsboro for those of you not from this part of the

17   country.  I have three daughters of my own.  I have two

18   stepchildren.

19        I am retired.  I'm retired from USAA.  I retired there

20   after 26 years of employment.  And I went to Longview High

21   School.  So I actually grew up close to here but went to

22   college at Stephen F. Austin in Nacogdoches.

23        My spouse's name is Woodrow Ray, also known as Woody.  He

24   retired from the San Antonio Fire Department after 33 years of

25   service.  Then he reemployed at San Antonio College Fire

1    Academy, and he worked there, I think, 10 years before

2    leaving.

3          And this is the first -- I'm been paneled before, but

4    I've not been selected for a jury.

5                THE COURT:  All right.  Thank you, Mrs. Ray.

6          Next we'll go to Panel Member No. 3, Ms. Moran.

7                THE PANEL MEMBER:  Good morning.  My name is Melinda

8    Moran.  I live in Big Sandy, Texas.  I have three children.

9          I work at Region 7 Education Service Center.  I've been

10   there for one year.  My educational background is college.

11         I do not have a spouse.

12         And I was selected for jury services once.  It was a

13   mistrial.

14               THE COURT:  Was it a civil case?

15               THE PANEL MEMBER:  It was a criminal case.

16               THE COURT:  And where did it take place?

17               THE PANEL MEMBER:  San Angelo, Texas.

18               THE COURT:  Thank you very much, ma'am.

19         Next is No. 4, Mrs. O'Dell.

20               THE PANEL MEMBER:  Good morning.  My name is Lisa

21   O'Dell.  I live in Hughes Springs, Texas.  I have three

22   children.

23         I work at Hughes Springs High School as a teacher.  I've

24   been there 13 years.  I have a Bachelor's degree from Stephen

25   F. Austin.

1      My husband's David.  He is currently -- he and a previous

2  worker together are starting a business together for

3  bookkeeping and tax services, and he's also currently employed

4  with Greg Bolls (phon.) at Lon's Catfish doing bookwork for

5  him as well.  He's been doing that for about a year.

6      And this is my first time on jury.

7          THE COURT:  Thank you very much, ma'am.

8      Next is No. 5, Mrs. Maiville?

9          THE PANEL MEMBER:  My name is Ashley Maiville.  I

10  live in Naples, Texas.  I have three children.

11      I work at Priefert.  It's just Priefert now, but it's

12  manufacturing -- it's steel.  I've worked there three years,

13  although I took a sabbatical for six months and worked from

14  home.  So I just recently went back.  I went to college at

15  Barton College in North Carolina.

16      My spouse's name is Justin Maiville.  He also works at

17  Priefert.  He is an over-the-road truck driver for them.  He

18  hauls steel.  He's worked there for, I think, two years, maybe

19  three.  I'm not real sure.

20      And I've never been on a jury before or done any of this.

21          THE COURT:  What kind of steel products does

22  Priefert make?  Are they I-beams or are they products?

23          THE PANEL MEMBER:  Yes, sir.  It's coil, I-beams.

24  They do ranch equipment, also.  It's a variety of different

25  steel processes.

1           THE COURT:  Okay.  Thank you very much, Mrs.

2    Maiville?

3           THE PANEL MEMBER:  Yes, sir.

4           THE COURT:  All right.  Next is No. 6, Mrs. Maberry.

5           THE PANEL MEMBER:  Hello.  My name is Ann Maberry.

6    I live Pritchett, Texas, actually between Big Sandy and

7    Gilmer.  I have three grown children.

8        And I was employed -- I'm retired now, but I worked for

9    Sitel Corporation for about eight years on the Verizon

10   customer service.  My education is one full year of college at

11   the University of Dallas.

12       My husband's name was Clarence Maberry, Jr.  He's been

13   deceased for 21 years, so I'm a widow.

14       And my prior jury service, I was once in a criminal jury

15   in Dallas, and I've been in a civil case here in this court.

16   It was a different patent case.

17           THE COURT:  And when was that, Mrs. Maberry?

18           THE PANEL MEMBER:  I cannot remember exactly, but I

19   think it's been maybe 10 years.

20           THE COURT:  Okay.  But it was a patent case in this

21   court?

22           THE PANEL MEMBER:  Yes, it was.

23           THE COURT:  All right.  Thank you very much, ma'am.

24       Next is No. 7, Mrs. Wall.

25           THE PANEL MEMBER:  Good morning.  My name is Laura

1  Wall.  I live here in Marshall, Texas, and have been here 30

2  years.  I have five grown children.

3      I am a manager at an oil field service company, and I've

4  done that for about 18 years.  Education, high school, some

5  college, and trade school.

6      My husband's name is Jerry Wall.  He owns a plumbing

7  company and has here in Marshall for 25 years.

8      And I have been summoned but never have served on a jury.

9          THE COURT:  All right.  Thank you very much.

10  Next is No. 8, Ms. Turner.

11          THE PANEL MEMBER:  Good morning.  My name is

12  Jeanette Turner.  I live in Marshall, Texas.  Two grown

13  children.

14      I am retired from the University of Texas Health Science

15  Center in Tyler.  I worked there for 25 years.  I have a

16  college degree, a Bachelor's from Wylie College.

17      Divorced since 1999.

18      And I've served on a civil jury here before with PNC and

19  Apple in 2021.

20          THE COURT:  What did you do at UT-Tyler, ma'am?

21          THE PANEL MEMBER:  Human resource and benefits

22  manager.

23          THE COURT:  Okay.  Thank you very much.

24          THE PANEL MEMBER:  Yes, sir.

25          THE COURT:  Next is No. 9, Mrs. Tijerina?

1          THE PANEL MEMBER:  Good morning.  I'm Anne Lesley

2    Tijerina, and I live here in Marshall, Texas.  I have two

3    grown children.

4       I work for the Texas Early College High School in

5    testing, TSI precollege testing.  Previously as an

6    occupational therapist, though.  I've worked at the TECHS for

7    a year and a half, but I have more than 35 years of experience

8    as an occupational therapist.  I have a Bachelor's degree in

9    occupational therapy.

10      My husband's name is George.  He's a retired educator and

11   coach from most recently TECHS but also the Marshall High

12   School system.

13      And I've been summoned but never served.

14          THE COURT:  All right.  Thank you very much.

15      Next is No. 10, Mr. Crocker.

16          THE PANEL MEMBER:  Hello.  My name is Ricky Crocker.

17   I live in Omaha, Texas.  I have four children.

18      I've worked for AEP Swepco at Welsh fire plant in Cason,

19   Texas, for 40 years.  I'm a high school graduate.

20      Wife's name is Lorie, and she works for the city of

21   Hughes Springs at the Legacy Events Center, been there five or

22   six years, I believe.

23      And I've served on one jury for a criminal case in Cass

24   County.

25          THE COURT:  Never on civil jury.

 1          THE PANEL MEMBER:  No, sir.

 2          THE COURT:  All right, sir.  Thank you.

 3      Next is No. 11, Mr. Singletary.

 4          THE PANEL MEMBER:  Yes.  Dan Singletary.  I live in

 5  Longview.  No kids.  Worked in the oil and gas industry --

 6          THE COURT:  Mr. Singletary, could you hold the mic a

 7  little closer?

 8          THE PANEL MEMBER:  Oil and gas industry --

 9          THE COURT:  Thank you.

10          THE PANEL MEMBER:  -- about 10 years.  Have some

11  college.  No spouse.  Never served on a jury.

12          THE COURT:  Never served on a jury of any kind?

13          THE PANEL MEMBER:  No, sir.

14          THE COURT:  Thank you very much.

15      Next is No. 12, Mrs. Ragsdell?

16          THE PANEL MEMBER:  Hi.  My name is Laura Ragsdell.

17  I live here in Marshall, born and raised.  I have two grown

18  children.

19      I am retired from a medical lab technician.  I just

20  retired in March.  And I have an Associate in Science degree

21  in college.

22      My husband is Dwayne Ragsdell.  He owns his own business,

23  Dealer Services, for about 18 years.

24      And I served on a civil jury, oh, I don't know, it's been

25  a long time, and we intimidated them.  They settled before --

```
 1              THE COURT:  Which court was it in, ma'am?

 2              THE PANEL MEMBER:  The other court.

 3              THE COURT:  Okay.  Harrison County District Court?

 4              THE PANEL MEMBER:  Yes.

 5              THE COURT:  All right.  Thank you very much.

 6         Next is Mrs. Sharp, No. 13.

 7              THE PANEL MEMBER:  My name is Lacy Marrow.  My

 8     maiden name is Sharp.

 9              THE COURT:  I'll correct that.

10              THE PANEL MEMBER:  I have two children.  I live in

11     Avinger, Texas.

12         I own and operate my own restaurant.  We have been open

13     since January 4th of last year.  I graduated high school, some

14     college.

15         My husband's name is Kevin Marrow.  He also works along

16     beside me at the restaurant, so he's been there the same

17     amount, since January.

18         And I've never been on a jury.

19              THE COURT:  Thank you, Mrs. Marrow.

20              THE PANEL MEMBER:  Thank you.

21              THE COURT:  Next is No. 14, Mr. Sullivan.

22              THE PANEL MEMBER:  I'm Tony Sullivan, and I live in

23     Jefferson, Texas.  I have three grown stepchildren.

24         I'm retired.  I worked at General Cable for 25 years as a

25     mechanic.  And let's see.  I have two years college.
```

1    Spouse is Monica.  And she had a finance company.  She's

2 also retired.  And I don't know how long she had that.

3    And I've been on civil jury before.

4         THE COURT:  When was that and where was it, sir?

5         THE PANEL MEMBER:  Oh, it was before you took office

6 here, and it was here.

7         THE COURT:  Was it a patent case?

8         THE PANEL MEMBER:  Yeah.  It was between Samsung and

9 Apple, I believe.

10         THE COURT:  Okay.  So it's been more than 10 years

11 ago.

12         THE PANEL MEMBER:  Yes.

13         THE COURT:  Thank you, Mr. Sullivan.

14    All right.  Next is No. 15, Ms. James?

15         THE PANEL MEMBER:  My name is Joan James.  I have

16 two children.

17    My place of employment is TNTX Truck d/b/a Shreveport

18 Truck Center.  I'm assistant parts manager and warehouse

19 manager.  I've worked there for over 12 years.  I have high

20 school education, some vo-tech education.

21    I'm not currently married.  I'm happily divorced for over

22 25 years.

23    And I've always been called for jury service, but I've

24 never actually been chosen.

25         THE COURT:  All right.  Thank you, ma'am.

1      Next is No. 16, Mr. Reynolds?

2           THE PANEL MEMBER:  My name is Ricky L. Reynolds.

3  I'm not married.  I have no children.

4      I work for Graphic Packaging International as a paper

5  maker.  I've been there for about eight years.  I have an

6  Associate's degree in process technology.

7      And I have served on a civil jury.  It was West Columbia,

8  Texas, and it's been years ago.

9           THE COURT:  All right, sir.  Thank you very much.

10     Go ahead, Mr. Onley.

11          THE PANEL MEMBER:  My name is Mike Onley.  I live in

12 Daingerfield, Texas.  I have three stepchildren, two

13 grandchildren, stepgrandchildren.

14     My place of employment is the city of Mt. Pleasant.  I

15 work for the Street Department, been there 18 years.  I went

16 to high school and graduated high school, five years in the

17 service.

18     And my wife's name is Karen.  She's disabled right now.

19     And I've been served on a jury but have not served on a

20 jury on a civil case.

21          THE COURT:  So you've served on a jury but not in a

22 civil case?

23          THE PANEL MEMBER:  Right.

24          THE COURT:  You served in a criminal case.

25          THE PANEL MEMBER:  No.  I'm sorry.  It was a civil

1    case.

2            THE COURT:  Okay.

3            THE PANEL MEMBER:  In Texarkana.

4            THE COURT:  Was it in state court or federal court?

5            THE PANEL MEMBER:  I believe it was in state court,

6    I believe.  Is that the one Texarkana state or federal?

7            THE COURT:  Well, the county seat of Bowie County is

8    New Boston.  So the county courthouse in Bowie County is in

9    New Boston, not Texarkana.

10           THE PANEL MEMBER:  I believe it would be Bowie

11   County then.

12           THE COURT:  How long ago was that?

13           THE PANEL MEMBER:  I'm not for sure.

14           THE COURT:  All right.  Did it have anything to do

15   with patents?

16           THE PANEL MEMBER:  No.

17           THE COURT:  All right.  Thank you, sir.

18       Next is No. 18, Mrs. Hipp?

19           THE PANEL MEMBER:  Good morning.  My name is Maria

20   Hipp, and I have -- live in Atlanta, Texas.  I'm from Mexico.

21   I lived 16 years in Louisiana.

22           THE COURT:  Mrs. Hipp, would you hold the microphone

23   a little closer?  Thank you.

24           THE PANEL MEMBER:  Okay.  I have three children, and

25   not employed.  So -- and I have -- my education is I finished

1    four years of college.

2        My spouse -- my husband is John Hipp, and he's employed

3    in the International Paper Mill.  And he's been working in

4    there for 30 years.

5        I have summoned before but I never been served.

6            THE COURT:  Never served on a jury.

7            THE PANEL MEMBER:  No.

8            THE COURT:  Thank you, ma'am.

9        Next is No. 19 on the panel, Mr. Berg?

10           THE PANEL MEMBER:  Good morning.  My name is Jeff

11   Berg.  I have -- live in Hallsville, Texas.  I have three

12   children, three grandchildren, and one on the way.

13       I work for Walmart, been there 36 years.  So I win.

14   Education is high school.

15       Spouse's name is Kim Berg.  She worked at a daycare.  She

16   no longer works there.  She's been there about six years.

17   She's just a housewife now.

18       I have served on a jury, actually criminal case a couple

19   of years at the county court, and then a patent case I'm going

20   to say eight, nine years ago here at this courthouse.

21           THE COURT:  In this court?

22           THE PANEL MEMBER:  Yes, sir.

23           THE COURT:  Do you remember the parties in that

24   case?

25           THE PANEL MEMBER:  No.  All I know it was about

1    messaging.  I remember that part of it.

2              THE COURT:  All right.  Thank you, Mr. Berg.

3         Next is No. 20, Mrs. Stepherson.

4              THE PANEL MEMBER:  My name is Betty Stepherson.  I

5    have two grown boys and two granddaughters.

6         I've worked for Marshall ISD.  I'm retired now.  I was

7    there for nine years.  And I taught pre-K and special needs

8    children.  I graduated SFA in '76.

9         My husband's name is Phillip, and he worked at Sabine

10   Mine.  He's retired as well.  He worked there probably 20

11   years plus.

12        And I served in -- probably in the '80s on a criminal

13   case in Lufkin, Texas.

14             THE COURT:  Is that the only time you've been on a

15   jury before?

16             THE PANEL MEMBER:  Yes, sir.

17             THE COURT:  Okay.  Thank you, ma'am.

18        Next is No. 21, Mrs. Nunez.

19             THE PANEL MEMBER:  Yes.  My name is Jessica Nunez.

20   I currently live in Ore City, Texas.  I have no children.

21        I work at Ore City Middle School as a paraprofessional,

22   and I've been there about nine months, since August of this

23   school year.  I have an associate's from NTCC college.

24        My husband's name is Israel Nunez.  He worked for -- I

25   think the company is called Bradley and Leeland for a couple

1    of years, road construction like bridges and stuff like that.

2         I was called for jury duty six years ago in Harris County

3    in Houston, but I wasn't chosen for it.

4              THE COURT:  And is your husband working in road

5    construction now?

6              THE PANEL MEMBER:  Not at the moment.  He is doing

7    like, I guess, odd jobs.

8              THE COURT:  Okay.

9              THE PANEL MEMBER:  Like he works sometimes cutting

10   trees.

11             THE COURT:  Is he working for himself basically?

12             THE PANEL MEMBER:  Basically, yeah.

13             THE COURT:  Okay.  Thank you, Mrs. Nunez.

14        Next is No. 22, Mr. Green.

15             THE PANEL MEMBER:  My name is Brian Green.  I live

16   in Atlanta, Texas.  I've got four children.  Two are grown but

17   I've got two grandchildren to go with that.

18        I work for Pallet One in New Boston, and I'm a safety

19   professional, and I've been out there for a little over a

20   year.  Worked five years prior to that with the Texas

21   Department of Transportation as a safety professional.

22   Education is college -- college level.  I've got an

23   associate's in occupational health and safety.

24        And my spouse's name is Rachel, Rachel Green.  No jokes,

25   please, if you know Friends.  She doesn't work.  She's

1    actually going to school to become a teacher.  So she's got

2    about one year left in that.

3         And I've been called for jury selection but never chosen.

4              THE COURT:  All right, sir.  Thank you, Mr. Green.

5         Next is No. 23, Mrs.  O'Quinn.

6              THE PANEL MEMBER:  Yes.  My name is Sharon O'Quinn.

7    I have four children.

8         I work at Hallsville ISD.  I am a teacher, and I have

9    worked there for 12 years.  I have a Bachelor's degree in

10   education.

11        My husband's name is Dennis O'Quinn.  He works at Eastman

12   Chemical Company.  He is a leadership coach currently.  He has

13   worked there for 40 years.

14        And I have served on a civil jury before in the district

15   court here in Harrison County.

16             THE COURT:  All right.  At the county courthouse.

17   Is that correct, ma'am?

18             THE PANEL MEMBER:  Yes.

19             THE COURT:  Okay.  Thank you.

20        Next is No. 24, Mr. Howlett.

21             THE PANEL MEMBER:  Good morning.  My name is Lee

22   Howlett.  I was born and raised here in Marshall.  I don't

23   have any children.

24        I'm retired.  I'm -- formerly was employed at TieTek out

25   in Woodlawn.  They make the composite plastic cross-ties.  I

1    was a machine operator for them for 15 years.  I got a high

2    school education.

3        And I'm a career bachelor, never been married.

4        And I have been summoned for two jury services, but both

5    were pled before they got ready to go with it.

6            THE COURT:  So you've never actually served on a

7    jury?

8            THE PANEL MEMBER:  No, sir.

9            THE COURT:  All right.  Thank you, Mr. Howlett.

10       Next is No. 25, Miss Hulett?

11           THE PANEL MEMBER:  Hello.  My name is Tanya Hulett.

12   I live in Jefferson, Texas.

13       I work at Mr. Cooper Mortgage Company in the foreclosure

14   prevention department.  I've worked there three years.  I have

15   is my Bachelor's degree from East Texas Baptist University.

16       I have no spouse and no kids, either.

17       And I have not served on a jury before.

18           THE COURT:  All right.  Thank you, ma'am.

19       Next is No. 26, Ms. Munerlyn.

20           THE PANEL MEMBER:  My name is Peggy Munerlyn.  I

21   live in Bloomburg, Texas.  I have four kids.

22       Right now I'm unemployed.  High school.

23       I have a spouse.  He's disabled so I take care of him,

24   and I'm not working at all.

25       And I haven't been on a civil case.

1          THE COURT:  Have you ever served on a jury, ma'am?

2          THE PANEL MEMBER:  No, sir.

3          THE COURT:  Okay.  Thank you very much.

4       Next is No. 27, Mr. Farr?

5          THE PANEL MEMBER:  Yes.  My name is Jesse Farr.  I

6    live in Atlanta, Texas.  I don't have any children.

7       I work for the Texas Department of Transportation as a

8    transportation engineer.  I've been there for 10 years.  I do

9    roadway and bridge design.  I got my Bachelor of Science from

10   UT-Tyler in civil engineering.

11      And no spouse so none of that information.

12      I have never served on a jury before.

13         THE COURT:  All right.  Thank you very much.

14      Next is No. 28, Mr. Henderson.

15         THE PANEL MEMBER:  My name is Jeffrey Henderson.

16   I'm from here in Marshall.  I have two children, one finishing

17   his second year of law school and the other is an

18   undergraduate.

19      I work for Austin Bank.  I'm a lender.  I've worked there

20   eight and a half years.  I have degrees from SMU in history

21   and business.

22      My spouse's name, my wife is Stephanie Henderson.  She

23   works for Hallsville ISD.  She's a district reading

24   coordinator.  She's been there five years.

25      And I've been summoned but not called in Judge Morin' and

1    Judge Black's court.

2         THE COURT:  Thank you, Mr. Henderson.

3      Next is No. 29, Mr. Hunter.

4         THE PANEL MEMBER:  My name is Mike Hunter.  I live

5    in Longview.  I've got two children, both off my payroll.

6      I drew my first retirement check this month, and I was

7    previously employed at Sabine Mining for 36 and a half years.

8    I've got high school education and technical school.

9      Spouse's name is Terry.  She does home health.  She's a

10   certified occupational therapist.  Those companies change

11   daily.  I never know who she's working for.  So she's done

12   that for probably 25 years.

13     I've been impaneled several times, only chosen once in a

14   civil trial.  When the jury walked in, they whispered to their

15   lawyer, the Judge let us go, and we never came back.

16        THE COURT:  All right, sir.  Thank you very much.

17     No. 30 is next, Mrs. Perry.

18        THE PANEL MEMBER:  Good morning.  My name is

19   Rachelle Perry.  I have two boys.

20     My husband and I own Perry's Hometown Flooring here in

21   Marshall for six years, and I also do bookkeeping for Texas

22   Gates for the last 12 years.  I am high school graduate.

23     My husband's name is Jarrod Perry.  We own Perry's

24   Hometown Flooring together.  Both worked there the same amount

25   of time.  We've had it open for six years.

1          I have served on a criminal case back in 2008, and I

2    served on grand jury duty for a year and a half in 2008 and

3    2009.

4               THE COURT:  But you never served on a civil case

5    before.

6               THE PANEL MEMBER:  No, sir.

7               THE COURT:  All right.  Thank you, Mrs. Perry.

8         Next is No. 31, Mr. Baur?

9               THE PANEL MEMBER:  My name is David Baur.  I live in

10   Douglassville, Texas.  I have six children and four

11   grandchildren.

12        I currently work for FiServ full-time as an enterprise

13   architecture, worked there for five years.  Educational

14   background includes United States Army, Airborne Infantry,

15   some college, and over 20 certifications in IT field.

16        My wife's name is the Lisa Baur, and she's job a lot

17   tougher than mine.  She's a housewife.  And then she's been

18   doing that for 12 years.

19        And then I was prior jury service in Cass County for a

20   criminal case.

21              THE COURT:  Never a civil case?

22              THE PANEL MEMBER:  No.

23              THE COURT:  Thank you, sir.

24        All right.  Next is No. 32, Ms. Figley?

25              THE PANEL MEMBER:  My name is Cindy Figley.  I live

1   in Longview, Texas.  I have three children.  One of them is

2   deceased.

3       My place of employment is Heartis Assisted Living.  I've

4   been there for about three years and two months.  My

5   educational background, I have a little bit of college, and I

6   finished high school.  I'm divorced.

7       I don't -- I did serve on a criminal case back in -- I'm

8   not even for sure.  It's been about 12 years ago in Tatum, and

9   I was selected.

10          THE COURT:  But you never served on a civil case?

11          THE PANEL MEMBER:  No, sir.

12          THE COURT:  All right.  Thank you, Ms. Figley.

13          THE PANEL MEMBER:  Uh-huh.

14          THE COURT:  Next is No. 33, Ms. Brannan.

15          THE PANEL MEMBER:  My name is Jannie Brannan.  I

16   live in Atlanta, Texas.  I have four children.

17       I work for an insurance company out of New York.  I'm a

18   senior operations administrator.  I've been there for 23

19   years.  I have a bachelor degree in accounting.

20       My husband's name is Anthony.  He works for a plumbing

21   company out of Texarkana.  He's a plumber.  He's been there

22   for two years.

23       And I've been summonsed before but never served.

24          THE COURT:  All right.  Thank you, ma'am.

25       Thank you, ladies and gentlemen.

1          Now I need to say a couple of more things to you before I

2     turn the questioning over to the lawyers.

3          The jurors who are actually selected to serve in this

4     case will serve in the role as the judges of the facts, and

5     the jury selected will make the sole determination about what

6     the facts are in this case.  Now, my job as the Judge is to

7     rule on questions of law, evidence, and procedure, to maintain

8     the decorum of the court, and to oversee an efficient flow of

9     the evidence.

10         Also I want to say a couple of things to you about our

11    judicial system that I hope will put things in a proper

12    perspective for you.

13         In any jury trial like this, besides the parties

14    themselves, there are always three groups of participants--the

15    jury, the judge, and the lawyers.  Now, with regard to the

16    lawyers, it's important for each of you to understand that our

17    judicial system is an adversary system, which means simply

18    that during the course of the trial each of the parties

19    through their lawyers will seek to present their respective

20    cases to the jury in the very best light possible.

21         I need to apologize.  I spent the weekend with a

22    three-year-old granddaughter who had a runny nose that she

23    brought home from daycare and she gave it to me.

24         Now, it's no surprise to any of you that lawyers are

25    frequently criticized in the public and in the media, but the

1    Court has observed that some of this criticism comes from a

2    basic misunderstanding of our adversary system in which the

3    lawyers act as advocates for the competing parties.  And as an

4    advocate, a lawyer is ethically and legally obligated to

5    zealously assert his or her client's position under the rules

6    of our adversary system.  And by presenting the best case

7    possible on behalf of their clients, the lawyers hopefully

8    will enable the jury to better weigh the relevant evidence to

9    determine the truth and to arrive at a just verdict based on

10   that evidence.

11        Now, this system of justice, this adversary system of

12   justice, has served our nation well for over 200 years, and

13   America's lawyers have been, are now, and will be a part an

14   indispensable part of that process.  So as we go forward with

15   the trial, even though it's possible that you might see me

16   frown or roll my eyes from time to time at the lawyers, I'm

17   simply trying to make sure that their advocacy doesn't go

18   outside the boundaries of our adversary system and our rules

19   of procedure.

20        But I think it's important for each of you to keep in

21   mind that the lawyers are simply doing their jobs, and it's

22   important for all of you to be aware of that.

23        Also, ladies and gentlemen, over the course of the trial,

24   for those of you that are selected on this jury, I want you to

25   know that I am going to do my very best to make sure that no

```
1    one on the jury knows how I feel about any of the evidence

2    presented during the trial, because determining the facts from

3    the evidence presented is the jury's job; it is not my job.

4    So those of you that are going to serve on this jury should

5    not take any expressions or comments that you see or hear or

6    you think you see or hear as coming from me as something to

7    consider in determining the ultimate facts in this case.

8         All right.  Counsel will now address the members of the

9    panel.

10        Mr. Bunt, you may address the panel on behalf of

11   Plaintiff.  Would you like a warning on your time?

12             MR. BUNT:  Yes, Your Honor.  May I have a

13   five-minute warning when I have five minute left?

14             THE COURT:  I'll warn you when you have five minutes

15   remaining.  You may proceed.

16             MR. BUNT:  Thank you, Your Honor.  May it please the

17   Court.

18        Good morning, ladies and gentlemen.  My name is Chris

19   Bunt.  It's my pleasure to be here today representing USAA,

20   the Plaintiff in this case.

21        I'd like to begin by thanking you for your time and for

22   your service here today, and I'd also like to thank you for

23   the jury questionnaire forms that you filled out.  Those have

24   helped us a great deal.

25        I know a little bit about each of you.  I'll give you
```

 1    similar information about myself.  I grew up in Hallsville,

 2    graduated from high school there, quite some years back.  My

 3    wife Celia also went to Hallsville and graduated from there.

 4        And she and I have lived in Tyler for the last 30 years.

 5    My brother-in-law and I have a law firm over there, and my

 6    wife is our office manager at the firm.

 7        My wife and I have two kids.  Our daughter is a freshman

 8    in college, and our son is a sophomore in high school.

 9        And I have been called on a number of occasions for jury

10    service but have never actually been picked for a jury.

11        You're going to learn a lot about this case during

12    opening statements, and I think you're going to find it very

13    interesting.  But I want to just give you a very high-level

14    overview right now.

15        This case concerns four United States patents that are

16    owned by my client, USAA.  These patents relate to technology

17    for depositing checks using your smartphone or other mobile

18    device instead of having to go to the bank or to an ATM to

19    deposit your money.  This technology is called consumer remote

20    deposit capture, or sometimes it's referred to as mobile

21    remote deposit capture, or just MRDC.

22        We allege that PNC is using our patented technology in

23    their own product.  And in patent cases, this sort of

24    trespassing on property is called infringement.  We intend to

25    put on evidence to show that infringement, and at the end of

 1    the case we will ask that you award damages to my client.  As

 2    the Court will instruct you, if you find that infringement has

 3    been proven, we are entitled to no less than a reasonable

 4    royalty for PNC's use of our property.

 5         Now, as I said, we'll put on evidence of infringement and

 6    we'll put on evidence of damages.  We intend to put on

 7    evidence to show that PNC owes USAA $300.4 million for the use

 8    of our property.  PNC denies that they infringe but says that

 9    if they do infringe, they owe no more than $8.3 million.

10    That's the gist of the case.

11         So with that in mind, let me say this.  This part of the

12    trial gives us a chance -- the lawyers a chance to speak

13    directly with you to see if you have any particular life

14    experiences that might affect the way that you look at the

15    particular evidence.  And it's fine to have particular life

16    experiences.  We all do.  It's only an issue if it moves you

17    to such an extent that you cannot just judge the case based on

18    the facts alone.

19         It's been my experience in these patent cases that

20    people's attitudes about patents generally fall into two

21    camps.  Camp one are folks who think that patents are a good

22    thing, that patents encourage innovation, that innovation

23    helps make advances in products, and without patent

24    protection, you wouldn't see the same research and development

25    taking place.  That's camp number one.  Let's just call that

1    pro patent.

2         The other camp are folks that think patents should not be

3    protected by law.  Instead of protecting patents, we should

4    just have unlimited competition.  And if you can come up with

5    an idea for a product and you can build it, it shouldn't

6    matter that somebody had the idea for it first and got a

7    patent on it.  So we'll just call that camp for pro

8    competition.

9         Let me start over here with Mr. Smith, Juror No. 1, if we

10   can.

11        Mr. Smith, can you tell me which of those two camps you

12   think you would fall within?

13             THE PANEL MEMBER:  The first one.

14             MR. BUNT:  Okay.  You feel you are more supportive

15   of pro patents?

16             THE PANEL MEMBER:  Yes.

17             MR. BUNT:  Mrs. Ray, to your left, how do you feel

18   about that?

19             THE PANEL MEMBER:  One, the first camp.

20             MR. BUNT:  Okay.  Is there anybody here on the first

21   two rows who feels differently about that?

22        Yes, sir.  Mr. Singletary?

23             THE PANEL MEMBER:  Camp two.

24             MR. BUNT:  Yes, sir.  Would you mind standing up?

25        Tell me about that.  You feel like there should be

1    more -- it should just be competition, no patent protection.

2            THE PANEL MEMBER:  Correct.

3            MR. BUNT:  You understand, of course, that I am

4    representing USAA, they have patents that have been issued by

5    the United States Patent and Trademark Office, and we have a

6    patent claim against PNC.

7        Am I starting off a little bit behind PNC because of your

8    feelings about patents in general?

9            THE PANEL MEMBER:  No.

10           MR. BUNT:  Okay.  Do you feel like patents are

11   entitled to protection under law?

12           THE PANEL MEMBER:  They are currently.  Right?

13           MR. BUNT:  Yeah.  But would you have difficulty

14   setting aside your feelings about patents to sit on a case of

15   this sort?

16           THE PANEL MEMBER:  No.

17           MR. BUNT:  Thank you, sir.  I appreciate your

18   candor.

19       Anybody else in the first two rows who feels

20   like -- feels that they would fall into camp No. 2?

21       How about over here in the gallery?  Do we have anybody

22   who feels like they would fit more into camp No. 2, the one I

23   was discussing?

24       Could we talk to Mr. Reynolds?

25       Yes, sir.  I remember seeing your questionnaire form, and

1    I think you said you had strong feelings about the patent

2    system.  Could you tell me a little bit more about that?

3              THE PANEL MEMBER:  Well, so I've been involved with

4    patent law firms before in the past.  I've actually worked for

5    them and been to trials but not serving.  It just depends.

6    There's a lot of mitigating factors when it comes to time of

7    patent, what are the charges.  And as you -- it can become

8    very complicated, and I was just going to say it's not a hard

9    line.

10             MR. BUNT:  Thank you, sir.  I appreciate that.  And

11   you're Mr. Baur, right?  Juror No. 31.

12        Could we go to Mr. Reynolds, Juror No. 16?

13             THE PANEL MEMBER:  Yes, sir.

14             MR. BUNT:  I think you said on your jury

15   questionnaire form that you had strong feelings about the

16   patent system.  Did I miss that?

17             THE PANEL MEMBER:  Well, the thing on my part is I

18   dealt with some friends that had patents before, and they've

19   been infringed on by outside entities, in other words, out of

20   the U.S., and they didn't have any kind of recourse to get it

21   back.

22             MR. BUNT:  Okay.  Is that going to start you off

23   leaning toward one side or the other in this case, though?

24             THE PANEL MEMBER:  No, sir.

25             MR. BUNT:  Okay.  Thank you, sir.

1     Ms. Figley, No. 32, did you have any feelings, particular

2  feelings, about the patent system in general?

3          THE PANEL MEMBER:  No, sir.

4          MR. BUNT:  Okay.  Thank you, ma'am.

5     And then Mr. Green, No. 22.  I think you said in your

6  questionnaire form and, correct me if I am wrong, that you

7  said you had strong feelings about companies who sue for

8  patent infringement.  Is that right?

9          THE PANEL MEMBER:  No.  I said that I have a problem

10 with frivolous lawsuits.

11         MR. BUNT:  Oh, okay.  I apologize.  Well, you

12 understand I've got a lawsuit here on behalf of USAA against

13 PNC.  Are your feelings about lawsuits going to affect the way

14 you look at my client because I'm the one bringing the lawsuit

15 here?

16         THE PANEL MEMBER:  At this point in time, I can't

17 answer that question because I don't know the details or

18 facts, because I can only say if I look at it and view it

19 later as a frivolous lawsuit, then, yeah.  But going in, no,

20 I'm a blank slate.

21         MR. BUNT:  Well, I don't really know an artful way

22 to ask this.  But sitting here right now before you've heard

23 any evidence, am I starting off behind PNC?

24         THE PANEL MEMBER:  I'm going to say yes.

25         MR. BUNT:  Okay.  Thank you.  I appreciate your

1    candor about that.  Thank you, sir.

2         I think everybody here has heard on the patent jury video

3    that a patent is a piece of property.  And when the Patent

4    Office issues the patent, it's like a deed.

5         Could I see a show of hands on the first two rows how

6    many of you are landowners, whether it's a house that you own,

7    a piece of pasture land, whatever.

8         Let's go to Mrs. O'Dell, Juror No. 4.

9         Mrs. O'Dell, let's say an oil and gas company happens to

10   come out to your land and they start drilling a well on your

11   property.  Anything about that -- would you feel uncomfortable

12   going to court to get them off of your property?

13             THE PANEL MEMBER:  No, not if I have it on my deeds

14   that I have those rights so it's not to somebody else already.

15             MR. BUNT:  Absolutely.

16        Mrs. Maiville, do you own a piece of property?

17             THE PANEL MEMBER:  What was that?

18             MR. BUNT:  Sure.  It's okay.  Do you own a piece of

19   property as well?

20             THE PANEL MEMBER:  Yes, sir.

21             MR. BUNT:  And same question to you.  If an oil and

22   gas company came out and started drilling a well on your

23   property, would you have any qualms about going to court to

24   get them off?

25             THE PANEL MEMBER:  No, sir.

1          MR. BUNT:  Anybody here on the first two rows feel

2     like they would have an issue going to court to protect their

3     property rights?

4          How about over here in the gallery?  Is there anybody who

5     feels that would be difficult?

6          Ms. Maberry, Juror No. 6, let's say that oil and gas

7     company had already started production and was getting oil out

8     of your piece of property.  Would you have any qualms about

9     asking the court to award you a reasonable royalty for the

10    property that they were taking out of your land?

11         THE PANEL MEMBER:  I wouldn't have any problem with

12    asking them that.

13         MR. BUNT:  Okay.  Mrs. Wall, same question to you.

14    Would you have a different response?

15         THE PANEL MEMBER:  No.  I would have no problem with

16    that.

17         MR. BUNT:  Is there anybody here on the first two

18    rows who feels like intellectual property should be treated

19    differently than land-type property or personal property like

20    a car?  Anybody?

21         How about over in the gallery?  Is there anybody here who

22    feels like intellectual property should be treated

23    differently?  Thank you.

24         I'm sorry.  I apologize.  Mr. Baur?

25         THE PANEL MEMBER:  Yes.  Intellectual property can

1    actually involve improvements on -- sometimes on existing

2    patents as well.  So there would be a very big difference to

3    me as far as like someone infringing on my own property and

4    putting in a well without my authorization or something like

5    that, whereas when they come into intellectual property law,

6    you know, you have variances, like and not for like, and

7    things like that that can impact those kinds of things.

8              MR. BUNT:  Thank you, sir.  I appreciate you letting

9    me know that.

10         As I mentioned, we're going to be putting on evidence and

11   expert testimony to prove infringement.  After that part of

12   the case, you're going to hear from our financial expert, Mr.

13   David Kennedy, who is going to explain the extra profits, the

14   cost savings, and other benefits that PNC has made using our

15   property.  AS I told you previously, he calculated the damages

16   to be $300.4 million.

17         I'd like to ask this question of the first two rows

18   first.  How many of you feel that, no matter what the evidence

19   is, even if I show infringement, that there is simply no way

20   you could write in a number for 300 million?  Is there anybody

21   here who feels like, you know, I don't care what the evidence

22   is, you're not going to get $300 million?  Anybody feel like

23   that in the first two rows?

24         If I could go to Mrs. Tijerina, Juror No. 9.

25         If I can put on evidence to show infringement and if I

1    can put on evidence to show damages, can you award whatever

2    damages they may be regardless of the size of them?

3                THE PANEL MEMBER:  No.

4                MR. BUNT:  Yes, ma'am?

5                THE PANEL MEMBER:  No.  I'm not agreeing with that.

6                MR. BUNT:  Oh, you're not agreeing with that.  Okay.

7    So tell me --

8                THE PANEL MEMBER:  Did you say 3.4 or 300 million?

9                MR. BUNT:  300.4?

10               THE PANEL MEMBER:  300.4 million.

11               MR. BUNT:  Yes, ma'am.  Would you have an issue with

12   awarding those sort of damages?

13               THE PANEL MEMBER:  Yes, I would.

14               MR. BUNT:  Okay.  Just because that's just a lot of

15   money?

16               THE PANEL MEMBER:  Yes.

17               MR. BUNT:  Thank you.  Is there anybody else that

18   feels like Mrs. Tijerina, that, you know what, Mr. Bunt,

19   that's just too much money.  Anybody else besides Mrs.

20   Tijerina over here?

21        Yes, sir.  Mr. Green?

22               THE PANEL MEMBER:  Yes.

23               MR. BUNT:  You have similar feelings about that?

24               THE PANEL MEMBER:  I do.  It's just we're talking

25   about an app, correct?

1           MR. BUNT:  I'm sorry.  Say it again?

2           THE PANEL MEMBER:  We're talking about an app?

3           MR. BUNT:  Yes.  It's an app that's on the PNC Bank

4     system.

5           THE PANEL MEMBER:  Okay.  Yeah.  304 million, yes.

6           MR. BUNT:  Thank you.  I appreciate that.

7         I think everybody here probably has heard of my company

8     USAA, my client.  USAA provides financial services to military

9     and to military families, and those services include banking

10    and insurance and investing services.

11        Is there anybody here who has had a bad experience with

12    USAA?  First two rows, anybody?

13        Mrs. Maiville, did you say -- Juror No. 5.  Did you say

14    that you had had insurance with USAA at one point?

15          THE PANEL MEMBER:  Yes, sir.  We had it for about

16    six months, and we just had an introductory rate.  And then

17    the rates went up, so we just -- it could have been longer

18    than six months, honestly.  It could have been a year maybe.

19    It was just car insurance.  But, anyways, we switched because

20    we got a lower rate.

21          MR. BUNT:  Okay.  There wasn't any bad experience

22    you had with USAA?

23          THE PANEL MEMBER:  No, sir.

24          MR. BUNT:  Thank you, ma'am.

25          THE PANEL MEMBER:  Yes, sir.

```
 1              MR. BUNT:  Anybody over here in the gallery who has

 2    had a bad experience with USAA?

 3         Okay.  Oh, Mr. Baur?

 4              THE PANEL MEMBER:  Does that include bad interest

 5    rates?

 6              MR. BUNT:  Any criticism you've got.

 7              THE PANEL MEMBER:  That would just be it.  Just bad

 8    interest rates.

 9              MR. BUNT:  Thank you, sir.

10         Mr. Berg, Juror No. 19, were you involved in a patent

11    case, a jury -- you sat on the jury of a patent case, I should

12    say?

13              THE PANEL MEMBER:  Yes, sir.  Yes, sir, I did.

14              MR. BUNT:  What was the name of that case?

15              THE PANEL MEMBER:  I could not tell you.  I know it

16    was about messaging is all I know it was about.  I mean,

17    that's all I can tell you.  I don't know who it was, the

18    people it was.

19              MR. BUNT:  That's all right.  Do you know -- did you

20    reach a verdict in that case?

21              THE PANEL MEMBER:  Yes.

22              MR. BUNT:  And was it for the Plaintiff or the

23    Defendant?

24              THE PANEL MEMBER:  It was for the Defendant.

25              MR. BUNT:  Oh, one other question.  Were you
```

1    involved in a lawsuit where you were sued?

2              THE PANEL MEMBER:  Me?

3              MR. BUNT:  Yes, sir.

4              THE PANEL MEMBER:  Oh, no.

5              MR. BUNT:  Okay.  Have you ever been accused by

6    somebody?  I thought I saw something --

7              THE PANEL MEMBER:  Well, yeah, I was sued, but it

8    was a harassment case against me.  I caught a -- I caught one

9    of my cashier's stealing, and so she came back and said I was

10   harassing her.  But it didn't go anywhere.  It didn't happen

11   or nothing came of it.  So --

12             MR. BUNT:  Well, you got sued, and you understand

13   I'm suing PNC?

14             THE PANEL MEMBER:  I understand.

15             MR. BUNT:  Are you going to feel or identify a

16   little bit more with PNC because you've been in the shoes of

17   being sued before?

18             THE PANEL MEMBER:  No, no, no.

19             MR. BUNT:  Thank you, sir.

20             THE PANEL MEMBER:  That's totally different cases

21   anyway.

22             MR. BUNT:  Sure appreciate it.

23        Mrs. O'Dell, Juror No. 4.  I apologize for making you hop

24   up and down.  Your sister and brother-in-law have USAA

25   insurance?

1    THE PANEL MEMBER:  I think so because they're both

2    retired military, and I'm pretty sure that's what they have.

3    But that's all I know.

4    MR. BUNT:  Nothing about that that would make it

5    hard for you to sit on this panel?

6    THE PANEL MEMBER:  No, sir.

7    MR. BUNT:  Did you say that you had used mobile

8    deposit for your own phone before?

9    THE PANEL MEMBER:  Yes.

10    MR. BUNT:  Do you use it frequently?

11    THE PANEL MEMBER:  No.

12    MR. BUNT:  Any particular reason you don't use it

13    more often?

14    THE PANEL MEMBER:  I have direct deposit from work,

15    so it's just easier that way.

16    MR. BUNT:  And did you work at a law firm at one

17    point?

18    THE PANEL MEMBER:  A long time ago, yes, sir.

19    MR. BUNT:  Was that around here in East Texas?

20    THE PANEL MEMBER:  Yes.  Stovall & Shelton, Hughes

21    Springs.

22    MR. BUNT:  Anything about that experience would make

23    you feel one way or the other?

24    THE PANEL MEMBER:  No, sir.

25    MR. BUNT:  Thank you, ma'am.

1          Mrs. Wall, Juror No. 7.  Do you use mobile deposit?

2               THE PANEL MEMBER:  I do.

3               MR. BUNT:  And do you use it frequently?

4               THE PANEL MEMBER:  Occasionally.

5               MR. BUNT:  Do you like the service?

6               THE PANEL MEMBER:  It's fine.

7               MR. BUNT:  Is there anything about it that would

8     make it difficult for you to sit on this panel?

9               THE PANEL MEMBER:  No.

10              MR. BUNT:  Okay.  Thank you, ma'am.

11         Mr. Crocker, Juror No. 10.

12         And just for everybody's benefit, some of you expressed

13    strong feelings about lawsuits in general.

14         Mr. Crocker, I think you said something about lawsuits in

15    your questionnaire.  Could you tell me a little bit more about

16    that?

17              THE PANEL MEMBER:  I only said about frivolous

18    lawsuits, you know.  Just -- you know what I mean by that.

19              MR. BUNT:  Yes, sir.  Same question I've asked some

20    of the other folks.  You understand I've brought a lawsuit.  I

21    certainly don't think it's frivolous.  I'm going to put on a

22    lot of evidence to show the infringement and damages.

23         But am I starting off behind because of your feelings

24    about lawsuits?

25              THE PANEL MEMBER:  No, sir.

1              MR. BUNT:  Thank you, sir.

2         Anybody else here on the first two rows who has any

3    particular feelings about lawsuits in general?

4         Anybody over here who hasn't already had a chance to say

5    something about lawsuits in the gallery?

6         Thank you-all.

7         The Defendant PNC is represented by a number of firms.

8    There's the Munger Tolles & Olson firm.  They have offices in

9    California and elsewhere.  There's also the Wilmer Hale law

10   firm.  They have offices in Washington, D.C., and elsewhere.

11        Is there anybody here who knows anybody from those two

12   law firms?  Okay.

13        The PNC is also represented by Ms. Melissa Smith of the

14   law firm of Gillam Smith.  Her law partners are Gil Gillam,

15   Tom Gorham, Travis Underwood.  Is there anybody here who knows

16   Ms. Smith or her partners or anybody else associated with her

17   firm?

18        Yes, sir.  Mr. Henderson?

19             THE PANEL MEMBER:  We're just acquainted.  I'm from

20   here; she's from here.  So --

21             MR. BUNT:  Would you consider her a friend, just an

22   acquaintance?  How would you describe the relationship?

23             THE PANEL MEMBER:  Professional friendship.

24             MR. BUNT:  How often do you-all see each other?

25             THE PANEL MEMBER:  Not very.  Nobody's seen anybody

1   with the pandemic.

2           MR. BUNT:  Right.  PNC is also being assisted today

3   by Mr. Mike Collins from Tyler.  Is there anybody here who

4   knows Mr. Collins.

5       Thank you.

6       Is there anybody here who owns stock in PNC?  Anybody in

7   the first two rows?

8       Anybody in the gallery?

9       I don't see any hands.

10      Anybody here who is a customer of PNC?

11      Yes, sir.  Juror No. 16, Mr. Reynolds.  Do you currently

12  have PNC as your bank?

13          THE PANEL MEMBER:  Yes, sir.

14          MR. BUNT:  By the way, do you use their mobile

15  deposit system?

16          THE PANEL MEMBER:  No, sir.

17          MR. BUNT:  Okay.

18          THE PANEL MEMBER:  I do inter-transfers.

19          MR. BUNT:  Okay.  So you use mobile banking, but you

20  don't use the mobile deposit.

21          THE PANEL MEMBER:  That's correct.

22          MR. BUNT:  You probably see where this is going.

23  I'm suing your bank.

24          THE PANEL MEMBER:  I understand.

25          MR. BUNT:  Is that going to -- it feels like that

1    might make you start off a little bit more toward them than to

2    me?

3            THE PANEL MEMBER:  Not really.

4            MR. BUNT:  Okay.  Are you a big fan of PNC?

5            THE PANEL MEMBER:  I only use them here locally in

6    Marshall.  I live in Atlanta, and so most of my stuff is done

7    in Atlanta.

8            MR. BUNT:  Okay.  Thank you, sir.

9        Mr. Henderson, could I go back to you for just a second?

10   Juror No. 28.

11           THE PANEL MEMBER:  Yes.

12           MR. BUNT:  Could you remind me, what is your job

13   title at Austin Bank?

14           THE PANEL MEMBER:  It's vice president and

15   relationship manager, but I'm a lender.

16           MR. BUNT:  Does your bank offer mobile deposit

17   services?

18           THE PANEL MEMBER:  I believe we do, but I'm ashamed

19   to admit I don't use it.

20           MR. BUNT:  That's okay.

21       Mrs. Tijerina, Juror No. 9, did I see that you write

22   songs?

23           THE PANEL MEMBER:  Yes.

24           MR. BUNT:  What sort of music?

25           THE PANEL MEMBER:  Gospel, faith-based country.

1          MR. BUNT:  And do you copyright your music?

2          THE PANEL MEMBER:  Yes, I do.

3          MR. BUNT:  Every time you write a song?

4          THE PANEL MEMBER:  Yes, I do.

5          MR. BUNT:  Why do you do that?

6          THE PANEL MEMBER:  To protect it from someone else

7   stealing those ideas or songs or lyrics.  Melodies as well.

8          MR. BUNT:  Thank you, ma'am.  I appreciate that.

9       Mr. Onley, Juror No. 17, you said you sat on a jury.  It

10  was a civil jury.  Is that correct, sir?

11         THE PANEL MEMBER:  Yes, sir.

12         MR. BUNT:  Did you-all find in favor of the

13  Plaintiff or the Defendant in that case?  Do you remember?

14         THE PANEL MEMBER:  I really don't remember what it

15  was and which case it was.

16         MR. BUNT:  Okay.  Do you remember what type of case

17  it was?  I mean, was it like a car wreck or a debt or any

18  idea?

19         THE PANEL MEMBER:  I really don't know the details

20  on it or anything like that.  I know I just was selected and

21  stuff.

22         MR. BUNT:  Okay.  No worries.  Thank you, sir.

23      Are there any jurors here who know one another?  I

24  figured I was going to get that.  Okay.  All right.  Let's go

25  one at a time.

1        The first row, Mrs. Maiville -- well, I'm sorry.  Mrs.

2   O'Dell, who do you know on the panel?

3             THE PANEL MEMBER:  I know Ms. Marrow, and I've been

4   acquainted with -- oh, never mind.  She's not here.  She was

5   kicked out.  Ms. Goodwin is not here.

6             MR. BUNT:  You are acquainted with Mrs. Marrow.  How

7   do you know her?

8             THE PANEL MEMBER:  We frequent her restaurant.

9             MR. BUNT:  Okay.  Not sure how to ask this, but you

10  go to her restaurant a lot.  Let's say you-all both end up on

11  the jury together.  Let's say you have different opinions

12  about who should win and who should lose.

13        Is it going to make it difficult between you-all if you

14  see each other all the time?

15            THE PANEL MEMBER:  No, sir.

16            MR. BUNT:  Sounds like you're kind of friendly?

17  Okay.  Thank you.

18        Mrs. Marrow, same question to you.  Anything about that

19  that's going to make it hard to sit on this panel?

20            THE PANEL MEMBER:  No, sir.

21            MR. BUNT:  Mrs. Maiville, you mentioned you know

22  somebody.

23            THE PANEL MEMBER:  I know David.

24            MR. BUNT:  Okay, Mr. Baur.  And how do you know each

25  other?

1          THE PANEL MEMBER:  We've been friends for, I don't

2     even know, years.  Seven, he says.

3          MR. BUNT:  Okay.  Same question to you-all.

4          THE PANEL MEMBER:  Oh, we disagree all the time.

5          MR. BUNT:  Okay.  That's a great friendship?

6          THE PANEL MEMBER:  I'm friends with his wife.

7          MR. BUNT:  Right.

8          THE PANEL MEMBER:  He's friends with my husband.

9          MR. BUNT:  How about -- was there anybody else on

10    the first row?

11       Yes, ma'am.  Mrs. Wall.

12         THE PANEL MEMBER:  Oh, yes.  I know Mr. Henderson

13    and then Rachelle Perry.  It's just been business and social

14    events.

15         MR. BUNT:  Same question to you.  Would it affect

16    the way you look at the evidence?

17         THE PANEL MEMBER:  Not at all.

18         MR. BUNT:  Second row, who knows each other back

19    there, or knows anybody?  Yes, ma'am?

20         THE PANEL MEMBER:  I forgot I know him, too.

21         MR. BUNT:  Okay.  You know.  Mr. Crocker?

22       Juror No. 13, Mrs. Marrow, you know Mr. Crocker as well?

23         THE PANEL MEMBER:  Yes.

24         MR. BUNT:  Anything about that?

25         THE PANEL MEMBER:  No.  As long as they still eat

62

```
 1   BLTs, I'm fine.
 2              MR. BUNT:  It sounds like yours is the place to go.
 3        Ms. Turner, you know somebody on the panel as well?
 4              THE PANEL MEMBER:  No. 9 Juror.  We just -- same
 5   high school.
 6              MR. BUNT:  Oh, okay.  All right.  Do you-all see
 7   each other frequently?
 8              THE PANEL MEMBER:  No, sir.
 9              MR. BUNT:  Okay.  How about out here in the gallery?
10   Was there anybody else who knew one another?
11        Mr. Green, No. 22.
12              THE PANEL MEMBER:  I know Jesse Farr.
13              THE COURT:  You have five minutes remaining.
14              MR. BUNT:  Thank you, Your Honor.
15              THE PANEL MEMBER:  I know Jesse Farr.  I worked with
16   him at the Texas Department of Transportation.  It would not
17   affect anything.
18              MR. BUNT:  Thank you, sir.  I appreciate that.
19        Could I see a show of hands of anybody who served as a
20   foreperson of a jury?  Mr. Baur and Mr. Berg.  Correct?  Okay.
21        And then Mrs. Stepherson, Juror No. 20, I think in your
22   jury questionnaire form, you said something to the effect of
23   trust no one?
24              THE PANEL MEMBER:  I don't trust anybody.
25              MR. BUNT:  Okay.
```

1          THE PANEL MEMBER:  Sorry.

2          MR. BUNT:  That's okay.  I just don't want to be

3     trusted less than PNC.  Are we starting off --

4          THE PANEL MEMBER:  You are all equal.  Everybody's

5     equal.

6          MR. BUNT:  That's perfect.  That is all I needed to

7     know.

8          One final question.  I am certain that I have forgotten

9     to ask you something very crucial and I'm going to kick myself

10    afterwards, but if there is some reason that you know that

11    this is not the jury for you, even if it's something you don't

12    want to talk about in front of everybody, if you want to take

13    it up later with the Judge, that's fine, but I need you to

14    raise your hand now and let me know if there's some reason

15    this is not the case for you.

16         Over here in the first two rows, anybody who has

17    something that I haven't covered that would make it difficult?

18         How about in the gallery?  Mr. Baur.  I think -- yes,

19    sir.  We will come back to you then, I think.

20         All right.  Thank you, ladies and gentlemen.  I certainly

21    appreciate your time and your attention, and we look forward

22    to putting on our case to you.

23         THE COURT:  All right.  Defendant may now address

24    the panel.

25         Would you like a warning on your time, Ms. Smith?

1          MS. SMITH:  Please, Your Honor; five minutes.

2          THE COURT:  I'll warn you when you have five minutes

3     remaining.

4          You may proceed.

5          MS. SMITH:  Thank you.  May it please the Court.

6          Good morning, everybody.  In the way of a reintroduction,

7     my name is Melissa Smith, and on behalf of PNC I thank you for

8     being here.  I think the Judge called it a sacrifice, and it's

9     indeed a sacrifice.  I know that every minute--every day for

10    those of you that are chosen--that you spend with us is a day

11    away from your obligations and your friends and your family,

12    and on behalf of PNC we appreciate it.

13         Now, I'm going to follow suit.  Mr. Bunt gave you a

14    little bit of information about himself, and I'll do the same

15    thing.

16         I went to the University of Texas at Austin undergrad.

17    Pretty quickly after that I, like Judge Gilstrap, attended

18    Baylor Law School.  That was about 25 years ago.  I moved to

19    Jefferson, Texas, after I graduated from law school and

20    started practicing here in the Marshall square.  That was --

21    I've been practicing here for 25 years.

22         I am part of the Gillam & Smith law firm, which is that

23    old yellow house that some of you drove past when you came to

24    court this morning.  I've had the same law partner for 25

25    years.

1          Personally, I am married.  My husband's name is Steven.

2     He used to be a police officer.  He's a retired police officer

3     now.  We have two kids.  We have a nine-year-old.  She turned

4     nine last week.  And we have an 11-year-old boy.  He's 10,

5     turning 11 on Wednesday.  So in my spare time I do a lot of

6     mom duties with them.

7          Now, Judge Gilstrap allows parties to give you that

8     high-level overview of this case, and you understand now that

9     PNC is a bank, and that what is being accused in this case,

10    Mr. Bunt said, was the remote deposit feature in its app.

11         And Mr. Bunt and Mr. Green had a discussion, and Mr.

12    Green said, you know, Are you accusing the app?  And I want to

13    clarify that.  The entire app is not being accused, that

14    300-plus million dollars.  It's actually two features in the

15    app.  It's the ability to present a photo of the check to the

16    customer first, and then the second feature is auto capture.

17    So USAA sued PNC about these two features in the app, and

18    PNC's response was to take those features out of the app.

19         Now, a lot has gone on, there have been a lot of

20    depositions, and a lot of documents since that time, and we've

21    learned a whole lot more about USAA's allegations and about

22    their patents, quite frankly.

23         So as Judge Gilstrap told you, PNC's position in this

24    case is that we do not infringe, those two features do not

25    infringe, and that actually the patents aren't valid.  But the

1    features, they are still out of our app.  So the eight of you

2    that are lucky enough to get chosen for this jury are going to

3    be tasked with deciding if PNC is wrongly accused.

4        Now, Mr. Bunt is a friend of mine.  He, as he said,

5    offices over in Tyler, but he grew up over in Hallsville.  Did

6    anyone come in and recognize Mr. Bunt today?

7        All right.  I can't see that far.  I apologize.  Juror

8    No. 23.  Let's see.  Mrs. O'Quinn?

9            THE PANEL MEMBER:  Yes.  I graduated with Chris from

10   high school.

11           MS. SMITH:  All right.

12           THE PANEL MEMBER:  He and his wife both.  But it's

13   been a long time.

14           MS. SMITH:  Well, it's been a long time.  But I

15   didn't graduate from high school with you.  So is Mr. Bunt

16   starting out with just a slight advantage perhaps in this case

17   because you go all the way back to high school with him?

18           THE PANEL MEMBER:  It might.  I think so.

19           MS. SMITH:  And as Judge told you, the only right

20   answer in this little exercise is a truthful answer, so I

21   appreciate your honesty.

22           THE PANEL MEMBER:  Yes.  I think that would happen.

23           MS. SMITH:  Thank you.

24       Anybody else know Mr. Bunt?

25       Now, I have to ask:  The other lawyers in this case with

1     Mr. Bunt are at a law firm called Irell & Manella, and it's in

2     Los Angeles, I believe.  They have several offices in Southern

3     California.  Anybody ever heard of that law firm?  I see lots

4     of heads shaking no?  All right.

5           Now, do we have any members of USAA on the panel by raise

6     of hand?

7           Juror No. 2, I anticipated that.  You retired from USAA,

8     ma'am?

9                 THE PANEL MEMBER:  Yes.

10                MS. SMITH:  And you're still a member.  Correct?

11                THE PANEL MEMBER:  Yes.

12                MS. SMITH:  That's all I need.  Thank you.

13          Anyone else on the first row that's a current member of

14    USAA?

15          Second row?

16          Anyone back in the gallery a current member of USAA.

17          All right.  Thank you.

18          Is there anybody, other than Juror No. 5, that has been a

19    member of USAA before but is no longer a member of USAA?

20          All right.  Juror No. 31.  I just need to see your hands.

21    Thank you.  Thanks.

22          All right.  As Mr. Bunt told you, and as many of you

23    know, USAA services military clients, its customers.  It's

24    kind of an exclusive group.  I can't be a member of USAA.

25          Is there anyone sitting there thinking, you know, that's

1    an honorable thing; you know, PNC is a bank, and we've got --

2    we've got another bank that services the military, but because

3    they service the military, they're going to start out a little

4    bit ahead in this lawsuit?

5         No. 12, you're smiling at me.  And when you smile at us

6    up here at the podium, you get called on.  I apologize.  Tell

7    me what's on your mind.

8              THE PANEL MEMBER:  I don't think it would.  I don't

9    think so.

10             THE COURT:  Let me remind everybody, you need to

11   stand up and you need to wait until you get the microphone.

12             THE PANEL MEMBER:  Okay.  I don't think it would,

13   but I do -- I do honor my military and thank them for all they

14   do so...

15             MS. SMITH:  And I can tell you I agree with you on

16   that because PNC does that, and PNC has a big bunch of

17   military customers.  But we let -- we have a big bunch of

18   customers.  We have all type of customers.

19        But, you know, if you -- if every time you look at that

20   table and see their witnesses, it brings, you know, patriotic

21   thoughts to mind that causes you to start kind of leaning that

22   way, I really would like to know about it.

23             THE PANEL MEMBER:  I don't think so.

24             MS. SMITH:  Okay.  All right.  I appreciate your

25   honest answer.  Thank you, ma'am.

1      Has anybody ever seen those USAA commercials on Sunday

2  Night Football?  Anybody ever seen any of their commercials?

3  I'm seeing some head shakes.

4      Juror No. 1, Mr. Smith, I don't think we're related.

5  Tell me about what you remember about those commercials.

6          THE PANEL MEMBER:  That it was just insurance for

7  the military.

8          THE PANEL MEMBER:  Okay.  Anything else?

9          THE PANEL MEMBER:  No, ma'am.

10         MS. SMITH:  Thank you, sir.

11      Juror No. 3, did you shake your head?  No?  Okay.  All

12  right.

13      Now, PNC has -- they have 300 branches, 300-plus branches

14  across Texas.  Some of you probably passed the Marshall branch

15  when you drove in to jury service today.

16      So has anybody ever had dealings with PNC that would

17  cause PNC to kind of start out from behind in this case?

18  Anybody on these first two rows?

19      Anybody back here?

20      Juror No. 16, you were my PNC customer.  Is that correct?

21         THE PANEL MEMBER:  Yes.

22         MS. SMITH:  All right.  Anything -- have you been

23  happy with your --

24         THE PANEL MEMBER:  I've not unhappy with you-all, so

25  ain't no problem.

1          MS. SMITH:  Okay.  That's what I needed to hear.

2    Thank you, sir.

3          All right.  Now, Mr. Bunt asked you-all a question, and

4    he divided you up into pro-patent and anti-patent, and I'm

5    going to take issue with that divide because I'll tell you,

6    PNC is pro-patent.  We have a bunch of patents of our own.  So

7    what I'm looking for are people that think competition is good

8    in the marketplace.

9          Anybody think competition is a good thing?

10         Juror No. 13.  I haven't spoken with you.  Is your place

11   over by Five D in Hughes Springs?

12         THE PANEL MEMBER:  Five D is in Avinger.  We are

13   actually across the street from the Legacy Events Center, the

14   only red light in town.

15         MS. SMITH:  Okay.  I have not yet visited.  Thank

16   you.

17         Tell me your thoughts on competition.

18         THE PANEL MEMBER:  I think competition is good.  I

19   mean, like, I own a restaurant.  I do burgers, and a lot of

20   places in town do burgers, too, but I feel like our burgers

21   stand out because I season them, I put egg and bread crumb in

22   them, and it's real beef, never frozen.  And I feel like

23   competition, like Burger King or McDonald's, you know, versus,

24   I have the upper hand because I do use real product versus

25   like sweeping, I guess.

1          MS. SMITH:  Okay.

2          THE PANEL MEMBER:  So I feel like competition is

3  good because you can compare who is better and who's not good.

4          MS. SMITH:  I appreciate that.  Thank you, ma'am.

5      Juror No. 14, what do you think about competition?  You

6  think competition can be a good thing?

7          THE PANEL MEMBER:  Yeah, I think it can.

8          MS. SMITH:  Tell me more about that.

9          THE PANEL MEMBER:  Well, if it wasn't for

10  competition, everybody would just take over--one party.

11          MS. SMITH:  All right.  Well, sir, I think you have

12  some prior civil service in a patent lawsuit.  Is that

13  correct?

14          THE PANEL MEMBER:  Yeah.  It was a long time ago.

15          MS. SMITH:  Do you remember who won and who lost in

16  that?

17          THE PANEL MEMBER:  I believe Samsung won, and it was

18  shocking, kind of.

19          MS. SMITH:  All right.  I believe you and I met on

20  that case, did we not?

21          THE PANEL MEMBER:  I don't remember it.

22          MS. SMITH:  I don't take offense to that, but good

23  to see you again, sir.

24      All right.  Now, I'm not going to --

25      I thought you had something for me.

1    Now, I am not going to talk about being a defendant in a

2    lawsuit specifically or anything like that, or any type of

3    litigation, but have we all been accused of doing something we

4    didn't do at some point in life?  Can we all agree?  I see

5    lots of shakes of heads.

6    Juror No. 3, I don't think anyone's spoken to you yet.

7    Let's hear from you, Ms. Moran.  How did that make you feel?

8            THE PANEL MEMBER:  Ask the question again.  I'm

9    sorry.

10           MS. SMITH:  When someone accused you of doing

11   something you didn't do.

12           THE PANEL MEMBER:  It was very frustrating and I

13   felt betrayed, I guess.

14           MS. SMITH:  And did you hesitate to defend yourself?

15           THE PANEL MEMBER:  No.

16           MS. SMITH:  Okay.  So do you think it's reasonable

17   for a company that's accused of something that they didn't do

18   to defend themselves as well?

19           THE PANEL MEMBER:  It's reasonable.

20           MS. SMITH:  I appreciate that.  Thank you, ma'am.

21   Now, Mrs. Wall, I think you had five kids, which makes

22   you the winner for this question.

23           THE PANEL MEMBER:  Well, I think he's got six,

24   somebody over there.

25           MS. SMITH:  I'll come back to him.  Okay?

```
 1        So when kids -- you said they were grown now.  Is that
 2   correct?
 3             THE PANEL MEMBER:  Yes.
 4             MS. SMITH:  I tried to take notes.
 5        Now, when those kids were growing up, did they ever get
 6   in little spats or fights?
 7             THE PANEL MEMBER:  Always.
 8             MS. SMITH:  Always.  Okay.  And was there something
 9   -- did one of them try to kind of hightail it to you and be
10   the first to tell you what happened?
11             THE PANEL MEMBER:  Always, yes.
12             MS. SMITH:  All right.  Same situation in my house.
13        Now, there's something instinctive about us wanting to be
14   the first to kind of tell our story.  You'd agree with that.
15   Correct?
16             THE PANEL MEMBER:  Correct.
17             MS. SMITH:  Okay.  And as a good mama, did you
18   always believe the first story you heard?
19             THE PANEL MEMBER:  No.
20             MS. SMITH:  Okay.  You see where I'm going with
21   this?
22             THE PANEL MEMBER:  I do.
23             MS. SMITH:  Okay.
24             THE PANEL MEMBER:  I do.
25             MS. SMITH:  And Mr. Bunt, the good lawyers over
```

1    there on the other side of the room stood up, and they're good

2    lawyers, and they're going to say some intelligent, reasonable

3    things, but can you wait until you hear from PNC before making

4    up your mind?

5              THE PANEL MEMBER:  Absolutely.

6              MS. SMITH:  All right.  Thank you, Mrs. Wall.

7         Now, let's see who I haven't talked to.

8         Juror No. 6, Ms. Maberry.  Do you agree or disagree with

9    this statement:  We need more lawsuits to keep companies

10   honest?

11             THE PANEL MEMBER:  I disagree.

12             MS. SMITH:  Why?

13             THE PANEL MEMBER:  I think there are other ways to

14   manage it before you get into the court.

15             MS. SMITH:  Okay.

16             THE PANEL MEMBER:  If you're being honest and not

17   just saying it's all me and not the other guy.  If you just

18   look at it, there is -- should be a way to resolve things

19   before you have to get to the court.

20             MS. SMITH:  Thank you, ma'am.  I appreciate that.

21        Now, on that note, on that note of honesty and resolving

22   things before you get to the court, Mr. Bunt talked to Jurors

23   4 and 5, Mrs. O'Dell and Mrs. Maiville, about this drilling on

24   someone's land in this land dispute.  Do you guys remember

25   that?

1        I'll start with Mrs. O'Dell.  Now, you have that land,

2   Mr. Bunt talked about that, and you're sitting at your kitchen

3   window one day and someone comes out and puts a drilling rig

4   on it.  Do you run to court and file a lawsuit?

5             THE PANEL MEMBER:  No.  You go to them directly

6   first.

7             MS. SMITH:  Exactly.  You'd call them, wouldn't you?

8   Send them an email?  Something like that?

9             THE PANEL MEMBER:  Yes, ma'am.

10            MS. SMITH:  Okay.  Thank you, ma'am.

11       Now, Mrs. Maiville, do you agree with Mrs. O'Dell, if

12   someone's out there pulling a drilling rig on your land and

13   pumping out oil, that you'd file a lawsuit first?

14            THE PANEL MEMBER:  No, I wouldn't email them.  I

15   would probably be like, What are you doing?

16            MS. SMITH:  I frankly wouldn't email them, either.

17       Well, let's go down that road a little more.  They pull

18   up this drilling rig and they drill on your land, on what you

19   in your heart of hearts think is your land.  Would you watch

20   them day after day after day taking oil off your land and say

21   nothing?

22            THE PANEL MEMBER:  No, ma'am.

23            MS. SMITH:  Okay.  Well, let me sweeten the deal a

24   little.  They're pumping that oil every day and you're

25   thinking, You know, eventually I'm going to sue them and I'm

1   going to get all the money for that.  So the longer they pump

2   that oil, the more money you make.  Do you think that's right?

3            THE PANEL MEMBER:  I mean, I think whenever somebody

4   does something wrong, it's nice to address the issue to begin

5   with.  You know, there's a lot of factors that go into that,

6   but I mean, no.

7            MS. SMITH:  Okay.  Okay.  That's what I wanted to

8   know.  Thank you, ma'am.

9            THE PANEL MEMBER:  Yes, ma'am.

10           MS. SMITH:  Now, you-all -- Judge Gilstrap showed

11  you-all the patent video.  Was there anybody that was

12  surprised -- because the validity of USAA's patents in this

13  case is going to be at issue.  Was there anybody surprised

14  when you saw that government video that you as jurors will

15  have the power to take somebody's patents away?  Anybody

16  surprised?

17       Juror No. 9, you are shaking your head up and down.

18           THE PANEL MEMBER:  I was.  I just was surprised that

19  they could go back to that and that was already obtained and

20  clarified and documented by the feds.

21           MS. SMITH:  Knowing that that is the law and that

22  the Judge will instruct you that you, indeed, have that power,

23  and the video told you you have that power, would you hesitate

24  at all to use that power if the evidence supported doing that?

25           THE PANEL MEMBER:  I think I might.  I think I might

1    hesitate.

2              MS. SMITH:  You would hesitate?

3              THE PANEL MEMBER:  To revoke.

4              MS. SMITH:  And so I want to talk a little more

5    about that because that's why we're here.  That's going to be

6    a big issue in the case on whether or not the patents are

7    valid.

8         Would it make it easier for you when you're hesitating if

9    you found out that maybe you're getting more information than

10   the Patent Office got?  Could that change things for you?

11             THE PANEL MEMBER:  Yes.

12             MS. SMITH:  All right.  Thank you, ma'am.

13        Ms. Turner, good morning.

14             THE PANEL MEMBER:  Good morning.

15             MS. SMITH:  We've been together before in this

16   courtroom.  It's good to see you again.

17             THE PANEL MEMBER:  Yes, ma'am.

18             MS. SMITH:  Any issue -- I couldn't tell if it was a

19   head nod up or down on that invalidating the patent.  I know

20   in your prior service you did not invalidate the patent; but

21   different evidence, new case, any hesitation with fulfilling

22   that role that the Judge would give you and the PTO has given

23   you?

24             THE PANEL MEMBER:  No, ma'am.

25             MS. SMITH:  Okay.  Thank you, ma'am.  And it is good

1    to see you again.

2              THE PANEL MEMBER:  Yes, ma'am.

3              MS. SMITH:  Now, who out here -- and I'm going to

4    let -- Juror No. 15 in that row, I haven't heard from you-all

5    yet.  I try to hear from everybody.

6         Who on the first row, Juror 15, says they would have a

7    generally positive view or, Juror 15, do you have generally a

8    positive or negative view of the justice system?

9              THE PANEL MEMBER:  Neither/or.

10             MS. SMITH:  All right.  What did you think when they

11   told you you had jury duty today and you found out it was a

12   patent case?

13             THE PANEL MEMBER:  I'm getting used to being called

14   for jury service because I get it quite often.

15             MS. SMITH:  On behalf of the system, I apologize for

16   that?

17             THE PANEL MEMBER:  That's okay.  Just my job.

18             MS. SMITH:  Okay.  Okay.  And did you say you had

19   actually -- you had not actually been picked for a jury,

20   though?

21             THE PANEL MEMBER:  Could you repeat that?

22             MS. SMITH:  Had you actually served or just showed

23   up --

24             THE PANEL MEMBER:  No.  I only get called; I've

25   never served.

1      MS. SMITH:  Okay.  Thank you, ma'am.  I appreciate

2  that.

3      Now, His Honor talked a little bit about the burden of

4  proof in this case and told you-all the burden of proof is on

5  the Plaintiff to prove their case.  And I'll tell you what

6  that means.  That means that PNC, we could -- we could sit on

7  our hands and do absolutely nothing, and if the Plaintiff

8  wasn't able to tip those scales and put on enough proof, we

9  would win.

10     Now, I'll tell you we'll put on a lot of evidence.  We'll

11  not sit on our hands, as you guys might suspect.  But does

12  anyone think, you know, PNC should have to do more; they

13  should have to prove that they're not infringing?  Anybody

14  have that thought?

15     Juror No. 17, Mr. Onley.  Think that's a fair burden, to

16  make the Plaintiff carry that burden?

17          THE PANEL MEMBER:  No, I don't.  I think they ought

18  to prove their point the same way with the other.

19          MS. SMITH:  I'm sorry.  I couldn't hear you.

20          THE PANEL MEMBER:  I think they ought to prove

21  you-all's case and come out and try to come out in the middle

22  or whatever.

23          MS. SMITH:  If the Judge says it's their burden to

24  prove their case and PNC does not have to prove that they

25  don't infringe, do you think that's fair?

```
 1                 THE PANEL MEMBER:  No.

 2                 MS. SMITH:  Okay.  Now, Mr. Onley, you have some

 3      past civil service.  Is that right?

 4                 THE PANEL MEMBER:  Yes, ma'am.

 5                 MS. SMITH:  What was the outcome of that case?

 6                 THE PANEL MEMBER:  I don't really recall the outcome

 7      of it.  It's been so long ago.

 8                 MS. SMITH:  Do you remember the subject matter at

 9      all, sir?

10                 THE PANEL MEMBER:  Ma'am?

11                 MS. SMITH:  Do you remember the subject matter at

12      all?

13                 THE PANEL MEMBER:  No, I don't.

14                 MS. SMITH:  Okay.  Thank you, sir.  Appreciate it.

15          Now, Mr. Bunt told you this case is about money.  He told

16      you that there are going to be hundreds of millions of dollars

17      at issue, and you-all have not heard the evidence yet.

18          My question is a little bit different.  My question is

19      this:  If the Plaintiff does not meet their burden of proving

20      these two features in this app on damages is worth 300

21      million, is there anybody that thinks, you know, the Plaintiff

22      worked hard, they spent all week here, they should get

23      something?  Anybody think that by a raise of hands.

24          I see heads nodding no.

25          Does anybody have any hesitation, if a Plaintiff is not
```

1    able to meet their burden, of sending them home with nothing?

2        Mr. Singletary, you're shaking your head.  No issue with

3    that?

4            THE COURT:  Let's use the microphone.  I couldn't

5    hear what he said.  Everybody in the room is entitled to know

6    what the answers are.

7        Why don't you stand up and give that answer again,

8    Mr. Singletary?

9            THE PANEL MEMBER:  I have no problem sending them

10   home empty-handed.

11           MS. SMITH:  All right.  Mr. Singletary, you ever

12   sold a house or a car or anything like that?

13           THE PANEL MEMBER:  New cars.

14           MS. SMITH:  All right.  When you put your car up for

15   sale, do you kind of aim high or put a price on it that maybe

16   you don't realistically expect to get and then negotiate down

17   from that?

18           THE PANEL MEMBER:  No.  Hard price.  I don't have

19   time for that.

20           MS. SMITH:  You don't have time for that.  All

21   right.  You think others might do something like that?  They

22   may aim a little high when they're selling a car or a house

23   and then negotiate off that?

24           THE PANEL MEMBER:  There are some that do that.

25           MS. SMITH:  All right.  Thank you, sir.  What did

```
 1    you do for a living again, sir?  I apologize.  I've forgotten.
 2              THE PANEL MEMBER:  I'm a drilling consultant.
 3              MS. SMITH:  And tell me what that means on a
 4    day-to-day --
 5              THE PANEL MEMBER:  I put those oil rigs on people's
 6    land.
 7              MS. SMITH:  Now knowing that, I would have used a
 8    different analogy.  But I'm sure you always put them on the
 9    right piece of land.  Right?
10              THE PANEL MEMBER:  Right.  That would never happen.
11    There's too many permits.  People know way ahead of time.  And
12    there's horizontal drilling, so we'd get next door and sneak
13    under.
14              MS. SMITH:  It was Mr. Bunt's analogy.  He started
15    this.  All right.  Thank you, Mr. Singletary.  I appreciate
16    that.
17         Now, what you're going to see in this case, again, is you
18    are going to see the Plaintiff bring their claims, and then
19    what's going to happen is PNC is going to be made to respond
20    to each claim.  So PNC is going to come in here and they're
21    going to bring in a damages expert, and the damages expert
22    might take issue with that $300 million for the two features.
23         Is there anybody that thinks, you know, if PNC is talking
24    about money, they must have done something wrong?  Anybody
25    have that thought.
```

83

1      I see heads shaking no.  All right.

2      Now, I'm running a little ahead of time, so I'll give you

3  a little time back, but what I will -- I'll kind of end where

4  Mr. Bunt did.  Is there anything that Mr. Bunt said or that

5  you heard about the Plaintiff's case that starts you leaning

6  just a little bit towards Plaintiff in this case?

7      Is there anything that you're sitting there thinking, you

8  know, Ms. Smith, you know, she asked a bunch of questions,

9  some good, some bad, but if she just would have asked me this

10  question, I would have told her that this just isn't the right

11  case for me, for whatever reason.

12      Let's hear it.  Juror No. 19, Mr. Berg.

13           THE PANEL MEMBER:  Yeah.  I kind of remember the

14  case now.  It was Motorola, the civil case that I had, and the

15  people that were suing Motorola had recently bought the

16  company and was suing for a patent thing.  I just don't want

17  this to be the same kind of thing where if the people that own

18  USAA just bought it and was suing for patents, in cases like

19  that.  I'm just -- was concerned about that.

20           MS. SMITH:  Okay.  And respectfully, sir, I think

21  the facts are a little bit different in this case.

22           THE PANEL MEMBER:  Okay.

23           MS. SMITH:  Otherwise, you would be willing to serve

24  on another patent case?

25           THE PANEL MEMBER:  Yes, ma'am.

```
 1                MS. SMITH:  Okay.  Thank you.

 2         And I had one more question for you, sir, about that

 3    case.  In that case, what was the outcome?

 4                THE PANEL MEMBER:  We -- the Defendant won.

 5                MS. SMITH:  And when you say 'they won'?

 6                THE PANEL MEMBER:  We didn't award any money at all.

 7                MS. SMITH:  Okay.  And did you invalidate the

 8    patents that those people had purchased?

 9                THE PANEL MEMBER:  Yes.

10                MS. SMITH:  Thank you, sir.  I appreciate it.

11                THE COURT:  You have five minutes remaining,

12    counsel.

13                MS. SMITH:  Thank you.

14         I think I'm finished, Your Honor.

15         Once again, thank you for your time and thank you for

16    your patience today in answering all of my questions, and on

17    behalf of PNC, we look forward to meeting the eight of you

18    that are lucky enough to serve.  Thank you.

19                THE COURT:  Counsel, approach the bench, please.

20                (The following was had outside the hearing of the

21                jury panel.)

22                THE COURT:  Mr. Bunt, does Plaintiff have any

23    challenges for cause?

24                MR. BUNT:  Yes, Your Honor, we do.  No. 9, 11, 19,

25    22, 28, and 31.
```

1          THE COURT:  All right.  After 22, give me those

2    numbers again?

3          MR. BUNT:  No. 28, Mr. Henderson, and 31.

4          THE COURT:  All right.  Ms. Smith, does the

5    Defendant have any challenges for cause?

6          MS. SMITH:  I do.  First of all, Your Honor, I do

7    not have an objection to Mr. Bunt's challenge for cause on 9

8    and 11.

9          THE COURT:  Just a minute, please.

10      I'm going to ask -- ladies and gentlemen, I'm going to

11   ask you not to talk while I am here with the lawyers at the

12   bench, please.  I'm going to let you have a recess in a few

13   minutes, and when you're outside the courtroom, feel free to

14   have all the conversations you want.  But while we're in the

15   courtroom, I need to ask you to be silent, please.  Thank you.

16      Okay, Ms. Smith.  Go ahead.

17         MS. SMITH:  PNC has no objection to Mr. Bunt's

18   challenge for cause on 9 and 11.

19      Our challenges for cause are 23, 2, 12 --

20         THE COURT:  Wait a minute.  No. 23 --

21         MS. SMITH:  Yes, Your Honor.

22         THE COURT:  Juror No. 2?

23         MS. SMITH:  No. 12 and 17.

24         THE COURT:  All right.  So let me make sure I'm

25   following you.  Defendants are challenging for cause No. 2.

1    You either join in challenging No. 9 or have no objection to

2    Plaintiff's challenge of No. 9.

3              MS. SMITH:  Correct.

4              THE COURT:  Same for No. 11.

5              MS. SMITH:  Correct.

6              THE COURT:  You're challenging 12, 17, and 23.  Is

7    that correct?

8              MS. SMITH:  Yes, Your Honor.

9              THE COURT:  And is that everything?

10             MS. SMITH:  Yes, Your Honor.

11             THE COURT:  Okay.  And I did not see anybody

12   indicate they had a scheduling issue.  So I guess we will

13   retain No. 2.

14        If both sides are agreeing that 9 and 11 should be

15   released from the panel, I'm not going to stand in the way of

16   that.  So we'll excuse No. 9 and No. 11.  I won't call them up

17   here to discuss it since it's not in dispute.

18        I will retain and we'll discuss at the bench issues

19   regarding No. 12, 17, 19, 22, and 23, and 28, and 31.

20        I haven't done the math, Mr. Bunt.  Are we going to get

21   as far back as 31?

22             MR. BUNT:  I don't think so, Your Honor.  I'm sorry.

23   Did I make clear No. 22 also?

24             MS. SMITH:  I don't think we'll get to 22 and 23.

25             THE COURT:  No. 22, I have Plaintiff challenging for

1    cause.

2              MR. BUNT:  Yes, Your Honor.  I doubt we'll get that

3    far, but I just -- I just wanted to make sure I had those.

4              THE COURT:  All right.  Did you have some comment

5    about 22, Ms. Smith?

6              MS. SMITH:  I didn't think we were going to reach

7    that far, Your Honor.

8              THE COURT:  It looks like to me we could potentially

9    get through 23 to 24, but I don't see any way we reach 28 or

10   31.  If everybody challenged were released from the panel up

11   through 23, we would still have more than enough to seat the

12   jury before we got to 28, according to my math.

13        Does anybody differ from that?

14             MS. SMITH:  No, Your Honor.

15             THE COURT:  If you'll agree with that, I don't see

16   any reason to bring No. 28 and 31 up.

17             MR. BUNT:  That's fine, Your Honor.  I think your

18   math is correct.

19             MS. SMITH:  Will you guys -- I challenged 2 because

20   she is a current member.  Are you guys going to not agree to

21   that in this case?

22             MR. SHEASBY:  You made a for-cause challenge.

23   Right?

24             MS. SMITH:  And I just wondered if you would agree

25   to that.

1          MR. BUNT:  No, I don't think I would agree.

2          THE COURT:  We do have a phone line connected to the

3     courtroom.  Sometimes witnesses have to testify by phone.

4     Apparently we have a wrong number that won't go away, so just

5     ignore that, please.

6          All right.  Is there some agreement, or is there lack of

7     agreement?

8          MR. BUNT:  Lack of agreement.

9          THE COURT:  So I'm going to hold back and discuss

10    here at the bench with panel member No. 2, 12, 17, 19, 22, and

11    23.  Does anybody -- based on the parties' agreements, I'm

12    going to release 9 and 11.

13         Anybody see anybody else that I need to bring up here?

14         MR. BUNT:  No, Your Honor.  But there is one other

15    issue.  I believe there was a MIL violation when Ms. Smith

16    mentioned that PNC had a number of patents.

17         THE COURT:  What do you expect me to do about it

18    now?

19         MR. BUNT:  I apologize, Your Honor.  I know your

20    views about interrupting.

21         THE COURT:  I saw you stand up, but sat back down.

22         MR. BUNT:  I did.

23         THE COURT:  I'm going to consider it waived in this

24    situation.  But, Ms. Smith, it clearly struck me as being

25    contrary to the MIL order.

```
1              MS. SMITH:  Understood.

2              THE COURT:  I will not expect to hear about PNC's

3    patents in this case without prior leave of the Court.

4              MS. SMITH:  Understood.

5              THE COURT:  All right.  Why don't you-all take your

6    seats, please.

7              MR. BUNT:  Thank you, Judge.

8              (The following was had in the presence and hearing

9              of the jury panel.)

10             THE COURT:  All right, ladies and gentlemen.  I'm

11   going to let most of you have a recess in just a minute.

12   Those of you that I do not ask to stay back, I'll let you exit

13   through the double doors and remain outside the courtroom

14   until we go through this next part of the process.

15        When you're outside the courtroom, ladies and gentlemen,

16   a couple of things.  Number one, stay in the building.  Don't

17   go outside.

18        Number two, when you go through those double doors, if

19   you make a left and go around the corner, you'll find the

20   water fountain and the restrooms.  So if you need the benefit

21   of either of those, take advantage of them.

22        Number three, you have heard absolutely no evidence in

23   this case.  So if you want to talk about the weather, if you

24   want to talk about kids and grandkids, if you want to talk

25   about why somebody's hamburger's are better than somebody
```

1    else's hamburgers, feel free to do that, but don't discuss

2    anything you have heard in the courtroom because you have

3    heard zero evidence in this case.

4        All right.  With those instructions, I am going to

5    release everybody for recess except for the following members

6    of the panel, and I'm going to ask these folks to stay in

7    their seats, please:  No. 2, Mrs. Ray; No. 12, Mrs. Ragsdell;

8    No. 17, Mr. Onley; No. 19, Mr. Berg; No. 22, Mr. Green; and

9    No. 23, Mrs. O'Quinn.

10       Everybody but those members of the panel, with those

11   instructions, is now excused for recess.

12               (Whereupon, the jury panel left the courtroom.)

13               THE COURT:  All right.  Please be seated.

14       Counsel, approach the bench.

15       And, Mrs. Ray, would you come up here and join us,

16   please, at the bench?

17       This is our microphone.  If we can talk quietly here.

18       It's very clear that you're a member of USAA and retired,

19   having worked there many years.  Can you treat USAA just like

20   PNC, or are you going to favor the company you're a member of

21   and retired from, even just a little bit?

22               THE PANEL MEMBER:  I probably will favor somewhat.

23               THE COURT:  Okay.

24               THE PANEL MEMBER:  I use their products a lot.

25               THE COURT:  All right.  Well, and this is the time

1    to find out, not later.

2         Mr. Bunt, do you have any questions for Mrs. Ray?

3              MR. BUNT:  No, Your Honor.

4              THE COURT:  Ms. Smith?

5              MS. SMITH:  No, Your Honor.

6              THE COURT:  Okay.  Mrs. Ray, I'm going to let you

7    join the rest of the group outside.  Just don't discuss what

8    we talked about up here.

9              (The panel member left the courtroom.)

10             THE COURT:  I'm going to excuse Mrs. Ray.

11        Mrs. Ragsdell, would you come up, please?

12        Good morning, Mrs. Ragsdell.

13             THE PANEL MEMBER:  Good morning.

14             THE COURT:  This is our microphone.  If we can just

15   talk in that direction quietly here.

16             THE PANEL MEMBER:  Okay.

17             THE COURT:  You had a discussion with counsel about

18   military families and USAA serving military families, and I

19   think you, like a lot of us, value and appreciate the service

20   of our military citizens?

21             THE PANEL MEMBER:  I do.

22             THE COURT:  And I think you said that, despite those

23   feelings of appreciation, the fact that USAA is limited to

24   serving families in the military, that that would not cause

25   you to favor them, that you could treat them and PNC just the

1    same.  Is that correct?

2              THE PANEL MEMBER:  Yes.

3              THE COURT:  Do you have any doubts about that?

4              THE PANEL MEMBER:  Un-huh.

5              THE COURT:  So if the evidence favors PNC, you could

6    rule for PNC and not USAA?

7              THE PANEL MEMBER:  Uh-huh.

8              THE COURT:  Okay.  And you're willing to listen to

9    all the evidence and make any decisions only after you've

10   heard all the evidence?

11             THE PANEL MEMBER:  Oh, yes.

12             THE COURT:  Okay.  Ms. Smith, do you have any

13   questions for Ms. Ragsdell?

14             MS. SMITH:  I don't, Your Honor.

15             THE COURT:  Mr. Bunt?

16             MR. BUNT:  No, Your Honor.

17             THE COURT:  Okay.  Mrs. Ragsdell, I'm going to let

18   you join the rest of the panel outside the courtroom.  Just

19   don't discuss what we talked about in here.

20             THE PANEL MEMBER:  Okay.

21             THE COURT:  Thank you, ma'am.

22             THE PANEL MEMBER:  Thank you.

23             (The panel member left the courtroom.)

24             THE COURT:  The Defendant's challenge for cause of

25   Mrs. Ragsdell is denied.  She stays on.

1    Mr. Onley, will you come up, please?

2    Good morning, sir.

3         THE PANEL MEMBER:  Good morning, sir.  How are you

4    doing?

5         THE COURT:  This is our microphone.  If you and I

6    can just talk into it.

7    I have in my notes that you said you didn't agree with

8    the burden of proof.  Can you explain to me how you disagree

9    with the burden of proof in a case like this?

10        THE PANEL MEMBER:  I believe that everybody has

11   their own opinion on everything.  I think going on, hearing

12   both, the outcome ought to be the outcome.

13        THE COURT:  All right.  So are you telling me that

14   PNC should have to prove that they didn't infringe instead of

15   USAA proving that they do infringe?

16        THE PANEL MEMBER:  I believe that both cases ought

17   to be heard, and one case ought to outweigh the other one.

18   PNC ought to prove they didn't infringe or USAA didn't -- or

19   the opposite.  You know what I'm saying.

20        THE COURT:  Okay.  I'm trying to understand.  Are

21   you telling me that you think both parties ought to have the

22   same burden; both parties have to prove the opposite of the

23   other?

24        THE PANEL MEMBER:  I believe that, you know, that if

25   USAA proves that PNC did infringe, then go from there.

1        THE COURT:  Ms. Smith, do you have questions for

2   Mr. Onley?

3        MS. SMITH:  I do not, Your Honor.

4        THE COURT:  Mr. Bunt?

5        MR. BUNT:  Yes, Your Honor.

6        THE PANEL MEMBER:  How are you doing?

7        MR. BUNT:  I'm good, thank you.

8    If Judge Gilstrap instructs you that USAA bears the

9   burden of proof on infringement, that we have to prove

10  infringement, can you follow his instructions?

11       THE PANEL MEMBER:  Yes, sir.

12       MR. BUNT:  And if he instructs you that PNC has the

13  burden of proof to prove the patent invalid, can you follow

14  that instruction as well?

15       THE PANEL MEMBER:  Yes, sir.

16       MR. BUNT:  Thank you, sir.

17       THE COURT:  Thank you, Mr. Onley.  I'll let you join

18  the rest of the panel outside.  Just don't discuss what we

19  talked about in here.

20       THE PANEL MEMBER:  Yes, Your Honor.

21       THE COURT:  Thank you.

22       (The panel member left the courtroom.)

23       THE COURT:  I'm going to deny Defendant's challenge

24  for cause on No. 17, Mr. Onley.

25    Mr. Berg, would you come up, please?

1          Good morning, sir.

2               THE PANEL MEMBER:  Good morning.

3               THE COURT:  This is our microphone.  If you and I

4     can just talk quietly.

5               THE PANEL MEMBER:  Yes, sir.

6               THE COURT:  Mr. Bunt, do you have questions for

7     Mr. Berg?

8               MR. BUNT:  Yes, Your Honor.

9          Hi, Mr. Berg.

10              THE PANEL MEMBER:  Hello.

11              MR. BUNT:  You mentioned in your jury questionnaire

12    form that you had an issue I think with patents in general,

13    and then you said during some questioning of Ms. Smith that

14    you had issue with, I guess, a company buying a patent and

15    suing on it?

16              THE PANEL MEMBER:  Well, a company -- companies

17    moving ownership, I guess, and then that company sues the

18    other company.  Motorola I remembered after a while, but

19    Motorola was the one that had the messaging system.  And then

20    the company had a new owner, but then they sued Motorola for

21    the patent.  It's called something, patent pirates or

22    something.  I don't know what it's called.  But that's where a

23    company will buy some patents, or buy a company, then they sue

24    them for -- somebody else for using them.  I don't know if

25    it's this way for USAA, but I'm just --

1          MR. BUNT:  It's not, I can assure you.  But did that

2     kind of sit in your craw the wrong way that they were bringing

3     a lawsuit when they --

4          THE PANEL MEMBER:  When they just bought the

5     company, yes, sir.

6          MR. BUNT:  You had -- that affected the way you

7     looked at the case?

8          THE PANEL MEMBER:  It did, because they hadn't had

9     that very long, but then they sued this other company for

10    millions of dollars and trying to get millions of dollars for

11    something, yes.

12         MR. BUNT:  And you also believe you found against

13    the Plaintiff in that case?

14         THE PANEL MEMBER:  Yes.  The whole jury did, yes.

15         MR. BUNT:  Thank you, sir.  I appreciate it.

16         THE PANEL MEMBER:  Yes, sir.

17         THE COURT:  Ms. Smith, do you have any questions?

18         MS. SMITH:  Yes, sir.

19        Knowing that this case, as Mr. Bunt said, is different,

20    no one purchased the patents and is suing, but instead USAA's

21    inventors are part of the company, you could be impartial?

22         THE PANEL MEMBER:  Yes, ma'am.  I'd just have to

23    listen to the case.

24         MS. SMITH:  But you're starting fresh and that other

25    case wouldn't have any impact?

1      THE PANEL MEMBER:  I was just making sure it wasn't

2  the same type of case because I would have probably been

3  impartial that way, but it's a whole new --

4      MS. SMITH:  Thank you.

5      THE COURT:  Mr. Berg, can you tell me that you will

6  follow my instructions if you're selected on this jury?

7      THE PANEL MEMBER:  Yes, sir.

8      THE COURT:  Because, quite honestly, it doesn't

9  matter if a plaintiff's owned a patent for 10 years or 10

10  minutes, they have a right to enforce their patents if they

11  can prove somebody else is infringing it.

12      THE PANEL MEMBER:  Got it.

13      THE COURT:  So I'm going to give you very specific

14  instructions if you're on this jury about what to do and how

15  to do it.  And I need to know that even if those instructions

16  don't necessarily line up with the way you would do it if you

17  were making the rules up as you go along, that you will follow

18  the rules as I instruct you.  Can you do that?

19      THE PANEL MEMBER:  Yes, sir.

20      THE COURT:  And you can make that commitment?

21      THE PANEL MEMBER:  Yes, Your Honor.

22      THE COURT:  Okay.  Mr. Berg, I'm going to let you

23  join the rest of the panel outside the courtroom.  Just don't

24  discuss what we talked about in here.

25      THE PANEL MEMBER:  Absolutely.

98

1          THE COURT:  Thank you, sir.

2               (The panel member left the courtroom.)

3          THE COURT:  All right.  I'm going to deny the

4     Plaintiff's challenge for cause on No. 19.

5          Now, let's take a second and see where we are.  No. 2 is

6     gone, No. 9 is gone, No. 11 is gone, 12 and 13 remain, so

7     that's three.  No. 19 remains.  We're not going get to 22, are

8     we?

9          MR. BUNT:  No, Your Honor.  I think we just go

10    through 19, and we each get four strikes.

11         THE COURT:  You agree, Ms. Smith?

12         MS. SMITH:  I do agree.

13         THE COURT:  Okay.  Mr. Green, you and Mrs. O'Quinn

14    are not going to have to come up.  We've solved everything

15    before we get to you.  So I'm going to let you two join the

16    rest of the panel outside.  Just don't discuss anything that

17    happened here in the courtroom.  All right?  Thank you both.

18              (Both panel members left the courtroom.)

19         THE COURT:  How long do you need to strike your

20    lists, counsel?

21         MS. SMITH:  Fifteen minutes would be ideal.

22         MR. BUNT:  Yes, Your Honor.

23         THE COURT:  All right.  I'll give you a few minutes

24    more.  At five minutes until noon if you'll have your strike

25    list turned into the Courtroom Deputy, please.

1      While counsel exercise their peremptory challenges, the

2  Court will stand in recess.

3                      (Brief recess.)

4          THE COURT:  Be seated, please.

5      Ladies and gentlemen, if you will listen carefully, when

6  your name is called, if you'll come forward and take your

7  place in the jury box.

8      We're going to seat eight jurors to hear the evidence in

9  this case, and I'm going to ask that the first four jurors

10  position themselves on the front row of the jury box and the

11  second four, 5, 6, 7, and 8, position themselves on the second

12  row of the jury box.

13      And what I would like to do is if Juror No. 1, if you

14  will enter the front row of the jury box, walk all the way to

15  the end, and stand in front of the last seat; Juror No. 2, if

16  you will enter the front row of the jury box, walk down and

17  stand in front of the third seat, leave an empty seat between

18  Juror No. 1 and Juror No. 2.  And if everybody else will

19  follow that same pattern, we'll end up with the first four

20  jurors on the front row with an empty seat between each member

21  of the jury, and the same thing on the back row.  That's what

22  I'd like.

23      And if you will all remain standing until all eight

24  members are in the jury box, I would appreciate it.  And if

25  you would, ladies and gentlemen, let those be your assigned

1    seats throughout the remainder of the trial process.

2        So with that, I'm going to ask our Courtroom Deputy

3    Ms. Brunson to call the eight members of the panel who were

4    selected as jurors in this case.

5            THE CLERK:  Scott Smith, Melinda Moran, Lisa O'Dell,

6    Ashley Maiville, Laura Ragsdell, Joan James, Michael Onley,

7    Maria Hipp.

8            THE COURT:  Thank you, ladies and gentlemen.

9        I'm going ask Ms. Brunson to administer the oath to you

10   as jurors at this time.

11           (Whereupon, the oath was administered by the Clerk.)

12           THE COURT:  Please be seated.

13       Members of the panel, even though you weren't selected, I

14   want you to understand how much the Court and the parties

15   appreciate your presence here this morning.

16       I'm about to release you in just a minute.  But before I

17   do, I want to say again that we recognize that unless you as

18   ordinary citizens are willing to make the sacrifice to come

19   when summonsed and present yourself for jury duty, that the

20   Court would be unable to discharge its obligations under the

21   laws and the Constitution.

22       It's never convenient to serve on a jury, it's always a

23   sacrifice, and I am aware that every one of you that were not

24   selected had other places to be this morning, other things to

25   do, responsibilities in your lives, and you set all those

1   aside, you came as summonsed, and you presented yourself for

2   jury duty in this case.

3        And even though you weren't selected, ladies and

4   gentlemen, every one of you has performed very real and

5   important public service by being here.  And I want you to

6   know that the Court and the parties in this case value that

7   public service and appreciate that public service.

8        Now, when I release you in just a few minutes, if you'll

9   exit through the double doors as you go around to your right

10  toward the entrance to the courthouse, you'll pass the Clerk's

11  Office where Ms. Clendening has her office.  She and her staff

12  are going to want to recover these very expensive numbers that

13  you're wearing on your clothing.  Those are not souvenirs that

14  you get to take home with you.  We'll use them again in other

15  cases.

16       If you have any questions about your service today, she

17  will be glad to address it with you.  If you need any

18  documentation for an employer verifying why you didn't come to

19  work today, she'll glad to furnish that to you.  But in

20  general, if you have any questions about your service as

21  prospective jurors, Ms. Clendening and her staff will be glad

22  to address that.

23       Ladies and gentlemen, thank you so much for the service

24  you've rendered by being here this morning.  Having selected

25  the jurors and seated them from among your number and you are

102

1    no longer necessary for us to go forward with this trial, I'm

2    excusing all the members of the venire panel who were not

3    selected for jury service this morning.

4          Thank you again, ladies and gentlemen.  We appreciate

5    your service.  You're excused.

6               (Whereupon, the jury panel left the courtroom.)

7               THE COURT:  Please be seated.

8          Ladies and gentlemen of the jury--and I can now refer to

9    you that way--I have a couple of important instructions I need

10   to give you before I release you for lunch, and I need to make

11   sure that you understand that during the trial of this case

12   the Court has ordered that the Clerk's Office is going to

13   provide lunch to you each day.  It will be brought to you in

14   the jury room.  That means you won't leave the courthouse and

15   have to go out into the community and find a place and stand

16   in line and get lunch.

17         That will serve two very important purposes.  Number one,

18   it will protect against you bringing back something from the

19   lunch break that we don't want you to bring back by way of a

20   virus or anything like that; and also it will mean that we can

21   cover more ground and take a shorter period for lunch each day

22   because you won't be going out having to find lunch and bring

23   it back.  So plan on the Court providing lunch for you each

24   day during the trial.

25         While you're at lunch today, please find a time to let

103

 1    Ms. Clendening's office have a good working cell phone number

 2    for each of you.  It is possible that we might need to reach

 3    you after hours one evening and before you show up the next

 4    day before trial, and we would need a good number to reach you

 5    for that purpose.  I don't think that's very likely, but I

 6    always like to have that just in case.  So if during the lunch

 7    break you'll make sure Ms. Clendening's office has a good

 8    working cell phone number for you.

 9        Now, here are some instructions that are very important.

10    I want you to listen carefully.  Do not discuss this case with

11    anyone.  Do not discuss this case with anyone.  It is

12    absolutely crucial and essential to the process that at the

13    end of the trial when you've heard all the evidence--and the

14    evidence will come to you from the sworn testimony of the

15    witnesses and the exhibits that the Court has admitted into

16    evidence, and that will be the evidence in this case.  The

17    Plaintiff will put on their evidence; the Defendant will put

18    on their evidence.  But when you have heard both sides'

19    evidence, their witnesses, their testimony, seen the exhibits

20    that the Court's admitted, it is essential that at that point

21    when the Court will ask you to answer certain written

22    questions, that the only information you have to draw upon to

23    answer those questions must come from the evidence that's

24    presented during this trial and this courtroom.  There must be

25    no outside information for you to draw on at all, and that's

104

1    why it is critical that you not discuss the case with anyone.

2         And I can promise you that, unless you live alone,

3    whenever you get home tonight, whoever is there, the first

4    thing they're going to say when you walk through the door is,

5    Tell me what happened in federal court in Marshall this

6    morning.  Don't even try to answer that question, because if

7    you do, you'll almost assuredly violate this instruction that

8    I'm giving you.

9         When that question is asked of you, just smile and blame

10   it on me, say, That very stern federal judge told me not to

11   even try to answer that question.  He told me that when this

12   case was over and I had been released, I could talk about my

13   jury service with anybody I want to, but until the case is

14   over and until the Judge releases me as a juror in this case,

15   I'm bound not to discuss the case with anyone.

16        Also, ladies and gentlemen, just so that there's no lack

17   of understanding, when I say don't discuss the case, I mean

18   that in the broadest sense of the words.  Don't communicate in

19   any way, any shape, any form, any fashion about this case with

20   anyone.  Those of you that are users of social media, that

21   means don't post anything on Facebook or tweet on Twitter or

22   use any of the other social media platforms to communicate

23   about this case with anyone.  It also means, ladies and

24   gentlemen, you're not to discuss the case among the eight of

25   you.

1          Now, when all the evidence has been presented, when I

2     have given you my final instructions on the law that you are

3     to apply, when counsel for the two competing parties have

4     presented their closing arguments to you, at that point I will

5     say, Ladies and gentlemen of the jury, you may retire to the

6     jury room to deliberate on your verdict in this case.  And the

7     verdict is a set of written questions that you will be asked

8     to answer.  And, again, the sole source of the information

9     that you will draw upon to answer those questions must be

10    limited to what comes to you in this courtroom through this

11    trial and nothing else.

12         Now, at that point when I say, Ladies and gentlemen, you

13    may now retire to the jury room to deliberate on your verdict,

14    it's like flipping a light switch, because among the eight of

15    you, until that moment, you must not communicate with each

16    other about this case.  But at that moment when you retire to

17    the jury room, when you've heard all the evidence, when you've

18    heard my final instructions on the law and you've heard

19    counsel's closing arguments, then the light switch flips and

20    you are required to discuss the evidence among yourselves as

21    you answer those written questions in the verdict form.

22         But before that point in time, you must not discuss the

23    case with each other or with anybody else, and you must not

24    discuss it, communicate about it in any way.  That means in

25    writing, that means orally, that means digitally, don't email,

1    don't instant message or text, don't do any kind of

2    communication.  That also means don't do any outside research.

3    Don't go online and do an internet search of any of the words

4    that you've heard in this trial or any of the parties or any

5    of the lawyers or anything about anything related to this

6    case.  Don't do any research of any kind.

7         Again, when it comes to the point that you'll be asked to

8    answer the specific questions about what the facts are in this

9    case that are contained in that verdict form, the only

10   information you should have to draw upon is the sworn

11   testimony of the witnesses given under oath subject to

12   cross-examination and the documents and exhibits that the

13   Court has admitted under the rules of evidence as exhibits in

14   this trial.  That's it.  And we must keep everything else out

15   of that universe of information to use and draw upon to answer

16   those questions.  It's absolutely essential.

17        As a matter of fact, ladies and gentlemen, probably it's

18   a pretty good bet that every time you get up out of those

19   chairs, you're going to hear me remind you, don't discuss the

20   case with anyone.  I'm going to say it over and over

21   throughout this trial because if any of you were to violate

22   that, it would jeopardize the entirety of the trial.  It's

23   likely that we could have to start completely over with a new

24   jury, and there would be literally many, many, many dollars

25   and many, many, many hours of effort and time wasted and

1    expended that we would never get any benefit from.  So this is

2    a very important instruction--don't discuss the case with

3    anyone in any way.

4         Also, ladies and gentlemen, I don't think it will happen

5    in this case, but I can't tell you that it's outside the realm

6    of possibility--there are no unimportant cases that get to

7    trial in a United States District Court, so it is possible,

8    though not likely, that some third party could approach you

9    during this trial and try to influence you about your decision

10   in this case.

11        If at any point in this trial, before I've accepted your

12   verdict and released you as jurors, if you feel that anybody

13   has approached you in any way that's not proper, is awkward,

14   or is other than it should be, then you should let Ms.

15   Clendening know immediately, she will advise the Court, and

16   the Court will deal with it.  I don't think it's likely, but

17   again, there are no unimportant cases that get to trial, and

18   so that is at least within the realm of possibility.

19        Also, ladies and gentlemen, over the course of this week

20   as you come and go, as we're here during the day together,

21   it's highly likely that you're going to come in close physical

22   contact with some of these lawyers, some of these corporate

23   representatives for the two parties, some of the witnesses,

24   some of the support staff.  You're going to probably come in

25   close contact with some of these people.  I want you to

1    understand that when that happens, they're not going speak to

2    you, they may not even make eye contact with you, they're

3    certainly not going to enter into any discussion or

4    conversation with you, and that's because I have instructed

5    them not to, and that's because the only information you

6    should draw upon to answer the questions in the verdict form

7    must be limited to the sworn testimony presented by the

8    witnesses and the exhibits the Court admits into evidence.

9         So as you come in one morning and you walk by one of

10   these lawyers or one of these parties and they don't speak and

11   they're not friendly and they don't even look at you, don't

12   hold that against them, don't think they're being rude or

13   unfriendly; just understand that they're following my

14   instructions, and don't expect anything different from them

15   in that regard.

16        I'm going to have other instructions for you after lunch,

17   but it is 25 minutes after 12:00, and Ms. Clendening's let me

18   know that your lunch is waiting for you in the jury room.  So

19   with these instructions, ladies and gentlemen, you are excused

20   for lunch at this time.  We will see you back here in about 45

21   minutes, give or take.

22        The jury's excused for lunch.

23             (Whereupon, the jury left the courtroom.)

24             THE COURT:  Be seated, please.

25        Counsel, as you are all aware, I met with lead and local

1    counsel in chambers this morning.  I expressed some

2    frustration at the tremendous number of disputes regarding

3    opening statement, demonstrative slides, and other matters.  I

4    gave you some high-level guidance about what the Court thought

5    was appropriate in regard to some of the issues raised by

6    those disputes, but I told you that there was no way I could

7    address the number, the vast quantity of disputes that you had

8    without delaying the trial, and I wasn't prepared to do that.

9         You indicated to me that you would communicate with each

10   other during the voir dire process this morning and that you

11   would hopefully narrow the scope of your disputes, at least

12   regarding opening statements and hopefully beyond that to the

13   other disputes that came in this morning.

14        At this point could I get a brief representation from

15   both sides as to where the parties stand in that regard?

16             MR. SHEASBY:  Your Honor, Jason Sheasby for

17   Plaintiff.  I will speak on behalf of our objections to PNC

18   slides.

19        The only objections that remain outstanding are slide 9,

20   slide 11, slide 36, and slide 45.

21             THE COURT:  So you have four remaining slides that

22   you're lodging objections to?

23             MR. SHEASBY:  Yes, Your Honor.

24             THE COURT:  All right.  Can I ask for a similar

25   representation from Defendant?

1          MR. LANTIER:  Good morning, Your Honor.  Rick

2     Lantier on behalf of PNC Bank.

3          Your Honor, there are additional -- there are a greater

4     number of disputes remaining as to Plaintiff's slides, and I

5     would just preface that by saying we did narrow during this

6     process down to 20 slides that we said we were likely to

7     present during the opening, and Plaintiff still has about 50

8     slides that it says it intends to present during the opening.

9     Of those, I believe there are 20 that are still in dispute.

10         About a handful of those, Your Honor, would be covered by

11    prior MIL rulings.  We just have not had the opportunity to

12    ask for a running objection on those points.  But I can read

13    off the numbers where there are still objections, if Your

14    Honor would like.

15         THE COURT:  I don't think that I really need you to

16    do that, Mr. Lantier.  What I wanted to do was to quantify the

17    scope of the remaining disputes.  And while I recognize that

18    these disputes have been narrowed materially since earlier

19    this morning, this is a process that the parties are going to

20    have to be more efficient with.

21         Here's what I want to do.  It's 12:30 by the clock here

22    on the bench.  We're going to take a 15-minute recess, and at

23    12:45 I want to see counsel for the Plaintiff and Defendant in

24    chambers, the same group that I had this morning, and we will

25    take up the four remaining disputed exhibits that the

111

1    Plaintiff has problems with, and we'll take up the 20

2    remaining exhibits that the Defendant has problems with, and

3    hopefully we'll be able to get opening statements started

4    without too much delay.

5          That still doesn't address a large quantity of disputes

6    regarding deposition designations and counterdesignations for

7    tomorrow, as well as disputes regarding the beginning

8    witnesses.  We'll talk about that in chambers, but we are

9    going to -- we're going to keep this trial on track.  I'm not

10   going to leave the jury in limbo for great periods of time in

11   the jury room while we argue about demonstrative disputes

12   that, by and large, should be worked out.  I don't remember

13   the number.  This is probably a fourth of the total number of

14   disputes I had this morning.

15         If we'd started with this number instead of the number

16   that you brought me this morning, we wouldn't be in the bind

17   that we're in.  So I think you appreciate the Court's

18   frustration.  We'll get through these disputes over the lunch

19   break, and then we will deal with things as we have to as we

20   go.

21         All right.  We're going to recess until 12:45.  I'll see

22   lead and local counsel in chambers at that time.

23         Court's in recess.

24                        (Lunch recess.)

25                   THE COURT:  Be seated, please.

1      Mr. Lantier, you're at the podium.  Do you have

2   something?

3          MR. LANTIER:  Very briefly, Your Honor.

4      Your Honor has now overruled all of PNC's objections to

5   Magistrate Judge Payne's rulings on the motions in limine and

6   motions to strike.  We would respectfully request a running

7   objection to those grounds so that we don't have to object

8   during the trial.

9      The second item is that we did file at Docket 675 an

10  objection to certain evidence.  We understand Your Honor's

11  overruled that objection from our discussion this morning.  We

12  would just note our objection for the record.

13     And the third and final thing is, with respect to PDX

14  25.32, PNC wishes to maintain its objection to the statements

15  in that document as contrary to law.

16         THE COURT:  Well, the Court's prior rulings stand.

17  You certainly are entitled to have them noted in the record

18  and the Court so notes them.  The Court has adopted the

19  magistrate judge's pretrial rulings in this case, and those

20  adoptions are reaffirmed.

21     To the extent you need a running objection, I certainly

22  will grant that.  I'm not convinced you need it, but I'm happy

23  to let you have it.

24         MR. LANTIER:  Thank you, Your Honor.

25         THE COURT:  All right.  Is there anything that we

113

1    need to take up before I bring in the jury and proceed with

2    the Court's preliminary instructions followed by opening

3    statements?

4            MR. SHEASBY:  Nothing from Plaintiff, Your Honor.

5            THE COURT:  Anything from Defendant?

6            MR. STONE:  Nothing from Defendant, Your Honor.

7            THE COURT:  Let's bring in the jury, please.

8            (Whereupon, the jury entered the courtroom.)

9            THE COURT:  Welcome back from lunch, ladies and

10   gentlemen.  Please have a seat.

11       Ladies and gentlemen of the jury, I now have some

12   preliminary instructions that I want to give you on the record

13   and before we start with the opening statements from the

14   attorneys and then get on to the evidence.

15       You've now been sworn as the jurors in this case, and as

16   the jury, you are the sole judges of the facts and, as such,

17   you will decide and determine what all the facts are in this

18   case.

19       As the Judge, I will give you instructions on the law,

20   decide any questions of law that arise during the trial, and

21   handle all matters related to evidence and procedure.  I'm

22   also responsible for maintaining and managing the flow of the

23   evidence over the course of the trial and maintaining a proper

24   decorum here in the courtroom.

25       At the end of the evidence, I'll give you detailed

1    instructions about the law to apply in deciding this case, and

2    I'll then give you a list of questions that you are to answer.

3    This list of questions is called the verdict form, and your

4    answers to those questions will need to be unanimous, and

5    those answers to those questions will constitute the jury's

6    verdict in this case.

7         Now, let me briefly tell you what this case is about.  As

8    you know, this case involves a dispute regarding certain

9    United States patents.  I know you've each seen the patent

10   video prepared by the Federal Judicial Center, but I need to

11   give you some instructions here and on the record about a

12   patent and how one is obtained.

13        Patents are either granted or denied by the United States

14   Patent and Trademark Office, which you will often hear

15   referred to simply as either the PTO, or the Patent Office.

16        A valid United States patent gives the holder of that

17   patent the right for up to 20 years from the date of the

18   patent application to prevent others from making, using,

19   offering to sell, or selling the patented invention within the

20   United States, or importing it into the United States, without

21   the patentholder's permission.  A patent is a form of property

22   called intellectual property, and like other forms of

23   property, a patent can be bought or sold.

24        A violation of a patentholder's rights is called

25   infringement.  A patentholder may try to enforce a patent

115

1    against persons it believes to be infringers by filing a

2    lawsuit in federal court, and that's what we have before us in

3    this case.

4        The process of obtaining a United States patent is called

5    patent prosecution.  To obtain a patent, one must first file

6    an application with the United States Patent and Trademark

7    Office, the PTO.  The PTO is an agency of the United States

8    government that employs trained examiners who review patents

9    and applications for patents.

10       Now, the application contains or includes within it what

11   is called a specification.  The specification contains a

12   written description of the claimed invention telling what the

13   invention is, how it works, how to make it, and how to use it.

14   The specification concludes or ends with one or more numbered

15   sentences.  These numbered sentences are called the patent

16   claims.

17       Now, when a patent is granted by the PTO, it is the

18   claims, ladies and gentlemen, that define the boundaries of

19   its protection and give notice to the public of those

20   boundaries.

21       Now, patent claims may exist in two forms referred to as

22   independent claims and dependent claims.  An independent

23   patent claim does not refer to any other claim in the patent.

24   It is independent.  It's not necessary to look at any other

25   claim within the patent to determine what an independent claim

1    covers.

2         On the other hand, a dependent claim refers to at least

3    one other claim in the patent.  A dependent claim includes

4    each of the elements or limitations of that other claim or

5    claims to which it refers, or as we sometimes say, from which

6    it depends, as well as the additional elements or limitations

7    recited within the dependent claim itself.

8         Accordingly, to determine what a dependent claim covers,

9    it's necessary to look at both the dependent claim itself and

10   the independent claim or claims to which it refers or from

11   which it depends.

12        Now, the claims of the patents-in-suit use the

13   word 'comprising'.  Comprising means including or containing.

14   A claim that includes the word 'comprising' is not limited to

15   the methods or devices having only the elements that are

16   recited in the claim, but also covers methods or devices that

17   add additional elements.

18        Let me give you an example.  If you take, for example, a

19   claim that covers a table, if the claim recites a table

20   comprising a tabletop, legs, and glue, the claim will cover

21   any table that contains these structures, even if it also

22   contains other structures such as leaves to expand the size of

23   the tabletop or wheels to go on the ends of the legs.

24        Now, that's a simple example using the

25   word 'comprising' and what it means.  In other words, it can

1    have other features in addition to those that are covered by

2    the patent.

3         Now, after the applicant files the application with the

4    PTO, an examiner is assigned and that examiner reviews the

5    application to determine whether or not the asserted claims,

6    the claims listed in the application, are patentable--that is

7    to say, appropriate for patent protection, and whether or not

8    the specification adequately describes the invention that's

9    claimed.

10        Now, in examining a patent application, the examiner

11   reviews certain information about the state of the technology

12   at the time the application is filed.  The Patent Office

13   searches for and reviews this type of information that's

14   publicly available or that was submitted by the applicant.

15   This type of information is called prior art.  An examiner or

16   the examiner in this case reviews this prior art to determine

17   whether or not the invention is truly an advance over the

18   state of the art at the time.

19        Now, prior art is defined by law, and I'll give you

20   specific instructions at a later time as to what constitutes

21   prior art.  However, in general, prior art includes

22   information that demonstrates the state of the technology that

23   existed before the claimed invention was made or before the

24   application for a patent was filed.  A patent contains a list

25   of certain prior art that the examiner has considered, and the

1    items on this list reflected within the patent are called the

2    cited references.

3         Now, after the prior art search is made and an

4    examination of the application, the examiner informs the

5    applicant in writing of what the examiner has found and

6    whether the examiner considers any claim to be patentable, in

7    which case it would be allowed.  Now, this writing from the

8    examiner to the applicant is called an office action.

9         If the examiner rejects the claims, the applicant has an

10   opportunity to respond to the examiner to try to persuade the

11   examiner to allow the claims.  The applicant also has the

12   chance to change or amend the claims or to submit new claims,

13   and the papers generated during these back-and-forth

14   communications, ladies and gentlemen, between the examiner and

15   the applicant, are called the prosecution history.

16        And this process may go back and forth between the

17   applicant and the examiner for some time until the examiner is

18   ultimately satisfied that the application meets the

19   requirements for a patent.  And in that case, the application

20   issues as a United States patent; or, in the alternative, if

21   the examiner ultimately concludes that the application should

22   be rejected, then no patent is issued.  Sometimes patents are

23   issued after appeals within the PTO or to a court.

24        Now, to help you follow the evidence, I'll give you a

25   brief summary of the positions of the two parties.

1    As you know, the party that brings a lawsuit is called

2    the plaintiff.  The Plaintiff in this case is United Services

3    Automobile Association, which you'll hear referred to

4    throughout the trial simply as Plaintiff or as USAA.  And as

5    you know the party against whom a lawsuit is brought is called

6    the defendant.  The Defendant in this case is PNC Bank, N.A.,

7    which you'll hear referred to throughout the trial as the

8    Defendant or simply as PNC.

9        As I told you during jury selection, this case involves

10   allegations of patent infringement brought by USAA against

11   PNC, and you should know that there are four United States

12   patents that have been asserted in this case by USAA against

13   PNC.  The first asserted patent is United States Patent No.

14   10,482,432.  And, as you may know, patents are commonly

15   referred to by the last three digits of their patent number.

16   So in this case Patent No. 10,482,432 will be referred to as

17   the '432, or the '432 Patent.

18       The second asserted patent in this case is United States

19   Patent No. 10,013,681, which you'll hear referred to as the

20   '681, or the '681 Patent.

21       The third asserted patent is United States Patent No.

22   10,013,605, which you'll hear referred to as the '605, or the

23   '605 Patent.

24       And the fourth and final asserted patent in this case is

25   United States Patent No. 8,977,571, which you'll hear referred

1   to as the '571, or the '571 Patent.

2       And these patents will be referred to at various times

3   throughout the trial collectively as the patents-in-suit.  You

4   may also hear the four of them referred to collectively as the

5   asserted patents.  And the asserted patents, ladies and

6   gentlemen, generally relate to mobile check depositing.

7       Now, the Plaintiff USAA contends that the Defendant PNC

8   is directly infringing certain claims of the patents-in-suit

9   by importing, using, offering for sale, or selling products

10  that include its patented technology.  USAA further contends

11  that PNC's infringement is willful.  Finally, USAA contends

12  that it is entitled to money damages as a result of that

13  infringement and to compensate it for that infringement.

14      Now, PNC, the Defendant, denies that it is infringing any

15  of the Plaintiff's patents -- any of the patents-in-suit.  And

16  the Defendant contends that the asserted claims of the

17  patents-in-suit are invalid for failure to satisfy the

18  enablement and written description requirements.  PNC also

19  denies that USAA is entitled to any money damages.

20      Now, I know, ladies and gentlemen, that there are many

21  new words and new concepts that have been thrown at you today.

22  I'm going to define a lot of these for you in the instructions

23  that I give you.  The attorneys are going to discuss them and

24  help you further with their opening statements.  The witnesses

25  are going to help you with their testimony so you have an

1    expanding understanding of these words and phrases.  So,

2    please, do not feel overwhelmed at this stage.  It's all going

3    to come together as we go through the trial, I promise.

4         Now, one of your jobs in this case is to decide whether

5    or not the asserted claims of the asserted patents have been

6    infringed.  You will be asked to decide whether or not certain

7    of the asserted claims of the patents-in-suit are invalid as

8    well.  Now, if you decide that any claim from the

9    patents-in-suit has been infringed by PNC and is not invalid,

10   then you'll need to decide what amount -- excuse me, then

11   you'll need to decide whether or not that infringement was

12   willful.  And you'll need to decide what amount of money

13   damages should be awarded to the Plaintiff as compensation for

14   that infringement.

15        Now, my job in this case is to tell you what the law is,

16   to handle rulings on evidence and procedure, and to oversee

17   the conduct of the trial as efficiently and effectively as

18   possible, and to maintain the decorum of the courtroom.

19        In deciding the law, ladies and gentlemen, it is

20   specifically my job to determine the meanings of any of the

21   claim language from the asserted patents that needs

22   interpretation.  I've already determined the meanings of this

23   claim language from the patents-in-suit, and you must accept

24   those meanings that I give you and you must use those meanings

25   when you decide whether any particular claim has or has not

1    been infringed.  And you're going to be given a document in a

2    few moments that will reflect these meanings or constructions

3    as they are sometimes called, which the Court has already

4    arrived at.

5         Now, for any claim term or language for which I have not

6    provided you with a specific definition or meaning, you should

7    apply the plain and ordinary meaning of that claim language.

8    If, however, I've provided you with a definition, you must

9    apply my definition to those terms and to that language

10   throughout the case.

11        You should remember, though, that my interpretation of

12   the language of the claims should not be taken as an

13   indication by you that I have any personal opinion or any

14   opinion at all regarding the issue of infringement because

15   that issue, ladies and gentlemen, is yours alone to decide.

16        I'll provide you with more detailed instructions on the

17   meaning of the claims before you retire to deliberate and

18   reach your verdict.

19        In deciding the issues that are before you, you'll be

20   asked to consider specific legal rules, and I'll give you an

21   overview of those rules now.  And then at the conclusion of

22   the case, I'll give you much more detailed instructions.

23        The first issue that you are asked to decide is whether

24   PNC has infringed any of the asserted claims from the

25   patents-in-suit.  Infringement, ladies and gentlemen, is

 1    determined and assessed on a claim-by-claim basis.  The

 2    Plaintiff in this case, USAA, must show by a preponderance of

 3    the evidence that a claim has been infringed.  Therefore,

 4    there can be infringement as to one claim, but there may be no

 5    infringement as to another claim.  Again, infringement is to

 6    be determined and assessed on a claim-by-claim basis.

 7         Now, there are also a few different ways that a patent

 8    can be infringed, and I'll explain these requirements for each

 9    of these types of infringement to you in detail at the

10    conclusion of the case, but, in general, a defendant may

11    infringe the asserted patents by making, using, selling, or

12    offering for sale in the United States, or importing into the

13    United States, a product meeting all the requirements of a

14    claim of the asserted patents, or that practices all of the

15    steps of a claim.  And as I say, I'll provide you with more

16    detailed instructions on the requirements for infringement at

17    the conclusion of the case.

18         Now, the second issue that you'll be asked to decide is

19    whether the asserted patents are invalid.  Invalidity is a

20    defense to infringement.  Therefore, even though the United

21    States Patent and Trademark Office has allowed these asserted

22    claims and even though an issued United States patent is

23    presumed to be valid, you, the jury, must decide whether those

24    claims are invalid after hearing the evidence presented during

25    the case.

1       You may find a patent claim to be invalid for a number of

2   reasons, including because it fails to meet the enablement or

3   written description requirements.  A claim may be invalid for

4   lack of enablement.  A patent may be invalid if its

5   specification does not describe the claimed invention in

6   sufficient detail so that one skilled in the art can make and

7   use the invention.

8       A claim can also be found to be invalid if there is a

9   lack of a written description.  A patent may be invalid if its

10  specification does not describe the claimed invention in

11  sufficient detail so that one skilled in the art can

12  reasonably conclude that the inventor actually had possession

13  of the invention that they are claiming.

14      Now, if you decide that any claim of the patents-in-suit

15  has been infringed and is not invalid, then you'll need --

16      Let's go off the record.

17                      (Pause in proceedings.)

18           THE COURT:  All right.  Let's go back on the record.

19  Let me continue with my preliminary instructions, ladies and

20  gentlemen.

21      If you decide that any claim from the patents-in-suit has

22  been infringed and is not invalid, then you'll need to decide

23  what amount of money damages should be awarded to the

24  Plaintiff USAA to compensate them for that infringement which

25  you've found.  A damages award, ladies and gentlemen, must be

1    adequate to compensate the patentholder for the infringement

2    and in no event may a damages award be less than what the

3    patentholder would have received if it had been paid a

4    reasonable royalty for the use of its patent.    However, the

5    damages that you award, if any, are meant to compensate the

6    patentholder and they are not meant to punish the Defendant.

7    And you may not include in any damages award an additional

8    amount as a fine or a penalty above what is necessary to fully

9    compensate the patentholder for the infringement.

10        I'll give you more detailed instructions on the

11    calculation of damages for the alleged infringement of the

12    patents-in-suit at the conclusion of the trial, including by

13    giving you specific instructions with regard to the

14    calculation of a reasonable royalty.  However, the fact that

15    I'm instructing you on damages does not mean that the

16    Plaintiff is or is not entitled to recover damages.

17        Now, during the trial, ladies and gentlemen, you're going

18    to be hearing from a number of witnesses in this case, and I

19    want you to keep an open mind while you're listening to the

20    evidence and not decide any of the facts until you've heard

21    all of the evidence.  And this is important.  While the

22    witnesses are testifying, remember that you will have to

23    decide the degree of credibility and believability to allocate

24    to the witnesses and to all of the evidence.

25        So while the witnesses are testifying, you should be

1   asking yourselves things like this:  Does the witness impress

2   you as being truthful?  Does he or she have a reason not to

3   tell the truth?  Does he or she have any personal interest in

4   the outcome of the case?  Does the witness seem to have a good

5   memory?  Did he or she have an opportunity and ability to

6   observe accurately the things that they've testified about?

7   Did the witness appear to understand the questions clearly and

8   answer them directly?  And, of course, does the witness'

9   testimony differ from the testimony of other witnesses?  And

10  if it does, how does it differ?

11      Now, these are some of the kinds of things that you

12  should be thinking about while you're listening to each of the

13  witnesses during this trial.

14      I also want to talk to you briefly about expert

15  witnesses.  When knowledge of a technical subject may be

16  helpful to you, the jury, a person who has special training

17  and experience in that particular field, we refer to them as

18  an expert witness, is permitted to testify to you about his or

19  her opinions on those technical matters.  However, ladies and

20  gentlemen, you're not required to accept an expert witness' or

21  any witness' opinions at all.  It's up to you to decide who to

22  believe and whether you believe an expert witness or any

23  witness, for that matter, and whether you think what they're

24  saying is correct or incorrect, or whether or not you want to

25  believe what they have to say.

1           Now, I anticipate in this case there will be expert

2    witnesses testifying in support of each side, but it will be

3    up to you to listen to their qualifications when they're

4    called to the witness stand.  And when they give you an

5    opinion and explain the basis for their opinion, you'll have

6    to evaluate what they say and whether you believe it and to

7    what extent, if any, that you want to give it weight.

8    Remember, ladies and gentlemen, judging and evaluating the

9    credibility and believability of each and every witness is an

10   important part of your job as jurors.

11          Now, during the trial, it's possible that there will be

12   testimony from one or more witnesses that will be presented to

13   you through what's called a deposition.  In trials like this,

14   it's difficult to get every witness together in person in the

15   courtroom at the same time when the trial takes place, so the

16   lawyers for each side, before the trial, take the depositions

17   of the witnesses.

18          In a deposition, a court reporter is present, the witness

19   is there and is sworn and placed under oath just as if he or

20   she were personally in court, and then the parties through

21   their counsel ask the witness questions and the witness

22   answers those questions, and those questions and answers are

23   recorded, taken down.

24          Also, ladies and gentlemen, understanding that you may

25   have some witnesses presented to you through depositions, as

128

I've just described, you need to understand that when you see

these deposition witnesses, they're likely to be presented to

you through video clips because that process of asking the

questions and receiving the answers and taking it all down is

not only written down, it's often recorded by video.

You should also understand that many, if not most,

depositions last up to seven hours in length.  Well, there may

be a witness who was deposed for seven hours, but at the time

of trial the parties believe that there's 20 minutes of

important testimony that you need to hear.  And if that

witness can't be here, rather than play seven hours of

recorded testimony, the lawyers will pick out those particular

parts that they believe are relevant and those will be spliced

and put together, and that way we will all listen to 20

minutes in this example as opposed to listening to seven

hours.

So if, while you're listening to deposition testimony, it

appears that something's been spliced together, or you hear a

different voice asking a question than the voice that asks the

earlier questions, or if you see any little gaps or glitches,

just ignore all those and understand that that's how we get to

listen to 20 minutes as opposed to seven hours to get that

same information.  But don't focus on the little

irregularities that are part of the process; focus on what the

witness who's testifying by deposition has to say.  Focus on

1    the questions and focus on the answers.

2        It's important that during the course of the trial when

3    deposition witnesses are presented to you, that you judge that

4    deposition testimony as to its credibility and believability

5    and allocate the proper weight to it just as you would as if

6    the witness were in person, live, testifying in open court

7    from the witness stand.

8        Also, ladies and gentlemen, over the course of this trial

9    it is possible that you're going to be shown certain documents

10   that have had portions of those documents redacted or blacked

11   out.  That happens because the Court finds that certain

12   information is not appropriate and should not be shown to the

13   jury.

14       If and when you're shown a document during this trial

15   that has a portion of it blacked out or redacted, don't focus

16   on what's been blacked out.  Don't guess or speculate as to

17   what was said before it was blacked out.  Focus on what is

18   legible and what you can see and read and comprehend for that

19   document, but don't be distracted by the portion that's been

20   redacted.  Focus on the portion that's not redacted.

21       Also during the course of the trial it's possible that

22   the lawyers for one side or the other will make certain

23   objections from time to time, and when they do, I'll issue

24   rulings on those objections.  Please understand it's the duty

25   of an attorney on each side of the case to object when the

1    other side offers testimony or other evidence that that

2    attorney believes is not proper under the rules of the Court.

3        Upon allowing the testimony or other evidence to be

4    introduced over the objection of an attorney, the Court does

5    not, unless expressly stated, indicate any opinion as to the

6    weight or the effect of that evidence.  As I've said, you, the

7    jury, are the sole judges of the credibility and believability

8    of all the witnesses and the weight and effect to give to all

9    of the evidence.

10       Now, prior to the trial beginning today, the lawyers in

11   this case, together with the Court, have spent many hours

12   working through the various exhibits that might be shown to

13   you during this trial.  And if there are objections to be made

14   to those exhibits, they've been made during those pretrial

15   procedures, and the Court has heard and considered those

16   objections and the arguments for and against, and has either

17   granted the objections or denied the objections.  And those

18   documents are either admitted and ready to be shown to you

19   during the trial or they've been excluded.

20       But that process, taking many hours over several

21   different days, has saved you the opportunity or the necessity

22   of sitting here and listening to all that, so that when a

23   document is presented to you as an exhibit that the Court has

24   already admitted, then the arguments for and against don't

25   have to be presented and heard, the rulings by the Court don't

131

1    have to be written down, all the argument that went before

2    doesn't have to be repeated, and that saved us during this

3    trial a lot of time.

4         And the parties through their counsel are to be

5    complimented for working with the Court and taking those

6    matters up and dealing with them in advance so that it will

7    streamline the process of this trial and avoid you having to

8    sit there listening through all that process that the Court's

9    already taken up.  That means that when an exhibit is

10   presented to you during this trial, the Court's already ruled

11   on it and found that it is admissible and the parties can

12   present it without going through a lengthy predicate and they

13   can put it in a proper context and use it as they think proper

14   with the witness.

15        And, again, that has saved us all a lot of time during

16   the trial.  However, it is still possible that objections may

17   arise during the trial.  If I should sustain an objection to a

18   question addressed to a witness, then you must disregard the

19   question entirely and you should not speculate about what the

20   witness would have said if I had allowed them to answer the

21   question.  On the other hand, if I overrule an objection

22   addressed to a question, then you should consider the question

23   and the answer just as if no objection had been made.

24        And you should know, ladies and gentlemen, that the law

25   of the United States permits a United States district judge to

1    comment to the jury regarding the evidence in the case, but

2    such comments from the judge on the evidence are only an

3    expression of the judge's opinion and the jury may disregard

4    such comments in their entirety because, as I've told you,

5    you, the jury, are the sole judges of the facts, you're the

6    sole judges of the credibility of the witnesses, and the

7    proper amount of weight and effect to give to all the

8    testimony.

9         Now, even though the law may permit me to comment on the

10   evidence in this case, as I indicated to you during jury

11   selection, I'm going to try very hard not to comment on the

12   evidence or the witnesses throughout the trial because I

13   recognize that falls within your area of responsibility.

14        Now, the court reporter in front of me, Mr. McRoberts, is

15   taking down everything that's said in the courtroom, but I

16   want you to understand that the written transcript of that is

17   not going to be available to you to review and consider during

18   your deliberations.  The transcript is prepared in case there

19   is an appeal of this decision to an appellate court.  That

20   means, ladies and gentlemen, you're going to have to rely on

21   your memories of the evidence.

22        In a moment you're going to be given a juror notebook,

23   and in the front of that notebook, you'll find -- or in the

24   back of that notebook, I should say, you will find that there

25   is a new legal pad and a pen for you to use to take notes if

1    you wish to during the course of the trial.  If you decide to

2    take notes, that will be up to you.  But, remember, any notes

3    that you take are for your own personal use.  You still have

4    to rely on your memory of the evidence, and that's why you

5    should pay close attention to the testimony of each and every

6    witness.

7         And, remember, you should not abandon your own

8    recollection because some other juror's notes indicate

9    something different.  Notes are to refresh your recollection

10   and that's the only reason you should be keeping them.

11        I'll now ask our Court Security Officer to pass out these

12   juror notebooks to each of the members of the jury.

13                   (Pause in proceedings.)

14             THE COURT:  Now, in these notebooks, ladies and

15   gentlemen, you'll see that you each have a copy of each of the

16   four asserted patents that we've talked about.  You'll also

17   find in this notebook a page with language from the asserted

18   claims that the Court has already construed or interpreted and

19   the definitions or constructions which I've provided to you.

20   And, again, you must apply my meanings and constructions to

21   that language from the claims as you make your decisions and

22   discharge your duty as jurors.

23        Also, you should find in there a section of tabbed

24   witness pages.  For every person that may serve as a witness

25   in this trial, there should be a page with their photograph

1    superimposed at the top of the page together with their name,

2    and the balance of that page left for additional note-taking

3    if you wish to take it.  And then, as I noted earlier, there

4    will be a legal pad toward the back of it where you can take

5    additional notes, and you should find a pen in each one of

6    those notebooks.

7         These notebooks, ladies and gentlemen, should be in your

8    possession at all times.  They are not meant to be left laying

9    around.  When you leave each day at the end of each day's

10   portion of the trial, I'll ask you to take the notebooks with

11   you to the jury room and leave them closed on the table there

12   so that you can pick them up the next morning.

13        Now, there may be times when we will have a short recess

14   and I'll simply say, ladies and gentlemen, you may close and

15   leave your notebooks in your chairs, in which case you can

16   just leave them in the chair where you're sitting.  But if

17   it's not going to be a short period of time, then I'll ask you

18   to take that notebook with you.  These notebooks should either

19   be in your own possession or they should be in the jury room,

20   but they should not be left where they are available to

21   anybody else but the eight of you.

22        Now, in a moment we're going to hear opening statements

23   from the attorneys in the case, and these opening statements

24   are intended and designed to give you, the jury, a road map of

25   what each side expects to offer by way of their evidence.  And

135

1    remember, ladies and gentlemen, this trial is -- throughout

2    this trial, what the lawyers tell you is not evidence.  The

3    evidence will come from the sworn testimony of the witnesses,

4    subject to cross-examination, and from the exhibits that the

5    Court has considered and admitted into evidence.  But what the

6    lawyers tell you is not evidence; it's simply their impression

7    of what the evidence is and they do have a duty to point out

8    to you what they believe the evidence shows, but remember,

9    what they tell you is not evidence.

10         Now, after the opening statements from both the Plaintiff

11   and then the Defendant, the Plaintiff will proceed to call its

12   witnesses, and that portion of the trial is called the

13   Plaintiff's case in chief.  And the Plaintiff will call its

14   witnesses one at a time, those witnesses will be sworn and

15   they'll testify, they'll be subject to cross-examination by

16   the Defense attorneys, and then when all the Plaintiff's

17   witnesses have been called and testified and been

18   cross-examined, then the Plaintiff will rest its case in

19   chief, and at that point we will transition to the Defendant's

20   case in chief.

21         And then the Defendant will call its witnesses, and those

22   Defense witnesses will be sworn and testify, they'll be

23   cross-examined by Plaintiff's counsel, and then when all the

24   Defendant's witnesses have been presented, then the Defendant

25   will rest the Defendant's case in chief.

1          Now, the Plaintiff, because it has the burden of proof,

2    will have the right to call rebuttal witnesses, if it chooses

3    to.  It may; it may not.  If the Plaintiff calls rebuttal

4    witnesses, then those witnesses will be presented and sworn,

5    they'll be examined by Plaintiff's counsel and cross-examined

6    by Defendant's counsel.  And when all the rebuttal witnesses

7    presented by the Plaintiff are complete, then the Plaintiff

8    will rest its rebuttal case.

9          When you've heard the Plaintiff's case in chief, the

10   Defendant's case in chief, and the Plaintiff's rebuttal case,

11   if the Plaintiff presents one, then you will have heard all

12   the evidence in this case.  And when you've heard all the

13   evidence in this case, then I will give you my final

14   instructions on the law that you are to apply to that evidence

15   that you have heard.  Then counsel for each party will present

16   their closing arguments.

17         Then when you've heard closing arguments from the

18   attorneys and I have given you my final instructions on the

19   law, that's when I will tell you, ladies and gentlemen, you

20   should retire to the jury room and to deliberate on the

21   verdict that I will send in with you, which will be a written

22   document with various questions in it that you're to answer.

23   And as I've told you, those answers to those questions that

24   you will arrive at must be unanimous answers to those

25   questions.

1    Let me repeat my earlier instructions to you.  You are

2  not to communicate about this case with anyone, and you are

3  not to communicate about this case among the eight of

4  yourselves until you've heard all of the evidence, until I've

5  given you my final instructions, and until counsel have

6  presented their closing arguments, and then when I tell you to

7  retire to deliberate, that's when you must discuss the

8  evidence among the eight of yourselves in an effort to reach a

9  unanimous decision about how to answer those questions in the

10  verdict form.

11    Let me remind you, ladies and gentlemen, the lawyers and

12  the representatives of the parties, the support staff for each

13  side, most of the people you see in this courtroom, are

14  related to one side of this case or the other.  I don't see

15  any outside third parties who wandered in off the street just

16  to have a place to sit and watch what's going on.  These

17  people are all connected with this trial.

18    And if and when during the course of the trial you come

19  in close physical contact with any of them, they are not going

20  to speak, they're not going engage in conversation, they're

21  not going to be friendly like we're used to here in East

22  Texas.  But when that happens, don't hold that against them

23  and don't think they're being rude.  They're simply following

24  my instructions because, as I've told you repeatedly, and I

25  will probably tell you many more times during this process,

1   when it comes the time for you to answer those questions in

2   the verdict form, the sole source of the information that you

3   should have before you to draw upon to arrive at your

4   unanimous answers to those questions must be limited to the

5   sworn testimony of the witnesses and the exhibits that the

6   Court has admitted into evidence.  That is the evidence in

7   this case.

8        All right, ladies and gentlemen.  With these

9   instructions, we're now going to proceed to hear opening

10  statements from the attorneys in the case.

11       The Plaintiff may now present its opening statement to

12  the jury.  Would you like a warning on your time, Mr. Sheasby?

13            MR. SHEASBY:  Yes, Your Honor.  Can I have a warning

14  with 15 minutes left and with three minutes left?

15            THE COURT:  I'll warn you when you have 15 minutes

16  remaining and three minutes remaining.  You may proceed with

17  Plaintiff's opening statement.

18            MR. SHEASBY:  May it please the Court.

19       Good afternoon, ladies and gentlemen of the jury.  I

20  speak on behalf of USAA, and the first thing I want to do is

21  to thank you for your sacrifice.  I know that being here is a

22  personal burden, I know it's a financial burden, and I hope

23  you can understand how incredibly, incredibly important this

24  case is to USAA.

25       You introduced yourself and Judge Gilstrap introduced

1    himself and I'll introduce myself.  I was born and raised my

2    entire life in California.  My wife and I have two daughters

3    and we also raise a niece and nephew.

4        Judge Gilstrap spoke about the fact that a trial by jury

5    is a right, and the way we think about it in most situations

6    is to the right of USAA or of the Defendants in this matter to

7    have a jury hear the dispute.  That's actually not completely

8    what the founders had in mind.  So the right to the jury trial

9    was created by the founders of our country, and the right to a

10   jury trial is actually the right of the citizens of this

11   country to decide the most important questions in our society.

12       The constitutional right to a jury trial is the right of

13   citizens to decide.  It is your power.  It is your right.

14   This process is what the founders intended.

15       USAA was founded in 1922.  It was founded by a group of

16   Army officers.  In 1922, just as today, military members and

17   their family have to travel all over the United States and

18   they have to travel all over the world.  And what these

19   military soldiers realized is they could not get insurance.

20   No one would insure them.  So they pooled their money to

21   insure each other.  That is called a mutual, a mutual in which

22   the members protect each other.

23       USAA was a mutual and was founded in 1922, and to this

24   day it remains a mutual.  It is owned by its members.  Who are

25   the members of the USAA?  They are active duty service

1    members.  They are service members who have been honorably

2    discharged, their family and employees of USAA.  Those are the

3    members of USAA.  Those are who own USAA.

4         In 1983, our members asked us to create a bank, and we

5    did.  But there was a particular challenge with our

6    membership.  Our membership is spread out all over the United

7    States, it's spread out all over the world when they're on

8    deployment, and they move all the time.  Because of that, USAA

9    doesn't have bank branches.  There was a division that was

10   created in USAA, and it was called the applied research

11   division.  And that applied research division is staffed by a

12   group of highly trained engineers.      And the applied

13   research division does two things.  They are separate, but

14   they're related.  The first thing the applied research

15   division does is create advanced technology patents.  They

16   invent technology, and they file patents on that technology.

17        The second thing applied research does is, when given by

18   the business, they design and build actual commercial

19   products.  They don't just invent.  They ultimately build

20   commercial products as well.  That's why they're called

21   applied research.

22        They had this idea.  Usually the way you deposit a check

23   is you have to mail it in, you have to drive to an ATM or

24   drive to a bank, or if you're wealthy and you're a wealthy

25   company, you are offered these very expensive specialized

1      check scanners to deposit a check remotely.

2           But what the applied research division invented was a

3      specialized downloaded application that would take control of

4      common consumer devices, fax scanner, printer that you have in

5      your room, a digital camera, a smartphone, if you could

6      download an application onto a general purpose computer, USAA

7      could take this device, capture images of the check, analyze

8      whether those images were sufficient for deposit in real time,

9      and make a decision that your deposit was possible.

10          USAA invented this technology.  USAA filed for patents on

11     this technology.  Those patents were granted by the United

12     States government.  This lawsuit exists because PNC infringes

13     those patents, and it's in this forum that that question will

14     be decided as our founders intended.

15          Mr. Huynh, can I have the slides, please?

16          Just like the right to a trial by jury is a

17     constitutional right, our founders actually enshrined the

18     rights to patent in the Constitution.  A patent is an absolute

19     right.  It's no different than the right to our home.  It's no

20     different than the right to our property.  No one can use a

21     patent without the express permission of the patentee.  And

22     once the Patent Office grants a patent, it is illegal to use

23     the patent without permission.  PNC does not have permission

24     to use USAA's patents.

25          I spoke to you about the technology at issue in this

1    case.  Sometimes it's referred to as consumer remote deposit

2    capture.  Sometimes it's referred to as mobile remote deposit

3    capture.  But this is an example of it in which you use a

4    general purpose processor in your smartphone to capture an

5    image of the check.

6         Now, it's not just an application.  It's actually a large

7    amount of back-end software systems, as well as detailed

8    software algorithms, that are analyzing that check to

9    determine if it's of sufficient quality, and then deposit it.

10   It's a massive system that is maintained at server farms all

11   throughout the United States by PNC for its accused product

12   and for USAA.

13        There are two generations of patents at issue in this

14   case.  The first generation is the 2006 patents.  These were

15   the original patents that were created that relate to the idea

16   of using a downloaded application to take control over a

17   consumer device, to analyze whether the check image is of

18   sufficient quality, and then to confirm in the session that

19   the deposit is successful.  We didn't stop there.  We

20   continued to develop new technology.

21        And in 2009, we launched a type of technology that is

22   particularly focused on making the system as accessible and

23   easy to use as possible.  That's the 2009 generation of

24   patents.  There are four patents at issue filed in 2006 and

25   filed in 2009.

1          In 2006, USAA rapidly launched its technology to its

2     members because it was needed so badly.  And we launched it

3     using a system that could accept images from home scanners,

4     home printer fax machines, could also accept images from

5     digital cameras.

6          Over time, our members began to obtain smartphones.  Once

7     they obtained smartphones, we decided to modify our

8     application, change it, create a specialized application for

9     downloading on the iStore for the iPhone for the app store.

10    That was in 2009.  When we released this application, it

11    quickly became the number one application on the iStore for

12    financial applications.  There was significant press coverage

13    about this innovation.  Articles were written about it.

14         And, in particular, PNC's executives read an article

15    raving about this technology, speaking about how great of an

16    idea it was, speaking about how they want -- the article said

17    that every bank should have this technology.  And PNC's

18    executives made a very fatal decision.  They decided to take

19    what USAA had created so they could compete with USAA.

20         What Judge Gilstrap said was absolutely correct.  What I

21    say to you is not evidence.  What is in evidence is what you

22    see on a slide like this.  And you see how there's that little

23    yellow box down at the bottom?  That's actually an evidence

24    number.  And in your deliberations if you want to see a piece

25    of evidence, you can write down that number and ask for it.

1        So this slide is a senior executive at PNC, Jerod

2   Laughlin, writing to Tom Kunz.  And what does he say above?

3   He says, USAA does it again.  And then he writes, When will

4   our iPhone app do this?  This is a senior executive telling

5   another senior executive at PNC, we want what USAA has.  Mr.

6   Kunz, who was the executive responsible for technology at PNC,

7   says, I agree that we should pursue this.

8        So there's lots of ways you can pursue technology.  One

9   of the ways you could pursue technology is by reaching out to

10  USAA and saying, We loved your technology; can we license it?

11       PNC took a different path.  This is a PNC document from

12  July 2010.  On the cover of that document is USAA's mobile

13  application, and the document is called MRDC, Mobile Remote

14  Deposit Capture, Game Plan.  PNC's game plan from their own

15  documents was to take USAA's technology.

16       Next slide, please?  Mr. Huynh, can you jump back to

17  slide 25, please?  Slide 25, please.

18       The pattern that PNC exhibited of taking from USAA is

19  chronic.  We saw a 2010 MRDC game plan.  We see a 2016 email

20  in which PNC is once again accessing USAA's application, and

21  PNC executives are saying, Can we do this?  How fast could we

22  roll this out?  PNC coveted USAA's technology, and they took

23  USAA's technology.  Not my words; the words from their

24  records.

25       In fact, PNC's own documents, internal documents about

1    USAA from a strategic initiative office, talk about USAA as

2    the first company to allow mobile deposits.  They talk about

3    us as an industry leader.  And in this case, they will

4    contradict that internal document and state that we created

5    nothing of value.

6         There are four questions that you will be asked to

7    decide.  The first question is infringement.  USAA has the

8    burden of proof by a preponderance of evidence as to

9    infringement.  And we've asked an expert, Professor Tom Conte

10   from the Georgia Institute of Technology --

11        Will you please stand, Professor Conte?

12        Thank you, Professor Conte.

13        -- to analyze each of the elements of our claims to

14   determine whether they are met.  Now, for infringement,

15   there's no intent requirement.  It doesn't matter if PNC

16   accidentally did it.  It doesn't matter if PNC made a mistake

17   and took our technology.  It does not matter.  It's an

18   absolute property right.  If they use it, they are violating

19   the law.

20        And what we're going to do is we're going to show each of

21   the elements of the claims.  Now, if you remember in voir

22   dire, counsel for PNC told you that USAA invented two little

23   things, showing the check and how you capture a check.  What

24   we invented is this claim.  This is our property right.  And

25   it talks about a system, a system that involves many, many

146

1    complex elements.  And we will go through each of those

2    elements and we'll show how it is met in PNC's product.

3         Let me give you an example.  So that last element

4    requires checking for error on the mobile device.  We will

5    show PNC's internal records in which they admit that their

6    mobile device checks for an error.  PNC will get up and tell

7    you, oh, we don't use their patents at all, we don't check for

8    an error.  Their own documents contradict the arguments they

9    are making in this case.

10        THE COURT:  15 minutes have been used.

11        MR. SHEASBY:  The second issue we will discuss is

12   validity.  Validity is an issue on which PNC bears the burden

13   of proof.  They bear the burden of proof by the preponderance

14   of the evidence -- by clear and convincing evidence.  Clear

15   and convincing evidence is not one pebble in favor.  Clear and

16   convincing evidence is substantial evidence in PNC's favor.

17        A patent is presumed valid and PNC must prove invalidity

18   by clear and convincing evidence, a much higher burden than we

19   have to prove infringement.  And there is a reason for that.

20   The reason for that is that the Patent Office concluded that

21   USAA's patents were valid, and the Patent Office issued USAA's

22   patents, and because of that, they are presumed valid.

23        Persons, the United States patent examiners -- and I

24   should clarify.  Concluded is the wrong word.  The actual

25   precise word is that they analyzed the patents and issued

them.

The United States patent examiners are persons of scientific competence in the field in which they work, and they evaluate the application and decide whether a patent can be granted.  That is why a presumption of validity exists.

In this case, there have been five United States patents granted.  PNC will argue that the United States Patent and Trademark Office was wrong all five times, all five of our patents are not infringed.  Oh, and by the way, if they're infringed, all five of our patents are invalid.

One of the excuses PNC will make is PNC will say, oh, you didn't design your system in your patent so that it could be used with mobile devices.  In 2006 it was too hard to use your patents with mobile devices.  But PNC paid an expert to come to trial and that expert will testify that in 2006 he had the ability to build a system covered by our patents, and yet PNC will claim that was not possible.

PNC will argue that we were not entitled to claim mobile device systems.  They will say, no, no, no, you only invented the use of scanners, even though the patent expressly refers to using digital cameras and teaches how to use digital cameras.  The Patent Office examined this exact issue. Whether we have the right to claim mobile device systems is a question of whether we can claim priority to the 2006 application.  It's a question of priority.  The Patent and

1    Trademark Office expressly concluded that we have the right to

2    claim mobile devices.

3         If you look at our patents, they expressly describe the

4    use of digital cameras and give detailed instructions as to

5    how to use digital cameras.  PNC will claim, We had no idea

6    how to create a device based on your patents.  This is a list

7    of factors that our patents describe as having -- should be

8    used to assess whether a check is of sufficient quality.  PNC

9    will say, Oh, we could never have built a system with that

10   patent.  The record will show that PNC uses every single one

11   of the criteria we list out in our patent.

12        PNC will say, Before you filed the patent, you had never

13   constructed a system that could work with digital cameras.

14   Our patent was filed in October 2006.  This is USAA's internal

15   documentation from August 2006, almost three months earlier.

16   What does it show?  It shows in the right-hand side that our

17   system was built to work with digital cameras, to work with

18   any device that could capture an image.

19        What PNC is going to try to do in this case is to mix up

20   two things--invention from the creation of commercial

21   products.  In 2006, we invented a system that could work with

22   any consumer device.  We expressly described how it worked for

23   cameras.  But in 2006, our members didn't have smartphones.

24   Our members didn't start having smartphones in significant

25   amounts until 2008 and 2009.

1          And PNC will argue that because we took until 2008 and

2     2009 to launch our specialized optimized application for

3     iPhone, our patents are no good.  Absolutely contradicts the

4     records in the patent showing that our system was built to

5     work with digital cameras before we filed.

6          It also flatly contradicts PNC's internal documents.  PNC

7     says we are an industry leader, we're the first company to

8     allow mobile devices.  PNC says that our competitive advantage

9     is innovative technology.  These are their documents.  And

10    they're going to get up and say that our patents are invalid,

11    that our technology is no good, that we didn't create mobile

12    systems, the exact opposite of what their internal documents

13    say.

14         The third issue you'll be asked to decide is willful

15    infringement.  Infringement is strict liability, but you'll be

16    asked the question as to whether PNC's infringement was

17    intentional, was willful.

18         This is a partial timeline of some significant events.

19    In 2006, we filed for the 2006 patent applications.  In 2009,

20    we filed for our second 2009 family applications.  Our first

21    application, the specification, the details of what we

22    invented, became public in 2011.

23         Our patents that are at issue in this case were granted

24    beginning in 2015.  We publicly disclosed to the world by

25    listing the patents on our application, which we know PNC

1    looked at repeatedly, with our patents numbers so that the

2    world would know that our patents protected our technology.

3    In 2020, we sued PNC for infringement.

4        What the record will show is that PNC launched its

5    product after our patents had been filed, they launched their

6    product after our products had been filed, they added the

7    second generation technology in the 2009 patent after

8    they -- our applications and patents had issued, and what we

9    will seek in this case is damages solely from the period from

10   2016 when we publicly announced to the world that our patents

11   protected mobile remote deposit capture through 2021, July

12   2021.

13       PNC was obligated to identify a witness to speak on

14   behalf of the company.  It's called a corporate

15   representative.  That corporate representative was a man named

16   Alex Goldstein, and he was obligated to speak as to the

17   complete basis for why PNC contends it does not infringe the

18   patents in this case.  He could provide no explanation

19   whatsoever.  This was the corporate representative who could

20   provide no explanation whatsoever.

21       There are a history to the patents that have been

22   asserted in this case.  There was some suggestion from PNC's

23   counsel that they were surprised that they were asked to

24   comply with the law.  The patent families that were at issue

25   in this case, another financial institution named Wells Fargo

1    used.  These two patent families were presented to Wells

2    Fargo.  PNC carefully followed these events.  This is an

3    internal email that describes the fact that they knew that we

4    had presented these exact same two patent families that are at

5    issue in this case against another bank.

6         We asked the executive who was tracking this, did he do

7    anything to try to avoid infringement?  He said he did not.

8    Wells Fargo made a significant payment to USAA in

9    acknowledgement of the importance and value of this

10   technology.  PNC uses the technology dramatically more than

11   Wells Fargo.

12        Now, PNC said something in their voir dire when they're

13   questioning you.  They said, We have taken the functionality

14   out.  This lawsuit is only about their product through July

15   2021, and for that entire period the technology that's accused

16   of infringement is present and used.

17        During the middle of this lawsuit, PNC released a new

18   system.  That system is not accused of infringement in this

19   case, but that system is important for a very particular

20   reason.  PNC had every reason in the world to try to stop

21   using USAA's technology.  It faced a significant federal

22   lawsuit.  It had every motivation.  And what it did was it

23   designed a new product that is covered by three of USAA's

24   other patents in the 2006 patent family.  All this focus to

25   attempt to avoid USAA technology and they could not do so.

1          PNC hired an expert to speak about infringement in this

2     case.  He ignored these three additional USAA patents, and

3     even their own paid expert could not say that this new product

4     that they launched, which is not at issue in this case but

5     which they claim is somehow exculpatory, is not infringing.

6     They were so addicted to USAA technology, they had to use it

7     even when they launched a new system during this litigation.

8          PNC is going to claim that one of the patent families

9     relates to something called auto capture.  And through the

10    entire period of this lawsuit, through July of 2021, they used

11    auto capture.

12          THE COURT:  Three minutes remaining.

13          MR. SHEASBY:  But one of the things they did, which

14    was interesting, is after this litigation was filed, they

15    suggested they took it out.  And you heard from counsel for

16    PNC that they took the feature out.

17          They actually didn't take the feature out.  We discovered

18    this in litigation.  The feature is there, it's temporarily

19    disabled, and it can be turned back on at any time because PNC

20    cannot stop using USAA's technology.

21          The last issue you'll be asked to consider is damages.

22          I'd like Mr. Kennedy to stand now.

23          Mr. Kennedy is an expert in licensing and reasonable

24    royalty, and he's going to speak to you about the value that

25    PNC has obtained from infringement of USAA's patents.  He will

153

1    establish that PNC, solely through the period of this lawsuit

2    from 2016 through 2021, has obtained a total of $604 million

3    in value from its use of USAA's patents, and he will calculate

4    that a reasonable royalty that is due to USAA is $300 million.

5         And the record will show that this technology is so

6    important to PNC that every month they will turn a billion

7    dollars in deposits solely from the use of this infringing

8    technology.

9         Ladies and gentlemen of the jury, we thank you for your

10   patience.  We thank you for your time.

11        THE COURT:  Defendant may now present its opening

12   statement to the jury.

13        Would you like a warning on your time, Mr. Stone?

14        MR. STONE:  I would, Your Honor, at 10 minutes and

15   three minutes, if I might.

16        THE COURT:  I'll tell you when you have 10 minutes

17   remaining and three minutes remaining.

18        MR. STONE:  I appreciate it, Your Honor.  Thank you.

19   May it please the Court.

20        THE COURT:  You may want to pull that microphone

21   down.

22        MR. STONE:  Yes.  I understand.

23        This case all started in September of 2020.  It started

24   when USAA served a complaint on PNC.  There was nothing from

25   USAA to PNC in advance.  They didn't write a letter or send an

1    email or call them on the phone or ask for a meeting.  They

2    just filed the lawsuit.

3         And they filed the lawsuit claiming that a remote deposit

4    feature that was part of the PNC's app infringed on their

5    patents.  And that's a feature that had been out there in

6    public use since 2011, for nine years.  It was well-known that

7    PNC had offered and continues to offer remote deposit as part

8    of its app.  But nobody from USAA ever said a word.

9         You'll see from the evidence that when USAA filed this

10   lawsuit, it was quite clear that USAA was not interested in

11   resolving this dispute, they were not interested in sitting

12   down and talking about this dispute.  They were only

13   interested in trying to get what they've asked you for

14   today--$300 million.

15        What did PNC do?  Well, PNC did what I think you would

16   expect.  They realized they should start to defend themselves

17   in this lawsuit.  PNC and its lawyers began to take discovery.

18   PNC didn't believe that it infringed, and we're going to show

19   you that it had good reason for believing then and now that it

20   didn't infringe.

21        But it hired experts like Doctor Bovik, who I'll ask to

22   stand, who's here to investigate the patents of USAA and the

23   product of PNC, to confirm that there was no infringement.

24   And we began to take discovery, get documents from USAA, and

25   we obtained internal confidential documents of USAA that cast

 1     doubt on the validity of USAA's patents, documents that had

 2     never been shown to the Patent Office.  And as we dug deeper,

 3     we learned that they more than cast doubt; they demonstrated

 4     that the patents were not valid.

 5          While all of this was going on, all of this discovery,

 6     PNC was trying to figure out what it was that USAA didn't

 7     think it should be including in its remote deposit feature.

 8     What is it they don't want us to include?

 9          Well, that became clear early in 2021, and it became

10     clear that there were at that time -- it became clear at that

11     time that there were two features of the app that USAA thought

12     PNC shouldn't use.  And let's talk about those features.

13          One of those is, as you hold your phone over the check

14     and take the picture, the app may show you the picture and

15     then you can look at it and decide, do I like that picture and

16     want to send it in, or do I not.  That's the show feature, if

17     you will.

18          And the other feature was that if you preferred to have

19     the software on the camera and the phone decide when to take

20     the picture, as opposed to you pushing the button, that was

21     the second feature.  That's called often auto capture.  I have

22     these two features sort of described on the screen showing the

23     picture of the check to the user, to the customer, and giving

24     them a chance to accept it and send it off or have it retaken

25     in auto-capture.

156

1        So when it became clear that these were the two features

2   that USAA thought PNC shouldn't use, what did PNC do?  It

3   removed those features.  It removed them from anything that

4   the customers could see.  The customers cannot see them on the

5   app, they don't have choices to use them on the app, they

6   can't use them on the app.  I'm sure, as Mr. Sheasby said,

7   that that software is still out there on servers and

8   computers, but customers do not have the ability to access it.

9        You're going to hear often this new version of the app

10  referred to by its name.  I'm going to write the name on the

11  easel because it's such a sexy and memorable name.  It's like

12  all updated versions of apps.  It's 4.20.1.  And I write it up

13  there because how could any of us remember it.

14       So PNC removed those two features from its app, and that

15  happened in July of 2021.  And as Mr. Sheasby said, they don't

16  contend that the four patents at issue in this case are

17  infringed by 4.20.1, and they don't seek any damages for

18  4.20.1.  So the problem that they complained about in

19  September of 2020 was solved by the removal of these features.

20       And Mr. Sheasby told you that they have an expert, Doctor

21  Kennedy, who's going to say that, well, while they used those

22  features from 2016 to 2021, they realized benefits of $600

23  million for which they should pay $300 million.  Well, how do

24  you think about that question?  How do you -- what are the

25  benefits of the two features that were taken out?

1         What you can do if you want real-world evidence and not

2    somebody speculating about the future, you can look at what

3    happened at PNC when the features were there and after they

4    were taken out.  You can compare the before and the after.  We

5    can look at how did customers like the app with those two

6    features in it and how did they like it after the two features

7    were taken out.  And we can look at PNC's business and say,

8    did its business take a downturn after the features were taken

9    out?  What was the impact on the business?

10        Well, we know that because we have data, real-world data

11   that shows us.  And it turns out customers liked the new app.

12   It has fewer steps, so it's a little faster and a little

13   easier to use.  And we know that because we can look at the

14   app store ratings.  And the two bars on your left are from the

15   Apple store.  That's for when you download the app, and if you

16   have an iPhone, you put it on your iPhone.

17        And before, when these two features were present, the app

18   got a 4.78 rating, pretty good.  And after the two features

19   were taken out, the rating of customers on the app store went

20   up to 4.85.  Certainly didn't go down, not a big jump up but

21   it didn't go down.

22        For those of you with Android phones, you can look at the

23   Google Play ratings.  When they had the two features in, it

24   was 4.49.  They took the two features out, it went up a

25   minuscule amount, but it went up to 4.50 and, importantly, it

1    didn't go down.

2         So real-world evidence before and after.

3         What about the impact on PNC's business?  How would we

4    think about that?  Well, one of the things that banks do is,

5    as you know, they try to continue to get more customers.  And

6    so we can look at a lot of different measures.  We can look at

7    how many people use the app and how many mobile deposits were

8    made, but we can also just look at overall the impact on the

9    business.

10        And here's a chart that shows you, from 2014 through

11   October of last year, which is sort of the cut-off point for

12   data in this case, you can see that PNC had a pretty steady

13   increase in the total number of accounts, and they had a

14   steady increase in the total number of checking accounts.

15        Well, what happened to this steady increase when the two

16   features were removed?  We can put that line on the chart and

17   we see no difference.  No noticeable difference at all.

18        So real-world evidence tells us that these two features,

19   which once they were taken out -- remember, once they were

20   taken out, as Mr. Sheasby said, there's no claim in this case

21   that the four patents at issue in this case are infringed by

22   this 4.20.1.  He wanted to talk to you about some other

23   patents that are not in this case and you're not going to be

24   asked any questions about on your verdict form.

25        You're going to be asked about these four patents, and we

1    have to take these issues one issue at a time, as I know you

2    will understand.  So we see that for these four patents and

3    these two features, that as soon as PNC was alerted that they,

4    USAA, thought they should be taken out, they were taken out.

5         I got ahead of myself.  I didn't really introduce myself,

6    and I should do that, and I apologize.

7         My name is Greg Stone, as you heard earlier.  I grew up

8    outside of Bakersfield, California, on a small cattle ranch.

9    My wife and I live now in Pasadena.  We have five adult

10   children and three grandchildren.

11        Ms. Smith introduced herself to you earlier so I won't go

12   into her background, but you're going to hear from Ms. Smith

13   throughout the course of this trial.

14        My other colleague at counsel table is Mr. Greg Lantier.

15   He grew up in upstate New York.  He lives now in Wyoming, a

16   small town in Wyoming, with his wife and three daughters, two

17   identical twins and an eight-year-old.

18        And then also at counsel table is Ms. Karen Larrimer.

19   She is at PNC Bank, the chief customer officer.  She's

20   responsible for making sure the bank meets customers'

21   expectations, and she's responsible for the entire retail

22   bank, which is an area of responsibility that covers all of

23   the branches, among other things.

24        Now, PNC Bank, some of you may or may not have heard of.

25   It was founded in 1852 in Pittsburgh.  It's still

1    headquartered in Pittsburgh, but it's obviously grown a lot

2    since then because, as you heard, there is over 200 branches

3    here in East Texas and there's branches in a variety of other

4    places in the country.  But it's still focused on the same

5    thing it's always been focused on, which is sort of the

6    everyday banking needs of its customers, individuals, small

7    businesses, medium businesses, sometimes large businesses.

8    That its focus.  So that's who we are.  That's why we're here

9    and how we got here.  That's how PNC reacted when it was sued.

10       What did it find out as it was preparing its defense?  I

11   told you the first thing we found out was we really didn't

12   think we infringed.  And I want to go back to that issue of

13   infringement because I'm going to give you a simple example.

14   The law, as you've been told, requires to prove infringement,

15   which is USAA's burden, you have to show that each and every

16   element of a patent claim is satisfied.  I'm going to give you

17   this simple example to make my point.  If you want to prove

18   literal infringement, you have to show that each element is

19   there.

20       And assume you had a patent on a soccer ball.  It's made

21   of leather, stitched together.  It's filled with compressed

22   air, and it's round.  Now, a football, does a football

23   infringe?  I mean, it's made of leather, it's stitched

24   together, it's filled with compressed air, but it's oblong.

25   It's different.  It doesn't satisfy that element.  And that's

1    one of the critical issues you're going to see.

2         Doctor Bovik is going to testify that there is at least

3    one element of each of the patent claims that USAA thinks is

4    infringed that isn't.  So what do we know?  Before 4.20.1,

5    there was no infringement because the elements were not

6    present in each case.  All the elements were not present.  And

7    after 4.20.1 was released after they took out the features, we

8    just heard there's no claim of infringement there.  And the

9    customers at PNC can't use those two features because they

10   don't see them on their app or have access to them.

11        But PNC had other reasons, other reasons for thinking it

12   didn't infringe.  You see, back in 2017, USAA gave interviews

13   to publications like the interview it gave in May of 2017 to

14   the American Banker.  And they told the American Banker, well,

15   we've been reaching out to banks that we think may be using

16   what is claimed in our patents to ask them to enter into

17   agreements to pay us money.

18        And this got a lot of publicity.  And they said, though,

19   one of the things we're not doing, we're doing this without

20   going to court.  We're reaching out with letters, emails.

21   We've had some in-person meetings.  We've had some phone

22   calls.

23        Well, PNC saw this.  A lot of bankers, I guess, read the

24   American Banker.  So people at PNC saw this, and they go,

25   well, has anybody from USAA raised an issue with us?  I mean,

1    our app has now been out there for six years.  Has anybody

2    said anything?  No phone calls, no letters, no emails, no

3    requests for a meeting.  And PNC goes, well, good, USAA

4    doesn't think there's anything wrong with our app.

5         And there's a third reason, a third reason why USAA

6    didn't think there were any issues, and that's because when it

7    implemented its app and decided to add remote deposit to it,

8    it went to companies to prepare it for it, it didn't do its

9    own design.  And Mr. Sheasby showed you this document that has

10   the USAA interface on it.  That looks like, wow, why are they

11   putting the USAA interface on one of their internal

12   presentations?  Right?

13        That -- but then think about it.  If Ford comes out with

14   a new tailgate that works in a different way, people at

15   General Motors or Chevy might take a picture of it and say, we

16   just want to talk about this.  Can we do something that's as

17   good or better?  We heard this morning about can we do a

18   better way to do hamburgers at our restaurant than somebody

19   else makes?  Same idea.  You look at what your competition is

20   doing and you try to do a better job.

21        Well, one of the apps that was out there in the market

22   before PNC introduced theirs was USAA's.  So they put a

23   picture of it on the cover of this presentation.

24        Now, you can go through this presentation page-by-page

25   and line-by-line and you won't see that there is any

 1    confidential information in there, you won't see there's any

 2    particular ways it even works, you won't see any source code

 3    or software there.  It's just here's a picture of how theirs

 4    works and, in fact, that picture is available and was

 5    available in -- in 2010 on the web.  You could just go Google,

 6    remote deposit user interfaces.

 7         So what were they talking about in this presentation?

 8    Why did they do it?  They said, well, we've got to decide --

 9    there are several companies out there that are providing

10    software.  We could go buy the software from one of those

11    companies.  Which one should we go to?

12         And they said, well, we can go to Mitek.  It's the leader

13    in this field.  USAA is using Mitek software in theirs.  Chase

14    Bank is using Mitek software in theirs.  We think B of A which

15    has announced their new feature is going to use Mitek software

16    as well.  That would be a good choice.  We'd be going out and

17    buying something that was the industry standard.

18         Ultimately, they got -- Mitek software was part of

19    something that BankServ, that was their app supplier, and

20    MFoundry provided them.  They didn't make the decision in July

21    of 2010, though.  They weren't in a rush.  They didn't make

22    the final recommendation until January of 2011.

23         And then they said, let's go ahead, let's add this

24    feature to our app.  We should do it because USAA's doing it.

25    Chase Bank is doing it.  PayPal has launched it using the

 1    exactly the companies that we are thinking of using, BankServ

 2    and Mitek, and Bank of America has done it.  This seems like a

 3    good way to go using the industry leaders, and that's what

 4    they did.

 5         Okay.  So it turns out they don't infringe, they had good

 6    reason to think they didn't infringe, and the evidence you

 7    will hear in this trial will establish both of those.

 8         So what's the -- what else was going on?  I told you

 9    earlier, we were taking discovery in the case, and we were

10    looking at documents, internal confidential documents that

11    hadn't come outside of USAA and hadn't been shown to the

12    Patent Office.

13              THE COURT:  Ten minutes remaining, counsel.

14              MR. STONE:  Thank you, Your Honor.

15         And what did we learn from those patents?  Well, those

16    applications that were filed in 2006 that claim in their

17    claims the ability to use a mobile phone to capture a check

18    image that is of sufficient quality to be deposited, it turns

19    out at the time all USAA knew how to do, all that they could

20    make work, was a scanner.  They didn't know how to make it

21    work with a mobile phone.  They hadn't tested mobile phones.

22    They didn't have any working examples of mobile phones.

23    That's important.

24         Now, in early 2007 after they filed their patent

25    application, they thought, Let's go test some mobile phones.

1    And you know what they found and determined?  Doesn't work,

2    can't do it.  So they set it to one side.

3         Then in May they decided, May of 2007, let's take another

4    look and see if we can figure out how to make it work.  They

5    had this concept.  Let's see if we can make it work with a

6    digital camera.  And they had a proposal which is, let's see

7    if we can do some research to figure out how to make it work

8    with camera phones.

9         So they had that proposal.  They started doing the

10   research.  In December of 2007, they found, oh, it's not

11   really working.  It only works 25 percent of the time.  We're

12   having failures 75 percent of the time.  It still didn't work.

13        Now, what they didn't get, what they couldn't get off the

14   check was they couldn't figure out to get the MICR line more

15   than 25 percent of the time.  That's the line at the bottom of

16   the check that has the routing number of the bank and the

17   account number and the check number.  And so they didn't get

18   that to work.  They didn't have a working model until

19   September of 2008.

20        Now, why does this matter?  Why does it matter?  Well,

21   Judge Gilstrap told you about the enablement requirement.  And

22   Mr. Sheasby showed you the Constitution, the Constitution that

23   will protect the rights of inventors.  Inventors.  That means

24   you have to have an invention.  And the enablement requirement

25   means that you have to have the ability to make that invention

 1   work and not only that, you have to describe to others how to

 2   make and use the invention.

 3       Well, in 2006 when they filed their patent applications,

 4   USAA couldn't tell others how to make and use something with a

 5   mobile phone because they didn't know how to do it, and it

 6   turns out it took them 23 months to figure that out.

 7       So one of the things we know is, wow, the law requires

 8   you to have something that works when you file your patent

 9   application.  And what we learned in the course of our

10   discovery in the case was what they had at 2006, they knew

11   didn't work, but they didn't tell the Patent Office that.

12       And when it comes to light after a patent has been

13   issued, when it comes to light that you had the inability to

14   make something work when you filed for your patent

15   application, that's a reason why juries find patents invalid,

16   because that's the law.

17       Even though they have the patent, remember they didn't

18   tell the Patent Office what you're going to see in this case

19   which is why we're here in this trial before you, is to show

20   you that evidence.  What that means is, if it comes to light

21   later, it's for you to re-examine that and say, yes, they

22   didn't, in fact, know how to make it work, and their patent is

23   invalid.  And you can't infringe an invalid patent.  If you

24   don't own the property, you can't go out and try to get

25   somebody else to pay money for having walked across it, if

1    that had happened.  But as Doctor Bovik is going to explain,

2    it didn't.

3         The same thing happened in 2009.  They filed their patent

4    applications in August of 2009.  In March of 2012,

5    two-and-a-half years later, they finally -- we have completed

6    the original scope of the prototype.  They finally had a

7    working prototype, two-and-a-half years later.  Again, when

8    they filed their patent application, when they raced to the

9    Patent Office to get their application on file, they jumped

10   the gun and they didn't have an invention because they didn't

11   know how to make it work, and they couldn't tell anyone else

12   how they could make it work.

13        In my last few minutes, you'll be asked these questions

14   in this case--infringement, not infringed, not infringed

15   before 4.20.1, and no issue in this case as to whether it's

16   infringed afterwards.

17        The patents are invalid because they don't at the time

18   they were filed enable other people to make and use the

19   invention because they hadn't made or used the invention yet

20   themselves.

21        And the third issue is what's it worth.  I'm going to

22   talk about that not because I think you should ever reach that

23   issue, but because it's an important issue and it explains

24   what I said to you at the beginning, that why we're here is

25   because they're asking for $300 million.

1              Imagine in 2017, when they said their patents started to

2    issue and they were starting to write letters to banks,

3    suppose they'd sat down or come to PNC and said, Hey, we want

4    to talk.  We want to talk about these two features that are in

5    your remote deposit app.  We think you shouldn't be using

6    those features.  And if you want to use them, we think you

7    should pay us a reasonable royalty.  Let's assume that

8    conversation happened, because when you get the instructions

9    from Judge Gilstrap, you're going to understand that this

10   hypothetical, if you will, this imaginary negotiation is the

11   way for you to think about this.

12              THE COURT:  Three minutes remaining.

13              MR. STONE:  Thank you.

14       So USAA says to PNC in this negotiation, we're willing to

15   let you keep using those two features, but you have to pay us

16   $300 million.

17       What's PNC going to say?  They're going to go, like, we

18   could take the features out right now, we could take them out.

19   And because we're here today and because we're just imagining

20   the negotiation back in 2016 or 2017, we know exactly today

21   what it costs to take those features out.  Exactly.  We know

22   what it costs to change the software, we know what it costs to

23   hire employees, we know every way you can measure it, we know

24   the impact on our business, we know all of the costs or

25   additional expenses or impact it has on our business of taking

1    out those two features.

2         And they would tell USAA, you know, we figured this out.

3    It's only going to cost us $10.5 million, and because some of

4    that money is we don't have to pay for the future, you can

5    take interest rates into account and figure out what the

6    number is, but just for now think about total out-of-pocket

7    costs over time is $10-and-a-half million.

8         Would you expect PNC to have agreed to pay 300 million

9    when they could solve the problem, improve their app store

10   ratings by a little bit, would you expect them to pay $300

11   million to keep the two features?

12        Remember what the two features are.  You take the picture

13   of the check, and then it's shown back to you to give you a

14   chance to retake it if you want or it's just sent off

15   automatically, or instead of using auto-capture which takes

16   the picture for you, you manually take the picture.

17        And you'll see in the how-to video that USAA puts out for

18   all of its customers telling them how to use the app, they

19   show them taking the picture manually.  It's just not that

20   important.  It's one of those things which is a nice add-on

21   feature which didn't cost PNC anything to add.  It was just

22   given to them as here's the next update of your app, you can

23   have this feature or not, and they added it, and then they

24   took it away so customers can't use it.

25        And then you heard about, well, they made a deal with

1

2

3                              (Redacted.)

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1        Ladies and gentlemen of the jury, we're going to take a

2   short recess.  When I come back or when we come back, we'll

3   proceed with the Plaintiff's first witness in the Plaintiff's

4   case in chief.

5        But we'll take a brief recess at this time.  You may

6   simply leave your notebooks closed in and in your chairs.

7   Please follow my instructions, and we'll have you back in here

8   shortly.

9        The jury's excused for recess.

10           (Whereupon, the jury left the courtroom.)

11           THE COURT:  Be seated, please.

12        Counsel, this morning the Court was confronted with a

13  huge number of objections between the parties as to proposed

14  demonstrative slides regarding both opening statements from

15  both sides and the first witness or two in Plaintiff's case in

16  chief.

17        We worked two hours this morning before the jury was

18  ready for voir dire to begin, and we worked over the lunch

19  hour as well and barely got through all the disputes you had

20  regarding opening statement objections, demonstrative slides

21  related to opening statements.

22        You may take this 10- or 12-minute recess and confer with

23  each other about your disputes that remain regarding slides to

24  be used with the Plaintiff's first couple of witnesses.  But I

25  do not intend, as I've made very clear to you since early this

1    morning, I do not intend to leave this jury in limbo while we

2    take hours to work through a similarly excessive number of

3    disputes.

4         So when I come back or when we come back from this 10- or

5    12-minute recess, I'm going to have Plaintiff call their first

6    witness.  And if there are slides put up and there are

7    objections, somebody will have to make the objection and you

8    will use your trial time making objections and hearing

9    responses and letting me rule on it unless you want to work

10   them out over the next 10 or 12 minutes.

11        The Court is not going to be abused by an excessive

12   number of objections that many of which in the Court's view,

13   having gone through the ones that were raised with regard to

14   opening statements are, if not frivolous, less than

15   substantive.  But I don't think that I have any other

16   alternative rather than to do that.

17        And I'm not going to reward your conduct from both sides

18   in creating an avalanche of exhibits -- excuse me, of disputes

19   for the Court on the first day of trial by leaving the jury in

20   limbo and taking an hour or two or more to work through all

21   the minutia that you've raised through these disputes.  So

22   you-all confer over this next 10 or 12 minutes, and whatever

23   you can work out, you've worked out, and whatever you can't

24   work out, you will raise it when the witnesses testify and

25   I'll deal with it if and when you raise it.  But I'm not going

1    to delay this trial because of your excessive number of

2    disputes imposed on the Court.

3         Is everybody clear?

4              MR. SHEASBY:  Yes, Your Honor.  Plaintiffs are

5    clear.

6         We have to raise a number of issues relating to

7    statements that were made by PNC --

8              THE COURT:  You have to speak up Mr. Sheasby.

9              MR. SHEASBY:  We have a number of issues relating to

10   violations of the protective order by PNC in its opening as

11   well as violations of a number of motions in limine.  We'd

12   like to be heard briefly on that.  It doesn't have to be right

13   now, but we did want to flag that.

14             THE COURT:  Well, as you are well aware, having

15   tried multiple cases to a verdict in this Court, it's my

16   practice to hear objections at the time of the infraction or

17   the alleged infraction occurs.  And to wait until it's in the

18   rear-view mirror, if you will, and raise it after the fact is

19   generally met with a denial as being untimely.

20        We had that this morning during opening statements and an

21   alleged limine violation which you took up at the bench after

22   the -- excuse me, not in opening, with regard to voir dire.

23   We had that come up during voir dire and that was raised at

24   the bench during objections for cause as to venire members,

25   and I ruled it was untimely.  I don't know why I would differ

1        from that approach now.

2                MR. SHEASBY:  Sure, yes, Your Honor.  I know you

3        take great umbrage to people interrupting during opening.

4            There were a number of misstatements of the law which

5        we'll send a trial brief on.  It's not that we want a

6        corrective instruction.  The amount of the Wells Fargo

7        verdict, I consciously did not say that out loud because

8        that's confidential information.  It was only shown to the

9        jury.  And Mr. Stone repeatedly publicized that in open court,

10       and I believe that I would like the record sealed on that

11       point.

12               THE COURT:  Well, let me say this.  I'm going to

13       take a short recess, and you-all need to spend that time

14       deciding what you do or don't want to urge as far as

15       objections to the demonstratives during your first couple of

16       Plaintiff's witnesses.  And if you're going to raise them,

17       raise them.  If you're not, you're not.  But we're not going

18       to stop this process --

19               MR. SHEASBY:  I understand, Your Honor.

20               THE COURT:  -- because of the excessive number of

21       disputes that the parties have raised as of this morning.

22               MR. SHEASBY:  I understand, Your Honor.

23               THE COURT:  All right.  You have anything, Mr.

24       Stone?

25               MR. STONE:  If you would like a response to the

175

```
1    Wells Fargo issue, I wanted to provide that.

2              THE COURT:  I'm not going to take that up at this

3    time.  If and when I take it up, I'll certainly afford both

4    sides an opportunity to be heard.

5         The Court stands in recess.

6                        (Brief recess.)

7              THE COURT:  Be seated, please.

8         Plaintiff, are you prepared to call your first witness?

9              MR. SHEASBY:  Plaintiff is prepared to call its

10   first witness.

11             THE COURT:  Let's bring in the jury, please.

12             (Whereupon, the jury entered the courtroom.)

13             THE COURT:  Please be seated, ladies and gentlemen.

14        Plaintiff, call your first witness.

15             MR. SHEASBY:  Your Honor, USAA calls Mr. Christopher

16   Wilkinson.

17             THE COURT:  All right.  If you'll come forward and

18   be sworn, please, Mr. Wilkinson.

19             (Whereupon, the oath was administered by the Clerk.)

20             THE COURT:  Please have a seat on the witness stand,

21   sir.

22        All right, Mr. Sheasby.  You may proceed with direct

23   examination.

24

25
```

176

```
 1                    CHRISTOPHER WILKINSON, SWORN,
 2    Testified on direct examination by Mr. Sheasby as follows:
 3    Q.   Good afternoon.  Mr. Wilkinson, can you introduce
 4    yourself to Judge Gilstrap and the jury?
 5    A.   Good afternoon.  My name is Christopher Wilkinson.
 6    Q.   Mr. Wilkinson, can you pull the mic a little closer to
 7    you or get up a little closer to it so we can hear you better?
 8    A.   Is that better?
 9    Q.   It is.  Thank you so much.
10         Why are you testifying today, Mr. Wilkinson?
11    A.   I'm a technologist at USAA, and I'm here to tell the
12    history about some people at USAA who created an amazing
13    technology that transformed our business.
14    Q.   Mr. Wilkinson, have you ever testified in court before?
15    A.   No, sir, I have not.
16    Q.   Can you tell us a bit about -- can you tell us what
17    patents are at issue in this case?
18    A.   In the 2005-2006 generation patents, we have the '432,
19    the '681, the '605.  And then the 2008-2009 generation of the
20    patents, we have the '571.
21    Q.   Can you tell us a bit about yourself?
22    A.   I was born and raised in a -- in Taft, Texas.  It's a
23    little bitty town just a little north of Corpus, population
24    2800.  It's very small.  Shortly out of high school, I
25    enlisted in the United States Air Force.  There I served until
```

```
1    January of '98 when I was honorably discharged as an E4, which

2    is the same time that I started working for USAA, and I've

3    been with USAA for the past 24 years.

4    Q.   Do you have a family, sir?

5    A.   Yes, sir, I do.  This year will mark my 30th anniversary

6    with my wife, and I have two grown children.

7    Q.   Do you come from a military family?

8    A.   Yes, sir.  My mom was career military.  She did aircraft

9    maintenance.  And then I have a stepfather who flew gun ships

10   for the Air Force as well.

11   Q.   What is your position at USAA?

12   A.   I am an assistant vice president, technical fellow.

13   Q.   And what is a technical fellow?

14   A.   A technical fellow is the highest level of engineering

15   achievable at USAA.

16   Q.   And what is consumer remote deposit capture.

17   A.   Consumer remote deposit capture gives our members the

18   ability to deposit checks rapidly into their savings account

19   or checking account from anywhere in the world.

20   Q.   Did you prepare a demonstrative about USAA's program or

21   its system?

22   A.   Yes, sir, I did.  Can you play that video?

23   Q.   Can you describe in advance what we're going to see here?

24   A.   Yes, sir.  I'm going to put the check down.  And I'm

25   going to take the USAA mobile app, and I'm going to hover over
```

1    the check.  And then it's going to take the check, and it's

2    going briefly subdue.  It's going to show me the check, and

3    then it's going to ask me to flip it over.  And I'm going to

4    flip it over.  I'm going to take that one it's going to

5    briefly show me, and at the very end it's going to give me the

6    ability to approve and deposit.

7    Q.   It takes the front and captures, takes the back and

8    captures?

9    A.   Yes, sir.  So as you can see here, I'm going to put it

10   over the top of the check.  And then as soon as it snaps,

11   you're going to see it come up.  There you go right there.  So

12   it can see what happened.

13        Now I'm going to do the same thing to the back.  It's

14   going to sense.  It's going to provide me the feedback that

15   will take it.  Now you can see it there in the background, the

16   check, the image that it took.

17   Q.   What is the impact of consumer remote deposit capture on

18   USAA?

19   A.   It's been extraordinary.  I mean, prior to consumer

20   remote deposit capture, only large consumers had the ability

21   to deposit checks using a very specialized scanner.

22   Q.   Can you describe the history of USAA?

23   A.   In 1922, 25 Army officers met in downtown San Antonio,

24   and each put in $25,000 of their own money to create a mutual.

25   The problem that they were trying to solve was, of course,

 1    they're military and they were always moving around.  And it

 2    was really hard for them to get coverage.  And if they did it,

 3    it was really hard for them to maintain it.  And so they

 4    decided to form a mutual.

 5         We remain a mutual today, which means the members insure

 6    themselves.  We're a member-owned company.

 7    Q.   Who are the members of USAA?

 8    A.   The members of USAA are all active duty military, those

 9    who have honorably served, their families.  And we also

10    encourage USAA employees to join the membership as well.

11    Q.   What does it mean to be member-owned?

12    A.   We're not a public company, so we're not traded on the

13    stock market.  And as a result of not being traded on the

14    stock market, we don't have to suffer the ebbs and flows of

15    Wall Street, which means we can take a more strategic view

16    into the technologies that we invest in.  And one of those

17    technologies is at suit in this case.

18    Q.   Can you give us another example?

19    A.   Yes, sir.  After we pay all the bills and we pay even the

20    member claims that are out there, we give back a substantial

21    amount of money back to the membership.

22    Q.   What is the source of money that is used to run the

23    business, for example, to invest in new technology like the

24    patents at issue in this case, or to rebuild members' homes

25    after floods or hurricanes?

1    A.    All that money, all that capital, comes from the members

2    themselves.

3    Q.    How many members does USAA have?

4    A.    We have approximately 13 million members.

5    Q.    And how many employees does USAA have and where are they

6    located?

7    A.    We have around 36,000 employees with roughly half living

8    in Texas.  We also have some facilities near large military

9    bases, military installations, in Colorado, Florida, Virginia,

10   and Germany.  And 20 percent of our employee base is either

11   prior military or a military spouse.

12   Q.    You said that USAA was founded by Army officers as an

13   insurance mutual.  Did USAA decide to create a bank at some

14   point?

15   A.    Yes, sir.  At the time, at that time period, many of our

16   members were looking for some low-cost banking solutions.  And

17   so since our mission is to facilitate the financial security

18   of our members, we built a bank in 1983.

19   Q.    You showed the patents-at-issue in this case.  Can you

20   now describe the inspiration for consumer remote deposit

21   capture?

22   A.    Yes.  During this time period, we had many of our service

23   members, men and women both, in Iraq and Afghanistan, and we

24   always have them on ship.  When they get time to take care of

25   personal business, they usually have to do so in very

1    constrained, bandwidth-oriented environments.  Most of the

2    bandwidth is dedicated to mission-essential duties.  We needed

3    to ensure that our application would work with those

4    constraints like a mobile devise would need.

5    Q.    So that's the history for why you made your website

6    mobile accessible?

7    A.    Yes, sir.

8    Q.    Can you now describe what's the inspiration for the

9    consumer remote deposit capture system itself?

10   A.    So many of our members live paycheck to paycheck, and

11   they needed a way to get money into their accounts rapidly to

12   pay their bills from anywhere in the world because a lot of

13   them are deployed.

14   Q.    Is consumer remote deposit capture used for direct

15   military pay?

16   A.    No, sir.  That's considered a direct deposit.  It's all

17   the other checks you would typically get like from your

18   spouse's income, your grandparents, your parents, friends,

19   selling things.

20   Q.    Who are the inventors on the 2006 generation patents?

21               MR. SHEASBY:  Can we put up that slide, Mr. Huynh?

22               THE WITNESS:  So in the 2005-2006 generations of

23   patents from applied research, we had Chuck Oakes, Bharat

24   Prasad, Rey Medina, Michael Morris, Randy Morlen.

25          From bank processing, we had Frank Major, Greg Harpel,

1    Jeff Pollack.  And business manager was Troy Huth, and

2    checking processing was Gabe Gravia.

3         And the 2008-2009 generations of patents in applied

4    research, we had Chuck Oakes, Bharat Prasad, Rey Medina, and

5    Minya Liang.

6    Q.   Between the inventors, how many patents have they been

7    awarded?

8    A.   Over 260 patents.  We're very lucky to have that many

9    inventors at USAA.

10   Q.   There are three inventors on both generations of patents:

11   Chuck Oakes, Bharat Prasad, and Rey Medina Can you tell us

12   about those three?

13   A.   They all worked in the applied research division at USAA.

14   Q.   And what does applied research do?

15   A.   So applied research invents -- researches and invents

16   technology, and they make a working product.  The second thing

17   they do is, if they're authorized by the business, they

18   commercialize that product.

19   Q.   Who led applied research at the time of these patents?

20   A.   Chuck Oakes lead applied research.

21   Q.   What is Mr. Oakes' relationship to Mr. Prasad and Mr.

22   Medina?

23   A.   Mr. Prasad and Mr. Medina are two of Mr. Oakes' earliest

24   recruits for the applied research division.

25   Q.   Can you tell us a bit more about Chuck Oakes?

1    A.    Mr. Oakes was a very humble and dedicated individual.

2    His whole goal was to create products and services that would

3    ease the lives of our members.  And this was the department

4    that he stood up and ran for a decade.

5    Q.    Did Chuck Oakes at some point in time retire from USAA?

6    A.    Yes, sir, he did.

7    Q.    Did Chuck Oakes continue to maintain a relationship with

8    USAA after he retired?

9    A.    He maintained a relationship with USAA up until he passed

10   in 2021.

11   Q.    What does this slide depict?

12   A.    So this is some of the slides we showed at Mr. Oakes'

13   memorial service.  If you'll look at the image on the far

14   left, you'll see Mr. Oakes there in the marine shirt.  And in

15   the right picture, you'll see Mr. Oakes in the center up

16   against the white board with the gray shirt.

17        And then you'll see Bharat Prasad there on the far

18   left--you'll be hearing from him a little bit today or

19   tomorrow--in the khaki shirt.

20   Q.    What's on this slide?

21   A.    This was one of the slides we showed at his memorial

22   service indicating the impact that he had not only to USAA but

23   also to our membership with his work on the Deposit@Home,

24   Deposit@Mobile.  And, you know, there's 118 patents granted.

25   Q.    Were these slides prepared for litigation?

184

```
1    A.   No, sir, they were not.

2    Q.   Can you tell us a bit about Rey Medina?

3    A.   Rey Medina was born and raised in San Antonio, Texas, and

4    was recruited shortly out of college by Mr. Oakes.  Mr. Medina

5    is responsible for many of the software solutions that power

6    consumer remote deposit capture.

7    Q.   Can you tell us a bit about Mr. Prasad at USAA?

8    A.   Mr. Prasad came to the U.S. for graduate studies shortly

9    after his mother's passing in India.

10   Q.   Did Mr. Prasad have a connection to the United States?

11   A.   Yes, sir.  He had a brother who holds a senior research

12   position at Los Alamos Labs in New Mexico.

13   Q.   Did Mr. Prasad play a role in the architecture of USAA's

14   consumer remote capture products?

15   A.   Yes, sir.  Mr. Prasad became the lead technical architect

16   on the project.  He still works in that capacity today in

17   applied research, holding the highest technical position

18   called a principal technical architect.

19   Q.   Did other banks than USAA offer ways to deposit checks

20   other than ATM or teller before USAA?

21   A.   Yes, sir.  Larger consumer -- business consumers could

22   use a specialized check scanning machines to deposit checks.

23   Q.   What is this slide depicting?

24   A.   This is one of those specialized check scanning machines.

25   But as I mentioned a bit earlier, we've got a lot of members
```

1    that are living paycheck to paycheck.  We couldn't ask them to

2    buy that device.

3    Q.    Do you have personal knowledge of the development of

4    consumer remote deposit capture at USAA?

5    A.    Yes, sir, I do.  Consumer remote deposit capture was

6    built on the infrastructure that I engineered and architected.

7    Q.    What consumer devices did USAA for focus on for its

8    program?

9    A.    We focused on general purpose devices, devices that the

10   user member already had that we could repurpose for our

11   solution.

12   Q.    Was the system intended to always use the same devices?

13   A.    No.  We built the system to expand and grow over time

14   with our membership.

15   Q.    What was the first phase of commercial launch?

16   A.    The first few series of versions were optimized for

17   consumer grade scanners, but it would also work with devices

18   that had a general purpose processor and a digital camera

19   sufficient resolution.

20   Q.    What was the second generation?

21   A.    Once our members started adopting the newer devices like

22   the iPhones and Windows phones and Android, we developed

23   specialized applications to help them.

24   Q.    What was the third generation?

25   A.    Once those smartphones got a little bit more

1    technologically advanced, we introduced our '571 Patent

2    technology.

3    Q.   Was the -- I want to go back and look at -- go back and

4    look at this slide.  Speaking about that first phase, in June

5    2006 was the system designed to use JPEG images?

6    A.   Yes, it was.

7    Q.   Okay.  First off, tell us what a JPEG image is.

8    A.   So a JPEG image is opened image format that many of the

9    devices used then and still use today to be able to view and

10   capture.

11   Q.   Why did you design the system from the beginning to be

12   used with JPEG?

13   A.   Since many of the devices during that time period could

14   use JPEG, we wanted to design the system that way.  And then

15   also because, since JPEG was such a universal format that

16   everybody was using, any other device that our members may

17   have adopted that may subsequently become popular, we could

18   expand our system to accept that.

19   Q.   What type of format did digital cameras and mobile phones

20   use in 2006?

21   A.   JPEG.

22   Q.   What type of format do digital cameras and mobile phones

23   today use?

24   A.   They still use JPEG.

25   Q.   Did the original system work with digital cameras?

1    A.   It would.  If the camera could take a sufficient

2    resolution photo, basically if it could take a higher quality

3    photo, it would work.

4    Q.   Are there records of this?

5    A.   Yes, sir.

6    Q.   Did you advertise this capability for the original system

7    to be used with digital cameras?

8    A.   So during this time period, many of our members didn't

9    have or couldn't afford expensive cameras that could take that

10   high quality of a photo, and so we didn't advertise it because

11   we didn't want to frustrate them.

12   Q.   Were you -- you were here in opening when counsel for PNC

13   told the ladies and gentlemen of the jury that the system

14   didn't work with digital cameras.  Were you here for that?

15   A.   Yes, sir, I was present.

16   Q.   Was that an accurate or inaccurate representation that

17   was made to the jury?

18   A.   That was an inaccurate representation.

19   Q.   Through what digital channel was USAA's consumer remote

20   deposit capture accessed in 2007?

21   A.   That was available on USAA.com.

22   Q.   Did USAA.com support smartphone devices in 2007?

23   A.   Yes, sir, we did.  From an engineer's perspective, a

24   digital phone, a smartphone, is nothing more than a general

25   purpose processor with a camera and a cell phone.  And just

1    like a PC that you have at home, it has a browser, and the

2    browser could access our application just like a PC could.  So

3    it would work.

4    Q.   What was the inspiration -- you spoke about it briefly,

5    but what was the inspiration for making USAA.com accessible to

6    mobile phones in 2006 and 2007?

7    A.   As I indicated a little bit earlier, during this time

8    period we had a lot of members deployed in Afghanistan and

9    Iraq, and the Navy is always on ships.  And typically when

10   they get time to do their personal business, they do so under

11   very constrained, bandwidth-oriented situations.  And so we

12   wanted to ensure that our application would be able to work

13   under those circumstances and to support a mobile device.

14   Q.   Do you know -- how do you know that mobile devices could

15   access consumer remote deposit capture in 2006 and 2011?

16   A.   It's because we tested every element of our website to

17   function with those types of devices.

18   Q.   Let me show you a document.  It's PX 195, consumer remote

19   deposit capture.  Do you recognize PX 1295?  Let me blow it up

20   for you.

21   A.   Thank you, sir.  Yes, I do.

22   Q.   What is PX 1295?

23   A.   This is the results of a mobile phone usage survey

24   amongst our members.

25   Q.   And what -- this document is from 2009.  What does it

1    show about 2007 and 2008 smartphone usage among members?

2    A.   It shows that in 2007, our members didn't have, couldn't

3    afford smartphones.  And it wasn't until 2008 where we started

4    to see enough adoption to where they could be able to make use

5    of the specialized application.

6    Q.   Did this data influence decisions on when to develop a

7    downloaded application for the iPhone?

8    A.   Yes, sir.  At USAA, we meet members where they're at.

9    And it wasn't until 2008 that they could use a downloadable

10   application for their specialized phones.

11   Q.   What was the -- at some point you did create an optimized

12   app for the iPhone for download.  Is that correct?

13   A.   Yes, sir.

14   Q.   What was the member reception to that optimized version

15   of the app for iPhone?

16   A.   It was extraordinary.  We became the number one banking

17   financial app in the iTunes store.  And if you-all have heard

18   anything about apps, that's pretty hard to do.

19   Q.   Once USAA decides to introduce technology to its members,

20   why don't you just -- you're a senior member in the CTO.  Do

21   you just snap your finger and say, the technology is ready for

22   commercial development?

23   A.   Many of our architects, many of our engineers, are booked

24   well in advance.  When a business executive determines they

25   want to release a new product or release new capability, they

190

1    need to put it on our road map.

2    Q.   You said a word, road map.  I'm going to show you an

3    exhibit.  This is PX 1746.3.  What does this depict?

4    A.   This is an example of one of our road maps.  And if you

5    look in the 2009 column, you see something is called mobile

6    deposit anywhere.  That's our Deposit@Mobile application, and

7    it was targeted for 2009.  And we did deliver in 2009.

8    Q.   So that was that specialized app for iPhone?

9    A.   Yes, sir.

10   Q.   Why not shift to 2007 or 2008?

11   A.   Again, going back to the survey, our members weren't

12   ready and they didn't have the devices.  And besides that, in

13   2008 we were already delivering foundational tools for the

14   bank.  And in 2007, we were doing scanning system

15   optimizations.

16   Q.   You were here in opening when counsel for PNC was showing

17   some documents about USAA's commercialization efforts for its

18   downloaded app?

19   A.   Yes, sir.

20   Q.   You're a senior member of the chief technology office.

21   Is that correct?

22   A.   Yes, sir.

23   Q.   And applied research is under the chief technology

24   office?

25   A.   It is.

1    Q.   Does the chief technology office treat invention and

2    commercialization as the same?

3    A.   No, sir, we do not.  In invention, we deliver a working

4    product and try to protect it.  Commercialization is where we

5    get that same working system and we optimize it such that it

6    becomes one of the best experiences our member would ever like

7    to have because, if it's not a pleasing experience, they're

8    going to go away from it.  They're not going to use it.

9    Q.   What was the impact of consumer remote deposit capture

10   over time?  Did use increase or decrease at USAA?

11   A.   We saw continual increases in consumer remote deposit

12   capture use.

13   Q.   Generally?

14   A.   Generally, yes, sir.

15   Q.   What has been the trend in the amount of errors or

16   failure over time?

17   A.   Generally downward over time.

18   Q.   Is it normal for failure rates to go down as demand goes

19   up?

20   A.   No, sir, it's not.  Typically, as demand goes up and

21   volumes go up and you introduce a wider array of devices into

22   the ecosystem, you're -- typically you'll see error rates

23   rise.

24   Q.   The fact that it didn't rise in this -- I withdraw the

25   question.

1    In 2009 after the iPhone was launched, did demand

2    influence the success rate you originally had?

3    A.    Yes, sir, it did.  In 2010, our demand peaked and

4    actually caused capacity issues on our back-end systems.

5    Those capacity issues turned into performance-related concerns

6    and caused failures.  Once we corrected the capacity concerns

7    on our back-end systems, the failure rates began to rapidly

8    fall.

9    Q.    Did USAA launch new technology in 2013?

10   A.    Yes, sir.  We launched our patented '571 technology in

11   2013.

12   Q.    And what is the '571 Patent?

13   A.    The '571 is an autonomous system through interactive

14   feedback with the user.  It tells them how to hold the check,

15   what to do with the check, if they're doing something wrong,

16   and then when -- through a live video stream, it's -- it's

17   doing all this image analysis.  And once the image is of

18   sufficient quality, basically it meets all the individual

19   criteria that that autonomous system is doing, it will

20   automatically capture the image.

21   Q.    Did USAA make any public announcements regarding its

22   patent applications?

23   A.    We did.  One of USAA's executive management group, Jeff

24   Dennies, had a very large mobile financial conference in June

25   of 2009.  At that conference he said we had patents, we were

193

1    applying for patents on our application.  It was also

2    indicated on one of his slides in his slide deck.

3    Q.   At some point in time, could members of the public look

4    at USAA's 2006 patent application?

5    A.   Yes, sir, they could.  In 2011 when the first patent in

6    the family issued, anyone could look at the specification.

7    Q.   I'm showing PX 0097.  Is this the first patent in the

8    2006 patent family?

9    A.   Yes, yes, sir.  This is the '200 that issued first.

10   Q.   And what's the date on which it issued?

11   A.   January 18th of 2011.

12   Q.   And what is the relationship between -- and so on this

13   date would the public be able to access the 2006 patent

14   application?

15   A.   Yes, sir.  Anyone from the public could view the

16   specification at this point.

17   Q.   Did the 2009 family also become public at some point?

18   A.   In March of 2015 when that first patent issued, it was

19   also the specification was also viewable by the public.

20   Q.   Did USAA obtain multiple patents from the 2006 patent

21   application?

22   A.   Yes, sir, we did.

23   Q.   Do you have an understanding as to why USAA obtained

24   multiple patents from the 2006 patent application?

25   A.   I do.

194

1    Q.    How did you form that understanding?

2    A.    I work very closely with USAA's Patent Office, and I have

3    continuation application patents of my own.

4    Q.    What is your understanding?

5    A.    The U.S. patent system allows for multiple patents to be

6    requested from a single application.  This is called

7    continuation application.

8    Q.    Does this slide depict the -- some of the patents in the

9    2006 patent family?

10   A.    Yes, sir.  This is some of the patents that were issued

11   from our original two 2006 filings.  The ones you see

12   underlined in bold are some of the patents at issue in this

13   case.

14   Q.    Now, at some point in time did USAA publicly identify the

15   patents that cover its consumer remote deposit capture system

16   and that cover consumer remote deposit capture?

17   A.    Yes, sir, we did.

18   Q.    How did USAA do this?

19   A.    When you first open up the application on your phone and

20   you go into it, there is a page in there that basically shows

21   all the patents that cover the technology that that

22   application uses, and we put the same information on our

23   website.

24   Q.    I'm going to show you a document.  It's PX 0195 and 0196.

25   Can you explain to the ladies and gentlemen of the jury what

1    this document is?

2    A.    Yes, sir.  What you see in the red square is what our

3    members would have seen on that patent disclosure page as of

4    December of 2016.

5    Q.    You were here in opening when I showed demonstratives of

6    PNC emails in which they were accessing the USAA app?

7    A.    Yes, sir, I was here.

8    Q.    When they accessed the USAA app, would they see the

9    patent marking information?

10   A.    They would.

11   Q.    After the '605 and '681 Patent were granted by the United

12   States Patent Office, what did -- let me go back actually one.

13        So this is the box.  What you see in red would be what

14   would be seen on the application in the website.

15   A.    Yes, sir.

16   Q.    And it lists the 8,977,571 Patent?

17   A.    Yes, sir.

18   Q.    What is that patent?

19   A.    That is the 2008-2009 generation of patent.

20   Q.    And it also lists the 9,224,136.  What family is that?

21   A.    That is from the 2005-2006 generation patent family.

22   Q.    So now I can skip forward.  After the '605 and '681

23   Patent were granted by the United States Patent and Trademark

24   Office, what did USAA do?

25   A.    So what you're looking at here is an excerpt from our web

196

```
 1    content management system that basically lets us know what we
 2    put on the page at what time and gives our content authors the
 3    ability to -- to watch and control that.  And if you look in
 4    that center column, in October of 2018, the '681 and the '605
 5    patents were added to that disclosure page.
 6    Q.    And what does PX 1098 show?
 7    A.    So this is what our members would have seen on the
 8    website as of August of 2020, and all those ones that you see
 9    in yellow and underlined in red are all the patents at issue
10    in this case.
11    Q.    Now, did USAA publicly ask banks to take license -- to
12    -- banks to take a license to its technology at some point in
13    time?
14    A.    In 2017, we did.
15              MR. SHEASBY:  Your Honor, may I approach briefly?
16              THE COURT:  You may.
17              (The following was had outside the hearing of the
18              jury.)
19              MR. SHEASBY:  In opening, Mr. Stone said, "They were
20    not interested in having any discussion when they filed the
21    lawsuit."  We actually sent them a letter and requested that
22    they take a license at the same time we filed the lawsuit.  I
23    think he's opened the door to that, and I just want to confirm
24    guidance from the Court that that is appropriate for me to ask
25    that question based on what Mr. Stone said in his opening.
```

 1              MS. SMITH:  Any outreach was after the lawsuit was

 2    filed.  Mr. Stone's comment was prior to filing the lawsuit.

 3              MR. SHEASBY:  He said, at the time they were not

 4    interested when they filed the lawsuit.  And that's

 5    definitively --

 6              THE COURT:  Let me ask you this.  Are either of you

 7    aware of a prior limine ruling that would keep this out but

 8    for the door being opened?  If it's a factual dispute about

 9    whether it was before or after, both sides can tell their

10    story through their witnesses.

11              MR. SHEASBY:  So I will disclose that Judge Payne

12    did not allow either of the letters into evidence, but there's

13    no limine ruling on the fact itself.

14              MS. SMITH:  And I assume if he's not allowing it

15    into evidence, we can't then circumvent his ruling and talk

16    about it.

17              MR. SHEASBY:  Your Honor, I think the door has been

18    opened.  They're making some big deal about the fact that they

19    didn't get a letter, that we weren't interested, that we were

20    only interested in filing the lawsuit.

21         We sent them a letter and requested that they license.

22    This door has been opened.  I should be able to talk about it.

23              THE COURT:  Let me ask you this.  Did Judge Payne

24    expressly prohibit either side from talking about whether the

25    outreach came before or after the filing of the lawsuit?

```
 1                 MR. SHEASBY:  He didn't.

 2                 THE COURT:  Are you aware of anything other --

 3                 MS. SMITH:  He prohibited the letters.  I mean --

 4                 THE COURT:  He kept certain letters out --

 5                 MS. SMITH:  Yes.

 6                 THE COURT:  -- as pre-admitted exhibits, but that's

 7      the extent of his conduct?

 8                 MS. SMITH:  Yes.

 9                 THE COURT:  I see no impediment to you going into

10      it, and then PNC can certainly counter that with any

11      contradictory evidence they have.

12                 MR. SHEASBY:  Thank you, Your Honor.

13                 (The following was had in the presence and hearing

14                 of the jury.)

15                 THE COURT:  Let's proceed.

16      Q.   (BY MR. SHEASBY)  Now, Mr. Stone, PNC's counsel in

17      opening, you were here when he spoke about the fact that he

18      said USAA was not interested in having discussions at all;

19      uSAA was just interested in filing a lawsuit.

20           Do you remember when he said that?

21      A.   Yes, sir.

22      Q.   Was that an accurate or inaccurate representation that

23      was made to the jury?

24      A.   That was an inaccurate representation.

25      Q.   After filing the lawsuit, right after it, did USAA reach
```

1    out to PNC?

2    A.   Yes, sir, we did send a letter, and they declined.

3    Q.   So let me -- you sent a letter.  What did the letter

4    request?

5    A.   Asking them to take a license.

6    Q.   And what was PNC's response?

7    A.   They declined, sir.

8    Q.   Have USAA members embraced consumer remote deposit

9    capture?

10   A.   Absolutely.

11   Q.   I'm going to show you a demonstrative.  And can you speak

12   to this demonstrative?  It's reflecting data in PX 912 and PX

13   594.

14   A.   Yes, sir.  In 2009-2010, you'll see that 3.5 million

15   checks were deposited over the consumer remote deposit capture

16   system, and that netted 2.1 billion in deposit amounts.

17        Fast forward a short decade later, we now had 31 million

18   checks deposited in 2020, and that netted 32 billion in

19   deposit amounts.

20   Q.   Did USAA have a view that -- let me re-ask that.  Does

21   USAA have a view as to whether the technology in the patents

22   at issue in this case will continue to remain important?

23   A.   We think it's only going to grow.  During the COVID-19

24   pandemic, we saw a $1.8 billion increase in deposits over the

25   consumer remote deposit capture system.

200

1   Q.   How has consumer remote deposit capture and the patents

2   in this case transformed USAA's banking?

3   A.   This slide really can speak for itself, but in 2006 we

4   had 3.4 million accounts that netted $26 billion in assets.

5   Now if you look at us at 2020, we have 9.5 million accounts

6   netting almost $109 billion in assets.  So quite dramatic

7   change.

8   Q.   Mr. Wilkinson, thank you for your time.

9             MR. SHEASBY:  Your Honor, I pass the witness.

10             THE COURT:  All right.  Cross-examination by the

11   Defendant?

12             MS. SMITH:  Yes, Your Honor.

13        Your Honor, may we approach with some binders, please?

14             THE COURT:  You may distribute witness binders.

15             MS. SMITH:  Thank you.

16             THE COURT:  All right, Ms. Smith.  You may proceed

17   with cross-examination.

18             MS. SMITH:  May it please the Court, Your Honor.

19                     CROSS EXAMINATION

20   BY MS. SMITH:

21   Q.   Good afternoon, Mr. Wilkinson.  My name is Melissa Smith,

22   and I represent PNC.  I don't believe we've yet met.  Nice to

23   meet you.

24   A.   Nice to meet you as well.

25   Q.   All right.  Now, Mr. Wilkinson, you've been here

1    throughout the voir dire and the opening statements.  Correct?

2    A.    Yes, ma'am.

3    Q.    And you were here when there was a lot of talk about the

4    Constitution and protecting patents and inventors.  Correct?

5    A.    Yes, ma'am.

6    Q.    But you also understand that the Constitution also

7    guarantees the right of somebody that's been wrongly accused

8    to come to court and defend themselves, do you not?

9    A.    Yes, ma'am.

10   Q.    Now, you're USAA's corporate representative.  Correct?

11   A.    Yes, ma'am.

12   Q.    And that means you're here to speak on behalf of everyone

13   at USAA.  Correct?

14   A.    Yes, ma'am.

15   Q.    And you understand that USAA has the burden of proving

16   infringement in this case.  Correct?

17   A.    Yes, ma'am.

18   Q.    You also have the burden of proving that $300 million in

19   this case, do you not?  Damages.

20   A.    Yes, ma'am.  Our -- our experts do.  That's not my area

21   of expertise, but, yes, ma'am, as USAA, I understand.

22   Q.    Okay.  And you agree that it's only fair that the eight

23   men and women on the jury wait to hear all the evidence before

24   making a decision about an amount of money like that, do you

25   not?

1    A.    Yes, ma'am.

2    Q.    So you agree it's only fair for the ladies and gentlemen

3    of the jury to hear from PNC before making a decision.

4    Correct?

5    A.    Yes, ma'am.  Those were the instructions the Judge gave.

6    Q.    Thank you, sir.

7          Now, Mr. Wilkinson, you're not an inventor.  We saw the

8    inventors that you listed on Mr. Sheasby's slide.  You're not

9    an inventor on any of USAA's patents at issue in this case.

10   Correct?

11   A.    I am not an inventor of the patents at issue in this

12   case.  Yes, ma'am.

13   Q.    And, Mr. Wilkinson, you actually didn't work on USAA's

14   Deposit@Home product.  Correct?

15   A.    That's partially incorrect, ma'am.  I built the

16   infrastructure, all the digital channels used.  So without

17   that architecture, it would not work.

18   Q.    Mr. Wilkinson, I placed a binder in front of you.  If

19   you'll take a look at that.

20         Sir, you gave a deposition in this case.  Is that

21   correct.

22   A.    Yes, ma'am.

23   Q.    Okay.  If you could look at page 129 in that binder.  I

24   think it's tab 1?

25   A.    I'm on page 129.

1    Q.    If you'll take a look, sir, at lines 13 through 15?

2    A.    Yes, ma'am.

3    Q.    And, sir, you testified under oath when you were in your

4    deposition, did you not?

5    A.    That is correct.

6    Q.    And after having looked at page 129, lines 13 through 15,

7    does that help you refresh your recollection of your prior

8    testimony, sir?

9    A.    This testimony is reflective of me not working on the

10   application.  I did not write the software.

11   Q.    So my question, sir, was, you did not work on USAA's

12   Deposit@Home product.  Correct?  And what is your answer, sir?

13   A.    I did not work on the software itself.

14         MS. SMITH:  Your Honor, may I have permission to

15   publish this impeachment, please?

16         MR. SHEASBY:  Your Honor, I would just ask for a

17   rule of completeness that it be 129, lines 13 through 130,

18   line 3.

19         THE COURT:  Ms. Smith, you may have leave to publish

20   it.

21      Mr. Sheasby, you may address it under the rule of

22   completeness during redirect.

23         MS. SMITH:  Mr. Nickels, if you have -- there you

24   go.  Thank you.

25   Q.    (BY MS. SMITH)  If you'll read along with me Mr.

1   Wilkinson.  The question is, Did you work on a product at USAA

2   called Deposit@Home?

3        And your answer is, sir?

4   A.   "No, sir, I did not."

5   Q.   Thank you, sir.

6        MS. SMITH:  You can take that down, Mr. Nickels.

7   Thank you.

8   Q.   (BY MS. SMITH)  Now, Mr. Wilkinson, you did not work on

9   USAA's Deposit@Mobile product.  Correct?

10  A.   I did not write that software.  Yes, ma'am.

11  Q.   That wasn't my question, Mr. Wilkinson.  If you'll take a

12  look again at your deposition, lines 16 through 18.

13  A.   It would help me if you could explain to me if you're

14  talking about the software itself or how the solution is ran.

15  It's two separate things.

16        THE COURT:  Well, Mr. Wilkinson --

17        THE WITNESS:  Yes, sir.

18        THE COURT:  -- the lawyers will decide how to ask

19  the questions.  And if you understand the question, you should

20  answer it.  And if you don't understand the question, you

21  should say that you don't understand it.

22        If Mr. Sheasby thinks revisiting the subject would be

23  beneficial, he'll have an opportunity to do that when Ms.

24  Smith finishes.  But it's not the witness' place to ask the

25  lawyers to ask questions in a certain way or make certain

```
 1   distinctions.  That's up to them.
 2              THE WITNESS:  Yes, sir.
 3              THE COURT:  All right.  And would you speak up just
 4   a little bit, Mr. Wilkinson?
 5              THE WITNESS:  Yes, sir.  Is that better?
 6              THE COURT:  That's better.  Thank you.
 7        Ms. Smith, please proceed.
 8              MS. SMITH:  Thank you, Your Honor.
 9   Q.   (BY MS. SMITH)  Mr. Wilkinson, I'll pick up where we
10   were, and taking a look at your deposition again, please, at
11   page 129, down to line 16 through 18.  If you wouldn't mind
12   taking a look at that for me, please.
13   A.   Okay.
14   Q.   Does that refresh your recollection of your testimony,
15   sir?
16   A.   Yes, ma'am.
17   Q.   Sir, you did not work on USAA's Deposit@Mobile product.
18   Correct?
19   A.   No, ma'am, I did not.
20   Q.   Thank you, sir.
21        And, in fact, you didn't have any role in developing
22   USAA's auto-capture feature.  Correct?
23   A.   That's correct.
24   Q.   Now, sir, USAA is asserting four patents in this case.
25   Correct?
```

206

1    A.    Yes, ma'am.

2    Q.    And we heard from the parties' opening statements that

3    PNC launched its mobile check deposit app in 2011.  You agree

4    with that, do you not?

5    A.    I would have to look at that slide, but I don't recall

6    the exact date on your slide, ma'am.

7    Q.    Okay.  Do you have any reason to dispute that PNC

8    launched its mobile check deposit app in 2011?

9    A.    No, ma'am, I have no reason to dispute.

10   Q.    And none of USAA's asserted patents had issued at that

11   time.  Correct?

12   A.    I believe our first one issued in January of 2011.  And

13   if you said you launched in 2011?

14   Q.    Well, sir, I'm speaking of the four patents in this suit.

15   You understand that, sir, the '571, the '605, the '681, and

16   the '432.  You have that understanding?

17   A.    Yes, I do now.  Thank you, ma'am.

18   Q.    So when we talk about the patents in this suit, Mr.

19   Wilkinson, assuming that the evidence comes in that PNC

20   launched its mobile check deposit app in 2011, none of your

21   patents had issued at that time.  Correct?

22   A.    Yes, ma'am.

23   Q.    Thank you, sir.

24         In fact, USAA's asserted patents that we just visited

25   about, they didn't issue for several years after PNC launched

1    its mobile check deposit app.  Correct?

2    A.    Yes, ma'am.

3    Q.    Now, Mr. Wilkinson, you have some patents.  Correct?

4    A.    Yes, ma'am, I do.

5    Q.    And you heard Mr. Stone in his opening statement refer to

6    something called the enablement requirement.  You're familiar

7    with that?

8    A.    I am.

9    Q.    And USAA certainly understood that it needed to comply

10   with the enablement requirement when it filed its patent

11   applications.  Correct?

12   A.    Yes, ma'am.

13   Q.    And it was back in -- I believe the date is 2006, Mr.

14   Wilkinson, that USAA first filed its patent applications for

15   the patents asserted in this case.  Do I have that correctly?

16   A.    Yes, ma'am, I believe that to be correct.

17   Q.    Okay.

18          MS. SMITH:  Mr. Nickels, if I could show the witness

19   Defendant's Exhibit 1129.

20   Q.    (BY MS. SMITH)  Mr. Wilkinson, can you see that document?

21   A.    Yes, ma'am.

22   Q.    Okay.  I believe this is an internal USAA presentation.

23   Is that correct?

24   A.    I couldn't tell you, ma'am.  It's got USAA written on it.

25   Q.    All right.  Do you see where it says, remote deposit with

1    digital cameras?

2    A.   Yes, ma'am.

3    Q.   Did I read it properly?

4    A.   Uh-huh.

5    Q.   If we hear some testimony -- do you know a gentleman

6    called Bharat Prasad?

7    A.   Yes, ma'am.

8    Q.   Okay.  And who is Mr. Prasad?

9    A.   He is a principal architect in applied research.

10   Q.   Okay.  If Mr. Prasad gave testimony that this document

11   was created in 2007, do you have any reason to dispute that?

12   A.   No, ma'am, I would not.

13   Q.   Okay.

14        MS. SMITH:  If we can turn to page 2, Mr. Nickels.

15   Q.   (BY MS. SMITH)  Now, Mr. Wilkinson, on page 2, we're

16   describing USAA's Deposit@Home system.  Correct?  You'll see

17   on the first line, it says Deposit@Home?

18   A.   Yes, ma'am, I read that.

19   Q.   Okay.  And USAA's Deposit@Home system, it used flat-bed

20   scanners to deposit checks.  Is that correct?

21   A.   It was one of the features, yes.

22   Q.   We see --

23        MS. SMITH:  If we could highlight, Mr. Nickels, the

24   flat-bed scanners.

25        THE WITNESS:  He did.

```
 1    Q.   (BY MS. SMITH)   Thank you, sir.

 2         Deposit@Home didn't use mobile phones to deposit checks.

 3    Correct?

 4    A.   That is partially incorrect.

 5    Q.   Is there anywhere on this current slide where it mentions

 6    the use of mobile phones to deposit checks, sir?

 7    A.   No, ma'am, it does not mention it on this slide.

 8              MS. SMITH:   Now, Mr. Nickels, if we could turn to

 9    page 5.

10    Q.   (BY MS. SMITH)   Mr. Wilkinson, this page describes a

11    proposal.   Correct?

12    A.   Yes, ma'am.

13    Q.   All right.   And if we read along, USAA is proposing to

14    research the viability for USAA to take check deposits via

15    cellar camera phones with internet access.   Correct?

16    A.   That's what it says, yes, ma'am.

17    Q.   And that's what -- per Mr. Prasad's testimony, that is

18    what USAA was proposing researching -- researching in 2007.

19    Correct?

20    A.   I would let Mr. Prasad have to answer that.

21    Q.   Well, if I have you assume that this document is from

22    2007, you agree that USAA is proposing to research the

23    viability of check deposits via digital cameras.   Correct,

24    sir?

25    A.   I don't know what context this slide was created in.   I
```

```
1    don't know if this was a business view or if this was an

2    engineering view.  Business would have a different view than

3    an engineer.

4    Q.   But you agree, regardless of if you're taking a business

5    view or you're taking an engineering view, USAA is saying

6    they're going to research the viability to take check deposits

7    via digital cameras.  Can we have that agreement, sir?

8    A.   No, ma'am, because there is a difference in

9    commercialization research versus invention research.

10   Q.   And so that sentence does not read that USAA is

11   researching the viability of USAA to take check deposits via

12   digital cameras if an engineer is reading it versus a

13   businessman, sir?  Is that what you're saying under oath to

14   these jurors?

15   A.   No, ma'am.  What I'm saying under oath is that this

16   research, in context, could mean research the viability of

17   taking it commercial versus research the viability of having

18   it work.

19   Q.   Now, we said you applied for your patents in 2006.

20   Correct?

21   A.   Yes, ma'am.

22   Q.   But this wasn't a document -- you didn't go back --

23   there's no evidence in this case that you went back to the PTO

24   in 2007 and said, well, we're still trying to make it, we're

25   still researching the viability.  We're not going to hear any
```

1   evidence about that, are we?

2   A.   I don't believe so, ma'am, no.

3   Q.   Now, Mr. Sheasby in his opening statement said that there

4   were a flurry of news articles about -- about USAA's

5   inventions and then, again, in your discussion with him you

6   guys talked about significant media.  Is that correct?

7   A.   Yes, ma'am.

8   Q.   Okay.  Now, you know as well as I do, Mr. Wilkinson, that

9   people can get their news from different sources.  Correct?

10  A.   Yes, ma'am.

11  Q.   And you know it's important, don't you, to know the

12  source of the news that you're reading?  Correct?

13  A.   That's correct.

14  Q.   All right.  Now, you'll admit that USAA actually tried to

15  influence what the media said about its lawsuit with Wells

16  Fargo, didn't it?

17  A.   I don't know that to be correct, ma'am.

18       MS. SMITH:  Well, let's take a look at DX 1214, if

19  we could, Mr. Nickels.

20  Q.   (BY MS. SMITH)  Now, I'm showing you what's been marked

21  as an internal USAA memo.  Do you have any reason to dispute

22  that, Mr. Wilkinson?

23  A.   No, ma'am, I do not.

24  Q.   All right.  We see it's also -- it's got not one, but two

25  confidential designations.  Correct?

212

A.    Yes, ma'am.

            MR. SHEASBY:  Your Honor, that's a violation of the
MIL.

            THE COURT:  Specify the limine order you're talking
about, Mr. Sheasby.

            MR. SHEASBY:  MIL No. 2A, Defendant's MIL No. 2A.

            THE COURT:  Plaintiff's MIL 20 relates to patent
applications.  This is not a patent application.

            MR. SHEASBY:  Defendant's MIL 2A.  I'm sorry, Your
Honor.  It's No. 25 in the order on page 8.

            THE COURT:  Is it your belief that Defendant's MIL
2A is applicable to the Defendant since it's usually raised by
the Defendant to be applied to the Plaintiff?

            MR. SHEASBY:  It was applied to both, Your Honor.
That's my understanding.

            THE COURT:  What's your response, Ms. Smith?

            MS. SMITH:  I didn't have that understanding, Your
Honor, and I don't think it's applicable.

            THE COURT:  I don't see anything in the order
memorializing that makes it mutual to be enforced by the
Plaintiff.  I'm going to overrule the objection.

            MR. SHEASBY:  Thank you, Your Honor.

            MS. SMITH:  Thank you, Your Honor.

            THE COURT:  Let's proceed.

Q.    (BY MS. SMITH)  All right, Mr. Wilkinson.  The title of

1   the article is RDC Litigation Monitoring Report.  Correct?

2   A.   Yes, ma'am, that's what I read.

3   Q.   And that refers to USAA's remote deposit capture

4   litigation.  Correct?

5   A.   I believe it does.

6   Q.   Okay.  And specifically this document is talking about

7   USAA's litigation against Wells Fargo that we've heard a

8   little bit about already.  Correct?

9   A.   I don't know, ma'am.  I've not read the article.

10  Q.   All right.  Well, let's look at the first paragraph.

11          MS. SMITH:  Mr. Nickels?

12  Q.   (BY MS. SMITH)  First thing, we see a reference to ESM

13  and CLO.  Do you see that at the first line, sir?

14  A.   Yes, ma'am.

15  Q.   Who is CLO?

16  A.   Chief legal office.

17  Q.   Those are the USAA lawyers?

18  A.   Yes, ma'am.

19  Q.   Okay.  And below that -- at the end of that sentence, we

20  see, External coverage of USAA's litigation against Wells

21  Fargo.  Does that clarify this is about the Wells Fargo

22  litigation for you, sir?

23  A.   Yes, ma'am, I'm reading it.  Yes, ma'am.

24  Q.   Okay.

25          MS. SMITH:  Now, Mr. Nickels, if we could highlight

214

1    in the document where we talk about developing a strategic --

2    on that first line, a strategic communication plan.

3    Q.    (BY MS. SMITH) Do you see that Mr. Wilkinson?

4    A.    Yes, ma'am, I do.

5    Q.    So what we're seeing here is the lawyers at USAA have

6    developed a strategic communication plan.   Correct?

7    A.    That's what it says, yes, ma'am.

8    Q.    And the purpose of that lawyer plan was to help shape

9    external coverage of USAA's litigation against Wells Fargo.

10   Correct?

11   A.    That's what the document says.

12   Q.    Thank you, sir.

13            MS. SMITH:   Now, if we could go, Mr. Nickels, to the

14   next heading, and I believe that heading is called Media.

15   Q.    (BY MS. SMITH)  Do you see that, Mr. Wilkinson?

16   A.    Yes, ma'am.

17   Q.    Okay.  Now, the paragraph under this heading describes --

18   and I'll give you a moment to take a look.  It describes news

19   media stories about USAA's lawsuit against Wells Fargo.  Is

20   that correct?

21   A.    I read that news media was straightforward, content

22   limited to Texas, and bank and tech media.  Yes, I read that.

23   Q.    Okay.  Well, let's read a little further down.  "Since

24   our lawsuit was filed, we've seen 65 media stories," that's

25   that flurry that Mr. -- that you and Mr. Sheasby were visiting

1    about.  Correct?

2         MR. SHEASBY:  Misstates his testimony, Your Honor.

3    This is not at all what he was speaking about he was speaking

4    about the launch of the iPhone app in 2006.  That is not

5    appropriate questioning.

6         MS. SMITH:  Your Honor, I think Mr. Sheasby will

7    have an opportunity to follow up with questions.  They were

8    talking generally about media.

9         MR. SHEASBY:  That is an inaccurate representation.

10   It's not proper.

11        THE COURT:  All right.  I'm going to allow the

12   examination of this witness as to this document.  You're

13   certainly free to revisit it on redirect, but I'm not going to

14   prevent the examination that's ongoing at this point.  He's

15   the corporate representative for the Plaintiff.  He should be

16   able to talk about a USAA document.

17        Let's proceed, Ms. Smith.

18        MS. SMITH:  Thank you, Your Honor.

19   Q.   (BY MS. SMITH)  Now, Mr. Wilkinson, this paragraph

20   indicates that USAA was actually out pitching stories to the

21   media.  Correct?

22   A.   I don't believe that that is the appropriate term.  I

23   don't read hitching anywhere in this article.

24   Q.   I apologize.  I used the word pitching, Mr. Wilkinson.  I

25   think the appropriate word would have been pitched.  So we

1    see -- I apologize, sir.

2         "Since our lawsuit was filed, we've seen 65 total media

3    stories, most of which reprinted or referenced stories

4    originally pitched by USAA."

5         Do I have that right?

6    A.   Yes, ma'am.  That's what I read as well.

7    Q.   All right.  Thank you, sir.

8         Now, there's a list of highlights underneath this

9    paragraph.

10             MS. SMITH:  If we could see those, Mr. Nickels.

11   Q.   (BY MS. SMITH)  So let's look at the first one.

12             MS. SMITH:  Thank you.  You're ahead of me.

13   Q.   (BY MS. SMITH)  Now, the headline for this story is,

14   "USAA sues Wells Fargo over remote-deposit patents."  Did I

15   read that properly?

16   A.   Yes, ma'am.

17             MS. SMITH:  Now, if -- Mr. Nickels, if we could take

18   a look at that side by side with what Mr. Sheasby showed in

19   his opening statements.  I think it's PDX 5.45.  Thank you.

20   Q.   (BY MS. SMITH)  All right.  Do you recognize that slide

21   from Mr. Sheasby's opening statement?

22   A.   Yes, ma'am, I do.

23   Q.   All right.  Mr. Sheasby didn't tell the ladies and

24   gentlemen of the jury, did he, where this story came from?

25   Did he?

```
 1    A.   I don't recall he did, ma'am.

 2    Q.   Okay.  But it's the same headline.  We're talking about

 3    highlights of that Wells Fargo litigation.  Correct?

 4    A.   They are using -- both of them use Wells Fargo and USAA

 5    in the name, yes, ma'am.

 6    Q.   And this article is just one example of USAA's strategy

 7    to help shape the external media coverage through its pitches.

 8    Correct?

 9    A.   Are you putting this in conjunction with this other slide

10    as well, ma'am?

11    Q.   Just generally Wells Fargo's attempts to shape and pitch

12    the media, sir?

13    A.   I'm sorry.  The dates don't match on these.

14    Q.   Thank you, sir.

15              MS. SMITH:  You can take I can that down, Mr.

16    Nickels.

17    Q.   (BY MS. SMITH)  Now, I'm going to show you another slide,

18    Mr. Wilkinson, from a Mr. Sheasby's opening statement.

19              MS. SMITH:  If we could see PDX 5.8, Mr. Nickels.

20    There we go.  Thank you.

21    Q.   (BY MS. SMITH)  Now, Mr. Wilkinson, you remember

22    Mr. Sheasby showed this slide in his opening statement.

23    Correct?

24    A.   Yes, ma'am, I do.

25    Q.   Okay.  And we see a date of July 2010 on that document.
```

1    Is that correct?

2    A.   Yes, ma'am.

3    Q.   And you recall that Mr. Sheasby said that this showed

4    that PNC had copied from USAA.  Correct?

5    A.   I believe he presented it as an internal document.  I

6    don't recall him saying 'copied'.

7    Q.   Well, this is just a picture--Correct?--of a layout of

8    USAA's app.  Correct?

9    A.   That would be accurate, yes, ma'am.

10   Q.   The picture doesn't show auto-capture.  Correct?

11   A.   Well, part of the auto-capture patent includes showing

12   the check, and this is showing the front of a check, so --

13   Q.   Excuse me, sir.  I apologize.

14       But it's not showing the auto-capture process, is it,

15   sir?

16   A.   No, ma'am.  It's a still image.

17   Q.   Okay.  And, in fact, there would be no way that PNC could

18   have copied a still image -- or could have looked at the still

19   image and copied auto-capture just by looking at this, could

20   it?

21   A.   That's correct, ma'am.

22   Q.   Okay.  In fact, USAA didn't even offer auto-capture as

23   part of its app back in 2010, did it?

24   A.   No, ma'am, it did not.

25   Q.   So when you were clarifying a moment ago saying, Well, it

1    might show auto-capture, there's no way in the world it could

2    be showing auto-capture in 2010 because auto-capture didn't

3    exist.  Correct?

4    A.   That's correct.

5    Q.   Now, the slide also doesn't disclose showing the user's

6    photos of the check after you take the pictures.  Correct?

7    A.   That's correct.

8    Q.   Okay.  So PNC could not have possibly copied that feature

9    by looking at this picture, could they have?

10   A.   Solely by looking at this picture, no, ma'am.

11   Q.   And PNC could not have known about USAA's patents by

12   looking at this picture.  Correct?

13   A.   Not by this single picture alone.

14   Q.   Well, why not?

15   A.   Because you're not looking at the patent disclosure page.

16   Q.   Your patents also hadn't issued yet had they, sir?

17   A.   That's correct.

18   Q.   Thank you.

19        Sir, you know what source code is?

20   A.   I do.

21   Q.   It's instructions in a computer program.  Correct?

22   A.   Roughly that's what you could define it as.

23   Q.   Okay.

24   A.   There's various types.

25   Q.   It's fair to say it defines how a computer program works?

220

1  A.   Yes, ma'am.

2  Q.   I apologize.  I apologize.

3  A.   I need to talk.  I know.  I'm sorry.

4  Q.   This photo that Mr. Sheasby showed the jurors, this

5  doesn't show the source code from USAA's app either, does it?

6  A.   No, ma'am, it does not.

7  Q.   And there's no world back in 2010 that PNC would have had

8  been able to access USAA's source code from this.  Correct?

9  A.   Not from this photo, no, ma'am.

10 Q.   Okay.  Now, you recall Mr. Sheasby mentioning in his

11 opening statement that PNC used a vendor called Mitek to

12 develop its remote deposit capture software.  Correct?

13 A.   I recall Mr. Stone talking about Mitek.  I don't recall

14 Jason talking about Mitek.

15 Q.   I apologize.

16          THE COURT:  Mr. Wilkinson, I'm going to ask you not

17 to refer to Mr. Sheasby or anybody else by just first name.

18 Please use either Mr. Sheasby or complete names, but first

19 names only are confusing in the record, so try not to use

20 first names only.

21          THE WITNESS:  Yes, sir.

22          THE COURT:  Thank you.

23          THE WITNESS:  Apologize.

24          THE COURT:  That's all right.

25 Q.   (BY MS. SMITH)  I stand corrected.  Mr. Stone.

1        Now, Mr. Wilkinson, it's fairly common in the banking

2   industry to use software from a third-party vendor.  Correct?

3   A.    Yes, ma'am, it is.

4   Q.    Okay.  Typically there is nothing wrong with using a

5   software vendor in the banking industry.  Correct?

6   A.    Yes, ma'am.

7   Q.    And USAA itself uses software from at least a dozen

8   vendors for its own check deposit systems.  Correct?

9   A.    Yes, ma'am.

10  Q.    I show you what's been marked as Defense Exhibit 1110.

11          MS. SMITH:  If we could take a look at 1110,

12  Mr. Nickels.  Thank you.

13  Q.    (BY MS. SMITH)  Do you agree what we're seeing here is an

14  internal USAA presentation, sir?

15  A.    I would assume so, yes, ma'am.

16  Q.    And do you agree that the date on this presentation is

17  December 3rd, 2007?

18  A.    That is what I read.

19  Q.    And that December 3rd, 2007 is after PNC filed its --

20  USAA filed its patent applications for its mobile check

21  imaging.  Correct?

22  A.    I'm sorry, ma'am.  Could you repeat the question?

23  Q.    Sure.  That December 3rd of 2007 date is actually after

24  USAA filed its patent applications for its mobile phone check

25  imaging patents.  Correct?  They were filed initially in 2006,

1    the first ones.

2    A.   Oh, this -- you're -- I'm sorry, ma'am.  I was confused.

3    This document was published after our filing of the patent?

4    Q.   Yes, sir.

5    A.   Yes, ma'am.

6    Q.   Thank you, sir.

7           MS. SMITH:  Now, if we could, Mr. Nickels, turn to

8    page 11.

9    Q.   (BY MS. SMITH)  And as we look at page 11,

10   Mr. Wilkinson, this actually shows the architecture for

11   USAA's check deposit system.  Correct?

12   A.   At a very high level, yes, ma'am.

13   Q.   And at a very high level we see All My Papers and Mitek

14   on there.  Do you see those names?

15   A.   Yes, ma'am, I do.

16   Q.   And do you agree that those are third-party vendors?

17   A.   Yes, ma'am, they are.

18   Q.   And one of those vendors again is the vendor we've heard

19   something about.  That's Mitek?

20   A.   Yes, ma'am.

21   Q.   And Mitek actually provided USAA with the software to

22   read the amount of the check.  Correct?

23   A.   I believe that's accurate, yes, ma'am.

24   Q.   Okay.  Because at that time USAA itself hadn't developed

25   the software to read the amount of the check.  Correct?

1   A.   I would have to ask Bharat Prasad at that point.  He

2   would have a better understanding than I would.

3   Q.   Well, is it reasonable to believe that if they're buying

4   third-party software from Mitek, that they probably don't have

5   it themselves?

6   A.   Yes, ma'am.

7   Q.   Thank you.

8        Now, when USAA uses this Mitek software from the Mitek

9   vendor, it doesn't have any insight, does it, into how that

10  third-party software actually works?

11  A.   We typically do not get the source code to understand how

12  it works.

13  Q.   And to understand how it works, you would need that

14  source code.  Correct?

15  A.   Yes, ma'am; in most cases.

16  Q.   And most vendors, frankly, they don't want you to have

17  access to their source code, do they?

18  A.   That's correct.

19  Q.   Okay.  And because USAA doesn't have access to its vendor

20  source code, it doesn't know how that software works.

21  Correct?

22  A.   Not in detail.  We wouldn't know how it works in detail,

23  but based on what it does, we could speculate.

24  Q.   Okay.  Aside from speculation, if you don't have the

25  code, you don't know exactly how the software works.  Correct?

```
1    A.    That's correct, ma'am.  We don't know exactly how it
2    works.
3    Q.    And USAA has absolutely zero problem with using vendor
4    software like that.  Correct?
5    A.    That's correct.
6    Q.    Okay.  So would you agree with me that there would be no
7    expectation by USAA that someone like PNC would know how the
8    functionality of their third-party software works?
9    A.    I would expect that their understanding would be the same
10   as ours.
11   Q.    You wouldn't hold them to a different standard, would
12   you, sir?
13   A.    No, ma'am.
14   Q.    Thank you.
15         Now, when USAA uses software from these third-party
16   vendors, you've never personally in your personal experience
17   checked to see whether the software infringes somebody else's
18   patents, have you?
19   A.    No, ma'am, I have not.
20   Q.    And you're not aware of anybody at USAA who would check
21   to see whether or not that third-party software infringes
22   someone's patents.  Correct?
23   A.    I believe our legal team does that, ma'am.
24   Q.    Okay.  Now, setting the legal team aside, you're not
25   aware of anybody at USAA that checks to see whether that
```

1   third-party software infringes someone's patents, do you?

2   A.   No, ma'am, I'm not aware.

3   Q.   Okay.  So certainly, again, you're not going to hold PNC

4   to a higher standard than USAA, are you?

5   A.   No, ma'am, I will not.

6   Q.   Now, USAA actually monitors what others in the industry

7   are doing.  Is that correct, Mr. Wilkinson?

8   A.   Yes, ma'am.  We do benchmarking.

9   Q.   Okay.  The word I heard is 'competitive analysis'.  Did I

10  get that right?

11  A.   Yes, ma'am.

12  Q.   Okay.  And this competitive analysis includes -- it

13  includes actually reports that USAA regularly receives

14  describing what others in the banking industry are doing.

15  Is that correct?

16  A.   Yes, ma'am, that's correct.

17  Q.   Okay.  And then you mentioned benchmarking, so then

18  USAA does benchmarking analysis with this data.  Correct?

19  A.   Yes, ma'am.

20  Q.   And benchmarking is a comparison between how USAA is

21  doing and how its competitors are doing.  Correct?

22  A.   Yes, ma'am.

23  Q.   And there is absolutely nothing wrong with USAA

24  performing this benchmarking analysis to see how it compares

25  to its competitors.  Correct?

226

```
 1   A.   That's correct.
 2   Q.   And, similarly, there would be absolutely nothing wrong
 3   with PNC performing its own benchmarking analysis to see how
 4   it compares with its competitors.  Correct?
 5   A.   If it is benchmarking, yes, ma'am, I agree.
 6   Q.   Now, you discussed this auto-capture feature that we're
 7   here to talk about earlier.  And you think auto-capture is an
 8   important feature.  Correct?
 9   A.   I do.
10   Q.   But you know and you'd admit that it's not necessary to
11   have auto-capture in order to deposit a check with a
12   smartphone.  Correct?
13   A.   I don't know that I would fully agree with that.
14   Q.   Well, for example, an app can have customers manually
15   capture a check image without auto-capture.  Correct?
16   A.   Yes, ma'am, but we -- a lot of our membership is disabled
17   and they require direct feedback in order to be able to
18   capture that image.
19           MS. SMITH:  May I have one moment, Your Honor?
20           THE COURT:  You may.
21                   (Pause in proceedings.)
22           MS. SMITH:  I may have to approach with a MIL, Your
23   Honor.
24       I'll move along, Your Honor.
25       Your Honor, may I approach?
```

1           THE COURT:  Approach the bench.

2           (The following was had outside the hearing of the

3      jury.)

4           THE COURT:  What's your --

5           MS. SMITH:  MIL 5C disallows them from saying that

6      their apps are designed to help individuals with disabilities

7      specifically related to war injuries, and he just said, "Many

8      of our customers" --

9           MR. SHEASBY:  He said nothing about war with

10     injuries, Your Honor.

11          THE COURT:  He said 'disabilities'; he didn't say

12     'war injuries'.  But the MIL does say 'disabilities'.

13          MR. SHEASBY:  But it is --

14          MS. SMITH:  I think we're getting pretty close to

15     the line and I'm --

16          MR. SHEASBY:  We shouldn't.  And I think Ms. Smith

17     should move on because he did not say 'war injuries'.

18          THE COURT:  Well, you know, Mr. Sheasby, that's why

19     I'm up here--to make those decisions; not to take your advice.

20          MR. SHEASBY:  I'm sorry, Your Honor.

21          THE COURT:  However, that being said, I think you

22     should move on.

23          MS. SMITH:  Okay.

24          THE COURT:  I don't think it's a gross violation of

25     the order.

228

1           MS. SMITH:  Not yet, Your Honor.  Thank you.

2           THE COURT:  We'll see.

3           MS. SMITH:  Thank you.

4           (The following was had in the presence and hearing

5           of the jury.)

6           THE COURT:  Let's proceed.

7    Q.   (BY MS. SMITH)  Well, Mr. Wilkinson, it's true that USAA

8    did not even include auto-capture when USAA first released its

9    mobile remote deposit capture app.  Correct?

10   A.   Yes, ma'am, that's correct.

11   Q.   So that would cause one to believe that it's possible to

12   do a remote deposit without auto-capture.  Correct?

13   A.   During that time period, yes, ma'am.

14   Q.   Okay.  It actually took USAA nearly four years after

15   launching Deposit@Mobile before USAA added auto-capture.

16   Correct?

17   A.   We had to wait for hardware, ma'am.

18           MS. SMITH:  Objection; non-responsive.

19           THE COURT:  Overruled.  You can re-address the

20   subject again if you choose to.

21           MS. SMITH:  Thank you, Your Honor.

22   Q.   (BY MS. SMITH)  Now, when USAA eventually released its

23   auto-capture feature, USAA members still had the option to

24   manually capture a check image.  Correct?

25   A.   Yes, ma'am, that's correct.

1    Q.   Okay.  So even after USAA added auto-capture, not every

2    USAA member used it when they were depositing a check.

3    Correct?

4    A.   That is incorrect.

5    Q.   So you're testifying under oath to the jurors that USAA

6    members still had the option to either use auto-capture or use

7    the manual capture, but they all used auto-capture.  Is that

8    your testimony, sir?

9    A.   So auto-capture just is multiple steps.  It's not just

10   the capturing the picture at the end; it's providing

11   interactive feedback.  You're still stepping through the same

12   source code branch when you're doing that.  The only thing

13   that changes at the end is whether you let the camera take the

14   picture or whether you press the button, but you're still

15   stepping through the same code.

16   Q.   And pressing the button is what we've been calling

17   'manual'.  Correct, sir?

18   A.   Yes, ma'am.

19   Q.   Okay.  And some of your members were still pressing the

20   button.  Correct?

21   A.   Yes, ma'am.

22   Q.   Okay.

23        MS. SMITH:  Mr. Nickels, if we could see DX 1376.

24   Q.   (BY MS. SMITH)  Mr. Wilkinson, would you agree that

25   DX 1376 is a document from USAA's files?  Got the USAA sign at

230

1   top right, for your benefit?

2   A.   I have no way to validate, but it does have USAA's

3   letterhead, yes, ma'am.

4   Q.   Do you have any reason to dispute that this is a USAA

5   document, sir?

6   A.   No, ma'am, I don't.

7           MS. SMITH:  Okay.  Now, looking at this document at

8   page 3, Mr. Nickels.

9   Q.   (BY MS. SMITH)  We see some meeting minutes.

10          MS. SMITH:  If we could highlight those.

11  Q.   (BY MS. SMITH)  And above the meeting minutes we see

12  'remote deposit capture'.  So, Mr. Wilkinson, this contains

13  meeting minutes concerning remote deposit capture.  Correct?

14  A.   Yes, ma'am.

15  Q.   And if we go down a little, we see it's dated August

16  21st, 2017.  Do you have any reason to dispute that date?

17  A.   No, ma'am, I do not.

18  Q.   And that's more than four years after USAA launched its

19  auto-capture feature.  Correct?

20  A.   Yes, ma'am.

21          MS. SMITH:  Mr. Nickels, if you could go to page 4.

22  (BY MS. SMITH)  Okay.  On page 4, I am going to direct your

23  attention to a paragraph that begins with "Mr. Backlund

24  spoke" --

25          MS. SMITH:  Thank you, Mr. Nickels.

1    Q.   (BY MS. SMITH)   "Mr. Backlund spoke on the deposit at

2    mobile version 3."  Do you see that, sir?

3    A.   Yes, ma'am, I read that.

4    Q.   Okay.  Now, toward the middle of that paragraph there is

5    a sentence that states, "Auto-capture usage" --

6         MS. SMITH:  Thank you, Mr. Nickels.

7    Q.   (BY MS. SMITH)  -- "has increased from 25 percent to 66

8    percent."  Do you see that?

9    A.   Yes, ma'am, I do.

10   Q.   Mr. Wilkinson, that would indicate that the prior to

11   August 17th, the date of this document, that USAA's

12   auto-capture feature was used only about 25 percent of the

13   time.  Is that correct?

14   A.   No, ma'am.

15   Q.   Well, what we know with certainty is that at some point

16   prior to 2017 auto-capture was out there and only 25 percent

17   of your members were using it.  Can you at least agree with

18   that?

19   A.   No, ma'am.  This could have been statistics from a pilot

20   that was being conducted on a different version of the

21   software.  I have no way of knowing -- I have no background of

22   this document; just what I'm reading.

23   Q.   And, sir, I apologize.  I'm asking you what you're

24   reading, and so I'm not asking you to speculate.  I'm asking

25   you if this USAA document published in 2017 after auto-capture

1    was released says that auto-capture usage was increased from

2    25 percent to 66 percent.

3    A.    That's what the document says.

4    Q.    Thank you, sir.

5          Now, even though auto-capture -- the auto-capture feature

6    was available, most of the time prior to 2017 USAA's members

7    chose not to use it.  Correct?

8    A.    I would not agree with that.

9    Q.    Is 25 percent most of the time, sir?

10   A.    Context matters, ma'am.

11   Q.    Thank you, sir.

12         Now, USAA's mobile Deposit@Mobile uses -- it uses its

13   patented inventions at issue in this case.  Correct?

14   A.    Yes, ma'am.

15   Q.    Okay.  And despite using USAA's patent invention, USAA

16   still gets complaints from members about their experience

17   using Deposit@Mobile.  Correct?

18   A.    Yes, ma'am.

19   Q.    And you're familiar with something that USAA called the

20   misery index.  Correct?

21   A.    I am familiar with that, yes, ma'am.

22   Q.    And the misery index is something that USAA uses

23   internally to define a bad experience.  Correct?

24   A.    Yes, ma'am.

25              MS. SMITH:  If we could look at DX 1450,

1    Mr. Nickels.

2    Q.   (BY MS. SMITH)  Now, I directed your attention to DX

3    1450, which is another USAA internal presentation.  Do you see

4    that document, sir?

5    A.   Yes, ma'am, I'm looking at it.

6    Q.   Thank you, sir.

7         Now, the heading on this slide refers to Deposit@Mobile

8    image capture research.  Correct?

9    A.   Yes, ma'am.

10   Q.   Okay.  And if we look down, there is some discussion of a

11   problem on the first slide.

12        MS. SMITH:  There we go.

13   Q.   (BY MS. SMITH)  And the problem described here is that --

14   let me see.  "Consistently Deposit@Mobile has been a top

15   negative mover on the misery index due to members encountering

16   multiple failed attempts to capture their checks for deposit."

17   Did I read that correctly?

18   A.   Yes, ma'am, you did.

19   Q.   Now, Mr. Wilkinson, that indicates that USAA was

20   receiving negative feedback from its members about multiple

21   failed attempts to capture their checks.  Correct?

22   A.   Yes, ma'am.

23   Q.   So even with USAA's patented technology, USAA's members

24   were complaining that they tried multiple times to deposit

25   their checks and they couldn't do it.  Correct?

1    A.    That's what I read, yes, ma'am.

2    Q.    Thank you, sir.

3          Now, --

4                MS. SMITH:  You can take that down, Mr. Nickels.

5    Q.    (BY MS. SMITH)  Mr. Wilkinson, you testified earlier

6    about USAA providing notice of its patents by listing them on

7    the USAA app or a website.  Correct?

8    A.    Yes, ma'am.

9    Q.    And that's what we call patent marking?

10   A.    Yes, ma'am.

11   Q.    But you're not the person responsible for managing the

12   publication of patent numbers on USAA's website.  Correct?

13   A.    That is correct.

14   Q.    A person responsible for that is Mr. Michael Howell.

15   Correct?

16   A.    I am not sure who is responsible for it at this point.

17   Q.    At some point Mr. Howell was responsible for it.

18   Correct?

19   A.    I don't know, ma'am.

20   Q.    Well, who's responsible for it now?

21   A.    I don't know.

22   Q.    Okay.

23   A.    I would -- based on what I recollect, it's typically a

24   process that our chief legal office does.

25   Q.    And no chief legal officer is going to come into this

235

1    trial and testify.  Correct?

2    A.   Not that I'm aware of, no, ma'am.

3    Q.   So we're not going to hear from anyone from USAA that's

4    in charge of putting those patent numbers on the website or

5    the app.  Correct?

6    A.   I believe so, yes, ma'am.

7    Q.   Okay.

8         MS. SMITH:  If we could see, Mr. Nickels, PDX 2.17.

9    Q.   (BY MS. SMITH)  I believe, Mr. Wilkinson, this is a

10   demonstrative that you showed to the jury earlier.

11   A.   That's correct.

12   Q.   And this slide shows a screenshot from USAA's code

13   database.  Correct?

14   A.   This -- yes, ma'am, this shows what they would have seen

15   on December of 2016 in the red box only.

16   Q.   Okay.  So my question was, this is a screenshot, not what

17   the consumer sees; it's what's telling you what the consumer

18   would see.  Correct?

19   A.   This is telling you what the consumer would see.

20   Q.   It's a code database.  Correct?

21   A.   It's our content management system, yes, ma'am.

22   Q.   Okay.  And that content management system is a private

23   system.  Correct?

24   A.   It is.

25   Q.   It's behind the scenes, if you will.

236

1    A.    Yes, ma'am.

2    Q.    Okay.  So users of USAA's mobile app don't have access to

3    this exact screen.  Correct?

4    A.    No, not with the release date and the effective dates.

5    They wouldn't see that, no, ma'am.

6    Q.    The public can't see this screen that you've shown the

7    jurors.  Correct?

8    A.    They would have seen what was in the red box.  It's

9    indicative of what gets published to our would-be website

10   through an automated system.

11   Q.    But all you brought us is what they can't see.  Correct?

12   They can't see what's up on the screen.  Correct?

13   A.    I'm sorry, ma'am.  I don't understand the question.

14   Q.    Well, when someone logs onto an app, they don't see the

15   metadata tags, effective release date, and things like that,

16   do they?

17   A.    No, ma'am, they do not.

18   Q.    Okay.  Now, I'm going to show you what's been marked

19   PDX 2.18.

20         MS. SMITH:  Thank you, sir.

21   Q.    (BY MS. SMITH)  Now, similarly, this slide shows another

22   screenshot from USAA.  What did -- I called it a code

23   database.  What did you call it?

24   A.    Web content management system.

25   Q.    Web content management system.  Is that correct?

1  A.   Yes, ma'am.

2  Q.   And this picture of USAA's web content management system

3  itself is not something that a consumer actually sees.

4  Correct?

5  A.   That's correct.

6  Q.   It's a back-end product that the public can't see.

7  Correct?

8  A.   That's correct.

9  Q.   Okay.  You didn't show the jury an actual image of the

10  patent disclosure that they would have seen on the screen way

11  back when.

12  A.   I don't understand the question, ma'am.

13  Q.   Well, we've agreed that the consumers can't see this;

14  it's the back-end product.  And what you didn't show the jury

15  was an actual image of the patent disclosure screen from 2016.

16  Correct?

17  A.   No, ma'am.  The -- what was in the red box -- because

18  it's a synchronized automated system, they would have seen

19  what was in that red box.  It's matched up with the content.

20  That's why it's called a content delivery manager.

21  Q.   But what you showed was back-end metadata and code that

22  they could not see.  Correct?

23  A.   The metadata around it they could not see.  That's

24  correct.

25  Q.   Now let's talk about USAA's website.

```
 1              MS. SMITH:  If we could see PDX 2.20.
 2   Q.   (BY MS. SMITH)  Is this an actual image of what a
 3   consumer or a member of the public would see when they bring
 4   up USAA's website?
 5   A.   This would be what they would have seen on August of 2020
 6   from the website itself, yes, ma'am.
 7   Q.   They would see this effective date and things of that
 8   nature down here?
 9   A.   No, ma'am; the gray part.  Of course, it wouldn't have
10   any of the yellow highlights or the red underline, but they
11   would see that top gray box.
12   Q.   Well, they certainly might see some of the content on
13   another page, but they're not seeing -- this is not exactly
14   -- what's on the screen is not exactly what they're seeing
15   when they log onto that website.  Correct?
16   A.   No, ma'am.  This is showing you that this particular
17   snapshot from our website was taken on that date.
18   Q.   Sir, did you show the jury any actual printouts from the
19   website?
20   A.   I don't understand the question, ma'am.
21   Q.   Did you go on the website -- if I log onto the website
22   and print out a page of the website, did you bring any of
23   those with you, sir?
24   A.   No, ma'am, I did not.
25   Q.   Okay.  Now, if PNC first launched its mobile remote
```

239

1    deposit capture app back in 2011, none of the asserted points

2    would have been marked on USAA's website prior to that time.

3    Correct?  Or at that time.

4    A.   I believe that to be accurate, yes.

5    Q.   Because they hadn't issued yet.  Correct?

6    A.   Yes, ma'am.

7    Q.   And if PNC added auto-capture to its app in April of

8    2016, none of the asserted patents would have been marked on

9    USAA's website at that time.  Correct?  Prior to the patents

10   issuing.

11   A.   Any particular patent you're talking about, ma'am?  Or

12   are you talking about all of them?

13   Q.   The ones in this lawsuit.

14   A.   Could you repeat the question?  I'm sorry.

15   Q.   If PNC added auto-capture to its app in April of 2016,

16   none of the asserted patents would have been marked on USAA's

17   website at that time.  Correct?

18   A.   I don't believe so.  I want to say March 2015 is when the

19   first -- when that one had issued.

20   Q.   Well, if Mr. Prasad comes and visits with these jurors

21   and says that the earliest date of alleged patent marking was

22   December 5th, 2016, do you have a reason to dispute that?

23   A.   No, ma'am, I would not.

24   Q.   All right.  Now, you understand, Mr. Wilkinson, that USAA

25   is seeking hundreds of millions of dollars in damages from

```
 1    PNC.  Correct?

 2    A.    Yes, ma'am, I'm aware.

 3    Q.    That's a lot of money.

 4    A.    It is.

 5    Q.    Okay.  Now, the jury should consider carefully before

 6    awarding that kind of money.  Correct?

 7    A.    I would if I were them, yes, ma'am.

 8    Q.    And, sir, you agree that it would be wrong for USAA to

 9    seek damages for things that are not patented.  Correct?

10    A.    I believe that's for them to decide, ma'am.

11    Q.    You personally don't think it would be wrong for USAA to

12    seek damages for things that are not patented?

13    A.    I didn't understand your question.

14    Q.    I'm sorry, sir.  You agree that it would be wrong for

15    USAA to also seek damages for things that are not patented.

16    A.    I'm sorry, ma'am.  I'm still not getting it.

17    Q.    I'll leave it at that, sir.

18          Do you agree that any -- I'll try it this way.  Do you

19    agree that any damages owed in this case should reflect the

20    actual value of USAA's patents?

21    A.    Yes, ma'am.

22    Q.    Okay.  Now, USAA didn't research out to PNC when its

23    patents issued, did it?

24    A.    Not that I'm aware of.

25    Q.    USAA, indeed, sent other banks letters to put them on
```

1    notice of USAA's patents.  Correct?

2    A.    I believe that to be accurate.

3    Q.    But PNC did not get one of those letters.  Correct?

4    A.    That's correct.

5    Q.    And I want to get the timeline here right, because the

6    first time that USAA ever contacted PNC about these patents

7    was when it filed a lawsuit on September 30th of 2020.

8    Correct?

9    A.    Without regards to media, ma'am?  Just direct letter

10   contact that you're referring to?

11   Q.    I'm referring to USAA communicating to PNC.

12   A.    Directly?

13   Q.    Yes.

14   A.    Yes, ma'am.  No, you're correct.

15   Q.    Okay.  Do you usually -- does USAA usually reach out to

16   people via the media without targeting media shaping and

17   pitching that we talked about earlier?

18   A.    That's not my area of expertise.

19   Q.    Okay.  Thank you, sir.

20        Now, it's undisputed--Correct?--that PNC changed its app

21   in May of 2021.  Correct.

22   A.    That is what I heard, yes, ma'am.

23   Q.    Okay.  And you heard Mr. Stone earlier today say that PNC

24   required, as well, all of its customers to discontinue using

25   its old app by July 27, '21.  Correct?

1   A.   I don't recall hearing that part, no, ma'am.

2   Q.   If you hear that evidence in this case, do you have any

3   reason to dispute that July 27th, 2021 date?

4   A.   Yes, ma'am, I would.

5   Q.   Okay.  Well, is USAA seeking damages in this case for

6   PNC's new app?

7   A.   No, ma'am.

8   Q.   Thank you.

9        The damage period actually ended last year when PNC

10  released a new app.  Correct?

11  A.   Yes, ma'am.

12  Q.   Okay.  It's undisputed that PNC's new app does not

13  infringe USAA's '432 Patent.  Correct?

14  A.   One more time, ma'am.

15           MR. SHEASBY:  Your Honor, I object to this.  He has

16  no access to PNC's source code.  He isn't getting access to

17  any of PNC's documents.  It's also a violation of a MIL.

18           THE COURT:  What's the relevance of this, Ms. Smith?

19           MS. SMITH:  The damage period, Your Honor.

20           MR. SHEASBY:  Your Honor, the damages period is

21  undisputed.  It's through July of 2021.  Let's move on.

22           MS. SMITH:  I'll take Mr. Sheasby's representation

23  then and move on.

24           THE COURT:  All right.  Then let's move on.

25           MS. SMITH:  Thank you.

1    Q.   (BY MS. SMITH)  Now, it's USAA's position that its

2    deposited mobile patent practices USAA's asserted patents in

3    the case.  Correct?

4    A.   Yes, ma'am.

5    Q.   But there's still customers that complain about problems

6    with USAA's Deposit@Mobile.  Correct?

7    A.   Yes, ma'am.

8    Q.   And USAA has an opportunity to review those customer

9    complaints?

10   A.   We do.

11   Q.   Keeps track of those complaints and your internal

12   documents.  Correct?

13   A.   To some extent, yes, ma'am.

14   Q.   Okay.

15        MS. SMITH:  Mr. Nickels, if we could look at

16   DX 1380, please.

17   Q.   (BY MS. SMITH)  All right.  Mr. Wilkinson, is this one of

18   those internal documents that is tracking some customer

19   complaints, sir?

20   A.   Give me a moment, ma'am, to get acclimated.

21   Q.   Okay.  Take as much time as you want.  Of course.

22   A.   This looks like it's a characterization of multiple types

23   of feedback from members; not only complaints.

24   Q.   Okay, sir.  Well, I'll be more specific.

25        MS. SMITH;  If we could look at row 2, Mr. Nickels.

244

1    Q.   (BY MS. SMITH)  It refers to camera issues with

2    Deposit@Mobile.  Do you see that, Mr. Wilkinson?

3    A.   No, ma'am, I don't.  Now I do.

4    Q.   Okay.  All right.  And the date that this data was

5    exported--see 'date exported' up there?--is June 7th, 2017.

6    Did I read that properly?

7    A.   Yes, ma'am.

8    Q.   So let's look at the customer comments in this

9    spreadsheet.

10        MS. SMITH:  If you could look at row 5, please, sir.

11   Q.   (BY MS. SMITH)  Now, in row 5, we see "The auto photo for

12   check deposits is terrible and there appears to be no way to

13   shut it off.  It's made the app go from wonderful to unusable.

14   Bring back the user option to take the photo manually."

15        Do you see that, sir?

16   A.   I do see that.

17   Q.   And, sir, this is a review of USAA's auto-capture

18   feature.  Correct?

19   A.   This is an opinion feedback.  It's -- on the far left it

20   said 'opinion feedback'.

21   Q.   Is there a difference in your mind between a review and

22   an opinion?

23   A.   Well, they may not know some of the features.  They may

24   not be properly trained on some of the aspects.  It's an

25   opinion based on what they know.

245

1    Q.   But this customer told USAA that its patented

2    auto-capture feature was terrible.  Can we agree on that?

3    A.   I don't see where they use the word 'patented', ma'am.

4    Am I missing something?

5    Q.   I apologize.  "USAA's auto-capture feature is terrible."

6    Correct?

7    A.   That's what they say, yes, ma'am.

8    Q.   Okay.  And this customer wanted there to be some way to

9    turn off the auto-capture feature.  Correct?

10   A.   Yes, ma'am.

11   Q.   Okay.

12          MS. SMITH:  If we could turn to row 70, please,

13   Mr. Nickels.

14   Q.   (BY MS. SMITH)  Mr. Wilkinson, on 70 we see another --

15   I'm sorry, sir.  Another--I'll use your words--opinion.  The

16   opinion states, "The only complaint I have is the deposit

17   mobile section.  It's absolutely terrible.  It was much better

18   before when you had the option to turn off auto-capture.

19   Currently I have to retake 7 to 8 times before it even

20   captures a check in the picture.  It's very frustrating."

21   Correct?

22   A.   That's what it says.

23   Q.   And that's a -- you could agree with me that that's a

24   negative opinion of USAA's auto-capture feature.  Correct?

25   A.   Yes, ma'am.

246

1    Q.   This member called it absolutely terrible.

2    A.   Yes, he did or she did.

3    Q.   So it's fair to say that some customers want auto-capture

4    to be disabled.  Correct?

5    A.   It's fair to say that this customer wants it off.

6    Q.   So disabling auto-capture could actually be a good thing

7    for at least one customer here.  Correct?

8    A.   From this particular person's standpoint, I would agree.

9         MS. SMITH:  Let's look at one final review,

10   Mr. Nickels, if we could, at row 33.

11   Q.   (BY MS. SMITH)  We see another opinion of the

12   auto-capture feature here.  Do you see that, Mr. Wilkinson?

13   A.   Yes, ma'am, I do.

14   Q.   And this customer said that "Auto-capture is the worst

15   feature I have ever used."  Correct?

16   A.   That is what they are stating.

17   Q.   Now, Mr. Wilkinson, USAA wants PNC to pay -- how much

18   money did we hear in opening statement?

19   A.   $300.4 million.

20   Q.   $300.4 million for a feature that USAA's own customers

21   say is the worst feature they've ever used.  Do I have that

22   correctly, sir?

23   A.   I would not classify it as a feature.

24        MS. SMITH:  I'll pass the witness.  Thank you, Your

25   Honor.

```
 1                  THE COURT:  Redirect by the Plaintiff?

 2                  MR. SHEASBY:  Yes, sir.

 3                  THE COURT:  Go ahead, counsel.

 4                         REDIRECT EXAMINATION

 5     BY MR. SHEASBY:

 6     Q.   Mr. Wilkinson, counsel for Defendant showed you three

 7     comments from your help line.  Is that correct?

 8     A.   From our opinion poll, yes, sir.

 9     Q.   Over the entire membership, what has been the impact of

10     auto-capture?

11     A.   It's typically enjoyable.  They typically love it.  Many

12     folks would not have used it without it in certain

13     circumstances.

14     Q.   Did counsel for PNC show you any analysis across all

15     membership as to the auto-capture technique?

16     A.   No, sir.  They handed-picked a few of the complaints.

17     Q.   Now, did counsel for PNC discuss the fact that the 2009

18     patent involves functionality that's used both with manual

19     capture and auto-capture?

20     A.   No, sir, they did not.

21     Q.   If you use manual capture, is it possible to achieve the

22     results that you do on your system without the 2009 patent?

23     A.   One more time, sir.  I'm sorry.

24     Q.   Without the 2009 patent, is it possible to achieve the

25     features that you do -- that results that you do on your
```

1    product even when you use manual capture?

2          MS. SMITH:  Your Honor, I object.

3          THE COURT:  State your objection.

4          MS. SMITH:  MIL violation.

5       May we approach, Your Honor?

6          THE COURT:  Approach the bench.

7          (The following was had outside the hearing of the

8          jury.)

9          MS. SMITH:  I'm working on the MIL, Your Honor, but

10   it's -- lay witnesses can't talk about claim limitations or

11   give expert testimony.

12         THE COURT:  It appears Mr. Lantier is working on the

13   MIL.

14         MS. SMITH:  I'm sorry, Your Honor.  I'm not as quick

15   as he is.

16         MR. SHEASBY:  So there is a MIL that says lay

17   witnesses can't talk about claim terms, and I'm not talking

18   about claim terms.  I'm merely eliciting that the auto -- the

19   2009 patent technology that both the manual and auto-capture

20   of USAA's system involves that underlying functionality.

21   We're not talking about claims at all.

22         THE COURT:  How does that talk about claim terms?

23         MS. SMITH:  I think it's a technical opinion, an

24   expert opinion from the witness that hasn't disclosed these

25   opinions to us.  He's a lay witness and he hasn't been

1    designated in his initial disclosures to give any type of

2    opinion like this, and he introduced himself as giving a

3    history of USAA.  We're well beyond that at this point.  So

4    it's beyond the scope of my cross as well.

5                MR. SHEASBY:  She opened up the issue of

6    auto-capture performance.  He has knowledge regarding it.  He

7    spoke about on direct the fact that auto-capture -- the

8    functionality of auto-capture is three legs, and that the

9    analysis and the feedback is used no matter whether you

10   ultimately take the picture manually or auto.

11               THE COURT:  Well, I am going to overrule the

12   objection about scope of the redirect.  Rule 611 doesn't apply

13   to redirect.

14               MS. SMITH:  Your Honor, those opinions --

15               THE COURT:  He's not going to give opinion

16   testimony, but the door's been opened to what he knows about

17   this product, and he can certainly testify within what he

18   knows.  All right?

19               MS. SMITH:  Thank you, Your Honor.

20               (The following was had in the presence and hearing

21               of the jury.)

22   Q.   (BY MR. SHEASBY) So I want to talk about 2009 patent

23   family that you spoke about.

24       What is the functionality that was created in that patent

25   family?  You talked about three things.

1    A.   Yes, sir.  So it provides direct feedback to the user

2    through an ongoing live video stream, and that video stream

3    it's giving the user indications of light, how they need to

4    hold the check, which way they need to turn it, different

5    things they need to accomplish.  And then when all the

6    conditions are correct, it will automatically capture the

7    check.  You can choose to do it manually at the end, but all

8    that interactive feedback, that video stream analysis, is

9    still inclusive.  It's still part of it.

10   Q.   Now, Ms. Smith suggested in her cross examination that

11   USAA's system was not a robust system.  Is that a fair

12   characterization?

13   A.   No, sir.  We have an extremely robust system.  We go

14   through painstaking details in making our system as robust as

15   possible, because failures are important to us.  If we can't

16   get that member's check deposited, there's a chance they may

17   not make bills, so all errors we care about.

18   Q.   And she spoke about top negative mover for mobile

19   deposit.  Why is mobile deposit a top negative mover?

20   A.   Because that's direct from members.  And, like I said, a

21   lot of our members are living paycheck-to-paycheck, and if we

22   can't get that check deposited, there's a chance they might

23   not make bills for that time period, and so anything like that

24   we take very serious.  And if they can't get the check

25   deposited at that point, the chances are it's probably not

1   going to deposit, and then we failed our member at that point.

2   They have to either mail the check in, which takes longer, or

3   they have to drive it to some other bank.

4   Q.   What does the fact that USAA tracks mobile remote deposit

5   capture as a top negative mover state about the importance of

6   the product?

7   A.   It means how much we care about that product and what it

8   means to our membership.

9            MR. SHEASBY:   Turn to DX 1149.  And let's go to page

10  15.

11  Q.   (BY MR. SHEASBY)  So this is from 2010, and this is the

12  performance result from 2010.  What percentage of time is

13  there an NCI failure for the mobile deposit system?  It's the

14  third bullet point down.

15  A.   Did you say Deposit@Mobile, sir?

16  Q.   Yes, sir.

17  A.   .02 of the total.

18  Q.   In 2010, what was the performance of the downloaded app

19  versus the website app that could use scanners or digital

20  cameras what had a better performance in terms of failures?

21  A.   The mobile app had a better opportunity to be successful.

22            MR. SHEASBY:   Let's turn to PX 1126.

23  Q.   (BY MR. SHEASBY)  Ms. Smith was showing you documentation

24  and you said, Well, you have to be careful with this

25  documentation because it may be about business development.

1    Do you remember that?

2    A.   Yes, sir.

3    Q.   I'm showing you PX 1126.  Is this a business document or

4    a technical document?

5    A.   This is a technical detailed design document.

6          MR. SHEASBY:  All right.  And let's turn to page 2

7    and let's look at the date of that.  Let's blow up that date.

8    Q.   (BY MR. SHEASBY)  The date is 8/14/2006.  Is that

9    correct?

10   A.   Yes, sir.  That is correct.

11   Q.   Is that before or after USAA filed its 2006 patent

12   application?

13   A.   That is before.

14         MR. SHEASBY:  If we turn to page 3.  Scroll down.

15   Four sorry.  Keep scrolling.  Keep scrolling.  Scroll a little

16   more.  I'm looking for that.  That's figure 1.

17         THE COURT:  Speak up a little bit, Mr. Sheasby.

18         MR. SHEASBY:  Yes, Your Honor.

19   Q.   (BY MR. SHEASBY)  How does figure 1 relate to the design

20   of USAA's system before it filed its patent application?

21   A.   In this detailed design document it indicates that we

22   could pull it from a digital camera, we would pull it from a

23   scanner, and we could pull it from a database of images.

24   Q.   So at the time of the original system in 2006, did you

25   actually witness it being used?

1    A.   Yes, sir.

2    Q.   Did you witness it being used with digital cameras?

3    A.   Yes, sir.

4         MR. SHEASBY:   I want to go to PX 1.7.  Actually

5    PX 1.31.  PDX 1.31, my opening presentation.

6    Q.   (BY MR. SHEASBY)  Counsel for PNC spoke to you about the

7    Wells Fargo litigation.  Is that correct?

8    A.   Yes, sir.

9    Q.   What patent families were at issue in the Wells Fargo

10   litigation?

11   A.   The same patent families as are in this one--the 2006 and

12   2009 families.

13   Q.   Okay.

14        MR. SHEASBY:   And let's scroll down.

15   Q.   (BY MR. SHEASBY)  This is an email to -- that a senior

16   executive at PNC received regarding that lawsuit.  Correct?

17   A.   Yes, sir, I believe so.

18   Q.   Now, you hadn't seen this document before today.

19   Correct?

20   A.   That's correct.

21   Q.   You haven't been able to see any of the PNC documents.

22   Correct?

23   A.   That's correct.

24   Q.   Counsel for Defendant PNC suggested that USAA and PNC

25   should be held to the same standard.  Do you remember that?

254

1    A.   I do remember that.

2    Q.   If you would have received notice that a system you were

3    using was being accused of infringement, what's the first step

4    you would have taken?

5    A.   I would have tried to find out what we're doing about it.

6         MR. SHEASBY:   Let's go to the next slide.

7    Q.   (BY MR. SHEASBY)   You were here in opening.   What does

8    the record show Mr. Kunz did about it?

9    A.   He did not take any steps.

10        MR. SHEASBY:   Let's go to PDX 1.9.

11   Q.   (BY MR. SHEASBY)   Counsel for PNC spoke to you about

12   benchmarking.   Do you remember that?

13   A.   Yes, sir.

14   Q.   Is saying, "Can we do this?   If so, how fast could we

15   roll it out?" benchmarking?

16   A.   No, sir.

17        MR. SHEASBY:   I pass the witness, Your Honor.

18        THE COURT:   Additional cross examination?

19        MS. SMITH:   No, Your Honor.

20        THE COURT:   All right.   You may step down,

21   Mr. Wilkinson.

22        THE WITNESS:   Thank you, sir.

23        THE COURT:   You're welcome.

24        THE WITNESS:   Do I take this book with me, sir?

25        THE COURT:   Just leave it there, please.

1      Ladies and gentlemen, it's almost 6:00.  We're going to

2  recess for the day at this juncture.  I failed to tell you

3  earlier, but I want to make it clear to you so that you can

4  coordinate with your family members and anybody else that

5  you're responsible for that I try to start each morning, once

6  the jury's selected and seated, at 8:30.  So I would like you

7  back in the morning assembled in the jury room so that we can

8  start at 8:30.  That means check the weather, that means check

9  the road conditions, that means get here a little bit before,

10 say 8:15, 8:20, and be ready to go as close to 8:30 as

11 possible.  That's not a guarantee I'll be ready for you at

12 8:30, but I'll do my very best for us to start at 8:30.

13     Also I have learned over the last 10 years that East

14 Texas jurors would rather work a longer day and be in trial

15 and be away from their homes and their businesses and their

16 families a shorter total number of days.  We could start at

17 10:00 in the morning and finish each day at 4:00, but it would

18 take us two or three weeks to try this case.  So I'm going to

19 try to keep us on a track where we're ending each day in the

20 neighborhood of 6:00, just so you can plan on that.  It's not

21 going to be exact, and if we finish a witness a few minutes

22 before 6:00, like this, we'll probably stop.  If we need to go

23 a few minutes past to finish a witness, we'll probably do

24 that.  It's not an exact science, but you need to plan and let

25 your family members and associates that you're working with

256

1    know that we're going to be going from about 8:30 to 6:00 each

2    day.

3        And then we'll be breaking for lunch with your lunch

4    brought into like we did today.  We took a longer lunch break

5    than we usually do, but that's because I had issues I needed

6    to work with counsel on, and hopefully that won't be a

7    reoccurrence every day, but keep in that schedule in mind, if

8    you will.

9        Please follow the instructions I've given you about your

10   conduct as jurors.  And first among equals on that list of

11   instructions is don't talk about this case with anybody.  And

12   like I told you, unless you live alone, somebody's going to

13   ask you what happened in federal court when you walk through

14   the door.  Just blame it on me and don't answer the question

15   and everything will be just fine.

16       Please travel safely to your homes.  Please take your

17   notebooks and leave them on the table in the jury room, and

18   I'll see you tomorrow morning ready to start at 8:30.

19       The jury's excused.

20           (Whereupon, the jury left the courtroom.)

21           THE COURT:  Counsel, is either side aware of

22   anything that needs to be raised with the Court before we

23   recess for the day?

24           MR. SHEASBY:  Nothing from Plaintiff?

25           MR. STONE:  Nothing for the Defendant, Your Honor.

257

1          THE COURT:  All right.  I'd like to see Mr. Bunt and

2    Ms. Smith in chambers.  Otherwise, we stand in recess until

3    tomorrow morning.

4          (The proceedings were concluded at 6:00 p.m.)

1       I HEREBY CERTIFY THAT THE FOREGOING IS A

2       CORRECT TRANSCRIPT FROM THE RECORD OF

3       PROCEEDINGS IN THE ABOVE-ENTITLED MATTER.

4       I FURTHER CERTIFY THAT THE TRANSCRIPT FEES

5       FORMAT COMPLY WITH THOSE PRESCRIBED BY THE

6       COURT AND THE JUDICIAL CONFERENCE OF THE

7       UNITED STATES.

8

9       S/Shawn McRoberts                 05/09/2022

10      _____DATE_____
        SHAWN McROBERTS, RMR, CRR
11      FEDERAL OFFICIAL COURT REPORTER

12

13

14

15

16

17

18

19

20

21

22

23

24

25