1                   IN THE UNITED STATES DISTRICT COURT
                   FOR THE EASTERN DISTRICT OF TEXAS
2                         MARSHALL DIVISION

3   UNITED SERVICES AUTOMOBILE      (   CAUSE NO. 2:20-CV-319-JRG
                                    )   (Lead)
4   ASSOCIATION,                    (   CAUSE NO. 2:21-CV-110-JRG
                                    )
5            Plaintiff,             (
                                    )
6   vs.                             (
                                    )
7   PNC BANK, N.A.,                 (   MAY 10, 2022
                                    )   MARSHALL, TEXAS
8            Defendant.             (   9:00 A.M.

9   _____

10

11

                              VOLUME 2
12

13

    _____
14

                        TRIAL ON THE MERITS
15

16              BEFORE THE HONORABLE RODNEY GILSTRAP
                UNITED STATES CHIEF DISTRICT JUDGE
17

    _____
18

19

20

21

22
                   SHAWN M. McROBERTS, RMR, CRR
23                    100 E. HOUSTON STREET
                     MARSHALL, TEXAS  75670
24                       (903) 237-8546
                  shawn_mcroberts@txed.uscourts.gov
25

260

```
1                    A P P E A R A N C E S

2         FOR PLAINTIFF:        IRELL & MANELLA, LLP -
                                LOS ANGELES
3                               1800 AVENUE OF THE STARS
                                Suite 900
4                               LOS ANGELES, CALIFORNIA  90067
                                (310) 277-1010
5                               BY:  MR. JASON SHEASBY

6                               IRELL & MANELLA - NEWPORT BEACH
                                840 NEWPORT CENTER DRIVE
7                               SUITE 400
                                NEWPORT BEACH, CALIFORNIA 92660
8                               (949) 760-0991
                                BY:  MS. LISA GLASSER
9                                    MS. REBECCA CARSON

10                              PARKER BUNT & AINSWORTH
                                100 E. FERGUSON, SUITE 418
11                              TYLER, TEXAS  75702
                                (903) 531-3535
12                              BY:  MR. ROBERT BUNT

13        FOR DEFENDANT:        MUNGER TOLLES & OLSON LLP - LA
                                350 S. GRANDE AVE., 50TH FLOOR
14                              LOS ANGELES, CALIFORNIA  90071
                                (213) 683-9255
15                              BY:  MR. GREG STONE

16                              WILMER CUTLER PICKERING HALE &
                                DORR - WASHINGTON DC
17                              1875 PENNSYLVANIA AVENUE NW
                                WASHINGTON, DC 20006
18                              (202) 663-6000
                                BY:  MR. GREGORY LANTIER
19
                                MUNGER TOLLES & OLSON -
20                              SAN FRANCISCO
                                560 MISSION STREET, 27TH FLOOR
21                              SAN FRANCISCO, CA 94105
                                (415) 512-4019
22                              BY:  MS. BLANCA YOUNG

23                              GILLAM & SMITH, LLP
                                303 SOUTH WASHINGTON AVENUE
24                              MARSHALL, TEXAS  75670
                                (903) 934-8450
25                              BY:  MS. MELISSA SMITH
```

OFFICIAL REPORTER:    SHAWN M. McROBERTS, RMR, CRR
                      100 E. HOUSTON STREET
                      MARSHALL, TEXAS  75670
                      (903) 923-8546

# INDEX

**EXAMINATION**

| Witness Name | Page |
|---|---|
BHARAT PRASAD
    Direct By MR. SHEASBY ............................................. 266
    Cross By MR. STONE ............................................... 309
    Redirect By MR. SHEASBY ......................................... 364
    Recross By MR. STONE ............................................ 375
    Redirect By MR. SHEASBY ......................................... 380
THOMAS CONTE, Ph.D.
    Direct By MS. GLASSER ........................................... 389
    Cross By MR. LANTIER ............................................ 467
    Redirect By MS. GLASSER ......................................... 508
ALEXANDER GOODSTEIN
    BY DEPOSITION .................................................. 516
THOMAS TREBILCOCK
    BY DEPOSITION .................................................. 530
THOMAS KUNZ
    BY DEPOSITION .................................................. 546
DAVID KENNEY
    Direct By MR. BUNT ............................................. 556

1          THE COURT:  Be seated, please.

2      Plaintiff, are you prepared to call your next witness?

3          MR. SHEASBY:  We are, Your Honor.

4          THE COURT:  All right.

5          MR. SHEASBY:  Do you want the rendition of exhibits

6  first or --

7          THE COURT:  Yes.  Let's do that.  If there are

8  representatives of both parties prepared, let's read into the

9  record those items from the list of pre-admitted exhibits used

10  during yesterday's portion of the trial.

11          MR. BUNT:  Chris Bunt for USAA.  The following

12  Plaintiff exhibits were used yesterday:  PX 097, PX 109, PX

13  157, PX 195, PX 196, PX 198, PX 594, PX 912, PX 1126, PX 1295,

14  PX 1746, PX 1377, PX 1761, and PX 1762.

15          THE COURT:  Any objections to that rendition from

16  the Defendant?

17          MS. SMITH:  No, Your Honor.

18          THE COURT:  Does Defendant have a similar rendition

19  to offer?

20          MS. SMITH:  We do, Your Honor.

21          THE COURT:  Please proceed.

22          MS. SMITH:  DX 1129, DX 1214, PX 107, DX 1110, DX

23  1376, DX 1450, and DX 1380.

24          THE COURT:  Any objection from Plaintiff?

25          MR. BUNT:  Your Honor, perhaps we -- perhaps we

1   could confer.  I show one on their list, PX 107, that's not

2   listed on our list.  I thought we had copies that matched up.

3           THE COURT:  That's the only pre-admitted exhibit you

4   have an issue with, Mr. Bunt?

5           MR. BUNT:  Yes, Your Honor.

6           THE COURT:  If we can resolve this quickly, let's do

7   it.  Otherwise, we'll take it up at the next recess.

8           MR. BUNT:  That one's okay as well, Your Honor, PX

9   107.

10          THE COURT:  All right.

11          MR. BUNT:  I did have one other comment, Your Honor.

12     Were you finished, Ms. Smith?

13          MS. SMITH:  I am, yes.

14          MR. BUNT:  I know Your Honor has a standing order on

15  sealing exhibits the week after trial, but for the record we

16  would like to note that there are a number of these that we

17  want sealed.  Is it okay if I read those in, the ones that we

18  would like sealed?  Because they are internal business records

19  of USAA.

20          THE COURT:  That's fine.

21          MR. BUNT:  Okay.  The sealed exhibits will be:  PX

22  195, PX 196, PX 198, PX 594, PX 912, PX 1126, PX 1295, PX

23  1746, and DX 1110, DX 1129, DX 1149, DX 1214, DX 1376, DX

24  1380, and DX 1450.

25          THE COURT:  Now, these are exhibits that you

1    anticipate will be used today at a time when you're going to

2    request the Court to seal the courtroom, or are you telling me

3    these have already been used?

4          MR. BUNT:  Those have already been used, Your Honor,

5    my understanding.

6          THE COURT:  All right.  Is there anything further on

7    this from the Defendant?

8          MS. SMITH:  No, Your Honor.  I have no ability

9    respectfully to know which of those are confidential and which

10   are not or if there is any dispute as to those.

11         THE COURT:  Review it, Ms. Smith, while we are

12   moving forward with the testimony.  And if after reviewing it

13   there is a lack of agreement, you can raise it with me later.

14         MS. SMITH:  I hope there is none, but thank you,

15   Your Honor.

16         THE COURT:  I do, too.  All right.  I take it

17   there's nothing else we need to discuss before I bring in the

18   jury and proceed with the next Plaintiff's witness?

19         MR. SHEASBY:  Not from Plaintiff, Your Honor.

20         MS. SMITH:  No, Your Honor.

21         THE COURT:  All right.  Let's bring in the jury,

22   please.

23         (Whereupon, the jury entered the courtroom.)

24         THE COURT:  Welcome back, ladies and gentlemen.

25   Please have a seat.  We'll continue with the Plaintiff's case

1    in chief.

2         Plaintiff, are you prepared to call your next witness?

3              MR. SHEASBY:  Plaintiff calls Mr. Bharat Prasad.

4              THE COURT:  All right.  If the witness will come

5    forward and be sworn, please.

6              (Whereupon, the oath was administered by the Clerk.)

7              THE COURT:  Please have a seat on the witness stand,

8    sir.

9              THE WITNESS:  Thank you, Your Honor.

10             THE COURT:  All right, counsel.  You may proceed

11   with direct examination.

12                     BHARAT PRASAD, SWORN,

13   testified on direct examination by Mr. Sheasby as follows:

14   Q.   Good morning, ladies and gentlemen of the jury.

15        Good morning, Mr. Prasad.

16   A.   Good morning.

17   Q.   Can you introduce yourself to the Judge Gilstrap and the

18   jury, please?

19   A.   Good morning.  My name is Bharat Prasad.

20   Q.   Mr. Prasad, why are you testifying today?

21   A.   I am one of the inventors on all the USAA patents in this

22   case.

23   Q.   Mr. Prasad, can you remind the ladies and gentlemen of

24   the jury what families of patents are at issue in this case?

25   A.   Yes.  There are two generations of patents here:  2006

1  generation, which is the '432, the '681, and the '605 Patent;

2  and we have the 2009 generation, which is the '571 Patent.

3  Q.   Mr. Prasad, what is your position at USAA?

4  A.   I'm the principal technical architect in USAA's applied

5  research division.

6  Q.   And what is applied research?  What does it do?

7  A.   We invent and we do research for commercializing

8  products.

9  Q.   Are those separate functionalities at applied research?

10 A.   Yes, they are two separately functionalities.

11 Q.   What is your educational background?

12 A.   So I have a Master's degree from Louisiana State

13 University in Baton Rouge.  I also have an engineering degree

14 from India.

15 Q.   How many United States patents have you been granted?

16 A.   I have been granted 140 patents to date.

17 Q.   And where do you live?

18 A.   I live in San Antonio, Texas.

19 Q.   Tell us about how you came to work at USAA.

20 A.   So I was recruited by USAA.  And when I saw the mission

21 of the company, serving the military and their families, I

22 knew that this was a place that I would want to work.

23 Q.   Why is that?

24 A.   So I come from a military background.  My father was a

25 commanding officer in the Indian Air Force.  He unfortunately

1    lost his life in active duty in the war against Pakistan, and

2    my mother had a really tough life trying to bring up me.  I

3    was just 20 days old.  My brother was two years old.  And she

4    struggled throughout her life for managing the finances,

5    bringing us up, and the only support she had was my

6    grandparents.

7         So when I saw USAA trying to do a lot for the military

8    members and their families, and taking care of the spouses in

9    case of the loss of the life of the person, that told me that

10   this would be an ideal place for me to apply my technical

11   skills and help the military members for our country.

12   Q.   What is the first subject you would like to talk to the

13   jury about?

14   A.   So today I would like to talk about first on the history

15   behind the 2006 patents.

16   Q.   And those are the first three patents we see on this

17   chart.

18   A.   Yes, sir.

19   Q.   What -- was there a goal that USAA focused on leading up

20   to the 2006 patents?

21   A.   Yes.  So we wanted to create a very simple way for our

22   members to deposit checks into their account.  We wanted to

23   use everyday devices they would have in their homes to be able

24   to deposit a check easily.  And we knew that devices would

25   change over the period of time, and as members bought new

1    devices, we wanted to make sure our technology could use it.

2    Q.    Why did you choose consumer devices for your system?

3    A.    We have military members who live all over the world, and

4    some of them are on ships trying to do banking and insurance

5    with USAA.  So we wanted to make sure these devices are

6    affordable, easily accessible by the members.  And also they

7    live paycheck to paycheck, and we cannot expect them to buy

8    costly equipment just to deposit a check.

9    Q.    So I'm going to show you PX 0002.  What is this?

10   A.    This is one of the patents, the '605 Patent.

11   Q.    And what family is this from?

12   A.    The 2006 generation patent.

13   Q.    I want to show you a passage from that patent.  It's

14   column 4, lines 1 through 9.  Does this passage relate to the

15   types of devices that USAA wanted to deploy in its system?

16   A.    That is correct.  It specifically prevents as imposing

17   specialized equipment such as commercial check scanners for

18   our members who could not afford them.

19   Q.    And what type of devices does it describe using -- I

20   withdraw the question.

21         It makes reference to digital cameras.  Do you see that?

22   A.    Yes, sir.

23   Q.    What is this document depicting?

24   A.    This is actually a picture of a check scanner which is a

25   commercialized check scanner.  Typically these are very costly

1    equipment something our members would not afford.

2    Q.   The patent makes reference to digital cameras.  What type

3    of digital cameras were you envisioning could be used?

4    A.   We were envisioning scanners, home -- home digital

5    cameras that they would have in their homes, and smartphones.

6    Q.   Why were you able to use everyday consumer devices in

7    your system that you created?

8    A.   We had created a downloadable application from USAA that

9    could work on these devices and take control of them.

10   Q.   Was it relevant if the camera was or was not physically

11   integrated in the same package as the general purpose

12   computer?

13   A.   No, it was not.  We envisioned both integrated and

14   separate systems to work with each other.

15   Q.   Were there devices available at the time that had a

16   general purpose computer communicatively coupled with a

17   digital camera?

18   A.   Yeah.  At that time, they were called PDAs.  Today we

19   call them smartphones, and they have a general purpose

20   computer on them.  They have a camera for capturing images,

21   and they can also talk to the network to communicate.

22   Q.   I'm now showing you Exhibit 3, which is the '681 Patent.

23   Do you recognize this?

24   A.   Yes, sir.

25   Q.   What family is this in?

```
1   A.   This is the 2006 family again.

2   Q.   And going back to the '605 Patent, I'm showing you figure

3   3 from the patent.  What does figure 3 depict in terms of your

4   research?

5   A.   So this figure --

6   Q.   Actually let me withdraw the question.

7        What does figure 3 relate in terms of your inventing?

8   A.   So this figure actually shows you what is inside a

9   smartphone, the internal components of a smartphone.  So you

10  can see that 302 which talks about processing unit, that is

11  the general purpose processor.  When you see 307 talking about

12  image capture apparatus, that is the camera and the lens.  And

13  communication channel in -- communication connections in 308,

14  that is the network connectivity.

15  Q.   Did USAA use designs -- use the designs in figure 3 in

16  its system?

17  A.   Yes.

18  Q.   What designs that are used in USAA's system are reflected

19  by figure 3?

20  A.   So we use the smartphones today for capturing a check,

21  and that is this design.

22  Q.   Do smartphones in USAA's system include general purpose

23  computers?

24  A.   Yes, they do.

25  Q.   And what smartphones are used in USAA's system today?
```

272

1    A.    Can you repeat the question?

2    Q.    Are iPhones used in USAA's system?

3    A.    Yes.  We use several types of devices, including the

4    iPhone.

5    Q.    Are Android devices used in USAA's system?

6    A.    Yes, they are.

7    Q.    Did you contemplate that the device could be directly

8    connected to the wireless network?

9    A.    We contemplated both that the device could directly

10   connect to the network and also go to the network through

11   connectivity through another system.

12   Q.    You spoke about the downloaded application that USAA

13   employed.  What did this downloaded application do?

14   A.    So the downloaded application that USAA created took over

15   the entire deposit process, and it took control of the camera

16   to capture the check image.

17   Q.    What's ran on the downloaded application?

18   A.    So there is an operating system on these devices, and the

19   operating system would run the application.

20   Q.    What types of Windows operating systems were you familiar

21   with in 2006?

22   A.    For the handheld, I'm familiar with the Windows mobile

23   operating system.  Windows also -- Microsoft also provided the

24   Windows desktop and the Windows cellular operating systems.

25   Q.    What version of the Windows mobile was in existence in

273

1    2005?

2    A.    At that time it was Windows mobile 5.0.

3    Q.    I want to show you a passage from the '605 patent, and

4    this is column 10, lines 23 to 27.  What is this passage

5    speaking about?

6    A.    It is talking about that downloaded component that USAA

7    had created, and it could take control of the image

8    generation, which is captured in the check image, and the

9    diluted process, which is the deposit process.

10   Q.    When you were commercializing your system, the system in

11   2006, did that use a downloaded application?

12   A.    Yes, it did.

13   Q.    So I'm now going to go back.  Did you prepare some

14   demonstrations of how your downloaded application works

15   currently?

16   A.    Yes, sir.

17   Q.    So yesterday the ladies and gentlemen of the jury saw a

18   presentation -- well, I'm just going to show this.  Let me go

19   back.

20         MR. SHEASBY:  Can you play that, Mr. Huynh?

21   Q.    (BY MR. SHEASBY)  So can tell us what's happening here?

22   A.    Here taking the image of the front of the check, we

23   display the check image.  Now we are taking the back of the

24   check and displaying the back of the check image.  And in the

25   end, the user gets to approve.

274

1        MR. SHEASBY:  And, Mr. Huynh, can we play this one

2  as well, please?

3        THE WITNESS:  Here again we are taking the front of

4  the check and display it.  And here we are capturing the back

5  of the check image and displaying it.

6  Q.  (BY MR. SHEASBY) Does that accurately reflect how USAA's

7  system currently operates?

8  A.  Yes, sir.

9  Q.  Now, you showed a laptop and a smartphone.  Were they

10 running the same application?

11 A.  They were running the same application, correct.

12 Q.  How is that possible?

13 A.  Because both the smartphone and the laptop internally are

14 the same configuration.

15 Q.  What do you mean, they are the same configuration?

16 A.  So the diagram that you saw earlier talking about general

17 purpose computer, a camera, and the connectivity to the

18 network, essentially the laptop and the phone are exactly the

19 same in that sense.

20 Q.  You were here in opening when PNC claimed your patent did

21 not teach the public how to build a remote deposit system

22 using a digital camera.

23 A.  Yes, sir.

24 Q.  Did you design specific techniques that ensure the system

25 works with digital cameras?

1    A.    Yes, we did.

2    Q.    Did you disclose those techniques in your patents to the

3    United States Patent Office?

4    A.    Yes, sir.

5    Q.    Can you give us an example of how USAA addressed the

6    challenges that exist with digital cameras?

7    A.    Yes.  So one of the techniques we created was to give

8    specific instructions to the user on how to position the

9    camera with respect to the check, and we give detailed

10   explanation on that.

11   Q.    And if you turn to your '681 Patent, column 7, lines 50

12   through 65, what are these?  What's here?

13   A.    So this is actually explaining how a digital photograph

14   can be captured through the digital camera.  So it's talking

15   about how to orient the check, orient the camera with respect

16   to the check, and how far and what's the angle in which to

17   position the camera to capture the check image.

18   Q.    It makes reference to graphical illustrations as well.

19   What are graphical illustrations?

20   A.    So in the earlier video, you saw some of the screens that

21   is walking the user through how to do the deposit.  Those are

22   the graphical illustrations.

23   Q.    In your first commercial system for the iPhone, did you

24   use these instructions in graphical interface?

25   A.    Yes, sir.

1    Q.   Do the instructions provided in the patent address skew

2    and warp?

3    A.   Yes, it does.  So if you look at the orientation of the

4    camera with respect to the check image, that address is

5    skewing.  And if you look at the angle of the camera and the

6    distance, it is warping.

7    Q.   Did you address -- did you design any other techniques

8    that you disclosed in the patent?

9    A.   Yes.  So we also created a technique of cropping, that

10   is, extracting the check image from the background image.

11   Q.   Did you implement the cropping algorithm in your patent

12   in your laboratory and did it work?

13   A.   We did implement it and it worked.

14   Q.   Are there other techniques you created and described in

15   the patent to ensure successful deposit with digital cameras?

16   A.   Yes.  We also created techniques for image analysis.  We

17   wanted to make sure the check is of good quality so that we

18   can deposit it.  So we created image algorithms to actually

19   look at the image's quality and accept it.

20   Q.   And does this -- when does this occur?  When does this

21   analysis occur?

22   A.   So this happens when the user is trying to deposit the

23   check in the session.  So when the user is trying to deposit

24   the check, all of these things happen at the same time.

25   Q.   Is there a phrase that's used to describe that?

277

1   A.   It is called real time.

2   Q.   And does this passage 2:33 to 55 describe those

3   techniques?

4   A.   Yes, sir, it does.

5   Q.   When did USAA create -- so we've spoken about invention.

6        I now want to speak a little bit about your commercial

7   development work.  May I do that?

8   A.   Sure.

9   Q.   When did USAA create a commercial system that could be

10  used with digital cameras?

11  A.   A commercial system for digital cameras came in 2009.

12  Q.   That was the Deposit@Mobile system?

13  A.   That is correct.

14  Q.   In 2006, did the Deposit@Home system, although it was not

15  advertised, did it work with digital cameras?

16  A.   Yes.  So 2006 was for digital cameras.  We did not

17  optimize it for digital cameras at that time.

18  Q.   I want to show you a document.  This is PX 1527.  What is

19  this document?

20  A.   This is a document Mr. Oakes is actually sending to his

21  leadership and also all of us on the core team.  He's talking

22  about how this technology is not just changing USAA, but also

23  revolutionizing the banking industry.  And he's talking about

24  how if USAA puts its mind to it, we can really do anything.

25  Q.   So USAA launched its original system that was optimized

1    for scanners but worked with digital cameras in what month and

2    year?

3    A.    In June of 20006.

4    Q.    And just to give some context, when is this email?

5    A.    This is, again, early June of 2006.

6    Q.    So it's a couple of weeks before the launch?

7    A.    A couple of weeks before the launch, yes.

8    Q.    And Mr. Chuck Oakes is the leader of applied research.

9    Is that correct?

10   A.    Yes, sir.

11   Q.    I want to show you another email.  This is PX 0041.  This

12   is another email from Mr. Oakes.  What is this email?

13   A.    This is an email Mr. Oakes is sending his leadership and

14   message that a user has actually used a webcam, a digital

15   camera, to deposit a check into USAA account.

16   Q.    So he says something at the top.  He said, "We were in

17   inventing mode last year."  Do you see that?

18   A.    Yes, I see that.

19   Q.    Is inventing mode different from commercialization mode

20   in your group?

21   A.    Yes, it is.

22   Q.    And so is this email talking about inventing mode or

23   commercializing mode?

24   A.    This email is talking about the commercial product having

25   been able to use a digital camera for an actual deposit.

1    Q.   So were you here yesterday when PNC's counsel represented

2    to the jury in opening that the original commercial system

3    couldn't work with digital cameras?

4    A.   Yes, I was.

5    Q.   Was that statement accurate or inaccurate when it was

6    made to the jury?

7    A.   It was inaccurate.

8    Q.   Do you see at the bottom of this email, Mr. Oakes says,

9    "I don't believe we are going to advertise this capability"?

10   A.   I see that.

11   Q.   Mr. Oakes knew that the system in 2006 had the capability

12   to use digital cameras?

13   A.   Yes, sir.

14   Q.   Was Mr. Oakes known to you to be a liar or to overstate

15   things?

16   A.   No, sir.

17   Q.   Now, what type of digital camera did the member use in

18   this event that occurred in October of 2006 with the

19   commercial system?

20   A.   The member used one of the cheapest available cameras

21   which was a webcam connected to his computer.

22   Q.   So you mean those little orbs that they used to give away

23   free?

24   A.   Yes, that's exactly it.

25   Q.   And did you consider it relevant that a member used such

1    a cheap digital camera?

2    A.    I did.  It told us that our system could work with any

3    type of a camera.

4    Q.    Did you provide instructions to the member so that they

5    could use it with a digital camera?

6    A.    No, sir, we did not.

7    Q.    Did you optimize it to be used with a digital camera?

8    A.    No, sir.

9    Q.    Did it work with digital cameras?

10   A.    Yes, it did.

11   Q.    I'm going to show you another document.  This is PX 1126.

12   Do you recognize this commercial document?

13   A.    Yes, sir.  It's a commercial design document USAA

14   created.

15   Q.    And what's the date of this document?

16   A.    It is dated August 14th, 2006.

17   Q.    And putting that in context, when did you file your

18   patent application?

19   A.    We filed our application for patent in October 31st,

20   2006.

21   Q.    And Mr. Oakes described that you did the invention phase

22   in what year?

23   A.    Invention phase was in 2005.

24   Q.    And I want to show you a page of this document.  This is

25   figure 3.  What does this figure depict?

1    A.   This is depicting how the system was working at that

2    time.  It could actually get images from digital cameras,

3    scanners, or any kind of image source.

4    Q.   And if you turn to the last page of the document, it

5    says, TWAIN supported scanners/digital cameras.  Do you see

6    that?

7    A.   Yes, I see.

8    Q.   Did your system support TWAIN digital cameras?

9    A.   Yes, it supported scanners and digital cameras.

10   Q.   Now, I want to show you another document.  This document

11   has a create date of 3/9/2007.  What does the create date in

12   USAA's records reflect?

13   A.   It reflects the document was created before but no later

14   than 3/9/2007.

15   Q.   And what does this document depict?

16   A.   This is a requirements document.  So this is exactly how

17   the system was working, and we are trying to extend it to the

18   Apple Macintosh system.

19   Q.   So in 2006, does this reflect how the system actually

20   worked?

21   A.   Yes, sir.

22   Q.   And it says, any scanner and any camera device.

23   A.   I see that, yes.

24   Q.   And it also says JPEG.

25   A.   Yes.

282

```
1    Q.    Was the system designed to use JPEG images?

2    A.    Yes, it was.

3    Q.    From when?

4    A.    From 2005.

5    Q.    Why did you design it for JPEG images?

6    A.    So JPEG is one of the most common standards all image

7    capture devices support whether it is home scanners, digital

8    cameras, or the smartphones.

9    Q.    What picture format were digital cameras, including those

10   in phones, generating in 2006?

11   A.    JPEGs.

12   Q.    What format do digital cameras and phones in USAA's

13   system today use?

14   A.    JPEGs.

15   Q.    Are there records confirming that the customers used this

16   original system with digital cameras?

17   A.    Yes, sir.

18   Q.    I want to turn back to the email announcing that the

19   member had used a webcam for deposit.

20         The next part of this email is from Rickey Burks.  And

21   Rickey Burks says, "We will need to determine if we should

22   allow devices other than scanners, and if so, what the

23   risks/issues will be."

24         First of all, who is Rickey Burks and what is he saying?

25   A.    Mr. Burks was our chief technology officer, and we
```

1    reported to him.  He's saying here whether we should as a

2    business allow commercializing this product to our members.

3    Q.    Did you inform Mr. Burks that you had built the system to

4    work with digital cameras?

5    A.    Yes, sir.

6    Q.    Did he allow you to continue to run it with members using

7    digital cameras?

8    A.    Yes, he did.

9    Q.    Did you advertise it?

10   A.    We did not.

11   Q.    One of the next passages in this email is from Michael

12   Luby to someone named Troy and Ryan.  So the record is clear,

13   who are Troy and Ryan?

14   A.    Mr. Ryan Barth and Mr. Troy Huth, they were from the

15   business side in banking at USAA.

16   Q.    And he's saying who should run with it.  What does he

17   mean by that?

18   A.    So Mr. Luby is saying that the business should take a

19   look at this technology we had already invented to see if we

20   can make it a commercial product for the bank.

21   Q.    At the time he was writing this email, did the business

22   know the full capabilities you had already built into the

23   system?

24   A.    No, they did not.

25   Q.    Did you inform them?

284

1    A.   Yes, we did.

2    Q.   At the end of this email or second from the end, there's

3    an email from Rickey Burks to Chuck Oakes, and he says, "We

4    need to get this into the queue and see where it falls from a

5    priority standpoint."

6         What is this discussing?

7    A.   So this is discussing the commercialization development

8    of the product.  And once the business gives the go-ahead, we

9    will put this in the queue of things that USAA was doing for

10   its members.

11   Q.   You were here in opening.  Is that correct, Mr. Prasad?

12   A.   Yes, sir.

13   Q.   Did PNC show this email to the jury in opening?  And if

14   you don't know --

15   A.   I don't remember, sir.

16   Q.   Okay.  So this is another document.  It's DX 1129.  And

17   it says, Short BRI [sic] brief?

18   A.   Correct.

19   Q.   So what is a short BRI [sic] brief?

20   A.   It's a short BIR brief.  The B-I-R stands for business

21   innovation research.  This is a business document.

22   Q.   So where we talked previously about invention and then

23   commercial research, where does this document fall in that

24   range?

25   A.   This is a commercial research part of it.

1    Q.   And what was the state of the system at the time this

2    document was being circulated amongst the business?

3    A.   The system already worked with digital cameras.

4    Q.   Was it optimized for digital cameras?

5    A.   No, it was not.

6    Q.   Were you advertising it to customers?

7    A.   No, we were not.

8    Q.   And what was the business deciding in this document?

9    A.   The business is trying to understand whether they should

10   turn this on for our members as a commercial product based on

11   the invention we had already created.

12   Q.   And by turning it on, you mean advertising and

13   optimizing?

14   A.   That is correct.

15   Q.   I'm going to show you another slide, another set of

16   slides.  So would you be involved in providing some of the

17   information and drafting parts of this document?

18   A.   Yes, sir.

19   Q.   And when it talks about enabling check deposit and

20   viability for USAA, do you remember when Mr. Stone suggested

21   in opening that that was an acknowledgement that the system

22   didn't work with digital cameras?

23   A.   I remember that.

24   Q.   Was he being accurate or inaccurate when he made that

25   representation to the jury?

1    A.    That was inaccurate.

2    Q.    What is this document actually discussing?

3    A.    This is talking about the business enablement and the

4    business viability on USAA-created product for its members for

5    depositing checks through digital cameras.

6    Q.    Now, in 2007 -- if we can go back.  In early 2007, what

7    was the business's ultimate conclusion as to whether to launch

8    a commercial product that was optimized for digital cameras in

9    mobile phones?

10   A.    So in 2007, early 2007, our members did not have those

11   type of cameras and smartphones, so we decided not to turn it

12   on at that time.

13   Q.    Did the business ultimately revisit this decision?

14   A.    So in June of 2007, when Apple released the iPhone, we

15   found that it became very popular with our membership.  And so

16   the business eventually revisited and said, let's start a

17   commercial product for the iPhone.

18   Q.    What was the member reception to the optimized version of

19   the app for the iPhone?

20   A.    After the release of the app, we found that it was the

21   number one banking app in Apple's iTunes store.

22   Q.    What is the next subject you will discuss with the ladies

23   and gentlemen of the jury?

24   A.    I would like to discuss about the inspiration behind the

25   '571 Patent.

1    Q.   How did the '571 Patent improve on the system?

2    A.   So it provided three very critical capabilities.  One was

3    the system would actually monitor the image it was seeing on

4    the video to say whether the image is of good quality and then

5    capture it.

6         It also provided corrective feedback -- continuous

7    feedback to the member to position the check and the camera

8    accordingly for success.

9         At the same time it allowed the system to automatically

10   capture the check instead of the user doing it.

11   Q.   Did your patent contemplate that the user, after

12   benefiting from the first two steps, may manually capture the

13   image?

14   A.   Yes, we contemplated that as well, yes.

15   Q.   What was the impact on the iPhone after introducing the

16   '571 Patent technology?

17   A.   If you look at three months before that technology and

18   the release of auto-capture and three months after, we saw

19   there was a nine percent drop, absolute drop, in failure

20   rates, which accounted to about 53 percent improvement.

21   Q.   Did Android show the same performance improvement

22   initially?

23   A.   Initially it did not because Google had an issue with the

24   operating system for Android phones.  And once they fixed it,

25   we saw the same kind of improvement.

1    Q.   Did you continue to expand on the '571 Patent?

2    A.   Yes, sir.  In 2016 we added ways to enable voice feedback

3    to the user to auto-capture.

4    Q.   What was the reason for adding voice feedback?

5    A.   We just wanted to make sure that our members, many of

6    whom are also visually impaired, could use the system.  We

7    wanted to make sure they could still use the capabilities that

8    auto-capture provided but hear all the feedback via audio.

9    Q.   What is the next subject you would like to discuss with

10   the jury?

11   A.   I'd like to walk them through the -- the process of the

12   patent application itself for the 2006 patents.

13   Q.   And when were the 2006 patent applications filed?

14   A.   October the 31st, 2006.

15   Q.   And what was the state of the USAA project on October

16   31st, 2006?

17   A.   It was already commercially launched to our members.

18   Q.   You have over 140 patents.  Is that correct?

19   A.   Yes, sir.

20   Q.   Other than the patents at issue in this case, can you

21   think of any other instance in which you had already launched

22   a commercial product at the time you filed the patents?

23   A.   No, sir, I can't.

24   Q.   Do you have an understanding as to why it's the general

25   practice at USAA to file patents before the commercial product

1    is launched?

2    A.   Yes, I do.

3    Q.   Why?

4    A.   There's a risk that we might lose the patents if we don't

5    file for it after commercialization soon.

6    Q.   Are you instructed by USAA to file before

7    commercialization if at all possible?  Actually I withdraw the

8    question.  Let me ask it this way.

9         Does this slide depict some of the patents in the 2006

10   family?

11   A.   Yes, it does.

12   Q.   And it lists the '136 Patent.  Is that correct?

13   A.   Yes, it does.

14   Q.   And the '638 patent.  Is that correct?

15   A.   Yes, it does.

16   Q.   And the '598 patent?

17   A.   Yes.

18   Q.   And in the three underlined patents are the patents that

19   PNC's product that's accused of infringement in this case is

20   allegedly using.  Is that correct, sir?

21   A.   I believe so.

22   Q.   Are you familiar with the history of the Patent Office's

23   examination of your 2006 patents?

24   A.   Yes, I am.

25   Q.   Did you gain this familiarity before the start of this

1    lawsuit?

2    A.   Yes.

3    Q.   Do you participate in the prosecution of your 2006 patent

4    family?

5    A.   Yes, I do.

6    Q.   Do you recognize PX 101?

7    A.   Yes.

8    Q.   What is this?

9    A.   This is the patent prosecution record for the '605

10   Patent.

11   Q.   And what is the patent prosecution record?

12   A.   So it's an official record of the U.S. Patent Office on

13   the investigations they conduct before granting a patent.

14   Q.   Did the Patent Office expressly discuss whether the

15   claims of the '605 Patent were properly disclosed in the

16   original application?

17   A.   Yes, sir.

18   Q.   What did they conclude?

19   A.   They concluded that all the claims were supported by the

20   original application we filed in October of 2006.

21   Q.   What are we seeing here on this page?  It's PX 101.302.

22   A.   This is a document we are submitting from USAA to the

23   U.S. Patent Office claiming the priority date of October 31st,

24   2006, for all the claims.

25   Q.   And if you can turn to -- I'm going to now show you

1   another slide.  What is this depicting?  This is page 251.

2   A.   This is the response coming back from the U.S. Patent

3   Office to USAA agreeing that the date of October 31st, 2006,

4   is allowed for all the claims.

5   Q.   And what does priority date -- establishing the priority

6   date mean?

7   A.   In my understanding, the establishing the priority date

8   is when the invention and the claims have been created on that

9   date.

10  Q.   Did you disclose to the Patent Office in your 2006 patent

11  family that you waited to launch the iPhone app mobile phone

12  system until 2009?

13  A.   Yes, we did.

14  Q.   When Mr. Stone told the ladies and gentlemen of the jury

15  that the Patent Office didn't know that you commercially

16  developed the iPhone app after 2006, was he being accurate or

17  inaccurate to the jury?

18  A.   That was inaccurate.

19  Q.   Do you recognize PX 100?

20  A.   Yes, I do.

21  Q.   And this is the patent prosecution record for the '681

22  Patent.  Is that correct?

23  A.   That is correct.

24  Q.   Did the Patent Office determine whether the claims in the

25  '681 Patent were properly disclosed in the 2006 application?

1    A.   Yes, they did.

2    Q.   What did they conclude?

3    A.   They concluded that all the claims of the '681 Patent

4    were supported by the original 2006 October application.

5    Q.   What's the third member of the 2006 patent family that's

6    asserted as to the PNC product at issue in this case?

7    A.   It is the '432 Patent.

8    Q.   Did USAA tell the Patent Office that it was entitled to

9    the 2000 [sic] filing date for the '432 patent?

10   A.   Yes, they did.

11   Q.   And what does PX 1173105 reflect?

12   A.   This reflects that the priority date of October 31st,

13   2006, applies to all the claims in the '432 Patent.

14   Q.   What is the next subject you would like to discuss?

15   A.   I wanted to discuss about the commercialization of our

16   products themselves at USAA.

17   Q.   Okay.  What consumer devices did you use for the original

18   prototype of your system for commercial purposes?

19   A.   So I wanted to make sure the devices used were affordable

20   by our members, they could buy it.  So I just bought a very

21   cheap, all-in-one scanner/printer from Walmart.

22   Q.   When did you demonstrate the prototype successfully?

23   A.   In October of 2005, we had the first demonstration.

24   Q.   Did you have software that rotated the image of the check

25   to identify the edges of the check at that time?

1    A.    Yes.  We had edit image functions like rotating the check

2    and extracting the check image.

3    Q.    What does PX 1622 reflect?

4    A.    This is talking about the successful deposit all the way

5    into an actual bank account.  We had this technology.

6    Q.    Were there mobile phones --

7              MR. SHEASBY:  Let's go to black now, Mr. Huynh.

8    Q.    (BY MR. SHEASBY)  Were there mobile phones that could

9    upload images using the USAA system in 2006?

10   A.    There were.  So if you looked at some of the phones at

11   the time, we had the Palm and the Nokia devices that could use

12   the same technology.

13   Q.    Were those phones the type of phones USAA members would

14   afford and have?

15   A.    They would not.

16   Q.    Were there digital cameras in mobile phones with

17   sufficient resolution in 2006 to be used in your system?

18   A.    Yes, there were.

19   Q.    Were they common?

20   A.    They were not common because, again, they are very pricey

21   phones.

22   Q.    Does mobile phones -- is the resolution of mobile phones,

23   does that create challenge over other digital cameras?

24   A.    Yes, sir.

25   Q.    Why is that?

1    A.    Typically digital cameras have higher resolution than the

2    cameras that are on the mobile phones.

3    Q.    So I want to show you a timeline.  What's this first part

4    of the timeline that's being depicted here?

5    A.    So this is the timeline of the progression of

6    Deposit@Home at the time.  So from October 2005 when we had

7    the first prototype successfully done, we opened it in June of

8    2006 for members, and then continued to improve it as a system

9    in 2007.

10   Q.    So this system was optimized for scanners.

11   A.    Yes, sir.

12   Q.    Did it work for digital cameras?

13   A.    Yes, it did.

14   Q.    If a deposit was accepted by your system, was it

15   automatic?

16   A.    It was fully automatic the way the system worked in

17   accepting a deposit into an account.

18   Q.    After a deposit was accepted, was there sometimes manual

19   adjustment when you were forwarding the image to the clearing

20   bank?

21   A.    Yes.  So this is called settlement.  So we would take in

22   some cases where the members used very cheap devices, cheap

23   cameras and cheap scanners, we did see there were situations

24   where we had to manually adjust the check for clearance and

25   settlement.

1  Q.   Did the user device on your system perform image quality

2  analysis?

3  A.   Yes.

4  Q.   Did the user device in your system perform error

5  checking?

6  A.   Yes, it did.

7  Q.   Can you describe how error checking was performed?

8  A.   So this error checking was performed in concert with the

9  server systems.  And the server would send back the responses

10  to the device, and the device would send it back to the user.

11  Q.   Why did you have the server assist the user?

12  A.   So that is mainly to make sure the process is very

13  efficient, and also it's a better member experience for the

14  user.

15  Q.   Did you show images of the check to the member in your

16  system?

17  A.   Yes, we did.

18  Q.   In your system was there any substantial impact based on

19  the order in which you showed the images after capture?

20  A.   Whether we showed the images one after another or both at

21  the end, we did not have any material impact.  What was

22  important was the member saw the images, they approved it for

23  deposit.

24  Q.   After you launched the Deposit@Home system in 2006, which

25  was a web-based access, what was the next commercial product

1    you developed?

2    A.   So after we did the 2006 release, we continued to improve

3    the system in 2007.

4    Q.   And does PX 1506 reflect nose improvements?

5    A.   Yes, it does.

6    Q.   And when were these improvements to the web-based system

7    completed?

8    A.   Before the third quarter of 2007, we had completed this.

9    Q.   After the completion of these improvements, where did you

10   turn next?

11   A.   So we completely focused our efforts on commercializing

12   the product for iPhone and Android systems.

13   Q.   When was iPhone released publicly?

14   A.   The iPhone app itself was released in 2009 by USAA.

15   Q.   When was the iPhone device released publicly?

16   A.   The iPhone device itself was in June of 2007.

17   Q.   Could you have concepted the iPhone app before June of

18   2007 if the device didn't exist?

19   A.   No, sir, we could not.

20   Q.   Now, what did you call the download -- the optimized

21   download app you created for iPhone and Android?

22   A.   It was called Deposit@Mobile.

23   Q.   Once you received -- how did the speed of Deposit@Mobile

24   commercial development compare to other commercial projects

25   that you worked on?

297

1    A.    So other commercial projects that I have worked on at

2    USAA, compared to that this technology was on a fast track.

3    Q.    Can you give us some examples of how Deposit@Mobile

4    commercial development the optimized app compares to other

5    projects that you worked on at USAA?

6    A.    Yes.  So one of the first projects I worked on when I

7    joined at USAA was to allow our members to pay bills through

8    our website.  Just called the bill pay system.  And that took

9    about three to four years for actual release.

10         I also worked on another effort where we allowed parents

11   to monitor their teenagers on how to drive using vehicle data,

12   and this again was a multi-year project.

13   Q.    Do you recognize PX 1409?

14   A.    Yes, I do.

15   Q.    And I'm going to show you a page of this document.  You

16   list the iPhone as one of four cameras.  Why are you treating

17   the iPhone as a camera?

18   A.    So among all the other features it provides, an iPhone is

19   a digital camera.

20   Q.    Now, yesterday Mr. Stone showed a passage to the jury

21   which says MICR ink was read only about 25 percent of the

22   cases.  Do you see that?

23   A.    I do see that.

24   Q.    And he represented that that reflected the capabilities

25   of the system in December 2007.  Do you remember that?

1    A.    Yes, I do.

2    Q.    Was he being accurate or inaccurate in his representation

3    to the jury?

4    A.    That was inaccurate.

5    Q.    How do you know it was inaccurate?

6    A.    So if you turn to the next slide, it talks about what

7    implements we did with our vendor.  Our vendor there is All My

8    Papers, and we made them to change their software to fit our

9    invention, after which we had a hundred percent success on

10   iPhone images.

11   Q.    So at the time of this presentation that Mr. Stone

12   showed, what was the success rate you were getting on MICR

13   reading?

14   A.    A hundred percent.

15   Q.    Now, did you give All My Papers the list of the specific

16   criteria you wanted them to adjust their system so it would

17   work in yours?

18   A.    Yes.

19   Q.    Was it a detailed list?

20   A.    It was not a detailed list.

21   Q.    I want to show you next another example, which

22   is -- exhibit, which is PX 1411.  So what is this document?

23   A.    This is a document Mr. Rey Medina is actually emailing

24   about the testing he is doing with the iPhone and other

25   devices.

1    Q.    And who is Rey Medina?

2    A.    Mr. Medina is a colleague of mine, and he's also a

3    co-inventor on some of other patents.

4    Q.    Does this reflect the devices you were implementing or

5    thinking about implementing commercially in June of 2008?

6    A.    Yes, it does.

7    Q.    And it lists the iPhone and the Razr R2.  Is that

8    correct?

9    A.    It does.

10   Q.    What was the overall success rate in these commercial

11   prototype runs?

12   A.    As it is shown, we had success of 96.3 percent.

13   Q.    And what was the iPhone percent rate?

14   A.    100 percent.

15   Q.    And the Razr R2, what is that?

16   A.    So Razr R2 was a Motorola phone, flip phone, that was

17   popular at the time.  It had a low resolution camera, just

18   about 2 megapixels.

19   Q.    And what was the iPhone's resolution?  Was it a low

20   resolution camera?

21   A.    The first generation of iPhone was a low resolution

22   camera of just 2 megapixels at the time.

23   Q.    I'm showing you the next document, which is PX 1139.

24   What is this document?

25   A.    This is a business -- the state of Deposit@Mobile and

1    presented to the business executives in December of 2008.

2    Q.   Is this another type of those documents where you tell

3    them -- I withdraw the question.  Let me ask it this way.

4         What does page 27 of 1139 say?

5    A.   So this is talking about the results we are seeing after

6    real-time integration from the iPhone app all the way to the

7    back end, and we are seeing success rates of 82 to 94 percent

8    on a lot of testing we had done there.

9              MR. SHEASBY:  Your Honor, at this time we have to

10   seal the court.

11             THE COURT:  All right.  Based on counsel's request

12   and to protect confidential information, I'll order the

13   courtroom sealed.

14        All persons present not subject to the protective order

15   in this case should excuse themselves and remain outside the

16   courtroom until the courtroom is reopened and unsealed.

17                       (Courtroom sealed.)

18             THE COURT:  Counsel, let me know when you've

19   completed any confidential information so I can unseal the

20   courtroom.

21             MR. SHEASBY:  Thank you, Your Honor.

22             MS. SMITH:  Excuse me, Your Honor.  May I approach

23   Mr. Sheasby?

24                       (Pause in proceedings.)

25             MS. SMITH:  I apologize.

301

```
 1              THE COURT:  All right.  We're sealed.  Let's

 2   proceed.

 3   Q.   (BY MR. SHEASBY)  Have you heard of a company called

 4   Mitek?

 5   A.   Yes, I have.

 6              MR. SHEASBY:  Let's go dark, actually.

 7   Q.   (BY MR. SHEASBY)  What is Mitek?

 8   A.   Mitek was a company that sold old software for desktop

 9   systems that would actually talk to commercial check scanners

10   to be able to capture check images.

11   Q.   Was Mitek the only provider of this type of software?

12   A.   No.  There were many on the market at the time.

13              MR. STONE:  Your Honor, may I object to this line of

14   questioning on the grounds it is not relevant?

15              THE COURT:  Restate your objection, Mr. Stone?

16              MR. STONE:  Yes.  It's not relevant in light of the

17   claims that are being tried and the defenses that are being

18   tried.  This is evidence that is not relevant.

19              THE COURT:  What's the Plaintiff's response?

20              MR. SHEASBY:  This is directly relevant.  There was

21   extensive discussion about Mitek yesterday and that Mitek

22   reflected a massive portion of the value of this product.  And

23   I'm going to elicit from the witness the accuracy or

24   inaccuracy of that representation.

25              MR. STONE:  That's not the legal issue that's raised
```

302

1    at all, Your Honor, I think we laid out previously.

2              THE COURT:  Relevance is a relatively low bar.  I'm

3    going to overrule the objection.

4              MR. STONE:  Thank you, Your Honor.

5    Q.   (BY MR. SHEASBY)  So you purchased software from Mitek

6    that was used with commercial check scanners.  Is that

7    correct?

8    A.   We did purchase software components from them, yes.

9    Q.   And of the -- what was the entire code base of your

10   original Deposit@Home system?

11   A.   It ran into millions of lines.

12   Q.   And how many lines of code was this Mitek software that

13   you purchased?

14   A.   Around a hundred lines.

15   Q.   What did you do with the Mitek software?

16   A.   So we just used the -- the Mitek software that we got

17   just to read the dollar amount on the check.

18   Q.   Did you have to instruct Mitek how to modify their

19   software?

20   A.   Yes, we did.

21   Q.   What did you have them modify it in order to do?

22   A.   We had to teach them the real-time system that we had

23   built.  And Mitek software did not work with real-time systems

24   so they had to modify their software to make it work.

25   Q.   And is PX 1945 an example of Mr. Medina teaching Mitek

1    about the errors and problems in their software?

2    A.    Yes, it is.

3    Q.    And who is Louise Stellar?

4    A.    Ms. Louise Stellar was the Mitek account representative

5    that worked with USAA at that time.

6    Q.    Did Mitek see portions of your code as part of this

7    process?

8    A.    Yes, they did.

9    Q.    Portions of your source code?

10   A.    Yes.

11   Q.    Who at Mitek saw your source code?

12   A.    It was actually the Mitek support staff, specifically on

13   Carvat from the team.

14   Q.    And does PX 508 reflect the type of information

15   Mr. Carvat would be provided about the system?

16   A.    Yes, it does.

17   Q.    And does PX 1925, does this reflect that Mitek was

18   invited onto USAA's campus to be provided an overview of your

19   system?

20   A.    That's correct.

21   Q.    Based on the examination of your application, can a

22   skilled engineer tell a substantial amount about how the

23   program was operating without access to source code?

24   A.    Yes.

25               MR. STONE:  Objection, Your Honor.

```
 1                THE COURT:  State your objection.

 2                MR. STONE:  This is improper subject of expert

 3     testimony and not for a lay witness.

 4                THE COURT:  It calls for an opinion.  This witness

 5     is not all qualified as an expert.  I'll sustain the

 6     objection.

 7                MR. SHEASBY:  Your Honor, I was asking about his

 8     software program.

 9                THE COURT:  You asked for his opinion as to -- it

10     may be his software program, but he's still not entitled to

11     offer an opinion.

12                MR. SHEASBY:  I'm happy to move on, Your Honor.

13                MR. STONE:  May the jury be instructed to disregard

14     the answer?

15                THE COURT:  I think the jury understands if I

16     sustain your objection, they are to disregard the question and

17     the answer.  Those are part of my earlier instructions.

18                MR. STONE:  Thank you, Your Honor.

19     Q.   (BY MR. SHEASBY)  What's the next issue -- did you

20     continue to have -- provide Mitek with information about your

21     system after the date of this document?

22     A.   Yes, we did.  We had to work with them continuously to

23     make those images work because it was not working for us.

24     Q.   What is the next issue that you will discuss?

25     A.   I'd like to discuss a bit more about what is behind the
```

1    '571 Patent family.

2    Q.    And remind us again what are the three legs of the '571

3    Patent.

4    A.    So it's autonomous monitoring of the image before

5    capturing for the quality itself; the continuous feedback it

6    gives to the user in terms of correcting for a successful

7    check capture; and, finally, the system automatically

8    capturing the check instead of the user capturing it.

9    Q.    I'm showing you PX 1138.  Do you recognize this document?

10   A.    Yes, I do.

11   Q.    What is this document?

12   A.    So this talks -- this is an invention form I had created

13   which contains all of the elements that went into the '571

14   Patent.  It talks about the system monitoring the image prior

15   to capture.  It talks about queueing the user on how to

16   instruct them to capture a successful image.  It also talks

17   about the video stream we analyze before capturing, and

18   automatically the software capturing it once it finds it's a

19   good image.

20   Q.    Were there devices in the market you could have used this

21   technology with in 2008?

22   A.    Yes.

23   Q.    What were they?

24   A.    At that time we used the Windows mobile phone to where we

25   were able to test this out.

1   Q.   Did the Windows mobile phone have access to live video

2   stream?

3   A.   Yes, it did.

4   Q.   Was it sufficiently popular with your members to support

5   a launch?

6   A.   No, it was not.

7   Q.   Do you provide an example in your patent of software that

8   can tap into a live video stream?

9   A.   Yes.  So the specification in this patent teaches how you

10  can use the Windows mobile phone from Microsoft Corporation

11  that had an API that allowed us to tap into the video stream.

12  Q.   What's an API?

13  A.   API is a piece of software that's running on the

14  operating system that we can use.

15  Q.   Do these same livestream APIs exist in Android and

16  iPhones now?

17  A.   Yes, they do.

18  Q.   Do you use these same Android and iPhone APIs for your

19  product?

20  A.   Yes, sir.

21  Q.   Did USAA build a commercial prototype of the system?

22  A.   Yes.

23  Q.   About how many months did it take to build the commercial

24  prototype?

25  A.   The app itself took about three months, but we had the

1    commercial prototype bulk of it less than a year.

2             MR. STONE:  Your Honor, might I inquire whether we

3    are done with the issues that needed to be sealed?

4             MR. SHEASBY:  We have one more.

5             THE COURT:  I asked counsel to let me know when he

6    covered the sealed or the information that needed to be

7    sealed.

8             MR. STONE:  Thank you, Your Honor.

9             THE COURT:  Let's continue.

10   Q.   (BY MR. SHEASBY)  Why did you wait until 2012 and 2013 to

11   build the commercial app?

12   A.   So we wanted to make sure the video camera has the right

13   resolution, and iPhone did not have that until 2009.

14        And also USAA Bank was observing the kind of phones our

15   members had, and we did not find it optimal until 2012, 2013,

16   to release this product to our members.

17   Q.   In the commercial development of a product, given the

18   large number of phones, was there a lot of testing that needed

19   to occur?

20   A.   For the commercial launch itself, we tested a bit because

21   our members carried various versions and various types of

22   phones, and we wanted to make sure it would work with all

23   those.

24   Q.   And by saying a bit, you actually had to test for all of

25   them.

```
1    A.    We had to test for all of them, yes.

2    Q.    Are you finished launching consumer remote deposit

3    capture products?

4    A.    No, we are not.  This is a journey for us, so we are

5    looking at newer devices.  For example, if Apple releases the

6    smart glasses, we are planning to support this for smart

7    glasses.

8    Q.    What is your views of the importance of your consumer

9    remote deposit capture?

10            THE COURT:  Mr. Sheasby, slow down, please.

11            MR. SHEASBY:  Yes, Your Honor.

12            MR. STONE:  Your Honor, I'd ask again, there's

13   nothing about this that is confidential and we should lift the

14   sealing of the courtroom at this time.

15            MR. SHEASBY:  Your Honor, this is my last question.

16            THE COURT:  Ask your question.

17   Q.    (BY MR. SHEASBY)  What is your views of the importance of

18   the consumer remote deposit capture technology that you

19   created?

20   A.    So working with Mr. Oakes and Mr. Medina, I have -- we

21   have collectively around 260 patents, but we consider this as

22   the most important work we have done in our careers at USAA.

23   Q.    Thank you, Mr. Prasad.

24            MR. SHEASBY:  I pass the witness, Your Honor.

25            THE COURT:  All right.
```

1                 THE WITNESS:  Thank you.

2                 THE COURT:  Mr. Stone, is there a need to maintain

3     the seal on the courtroom for the beginning of your

4     cross-examination?

5                 MR. STONE:  There is not.  May we distribute

6     binders, please?

7                 THE COURT:  You may distribute the binders.

8         I'll order the courtroom reopened and unsealed.  I'll

9     direct the Court Security Officer to invite the public to

10    return.

11                    (Courtroom unsealed.)

12                 THE COURT:  Mr. Stone, you may proceed with

13    cross-examination.

14                 MR. STONE:  Thank you, Your Honor.

15                       CROSS-EXAMINATION

16    BY MR. STONE:

17    Q.   Good morning, Mr. Prasad.

18    A.   Good morning.

19    Q.   We never met before, have we?

20    A.   No, sir.

21    Q.   The videos that you showed us, the demonstration videos,

22    those were not prepared in 2006, were they?

23    A.   The videos were prepared just before coming here, yes.

24    Q.   And you didn't prepare these videos using products that

25    existed in 2006, did you?

```
 1    A.    They are the current versions of those products.

 2    Q.    And the phone you used was an iPhone?

 3    A.    It was a Samsung Android phone.

 4    Q.    And then the laptop that you used was a Samsung 2 in 1?

 5    A.    Yes, sir.

 6    Q.    And the Samsung phone of that version did not exist in

 7    2006, did it?

 8    A.    I'm not sure whether Samsung had a laptop at the time.

 9    Q.    I'm sorry.  I was asking you back about the phone.

10    Samsung didn't have a smartphone in 2006, did it?

11    A.    Not Samsung.  Correct.

12    Q.    It had function phones.  Correct?

13    A.    It did, yes.

14    Q.    And it didn't have a 2-in-1 laptop in 2006, did it?

15    A.    I'm not sure, sir.

16    Q.    Did patents that you and Mr. Oakes and Mr. Medina have --

17    I think you told us they totaled 262?

18    A.    260 patents, about that, yeah.

19    Q.    And how many of those relate to remote deposit?

20    A.    I'm not exactly sure, sir.

21    Q.    Can you give me an estimate?

22    A.    Maybe around half of it, yeah.

23    Q.    And each of those patents, in your view, Mr. Prasad, is

24    valuable.  Correct?

25    A.    Yes, sir.
```

311

```
1    Q.    Each of those is worth money to USAA.  Correct?

2    A.    I wouldn't be able to put a number or money around it,

3    no.

4    Q.    Okay.  But you would agree each of them is valuable.

5    A.    It is a value, yes.

6    Q.    And each of them in your view provides a different aspect

7    of some important feature that is part of remote deposit

8    capture.  Correct?

9    A.    I cannot answer that.  Sorry.

10   Q.    Well, each of them covers something different, don't

11   they?

12   A.    They might, yes.

13   Q.    You can't get more than one patent on the same thing, can

14   you?

15   A.    You can have the same application leading to multiple

16   patents.  Correct.

17   Q.    But each of the patents has to cover -- each of the

18   claims has to cover something different and distinct.

19   Correct?

20   A.    That's my understanding.

21   Q.    Because you've done a number of patent applications.

22   Correct?

23   A.    Correct.

24   Q.    And you're familiar with the concept of double-patenting

25   which is not permitted.  Correct?
```

1    A.   I'm not very familiar, but --

2              MR. SHEASBY:  Your Honor, the issue of

3    double-patenting has no relevance whatsoever to this case and

4    it should not be discussed at all.

5              THE COURT:  I'll overrule that.  It's a

6    straightforward question.  We're not going to go further into

7    it, but I'm not going to exclude that one question.

8              MR. STONE:  Thank you, Your Honor.  I don't intend

9    to go further than that.

10             THE COURT:  I assumed that.  Let's proceed, Mr.

11   Stone.

12   Q.   (BY MR. STONE)  Do you have the question in mind, Mr.

13   Prasad?

14   A.   Yes, sir.

15   Q.   Okay.  Can you answer it?

16   A.   Yes.  So I understand that each patent has its own level

17   of unique claims for validity, yeah.

18   Q.   And the claims at issue in this case, they were filed

19   when?  The actual claims at issue in this case were filed

20   when?

21   A.   Which patent, sir?

22   Q.   Let's take the '432 first.  When were those claims at

23   issue in this case filed?

24   A.   I believe the claims for the '432 was 2015.  I'm not

25   sure.  I have to look through the claims.

313

```
1    Q.   Let's just look at it on the screen.

2              MR. STONE:  Let's bring up DX 29.

3    Q.   (BY MR. STONE)  This is the '605.  We'll just do this one

4    first if you don't mind.

5              MR. STONE:  Not the date of the patent, please.  If

6    we could go down to where it says, filed.

7    Q.   (BY MR. STONE)  The claims of the '605 Patent that are at

8    issue in this case were filed in July of 2017.  Correct?

9    A.   Yes, sir.

10             MR. STONE:  Let's go to DX 30 if we could.

11   Q.   (BY MR. STONE)  This is the '681 Patent.

12             MR. STONE:  And if you could go down and show --

13   Q.   (BY MR. STONE)  -- for DX 30, the claims there were filed

14   in July 28th of 2017.  Correct?

15   A.   Yes, sir.

16             MR. STONE:  And then if we could go to DX 32, which

17   I think will be the '432 Patent, if we can show when the

18   claims were filed there of the '432 Patent.

19   Q.   (BY MR. STONE)  They were filed in May 18th of 2018.

20   Correct?

21   A.   That is correct.

22   Q.   Now, you told us about the success rates or failure rates

23   that USAA had when they introduced auto-capture to their

24   members.  Do you remember that testimony?

25   A.   Yes, I do.
```

314

```
1    Q.   And you put up a chart which I think I was given it as
2    your demonstrative PDX 18-28, but it's possible it got
3    renumbered.
4             MR. STONE:   But let's try to bring up what I have as
5    PDX 18-28.
6    Q.   (BY MR. STONE)   This is the chart that you showed us
7    earlier during your examination.   Correct?
8    A.   Yes, sir.
9    Q.   And to prepare this chart, you looked at a database that
10   is PX 913.   Correct?
11   A.   I'm not sure what database that is, sir.
12   Q.   Oh, you went and looked at a database to get the
13   information for this chart, didn't you?
14   A.   Yeah.   This is -- this chart is based on the failure
15   rates we were seeing at the time prior to auto-capture and
16   what's in green is after auto-capture.
17   Q.   And I understand.   But to get the data to put on the
18   chart that you showed us, you went and looked at the data,
19   didn't you?
20   A.   Not me personally.
21   Q.   Well, somebody gave you this and you didn't check to see
22   if it was right?
23   A.   This is a document from USAA, so it is definitely -- has
24   been verified.
25   Q.   The chart was prepared by USAA?
```

315

```
 1   A.   Yes.

 2   Q.   But the data is in an Excel spreadsheet.  Correct?

 3   A.   Correct.

 4   Q.   And you didn't go look at that data.

 5   A.   I'm talking to the chart here, yes.

 6   Q.   Okay.  But the data shows that if you -- the data shows

 7   that before auto-capture was released, the first capture rate

 8   success was on the uptick, didn't it?

 9   A.   The success rates, yes.

10   Q.   Was already on the uptick before auto-capture was

11   released?

12   A.   Correct.

13   Q.   And then after auto-capture was released and that uptick

14   continued, then the success rate dropped off again, didn't it?

15   A.   Correct.

16   Q.   So if you look at a time period longer than three months

17   on each side, what you'll see is you happen to release

18   auto-capture at a point in time when things were on the

19   upswing and then they came back down on the downswing, didn't

20   they?

21   A.   They came back down for different reasons I'm not sure,

22   but yes.  This is the failure rate chart, though.

23   Q.   Well, but your -- your database doesn't have failure

24   rates.  It just has success rates.  Right?

25   A.   Yes.
```

316

1    Q.    Okay.  So can we agree then that if you go back in time

2    to an earlier point in time, success rates were already going

3    up.  And if you go out in time a little bit past your three

4    months, success rates dropped back off again.  That's true,

5    isn't it?

6    A.    I'm not sure.  I have to look at the data for that.

7    Q.    You haven't looked at that.

8    A.    No.

9    Q.    Well, let me show you DX 3.14.  DDX 3.14.  Now, this

10   shows a few more months on each side of the release date for

11   the auto-capture for the iPhone, which was May of 2013.

12   Correct?

13   A.    Correct.

14   Q.    And you see that on the left-hand side on this chart, the

15   iPhone rate is high, and then it drops off, and then it's

16   starting back up.  Do you see that?

17   A.    Yes.

18   Q.    And then it goes up, and then it drops back down again.

19   Do you see that?

20   A.    Yes.

21   Q.    So if we look at the number for May of 2012 and April of

22   2014, those are essentially at the same success rates.

23   Correct?

24   A.    Approximately, yes.

25   Q.    Okay.  Thank you.

317

 1          MR. STONE:  We can take that down.

 2    Q.   (BY MR. STONE)  Now, in 2006, what USAA had was a system

 3    they called Deposit@Home.  Correct?

 4    A.   Yes, sir.

 5    Q.   And Deposit@Home used scanners, didn't it?

 6    A.   In the commercial system, we had optimized it for

 7    scanners, yes.

 8    Q.   Okay.  And let me ask you about the laboratory.  You work

 9    at a laboratory.  Correct?

10    A.   Correct.

11    Q.   And in your research laboratory, prior to October 31st of

12    2006, no one at USAA had used a digital camera to take a check

13    image that was then deposited through your system

14    Deposit@Home, had they?

15    A.   That is correct.

16    Q.   And nobody in your research laboratory at USAA as of

17    October 31st, 2006, had used a smartphone to take a picture of

18    a check image and deposited it using Deposit@Home, had they?

19    A.   That is correct.

20    Q.   And they hadn't even done it using a feature phone, had

21    they?

22    A.   That is correct.

23    Q.   Prior to October 31st of 2006, in the USAA research

24    laboratory, nobody had used anything other than a scanner to

25    get a check image to deposit through your system, had they?

318

1    A.    At the laboratories, that is correct.

2    Q.    Okay.  Now, in October of 2006, one of your members who

3    was using Deposit@Home, instead of plugging it into their

4    scanner, plugged it into a webcam.  Correct?

5    A.    That is correct.

6    Q.    And it's easy enough, using that TWAIN driver, to send

7    photographs over the internet to your friends, for example,

8    right from your digital camera onto your laptop over the

9    internet.  Correct?

10   A.    I'm not sure what friends -- I'm not sure about the

11   friends' part.

12   Q.    Take the friends' part out.  Take the friends' part out.

13   That was unnecessary.

14        It was easy, using a TWAIN driver, to plug your digital

15   camera into your laptop and download the pictures onto your

16   laptop in 2006.

17   A.    You could download it, too, if you wanted to, yes.

18   Q.    Okay.  And the one member who did this before you filed

19   your patent application is one member -- they used a webcam.

20   A.    Yes.

21   Q.    And the image that came through required manual

22   adjustment.  Correct?

23   A.    I'm not aware of that, no.

24   Q.    You looked at Exhibit DX 1124 earlier, didn't you, the

25   Chuck Oakes' email stream?

1    A.   Yes, sir.

2    Q.   It says it needed manual adjustment, doesn't it?

3    A.   I'm not aware of that.

4    Q.   Well, let's take a look at DX 1124.

5              MR. STONE:  Let's go down one page, if we can.

6    Q.   (BY MR. STONE)  If you look at the second paragraph from

7    the top --

8              MR. STONE:  Could we blow that up, the one that says

9    also?

10   Q.   (BY MR. STONE)  It says the image was usable, but it did

11   take some tweaking on the back end.  Did I read that

12   correctly?

13   A.   Yes, you did.

14   Q.   And then it says, so it didn't go through the flow

15   smoothly.  Is that what it says next?

16   A.   Yes, it does.

17   Q.   And by flow smoothly, you understand that to mean the

18   process by which the image is ultimately sent for deposit.

19   Correct?

20   A.   That is correct.

21   Q.   Because an image to be sent for deposit has to meet

22   certain criteria, doesn't it not?

23   A.   Yes, it does.

24   Q.   And you wanted a system that worked in real time.  Right?

25   A.   Correct.

320

```
1   Q.   So if the images didn't meet the criteria when they came

2   through, the process would be slowed down.

3   A.   It depends on what --

4   Q.   You couldn't immediately tell the customer, we've

5   deposited this to your account.  Instead, you have to wait for

6   a human to look at the image, adjust it, and decide if it can

7   be deposited.  Correct?

8   A.   That is not correct.

9   Q.   Well, let me ask you this.  What it says here is, in the

10  next sentence, "We would need to find a way to overcome the

11  manual image adjustment."  Manual image adjustment refers to a

12  human being doing it manually.  Correct?

13  A.   Yes.

14  Q.   Okay.  And so with this one image that came in in 2006,

15  it required manual adjustment.

16  A.   Correct.  This is an email from Mr. Huth.

17  Q.   Yes.  We can go back up.  Let's -- it's in response to an

18  email from Mr. Luby right below.  Correct?

19  A.   Correct.

20  Q.   And Mr. Luby was the president of USAA bank at the time.

21  Correct?

22  A.   That is correct.

23  Q.   And what he said, he's talking about this idea of using a

24  digital camera, and he says, that's a great idea.  Right?

25  A.   Correct.
```

1    Q.    He says, we should figure out how to make it work.

2    Correct?

3    A.    Correct.

4    Q.    And this went to people that worked with you in the

5    applied research division.  Correct?

6    A.    Not directly from Mr. Luby, no.

7    Q.    Mr. Huth, was he in the applied research division?

8    A.    Mr. Huth was a business person in the bank.

9    Q.    Okay.  And what about Mr. Barth?

10   A.    Mr. Barth was a business executive in the bank.

11   Q.    So he is sending it to other business people, saying, we

12   should figure out how to make this work.  Correct?

13   A.    Correct.

14   Q.    And he also says, how about doing it with a phone.

15   Correct?

16   A.    Correct.

17   Q.    And then if we go to the first page of the document, so

18   at the very top, we have an email from Mr. Oakes to you

19   sending all of this email chain from Mr. Oakes to you.

20   Correct?

21   A.    Correct.

22   Q.    And he said to you, FYI, for your information, great

23   opportunity; let's talk.  Correct?

24   A.    Correct.

25   Q.    And let's look -- let's go back and look at the email

1    just below that from Mr. Burks.  You told us that Mr. Burks

2    was involved in what?  What was his position at the time?

3    A.    He was the chief technology officer.

4    Q.    And the applied research division reported to him.

5    A.    That is correct.

6    Q.    And so he knew what was going on in the applied research

7    division.

8    A.    Correct.

9    Q.    And Mr. Oakes was in charge of the applied research

10   division.

11   A.    Yes, sir.

12   Q.    And he said to Mr. Oakes, we should get this in the

13   queue.  Correct?

14   A.    Yes, sir.

15   Q.    And when he said, let's get it in the queue, we meant get

16   it in the queue to work on this.

17   A.    To commercialize it, yes.

18   Q.    To work on it.

19   A.    To commercialize the system and develop, yeah.

20   Q.    To develop the system.

21   A.    Yes, for commercialization.

22   Q.    Because you hadn't tested any cameras in the laboratory

23   as of November 6th of 2006, had you?

24   A.    We did not use a camera, but we knew it worked, yes.

25   Q.    You hadn't tested any, was my question.  You had not

323

1    tested any.

2    A.    Correct.

3    Q.    You hadn't experimented with any.

4    A.    We had experimented with the TWAIN layer that we knew

5    would work with digital cameras.

6    Q.    You had not experimented with any cameras, Mr. Prasad,

7    had you?

8    A.    Correct.

9    Q.    Okay.  And you hadn't experimented with any smartphones,

10   had you?

11   A.    Correct.

12   Q.    And you hadn't experimented with any feature phones.

13   A.    Correct.

14   Q.    Now, in early 2007, you and Mr. Morris decided to test

15   some phones and phone cameras that were available on the

16   market.  Correct?

17   A.    Correct.

18   Q.    And you went out and purchased those phones.

19   A.    That is correct.

20   Q.    You didn't think they would work because you didn't think

21   the resolution of the cameras would be good enough, but you

22   thought you would try them.  Correct?

23   A.    That's not correct.

24   Q.    Did you think they would work then?

25   A.    Yes.

324

```
1   Q.   And you discovered the resolution wasn't good enough,

2   didn't you?

3   A.   For those phones, yes.

4   Q.   So you thought they would work, but you discovered they

5   didn't.  Correct?

6   A.   They did not work for the commercialization aspect of it

7   at the time.

8   Q.   Now, Deposit@Home, you downloaded an app in order to use

9   Deposit@Home to your laptop?

10  A.   It was an automatic download.

11  Q.   It was a web-based system?

12  A.   Yes, sir.

13  Q.   And you went to the website of USAA?

14  A.   Yes.

15  Q.   And you, using the website, you scanned the check on a

16  scanner and then you sent that image over the internet to the

17  website of USAA into the Deposit@Home site where it was

18  received.  Correct?

19  A.   Yes.  The application did it automatically, yes.

20  Q.   And one of the things that was important for that image

21  was that it would be extracted from whatever was on the

22  background.  Right?  You needed to know where the edges of the

23  check were.

24  A.   Correct.

25  Q.   And in order -- on Deposit@Home, in order to know where
```

1    the edges of the check were, the user manually identified the

2    corners?  Is that right?

3    A.    No.  That was not right.

4    Q.    They didn't identify three of the four corners?

5    A.    No, they did not.

6    Q.    Did the software in October of 2006 automatically

7    determine the edges?

8    A.    So they actually had multiple options.  They could click

9    one corner if they wanted to.

10   Q.    Okay.  So they could manually click one corner.

11   A.    But it automatically did it, too, yes.

12   Q.    And that would then help identify the edges.

13   A.    Yes.  That was one option.

14   Q.    Because it was important to identify the edges.  Correct?

15   A.    Correct, sir.

16   Q.    And at that time in October of 2006 for Deposit@Home,

17   the -- it was important that some information on the check

18   image be readable.  Correct?

19   A.    Correct.

20   Q.    I think we have a check --

21         MR. STONE:  Maybe we could bring up, Mr. Nickels, a

22   check?  I think it's DDX 3.1.

23   Q.    (BY MR. STONE)  This is just an example check for all of

24   us to look at while I ask you a few questions about it, Mr.

25   Prasad.  But the software had to be able to read from the

1    image the amount of the check, the bank where the check was

2    drawn, and the account from which the money was to come.

3    Correct?

4    A.    That is correct.

5    Q.    And so the amount of the check is what is called in the

6    courtesy amount line or the CAR.  Correct?

7    A.    That is correct.

8    Q.    And that number was often going to be in handwriting.  Is

9    that correct?

10   A.    Yes, sir.

11   Q.    And then the MICR line that we see down in the bottom,

12   that consists of the bank routing number so you know what bank

13   it is, and the account number so you know the account of the

14   person who wrote the check.  Correct?

15   A.    That is correct.

16   Q.    And if you couldn't read this -- if the software on the

17   system couldn't read this information from the image, it

18   wasn't able to process the check automatically, was it?

19   A.    In most cases.  Correct.

20   Q.    Okay.  And so one of the things you needed was software

21   that would enable you to read the amount of the check.

22   Correct?

23   A.    Yes, sir.

24   Q.    And USAA acquired the software to read the amount of the

25   check from another company.  Correct?

327

1    A.   That is correct.

2    Q.   Could you tell us the name of that company?

3    A.   It was Mitek Systems.

4    Q.   Okay.  So you went to Mitek and said, we need to know how

5    to read this handwritten check amount.  Can you give us that

6    software?  And they sold it to you.  Correct?

7    A.   Yes, sir.

8    Q.   And then you also needed to read the information on the

9    MICR line.  Correct?

10   A.   That is correct.

11   Q.   And you went to another company and purchased that

12   information from them.  Correct?

13   A.   That is correct.

14   Q.   And what was that company's name?

15   A.   All My Papers.

16   Q.   Okay.  And you continued to use software from Mitek and

17   software from All My Papers for many years after 2006.

18   Correct?

19   A.   Correct.

20   Q.   Now, you -- we -- earlier you showed us a document, a

21   TWAIN document.  It's PX 1126.

22            MR. STONE:  If we could bring that up?

23   Q.   (BY MR. STONE)  You showed us this document earlier.

24   Right?

25   A.   Yes, sir.

1    Q.   This document was not prepared by USAA, was it?

2    A.   Yes, it was.

3    Q.   Well, let's go back to the whole page.  Look at the

4    bottom.  Who does it say prepared it?

5    A.   TATA Consultancy Services, India.

6    Q.   Is TATA Consultancy Services in India owned by USAA?

7    A.   The company is not owned by USAA, no.

8    Q.   Okay.  And then let's go to page 5 of this document.

9              MR. STONE:  Let's blow that up.

10   Q.   (BY MR. STONE)  It says -- under the purpose, it says,

11   "This DLL has been developed for the home deposit scanning

12   project for USAA FSB."  Do you see that?

13   A.   Yes, I do.

14   Q.   And USAA FSB refers to USAA bank.  Correct?

15   A.   Correct.

16   Q.   Okay.  And the home deposit scanning project refers to

17   Deposit@Home.  Correct?

18   A.   Correct.

19   Q.   And the DLL, DLL is a library of information.  Correct?

20   A.   Correct.

21   Q.   What does DLL stand for?

22   A.   Dynamic Linked Library.

23   Q.   Okay.  And so the DLL that was being developed for the

24   home deposit scanning project for USAA Bank was a library of

25   information and it was being prepared by TATA Consultancy.

329

1    Correct?

2    A.    Not the DLL, no.

3    Q.    They were not preparing the DLL?

4    A.    No, sir.

5    Q.    Okay.  So it goes on to say, The core objective of this

6    project is to provide a facility to the customers of USAA to

7    deposit checks from their home.  Do you see that?

8    A.    Correct.

9    Q.    And it says, If the customer has a scanner attached, they

10   can log into USAA and scan the check and deposit it.  Do you

11   see that?

12   A.    Correct.

13   Q.    And it goes on to say, The portal page is designed in

14   such a way that it will directly take care of scanning the

15   checks from the customer's scanner.  Right?

16   A.    Yes.

17   Q.    And this is completely Java-based.  That's a computer

18   language, I take it?

19   A.    Correct.

20   Q.    And TWAIN is the only technology which bridges

21   applications and scanning devices.  Right?

22   A.    Correct.

23   Q.    Okay.  So this proposal, this document, and I would say

24   rather than proposal, this document was prepared for USAA by

25   TATA.  Correct?

```
1    A.    TATA was part of the team, the core team.

2    Q.    Okay.  But it's a different company.

3    A.    The company itself is different from USAA, correct.

4    Q.    Okay.  And this document, if we look at the change

5    history --

6               MR. STONE:  Go back to page 2.

7    Q.    (BY MR. STONE)  If we go back to page 2 and we look at

8    the change history, this document was prepared in 2006.

9    Correct?

10   A.    Yes, sir.

11   Q.    Okay.  August of 2006.  Right?

12   A.    Correct.

13   Q.    Okay.  There's no discussion in this document of mobile

14   phones, is there?

15   A.    Yes, there is.

16   Q.    Oh?  Where's the discussion of mobile phones?  Where's

17   that word?

18   A.    I don't see the word here, sir.

19   Q.    Okay.  And, in fact, in the three patents we looked at

20   earlier, the '605, the '432, the '618, the word 'mobile

21   phone' doesn't appear in any of those patents in these

22   original specification filed in 2006, does it?

23   A.    That is correct.

24   Q.    And the word 'smartphone' doesn't appear in the original

25   application, either, does it?
```

1    A.   That is correct.

2    Q.   Now --

3              THE COURT:  Let me interrupt for just a minute.

4              MR. STONE:  Yes, Your Honor.

5              THE COURT:  I think, ladies and gentlemen, there's

6    not a perfect place, but we're going to take a short recess at

7    this juncture.  This is a time when you can simply close your

8    notebooks and leave them in your chairs.

9         Please follow all the instructions I've given you about

10   your conduct, including not to discuss the case with each

11   other.

12        And we'll be back shortly and continue with the

13   Defendant's cross-examination of this witness.

14        The jury's excused for recess.

15             (Whereupon, the jury left the courtroom.)

16             THE COURT:  Counsel, I'll try to keep this to 10 or

17   12 minutes.  The Court stands in recess.

18             MR. STONE:  Thank you, Your Honor.

19                       (Brief recess.)

20             THE COURT:  Be seated, please.

21        All right.  Are we ready to continue with

22   cross-examination?

23             MR. STONE:  Yes, Your Honor.

24             THE COURT:  Let's bring in the jury, please.

25             (Whereupon, the jury entered the courtroom.)

```
 1              THE COURT:  Please be seated, ladies and gentlemen.
 2         We'll continue with the Defendant's cross-examination of
 3    Mr. Prasad.
 4         Mr. Stone, you may continue.
 5              MR. STONE:  Thank you, Your Honor.
 6    Q.   (BY MR. STONE)  Mr. Prasad, earlier we were speaking
 7    about the TWAIN software.  Remember that?
 8    A.   Yes, sir.
 9    Q.   TWAIN software was something that USAA obtained from
10    another company.  Correct?
11    A.   Correct.
12    Q.   You paid -- you purchased it or licensed it from another
13    company?
14    A.   Correct.
15    Q.   What was that company?
16    A.   It was called Asprise, LAB Asprise.
17    Q.   Okay.  And you were shown earlier on your direct
18    examination by Mr. Sheasby, you were shown an invention
19    disclosure form.  Is that right?
20    A.   Correct.
21    Q.   And you were instructed during your time at USAA that
22    it's important that invention disclosure forms be signed and
23    dated.
24    A.   Correct.
25    Q.   And that they be witnessed by someone else independent of
```

1    you?

2    A.   By the core team, yes.

3    Q.   Somebody else on the core team needed to sign it as well.

4    Correct?

5    A.   They used to be -- yeah.  We used -- I don't know if it's

6    an official signature on that document.

7    Q.   Okay.  But you understood the need for corroboration of

8    the date and the time of that form being filled out.  Correct?

9    A.   I would think so.  I'm not sure.

10   Q.   Okay.  Let me go back now to 2006.  When was -- it was in

11   October through June, was it not, October through June,

12   October of 2006, June of 2007, that USAA employees first

13   conceived of the idea of using the display on a handheld

14   mobile device to assist the customer in having a digital

15   camera take a photo of a check to be submitted?

16   A.   For commercialization purposes, yes.

17   Q.   And you didn't -- when you -- it's not limited that way.

18   That's when you first conceived of the idea of even doing it

19   at all.  Is that correct?

20   A.   That is not correct.

21   Q.   I want you to look -- you gave a deposition in this case.

22   Correct?

23   A.   Correct.

24   Q.   On October 13th of 2021.  Correct?

25   A.   Correct.

1    Q.   It's in the binder that's there before you, is your

2    transcript.  Turn, if you would, to page 29 and read the

3    question, page 29, lines 21 through 25.

4         Do you have that in front of you?  Have you had a chance

5    to read the question?

6    A.   This is the Wells Fargo --

7    Q.   Oh, no, no.  There should be a deposition ahead of that

8    in this case.

9    A.   Sorry.

10   Q.   That's okay.  My apologies if I gave you bad directions,

11   Mr. Prasad.

12   A.   I have it, sir.

13   Q.   Okay.  Have you read the question at page 29, lines 21

14   through 25?  Just read it to yourself.

15   A.   Yes, I do.

16   Q.   And then would you read the answer at lines 31

17   through -- I'm sorry, on page 31, lines 1 through 4.

18   A.   I do.

19   Q.   Does that refresh your recollection that USAA employees

20   first conceived of the idea of using a display on a customer's

21   handheld mobile device to assist the customer in having a

22   digital camera take a photo of a check in October or November

23   of 2006 through June of 2007?

24   A.   It does with respect to the iPhone, yes.

25   Q.   You didn't have an iPhone in October or November 2006,

1    did you?

2    A.    No, sir.

3    Q.    And you didn't have one until June of 2007 when they

4    first became available, did you?

5    A.    Correct.

6    Q.    And the first time you conceived, any USAA employee

7    conceived of using the idea of a display on a customer's

8    handheld mobile device to assist the customer in having a

9    digital camera take a photo of a check was with respect to the

10   iPhone.  Correct?

11   A.    With respect to the iPhone, correct.

12   Q.    And the cameras on devices, mobile phone cameras prior to

13   the iPhone were really poor.  Right?

14   A.    There were advanced phones with good cameras, too, at the

15   time.

16   Q.    Take a look, if you would, at your deposition at page 30,

17   lines 10 through 13.

18   A.    Yes, sir.

19   Q.    Does that refresh your recollection that prior to the

20   iPhone the cameras on phones were really poor?

21   A.    Yes.

22   Q.    Okay.  And you knew those cameras would not be really up

23   to the mark to capture the right kind of check with the proper

24   resolution.  Isn't that right?

25   A.    For the type of phones our members could afford, correct.

336

1    Q.   And you were talking there about not only phones that

2    were on the market that you have said your members could

3    afford, but you were talking about Microsoft mobile ME phones.

4    Correct?

5    A.   That is correct.

6    Q.   And you were talking about the Palm, like the Palm Pilot.

7    Correct?

8    A.   That's correct.

9    Q.   And the Nokia device as well.   Correct?

10   A.   Correct.

11   Q.   All of those were included in what you just described was

12   something that was not really up to the mark.   Isn't that

13   right?

14   A.   The type of phones our members could afford, they were

15   not.

16   Q.   Okay.   And the phones, when you bought them and tested

17   them in the first few months of 2007, you purchased those

18   phones for experimentation.   Right?

19   A.   Towards a commercial product, yes.

20   Q.   Well, I want you to take a look again, if you would, at

21   your deposition, and the question at page 31, lines 6 through

22   11, and then the portion of your answer at page 32, lines 18

23   through 20.

24   A.   Yes, sir.

25   Q.   Have you had a chance to read that?

1  A.    Yes.

2  Q.    Does that refresh your recollection that those phones

3  that you purchased in the first half of 2007 were purchased

4  for experimentation purposes?

5  A.    For commercialization, yes.

6  Q.    When you gave --

7  A.    Experimentation for commercialization, yes.

8  Q.    When you gave your deposition, you said they were

9  purchased for experimentation.  Correct?

10  A.    This is experimentation for commercialization, yeah.

11  Q.    And you didn't say anything about commercialization in

12  your deposition, did you?

13  A.    I don't see that on those lines, no, sir.

14  Q.    In fact, the first time you decided -- USAA decided they

15  might start working on exploring how to do -- expand

16  Deposit@Home to allow digital cameras to come into the picture

17  was not until after your member had used a webcam to do that.

18  Correct?

19  A.    Can you repeat the question, sir?

20  Q.    Certainly.  You had a member who used a webcam to take a

21  picture of a check in October of 2006 and that led to the

22  email that included you and Mr. Oakes that we saw earlier.  Do

23  you remember that?

24  A.    That is correct.

25  Q.    And it was that event that caused USAA to decide you

1    might want to start working on exploring how to expand

2    Deposit@Home in 2006 to allow cameras to come into the

3    picture.

4    A.    For the commercial product, that is correct.

5    Q.    Take a look at your deposition, if you would.  Look at

6    page 40.  The question at lines 5 through 8, the answer at

7    lines 20 through 24.

8    A.    Yes, sir, I see that.

9    Q.    Does that refresh your recollection that the first time

10   USAA decided that they might want to start working on

11   exploring how to expand this application in 2006 to allow

12   cameras to come into the picture was after the member had

13   submitted a picture of a check using a webcam?

14   A.    Yes, sir.  Expanding the application.  So it is a

15   commercial effort we are trying to do there.

16   Q.    Expanding Deposit@Home?

17   A.    Deposit@Home as it was commercialized to the members,

18   yes.

19   Q.    And at that time you had not tested any digital cameras

20   in your laboratory, had you?

21   A.    That is correct, sir.

22   Q.    And you had not tested any type of phone, smart feature

23   or otherwise, had you?

24   A.    Yes, sir, we had not.

25   Q.    Okay.  And going from a system that uses a scanner to

1    take the image of the check to a system that uses a camera on

2    a mobile phone is not easy, is it?

3    A.   It has different challenges with the mobile phone, so it

4    is different, yes.

5    Q.   And it's not easy, is it?

6    A.   It is not easy.  Correct.

7    Q.   Okay.  And, in fact, it's a different ball game

8    completely, isn't it?

9    A.   In one context, yes, it is.

10   Q.   There is a lot of complexity surrounding using a mobile

11   phone that doesn't exist in using a scanner.  Correct?

12   A.   It has its complexities, yes.

13   Q.   A scanner is flat.  Correct?

14   A.   That's right.

15   Q.   It has a white background.

16   A.   Mostly, yeah.

17   Q.   The camera focal length and distance is all set by the

18   scanner design.

19   A.   Correct.

20   Q.   The resolution of the camera is set for --

21   A.   Not necessarily, yeah.

22   Q.   Okay.  It's adjustable to work with the distance at which

23   you put the paper on the scanner.

24   A.   Yes, sir.

25   Q.   The lighting conditions are almost always uniform.

340

```
 1    A.    Correct.

 2    Q.    When you go to a digital camera or a mobile phone, the

 3    lighting can be varied.  Correct?

 4    A.    Correct.

 5    Q.    And the background could vary from a kitchen table to a

 6    stack of papers?

 7    A.    Yes, sir.

 8    Q.    Okay.  And you could have shadows on it.  Correct?

 9    A.    Correct.

10    Q.    In fact, when you prepared the videos that you showed

11    earlier this morning, you held the camera out in front of you

12    and the check out of front of you so the light from above

13    would not be shadowed by your head or something looking over.

14    Correct?

15    A.    Yes, sir.  And there was also the video capturing the

16    whole thing to allow space for that.

17    Q.    And you also know that, when you use a digital camera or

18    a phone camera, one of the things you have to be careful about

19    is the angle of the camera so that you don't change the

20    perspective and get skewing or -- or some other non-uniformity

21    in the photo.  Correct?

22    A.    Correct, sir.

23    Q.    Okay.  And you would describe a scanner as a controlled

24    two-dimensional environment for purposes of obtaining check

25    images, wouldn't you?
```

```
 1    A.   It is controlled.  It has its challenges for two

 2    dimensional, correct.

 3    Q.   And you would describe using a camera phone or even a

 4    digital camera as being a three-dimensional environment.

 5    Correct?

 6    A.   Yes, sir.

 7    Q.   And it's a complex series of steps and processes that you

 8    need to go through to take an image in a three-dimensional

 9    environment and turn it into is an acceptable two-dimensional

10    image.  Correct?

11    A.   Correct.

12    Q.   And you would describe the difficulty of solving that

13    problem as extremely hard, wouldn't you?

14    A.   Yes, it is.

15    Q.   In order to do that, you need things like shaping

16    algorithms.  Correct?

17    A.   I'm not exactly sure.

18    Q.   You need histograms, don't you?

19    A.   That's one of the techniques you could use, yes.

20    Q.   You need skewing algorithms.  Correct?

21    A.   That's another technique you could use.

22    Q.   You need multiresolution or segmentation algorithms,

23    don't you?

24    A.   That's another technique you could use.

25    Q.   These are all very -- these are technical terms that
```

342

1  we're using now.  Right?

2  A.  Yes, sir.

3  Q.  And you need to be able to separate out the check from

4  the background and everything around it because it's only that

5  check image that the federal banks require, the Federal

6  Reserve requires.  Right?

7  A.  That is right.

8  Q.  In order to do that, to extract the check from the

9  background, somebody needs to write computational algorithms.

10  Isn't that true?

11  A.  That is true.

12  Q.  And you developed those algorithms at USAA.  Correct?

13  A.  Yes, sir.

14  Q.  And you needed those algorithms in order to make the

15  check image capture and deposit with handheld cameras work,

16  didn't you?

17  A.  Correct.

18  Q.  It didn't work without those algorithms.

19  A.  Correct.

20  Q.  And a majority of those you wrote internally to USAA.

21  Correct?

22  A.  Yes.

23  Q.  And you also had some vendor technologies that were

24  incorporated that we talked about earlier from Mitek and All

25  My Papers.  Correct?

```
1    A.   That is correct.

2    Q.   But you essentially at USAA wrote all the algorithms for

3    extraction of the check image from an environment a 3D

4    environment like you get with a camera to reduce the image to

5    a 2D image.  Correct?

6    A.   Correct.

7    Q.   And that writing of those algorithms took a couple of

8    years, didn't it?

9    A.   For commercialization purpose, yes.

10   Q.   The algorithms to be written and completed took a couple

11   of years.  Correct?

12   A.   For -- again, it went through the journey of invention

13   and then it went to the commercialization aspect of it, yes.

14   Q.   So I want to ask you just about how long it took to write

15   the algorithms that were used.  Okay?

16   A.   Yes, sir.

17   Q.   It took you a couple of years to write those algorithms,

18   didn't it?

19   A.   It might have.  I'm not sure about the time frame.

20   Q.   Well, did you write any of the algorithms?

21   A.   I personally did not write those algorithms.

22   Q.   So you can't tell us how long it took.

23   A.   No.

24   Q.   But you know from Mr. Medina that it took him a couple of

25   years to write the algorithms that he put into this system.
```

1    Correct?

2    A.   He hasn't told me the actual amount of time he took,

3    yeah.

4    Q.   So can you tell the ladies and gentlemen on our jury how

5    long it took to write those algorithms?

6    A.   I don't have a timeline, exact timeline, on how long it

7    took.  We released the product -- we had a working prototype

8    that led to commercialization into an actual product that went

9    out to our members, but I can't tell exactly the amount of

10   time Mr. Medina or others spent time on coding the algorithms.

11   So...

12   Q.   But you released the product in 2009.

13   A.   Yes, sir.

14   Q.   And you had a working prototype in September of 2008.

15   A.   That is correct.

16   Q.   And you -- it took you quite a while, you would agree

17   with that, to write these algorithms, wouldn't you?

18   A.   I wouldn't say it was quite a while.

19   Q.   Okay.  Take another look at your deposition, if you

20   would, Mr. Prasad.  Look at page 85, line 17, please, and the

21   answer that follows at page 85, lines 18 through 21.

22   A.   Yes, sir, I see that.

23   Q.   Okay.  And does that refresh your recollection that it

24   took quite a while to write the algorithms?

25   A.   That is what I say there, yes.

345

1   Q.   Okay.  And you concepted a lot of the things that you

2   were working on in 2008 for the use of a mobile device or a

3   handheld mobile device in 2008.  Correct?  That's when you

4   concepted them?

5   A.   For a commercialization, yes.

6   Q.   And a concept is -- a concept is like an idea.  Correct?

7   A.   Not always.

8   Q.   Okay.  When you say you concepted something, that means

9   you conceived of it.  Correct?

10  A.   Not always.

11  Q.   Okay.  The algorithms that you developed at USAA, you

12  didn't think those algorithms were obvious, did you?

13  A.   No, sir.

14  Q.   You thought they were non-obvious?

15  A.   Correct.

16  Q.   Even with somebody of your level of education, skill, and

17  experience, you thought they were non-obvious?

18  A.   Yes, sir.

19       MR. SHEASBY:  Your Honor, I object to this line of

20  questions.  I'd like to approach.  I think a door has been

21  opened.

22       THE COURT:  Approach the bench, counsel.

23       (The following was had outside the hearing of the

24       jury.)

25       THE COURT:  What's the issue, Mr. Sheasby?

1          MR. SHEASBY:  Obviousness is not part of the case,

2    and he just talked about whether something is obvious or not

3    obvious.  And so I object to that, and I'd like an instruction

4    that there's no dispute that the patent is not obvious.

5          THE COURT:  The jury's heard nothing about

6    invalidity based upon obviousness.  The only way they would

7    know to accept that word is in its plain and ordinary

8    colloquial meaning.  I think it makes it worse if I try to

9    instruct them otherwise.

10      So I'm going to overrule that objection.

11          MR. SHEASBY:  Then I have a new objection.  I'd like

12   Mr. Stone to move on and stop speaking about obviousness.

13          THE COURT:  Well, obviousness is a term of art and

14   of certain legal application in this area of the law.  It also

15   has a plain colloquial meaning.

16      I'm not going to instruct Mr. Stone not to use the word

17   'obvious,' but I will call it to everybody's attention that

18   perhaps, where appropriate, a different word choice to make

19   the same point would be appropriate.

20          MR. STONE:  And I'm trying when I can.

21          THE COURT:  All right.  Let's move on.

22          MR. STONE:  Thank you.

23          (The following was had in the presence and hearing

24          of the jury.)

25          THE COURT:  Let's proceed.  Objection's overruled.

347

1          MR. STONE:  Thank you.

2     Q.   (BY MR. STONE)  You were shown a document earlier which

3     was a May of 2007 document.  Do you recall that?

4     A.   I don't, sir.

5     Q.   Okay.  I think it's 1124, but I'm not sure.

6          MR. STONE:  Oh, no.  Take it down.  I'll come back

7     to it.

8     Q.   (BY MR. STONE)  You were shown a document that talked

9     about researching the viability for USAA to take check

10    deposits via cellular camera phones with internet access.  Do

11    you recall that?

12    A.   I'm not sure I recall that document, but if it can be

13    brought up on the screen.

14    Q.   Let me ask you, viability means to you the feasibility of

15    doing something?

16    A.   At a general term, yes.

17    Q.   Okay.  And that was something that along the way, as you

18    worked on research projects, you would assess whether the

19    research project was viable to go ahead and develop it into

20    something that you might later commercialize.  Correct?

21    A.   When you're talking in the technical --

22    Q.   I am.

23    A.   -- aspect?  Yes.

24    Q.   So the process that you would go through at USAA was you

25    would conceive of an idea.  That would be the first step.

348

1    Correct?

2    A.    Right.

3    Q.    Then you would do research and experimentation to

4    determine if the idea was viable, if it could be made to work.

5    Correct?

6    A.    At the technical level, yes.

7    Q.    And then if you felt at the technical level it was viable

8    and could be made to work, then you might, if it made sense

9    from a business perspective, take whatever additional steps

10   were necessary to commercialize it.  Correct?

11   A.    That is correct.

12   Q.    So that three-step process is what USAA went through on

13   many different projects, including the ones related to

14   Deposit@Home and Deposit@Mobile.  Correct?

15   A.    It would not be three-step all the time, no.

16   Q.    But you went through it with many of the projects.

17   A.    Many of them would go through something similar, yes.

18   Q.    And you had L levels within the company which you

19   designated the level at which a project was at.  Correct?

20   A.    Correct.

21   Q.    And the software modules that you wrote for capturing

22   camera check images in connection with your research project

23   at USAA were written beginning in spring of 2007.  Correct?

24   A.    For commercialization.  Correct.

25   Q.    Take a look again at your deposition transcript, Mr.

349

1    Prasad, if you would, page 94, lines 10 through 16.

2    A.    Yes, sir.  I see that.

3    Q.    Okay.  Does that refresh your recollection that you

4    started writing software modules for capturing camera images

5    in connection with the research project that was ongoing at

6    USAA during the spring of 2007?

7    A.    Yes.  So this is research after invention.  Correct.

8    Q.    Okay.  So this is what we described earlier as you

9    concepted the idea, and then you started doing the research.

10   This is step two?

11   A.    Correct.

12   Q.    And when the iPhone was released, you switched your

13   efforts from the digital camera to the iPhone.  Correct?

14   A.    Yes, sir.

15   Q.    They started working on algorithms for the iPhone after

16   it was released in June of 2007.  Correct?

17   A.    Correct.

18   Q.    Nobody had started work on those before then, had they?

19   A.    Not for the iPhone, no.

20   Q.    Now, when you came out with the product ultimately

21   Deposit@Mobile, you gave it a new name.  Correct?

22   A.    I'm sorry, sir.  I don't understand the question.

23   Q.    It was no longer Deposit@Home.  It was Deposit@Mobile.

24   A.    Yes.  Yes, it was.

25   Q.    And that was released after you had a working prototype

1    internally.  Right?

2    A.    Correct.

3    Q.    And the working prototype was September of 2008.

4    A.    Correct.

5    Q.    And then after you had released it, you conceived of the

6    idea that maybe you could use the phone and software on the

7    phone to decide whether they could -- it would take the

8    picture as opposed to the human deciding when to take the

9    picture.  Correct?

10   A.    No, sir, that's not correct.

11   Q.    That idea was conceived of in the time period when you

12   were first releasing Deposit@Mobile, wasn't it?

13   A.    No, sir.  The idea was not conceived then at that point.

14   Q.    Okay.  You filed a patent application on it in 2009.

15   A.    2009 was a different patent application.

16   Q.    That's what I'm asking you about.

17   A.    Oh, okay.

18   Q.    I'm sorry.  Maybe I confused you, and I apologize.

19   A.    No, sir.  Sorry about that.

20   Q.    Let me be clear.  Switching topics to the idea of

21   auto-capture.

22   A.    Okay.  Got it.

23   Q.    The idea of auto-capture was conceived of in 2009 time

24   frame.  Correct?

25   A.    2008 time frame.

1    Q.    2008 time frame.

2    A.    Correct.

3    Q.    And you started work on it then.  Correct?

4    A.    We were not allowed to commercialize it yet by the

5    business, but we had started writing some aspects of it.

6    Correct.  You're right.

7    Q.    And so what was involved with auto-capture was you needed

8    to replace the human making a decision of I think the image

9    that I see in my camera or my phone looks good enough that I

10   should take it, to take that human interaction and make it in

11   software that would be on the phone.  Correct?

12   A.    That was one aspect of it, yes.

13   Q.    Okay.  And in order to do that, you had to figure out how

14   is this software going to know when the resolution is good

15   enough.  Correct?

16   A.    Not just the resolution, but a lot of criteria,

17   monitoring criteria for that.

18   Q.    Okay.  There were a lot of monitoring criteria that had

19   to be satisfied that a human sort of does instinctively that

20   you had to teach the software how to do.

21   A.    Correct, sir.

22   Q.    And I may not list them all, and you can add to my list,

23   but the monitoring criteria that you had to teach the software

24   to do included:  Is it in focus?  Is the resolution good

25   enough?  Is the lighting good enough?  Can I see the

352

 1    difference between the check edge and the background?  Is it

 2    skewed or is it more or less straight?  Is it in some fashion

 3    otherwise wavy?  All of those factors about it, are there

 4    shadows on it, you had to teach the software how to adjust for

 5    those monitoring criteria.  Correct?

 6    A.    Yes, sir.

 7    Q.    Okay.  And the monitoring criteria, in order to teach the

 8    software how to do it, they have to be within pre-determined

 9    ranges.  Correct?

10    A.    In many cases they were, yes.

11    Q.    I mean, you have to say this lighting is not enough,

12    which need more lighting so don't take the picture

13    automatically.  The crookedness of the check is too much,

14    don't take the picture yet, and so on.  Correct?

15    A.    Not for all -- each of the criteria, no.

16    Q.    But for many of the criteria, you would agree?

17    A.    Yes.

18    Q.    So for many of the criteria, you had to know what the

19    ranges were that would make this work.

20    A.    These are algorithms that were well-known in the field at

21    the time.  So there's no actual specific ranges you would need

22    to specify at the time.

23    Q.    Well, you wrote a lot of algorithms for auto-capture at

24    USAA, didn't you?

25    A.    Yes, sir.

1    Q.   And each of those algorithms came with a set of

2    pre-determined criteria or ranges that had to be met.

3    Correct?

4    A.   I would like to go through specific ones because not all

5    of them have ranges.  Yes.

6    Q.   Can we agree that some of them have ranges?

7    A.   Yes.

8    Q.   Okay.  And the ranges had to be determined as a result of

9    doing research in your laboratory.  Correct?

10   A.   Yes.

11   Q.   Because you had to do the research to say, this is not

12   enough light, for example, or this is too much light.

13   Correct?

14   A.   Well, the algorithms that are already available as a

15   computer science or an image capture analysis algorithm, that

16   would already define those ranges.  That was public

17   information in some sense.

18   Q.   But the ones you wrote internally, you wrote your own

19   ranges.  Correct?

20   A.   We just used our internal system to use some of those

21   well-known techniques, and we had our own internal ranges,

22   yes.  That's right.

23   Q.   And Mr. Medina testified, didn't he -- let me withdraw

24   that.

25        Mr. Medina wrote a number of these algorithms, didn't he?

354

```
 1    A.    Yes, he did.

 2    Q.    And Mr. Medina found that some of the publicly available

 3    algorithms for certain things were insufficient, didn't he?

 4    A.    He might have.  I'm not sure.

 5    Q.    The MICR line that we looked at earlier, you would agree

 6    it's crucial for the MICR line to be read by the software,

 7    wouldn't you?

 8    A.    Yes, sir.

 9    Q.    And in that instance where you can't read the MICR line,

10    it's not a check image that is acceptable for deposit, is it?

11    A.    That's not always correct.

12    Q.    And go ahead.  Tell me when it's not correct.  When is an

13    unreadable MICR line acceptable for deposit?

14    A.    You can process a check image as long as you get the

15    critical elements of the MICR line.  You don't need to get

16    everything.

17    Q.    Okay.  You need to get the account number?

18    A.    Yes, sir.

19    Q.    Correct?  And you need to get the bank routing number.

20    Correct?

21    A.    Correct.

22    Q.    One thing you don't need to get is the check number?

23    A.    And there are other numbers on the line you didn't need.

24    Q.    But the two numbers you have to be able to read are the

25    bank routing number and the account number.  We can agree on
```

1    that?

2    A.   You don't have to be, no.

3    Q.   It's not acceptable for deposit if you can't read those

4    two numbers, is it?

5    A.   You can reconcile those later if you don't get to read

6    the whole thing correctly.

7    Q.   So somebody manually can go look at the check image and

8    say, I'll figure out which bank the check is written on.

9    A.   Typically banks do that, yes.

10   Q.   And you would go look at it and say, I'll figure it out

11   by manually reading it which account is drawn on.

12   A.   That is correct.

13   Q.   But that requires a time period for human intervention,

14   doesn't it?

15   A.   That is true.

16   Q.   So you can't instantly make the decision on the system

17   that you're going to go ahead and take the money out of one

18   account and put it into another account until you've had that

19   human interaction to know where to go to get the money.

20   Correct?

21   A.   You never take the money out instantly at all ever.  You

22   can always deposit it instantly.

23   Q.   And you don't know where to go get the money until you've

24   been able to read the information on the MICR line.  Correct?

25   A.   Yeah.  You don't need that for the deposit, yes.

1   Q.   And you would agree with me, wouldn't you, that

2   auto-capture is extremely complex?

3   A.   I would, yes.

4   Q.   And it's not simple to implement.  Correct?

5   A.   No, it's not.

6   Q.   And it's not simple to even think of the idea.  Correct?

7   A.   Yes.

8   Q.   And at USAA, after you thought of the idea of doing

9   auto-capture, you had people testing different things to come

10  up with which monitoring criteria you would use.  Correct?

11  A.   We had conceived the idea as part of the specification of

12  the patents, and we knew that those would be at the minimum

13  required to be able to satisfy.  Correct.

14  Q.   But you had people doing tests to decide which monitoring

15  criteria you should use in Deposit@Mobile.  Correct?

16  A.   We were testing for whether it can become a viable

17  commercial product, correct.

18  Q.   And to see which monitoring criteria to use.  Correct?

19  A.   Not to use, no.  That's not correct.

20  Q.   Take a look, if you would, at your deposition at page

21  197, line 15, through 198, line 8.

22  A.   Can you tell me the line numbers?

23  Q.   Yes.  197, line 15, through 198, line 8.  Just let me

24  know when you've read it.  I don't want to rush you.

25  A.   Yes, sir.  I have read it.  Thank you.

357

1    Q.   Okay.  And you would agree, would you not, that after you

2    thought of the idea of doing auto-capture, you had people at

3    USAA testing different criteria to see which ones you would

4    need to put in?

5    A.   Yes.  Not creating them, but which ones to put in,

6    correct.

7    Q.   Testing which ones to put in.  Correct?

8    A.   Exactly, yeah.

9    Q.   Okay.  And you ended up putting in some that you don't

10   even mention by name in your patent.  Correct?

11   A.   For most of the image criteria, I think we captured all

12   of it on the patent.

13   Q.   Do you include a criteria that measures the movement of

14   the camera in your use of the camera when you -- in your use

15   of the app when you release it?

16   A.   For the image, yes.

17   Q.   Yes.

18   A.   We do.

19   Q.   So you call that the antishake criteria, don't you?

20   A.   The shaking is a device aspect, not a image aspect, no.

21   Q.   But you -- but if the camera or the phone is shaking,

22   that affects the image, doesn't it?

23   A.   Yes.  That is reflected in the other monitoring criteria,

24   correct.

25   Q.   And that's not listed in the patent, is it?

1    A.    The image ones are listed in the patent.

2    Q.    The shaking criteria is not listed in the patent, is it?

3    A.    Yes, the shaking criteria is not because it's not an

4    image criteria, yes.

5    Q.    And the testing that you did, the research testing for

6    auto-capture, was done in 2010.  Correct?

7    A.    We started somewhere -- I don't exactly know the dates,

8    sir, but it started somewhere in 2010-'11 time frame, I would

9    think.

10   Q.    And the research testing for auto-capture continued until

11   2012 at least, didn't it?

12   A.    Yes, sir.

13   Q.    You didn't start development of the product until after

14   2012, did you?

15   A.    In 2012, we got the commercial approval to commercialize

16   it.

17   Q.    Okay.  So up until sometime in 2012, you were doing

18   research testing.  Correct?

19   A.    That is correct.

20   Q.    And that's with respect to auto-capture.  Correct?

21   A.    Yes, sir.

22   Q.    Okay.  You would describe the change from using a scanner

23   to using a camera phone as a paradigm shift, wouldn't you?

24   A.    I would.

25   Q.    Yes.

```
1              MR. STONE:  And if we could bring up DX 1110.

2    Q.  (BY MR. STONE)  This was the document I couldn't remember

3    the number of earlier.

4              MR. STONE:  And if we could go to page 12.

5    Q.  (BY MR. STONE)  You describe at the top, initial tests on

6    over 1200 check images taken from four cameras.  Correct?

7    A.  Correct.

8    Q.  And these were testing to see whether the library that

9    All My Papers had provided you was sufficient.  Correct?

10   A.  The original library, correct.

11   Q.  And at that time you concluded the original library was

12   not sufficient.  Correct?

13   A.  Yes, sir.

14   Q.  And the reason you determined it was not sufficient was

15   because the MICR information was only read 25 percent of the

16   time.  Correct?

17   A.  That's correct.

18   Q.  And so you needed to change the library.  Correct?

19   A.  That is correct.

20   Q.  And that change occurred after this presentation was made

21   or about the time of this presentation.  Correct?

22   A.  No.  It was done before, before the presentation.

23   Q.  Before the presentation, because you report on it in a

24   later page, don't you?

25   A.  That is correct.
```

1          MR. STONE:  If we can go to the next page.

2     Q.   (BY MR. STONE)  And then there we see on the second

3     bullet, what you had done with this new library was you had

4     tested five images.  Correct?

5     A.   That's correct.

6     Q.   And, in fact, you didn't test them; All My Papers tested

7     them.  Right?

8     A.   That is correct.

9     Q.   And All My Papers reported back, we've got success with

10    five images.  Correct?

11    A.   That is correct.

12    Q.   And then you sent them more images to test.  Correct?

13    A.   I think so.  I'm not sure.

14    Q.   And when you told us earlier today that you'd had a

15    hundred percent success rate, you were referring to the five

16    images, weren't you?

17    A.   Not just the five, no.

18    Q.   Well, you had -- with the earlier library, you had only a

19    25 percent success rate.  Right?

20    A.   Correct.

21    Q.   And so by the time you gave this report -- and you

22    know -- you did this report, didn't you?

23    A.   Yes.

24    Q.   Okay.  When you did this report, at the time of it you

25    only had results for five images.  Correct?

```
 1    A.    That is correct.

 2    Q.    Okay.  And those five went through.

 3    A.    Yes.

 4    Q.    And this is December of 2007, isn't it?

 5    A.    That is correct.

 6    Q.    Okay.  And there was the phases for the development of

 7    auto-capture --

 8              MR. STONE:  If I can go back to that one more time.

 9    Q.    (BY MR. STONE)  -- were research phase.  Correct?  That

10    was, after conception, there was research.

11    A.    Well, conception would be invention, and then you'd be

12    research.

13    Q.    And then after research, you developed a research

14    prototype.

15    A.    Yes, in many cases.

16    Q.    And then you would do research testing?

17    A.    It would be -- again, not everything would be happening

18    in exactly those steps, but, yes, we would do testing, too,

19    yes.

20    Q.    Okay.  And then if the testing and the research and the

21    experimentation gave you reason to think it would be worth

22    doing it, you would then move to commercialization.

23    A.    That is not true, no.

24    Q.    Not all projects move to commercialization, do they?

25    A.    Not all projects move to commercialization, no.  You're
```

 1    right.

 2    Q.   And so for the particular project of auto-capture, you

 3    started with conception?

 4    A.   Yes.

 5    Q.   And then you went to research?

 6    A.   Yes.

 7    Q.   And then you went to research prototype?

 8    A.   Which is commercialization, yes.

 9    Q.   And then you went to research testing?

10    A.   As part of commercialization, yes.

11    Q.   Okay.  So at some point you go to commercialization.

12    Correct?

13    A.   And so --

14    Q.   Just yes or no.

15    A.   Yes.  Yes.

16    Q.   And so I think what I want to make sure we all focus on

17    is there is a period of time during which you do viability

18    research.  Correct?

19    A.   Technical viability, yes.

20    Q.   Okay.  And is there a time when you do technical

21    experimentation?

22    A.   For commercialization, yes.

23    Q.   But you do technical experimentation to see if it's even

24    viable.

25    A.   From a technical standpoint, whether it would be proof of

1    concept.  Right, yes.

2    Q.    When did you settle on which particular monitoring

3    criteria would be used in your prototype for auto-capture?

4    A.    So we conceived the idea in 2008 and had a number of

5    monitoring criteria, which is all part of the specification,

6    and we continued to test those out as the journey towards

7    commercialization for auto-capture moved into 2012 and 2013.

8    Q.    And in 2012 or 2013, had you settled on which monitoring

9    criteria you thought it was appropriate to use?

10   A.    Yes, we had.

11   Q.    And by 2012 or 2013, is that when you settled upon what

12   were the appropriate pre-determined ranges?

13   A.    For those that applied to -- that needed ranges, yes.

14   Q.    Okay.  And how many of those criteria needed

15   pre-determined ranges, as you recall?

16   A.    I can't recall how many would need that, sir, at this

17   point.

18   Q.    More than five?

19   A.    I'm not sure.

20   Q.    Any estimate you can give us of how many?

21   A.    I'd have to really look at the code at this point to see

22   which one needed the range, which one did not.

23   Q.    If we looked at the code, could we determine, if they

24   have a pre-determined range in there, that they must have

25   needed it?

```
 1    A.    Possibly, yes.

 2    Q.    Okay.  Thank you, Mr. Prasad.

 3              MR. STONE:  Pass the witness, Your Honor.

 4              THE WITNESS:  Thank you, sir.

 5              THE COURT:  Is there redirect?  Then let's proceed

 6    where with redirect examination by the Plaintiff.

 7              MR. SHEASBY:  Let's go to PX 003.

 8                       REDIRECT EXAMINATION

 9    BY MR. SHEASBY:

10    Q.    Mr. Stone spent a significant period of time talking to

11    you about commercialization efforts.  Do you recollect that?

12    A.    Yes, I do.

13    Q.    In your experience with over 140 patents, does

14    commercialization efforts have any relevance to invention?

15    A.    No.

16    Q.    In your experience with over 140 patents, what document

17    is used to determine enablement?

18    A.    The specification of the patent.

19    Q.    Mr. Stone examined you for an hour and a half.  Did he

20    show you a single passage from the patent?

21    A.    No.

22              MR. SHEASBY:  Let's go to PDF page 24.  And I'll be

23    there in a second, Mr. Huynh.  And can you turn to

24    column -- let's blow up column 7, lines 50 through 64.  Column

25    7, lines 50 through 64, Mr. Huynh.
```

1    Q.    (BY MR. SHEASBY)   What does this passage tell the Patent

2    Office and to other skilled engineers who read your patents?

3    A.    We are describing digital cameras to be used with this

4    patent.

5            MR. STONE:   Objection, Your Honor.   I think this

6    calls for expert testimony to say what the specification tells

7    the Patent Office or others.

8            MR. SHEASBY:   I disagree with that.

9            THE COURT:   He can testify.   He's one of the

10   inventors on the patent.   He can testify to what his patent

11   application means within his understanding.

12           MR. SHEASBY:   Thank you, Your Honor.

13           MR. STONE:   Thank you.

14   Q.    (BY MR. SHEASBY)   Please answer the question, Mr. Prasad.

15   A.    Thank you, sir.   So this particular thing talks about

16   customer instructions they need to follow to take a digital

17   photograph from a digital camera and what they need to do to

18   get a successful check image capture.

19   Q.    Did you actually apply these instructions in the

20   graphical user interface?

21   A.    Yes, sir.

22   Q.    Did it work?

23   A.    Yes, it did.

24   Q.    So Mr. Stone spent a long time using jargon.   He talked

25   about his histograms and skewing algorithms and segmentation

1    and extraction techniques.

2    A.   Yes, sir.

3    Q.   Did all of those techniques exist publicly at the time of

4    your work?

5    A.   Yes.

6    Q.   Does USAA build special versions of these types of

7    technologies to thrill its members?

8    A.   Yes, we do.

9    Q.   Do you need to have USAA's special versions to thrill the

10   members?

11   A.   Yes.

12           MR. STONE:  Objection, Your Honor.

13           THE COURT:  Just a minute.  Just a minute.

14      State your objection, counsel.

15           MR. STONE:  It calls for expert opinion.

16           MR. SHEASBY:  He asked him extensively about

17   algorithms in his direct -- in his cross-examination, Your

18   Honor.

19           THE COURT:  He did, and I believe substantively the

20   door is opened.  You just can't ask this witness for pure

21   opinion, speculative testimony, but he can testify of his own

22   personal understanding as one of the inventors.

23   Q.   (BY MR. SHEASBY)  Could you have --

24           THE COURT:  I'll overrule the objection.  Restate

25   the question.

1    Q.   (BY MR. SHEASBY)  Could you have built the commercial

2    system with mobile phones without waiting for USAA's special

3    algorithms?

4              MR. STONE:  Your Honor, I object again.  This just

5    needs to be clear that it's his opinion.

6              MR. SHEASBY:  It's his opinion as the inventor of

7    the patent.

8              THE COURT:  Well, it needs to be clear that -- it's

9    his opinion is not a proper objection.  If the question

10   doesn't call for that, then you can object that it calls for

11   opinion testimony.

12             MR. STONE:  I do.  That's my objection.

13             THE COURT:  All right.  I'll overrule that

14   objection.

15             MR. STONE:  Thank you, Your Honor.

16   Q.   (BY MR. SHEASBY)  Please answer the question, Mr. Prasad.

17   A.   Can you repeat the question, sir?

18   Q.   Would a -- could you have built the system without

19   waiting for USAA's special algorithms?

20   A.   No.

21   Q.   And why is that?  Why did you have to have USAA's special

22   algorithms?  What about USAA makes that important about USAA

23   needs for its customers?

24   A.   So these algorithms essentially teaching in the

25   specification how to actually capture the check image from a

368

```
 1    digital camera successfully.  And these are complex

 2    algorithms, and that's the reason why we teach them inside the

 3    specification.

 4    Q.   So the algorithms, the special algorithms that Mr. Stone

 5    was referring to, where are they disclosed?

 6    A.   In the specification of the patent.

 7              MR. SHEASBY:  Let's go to PX 0001, page 21, column

 8    4, lines 3 through 12.

 9    Q.   (BY MR. SHEASBY)  This is a portion of your 2009 patent

10    application.  Do you see that?

11    A.   I do, yes.

12    Q.   What do these algorithms teach other engineers to do?

13    A.   These are the image monitoring criteria that engineers

14    can use to extract the check image successfully.

15    Q.   With the algorithms presented in your patent application,

16    can you build USAA's system?

17    A.   Yes.

18    Q.   Does the 2009 patent have histogram algorithms for image

19    extraction?

20    A.   Yes, they do.

21    Q.   Are they automatic?

22    A.   Yes.

23    Q.   Did USAA have image extraction in Deposit@Home?

24    A.   Yes.

25              MR. SHEASBY:  Your Honor, may I approach the counsel
```

369

1    table?

2              THE COURT:  You may.

3              MR. SHEASBY:  Thank you.

4    Q.   (BY MR. SHEASBY)  Mr. Stone asked you to read portions of

5    your deposition.  Is that correct?

6    A.   That is correct.

7    Q.   He didn't show the ladies and gentlemen of the jury any

8    portions of your deposition, though.  Is that correct?

9    A.   That is correct.

10   Q.   And he talked about when the invention of using a

11   handheld device to capture images was created by USAA.  Do you

12   remember that?

13   A.   Yes, I do.

14             MR. SHEASBY:  I want to display page 33, lines 2

15   through 21.

16             MR. STONE:  Your Honor, improper use of a deposition

17   that has not been used for impeachment.

18             MR. SHEASBY:  It's being used for completeness, Your

19   Honor.

20             MR. STONE:  He should not ask the witness he's not

21   impeaching.  I simply asked the witness to refresh his

22   recollection.

23             THE COURT:  I think it's permissible under the

24   doctrine of additional completeness.

25             MR. SHEASBY:  Thank you, Your Honor.

370

```
 1              THE COURT:  It needs to relate to the segments of

 2   the deposition that have been used earlier.

 3              MR. SHEASBY:  It does, Your Honor.

 4              THE COURT:  All right.  Let's proceed.

 5              MR. SHEASBY:  So let's go to page 33, lines 2

 6   through 21.

 7   Q.   (BY MR. SHEASBY)  "So for the first time you had the

 8   idea, that USAA had the idea of using the display of a mobile

 9   device with an integrated camera to help the user take the

10   picture was in the October/November 2006 time frame and you

11   continued to develop that into 2007.  Is that fair?"

12        Answer, "I would -- I would still say it's 2005.  The

13   reason for that is that we knew that the display does not have

14   to be part of the device.  Right?  We didn't have to have the

15   same form factor for both the display and the camera.  We knew

16   that it can be separate.  It doesn't have to be just like the

17   scanner bed.  Right?  Deposit@Home was for scanners.  Scanners

18   is a camera, but a scanner is not a display.  So scanner -- we

19   knew that scanner can be a camera.  And so the concept came

20   with the display, it can still be your home computer.  So I'd

21   say the concept goes all the way back to June of 2005."

22        Do you stand by that testimony?

23   A.   I do.

24              MR. SHEASBY:  Let's pull that down.

25   Q.   (BY MR. SHEASBY)  And Mr. Stone talked to you about the
```

1    concepting of the iPhone.  Is that correct?

2    A.    Correct.

3    Q.    Now, the iPhone was not released until June of 2007.  Is

4    that correct?

5    A.    Correct.

6    Q.    But there were smartphones and other types of those

7    devices before 2007.  Is that correct?

8    A.    That is correct.

9    Q.    Did you describe a smartphone in your patent?

10   A.    Yes.

11   Q.    Was that described in figure 3?

12   A.    Correct.

13            MR. SHEASBY:  Let's pull up that figure.  '605

14   Patent, figure 3.  I believe that's on page -- it's on page

15   16, Mr. Huynh.

16   Q.    (BY MR. SHEASBY)  Now, Mr. Stone said you -- do you use

17   the little words mobile phone or mobile device in your patent?

18   Do you remember that?

19   A.    I do.

20   Q.    Do the individual names you used to describe a device

21   have relevance to an engineer?

22   A.    No, it does not.

23   Q.    He didn't show or even engage with you on figure 3 of

24   your patent, did he?

25   A.    No.

372

1          MR. SHEASBY:  Let's go to PX 1126 at page 6.

2     Q.   (BY MR. SHEASBY)  So Mr. Stone tried to suggest that TATA

3     Consultancy was not part of the USAA development team.  Do you

4     remember that?

5     A.   I do remember that.

6     Q.   Was TATA Consultancy, were those trained engineers that

7     were part of your team that helped you build the commercial

8     system?

9     A.   Yes, they were.

10          MR. SHEASBY:  And I want to turn to page -- I want

11     to turn to that -- I think it's page 3, Mr. Huynh, of that

12     document.  Scroll down a little more.  Scroll down a little

13     more.  One more.  One more.  Let's pull it up.

14     Q.   (BY MR. SHEASBY)  Now, Mr. Stone, he said something that

15     it pricked my ear.  He kept saying, in your laboratory did you

16     test for mobile phones in October of 2006?  In your laboratory

17     did you test for handheld devices in October of 2006.

18          In October of 2006, was the original commercial system

19     still in the laboratory or was it commercially released?

20     A.   Commercially released.

21     Q.   And do the records show that in October of 2006 in the

22     commercial release of the product, customers were using

23     handheld digital cameras to successfully deposit checks?

24     A.   Yes, they were.

25     Q.   And so in 2006 the commercial system wasn't in the lab

```
 1    anymore.  Fair?

 2    A.    That is correct.

 3    Q.    It was at the bank.

 4    A.    Yes.

 5    Q.    And Mr. Stone didn't ask you about what was going on at

 6    the bank, did he?

 7    A.    No, he did not.

 8              MR. SHEASBY:  Let's go to PX 1167.  Let's go to the

 9    next page.

10    Q.    (BY MR. SHEASBY)  So USAA has had commercial systems for

11    consumer remote deposit from 2006 to today.  Is that fair?

12    A.    Yes, sir.

13    Q.    When did you stop improving those algorithms or stop

14    improving those systems?

15    A.    Sorry.  Can you repeat the question?

16    Q.    When did you stop improving the algorithms in your

17    systems?  When did you stop writing them?

18    A.    We never stopped writing them.

19    Q.    So when Mr. Stone was suggesting to the ladies and

20    gentlemen of the jury it took a -- you've been working on this

21    for a very, very long time, was that a fair description of how

22    long it took to make the first commercial version?

23    A.    No.

24    Q.    So I'm showing this Deposit@Home document, and it talks

25    about a target of September --
```

```
 1                    MR. SHEASBY:  Let's scroll down.

 2    Q.   (BY MR. SHEASBY)  It says Deposit@Home for iPhone, L4

 3    research effort.  Do you see that?

 4    A.   Yes, I do.

 5    Q.   And he was -- remember when Mr. Stone was suggesting to

 6    the jury that research was part of invention at USAA?

 7    A.   Yes.

 8    Q.   Is research -- is an L4 research invention or is it

 9    commercial?

10    A.   This is commercial.

11    Q.   And so when Mr. Stone was suggesting to the jury that

12    research was part of invention as opposed to

13    commercialization, was he being accurate or inaccurate with

14    the jury?

15    A.   Inaccurate.

16    Q.   And it talks about a timeline of three months to build

17    the iPhone app.  Is that correct?

18    A.   That is correct.

19    Q.   And did that timeline hold?

20    A.   Yes, it did.

21    Q.   And was this for the actual iPhone app that was

22    downloaded on the phone?

23    A.   Correct.

24    Q.   It took three months.

25    A.   Yes.
```

1    Q.   And Mr. Stone suggested to the jury it took years and

2    years and years.  Is that fair?

3    A.   I would say that, yes.

4    Q.   And do you think it was fair of him to suggest that to

5    the jury?

6    A.   No, sir.

7              MR. SHEASBY:  I pass the witness.

8              MR. STONE:  Your Honor, may I have two questions?

9              THE COURT:  Sir?

10             MR. STONE:  May I have two questions, additional

11   questions?

12             THE COURT:  You may have additional questions on

13   cross-examination, two questions or as many as you want.

14                      RECROSS EXAMINATION

15   BY MR. STONE:

16   Q.   Mr. Prasad, the October 2006 example that you were just

17   asked about by Mr. Sheasby of actual users using the

18   commercial Deposit@Home system, do you remember that question?

19   A.   Yes, sir.

20   Q.   Mr. Sheasby asked you, Well, wasn't it true that there

21   was actual use of cameras in the real system in October of

22   2006.  He asked you that.  Right?

23   A.   Yes, sir.

24   Q.   Even though you hadn't been doing any experiments on that

25   in the laboratory as of that time.  Correct?

376

1    A.   That is correct.

2    Q.   And the one instance you know of of somebody using it

3    with the real system was the webcam by one customer in October

4    of 2006 that was reported in the email, Exhibit 1124, DX 1124,

5    that you and I talked about.  Correct?

6    A.   There are other cameras, sir.

7    Q.   The only instance that you know of is the one instance

8    with the webcam in October of 2006.  Correct?

9    A.   No, that's not correct.

10   Q.   Is there an email that talks about any other ones?

11   A.   There's no email tied to it, no.

12   Q.   In your deposition when we asked about whether anybody at

13   USAA, customer or employee of USAA, had deposited a check

14   using a digital camera as of October 2006, you told us the

15   webcam use was the only one, didn't you?

16   A.   It was the webcam was one of them, but --

17   Q.   You told us it was the only one, didn't you, Mr. Prasad?

18   A.   I don't recall that, sir, as the only one, no.

19   Q.   Can you identify the date of any other one?

20   A.   I can't tell you the date, but we have seen -- we have

21   records of digital cameras being used.

22   Q.   Have you been shown those records today?

23   A.   Have I been shown?  No, sir.

24   Q.   Did Mr. Sheasby show you those records?

25   A.   No, sir.

1    Q.   And did you testify truthfully in your deposition?

2    A.   Yes, sir.

3    Q.   And did you do everything you could then to prepare to

4    give us your truthful testimony?

5    A.   Yes, sir.

6    Q.   And if in your deposition you told us that the only one

7    you knew of was the one webcam in October of 2006, would that

8    be true?

9    A.   If it says that, that would be true there, yes.

10   Q.   Okay.  And you didn't do any experiments in your

11   laboratory before that particular customer used a webcam to

12   deposit a check image in the Deposit@Home system, did you,

13   sir?

14   A.   Yes, sir.  We did not.

15   Q.   You did not.  Thank you very much.

16             MR. STONE:  Pass the witness.

17             MR. SHEASBY:  Your Honor, may I approach just

18   briefly?

19             THE COURT:  Approach the bench.

20             (The following was had outside the hearing of the

21             jury.)

22             MR. SHEASBY:  Your Honor, there's an exception to

23   the hearsay document in which they're questioning whether this

24   witness' recollection is accurately reflected.  We actually

25   have business records that were produced in this case showing

1    a number of cameras that had been produced.  It was hearsay to

2    us so we couldn't admit it as an exhibit, but now that the

3    hearsay has been overruled, I would like to proffer it as an

4    exhibit.

5              THE COURT:  What's the response of the Defendant?

6              MR. STONE:  There's no basis -- it's not an exhibit

7    that's in the case.  I don't know what exhibit this is.  I was

8    questioning the witness' testimony.  The witness wasn't shown

9    any exhibits and the witness testified under oath in his

10   deposition this was the only instance he knew of.

11             THE COURT:  I'm not going to admit an exhibit at

12   this point.  If you want to take this witness on further

13   direct examination and use a demonstrative with him, I don't

14   have a problem with that, but I'm not going to admit any new

15   documents in the middle of a trial.

16             MR. STONE:  Well, these would be documents that

17   aren't pre-admitted, for sure, and they are not on the exhibit

18   list.

19             THE COURT:  That's why they could only be used as a

20   demonstrative and not as an exhibit.

21             MR. STONE:  I don't know if they've been produced,

22   Your Honor.  They shouldn't be used as a demonstrative.

23             THE COURT:  Well, you need to locate them,

24   Mr. Sheasby, you need to show them to Mr. Stone, and if he has

25   a problem with them, he needs to raise that with me before

1    they're used.

2          MR. SHEASBY:  Okay.  Thank you.  I'll do that right

3    now.

4          THE COURT:  All right.

5          (The following was had in the presence and hearing

6          of the jury.)

7          THE COURT:  Counsel.  You've reviewed that document.

8    Approach the bench.

9          (The following was had outside the hearing of the

10         jury.)

11         THE COURT:  Tell me what we're talking about.

12         MR. SHEASBY:  It's a document that was produced,

13   it's our records of the type of devices that were used, and it

14   includes digital cameras.

15         MR. STONE:  It is undated so we don't know whether

16   it relates at all to the issue of October of 2006.  It's an

17   undated -- I'm sorry.

18         MR. SHEASBY:  I interrupted you, Mr. Stone.  Please

19   continue.

20         MR. STONE:  It's an undated document that has no

21   indication when it was prepared, and it doesn't -- can't even

22   tell by looking at it what's a camera and what's not a camera.

23         THE COURT:  All right.  If you want to take this

24   witness on redirect with that document -- it's been produced

25   in the case.  If you want to identify he has personal

380

```
 1    knowledge of it, then it can be used as a demonstrative to aid

 2    his testimony.

 3              MR. SHEASBY:  Thank you.

 4              THE COURT:  Not as an exhibit.

 5              MR. SHEASBY:  I understand.

 6              MR. STONE:  Thank you, Your Honor.

 7              (The following was had in the presence and hearing

 8              of the jury.)

 9              MR. SHEASBY:  Let's pull up the document.

10                        REDIRECT EXAMINATION

11    BY MR. SHEASBY:

12    Q.   Does USAA have lists of the type of devices that are used

13    with its original Deposit@Home system?

14    A.   Yes, sir.

15    Q.   Does this reflect one of those lists?

16    A.   Yes.

17    Q.   What are the highlighted devices?

18    A.   These are digital cameras.

19              MR. SHEASBY:  I pass the witness.

20              THE COURT:  Is there further cross?

21              MR. STONE:  No further cross, Your Honor.

22              THE COURT:  All right.  You may step down,

23    Mr. Prasad.

24              THE WITNESS:  Thank you, Your Honor.

25              THE COURT:  You're quite welcome.
```

1          MR. SHEASBY:  Your Honor, may we clear binders?

2          THE COURT:  Just a moment.  Have a seat, counsel.

3      Ladies and gentlemen, as if there wasn't enough to do

4  around here, I have set an emergency motion over the noon hour

5  that I have to take up.  So I'm going to -- rather than press

6  right up until 12:00 noon, I'm going to send you to lunch a

7  little early so I can get that handled.

8      I'm going to ask you to take your notebooks with you to

9  the jury room over the lunch break.  Lunch either should be

10 there or should be on its way to you shortly.

11     Please follow all my instructions, including, of course,

12 as you would expect me to remind you, not to discuss the case

13 with each other.  And as soon as I can finish this unrelated

14 matter over the lunch break and you've had time for your

15 lunch, I'll get you back in here and we'll continue with the

16 next witness.

17     The jury's excused for lunch.

18          (Whereupon, the jury left the courtroom.)

19          THE COURT:  Be seated, please.

20     Counsel, in reviewing what's previously been submitted,

21 I'm persuaded that a joint effort by both sides to revisit and

22 resubmit a newly-updated version of the proposed final jury

23 instructions and verdict form would benefit the Court.

24     Therefore, I'm going to order you to meet and confer and

25 jointly submit as a single document in Word form an updated

382

1    and newly proposed final jury instruction and verdict form by

2    3:00 tomorrow.  It's to be delivered to my staff, as I say, in

3    Word format, electronically, by that time.

4         And where there are areas that the parties disagree, you

5    should either identify each other's competing submissions by

6    different color highlighting, different fonts, or some clear

7    indication noted on the submission so I can see where you

8    differ, and those differing provisions should be in that one

9    jointly submitted document, one right after the other so I

10   don't have to flip through various versions to look for them.

11        Also, when we met in chambers this morning about

12   overnight disputes, as everyone was walking out of the room

13   Mr. Bunt said, When are we going to take up Mr. Kennedy's

14   issues?

15        I said something like, We'll get to it.

16        And then after we got on the bench, I noticed in

17   reviewing what had been submitted overnight, I don't see any

18   disputes regarding Mr. Kennedy.

19        Are there live disputes regarding issues concerning

20   Mr. Kennedy that have to be addressed before he testifies?

21             MR. BUNT:  It was my understanding that the

22   Defendant had two objections to slides, to demonstratives.

23             THE COURT:  Well, that was not -- at least unless I

24   overlooked it, that wasn't in the binder that was submitted

25   overnight.

1      I'm going to direct both sides to meet and confer on that

2   issue over the lunch break and update me when we come back

3   from lunch as to whether there are, in fact, issues that need

4   to be presented to the Court or not.

5           MS. YOUNG:  And, Your Honor, may I just clarify?

6      In the binder--and I apologize because it's not presented

7   very clearly--but there is a blue slip sheet in between the

8   discussion of the parties' disputes over deposition

9   designations, and then there are -- there is a submission

10  about the parties' disputes related to demonstratives after

11  that.

12          THE COURT:  All right.  Well, it's possible I

13  overlooked it.  I still want both sides to meet and confer,

14  and if you can work it out, please do.  If you can't, let me

15  know.

16          MS. YOUNG:  Thank you, Your Honor.

17          THE COURT:  All right.  Unless you want to sit here

18  and listen to me take up a temporary restraining order in an

19  unrelated matter, you are excused for lunch and we will

20  reconvene as close to 1:00 as possible.

21     Court stands in recess.

22                  (Lunch recess.)

23          THE COURT:  Be seated, please.

24     Ms. Smith, Mr. Bunt, I understand we still have

25  demonstrative issues regarding Mr. Kennedy?

1              MR. BUNT:  Yes, Your Honor.  There are two issues.

2              THE COURT:  I've reviewed the hidden disputes behind

3      the blue page over the lunch hour, and I'll be prepared to

4      talk about it with you at a recess later today.

5              MR. BUNT:  Thank you, Your Honor.

6              MS. SMITH:  Thank you, Your Honor.

7              THE COURT:  Okay.  Are we prepared to go forward

8      with the next witness, Plaintiff?

9              MS. GLASSER:  Yes, Your Honor.

10             MR. LANTIER:  Your Honor, may I ask for guidance on

11     one issue before we go forward?

12             THE COURT:  What's that, counsel?

13             MR. LANTIER:  Two issues very briefly.  One is --

14     and this will come up with Doctor Conte.  My understanding of

15     the Court's practice is that I should not be cross-examining

16     on prosecution history estoppel issues based on what Judge

17     Payne said during the pretrial conference.

18         I just wanted to confirm with Your Honor that that is the

19     rule that should apply here.

20             THE COURT:  Well, let me say this.  You should

21     fashion your cross-examination and comport yourself in this

22     court pursuant to the guidance given you by the magistrate

23     judge during the pretrial process.

24             MR. LANTIER:  Thank you, Your Honor.

25         The second issue is, as Your Honor's aware, there's been

1    summary judgment that the version 4.20.1 is a non-infringing

2    alternative to three of the patents that are asserted here.  I

3    just wanted to -- I didn't want to get crosswise with Your

4    Honor.  Am I permitted to say to the jury that the Court has

5    ordered that, similar to the way we would say it about a

6    *Markman* ruling?

7              THE COURT:  Tell me specifically what you would

8    propose to say.

9              MR. LANTIER:  For example, a cross-examination

10   question might be, You understand that the Court has found

11   that version 4.20.1 is a non-infringing alternative to the

12   '432 Patent.

13             THE COURT:  All right.  Does Plaintiff have a

14   problem with that?

15             MS. GLASSER:  Yes, absolutely, Your Honor.  That was

16   not Judge Payne's ruling is the fundamental problem with it.

17   But I don't think that the parties should be telling the jury

18   about court orders other than the one court order that's

19   actually in their juror notebook which has the constructions

20   in it.

21        On the first issue, the motion for summary judgment was

22   about whether there's a factual dispute that three of the four

23   patents in this case infringe -- are infringed by the new

24   product that's not in this case.  Obviously it's not a

25   non-infringing alternative just because it doesn't infringe or

1   nobody is contesting whether it infringes those three, and

2   Judge Payne made that very abundantly clear in his order.

3        We do contest that it's a non-infringing alternative, and

4   Judge Payne was clear that PNC bears the burden on that issue

5   and that that fact is not established.

6        So on those two bases, we would object.  I think, as I

7   spoke with Mr. Lantier over the break, it's perfectly fine if

8   he wants to say in his cross something like, You didn't give

9   any testimony here today or you didn't say in your report that

10  the new version infringes those three patents.  Correct.

11       And he can say presumably, correct.

12       But other than that, I don't think any of this is proper.

13            THE COURT:  Mr. Lantier?

14            MR. LANTIER:  I would just say, Your Honor, the text

15  of Judge Payne's order is that the Court -- and Your Honor --

16  Your Honor has confirmed it, the Court grants the motion that

17  4.20.1 is a non-infringing alternative to the '432 Patent.

18  That's the text of the order and what was included there, Your

19  Honor.

20            MS. GLASSER:  Can I read the rest of it, Your Honor?

21  It says the opposite of that in other places.

22            THE COURT:  Well, in reviewing some of the disputed

23  demonstrative slides for other witnesses, it seems that

24  version 4.20.1 has been determined not to literally infringe

25  three of the patents.  Is that not the case?

1           MR. LANTIER:  I don't think that there was any

2    argument about doctrine of equivalents infringement for those

3    patents with version 4.20.1.  I believe that the order was

4    complete as to any type of infringement.

5           THE COURT:  I'll review the orders at issue before

6    we get to that.  Be sure that you seek guidance from the Court

7    before going into any of these matters and give me an

8    opportunity to look at the orders.

9           MR. LANTIER:  Thank you, Your Honor.

10          THE COURT:  All right.  Let's bring in the jury.

11          (Whereupon, the jury entered the courtroom.)

12          THE COURT:  Welcome back from lunch, ladies and

13   gentlemen.  Please have a seat.

14      All right.  Plaintiff, call your next witness.

15          MS. GLASSER:  Thank you, Your Honor.  USAA calls

16   Professor Thomas Conte.

17          THE COURT:  All right.  If you'll come forward,

18   Doctor Conte, and be sworn by our Courtroom Deputy.

19          (Whereupon, the oath was administered by the Clerk.)

20          THE COURT:  Please have a seat on the witness stand,

21   sir.

22          THE WITNESS:  Thank you.

23          THE COURT:  Counsel, briefly approach the bench,

24   please.

25          (The following was had outside the hearing of the

```
 1              jury.)

 2              THE COURT:  Were there not to be depositions before

 3    Doctor Conte earlier?

 4              MS. GLASSER:  We agreed to switch the order.

 5              THE COURT:  I'm glad somebody told me.

 6              MS. GLASSER:  Sorry about that.

 7              MS. GLASSER:  All right.  Let's go.

 8              (The following was had in the presence and hearing

 9              of the jury.)

10              MS. GLASSER:  And actually, Your Honor, before we

11    formally begin as well, the parties have also conferred and,

12    with Your Honor's permission, we would like to turn off the

13    video in the gallery because there will be some snippets of

14    source code that are shown.

15              THE COURT:  Throughout this examination or only for

16    a designated portion?

17              MS. GLASSER:  They are in multiple portions

18    throughout the presentation, and so we believe it would be

19    disruptive to have people shuffling in and out.  The majority

20    of folks out there are not permitted to see the source code.

21              THE COURT:  Do you anticipate discussing any of it

22    orally in a way that the record would need to be sealed?

23              MS. GLASSER:  No.  And, in fact, we have conferred

24    as well with a third party to ensure there is no objection to

25    it being discussed orally.
```

1           THE COURT:  So the only way it could be disclosed

2      would be visually.

3           MS. GLASSER:  Correct.

4           THE COURT:  All right.  And I gather both sides are

5      in agreement with that approach?

6           MR. LANTIER:  Yes, Your Honor.

7           THE COURT:  All right.  Then have we taken the steps

8      to implement that now?

9           MS. GLASSER:  I believe that that has been done or

10     that it can be done fairly easily.

11          THE COURT:  Well, I'll order, based on the parties'

12     agreement, that the monitors inside the bar in the jury box

13     remain operative and unaffected, but the three monitors that

14     face the gallery will be turned off during the examination of

15     Doctor Conte.

16          MS. GLASSER:  Thank you very much, Your Honor.

17          THE COURT:  All right.  Let's proceed with direct

18     examination of the witness.

19                    THOMAS CONTE, PhD, SWORN,

20     testified on direct examination by Ms. Glasser as follows:

21     Q.   Good afternoon, Professor.

22     A.   Good afternoon.

23     Q.   Can you please introduce yourself to the jury?

24     A.   Sure.  My name is Tom Conte.  I'm an associate dean and

25     professor of computer science and electrical and computer

```
1    engineering at Georgia Tech.
2         I live with my wife and our two children in Decatur,
3    Georgia, and my hobbies are woodworking and photography and
4    walking our four rescue dogs.
5    Q.   What is your role in this case?
6    A.   So I was asked to analyze certain USAA asserted patents
7    and their asserted claims and also analyze the PNC Mobile
8    Deposit System and then determine whether or not PNC infringes
9    those asserted claims.
10   Q.   And have you prepared graphics to illustrate some of your
11   testimony today?
12   A.   I have, and here they are.
13   Q.   Let me put up the graphic for your education, please.
14   A.   Sure.
15   Q.   And, Professor Conte, can you briefly describe your
16   educational background?
17   A.   Sure.  I went to the University of Delaware where I
18   received my Bachelor's of Electrical Engineering in 1986 with
19   a focus on computing.
20        I then went to the University of Illinois for graduate
21   school where I got my Master's degree in '88 and then my
22   doctorate in '92.
23   Q.   And can you provide us with an overview of your
24   professional background after you received your doctorate
25   degree?
```

1   A.    Okay.  So immediately after I got my Ph.D., I got a job

2   teaching at the University of South Carolina.  That's where I

3   met my future wife.  We got married, and then we moved to

4   Raleigh-Durham, North Carolina, where I taught at NC State

5   University until mid 2008.  And then Georgia Tech recruited me

6   away, and that's where, as I said, I'm associate dean and

7   professor of CS and ECE at Georgia Tech.

8   Q.    During those roughly 30 years of teaching at

9   universities, did you also obtain specific industry

10  experience?

11  A.    I did.  So, you know, that old adage that those who can't

12  do, teach, I don't believe in that and especially as an

13  engineer.  So I've always worked in industry part-time and in

14  the summers.  In fact, one attraction to going to the

15  University of South Carolina was that they had an NCR division

16  there that built bank servers.  So a day a week, I worked

17  there, and then during the summers I worked there as an

18  engineer.  We'll hear more about bank servers later today.

19        Then when I moved to Raleigh-Durham, I got a day a week

20  and a summer job working at IBM in their embedded processor

21  group.

22        And then around '99, a bunch of us had a bright idea and

23  we went off and did a start-up called BOPS. And BOPS built

24  mobile processors for video, image recognition, and things

25  like this.

1       And then I've also worked for some other companies on

2   mobile processors as well.

3   Q.   When you were working at BOPS, what were the two types of

4   things that you did?

5   A.   So I worked with intellectual property, inventions, and I

6   also developed a product.

7   Q.   Now, are those two separate things, developing inventions

8   and developing products?

9   A.   Yes, they are.

10  Q.   Do you have experience with mobile technology and banking

11  specifically?  Could you elaborate on that a little bit?

12  A.   Yes.  So as I said, at IBM, then at BOPS, and then in

13  later jobs that I had, I worked on mobile processors,

14  including some that go into phones even today.

15      I also worked on bank servers when I was at NCR, and I

16  believe even NCR software is at issue today as well.

17  Q.   Now, could you tell us, have you received any significant

18  awards or recognitions?

19  A.   Okay.  You made me make up a slide on that.  So I am the

20  past president of the IEEE Computer Society.  That's the

21  largest society in IEEE.  I was elected to that by my peers

22  and served in that role in 2015.

23      I'm also a fellow of the IEEE.  That's a pretty select

24  group.

25      I invented 40 patents and am the author of over 100

1    papers in the fields of computer engineering, computer

2    science, and electrical engineering.

3    Q.   Now, for the 40 issued U.S. patents, were any of your

4    inventions put into commercial products before the application

5    for the patent was filed?

6    A.   Absolutely none.

7    Q.   Were any of them ultimately put into commercial products?

8    A.   Yes.  Three of them were.

9    Q.   And is there a difference between invention to create a

10   valid patent and ultimate commercialization?

11   A.   Yes.

12        MR. LANTIER:  Objection, Your Honor.  At this point

13   I think we are straying into new opinion testimony.

14        MS. GLASSER:  That was my last question on that

15   particular slide so I'm happy to move on.

16        THE COURT:  Well, counsel's objected to your last

17   question whether it was your last question or your next

18   question.

19      What's the basis of your objection, Mr. Lantier?

20        MR. LANTIER:  Your Honor, the basis is that that's

21   not disclosed in the expert report that was served in this

22   case.

23        THE COURT:  What's your response to that, Ms.

24   Glasser?

25        MS. GLASSER:  The fact that he's an inventor on the

```
1    patents and his industry work is disclosed in the report.  And
2    there's no objection to this slide, either, by the other side.
3    It was predisclosed.
4            THE COURT:  What specifically do you believe exceeds
5    the scope of the expert's report, counsel?
6            MR. LANTIER:  Your Honor, he was testifying about
7    the -- in his experience, which was not in the report, but
8    whether there was commercialization of patented products at
9    the time the patent was applied for.  It's not within the
10   scope of his opinion.  It's not even subject matter of his
11   report.
12           THE COURT:  I'm going to overrule the objection.
13   We're talking about his background and his qualifications to
14   be an expert in this case.  He's not begun testifying about
15   substantive matters related to the patents-in-suit.
16           MR. LANTIER:  Yes, Your Honor.
17           THE COURT:  All right.  Let's proceed.
18   Q.   (BY MS. GLASSER)  Now, in addition to over the last 30
19   years, you mentioned you've been teaching and you've also been
20   working for industry.  Is that right?
21   A.   That's correct.
22   Q.   And during that time period, have you also been engaged
23   on a number of occasions to review patents for, for example,
24   litigation matters like this one?
25   A.   I have, yes.  I think my first engagement was 19 years
```

1    ago.

2    Q.    And over those 19 years, do you sometimes analyze them

3    for the patentholder and sometimes analyze them for someone

4    who's been accused of infringement?

5    A.    Yes.  I've done both.

6    Q.    Have you ever had an occasion where an innovator like

7    USAA in the past has both retained you and retained the law

8    firm that Mr. Sheasby and I work for?

9    A.    Yes.  In fact, USAA retained me in the Wells Fargo

10   matters.

11   Q.    Are you being compensated for your time in this and any

12   other consulting matter that you get engaged on?

13   A.    Yes.  I'm being compensated at my ordinary and customary

14   rate of $600 per actual hour worked.

15   Q.    Is your compensation dependent in any way at all on the

16   opinions you give or the outcome of this case?

17   A.    Absolutely not.

18           MS. GLASSER:  Your Honor, I would offer Doctor Conte

19   as an expert in computer science and mobile device technology.

20           THE COURT:  Is there objection?

21           MR. LANTIER:  No objection, Your Honor.

22           THE COURT:  Then without objection, the Court will

23   recognize this witness as an expert in those designated

24   fields.

25           Please continue, counsel.

1   Q.    (BY MS. GLASSER)  Doctor Conte, what analysis at a high

2   level did you perform in this case?

3   A.    So at a high level, I analyzed claims of the patents

4   you've heard about, the '432, the '681, the 605, the '571.

5         I also analyzed PNC's mobile check deposit system, and

6   I'll go into that in depth.

7         And then I determined whether or not all of the asserted

8   claims are present in the PNC system.

9   Q.    Now, how did you go about analyzing the PNC system?  What

10  types of PNC materials did you have access to?

11  A.    Well, I had access to PNC technical documents, PNC sworn

12  witness testimony, and PNC source code to the acts.

13  Q.    So once you had all that information available to you,

14  the source code and the witness testimony and the documents,

15  how do you actually go about determining whether the PNC

16  accused products infringe?

17  A.    So what I do is I look at the documents, I compare them

18  to the claim elements, and then for each and every element --

19  let me go back to that.  For each and every

20  element -- actually here we go.  For each and every element in

21  the claim, I look over to the right here, see if it's in the

22  system.  If it is, I'll put a checkmark there meaning it's

23  present.

24        And then at the end of the day, if there's a checkmark in

25  all the boxes, then I can conclude they infringe.

1  Q.   And is this analysis that you just described what's known

2  as literal infringement?

3  A.   It is.

4  Q.   Did you also perform a second type of infringement

5  analysis in this case called doctrine of equivalents

6  infringement?

7  A.   I did.  And that is where something is equivalent if it

8  performs substantially the same function in substantially the

9  same way to achieve substantially the same result.

10 Q.   Okay.  So before we get into the details of your

11 opinions, do you have a road map for us of the topics that

12 you're prepared to present on today?

13 A.   I do and here it is.  So first I'll talk about USAA's

14 asserted patents.  Now, you've heard a lot about them so what

15 I'll do is just focus on some aspects that are relevant to my

16 analysis.

17      And then I'll go over how the PNC Mobile Deposit System

18 works.

19      And then I'll go through that element-by-element analysis

20 with those two pieces of information in hand.

21 Q.   So turning to the first subject of the USAA patents, can

22 you just briefly remind us how are those patents grouped?  I

23 think this is a slide we've seen before in the opening.

24 A.   Yeah.  There are two groups.  There is the 2006

25 generation and the 2009 generation.

398

1    Q.   Did you prepare slides highlighting some of the key

2    concepts in the 2006 patents that were important to your

3    understanding and analysis?

4    A.   I did.  So here's some of the specifications, and it

5    talks about what you've heard--that the advantage of the

6    embodiments of the invention is the ability to operate in

7    conjunction with electronics that today's consumers actually

8    own or can easily acquire, such as a general purpose computer.

9         Then it goes further and it says, general purpose

10   computer specifically excludes specialized equipment like a

11   bank or a business would buy to process checks.

12   Q.   Now, I'm going to pause you there for a minute.

13        Were you here when it was mentioned during the jury

14   instructions that there would be constructions or definitions

15   from the Court for some of the claim terms?

16   A.   Yes, I was.

17   Q.   And is general purpose computer a term that has a special

18   definition from the Court for this case?

19   A.   It does.  So the definition is, a computer that is not

20   specialized for a particular purpose.

21   Q.   What is an example of a general purpose computer that is

22   not specialized for a particular purpose?

23   A.   Well, that would be like a tablet computer.  It could be

24   like a notebook computer or could be like a smartphone.

25   Right?  And any one of these cases, you can download multiple

399

1    apps to that computer and do a whole variety of things.

2         You know, in fact, you'd imagine, as a computer geek, I

3    have tons of computers at home, and my wife won't touch them.

4    She does everything with her smartphone, much to my chagrin.

5    Q.   Now, in the USAA patents, do they describe ways in which

6    the general purpose computer can be configured?

7    A.   Yes.  They discuss that, and I'll read it, General

8    purpose computer element 111 may be in a desktop or laptop

9    configuration.

10   Q.   Now, what does that exact phrase, laptop configuration,

11   what does that mean to a person like you who's skilled in the

12   art of computing?

13   A.   A laptop configuration means that everything's contained

14   in one box so you don't have a bunch of things hanging off it.

15   Q.   Can you dig into that a little bit more?  Can you give us

16   an example of devices that are in what's called a laptop

17   configuration?

18   A.   Sure.  In fact, the three I just mentioned.  So a tap

19   tablet computer, a notebook computer, or -- or a smartphone is

20   in a laptop configuration.  Everything you need is in one box.

21   Q.   And how long has that been the understanding of folks

22   like you skilled in the art of computing?

23   A.   Oh, wow.  Probably back to the mid '90s.  No, no.  Let me

24   say the mid '80s.

25   Q.   Do the patents make reference to any particular special

1    types of mobile devices?

2    A.   They do.  And so here's a section where they talk about

3    various digital devices such as a PDA.  Now, PDA, that term

4    means personal digital assistant.  That's a handheld computer.

5    So, in fact, a smartphone today is a PDA.  The only difference

6    today is it actually has a phone part with it.

7    Q.   Now, there was some discussion earlier today about filing

8    dates of patents, and so I want to be very clear.  All of

9    these statements from the specification that you're pointing

10   to, were these in the original 2006 patent application or were

11   they added later?

12   A.   Oh, the specification cannot be edited.  So, yes, these

13   were in the original application.

14   Q.   In 2006?

15   A.   In 2006.

16   Q.   Now, you mentioned the term -- actually let me go to one

17   other topic from the specification.

18        Do the patents describe how this type of general purpose

19   computer in the invention should interact with the imaging

20   device like the camera?

21   A.   Yeah, it does.  It talks about the image capture device

22   112 may be communicatively -- I always screw that word up --

23   communcatively coupled to the computer 111.

24   Q.   Okay.  So what does communicatively coupled mean in the

25   context of, for example, an iPhone?

1   A.   So if you were to take your iPhone and, let's say, smash

2   it with a hammer, I don't recommend it, but if you did that

3   and you pulled it apart, you'd see the processor is connected

4   with the camera with a set of wires.  So it's communicatively

5   coupled to the processor.

6   Q.   Okay.  So let's turn then to your analysis of the PNC

7   Mobile Deposit System, starting with the most general question

8   which is, what does the PNC Mobile Deposit System include?

9   A.   So the PNC Mobile Deposit System includes the app that

10   runs on the user's phone; it includes software that runs on

11   the PNC servers; and when you launch the app, it communicates

12   with that software on the server to form the system that

13   allows the user to do mobile deposit of checks.

14   Q.   Just to break it down into pieces about which parts PNC

15   is performing, so that mobile device itself physically is

16   manufactured by someone else in a factory.  Right?

17   A.   Of course.  Of course.

18   Q.   And same with server equipment.  Is that right?

19   A.   That's right.

20   Q.   So who takes those pieces of the system and assembles the

21   complete PNC Mobile Deposit System into one?

22   A.   PNC does.  In fact, part of the assembly is done by the

23   app itself when it reaches out and communicates with the

24   server and establishes this connection to make the system.

25   Q.   Now, in terms of the PNC software you're talking about

```
 1   that controls the system, are there some parts of that code

 2   that PNC went out and purchased from a vendor?

 3   A.   Yes, of course.

 4   Q.   And then does PNC itself incorporate those and customize

 5   them?

 6   A.   Yes.  That's -- that's a standard practice.

 7   Q.   Okay.  So we've been talking about the software.  What

 8   exactly is the PNC software made out of?

 9   A.   All right.  So software is made out of source code.  And

10   what that is is what I teach computer science students about.

11   And we're going to get a chance to look at some source code.

12   And when we do, I'll explain to you how it works.

13        So source code is really the list of instructions that

14   you have to make a computer program do what it does.

15   Q.   And what is an algorithm?

16   A.   An algorithm is a set of steps and -- that ultimately the

17   only other requirement for an algorithm is that it terminates.

18   So a set of steps that eventually you do and it ends.

19   Q.   Now, what source code versions did you examine for the

20   PNC system?

21   A.   Okay.  So I looked at the PNC IOS release from April 2016

22   up to mid 2021, I looked at the PNC Android release from --

23   releases from September 2017 up to mid 2021, and I looked at

24   all the PNC mobile deposit server software produced.

25   Q.   And did you have a team that assisted you in reviewing
```

1    all of that source code?

2    A.    I did.    There was a team of three programmers that went

3    out, and the way I did that was -- and this is PX 030.    PNC

4    supplied this flowchart, and it's pretty big.    We'll see

5    pieces of it later.    And it describes how their whole system

6    works.

7         And so what I did was, when I wanted to see how a block

8    worked, I asked the programmers to go out and get that source

9    code to me, and then I looked at that to see how it operated.

10   Q.    So that supplies all of the big picture high level, and

11   then you have to look at the source code or other documents to

12   understand some of the implementation details?

13   A.    Absolutely.

14   Q.    So from a technical perspective, once this system is

15   assembled together using the code, how does PNC actually

16   control the customer's mobile device?

17   A.    So what PNC does is that the customer must download the

18   PNC mobile app if they want to make mobile deposits with PNC.

19   In fact, when you download it, there's this agreement that you

20   agree to, and it says, use of PNC's mobile deposit feature

21   requires that you use their mobile app.    So you can't go in

22   the back room and program your own app--right?--to access

23   their servers.    You have to use the PNC mobile app.

24   Q.    Does PNC require everyone who banks with them to do

25   mobile deposit?

1    A.    No, of course not.

2    Q.    But if they do do mobile deposit, then are they bound by

3    particular terms?

4    A.    They are.  If they do do mobile deposit, they must do it

5    with the PNC app.

6    Q.    Have you prepared for the Court and jury a walk-through

7    of the high level steps that occur once this application

8    software is installed and running on the customer device?

9    A.    I have.  So this is how it works.  When you launch the

10   app, it asks you to authenticate with the username and

11   password or fingerprint or something like that.  Then you

12   choose from a set of menu items, like, you know, pay bills,

13   whatever.  Let's say you choose deposit checks.

14       Next what it does, it asks you to pick the deposit

15   account.  Then you look at the check, you read the number off

16   the front, and you enter it.  And then a screen pops up, and

17   it -- you see -- you use the camera to capture images of the

18   check.  It will show you this ghost of the check.  You're

19   supposed to fill the frame with that ghost check image.  If

20   you don't, it will give you hints like move closer.

21   Q.    And so when you say the ghost of a check, you're talking

22   about this rectangle that sort of shows up on the screen and

23   starts hovering over where the user is providing the check?

24   A.    Yeah.  They call it a ghost image.  So we'll use that

25   term again later.

1    Q.    Okay.  And so then what happens?  How does it actually

2    capture?

3    A.    So once the image is good, it says success and it snaps a

4    picture of the image.  And then it presents the image to you.

5    And what the user can do is look at that image.  If that image

6    is good, then hit continue.  If that image isn't good, then

7    you can retake the photo.

8         And, of course, PNC does this because they want to

9    increase the likelihood that they get good photos in the back

10   end.

11   Q.    Could you explain that a little bit more?  So why from a

12   technical perspective are the photos presented to the user

13   after they're taken?

14   A.    So from a technical perspective, the quality of the image

15   is very important.  So from a technical perspective, you

16   present the image to the user so that they can examine it.

17   And even though you took the picture, it might be that it is

18   fuzzy or something.  And so, again, the user can choose to

19   retake that picture.  And ultimately the probability of

20   success in PNC's applications overall across all deposits is

21   going to increase.

22   Q.    Okay.  And so then I think you showed us just visually on

23   the screen only the front of the -- sorry, the front of the

24   check.  What happens after the front of the check?

25   A.    I'm a step ahead of you.  So here it says, capture back

```
1   of check, and the same process proceeds.  They will snap the

2   picture, says success.  And then it gives the user an

3   opportunity to review the back of the check.  And, again, if

4   it's a bad image, retake it; a good image, continue.

5       And then what pops up is the screen that tells you when

6   the funds will be available and how much -- how -- sorry.  You

7   can choose in PNC's app to pay $2 and have the funds

8   immediately available.  And it gives you the submit button.

9       And then when you mash that submit button, it pops up

10  this confirmation of deposit screen.

11  Q.   So for your element-by-element analysis applying the

12  system to the patents, which patent did you analyze first?

13  A.   Okay.  So let's start with the '432 Patent, claim 1.  And

14  let me explain what I've done here.

15      On the left is how the claim actually appears in the

16  patent in the back of the juror notebooks.  And I've just

17  taken the text here for each element and put them in rows in

18  this table.  And so I'm going to use this table to mark off

19  elements as I find them.

20  Q.   Okay.  Have you prepared a chart like that for the '432

21  Patent for us to walk through?

22  A.   I have.

23  Q.   What were the first elements that you analyzed?

24  A.   So the first elements are element A, a system comprising.

25  And then element B, a customer's mobile device, including a
```

1    downloaded app, the downloaded app provided by a bank to

2    control check deposit by causing the customer's mobile device

3    to perform:  and then C through J.

4    Q.    Okay.  So -- oh, did you apply any definitions from the

5    Court for this term?

6    A.    I did.  The Court gave us two definitions.  The Court

7    defined mobile device to be a handheld computing device.  The

8    Court defined check deposit to mean a transaction involving

9    provision of a check to a depository in a form sufficient to

10   allow money to be credited to an account.

11   Q.    And did you analyze whether elements A and B are present

12   in the PNC product under the Court's definitions?

13   A.    I did.  So the PNC mobile app does run on a handheld

14   device, and it does provide a check image to their servers,

15   which ultimately results in the funds being credited to the

16   account.

17         This isn't the only evidence I looked at.  I also looked

18   at the source code, for example.

19   Q.    And actually just to clarify some terminology.  So a

20   mobile phone is a type of handheld computing device.  Is that

21   correct?

22   A.    Yes.

23   Q.    Is it the only type of handheld computing device that can

24   exist?

25   A.    No.  There's many other types of handheld computing

1    devices that can exist.

2    Q.   And so what did you conclude ultimately regarding

3    elements A and B?

4    A.   So these elements are present, so I'll put a checkmark

5    there.

6         And then the next element is "instructing the customer to

7    have a digital camera take a photo of a check."  And so with

8    that, we saw this in the walk-through.  It does instruct the

9    customer to take a photo of the front of the check and the

10   back of the check, and I also confirmed this functionality in

11   the software itself.

12   Q.   And so what was your conclusion then regarding the

13   entirety of element C?

14   A.   Well, for all that evidence, it's present.  So let's put

15   a checkmark there.

16   Q.   And what was the next element you reviewed?

17   A.   That's "giving an instruction to assist the customer in

18   placing the digital camera at a proper distance away from the

19   check for taking the photo."

20        And here is our first source code.  So this shows -- the

21   top shows this code that actually produces this ghost image.

22   And this is fairly easy to read because the programmers named

23   the routine, show ghost image.

24   Q.   Okay.  So just to be clear, the black-and-white small

25   font at the top, those are actually excerpts that you've put

1    on the slide from the actual real underlying source code.  Is

2    that correct?

3    A.    That's correct.

4    Q.    Okay.  And that code itself corresponds to what you

5    visually see on the app down on the bottom part of the slide?

6    A.    That's right.  This is the code that actually makes the

7    bottom happen.  And you see if the horizontal fill is wrong or

8    the minimum padding is wrong, it's going to say things like

9    get closer.  Right?  You got to get closer.  In fact, if

10   you're too close, it's going to say, you know, back up.

11        And so it does both these ghost image and these feedback

12   hint bubbles, is what PNC calls them.  So for all those

13   reasons then, element D is present in the PNC Mobile Deposit

14   System, and I can put a checkmark there.

15   Q.    Did you go on to analyze element E?

16   A.    I did.  And it is "presenting the photo of the check to

17   the customer after the photo is taken by the digital

18   camera."  And we saw this.  So after the photo is taken, it

19   does prevent -- present the photo of the check to the customer

20   and gives them the option to retake.

21        And, again, the reason here is to try to increase the

22   likelihood of getting a good image on the back end.  And it

23   does the same thing for the back of the check.

24   Q.    And --

25   A.    I'm sorry.

1    Q.   I apologize.  I actually -- just for the record and for

2    the jury if they need the evidence, the source code we looked

3    at on the prior slide, was that PX 312 and PX 315?

4    A.   Yes, it was.

5    Q.   And then I think I may have interrupted you regarding

6    element E.

7    A.   Okay.  So that's the evidence, plus I confirmed that in

8    the source code.  Therefore, element E is present.  We can put

9    a checkmark there.

10        Now let's move on to element F.  That's "using a wireless

11   network, transmitting a copy of the photo from the customer's

12   mobile device, and submitting the check for mobile check

13   deposit in the bank after presenting the photo of the check to

14   the customer."

15   Q.   And that is a fairly lengthy element.  If we could break

16   it up into pieces, what analysis did you do for the first part

17   of element F regarding the wireless network?

18   A.   All right.  So for the first part -- and, again, that's

19   providing -- that's transmitting a copy of the photo of the

20   check from the customer's mobile device.

21        Here I'm showing the source code for where that

22   transmission occurs, and you'll see here

23   remotedepositrequest.create, and I've highlighted something

24   here called carrier.  That's your carrier like AT&T or Verizon

25   or something.  So it says, use that carrier, and it's sending

1    the back image and the front image.

2    Q.   And that's all from within Exhibit PX 353?

3    A.   That's correct.

4    Q.   Now, what about the second part of element F, submitting

5    the check?

6    A.   Well, I'm not done yet.  Let me show you a little more

7    about the first element just to be complete.

8         Here is an example of turning off of the network by going

9    to the airplane mode.  And if you do that and you try to

10   proceed, it's going to say, a network error occurred, please

11   check your connection.  So there's no way you can submit a

12   check, of course, if you can't communicate with the servers.

13   Q.   So this is what actually happens on the mobile device

14   when that code you just showed is running.  Is that right?

15   A.   That's correct.

16   Q.   Now, what about that second part of the element?

17   A.   The second part is submitting the check for mobile check

18   deposit in the bank after presenting the photo of the check to

19   the customer.

20        And as you saw on the walk-through, the photos of the

21   check is presented first.  And here's that submit button.

22   When the user mashes that submit button, in IOS, in that

23   version, it calls the software, routine submit deposit

24   complete.  In Android, it calls the function -- actually the

25   method, confirm submit deposit complete.

```
1    Q.   So I think function and method are new terms here.   Are

2    those source code terminology and what do they mean?

3    A.   Okay.  They are source code terminology, and what they

4    mean is that this is the name of another set of instructions

5    that perform that function.

6         So in IOS if you, what we say is, invoke, if you invoke

7    submit deposit complete, it's going to go off and run those

8    instructions that do what happens after you press the submit

9    button.

10        In the Android version, it's called slightly differently.

11   They put a confirm in front, to confirm submit deposit

12   complete.  And in the Android version, they call it a method.

13   Hey, programmers can't decide on anything.  Right?  They call

14   it a method, and that method then is the same thing.  It's a

15   list of instructions that -- that do a specific operation.

16   Q.   For purposes of determining whether element F is

17   satisfied, is there any material difference between the IOS

18   and Android versions?

19   A.   No, there's no material difference.

20   Q.   So taking all of that together, did you reach an opinion

21   regarding element F?

22   A.   I did.  That's present.  So let's put a checkmark there.

23        And the next element is "a bank computer programmed to

24   update a balance of an account to reflect an amount of the

25   check submitted for mobile check deposit by the customer's
```

1    mobile device."

2        And so for this, we're going to go to this big chart.

3    And what I've done is I -- here's the chart on the left, and

4    that's PX 303 again.  And I've blown up a section of this.

5    And that submit deposit, that's what happens when you mash the

6    submit button.

7        And what it does is it sends the account and the amount

8    in this IFA standard is how long you have to wait for all the

9    funds, it sends that down here to the bank computer.  So

10   everything below this first blue line is done in the bank

11   computers, in the servers in the back end.  And here the

12   computer processes the submitted deposit, and then it updates

13   the bank account balance.

14       So based on that evidence and also my analysis of the

15   source code, that's present.  So let's put a checkmark there

16   as well.

17   Q.   And which elements did you look at next?

18   A.   Okay.  So element H is an intro to INJ.  Element H says,

19   "wherein the downloaded app causes the customer's mobile

20   device to perform additional steps including:"  and then I and

21   J.

22       Now, I is confirming that the mobile check deposit can go

23   forward after optical character recognition is performed on

24   the check in the photo.

25   Q.   And did you determine whether -- actually you know what?

1    Before we go there, you mentioned optical character

2    recognition, and there's another term, OCR, that I think came

3    up with some other witnesses.  What is the relationship

4    between those two things?

5    A.   They're one and the same.  So that's a computer algorithm

6    that looks at an image and figures out what the characters are

7    in image.

8    Q.   And OCR is just the abbreviation?

9    A.   Yes, optical character recognition.

10   Q.   Did you determine whether the downloaded app for PNC in

11   fact causes the deposit to go forward after OCR is performed?

12   A.   Yes, it does.  And I confirmed that in the software, but

13   here's a real good visual example of what happens if it can't

14   go forward.

15       So let's say the user enters an amount from the front of

16   the check that doesn't match what the OCR -- what the computer

17   reads from the front of the check.  It's going to pop up this

18   error.  It says, can't validate amount.  And it gives the user

19   two options.  One is either verify the amount you entered is

20   correct, or if the amount you entered is correct, retake the

21   photo because the photo somehow the OCR couldn't read it.

22   Q.   And what about if the mobile device does not find any

23   error at that stage?

24   A.   Right.  So if it doesn't find any error at that stage,

25   then it goes forward and ultimately you get to that submit

1    step.

2    Q.   Now, what was your conclusion then regarding elements H

3    and I together?

4    A.   Those are present.  Now we can move onto element J.

5    Q.   And let me ask you about element J.  So element J, I

6    think you already mentioned this, but element J is connected

7    up to element H.  Is that right?

8    A.   That's correct.  This is also talking about wherein the

9    downloaded app causes the customer's mobile device to perform

10   additional steps.  J is checking for errors before the

11   submitting step.

12   Q.   And did you identify any code that runs on the mobile

13   device that checks for errors before the submitting step?

14   A.   I did, and here's some of that code.  So this is code

15   running on the mobile device, and you'll see here it's

16   checking error codes.  And depending on what the error code

17   is, and I've highlighted some, validate amount or error image,

18   front not clear, depending on what that error code is, it's

19   going to do different things.

20   Q.   And this is from PX 362.  Is that right?

21   A.   That's correct.

22   Q.   Okay.  So can you give some additional examples from this

23   code of error checks that are occurring with this code that

24   runs on the mobile device?

25   A.   Sure.  So there is a whole set of errors that can occur

1    when the image is not good, so too far away, too much light,

2    not enough rotation angle, bad viewing angle.  In this case,

3    it asks the user to retake the photos.

4    Q.   And why is the mobile device checking for those errors?

5    What does it do if it finds them?

6    A.   Well, it needs to check for those errors so that it tells

7    the user there was an error and then give the user an option

8    to fix it.

9    Q.   Does any processing occur on the server?

10    A.   Yes, of course.  The server does some of the checking.

11    For example, this last one--error, duplicate check.  So the

12    server checks to see if the user is trying to pull a fast one

13    and deposit a check twice.

14    Q.   And then what does the mobile device check?

15    A.   Well, what it does is it checks the result from the

16    server, and depending on that, it then pops up this message

17    saying, hey, you can't do that.

18    Q.   So if the mobile device finds an error using this code

19    we're seeing on the screen, what exactly does it do?

20    A.   So if it finds an error using this code, what it does is

21    it will do some corrective action or inform the user.  And

22    that's key.  It informs the user based on what results in this

23    case the server determined.

24    Q.   And the bottom of your slide says, all of this error

25    checking is before submit.  Can you elaborate on that a little

1    bit?

2    A.    Yes.   Remember how we tied the submit button to source

3    code?   It does that submit deposit complete or confirm submit

4    deposit complete depending on the two versions.   Well, all of

5    this error checking that I presented is done in the source

6    code before you even get to that button.

7          So the reason I pointed that out is the claim requires

8    that checking for errors before the submitting step.

9    Q.    Did you identify any other examples of the downloaded

10   application causing the customer's mobile device to check for

11   errors that occur before submission?

12   A.    Yes.   So here's an example.   So accounts have, of course,

13   a deposit limit per day, and here's an example of trying to

14   deposit a check that's a hundred dollars over the limit.   And

15   if someone attempts to deposit a check over that limit, it

16   pops up this message and says, exceeded your daily deposit

17   limit.

18   Q.    And how -- before the software performs that check, what

19   does the user do?   Do they have to enter some information

20   relating to the check?

21   A.    Yes.   They enter the amount from the image of the check.

22   And all of this, again, happens before you can get to that

23   submit button.

24   Q.    Now, do you have an understanding of whether PNC has ever

25   disputed this element?

```
 1   A.   Yes.  My understanding is that PNC has said all their

 2   errors are completely checked on the server, and the phone

 3   doesn't do any work.

 4   Q.   And to be clear, do you agree with that?

 5   A.   No, I don't.  But even if they are -- if that were true,

 6   I went forward and did a doctrine of equivalents analysis.

 7   Q.   And so under the doctrine of equivalents analysis, even

 8   though you disagree based on all of that code and other

 9   evidence that you just showed, did you do a completely

10   separate analysis of whether claim 1 would still be met under

11   the doctrine of equivalents even under PNC's position?

12   A.   Even under PNC's position, yes.  And so even under PNC's

13   position, it does substantially the same function.  Okay?  It

14   checks for errors before the deposit is submitted.  It does it

15   in substantially the same way.  It's checking for errors with

16   the deposit, such as the deposit amount, the missing MICR

17   line, et cetera, and it achieves substantially the same result

18   that's identifying the error and informing the customer of the

19   error and providing an opportunity to correct the error before

20   the deposit is submitted.

21   Q.   So taking all of that together, what is your ultimate

22   opinion as to claim 1 of the '432 Patent and PNC's conduct?

23   A.   Yes.  So in this case I've shown you, for all the

24   evidence I've shown you, that each and every element of claim

25   1 of the '432 is present.  So I concluded that claim 1 of the
```

1    '432 is infringed by the PNC Mobile Deposit System.

2    Q.   Did you go on then to analyze claim 12 of the '681

3    Patent?

4    A.   I did.  And here is claim 12 of the '681.  It's long, but

5    here's the good news.  A lot of the evidence that we've

6    already seen is also evidence of a lot of the elements in this

7    claim.  So we don't have to redo all of the tedious analysis

8    because we've seen a lot of that.  Not all of it but a lot.

9    Q.   Well, let's start with element A.  What additional

10   details does this element require that you haven't already

11   shown to the jury?

12   A.   Sure.  Element A is a system for allowing a customer to

13   deposit a check using the customer's own mobile device with a

14   digital camera.  That's the same as we've heard, but it goes

15   on a system configured to ask the customer to log in using a

16   username and password, the system including:  and then steps B

17   through K.

18        And, indeed, we saw this in the walk-through.  It does

19   ask the customer to log in using a username and password, and

20   here's that screen that did that.  So that's present in PNC's

21   system.

22   Q.   Okay.  So now what is going on here on this slide with

23   the screen highlighting for elements B, C, and D?

24   A.   Okay.  So B, C, and D require much of the same evidence

25   that we've already seen.  In fact, we saw that evidence in the

1    claim we just analyzed.  And so the only new extra detail here

2    is camera software that works with the digital camera.  And we

3    saw that.  It has software that works with the digital camera.

4    In fact, it opens up the camera to take images of the check.

5         So all of this is present, and I can put checkmarks

6    there.

7    Q.   And just for the record, the element where you had

8    previously presented that evidence was element B of the '432.

9    Correct?

10   A.   Oh, yes.  I'm sorry.  Yes, element B of the '432 claim.

11   And the three elements of the '681 claim began with the

12   customer's mobile device including and ended with the element

13   a downloaded app associated with a bank, et cetera.

14   Q.   So for the next element, element E, how does that relate

15   to what we saw for the '432 Patent?

16   A.   Same evidence.  Here it adds a little extra detail.  Here

17   the detail is the photos of the front and back sides of the

18   check.

19   Q.   So does the PNC system, in fact, capture photos both

20   front and back?

21   A.   It does.  And we saw that in the walk-through.  And,

22   again, I confirmed that in the code.

23   Q.   And so what did you conclude regarding element E as a

24   whole?

25   A.   Okay.  So that element is present.  We can put a

1    checkmark and move on to element F.  Element F begins with

2    displaying a graphical illustration.  And this requires the

3    same evidence as element D of the '432, claim 1.

4    Q.    And --

5    A.    Okay.  I'm sorry.

6    Q.    Go on.  I was just going to ask you about the underlying

7    language, graphical illustration.

8    A.    Okay.  So what's a graphical illustration?  Well, that's

9    what we saw.  There's graphical illustrations in what it

10   presents.  In fact, the evidence that I used for that element

11   in the '432, claim 1, already showed this.

12        There is a ghost image, and there is hint bubbles.  All

13   of these are graphical illustrations to assist the customer in

14   having the digital camera take photos of the check.

15        So all of that is present, and I can put a checkmark

16   there.

17   Q.    Okay.  So let's turn to element G.  And before you

18   present your analysis on that, how does element G relate to

19   element E that you just described?

20   A.    Right.  So element G is calling out something from

21   element E.  What it's calling out is presenting the photos of

22   the check.  Element E is talking about having the digital

23   camera take photos of the front and back sides of the check.

24   So photos of the check are photos of the front and back sides.

25   Q.    And does the PNC-accused product present front and back

1    photos after they are taken?

2    A.    It does.   In fact, here they are.

3              MR. LANTIER:   I object, Your Honor.

4              THE COURT:   What's your objection?

5              MR. LANTIER:   The only discussion of this that's

6    been disclosed is in paragraphs 408 to 412 in the expert

7    report, and I don't believe that that question and answer that

8    is about to be given are contained there.

9              MS. GLASSER:   I disagree.   And, again, the slides

10   were sent to PNC counsel last night.   They indicated they had

11   no objection to them.

12             MR. LANTIER:   I don't have an objection to the

13   slide, Your Honor.   It's the testimony that's coming up.

14             THE COURT:   Well, obviously I don't have this expert

15   witness' report committed to memory.   I'll be glad to take

16   this up outside the jury's presence, but I'll have to do it in

17   that fashion.

18        Ladies and gentlemen of the jury, I'm going to need to

19   resolve this without your presence in the courtroom.   I'm

20   going to ask you to retire to the jury room briefly.   I hope

21   this won't take very long.

22        You can simply close and leave your notebooks in your

23   chairs, and we'll have you back in here to continue as soon as

24   possible.

25        The jury should retire to the jury room at this time.

423

 1          (Whereupon, the jury left the courtroom.)

 2          THE COURT:  All right.  Be seated, please.

 3      Mr. Lantier, I need you to tell me as explicitly as you

 4  can how you believe the last question put forward by opposing

 5  counsel calls for an answer that exceeds the scope and content

 6  of the expert's report.

 7          MR. LANTIER:  Yes, Your Honor.  The concern here is

 8  that the -- the opinion disclosed in the expert report was

 9  that the PNC mobile app discloses a photo and then it

10  discloses another photo after showing the first photo to the

11  user who's using the iPhone.

12      The whole opinion was given in the context of the '432

13  Patent, paragraph -- I think it's C, or claim element C.  As I

14  said, it's at paragraphs 408 to 412.  I'm sorry.  It's claim

15  element is 1A3 where the substantive opinion was given in the

16  context of the '432 Patent.

17          THE COURT:  What paragraph number of Doctor Conte's

18  report are you talking about?

19          MR. LANTIER:  408 through 412, Your Honor.

20          THE COURT:  Well, it's a 338-page report.  Let me

21  get there.

22          MR. LANTIER:  Yes, Your Honor.  It's on page 206,

23  and I apologize for moving too quickly.

24          THE COURT:  Paragraph 400 and what?

25          MR. LANTIER:  408, four zero eight, Your Honor.

1          THE COURT:  All right.  All right.  I have that

2     before me.  Now, tell me how opposing counsel's question asked

3     the witness to go beyond the scope of this particular portion

4     of the report.

5          MR. LANTIER:  So, Your Honor, we're now talking

6     about the '681 Patent, and the opinion for the relevant

7     element of the '681 Patent is found at page 253 to paragraph

8     566 of the report.

9          THE COURT:  What page of the report is that on?

10          MR. LANTIER:  253.  It's paragraph 566.

11          THE COURT:  Paragraph 566 appears to be on page 262.

12          MR. LANTIER:  Your Honor, you may be looking at PDF

13     pages.  I was reading the numbered page.

14          THE COURT:  That's probably the difference.  It's

15     paragraph 566?

16          MR. LANTIER:  Yes, sir.

17          THE COURT:  Okay.  All right.  I have that in front

18     of me.

19          MR. LANTIER:  So Your Honor can see that that's

20     merely a cross-reference back to the paragraphs that we had

21     previously looked at, the 408 to 412.

22       But the question that was asked of the witness and that

23     the witness started to answer was, does PNC's app present the

24     photos of the check to the customer.  And there is no opinion

25     in the report that that occurs.

1      The opinion is that the photo is taken and the photo of

2   the check is presented to the customer for review, which is

3   accurate to what PNC's mobile app does.

4          THE COURT:  All right.  Ms. Glasser, what's your

5   response on behalf of Plaintiff?

6          MS. GLASSER:  So the first major thing that was

7   omitted by opposing counsel was the actual heading and

8   statement.

9      So Doctor Conte's report states, paragraph 566,

10  Presenting the photos of the check to the customer after the

11  photos are taken, it is my opinion that this element is

12  infringed.  And then he goes on.  So he's expressly stating

13  that this element with photos, plural, is present.

14     And then as counsel partially correctly noted, it

15  references back to the '432 Patent.  The '432 Patent section,

16  in turn, incorporates by reference the overview of the product

17  from the beginning of the patent.  And so if you go to, for

18  example, page -- I guess it's easiest with paragraph numbers.

19     So paragraph numbers starting with 133, it's showing

20  exactly what he is talking about, capturing the front and the

21  back of the check, and then presenting the front and the back

22  of the check.  He actually walks through in his report for the

23  '432 Patent.  Even though he doesn't have to do the front and

24  the back, he does do that full analysis for the '432 because

25  it applies to all three of the claims.

1      What counsel is doing here is he's actually trying to

2   argue Doctor Bovik's opinion.  So Doctor Bovik has this

3   opinion that, to him, unless you present the checks at the

4   same time, it doesn't count.  But that's not Doctor Conte's

5   opinion and that's not what the report says.

6              THE COURT:  All right.  Anything further?

7              MS. GLASSER:  Not unless Your Honor has questions.

8   Your Honor, I think the report is pretty explicit.

9              THE COURT:  All right.  Based on your arguments and

10   the particular provisions of the report that have been

11   referenced to the Court, I'm going to overrule the objection.

12   And I'll charge this time to the Defendant.

13      Let's bring the jury back in, please.

14              (Whereupon, the jury entered the courtroom.)

15              THE COURT:  Thank you, ladies and gentlemen.  Please

16   be seated.

17      I've overruled the objection that was made just before

18   you left the courtroom, and I'll direct Plaintiff's counsel to

19   continue with her direct examination of the witness at this

20   time.

21   Q.  (BY MS. GLASSER)  Doctor Conte, do you have the question

22   in mind or would it be helpful to read it from the transcript?

23   A.  If you could read it back, it would be good.

24   Q.  Does the PNC-accused product present front and back

25   photos after they are taken?

1   A.   Yes, it does.  And so we saw that through the

2   walk-through, but also here's the source code, and this is

3   where it prevents -- presents the front of the check, and you

4   see I've highlighted front of the check, and here is where it

5   presents the back of the check.

6   Q.   And now so to be clear about your graphic, in the PNC

7   system, are those front and back photos presented

8   simultaneously at exactly the same time or are the photos each

9   presented individually just after they're taken?

10  A.   They're presented individually just after they're taken.

11  Q.   Do you have an understanding of whether PNC has ever

12  disputed this element?

13  A.   Yes.  PNC has said that you can't present the first photo

14  until you've taken images of both the front and back.  But

15  that just isn't the case.  I mean, if you look here at photos

16  of the check, that's talking about the front and the back

17  sides of the check like I showed you.  And, sure enough, the

18  PNC system presents photos of the front and the back sides of

19  the check after they're taken.  That's what the language says.

20       So it's literally infringed but also under the doctrine

21  of equivalents.

22  Q.   So taking all of that together, what is your conclusion

23  regarding element G?

24  A.   My conclusion is that's present, and I put a checkmark

25  there.

1    Q.   And what is the next element you analyzed?

2    A.   So that's element H that begins with, confirming that the

3    check deposit can go forward.  And this requires the same

4    evidence that we've seen in elements H and I of '432, claim 1.

5    There is a little extra detail which is determining an amount

6    of the check and reading that magnetic ink character

7    recognition, or MICR line.

8    Q.   And actually I apologize.  In the back and forth, I

9    neglected to put in the exhibit number for that previous slide

10   on the front and back photos.  Was that PX 317?

11   A.   It was.

12   Q.   Thank you for that.

13        Okay.  So on element H, now in addition to the elements

14   you just showed, did you identify PNC source code specific to

15   that extra specificity that's in claim 12?

16   A.   I did.  And so here is the PNC source code where it

17   actually does OCR--you see code line method, OCR--and it

18   calculates the recognized amount, and also determines whether

19   or not the MICR, those funny characters at the bottom of the

20   check, is present.  If they're not present, it will pop up the

21   screen over here saying that it can't find them.

22   Q.   And that time, it's from PX 361?

23   A.   That's correct.

24   Q.   And so taking into consideration the source code and the

25   other evidence you reviewed, what did you conclude regarding

1    element H?

2    A.    That's present, so I can put a checkmark there.

3          And now I move on to element I and J.  I is using a

4    wireless network transmitting a copy of the photos over a

5    public communications network, and it goes on.  And J is a

6    computer associated with a bank, programmed to update a

7    balance of an account to reflect the check submitted for

8    mobile check deposit by the customer's mobile device.

9          If it sounds familiar, we've seen the evidence for these

10   as well.  And that evidence was in '432, claim 1, elements F

11   and G.  The only extra piece here is over a public

12   communications network, as opposed to a wireless network.

13              THE COURT:  Doctor Conte, slow down just a little

14   bit, please --

15              THE WITNESS:  My apologies, Your Honor.

16              THE COURT:  -- especially when you are reading.  It

17   gets awfully fast.  Go ahead.

18              THE WITNESS:  I will try.

19         Where was I?  Oh, so a public communications network.

20   Well, your phone uses a public communications network.  It

21   uses a cellular network, and it can also use public WiFi to

22   access the internet.

23         So that's all present, and we can put checkmarks there.

24   Q.    (BY MS. GLASSER)   Okay.  And then what about the very

25   last element of claim 12?  What are we looking at there?

1    A.   Okay.  That is the "system configured to generate a log

2    file for the mobile check deposit, the log file including an

3    image of the check submitted for mobile check deposit."

4    Q.   And did you determine whether such a log file is present

5    in the PNC system?

6    A.   It is, indeed.  The log file here is called the NCR

7    passport capture database, and here is the section of code

8    And this is, before you ask me, PX 361.  And it shows

9    inserting the front binary image and the rear binary image

10   into this log file.

11   Q.   What was your conclusion regarding the entirety of

12   element K?

13   A.   That's present, so I can put a checkmark there.

14   Q.   I'd like you to ask you to turn to claim 30 of the same

15   patent.

16   A.   Okay.  Before I go on, let me just state that I put a

17   checkmark in each and every element.  So in my opinion the

18   '681 Patent, claim 12, is infringed by the PNC Mobile Deposit

19   System for all the reasons that I presented.

20   Q.   Thank you, Doctor Conte.

21        So did you then go on, though, to analyze claim 30?  Do

22   we have a slide to put up for that?

23   A.   I did.  Here's claim 30.

24   Q.   Now, there's a lot in claim 30 that's similar to claim

25   12.  Is that right?

1    A.    Yes.   Quite a bit.

2    Q.    Is there something different, though, about the format

3    and structure of the claim?

4    A.    Yes.   So let's talk about that.   It talks about up here

5    in element A, a non-transitory computer readable medium

6    storing an app that, when downloaded and run by a customer's

7    mobile device, causes the customer's mobile device to perform,

8    and then elements B through H.

9    Q.    Okay.   So previously we looked at claims that referred to

10   a system that included, for example, a mobile device or a bank

11   computer or things like that.   Does this particular claim

12   require the physical mobile device or the physical server?

13   A.    It doesn't.   It's talking here about a non-transitory

14   computer readable medium.

15   Q.    And what does that term mean in computer science?

16   A.    So a non-transitory computer readable medium, sometimes

17   we call that non-volatile memory, are things such as the flash

18   storage that's in a smartphone that stores the apps in a

19   smartphone, or a disk drive that's in PNC's development

20   computers, for example.

21   Q.    And is the PNC application, that software, is it in fact

22   stored in non-transitory computer readable media?

23   A.    It is.   It is stored in non-transitory computer readable

24   media on the user's smartphone.   It is stored in

25   non-transitory computer readable media in the disk drives at

432

1    PNC's offices.

2    Q.   So just to make sure we're clear, is -- PNC is performing

3    this claim in at least two separate places, first on its own

4    servers, and then also separately when the code is running on

5    the customer's phone?  Is that right?

6    A.   That's right because it's in both places.

7    Q.   Okay.  With that background, can you explain the second

8    part of element A, the when-downloaded-and-run piece of it

9    before we go on to the next element?

10   A.   Oh, I'm sorry.  So when downloaded and run by the

11   consumer's mobile device causes the consumer's -- sorry.  I

12   keep on saying consumer.  Let me correct this.  When

13   downloaded and run by the customer's mobile device causes the

14   customer's mobile device to perform.

15        So, yes, we've seen that.  The app, when downloaded by

16   the customer's mobile device, causes the customer's mobile

17   device to perform a series of steps.  And I will show you that

18   each and every one of those steps listed in claim 30 is

19   performed by the PNC mobile app when it's downloaded to the

20   customer's mobile device.

21   Q.   So turning to those next elements, did you address all of

22   the evidence that satisfies some of those elements already?

23   A.   I did.  So all the way from the element that begins with

24   instructing a customer to have a digital camera take photos of

25   the front and back sides of the check, down to element F that

1    begins with, confirming that the mobile check deposit can go

2    forward, these all require the same evidence that we've seen

3    in the '681 Patent, claim 12.  So there, those are present.

4    Q.   So turning to elements G and H then, are there any parts

5    of those elements that you did not address previously?

6    A.   Yes.  So most of this was addressed in element I,

7    including G, checking for errors, and H that begins with,

8    using a wireless network, transmitting a copy of the photos

9    over a public communications network.

10        But it adds, "submitting the check for mobile check

11   deposit after the customer is authenticated, the photos of the

12   check are presented to the customer, and the customer's mobile

13   device checks for errors."

14   Q.   And can you walk us through whether you determined that

15   PNC's system performs all of those additional pieces of the

16   claim?

17   A.   Yes.  So let's break it down.  It talks about the

18   customer's authenticated and, yes, the customer is

19   authenticated by the app.

20        It talks about the photos of the check are presented to

21   the customer.  And, yes, we saw both the code and the app

22   screenshots where it presents the photos of the check to the

23   customer.

24        It talks about checking for errors.  And we talked about

25   that in depth, and it does that both literally and under the

1    doctrine of equivalents.

2        And it also then does all of those things before

3    submitting the check for mobile deposit.  And so let me be a

4    little more precise.  Submitting the check for mobile deposit

5    happens after all of those things.  And so that is the

6    submitting screen that we've seen.

7    Q.   So taking all the pieces together, what is your opinion

8    regarding claim 30?

9    A.   Claim 30, all of the elements are present in the PNC

10   Mobile Deposit System for all the reasons that I presented.

11   Therefore, it's my opinion that claim 30 of the '681 Patent is

12   infringed by the PNC Mobile Deposit System.

13   Q.   Now, can we turn next to your analysis of the '605

14   Patent?

15   A.   Sure.  I'd be happy to.  This is claim 12 of the '605,

16   elements A through N.

17   Q.   And now that we have been through the other two patents

18   in this 2006 group, are you able to apply your prior evidence

19   and analysis to almost all of these elements?

20   A.   I am, and that's in fact why I did this long claim last,

21   because we've seen the evidence for almost all of the

22   elements, everything from the beginning, "a system for

23   allowing a customer to deposit a check," and then it continues

24   all the way down to the element, "confirming that a mobile

25   check deposit can go forward after performing an optical

1    character recognition on the check, the optical character

2    recognition determining the amount of the check and reading

3    the MICR line."

4        And we've also seen the evidence for element N,

5    "generating a log file for the mobile check deposit, the log

6    file including an image of the check submitted for mobile

7    check deposit."

8        So we've seen all of that, and I can mark all of that

9    off.

10   Q.   And when you say we've seen all of that, in particular

11   all those match to the evidence that you just presented for

12   '681 Patent, claim 12.  Is that correct?

13   A.   That is correct.  We've seen all of that evidence when I

14   went over that for the '681 Patent, claim 12.

15   Q.   Now, what about element M?  Did you analyze element M?

16   A.   I did.  So element N -- pardon me, M is initiating the

17   mobile check deposit after performing the confirming step.

18   And, yep, it does that.

19       So here is that big walk-through again, this giant

20   walk-through, and I've highlighted some pieces of it.  And so

21   here is where the confirmation step happens.  And remember we

22   talked about how it sends the account and amount down to the

23   servers, and then here is what the server does.  It does

24   everything, including depositing or initiating mobile check

25   deposit at the bank.  And that's what this generate X937

1    posting file does.  That's what the regulations require.

2        And that is PX 303 again.

3    Q.   And so taking those pieces together, what is your

4    ultimate opinion regarding infringement of claim 12 of the

5    '605 Patent?

6    A.   So in my opinion, for all the evidence we've seen, each

7    and every element is present.  So the '605 Patent, claim 12,

8    is infringed.

9    Q.   Now, are all the claims you analyzed so far what is known

10   as independent claims?

11   A.   Yes, they are.  Those are independent claims.

12   Q.   And what is a dependent claim?

13   A.   A dependent claim is, as I believe the Judge explained

14   yesterday, it's a claim that adds one or more elements to

15   another claim.

16   Q.   And did you analyze any of the dependent claims for the

17   2006 patents?

18   A.   I did.  So these are the dependent claims that I

19   analyzed, and instead of reading them here, let me walk

20   through them.

21   Q.   Let's turn to your first slide.  What are we looking at

22   here?

23   A.   So this is the '432 Patent, claim 3; the '681 Patent,

24   claim 13; and the '605 patent, claim 13.  And these all add

25   substantially the same element, includes determining an amount

1    of the check and comparing the determined amount of the check,

2    or determining -- let me read that again.  I'm sorry.

3    "Includes determining an amount of the check and comparing the

4    determined amount to an amount indicated by the

5    customer."  And it does do that.  It uses OCR to do that.

6    That's what the element calls out, optical character

7    recognition.

8         And this is that example I presented earlier.  We've

9    already seen it does this, but I just wanted to indicate this

10   is an example where it says they don't meet.  And it's

11   important.  It gives two options.  It says, they don't meet,

12   please verify the amount you entered is correct, or it could

13   be the OCR messed up so please retake the photo.

14        So all of those are present.  Let's put checkmarks there.

15   Q.   Which claims did you look at next?

16   A.   Okay.  '432 Patent, claim 5; '681 Patent, claim 22; and

17   '605 Patent, claim 22.  And these all substantively -- let me

18   say that differently.  These all add substantially the same

19   element, which is confirming step is performed after duplicate

20   detection is performed.

21   Q.   What is duplicate detection briefly?

22   A.   Duplicate detection is that someone's trying to deposit

23   the same check that has been deposited before, and we

24   discussed this prior.  And it does indeed do this, and it will

25   pop up a message if you try to do that and say, hey, the

1    check's already been deposited for mobile deposit.

2        So those are all present.

3    Q.   Which claims did you look at next?

4    A.   That's '432 patent, claim 21; and '681 Patent, claim 26.

5    And those both add, "perform an additional step of assisting

6    the customer with lighting for taking the photo."  And we saw

7    this in the error checks, but also it does this.  Here is the

8    app doing it.  It will instruct the customer that the lighting

9    isn't sufficient here.  It says, use dark background.

10   Q.   What was your conclusion regarding those elements?

11   A.   Okay.  Those are present.  Let's put checkmarks there.

12   Q.   And this slide is simply summary of everything you just

13   walked through regarding all of those claims.  Is that right?

14   A.   That's right.  This lists all of the claims that I called

15   out and showed evidence for and already spoke of.

16   Q.   Let's turn then to the 2009 patent, which is the one

17   we've been referring to as the '571.  Did you analyze PNC's

18   infringement of that patent as well?

19   A.   I did.  So the '571 Patent is about auto-capture.  So

20   here is the problem.  The human eye really can't reliably

21   assess how good an image is for check deposit.  So what USAA

22   invented was a solution where the processor assesses the image

23   quality criteria, the processor supplies corrective feedback,

24   and then the processor automatically captures the image when

25   the criteria are satisfied.

1    Q.   So this is another way to help increase image quality in

2    addition to the things you mentioned earlier, like the guides

3    on the screen and the presentation and the other steps?

4    A.   That's correct.  This adds -- in addition to all the

5    corrective feedback and the guides, it adds this once you pass

6    a criteria, automatically capture an image.

7    Q.   Have you prepared slides highlighting some of the key

8    concepts in the '571 patent specification?

9    A.   I have.  So here is the specification, and it talks about

10   the mobile device may include a video-enabled phone.  It goes

11   further and it talks about, a frame of the video may be

12   obtained and monitored with respect to monitoring criteria.

13   Q.   Does the patent give specific details about what the

14   monitoring criteria can be?

15   A.   Yes.  The patent gives a long list of monitoring

16   criteria, light contrast on the image, light brightness of the

17   image, positioning of the image, dimensions, tolerances,

18   character spacing, skewing, warping, corner detection, and

19   MICR line detection, and also using histograms.

20   Q.   What is a histogram?

21   A.   A histogram is a plot of -- for example, let's say you're

22   looking at a black-and-white photo.  It will plot how many are

23   all black, how many are somewhat gray, how many are somewhat

24   less gray, how many are even less gray, all the way up to

25   white.

1   Q.   And are there specific examples of histograms described

2   in the 2009 specification?

3   A.   There are.

4   Q.   Did you see testimony about PNC's use of these specific

5   monitoring criteria that are listed out in the '571 Patent?

6   A.   I did.  This is Mr. Alexander Goodstein.  He is PNC's

7   corporate representative.  He was read that passage from the

8   specification, and he was asked, those are the criteria that

9   PNC's mobile auto-capture system was using to evaluate check

10  quality.  Correct?

11       And he said, I believe it was using some of these

12  details, yes.

13  Q.   Do you agree with Mr. Goodstein?

14  A.   I not only agree with him, I found that in fact the PNC

15  software was using each and every one of those criterias

16  called out in the specification.

17  Q.   Now, did you then go on to walk through every word of the

18  claims of the '571 patent like you did for the prior three?

19  A.   I did.

20  Q.   And have you prepared a graphic to walk us through that?

21  A.   I did.  So here is claim 1, and again I put it in a table

22  form.  And the first element is a non-transitory

23  computer-readable medium comprising computer-readable

24  instructions for depositing a check that, when executed by a

25  processor, causes the processor to:  and then elements B

1    through D.

2    Q.   So this is similar to the '681, claim 30, in the sense

3    that it's satisfied just by the software itself on some form

4    of storage media.  Is that right?

5    A.   That's correct.  This says that same form that we saw

6    before about a non-transitory computer-readable medium storing

7    an app.

8    Q.   Is there a definition from the Court that applies to any

9    part of element A?

10   A.   There is.  The Court gave us the definition of depositing

11   a check as, "providing a check to a depository in a form

12   sufficient to allow money to be credited to an account."

13   Q.   And did you analyze whether element A is satisfied under

14   the Court's definition?

15   A.   Yes, it is.  That's, indeed, what happens.  It does

16   provide a check to a depository in a form sufficient to allow

17   money to be credited to an account.

18   Q.   What element did you look at next?

19   A.   Next I looked at element B.  That was "monitor an image

20   of the check in a field of view of a camera of a mobile device

21   with respect to a monitoring criterion using an image

22   monitoring and capture module of the mobile device."

23   Q.   Okay.  Are there some definitions from the Court that you

24   applied here as well?

25   A.   There are.  So, for example, the Court gave us a

1    definition of mobile device, and that is "computing device

2    capable of being easily moved and that is controlled by a

3    mobile operating system."

4         And indeed smartphones are easily moved and they're

5    controlled by mobile operating systems such as IOS for -- for

6    iPhones or Android -- Google Android for Android phones.

7         And the Court also gave us the definition, image

8    monitoring and capture module, which is function, image

9    monitoring and capture, corresponding structure.  Image

10   monitoring and capture module 456 as set forth in the

11   specification; and equivalents thereof.

12   Q.   Okay.  So let's break that down.  456 is the number used

13   in the specification to refer to the image monitoring and

14   capture module.  Is that correct?

15   A.   That's correct.  And this is the place in the

16   specification where it refers to it.  And so -- go on.  I'm

17   sorry.

18   Q.   No, I was just going to ask you, so can you walk us

19   through what does the specification tell us about the image

20   monitoring and capture module?

21   A.   Sure.  So it talks about an image monitoring and capture

22   module 456.  So let's put a box there, 456.

23   Q.   Let me just pause you for a minute, partly because I

24   think you and I both are talking a bit fast even though the

25   court reporter is really, really good, but also to clarify.

443

1        So the image we're looking at on the left is directly

2    from the patent specification.  Right?

3    A.   That's correct.  This is from the '571 Patent

4    specification, column 12, 65 through 13 --

5    Q.   And then what we're seeing on the right is you've created

6    a graphic to illustrate that.  Is that right?

7    A.   That's correct.  So I'm going to create this graphic

8    here.  And I promise I'll talk slower.  I've rarely been

9    accused of talking too fast.

10           THE COURT:  Make sure that you both finish before

11   the other one starts.  You've talked over each other a little

12   bit as well.

13           MS. GLASSER:  Yes, Your Honor.  Thank you.

14           THE COURT:  All right.  Let's proceed.

15           THE WITNESS:  My apologies.

16       All right.  So we have the image monitoring and capture

17   module 456.  And it says, may include the camera 207.  So

18   there's a camera.  And it says, contained within a mobile

19   device 106.  So let's put that in a mobile device.  And it

20   says that also it's following a software call, so it has

21   software.  Let's put the software there.

22   Q.   (BY MS. GLASSER)  And does the specification explain

23   whether that camera can be a video camera?

24   A.   It does.  The specification talks about that the device

25   may comprise a video source such as a video camera, and it

1    goes further and says, a frame of the video may be obtained

2    and monitored with respect to the monitoring criteria.

3    Q.    So does the PNC-accused system, in fact, include an image

4    monitoring and capture module?

5    A.    Well, yes, sure.  I mean, it has a camera, it has PNC

6    implemented software, and that software controls the camera

7    and causes it to obtain and monitor video frames based on

8    monitoring criteria.

9    Q.    Can you give us specific examples from the PNC

10   implemented software that controls the camera to monitor video

11   frames -- video frames?  Excuse me.

12   A.    Sure.  Here's an example, and this is code that works

13   with the camera to monitor video frames.  This is running on

14   the mobile device.  And this shows it checking, for example,

15   you see science brightness, it's checking the brightness

16   that's coming from the frame and comparing it to a brightness

17   minimum.  It does that here for skew angle at max, and it does

18   that here for a rotation angle as well.

19   Q.    And that's from PX 384?

20   A.    It is.

21   Q.    Now, within this term, we see again -- within this

22   element, we see again this term monitoring criterion.  Does

23   the Court provide us a definition for that?

24   A.    The Court does.  The Court defines that as one or more

25   features of a check that when -- let me start again.

1    One or more features of a check that provide information

2    about the suitability of the image to represent the check.

3    Q.   And just to remind us briefly again, does the patent give

4    some examples of features of a check image that provide

5    information about the suitability?

6    A.   It does.  It gives this long list and, again, each and

7    every one of those items in that list I found in PNC's Mobile

8    Deposit System.

9    Q.   So applying the Court's definition, can you show us some

10   specific examples of what you actually see on the mobile

11   device screen when the monitoring criteria are being assessed

12   in the PNC system?

13   A.   Yes.  You'll see, for example, this -- if the

14   lightness/brightness contrast is not acceptable, it will say

15   use dark background.  Positioning, it will say move closer or

16   too close.  And skewing, it might say center the check.

17   Q.   So -- and you showed the source code for that a moment

18   earlier.  Right?

19   A.   I did.  That's the same.

20   Q.   Does PNC have any visibility into the part of the PNC

21   code that came from the vendor?

22   A.   Yes, they do.

23   Q.   Does PNC itself configure that MiSnap code?

24   A.   They do.  They have the full ability to configure it.

25   Q.   And so looking at the evidence you saw in the screen and

1    the source code and documentation, what's your opinion

2    regarding element B?

3    A.    Element B is present.  So let's put a checkmark there,

4    and we can move on now to element C.

5    Q.    Are there additional definitions from the Court that are

6    important to look at here?

7    A.    Yes.  So element C is "capture the image of the check

8    with the camera when the image of the check passes the

9    monitoring criterion."

10         And, again, when you pass the monitoring criterion, what

11   you'll see is this screen, success, and the display freezes.

12   The Court gave us the definition for when the image of the

13   check passes the monitoring criterion to mean "capture the

14   image of the check with the camera at or after the moment the

15   image of the check passes the monitoring criterion."

16         And then the Court gave us a definition of 'passes the

17   monitoring criterion' to mean "determining that a particular

18   monitored criterion is within the pre-determined range."

19   Q.    And did you apply those definitions to analyze the PNC

20   source code?

21   A.    I did.  So here, for example, is the pre-determined range

22   portion of that, and we've seen this source code just a moment

23   ago.  And, look, it has -- it's testing for ranges.  This is

24   greater than or equal to for brightness.  This is less than a

25   max for skew, greater than or equal to for rotation angle.

```
 1        So it's checking to see if the criterion is within a
 2   pre-determined range.
 3   Q.   So that's all -- demonstrates the second half of element
 4   C.  Is that right?
 5   A.   That's correct.
 6   Q.   And then did you also analyze the part of the Court's
 7   definition regarding the word 'when'?
 8   A.   I did.  So that is, again, when is at or after.  So at or
 9   after passing the monitoring criterion.  Here is the source
10   code that does that.
11        Now, this is 120 lines.  I've cut out the main pieces,
12   but here is 'handle preview frame,' and the frame's coming in
13   here, it's called frame, and you can see it's bytes.  It's
14   sent to something called analyzer.analyze.  And what that
15   returns is whether or not it passes the monitoring criterion.
16        If it passes the monitoring criterion, what it does is it
17   captures the frame, it puts that frame in a JPEG file, it adds
18   extra information to it, and that is what ultimately gets
19   submitted to the server.
20   Q.   Now, you mentioned the term JPEG.  Is that the same JPEG
21   that's been discussed with other witnesses that you've seen
22   here in this court yesterday and today?
23   A.   Yes.  JPEG stands for Joint professional -- no, let's
24   see, Photographers Expert Group.  That's a standard used to
25   store, photos and it is the same as what we've heard.
```

1   Q.   And the PNC system uses JPEGs.  Is that correct?

2   A.   That's correct.

3   Q.   Now, is there any difference at all in the PNC IOS

4   portion of the code versus the PNC Android code?

5   A.   Yeah, there's a little difference and they're both trying

6   to deal with the fact that today you have very high resolution

7   cameras.  And so in the IOS version, it actually captures the

8   best of five frames that pass the criterion, and again that

9   still satisfies the claim element.

10       In the Android version, a capture, it sees one frame that

11  passes the criterion and then sets a timer to capture the next

12  one that passes the criterion.  And, again, that also

13  satisfies the claim element.

14  Q.   Now, even though you found the element -- actually I

15  should ask you, I think you've now been through all the pieces

16  of element C.  But did you conclude that the entirety of

17  element C was satisfied by PNC code?

18  A.   I did.

19  Q.   And even though you reached that conclusion, did you then

20  go on and also perform a separate doctrine of equivalents

21  analysis?

22  A.   I did.  And here's that analysis.  So, in addition, the

23  PNC-accused system is substantially the same.  It performs

24  substantially the same function.  The image is transmitted to

25  the depository only after the app determines that the image

449

1    has passed one or more monitoring criterion.

2         It does it in substantially the same way by capturing the

3    image -- capturing the image data, for example, in a JPEG file

4    format encoded with metadata.  And it achieves substantially

5    the same result.  It only transmits check images to the

6    depository that are likely to be successfully deposited or

7    processed.

8    Q.   And then, in conclusion, what opinion did you reach

9    regarding element C?

10   A.   Okay.  So that's present, so let's put a checkmark there.

11   Q.   So there is one more element of the '571 Patent.  Did you

12   analyze element D?

13   A.   Yes.  Element D is "provide the image of the check from

14   the camera to a depository via a communication pathway between

15   the mobile device and the depository."

16        And, in fact, we've already seen this code.  I showed it

17   earlier for wireless network.  And what I've done here is I've

18   included a couple of other lines that show the back image and

19   the front image getting pulled from the image that's captured.

20        And then this is that same code that uses the carrier to

21   send the images to the server.

22   Q.   So what is your conclusion regarding infringement of

23   claim 1 of the '571 Patent as a whole?

24   A.   Claim 1 of the '571 Patent, based on all the evidence I

25   presented, is infringed in the PNC Mobile Deposit System.

1    Q.   Did you also analyze infringement of claim 9?

2    A.   I did.  And claim 9 is one where much of the same

3    evidence we saw on claim 1 satisfies elements of claim 9.

4    That includes the first element A, a non-transitory

5    computer-readable medium.  That in fact is identical to the

6    first element of claim 1.

7         And then elements from C, monitoring an image of the

8    check in the field of view of the camera, down through E,

9    transmitting the image of the check from the mobile device to

10   a deposit system, all of those require the same evidence that

11   we saw in analyzing claim 1.

12   Q.   What did you find in the source code regarding the last

13   element, element B?

14   A.   Element B is "initialize a software object on a mobile

15   device operated by a user, the software object configured to

16   communicate with a camera."  And here I found that's present.

17   Here is the PNC mobile app.  It initializes a software object,

18   and it tells it to use the camera to take a picture of the

19   front of the check.

20   Q.   And that's from PX 308?

21   A.   That is.

22   Q.   What was your conclusion regarding claim 9?

23   A.   Okay.  So based on all of that evidence, all the elements

24   are present, so claim 9 of the '571 is infringed by the PNC

25   Mobile Deposit System.

451

1    Q.   Did you go on to analyze dependent claim 2?

2    A.   I did.  Dependent claim 2 goes on "further comprising

3    instructions that provide feedback via the mobile device to a

4    user of the mobile device."  And we've seen that.  We saw the

5    code that actually does that.  That provides the feedback to

6    the user the mobile device.

7         So this is present.  We can put a checkmark there.

8    Q.   Then did you also analyze claims 12 and 13?

9    A.   I did.  So claim 12 is adding to claim 9 that the

10   monitoring criterion comprises light contrast or light

11   brightness of the image.  And we saw the source code for that.

12   It does look at light brightness and light contrast.

13        Claim 13 is a non-transitory computer-readable medium of

14   claim 9, and it goes on, where the criterion is skewing of the

15   image or warping of the image.  And, indeed, it looks at skew

16   and rotation angle, which would be warping.  So it does that.

17   And, therefore, these both are infringed.

18   Q.   Can you summarize, Doctor Conte, your findings regarding

19   infringement of the '571 patent?

20   A.   Yes.  In my opinion, for all the evidence I presented,

21   all of the asserted claims, 1, 2, 9, 12, and 13, are infringed

22   by the PNC Mobile Deposit System.

23   Q.   Now, turning to a slightly different topic, do you have

24   an understanding of whether PNC has made an argument that even

25   if all elements are present, it still should not be

1    responsible for the infringement?

2    A.    My understanding is that, yes, they made that argument.

3    Q.    And you've talked about this sort of throughout this

4    presentation today.  But for the jury, have you prepared a

5    summary highlighting some of the reasons that that is

6    incorrect?

7    A.    I have.  So, for example, PNC controls and benefits from

8    the system.  So they control the system.  Their software

9    actually creates the system when you launch the mobile app and

10   it reaches out to the software running the PNC software

11   running on the server.

12        And they also benefit from this because, of course, they

13   receive mobile check deposits.

14   Q.    What's the second high-level reason in your summary?

15   A.    So PNC makes the system by assembling system components

16   by using its software.  And, again, the apps form the system

17   by communicating back and forth.  They form the system when

18   you launch the app.  And they assemble it from system

19   components.

20   Q.    And then is there even a third reason that applies to

21   some of the claims at issue?

22   A.    There is.  So if you recall, the '681 Patent, claim 30,

23   and all of the '571 Patent claims, were the ones that talked

24   about that computer-readable media.  And these are infringed

25   by PNC's own computers.  So at PNC's own computers, their

1    development computers, they have the app.

2    Q.   So switching gears again, could you summarize for us

3    exactly which products and time frame are accused of

4    infringement in this specific litigation?

5    A.   Sure.  So those are the PNC IOS versions, and that's from

6    April 2016 up through mid 2021, and the PNC Android releases

7    from September 2017 up through mid 2021.

8    Q.   And you have rendered an opinion that all of those

9    versions infringe the four patents at issue in this case.  Is

10   that correct?

11   A.   I have.  That is my opinion, yes.

12   Q.   At some point in 2021, about a year into the litigation,

13   do you have the understanding that PNC stopped using that

14   specific product accused of infringement and launched a new

15   product?

16   A.   Yes.  That's this infamous 4.20.1 we've been hearing

17   about.

18   Q.   And to be clear, are you offering an opinion that that

19   new product infringes the '432, '605, or '681 Patent?

20   A.   I'm not.

21   Q.   And, now, did you -- are you aware that PNC has made an

22   argument as part of their damages case that they had some kind

23   of alternative, that they could have used this product

24   earlier?

25   A.   I am aware of that.

1   Q.   Do you have an opinion on whether PNC has proven that it

2   would have been viable from a patent perspective for PNC to

3   have made those changes earlier?

4   A.   It would not have been.  So let's go over what their

5   alternative does.  First, it disables the auto-capture feature

6   temporarily.

7        Second, it omits the post-capture screen with the retake

8   photo functionality.  And, again, the function of that screen

9   is to try to get better images.

10       And then, third, instead of the user entering the dollar

11  amount of the check via the keypad, the user indicates the

12  check amount by confirming an amount displayed.

13       Now, this alternative does not avoid infringement.  USAA

14  owns other patents in the 2006 family, the '598, the '638, and

15  the '136 Patents, and they do not require any of auto-capture,

16  retake photo screen, or keypad entry of an amount.

17  Q.   And so if PNC -- actually let me ask you this.  Are you

18  aware -- you've reviewed a lot of the deposition transcripts

19  and expert records reports from the PNC side.  Is that right?

20  A.   That is correct.

21  Q.   Are you aware of any PNC witness ever disputing as part

22  of this case that the new product infringes these other USAA

23  patents?

24            MR. LANTIER:  I object, Your Honor.

25            THE COURT:  State your objection.

```
 1              MR. LANTIER:  This is not in the report, and it
 2    violates Judge Payne's ruling and motion in limine 1B.
 3              MS. GLASSER:  It certainly doesn't violate the
 4    ruling.  But the reason it's not in his report is he had to
 5    serve his report first, and he didn't get a chance to see the
 6    other side's report until after he had served it.
 7              MR. LANTIER:  Your Honor, he's acknowledged he never
 8    offered an opinion in a report in this case that these patents
 9    are infringed.
10              MS. GLASSER:  Well, that's absolutely incorrect
11    which we'll get to in a moment, but...
12              MR. LANTIER:  Your Honor, there's nothing for
13    anybody to respond to.  He had not offered an opinion in this
14    case that those patents are infringed.  He never got through
15    the elements and said, here's the evidence for each element.
16              THE COURT:  Is that in dispute, Ms. Glasser?
17              MS. GLASSER:  Doctor Conte in his report reviewed
18    and attached extensive claim charts regarding PNC's
19    infringement of the other three patents, though, of course
20    it's PNC's burden to prove a non-infringing alternative.  And
21    so he simply stated he reviewed that and that none of it
22    avoided infringement of those patents.
23         PNC's expert then chose not to respond in his rebuttal
24    report.
25              MR. LANTIER:  Your Honor, it's not PNC's burden to
```

1    prove a non-infringing alternative.  I hesitate to state more.

2            THE COURT:  Well, none of these three patents that

3    are on the screen are at issue in this case, and this witness

4    is not offering opinion that the version 4.20.1 infringes any

5    of the asserted patents in this case.  I think that's clear.

6            MS. GLASSER:  He actually is with respect to the

7    '571, which we'll get to in a moment.

8            THE COURT:  All right.  With regard to the MRDC

9    patents.

10           MS. GLASSER:  With the 2006, correct, Your Honor.

11           THE COURT:  The 2006 MRDC patents, he is not

12   asserting any allegation in his report or otherwise that that

13   4.20.1 product infringes those three patents.

14           MS. GLASSER:  Correct, Your Honor.

15           THE COURT:  Okay.  And it's my reading -- well, I'll

16   stop there.  Let me review the remainder of this with you-all

17   at the bench.  Approach the bench, please.

18           (The following was had outside the hearing of the

19           jury.)

20           THE COURT:  I have looked at Judge Payne's order,

21   and I think it clearly says -- I think, on balance, it clearly

22   says that 4.20.1 is a non-infringing alternative as to the

23   three 2006 patents.

24       I am not going to let you on cross, Mr. Lantier, bolster

25   that conclusion with the imprimatur of the Court.

457

```
1              MR. LANTIER:  Understood.

2              THE COURT:  You can simply say it's a fact, is it

3    not, that these three or this 4.20.1 is a non-infringing

4    alternative as regards those three patents?

5              MS. GLASSER:  Your Honor, I think -- can I show you

6    the rest of the Court's order?

7              THE COURT:  I read it backward and forward, and I

8    will grant you, Ms. Glasser, it perhaps in hindsight could

9    have been written a little more clearly.  But I've read it

10   completely, and on balance I believe it holds for the

11   proposition and rules that 4.20.1 is a non-infringing

12   alternative as to those three patents.  It is not established

13   that it's a non-infringing alternative as to the '571 Patent.

14       And it also holds that 4.20.1 does not infringe any of

15   the three 2006 MRDC patents.  And that's -- and I'm happy for

16   you to explore that on cross, but you're going to have to do

17   it as an established fact and not try to bolster it with the

18   ratification or approval of the Court.

19             MS. GLASSER:  May I be heard briefly on a small

20   subpart of that?

21             THE COURT:  You may, and then I want to get back to

22   what's on the screen now.

23             MS. GLASSER:  Which is that I think what counsel is

24   going to do which concerns me is there is the phrase

25   non-infringing and then there's the legally relevant phrase
```

1    that Judge Payne addresses later in that order that something

2    isn't available or viable non-infringing alternative.

3        And he also ruled later in that order that PNC had not

4    shown that it is actually under the law an available

5    non-infringing alternative because when you just infringe

6    other patents instead --

7            THE COURT:  As to the '571 Patent.

8            MS. GLASSER:  As to all of them.  I can show it to

9    Your Honor if I can go grab the binder.  I think this is a

10   critical issue because he's going to argue that in the closing

11   with some kind of sound bite from this and it's going to be

12   very misleading.

13           THE COURT:  All right.

14           MR. LANTIER:  Your Honor, we're not going to mislead

15   anyone in the closing.  I can assure you of that.

16           THE COURT:  Well, don't expect me to ask her to

17   agree that you're not going to do that or you agree that she's

18   not going to do that.

19           MR. GLASSER:  I have it highlighted.  Is it okay for

20   me to go get it --

21           THE COURT:  Go get your copy.  I have my copy.

22           MS. GLASSER:  So the two most important parts I

23   think are right up at the top here, page 10.  And then at the

24   bottom where it says, Ultimately PNC is the party contending

25   that it has an NIA, will need to persuade the jury that

459

1    version 4.20.1 is available to it.  And that's all he -- in

2    this middle part, too, is also really critical.  USAA contends

3    under AstraZeneca a proposed alternative covered by patents

4    outside the immediate lawsuit is not available and thus cannot

5    be an NIA for damages purposes, which is the only purpose

6    they're offering it for.

7                THE COURT:  But this is talking about 4.20.1 as to

8    the '571 Patent.

9                MS. GLASSER:  Right.  But if it infringes other

10   patents --

11               THE COURT:  The assertion is that it may infringe

12   other patents --

13               MS. GLASSER:  Yes.

14               THE COURT:  -- in PNC 3 --

15               MS. GLASSER:  Yes.

16               THE COURT:  -- and may not be available as a

17   non-infringing alternative here.

18               MS. GLASSER:  Correct.  And that's why I don't want

19   him to use the phrase non-infringing alternative because, as

20   Judge Payne held, he says, the Court agrees that something

21   that's covered by patents outside the lawsuit, even though the

22   alternative does not infringe the asserted patents, could

23   therefore be unavailable, and then ultimately says PNC bears

24   that burden.  And so --

25               THE COURT:  I understand.  But we're talking about

1   4.20.1 as a non-infringing alternative as to the '571 patent,

2   and it's not -- that order does not hold that it is a

3   non-infringing alternative as to the '571 patent.

4           MS. GLASSER:  And I apologize, Your Honor, but what

5   he's talking about isn't the patents in the suit.  He is

6   talking, under AstraZeneca, that a proposed alternative

7   covered by patents outside the immediate lawsuit cannot be an

8   NIA at all.

9       And so I think it's fine for him to say they're not

10  infringing.  I just don't think he should use the phrase

11  non-infringing alternative because that's going to walk right

12  into what the damages instructions are.  Judge Payne has

13  already addressed this correctly.

14          MR. LANTIER:  I don't think that's an issue, Your

15  Honor.

16          THE COURT:  Say that again?

17          MR. LANTIER:  Do you want me to just say it's a fact

18  that it's not infringing?

19          THE COURT:  If you are satisfied with that, that

20  satisfies me.

21          MR. LANTIER:  Yes, Your Honor.  That's fine.

22          THE COURT:  Now, if we've covered this report and

23  recommendation and its impact, I want to talk about where we

24  go from here with regard to what's left on the screen.

25          MS. GLASSER:  I'm sorry.  It's in another binder.

```
1              So the only question that was left is as to this issue

2     about whether there's infringement of the other three patents.

3              THE COURT:  The other three being the 2006 MRDC

4     patents.

5              MS. GLASSER:  The three in the 246 case that he was

6     just talking about.

7              THE COURT:  Okay.  What we're calling PNC 3.

8              MS. GLASSER:  Sure, yes.  And actually, I mean, it's

9     not critical that I ask the question.  Obviously we can just

10    ask Mr. Bovik the same thing.  As long as we're allowed to ask

11    Mr. Bovik the question, which I'm not sure why we wouldn't be,

12    I don't necessarily --

13             THE COURT:  Tell me what the question is.

14             MS. GLASSER:  Does any PNC witness dispute as part

15    of this case that PNC's new product infringes the other

16    patents?  Mr. Bovik decided not to respond to that.

17             MR. LANTIER:  Well, that would be improper, Your

18    Honor.  That's a burden shift.

19             THE COURT:  I don't see any basis to talk about

20    whether or not patents that are not asserted in this case are

21    or are not infringed.

22             MS. GLASSER:  We'll do a brief for you on that.

23    Judge Payne did address it and held that it was relevant under

24    AstraZeneca and a couple of other cases.  It's fairly well

25    established.  I think we can -- we can brief it for you.
```

```
 1              THE COURT:  Well, at least as regards to Doctor

 2    Conte, I'll carry it as to your later witness, but as to

 3    Doctor Conte, you don't need to ask -- you should not ask that

 4    question.

 5              MS. GLASSER:  Would it be helpful to do the brief on

 6    the topic?

 7              THE COURT:  Well, we need to continue with the

 8    witness.

 9              MS. GLASSER:  Yes.  And I'm happy to not go there

10    now, but would it be helpful for us to do that tonight, just

11    for upcoming events?

12              THE COURT:  It might be.

13              MS. GLASSER:  Okay.  Thank you.

14              THE COURT:  So where are we?

15              MS. GLASSER:  So I can just move on to the '571

16    Patent issue then.

17              THE COURT:  All right.  Do we have an unanswered

18    question that's still barring an objection?

19              MR. LANTIER:  I think if you sustain the objection,

20    Your Honor, then there's nothing further for right now.  Just

21    to the question so the witness doesn't answer.

22              MS. GLASSER:  And I can just withdraw it.

23              MR. LANTIER:  If you withdraw the question, that's

24    fine, too.

25              THE COURT:  Either way.  Okay.
```

1          MR. LANTIER:  Thank you, Your Honor.

2          (The following was had in the presence and hearing

3          of the jury.)

4          THE COURT:  All right.  Ms. Glasser, where are we on

5    this unanswered question?

6    Q.   (BY MS. GLASSER)  So I'm not sure if any of us have the

7    exact question in mind, but I can withdraw that and focus you

8    on the '571 patent.

9          THE COURT:  All right.  Let's move on.

10   Q.   (BY MS. GLASSER)  So as to the patents you just discussed

11   for us, your opinion regarding a set of three other USAA

12   patents that are not the ones asserted in this case just to

13   orient us to where we're at.

14   A.   Okay.

15   Q.   So I want to talk to you now about the patents in this

16   case, and you mentioned a moment ago as well that you're not

17   offering an opinion in this case that the new PNC product

18   infringes the 2006 patents.  Correct?

19   A.   That's correct.

20   Q.   But what about the '571 Patent, this new design?  Did PNC

21   even avoid the '571 Patent with that new design?

22   A.   No, they did not.  I mean, PNC deactivated parts of the

23   code so that does not perform auto-capture, but the same

24   infringing code is still present in the PNC app, and it can be

25   reactivated with, you know, flip of a switch.

1    Q.   And you said that it doesn't perform auto-capture.  Your

2    slide says by default?

3    A.   By default.  That's correct.

4    Q.   So you talked earlier about there is two ways that the

5    '571 Patent was infringed during that 2006 to 2021 time

6    period, infringed on the mobile phone itself and then also on

7    the PNC computer system.  Is that right?

8    A.   That's right.

9    Q.   The new product, does it still infringe in both ways or

10   just one?

11   A.   Just on the PNC development servers.

12   Q.   Now, did you review any PNC testimony that further

13   confirmed your opinion that that infringing '571 code is still

14   in use on the PNC internal system?

15   A.   I did.  Here is testimony from Mr. Alexander Goodstein,

16   and he was asked, "And you still actually have auto-capture in

17   your source code.  Correct?"

18        And he answered, "I have not reviewed the source code,

19   but I believe that it is still in my text source code."

20   Q.   Thank you, Professor Conte.

21        Could you just summarize for us, we've been here a while

22   this afternoon, summarize for us at a high level your ultimate

23   expert opinions presented in this case?

24   A.   Yes.  For all the reasons with all the evidence I

25   presented, it's my opinion that PNC Mobile Deposit System

1    infringes all USAA asserted patent claims.  That includes the

2    '432 Patent, '681 Patent, '605 Patent, and the '571 Patent

3    asserted claims.

4    Q.    Thank you, Professor Conte.

5              THE COURT:  You pass the witness, counsel?

6              MS. GLASSER:  Pass the witness.  Thank you, Your

7    Honor.

8              THE COURT:  All right.  Ladies and gentlemen, we've

9    been back right at two hours since lunch.  We're going to take

10   a short recess.  When we come back from recess, the Defendant

11   will cross-examine Doctor Conte.

12       You can simply leave your notebooks in your chairs, don't

13   discuss the case among yourselves, take this opportunity to

14   stretch your legs and get a drink of water, and we'll continue

15   shortly.

16       The jury's excused for recess.

17              (Whereupon, the jury left the courtroom.)

18              THE COURT:  All right, counsel.  Take about five

19   minutes and then lead and local counsel should meet me in

20   chambers and we'll see where with we are with regard to Mr.

21   Kennedy.

22       The Court stands in recess.

23                       (Brief recess.)

24              THE COURT:  Be seated, please.

25       Mr. Lantier, are you prepared to cross-examine the

1    witness?

2           MR. LANTIER:  Yes, Your Honor.

3           THE COURT:  You may go to the podium and prepare.

4       And while he's doing that, let's bring in the jury.

5    Before you do that, though, Mr. Mixon, are the monitors going

6    to continue in their current status during this

7    cross-examination?

8           MR. LANTIER:  Thank you for asking.  There's no need

9    to shield the gallery from the monitors.

10          THE COURT:  And it's been obvious to me while the

11   direct examination of Doctor Conte's been going on that there

12   has been people who I don't recognize in the gallery standing

13   up and leaning forward so they can see the monitors that are

14   on the tables here.

15      So I don't know how efficient this process has been, but

16   if we're going to continue with that kind of sealing, we're

17   going to need to make sure that the monitors on counsel tables

18   are not visible by those in the gallery even with far-sighted

19   abilities.

20          MR. LANTIER:  Thank you, Your Honor.

21          THE COURT:  And if it's Defendant's position we

22   don't need to maintain that, then I direct the monitors be

23   turned back on in the gallery.

24          MR. LANTIER:  Yes, Your Honor.  And I don't believe

25   I'm showing any third-party source code.  But if the plaintiff

1    notices something, I would --

2              THE COURT:  I doubt the Plaintiff will be bashful.

3    All right.  Let's bring in the jury.

4              (Whereupon, the jury entered the courtroom.)

5              THE COURT:  Welcome back, ladies and gentlemen.

6    Please have a seat.  We'll proceed with cross-examination of

7    Doctor Conte by Defense counsel.

8         Mr. Lantier, you may proceed.

9              MR. LANTIER:  Thank you, Your Honor.

10                        CROSS EXAMINATION

11   BY MR. LANTIER:

12   Q.   Good afternoon, Doctor Conte.

13   A.   Good afternoon.

14   Q.   I'm Greg Lantier.  It's nice to meet you.

15   A.   Same here, Greg -- Mr. Lantier.

16   Q.   You were asked in this case to offer opinions on

17   infringement.  Correct?

18   A.   That's correct.

19   Q.   And you were not asked to offer any opinions on

20   invalidity.  Correct?

21   A.   That's correct.

22   Q.   In fact, you're the only witness that the jury will hear

23   from who will testify that PNC infringes.  Correct?

24   A.   I'm not sure.

25   Q.   You, sir, have never used PNC's mobile app.  Correct?

1    A.   I have not.

2    Q.   Now, let's talk for a moment about your work.  Okay?

3    A.   Yes.

4    Q.   You informed the jury that you're a professor at Georgia

5    Institute of Technology.  Is that right?

6    A.   Professor and associate dean, yes.

7    Q.   And I don't mean any offense, but on occasion you have

8    referred to that as your, quote, so-called job.  Correct?

9    A.   Yes.

10   Q.   Now, in this case -- strike that.

11        Your work as an expert witness in this case is separate

12   from your work at Georgia Tech.  Correct?

13   A.   Not exactly.

14   Q.   Sir, it's no part of your obligation or your duties as a

15   professor at Georgia Tech to serve as an expert in litigation.

16   Correct?

17   A.   That's correct.

18   Q.   And for serving as an expert in this case, you're being

19   paid $600 an hour.  Correct?

20   A.   That's correct.

21   Q.   Now, this isn't the first time that you've served as an

22   expert in a case with Irell & Manella serving as counsel.

23   Correct?

24   A.   That's correct.

25   Q.   Irell & Manella is the law firm where Mr. Sheasby and Ms.

 1    Glasser are partners.  Correct?

 2    A.    That's correct.

 3    Q.    And it's in Los Angeles?

 4    A.    I don't know if it has other offices, sir.

 5    Q.    In fact, this is about the 10th case that you've worked

 6    on with Irell & Manella.  Correct?

 7    A.    I haven't counted them, sir.  I'm sorry.

 8    Q.    Sir, there's a binder in front of you that contains your

 9    deposition at tab 2.  And I would refer you to your

10    deposition -- excuse me.  I'll refer you to the document at

11    tab 2 at page 139, line 17 to 140, line 1.  Just please let me

12    know when you're there.

13    A.    These are the actual pages.  Right?  This is condensed.

14    Q.    Yes, the transcript pages.

15    A.    Okay.  Yes.  Okay.  That refreshes my memory.

16    Approximately 10 cases.

17    Q.    So the deposition transcript refreshed your recollection

18    that you've worked with Irell & Manella on approximately 10

19    cases.  Correct?

20    A.    Yeah.  I couldn't recall the exact number.  Thank you.

21    Q.    And, in fact, you can't even estimate how much money you

22    have been paid over the years serving as an expert in cases

23    with Irell & Manella.  Correct?

24    A.    Yeah.  I haven't sat down and estimated how much money I

25    have made serving on cases where Irell & Manella represented a

1    defendant.

2    Q.   Sir, did you mean to say where they represented the

3    defendant or the plaintiff?

4    A.   Oh, I'm not quite sure if they were all plaintiff or

5    defendant.  So either case, sorry.

6    Q.   But in every one of those cases, you were on the same

7    side of the case as Irell & Manella.  Correct?

8    A.   In the cases where I was retained by clients of Irell &

9    Manella, yes.

10   Q.   You're sure that you've been paid more than a hundred

11   thousand dollars for your work in cases with Irell & Manella.

12   Correct?

13   A.   That sounds about right.

14   Q.   It may have been more than $500,000.  Correct?

15   A.   Over 10 cases, yes.

16   Q.   And you can't rule out that you've been paid over $1

17   million for your work in cases with Irell & Manella.  Correct?

18   A.   Over 10 cases?  It may well be.

19   Q.   Okay.  And, sir, it's true that you've owned a Ferrari.

20   Correct?

21   A.   I no longer do, but yes.  That was stupid.

22   Q.   Okay.  I'd like to turn to your opinions on the patents

23   now.  Would that be okay?

24   A.   Yes.

25   Q.   And I'd like to establish one point so that we can move

471

1    forward in a hopefully expeditious way here.  And, sir, that

2    point is this:  If each and every element of a claim is not

3    present in a product that you're analyzing, then there is no

4    infringement.  Correct?

5    A.   If that includes the doctrine of equivalents, then I

6    would agree.

7    Q.   Yes.  Each and every element must be present either

8    literally or under the doctrine of equivalents or there is no

9    infringement.  Correct?

10   A.   That's my understanding, yes.

11   Q.   So, in other words, if we identify at least one element

12   of a patent claim that's not present in the accused PNC

13   systems, then you would agree we don't need to do any more,

14   there's no infringement.  Correct?

15   A.   If you identify?

16   Q.   Correct.

17   A.   Well, I disagree with your identification of those items.

18   Q.   Fair enough, sir.  If it is the case that one element of

19   a claim is not present in PNC's system, then that system does

20   not infringe that claim.  Correct?

21   A.   If one element is neither literally nor -- let me say it

22   this way.  Not present literally or the doctrine of

23   equivalents, then, yes, that's correct.

24        MR. LANTIER:  Now, could we please call up DDX 12,

25   Mr. Nickels?  I'm sorry.  Mr. Nickels, demonstrative Exhibit

1    No. 12.

2    Q.   (BY MR. LANTIER)  Doctor Conte, I'll move on without the

3    exhibit.  I don't think we need it.  Do you remember in your

4    demonstrative exhibits, you broke out the four asserted

5    patents in this case into two groups.  Is that right?

6    A.   I'm not the only one, but yes.

7    Q.   So there was a group that you referred to as the 2006

8    generation.  Do you remember that?

9    A.   Yes.

10   Q.   And then there was one patent that's referred to as the

11   2009 generation.  That's the '571 Patent.  Correct?

12   A.   One patent in this case, yes.

13   Q.   So the three patents that are in the first group, the

14   2006 generation, are the '432 Patent, the '681 Patent, and the

15   '605 Patent.  Correct?

16   A.   That is correct.

17   Q.   Now, you discussed version 4.20.1 during your direct.

18   Correct?

19   A.   That is correct.

20   Q.   And version 4.20.1 launched in May of 2021.  Correct?

21   A.   Yes.  I believe that's correct.

22   Q.   It's been in use for a year now.  Correct?

23   A.   That would be a year, yes.

24   Q.   And 4.20.1 was the version of PNC's mobile app that was

25   in use when you first offered an opinion that there is

1    infringement.  Correct?

2    A.    I'm not sure if that's the case.

3    Q.    Sir, you served your opening report on November 24th,

4    2021.  Correct?

5    A.    Oh, I see.  I believe PNC had already released that

6    version at that point, yes.

7    Q.    Yes.  PNC had released it about six months earlier.

8    Correct?

9    A.    Yeah, that's six months.  Seven, yeah.

10   Q.    Now, it is a fact that version 4.20.1 does not infringe

11   the '432 Patent.  Correct?

12   A.    I haven't determined that one way or the other.

13   Q.    Sir, do you understand that in this case it is a fact

14   that version 4.20.1 does not infringe the '432 Patent?

15   A.    Okay.

16   Q.    And you understand that it is a fact that version 4.20.1

17   does not infringe the '681 Patent.  Correct?

18   A.    Same answer.  I don't recall making that opinion, but,

19   okay, I'll agree to that.

20   Q.    Sir, you understand that in this case, that is a fact

21   that version 4.20.1 does not infringe the '681 Patent.

22   Correct?

23   A.    I don't understand that, but I'll take your word for it

24   and we can move on instead of debating it.

25   Q.    And it is a fact that version 4.20.1 does not infringe

474

1    the '605 Patent.  Correct?

2    A.   Same answer.  Again, I'll take your word for it.

3    Q.   And, sir, you certainly did not offer any opinion that

4    version 4.20.1 infringed any of those three patents.  Correct?

5    A.   I believe that's correct.

6    Q.   And those are all three of the 2006 generation patents.

7    Correct?

8    A.   That's correct.

9    Q.   All right.  Would it be okay with you if we discussed the

10   '605 and '681 Patents first?

11   A.   It would be fine with me.

12   Q.   If you need to reference it, the '681 Patent, which is PX

13   3, is at tab 7 of your binder.

14   A.   Thank you.

15        MR. LANTIER:  But I'd ask if we call up claim 12 of

16   the '681 Patent.

17   Q.   (BY MR. LANTIER)  And claim 12 is one of the two

18   independent claims that you said PNC infringes with the old

19   version of its mobile app.  Correct?

20   A.   That's correct.

21   Q.   Okay.  Now I'd like to -- since you've already discussed

22   that you offered no opinion of infringement for version

23   4.20.1, would it be okay if we focused now on the old version

24   of PNC's app?

25   A.   I offered no opinion with respect to this patent, that's

1    correct.

2    Q.    And now you understand we'll talk about the prior version

3    that was discontinued.   Correct?

4    A.    The version in the infringement period, yes.

5    Q.    If we could focus in on the portion of the claim, the

6    element found at column 15, lines 36 to 37.

7    A.    I thought he was going to blow that up.

8    Q.    He is going to blow it up, sir.   I was waiting for the

9    same thing.

10        Okay.   Do you see this element here, presenting the

11    photos of the check to the customer after the photos are

12    taken?

13    A.    I do.

14    Q.    Okay.   And this limitation is present in claim 12 of the

15    '681 Patent.   Correct?

16    A.    That is correct.

17    Q.    And it's present in claim 30 of the '681 Patent, which is

18    the other claim you talked about.   Correct?

19    A.    That's correct.

20    Q.    And it's also present in claim 12 of the '605 Patent.

21    Correct?

22    A.    I believe that's correct as well.

23    Q.    And when you talked to the jury about what evidence you

24    were citing to meet this particular claim element, you relied

25    on the same evidence for all three of those claims.   Correct?

1    A.    I believe that is correct.

2    Q.    That was where you had your arrows, if the jury

3    remembers.  You had the two claims next to each other, and

4    then you had the arrows that went and you drew the same arrow

5    between those elements.  Correct?

6    A.    I didn't want to be here all day, so yeah.

7    Q.    Understood.

8            MR. LANTIER:  Could we switch to the elmo, please,

9    Ms. Brunson?

10   Q.    (BY MR. LANTIER)  Now, Doctor Conte, I want you to assume

11   for me that we have a check.  Okay?

12   A.    Okay.

13   Q.    And the check has a front and it has a back.

14   A.    Okay.

15   Q.    Are you with me?

16   A.    Yeah.

17   Q.    Okay.  We're going to take a mobile camera, an iPhone, an

18   Android -- Google Android phone, and we're going to take a

19   picture of the front of the check and we're going to take a

20   picture of the back of the check.  Are you with me?

21   A.    Yes.

22   Q.    Now, one option that we have is we could take a picture

23   of the front, we could take a picture of the back, and then

24   decide not to show those pictures on the iPhone.  Is that

25   right?  That's one option we would have?

1    A.    I assume so, sure.

2    Q.    There's a second option.  The second option is we could

3    take a picture of the front and we could take a picture of the

4    back, then we could show those two pictures to the iPhone

5    user.  Correct?

6    A.    Yes.

7    Q.    Okay.  So we'll call the first version take, take, not to

8    show, or no show.  Okay?

9    A.    One would work, but sure.

10   Q.    Pardon, sir?

11   A.    Using No. 1 would work, but sure.  We can -- however you

12   say, sir.

13   Q.    And we'll refer to option No. 2 as take, take, show,

14   show.  Okay?

15   A.    Yes.

16   Q.    Because we're going to take the front, take the back,

17   show the two pictures to the user.  Okay?

18   A.    That's right.  Those are the two options you presented.

19   Q.    And there's one more option.  Correct?

20   A.    There might be more than one more.  I haven't thought of

21   it.

22   Q.    We could take a picture of the front, we could show it to

23   the user of the iPhone, then we could take a picture of the

24   back and we could show it to the user of the iPhone.  Correct?

25   A.    I can think of two more cases, but yes.

1  Q.   Sure.  And, sir, I assume you are saying you might show

2  only the front or only the back or something like that.

3  Correct?

4  A.   Right.  You could have take, not show.  You could have

5  take, show, take, not show, et cetera.

6  Q.   For simplicity, can we focus on these three main options:

7  you could take them and not show at all, you could take them

8  both and show them both, or you could take one, show one, take

9  one, show one.  Is that okay?

10 A.   For sake of argument, okay.

11 Q.   All right.

12         THE COURT:  Let me just clarify this.  Counsel

13 structures the questions in the way he or she wishes and the

14 witness responds to those questions.

15     If you think there's some other way to do it, Doctor

16 Conte, unless he asks you is there another way to do it, you

17 wait until opposing counsel gets a chance to redirect and go

18 into it if opposing counsel chooses to.

19     It's not your place to tell him there's two other ways to

20 do this or that's not right.  He'll put the proposals before

21 you in a question form the way he chooses to, and you need to

22 respond to that, but not offer extraneous comments or other

23 alternatives that are not called for.

24     And then when he's finished, Ms. Glasser will get a

25 chance to come back up and reexplore anything that she thinks

1    his questions have left open issues on that, from her

2    standpoint, she needs to re-examine.

3         But the witness is a responsive player here, not an

4    initiating player.  Counsel are the initiating players in a

5    courtroom, and I want to make sure you understand that as we

6    go forward.

7              THE WITNESS:  I do.  My apologies, Your Honor.

8              THE COURT:  All right.  Let's proceed on that basis.

9              MR. LANTIER:  Thank you, Your Honor.

10   Q.   (BY MR. LANTIER)  Now, if we could stick with the elmo,

11   the jury will remember, Doctor Conte, that you used some

12   demonstrative exhibits during your testimony.  Correct?

13   A.   I did.

14   Q.   And I'd like to place before the jury and you the

15   two -- two of the demonstrative exhibits you used to

16   illustrate your infringement opinion on this particular

17   limitation.  One of those was PDX 5.63.  Is that right?

18   A.   No, that's incorrect.

19   Q.   You are right, sir.  You tied these two limitations

20   together.  Do you recall that?  This is the limitation

21   instructing the customer to have the digital camera take

22   photos of front and back sides of the check.  Correct?

23   A.   That's correct.

24   Q.   And you said that one was related to the other

25   limitation, which is on PDX 5.69, and that's this one here.

480

1    Correct?

2    A.    That's correct.

3    Q.    And that's the limitation presenting the photos of the

4    check to the customer after the photos are taken.  Right?

5    A.    That's correct.

6    Q.    Now, on slide PDX 5.63, you placed two images of -- I

7    don't think the auto zoom -- it looks like we're a little out

8    of focus.

9              THE COURT:  Try the wheel at the top.

10             MR. LANTIER:  There we go.  Thank you, Your Honor.

11   Q.    (BY MR. LANTIER)  On Exhibit PDX 5.63, you placed

12   together an image of capturing the front of a check followed

13   by an image of capturing the back of the check.  Correct?

14   A.    Yes, that's what I placed on that slide, yes.

15   Q.    And then when we turn to PDX 5.69, you placed over the

16   top of one another review the front of the check and review

17   the back of the check.  Correct?

18   A.    Are you speaking about the images on the left of the

19   code?

20   Q.    Yes, sir.

21   A.    Yes, those are the images on the left.

22   Q.    And you placed a little yellow exhibit sticker there.

23   Right?

24   A.    I believe we didn't use the yellow.

25   Q.    Okay.  You may be correct on that, sir.  We might have an

1    updated so maybe you didn't do that and I apologize for the

2    suggestion if I have it wrong.

3         Now, let's go back to PDX 5.63.  This is the one where

4    we're showing capturing both the front and back of the check

5    right over the top of one another.  Correct?

6    A.   Yes.

7    Q.   That's not how PNC's app actually operates.  Correct?

8    A.   I disagree.

9    Q.   Well, sir, in PNC's old app, the first thing that happens

10   is that we capture the front of the check.  Correct?

11   A.   Yes.

12   Q.   But the next thing that happens is not capturing the back

13   of the check.  Correct?

14   A.   I can't quite answer that.  It depends on the granularity

15   of next.

16   Q.   All right.  Maybe if we put PDX 5.69 back up, it will

17   help us.  Do you see that there?

18   A.   Yes.

19   Q.   The next thing that happens in PNC's app, do you see it

20   says, review front of check?  Correct?

21   A.   That's correct.

22   Q.   The next thing that happens in PNC's app is that we

23   review the front of the check.  Correct?

24   A.   That's correct.

25   Q.   But then to get the next thing that actually happens in

482

1    PNC's app, we've got to go back to your other demonstrative

2    and take capture the back of the check.  Correct?  Because

3    that's the next thing that happens?

4    A.   Are you asking -- I'm sorry.  So the next thing that

5    happens is capture back of check.  Correct.

6    Q.   So in PNC's app we capture the front of the check, we

7    review the front of the check.  Correct?

8    A.   Correct.

9    Q.   The user decides whether to retake that photo.  Correct?

10   A.   That is correct.

11   Q.   Then we capture the back of the check.  Correct?

12   A.   That is correct.

13   Q.   And then if we go back to PDX 5.69, at this point after

14   that event, the back of the check is presented to the customer

15   for review.  Correct?

16   A.   That is correct.

17   Q.   All right.  So we can show that PNC's old app performs

18   take, take, show, show.  Correct?  I'm sorry.  Excuse me, sir.

19   I'll strike that question.  I misspoke.

20       We can see that PNC's old app does option 3, which is

21   take, show, take, show.  Correct?

22   A.   I would agree with either, but sure.

23   Q.   And, sir, we can also agree that version 4.20.1 does

24   option 1.  Correct--take, take, do not show?

25   A.   I believe that's correct, yes.  I don't recall, but I

1    believe that's correct.

2    Q.    Okay.  Now, you stood up during the opening statements

3    that were made yesterday by Mr. Sheasby.  Correct?

4    A.    I did.

5                MR. LANTIER:  And if we could switch back, please,

6    Ms. Brunson, to the slides and call up PDX 1.5.

7    Q.    (BY MR. LANTIER)  Do you remember that -- while we wait

8    for that, I'll carry on.  Do you remember that Mr. Sheasby --

9    A.    Here it is.

10   Q.    -- put this slide on the screen and said that PNC

11   accessed USAA's mobile app and it took USAA's technology?

12   A.    I don't recall his exact words.  I'm sorry, sir.

13   Q.    Would it be helpful if I refreshed your recollection with

14   what he said specifically?

15   A.    Yes, it would.

16               MR. LANTIER:  Why don't we go to yesterday's

17   transcript at page 144, lines 18 to 24.

18   Q.    (BY MR. LANTIER)  So PDX 1.5 was on the screen and Mr.

19   Sheasby said, we saw a 2016 email in which PNC is once again

20   accessing USAA's application, and PNC executives are saying,

21   can we do this?  How fast with we roll this out?  Then he

22   talks about coveting technology and I think he talked about

23   being addicted to technology?

24               MS. GLASSER:  Objection, Your Honor.  That

25   transcript is not referring to this at all as you can even see

1    from the date in 2016.  The other one he just showed was a

2    2009.

3              THE COURT:  I'm sorry.  I'm not following your

4    objection, Ms. Glasser.

5              MS. GLASSER:  So the slide that Mr. Lantier just

6    presented had the date 2009, and he's now trying to read into

7    the record to refresh recollection allegedly about that

8    document, something that relates to a different email from

9    2016.

10             THE COURT:  All right.  What's your response to

11   that, Mr. Lantier?

12             MR. LANTIER:  Your Honor, I think, as everybody will

13   remember, Mr. Sheasby was flipping through four slides quickly

14   at this point in his opening statement.  If you want, we can

15   go to slide PDX 1.6.  That is the 2006 email -- the 2016

16   email.

17             THE COURT:  Approach the bench, counsel.

18             (The following was had outside the hearing of the

19             jury.)

20             THE COURT:  I'd rather you go to the other slide.  I

21   just told the jury in my preliminary instructions the

22   transcript would not be available when they retire to

23   deliberate.

24             MR. LANTIER:  Okay.  I'm sorry, Your Honor.

25             THE COURT:  And now we're showing them the

1    transcript, and I don't want them to ask me to send it back

2    during their deliberation.

3              MS. GLASSER:  Actually I was thinking about

4    objecting, but I didn't want to be disruptive.  We are not to

5    show the transcripts during examination?

6              THE COURT:  I would prefer that you seek leave to do

7    it because, again, I think it creates a possibility that would

8    generate confusion with the jury in my instructions.  So let's

9    use your alternative method.  Okay?

10             MR. LANTIER:  Yes, Your Honor.  And please accept my

11   apology.

12             THE COURT:  Not a problem.

13             (The following was had in the presence and hearing

14             of the jury.)

15             MR. LANTIER:  Could we take that down, please?  And

16   we can go back to slide 1.6.

17   Q.   (BY MR. LANTIER)  Now, we'll remember that this was the

18   next slide that was shown to the jury, and it was suggested

19   that PNC set out to access these images of USAA's mobile app

20   and copy it.  Correct?

21   A.   I'm sorry.  I don't recall exactly what he said here.

22   Q.   Okay.  Why don't we look at what PNC would have seen if

23   it went and looked at what USAA shows about its own mobile

24   app.  Okay, sir?

25   A.   Sure.

486

1          MR. LANTIER:  Could we call up PX 905?

2     Q.   (BY MR. LANTIER)  Now, this is a video that I'd like to

3     play because it goes to the allegations that were made during

4     the opening yesterday that PNC accessed and took USAA's

5     technology.

6          MS. GLASSER:  Objection, Your Honor, both to the

7     colloquy and I have a separate objection that might be best

8     made at sidebar with Your Honor's permission.

9          THE COURT:  Approach the bench, counsel.

10         (The following was had outside the hearing of the

11         jury.)

12         THE COURT:  You don't need to explain why you want

13    to do it and why you think it's helpful.  That's a clear

14    sidebar comment.  Just ask questions.

15       What's your other objection?

16         MS. GLASSER:  So Doctor Conte's only addressing

17    infringement, and he is -- the deposit at mobile application

18    for purposes of showing infringement or non-infringement was

19    specifically excluded.

20         MR. LANTIER:  Your Honor, this is responsive to the

21    allegations that were made during the willfulness part of the

22    case, and Doctor Conte is the only witness who we can ask

23    about how PNC's mobile app works.  We need to be able to

24    defend ourselves when it's said that we copied their app to

25    show that we did not copy their app.

1       MS. GLASSER:  Especially now with the colloquy that

2   was made, I don't see how the jury would possibly not be

3   completely confused about that and think this is somehow --

4       THE COURT:  Tell me exactly what this video is going

5   to show.

6       MR. LANTIER:  It will show two things, Your Honor.

7   It's a 40-second video.  It will show that USAA's mobile app

8   and its public demonstration differs in this key regard from

9   PNC's mobile app.  So it shows that we did not copy USAA's

10  mobile app because if we had copied their app, we would do it

11  the same way and we don't.

12      MS. GLASSER:  And just leaving aside the other

13  problems with that, Doctor Conte's not permitted to talk about

14  willfulness.  And so trying to have him say there is something

15  non-willful, I'm not sure how that could possibly be

16  appropriate.  It's totally outside the scope of my --

17      MR. LANTIER:  I'm not going to ask --

18      THE COURT:  How does -- I'm going to have to insist

19  that everybody speak when I call on them.  Everybody seems to

20  want to jump in as soon as the last word is out of the other

21  one's mouth, and I'm going to need to regulate the back and

22  forth on these objections, both at the bench and in the

23  courtroom.

24      Showing a video to show that the PNC product doesn't do

25  something the same way, how is that -- how is that relevant to

1    willfulness when it really seems to go directly to the

2    infringement issue?

3              MR. LANTIER:  Because the allegation that's been

4    made is that PNC saw the USAA mobile app and took it or copied

5    the app.  And if PNC had copied the app, it wouldn't --

6              THE COURT:  I haven't heard anybody say that the

7    Defendant copied the Plaintiff's product.  I've heard a lot of

8    allegations that the Defendant's products infringe the

9    Plaintiff's patents, but I haven't heard a copying word once

10   in this trial.

11             MR. LANTIER:  I think that counsel may have been

12   trying to not use the word copy for the strategic reason.

13   What he said was to the jury yesterday in opening PNC accessed

14   USAA's mobile app and it took its technology.  That is

15   tantamount to saying to the jury that PNC copied the mobile

16   app.

17             THE COURT:  I will be honest with both of you.  I'm

18   at a disadvantage unless I see the video.  I'm happy to send

19   the jury out, watch it for 40 seconds, but with that added

20   context give you an answer to whether it can or can't be

21   played with this witness.  But I'm not going to be able to

22   resolve this just listening to you go back and forth about

23   what it does and doesn't do.

24             MR. LANTIER:  I understand, Your Honor.  I would not

25   --

```
1          THE COURT:  You know, the time that takes is going
2   to get charged to somebody.  If you want me to go forward with
3   it, I'll do that.  If you don't, then let's move on.  It's
4   your call, Mr. Lantier.
5          MR. LANTIER:  I understand, Your Honor.  We would
6   like to go forward with it.
7          THE COURT:  All right.  Take your places.
8          (The following was had in the presence and hearing
9          of the jury.)
10         THE COURT:  Ladies and gentlemen, there's a matter I
11  again need to take up outside of your presence.  This will be
12  very short, I think.
13      If you'll simply close your notebooks, leave them in your
14  chairs, take an opportunity to get an extra recess that the
15  rest of us won't get, stretch your legs and get a drink of
16  water, and I think you'll be back in here very shortly.
17      I'm going to ask the jury to retire to the jury room at
18  this time.
19         (Whereupon, the jury left the courtroom.)
20         THE COURT:  All right.  Mr. Lantier, the jury's out
21  of the courtroom.  If you'll exhibit this 40-second video that
22  we've been discussing at the bench, I will look at it and that
23  will aid me in deciding how to rule on the pending objections.
24         MR. LANTIER:  Thank you, Your Honor.  Just for
25  record purposes, this is PX 905.  I'm not sure that I said
```

 1    that on the record, and this was pre-admitted by Judge Payne.

 2            THE COURT:  You did not say that on the record.

 3        Ms. Glasser, you're on your feet.

 4            MS. GLASSER:  I wanted to make one other comment

 5    about the video as well in addition to the other issues that

 6    we had with it, which is that I don't know the time period of

 7    the video, so I'm not sure what he's about to show.  But I'm

 8    absolutely certain it's not from the time period of either of

 9    those emails.

10            THE COURT:  Well, why don't you sit down, we'll all

11    watch it, and then I'll let you make any additional comments

12    you think are appropriate.  Let me see the video, please.

13        Is there audio that goes with it or just video?

14            MR. LANTIER:  No, Your Honor, just video.

15            (Whereupon, Plaintiff's Exhibit No. 905 was played

16            in open court.)

17            THE COURT:  That completes the video?

18            MR. LANTIER:  Yes, Your Honor.

19            THE COURT:  All right.  I'll hear any additional

20    comments from Plaintiff.

21            MS. GLASSER:  Sure.  So to just briefly summarize

22    the first objection, it's outside the scope of the direct

23    examination because Doctor Conte addressed only infringement

24    and counsel has indicated he's allegedly not using this to

25    show infringement or non-infringement.

1          The second objection is that this has been expressly

2     excluded already for purposes relating to infringement and,

3     particularly with counsel's colloquy, it will be extremely

4     misleading in that regard.

5          And then, additionally, the video itself doesn't go to

6     any of these issues.  It's from, I think, a completely

7     different time period.  It also didn't fully show the step

8     that Mr. Lantier said he wanted to focus on.

9               THE COURT:  All right.  Mr. Lantier, do you have any

10    additional comments for me?

11              MR. LANTIER:  Yes, Your Honor.  This was an exhibit

12    that Plaintiff moved to put in evidence.  Judge Payne allowed

13    it in evidence.

14         It shows that PNC did not copy USAA's mobile app or did

15    not access it and take its technology the way that was

16    represented to the jury during the opening statements.

17         And to the extent that counsel wants to redirect on the

18    time period that the video is from, that's okay, although the

19    app I believe worked the same way during the entire time

20    period.

21              THE COURT:  You made a comment at the bench that

22    Doctor Conte was the only witness through which you could show

23    this.  Explain to me why Doctor Conte is the only witness

24    through which you could show this.

25              MR. LANTIER:  Because the relevant point here is

1    comparing what PNC is using to what it allegedly copied, and

2    the only witness who we can cross-examine about how PNC's

3    mobile app operates is Doctor Conte.  He's the only one who's

4    analyzed that issue.

5            THE COURT:  While it has been pre-admitted by Judge

6    Payne as a part of the pretrial process, it clearly doesn't

7    relate to the infringement issue and relates to the

8    willfulness -- or excuse me -- yes, the willfulness issue

9    vis-a-vis copying.  I have not heard evidence of copying so

10   far, and Doctor Conte is an infringement witness for all

11   intents and purposes.

12       If there is overt evidence or testimony regarding copying

13   by PNC of USAA's product, I will certainly reconsider letting

14   this be shown in the Defendant's case in chief through one of

15   your witnesses, but at this point it does not seem to coincide

16   with the direct testimony of the witness, and I don't see how

17   this would be viewed by the jury as regards a willfulness

18   issue.

19       I see no way they will not view this solely as regards

20   the infringement issue.  And it's not properly before the

21   Court for that.

22       We're not going to compare products to determine

23   infringement.  We're going to compare the accused products to

24   the claims that are asserted.

25       At this point I'm going to deny your motion to proceed

1    with the video.  If there is overt testimony or evidence that

2    clearly puts copying before the jury, or if there's at a later

3    point in the trial you think something has arisen that would

4    justify presenting this, and it seems to me this can be

5    presented through any PNC witness since it's a PNC video, I'll

6    certainly entertain a request to play it at a later time, but

7    not at this time with this witness.

8              MR. LANTIER:  I understand, Your Honor.  And I don't

9    think this changes anything you said.  It's a USAA video

10   rather than a PNC video.

11             THE COURT:  Well, I may have misspoken.

12             MR. LANTIER:  It is a publicly available video, and

13   your point is well taken.

14       Because I'm sensitive to the jury time, can I ask about

15   one other line of questioning now to make sure we don't have a

16   repeat of this?  And that is this.

17             THE COURT:  I have no problem with that.

18             MR. LANTIER:  This witness testified that he was --

19   that he served as the expert in the case against Wells Fargo,

20   and I would like to inquire of him as to how the Wells Fargo

21   mobile app operated because I think it goes both to the issue

22   of copying, but also more broadly to the issue of this

23   witness' credibility.

24             THE COURT:  How does the factual inquiry as to how

25   the Wells Fargo product operates impact this witness'

494

1    credibility?

2              MR. LANTIER:  Because, Your Honor, the Wells Fargo

3    product operated differently from the PNC mobile app, and he

4    has now said that both of them infringe this patent.

5              THE COURT:  Well, and you're correct and I

6    appreciate you correcting me, that this is a USAA video and

7    not a PNC video.  I still have no problem with it being played

8    later in the case if the copying issue is put forward.

9         But we are in the midst of the infringement portion of

10   the case.  This witness on direct has gone through the

11   asserted claims and addressed each element, put his little

12   checks by them.

13        To play this video at this juncture, which reflects the

14   Plaintiff's product and not the Defendant's product, invites

15   an incorrect comparison as to the infringement issue and I

16   think there is more potential prejudice here than there is

17   probative value.  And, consequently, I'm going to preclude the

18   playing of the video, the USAA video, at this time and I'm

19   going to preclude the inquiry as to the Wells Fargo product

20   for the very same reason.

21        If in the later portion of this trial when we don't have

22   the infringement expert for the Plaintiff who's just gone

23   through each of the elements of the claims on the witness

24   stand and if there is the introduction of direct claims of

25   copying, then I'll be glad to reconsider your request with

1    regard to both of those items.

2              MR. LANTIER:  I understand, Your Honor.

3              THE COURT:  All right.  Let's bring the jury back

4    in.

5              (Whereupon, the jury entered the courtroom.)

6              THE COURT:  Thank you for your cooperation, ladies

7    and gentlemen.  Please have a seat.

8         All right.  Let's proceed with your cross-examination,

9    Mr. Lantier.

10             MR. LANTIER:  Thank you, Your Honor.

11   Q.   (BY MR. LANTIER)  Doctor Conte, could we speak now about

12   the '432 Patent?

13   A.   Yes, Mr. Lantier.

14   Q.   And if you'd like to reference it, it is found at tab 4

15   of your binder.  It's PX 4 as well.

16        Claim 1 is the only independent claim of the '432 Patent

17   that you testified PNC infringes.  Correct?

18   A.   Correct.

19   Q.   And so if PNC's old mobile app doesn't infringe claim 1,

20   then it doesn't infringe any of the asserted claims of the

21   '432 Patent.  Correct?

22   A.   That's correct, yes.  If it doesn't infringe -- if it's

23   found to not infringe, then the dependent claims would not be

24   infringed, either.

25             MR. LANTIER:  Now, could we please call up claim 1

1    of the '432 Patent?  That's at column 14, lines 22 to 49.

2    Q.    (BY MR. LANTIER)  Now, Doctor Conte, claim 1 is a system

3    claim.  Correct?

4    A.    That's correct.

5    Q.    And it's a system that comprises two things.  Correct?

6    A.    Yes, I believe, yes.

7    Q.    One is a bank computer.  We can see that down at line 40.

8    Correct?

9    A.    Yes.

10   Q.    There's no question that PNC is a bank and has computers.

11   Correct?

12   A.    Correct.

13   Q.    But the other element of claim 1 of the '432 Patent is a

14   customer's mobile device.  Correct?

15   A.    That's not quite precise.

16   Q.    The system comprises a customer's mobile device that has

17   certain requirements and a bank computer that is programmed to

18   do certain things.  Correct?

19   A.    It's still not quite precise.

20   Q.    All right.  Are you disputing that the claim reads, "a

21   system comprising a customer's mobile device"?

22   A.    I'm not disputing that.

23   Q.    And these claims were written by USAA.  Correct?

24   A.    Yes.

25   Q.    And they could structure the claims the way that they

1   chose to structure them.  Correct?

2   A.   Yes.

3   Q.   Now, PNC, of course, does not sell customers their mobile

4   devices.  Correct?

5   A.   Correct.

6   Q.   And direct infringement of a patent claim requires that

7   the Defendant make, use, sell, offer to sell, or import

8   something that meets each claim element.  Correct?

9   A.   I believe that's the definition, yes.

10  Q.   And you agree that PNC does not offer to sell its

11  customers mobile devices.  Correct?

12  A.   I don't know one way or the other, but I'll accept they

13  do not.

14  Q.   And it doesn't import iPhones or Android phones.

15  Correct?

16  A.   I believe that's correct, yes.

17  Q.   So your testimony isn't that PNC provides customer mobile

18  devices that have this software on them.  Correct?

19  A.   Yes, it is.  I'm sorry.

20  Q.   Sir, your testimony is that PNC supplies iPhones to its

21  customers?

22  A.   No.

23  Q.   Okay.  Your -- the basis that you say PNC meets this

24  system claim is that you say PNC controls the system.

25  Correct?

1    A.   In part, yes.

2    Q.   And you say that PNC -- or PNC's customers are acting

3    sort of at PNC's behest.  Correct?

4    A.   I don't recall saying that.

5    Q.   I think, sir, you said control and benefit.  That was the

6    words you used.  Is that right?

7    A.   That was in reference to PNC, yes.

8    Q.   Yes.  Now, PNC doesn't require any customer to deposit a

9    check using mobile deposit.  Correct?

10   A.   That's correct.

11              MR. LANTIER:  Now, if we could put claim 1 of the

12   '432 Patent back up here and we can take the highlighting off.

13   I want to focus on a second limitation.  And if we could

14   please blow up the portion of that claim from line 43 to the

15   bottom of the claim at line 48.

16   Q.   (BY MR. LANTIER)  And we see here it says, wherein the

17   downloaded app causes the customer's mobile device to perform

18   additional steps.  Do you see that?

19   A.   Yes.

20   Q.   And the last step is the checking-for-errors step.

21   Correct?

22   A.   That's correct.

23   Q.   So the customer's mobile device has to perform the

24   checking for errors.  Correct?

25   A.   For literal infringement, yes.

```
1    Q.    Yes.  For literal infringement, that's what the claim
2    says.  Correct?
3    A.    For literal infringement, yes.
4    Q.    Now, you told the jury that PNC operates servers.
5    Correct?
6    A.    In part, yes.
7    Q.    And we -- you call those mobile back-end servers in your
8    report.  Is that right, sir?
9    A.    I believe that's one of the terms I used.
10   Q.    These are what are called server computers.  Correct?
11   A.    Yes.
12   Q.    They are not mobile devices.  Correct?
13   A.    That is correct.
14   Q.    You can't hold them in your hand.  Correct?
15   A.    Depends on the size of your hand, but I think that's
16   correct.
17   Q.    And you know that these servers for PNC are located in
18   Greenfield, Virginia.  Correct?
19   A.    I believe that's where the majority of them are, yes.
20   Q.    And PNC's server is where image quality analysis is
21   performed.  Correct?
22   A.    That's imprecise.
23   Q.    Okay.  Sir, could you turn in your binder to tab 1,
24   which is your own expert report?
25   A.    Yes.
```

1    Q.   And turn to paragraph 143, please.

2    A.   I'm there.

3    Q.   Does paragraph 143 of the expert report refresh your

4    recollection that image quality analysis is performed at the

5    mobile deposit server?

6    A.   That's one place it's performed.

7    Q.   Sir, you have not offered an opinion that the IQA, image

8    quality analysis, itself is performed anywhere other than at

9    the server.  Correct?

10   A.   I disagree.

11   Q.   If we could -- and paragraph 143, again of your expert

12   report, sir, does that refresh your recollection as to where

13   image quality analysis is performed?

14   A.   That is one place where it's performed.  That is -- I

15   agree with you.

16   Q.   So that did refresh your recollection.  Is that right?

17   A.   I didn't have any loss of recollection.  Your question

18   was imprecise.

19        MR. LANTIER:  Your Honor, with your permission,

20   could we publish paragraph 143 to the jury?

21        THE COURT:  I'll allow that.

22        MR. LANTIER:  Could you please call up paragraph 143

23   of Doctor Conte's report?

24   Q.   (BY MR. LANTIER)  Do you see it says that the RSS credit,

25   et cetera, flow is used to submit the captured check images to

501

1    the mobile deposit server software where image quality

2    analysis is performed?

3    A.    That's correct.  And I agree with that.

4    Q.    And you didn't say, which is one place where image

5    quality analysis is performed.  Correct?

6    A.    Nor did I say the only place, but correct.

7    Q.    Now, if we could turn to DDX 226, which is at tab 5.

8    A.    Would you mind if I use my larger version?

9    Q.    Sure.

10   A.    It's my 58-year-old eyes.  Okay.

11   Q.    Now, another thing --

12            THE COURT:  Let me remind both of you gentlemen,

13   it's important that we not have two people talking at one

14   time.  Some of it just seems to be lingering comments that

15   trail off while the other one starts.  But when there are two

16   people talking at one time, we don't get an accurate record,

17   and it's just not fair to the court reporter who's charged

18   with protecting the record here.

19       So make sure that you're not talking or mumbling or

20   making noises while the other one is talking.  All right?

21            MR. LANTIER:  Yes, Your Honor.

22            THE WITNESS:  Yes, Your Honor.

23            THE COURT:  Okay.  Let's go forward.

24            MR. LANTIER:  Could we blow up the upper left-hand

25   corner of that document, please?

502

1    Q.    (BY MR. LANTIER)   Now, Doctor Conte, one other opinion

2    you offered was that the diamond that says, within RDC

3    velocity limits, constitutes checking for errors on the mobile

4    device.   Correct?

5    A.    That is correct.

6    Q.    That check occurs prior to taking any image of the check.

7    Correct?

8    A.    That is correct.

9    Q.    And, in fact, if that test returns a negative result, a

10   no, PNC's mobile system will not allow the customer to take a

11   picture of the check.   Correct?

12   A.    That's correct.

13             MR. LANTIER:   If we could, please, turn to the '571

14   Patent.

15             THE WITNESS:   What tab is that?   I'm sorry?

16   Q.    (BY MR. LANTIER)   That will be at tab 2 in your binder.

17   I'm sorry.   Not tab 2.   It is at tab 3.   Just let me know when

18   you're there.

19             MR. LANTIER:   If we could call up claim 1.

20             THE WITNESS:   I'm there.

21   Q.    (BY MR. LANTIER)   Okay.   Now, let me start with version

22   4.20.1.   Are you with me?

23   A.    Yes.

24   Q.    Okay.   So this is the version of PNC's mobile app that

25   was in use at the time that you issued your infringement

1    opinions in this case.  Correct?

2    A.    It was in use.  It was not at issue, but yes.

3    Q.    It's not at issue in this case.

4    A.    That's correct.

5    Q.    The asserted '571 patent claims require auto-capture

6    features.  Correct?

7    A.    The term auto-capture is not present in the claim.

8    Q.    Do the claims of the '571 Patent require auto-capture

9    features?

10   A.    Generally, yes.

11   Q.    Sir, do the claims of the '571 Patent require

12   auto-capture?  Yes or no.

13   A.    Yes.

14   Q.    And version 4.20.1 does not in its default configuration

15   infringe the '571 Patent.  Correct?

16   A.    In its default configuration, no.

17   Q.    PNC disabled the auto-capture feature in version 4.20.1.

18   Correct?

19   A.    That's correct.

20   Q.    And you're not aware of any way for a PNC customer to

21   configure version 4.20.1 to enable auto-capture.  Correct?

22   A.    I'm not aware one way or the other, that's correct.

23   Q.    PNC had to change code in order to disable auto-capture

24   for version 4.20.1.  Correct?

25   A.    Yes, that's correct.

504

```
1    Q.    Okay.  Now could we please talk about the old PNC app,

2    the one you are accusing of infringement here?

3    A.    I would love to.

4    Q.    And we can stick with claim 1.  I'd like to focus in

5    specifically on one portion of claim 1, which is the

6    image -- where it says, that will monitor an image of the

7    check in a field of view of a camera of a mobile device with

8    respect to a monitoring criterion, and then here's the

9    important part for our purposes, using an imaging monitoring

10   and capture module of the mobile device.  Do you see that?

11   A.    I do.

12   Q.    And you testified about this on direct, but you

13   understand that the Court has construed this term to be what's

14   known as a means-plus-function claim term.  Correct?

15   A.    I do.

16   Q.    And you talked about what structure is required under the

17   means-plus-function construction of the Court.  Correct?

18   A.    I did.

19   Q.    And you'd agree with me, sir, that PNC does not infringe

20   this claim unless its system includes the structure disclosed

21   in the specification or a structure equivalent.  Correct?

22         MS. GLASSER:  Objection, Your Honor.  I think he's

23   sort of saying what the Court's jury instructions are going to

24   address for a means-plus-functions claims.

25         THE COURT:  What's your response, Mr. Lantier?
```

505

1              MR. LANTIER:  Your Honor, I don't know how this

2    expert could have applied the law without the basic of what's

3    required to meet or infringe a means-plus-function claim.

4         I was just asking him what's required -- I was asking him

5    to confirm his understanding that in order to infringe a

6    means-plus-function claim, you must show that the accused

7    product contains the claim structure or its structural

8    equivalent.

9              MS. GLASSER:  May I respond, Your Honor?

10             THE COURT:  Briefly.

11             MS. GLASSER:  And that's the issue.  That exact

12   phrasing I think will -- I don't know what the Court's

13   instructions will ultimately be, but I think they very well

14   may not do that phrasing and Mr. Conte's report doesn't do

15   that exact phrasing, either.  So it's a legal issue how

16   exactly you would phrase that, and I don't think ultimately

17   that's what it's going to be.

18             THE COURT:  Well, whatever the Court's exact

19   instructions to the jury are at the close of the evidence will

20   control over anything that's said during the trial, and this

21   does relate directly to the infringement issue for which

22   purpose this witness has been called.

23        I'm going to permit it.  I'll overrule the objection.

24             MR. LANTIER:  Now, if we could, please, call up PDX

25   5.103.

1  Q.    (BY MR. LANTIER)  You remember, Doctor Conte, that when

2  you were speaking with Ms. Glasser, you testified about

3  monitoring criterion that you said were recited in the '571

4  Patent.  Correct?

5  A.    Yes.

6  Q.    And you said that you found each of those criterion to be

7  used by PNC.  Correct?

8  A.    I did.

9  Q.    You did not testify about the order in which PNC

10  evaluates any of those criterion relative to one another.

11  Correct?

12  A.    That's correct, I did not.

13  Q.    And you didn't discuss what steps in particular the

14  software goes through in order to monitor any of those

15  criteria.  Correct?

16  A.    I don't think that's quite accurate.

17  Q.    And you did not use the term 'structurally equivalent' in

18  your direct testimony.  Correct?

19  A.    With respect to what?  I'm sorry.

20  Q.    With respect to this claim element, sir?

21  A.    I'm sorry.  I think I've lost the plot.  Which claim

22  element was this?

23  Q.    This is the --

24          MR. LANTIER:  If we can go back to claim 1 if we

25  still have that.

1    Q.   (BY MR. LANTIER)  This is the image monitoring and

2    capture module requirements.  You remember that, sir?

3    A.   The prior PDX 5.103 was never displayed to me.

4    Q.   Yes.  And I apologize, sir.  I was hoping we could call

5    it up, but we didn't so I just didn't want to take everyone's

6    time.  If we can call it up, we'll show you what it was.

7         But what it was was a chart where you had on the one side

8    of it a series of check boxes.

9         I don't think this was it.  If we go to maybe the next

10   slide.

11        It was a series of check boxes.  You said on the one hand

12   that there were these monitoring criterion set forth in the

13   patent and then PNC used those monitoring criterion.  Correct?

14   A.   It's a little further on if that helps.

15   Q.   Okay.  Maybe I may have miswrote it.

16   A.   Try 113.  Perhaps that's it.

17   Q.   Oh, that might be it.  Thank you, sir.

18            MR. LANTIER:  Back up to 113.

19            THE WITNESS:  Oops.  Okay.  Maybe two more back.  I

20   think by 20 questions, we'll get this.

21            THE COURT:  Just check your materials, Mr. Lantier,

22   and when you're ready, ask a real live question.

23            MR. LANTIER:  Understood, Your Honor.  I think we

24   can move on.

25   Q.   (BY MR. LANTIER)  Now, you remember, Doctor Conte,

508

1    throughout your testimony today, you referred to PNC's source

2    code.  Correct?

3    A.    That's correct.

4    Q.    And you said that you analyzed the source code in order

5    to locate and determine whether PNC was meeting the elements

6    of the different claims.  Correct?

7    A.    That is correct.

8    Q.    You've seen no evidence that PNC ever had access to

9    USAA's source code.  Correct?

10   A.    That's correct.

11              MR. LANTIER:  No further questions.

12              THE COURT:  You pass the witness?

13              MR. LANTIER:  I pass the witness, Your Honor.

14              THE COURT:  Is there redirect, Ms. Glasser?

15              MS. GLASSER:  Yes, Your Honor.

16              THE COURT:  All right.  Proceed with your redirect.

17                       REDIRECT EXAMINATION

18   BY MS. GLASSER:

19   Q.    Good afternoon again, Professor Conte.

20   A.    Good afternoon.

21              MS. GLASSER:  May I proceed, Your Honor?

22              THE COURT:  You may proceed.

23   Q.    (BY MS. GLASSER)  So the very first topic that opposing

24   counsel raised with you was the work you've done over the past

25   19 years, and he asked you about your total compensation over

1    that time period.

2        Can you give us a rough sense of all of the different

3    types of work that you've done over that time period and to

4    the range of different law firms and clients that you've

5    worked with without naming the particular matters but just to

6    give the jury some context?

7    A.    Let's see.  I've worked on over 60, six zero, matters.

8    I've worked for at least 10 different firms.  And as I said

9    before, I've represented both defendants and plaintiffs.

10   Q.    And when you get called upon about a potential expert

11   engagement like you're working on here, do you have the

12   opportunity to take a careful look at what the allegations are

13   in the case so that you can decide whether or not you agree

14   with the position of the party who's seeking to retain you?

15   A.    I always do that, yes.  And if I do not agree, then I say

16   find someone else.

17   Q.    Let's turn now to the '681 Patent.  Opposing counsel

18   asked you a few questions about presenting the photos after

19   the photos are taken.  Do you recall that?

20   A.    I do.

21   Q.    And, now, I think counsel spent the bulk of the time

22   going through and showing that if somebody wants to, they can

23   present an image and then take the other image and present it

24   in that fashion.  Is that right?

25   A.    That's correct.

1    Q.   And during your direct examination, did you, in fact,

2    explain exactly that--that the front and back images can be

3    shown either sequentially as in the PNC system or

4    simultaneously?

5    A.   I did.

6    Q.   And can you remind the jury about -- I know you have two

7    opinions on that, both literal and doctrine of equivalents,

8    but first let's go through your doctrine of equivalents

9    opinion on that.

10   A.   Okay.  So the doctrine of equivalents opinion is that PNC

11   system achieves the same result regardless of the order that

12   the photos are presented after they are taken whether or not

13   they are interlaid (ph).

14   Q.   And the important thing is that in the claim is the word

15   after.  So the important thing is that the photos are

16   presented, each of them, after the photo has already been

17   taken.  Correct?

18   A.   That's correct.

19   Q.   As opposed to just being shown visibly right up front and

20   then not for the customer to approve afterwards?

21   A.   That's correct.

22   Q.   Okay.  And how is that done and what is the result in the

23   system for PNC?

24   A.   So in PNC's system, that's done by, again, taking the

25   photo, then presenting it to the user so that they can approve

511

```
 1    it or not to determine, you know, whether or not it's a good

 2    image, and they do that both for the front and the back.  And

 3    they're presented after they're taken to approve again,

 4    whether it's a good image or not.

 5         So the end result is that PNC servers get a higher

 6    quality image by virtue of presenting it to the user.

 7    Q.   And I just, for the sake of clarity, wanted to have you

 8    show the jury the code that you've looked at, again to support

 9    both your literal and doctrine of equivalents opinion on that

10    issue.

11              MS. GLASSER:  Could we please have slide 69?

12    Q.   (BY MS. GLASSER)  And can you remind us here -- again,

13    this is where you explain that ultimately both images are

14    presented after they're taken.  Correct?

15    A.   That is correct.

16    Q.   And I think actually if we walk back to the beginning of

17    this field, first you show just the front of the check.

18    Right?

19    A.   That's correct.

20    Q.   And can you explain to us how the code in PNC's system

21    matches up literally?

22    A.   So what happens here, and let me see if I can do this, is

23    it comes into this routine, and if what it's doing is the

24    front of the check, it does this, retry instruction text set

25    visibility view visible.  And that's what creates this -- this
```

512

1    screen.

2         And then if -- you see that it's working off this 979, if

3    doc type is front check.  So if it is the front check, it does

4    this.  Else, if it's the back, it will do this.  So else if

5    it's the back of the check, it will present the back of the

6    check.

7    Q.   And ultimately in the PNC system, both images are taken.

8    Correct?

9    A.   That is correct.

10   Q.   And both are presented to user after they're taken.

11   Correct?

12   A.   Yes, they are.

13   Q.   Let's turn then to the topic of the '432 Patent.

14   Opposing counsel asked you a number of questions about the

15   checking-for-errors element.  Do you recall that?

16   A.   I do.

17        MS. GLASSER:  Could we have slide 52, please?  I'm

18   sorry.  Actually slide 54 first, please.

19   Q.   (BY MS. GLASSER)  And now, in this element, the claim

20   requires that there be a step of checking for errors on the

21   mobile device before the submitting step.  Correct?

22   A.   That's correct.

23   Q.   Does the claim say anything to preclude the server also

24   participating in error checking as well?

25   A.   No, the claim does not preclude the server from

513

1    participating.

2    Q.   And how do we know from the source code that we're

3    looking at on the screen that there is error-checking going

4    on, specifically on a mobile device itself?

5    A.   Because it says remote deposit error code, and then it's

6    checking what the error codes are.

7    Q.   And each of the ones highlighted on the right side are

8    errors that are being checked on a mobile device.  Is that

9    correct?

10   A.   That's correct.

11   Q.   And then this is the actual source code itself.

12           MS. GLASSER:  But if we could go to slide 252,

13   please.

14   Q.   (BY MS. GLASSER)  And before we focus on the slide

15   specifically, how do we know -- in addition to the code, how

16   do we know, just from looking at the mobile device screen

17   itself, that the mobile device itself is checking for errors?

18   A.   Well, we know because the mobile device is displaying a

19   message that an error occurred.

20   Q.   And we have one example of that here on slide 52.  Is

21   that right?

22   A.   That's correct.

23           MS. GLASSER:  And if we could go back to slide 54.

24   54 and 55.

25   Q.   (BY MS. GLASSER)  Can you give us examples of the some of

1    the other displays that pop up on the mobile device itself

2    after the mobile device is checking for each of these listed

3    errors?

4    A.    Sure.  So the first one is validating the amount.  That's

5    the amounts don't match.  The next that it would pop up a

6    message for is that the front image is not clear.  And then

7    there's a set of pop-ups with respect to both images.  And

8    there it would present images not clear, pop-up to the user

9    and ask them to retake the photos.

10          Then there are two error checks that see if the

11   endorsement is missing.  And if it is missing, it will ask the

12   user to retake the photo of the back of the check.

13          And then, finally, if there are duplicate checks, it's

14   just going to say you're out of luck, you're trying to submit

15   a duplicate check.

16   Q.    Thank you, Professor Conte.  And then if we could briefly

17   touch upon the '571 Patent as well.

18          MS. GLASSER:  If we could put up one of the slides

19   of the claim just to orient ourselves.  How about slide 121?

20   Q.    (BY MS. GLASSER)  And this is your slide, but this is the

21   exact language from the patent claim.  Correct?

22   A.    That is correct.

23   Q.    Now, opposing counsel asked you a question about whether

24   you had presented testimony about the order among all those

25   different monitoring criteria on the PNC system.  Do you

1    recall that?

2    A.    I do.

3    Q.    And just to refresh the jury, you testified that PNC

4    actually uses not just one of the monitoring criteria listed

5    in the '571 Patent specification but all of them.  Correct?

6    A.    That is correct.

7    Q.    Does the patent claim itself require in any way that

8    those monitoring criteria be analyzed in a particular order

9    within them?

10    A.    No.  All the patent says is, with respect to A singular,

11    monitoring criteria.

12    Q.    And then does PNC actually dispute, based on the

13    materials you saw, that it uses the monitoring criterion?

14    A.    They do not.

15    Q.    Thank you, Professor Conte.

16          MS. GLASSER:  I pass the witness, Your Honor.

17          THE COURT:  Is there further cross-examination, Mr.

18    Lantier?

19          MR. LANTIER:  No further cross, Your Honor.

20          THE COURT:  All right.  Doctor Conte, you may step

21    down.

22          THE WITNESS:  Thank you, sir.

23          THE COURT:  You're welcome.

24       Plaintiff, call your next witness.

25          MS. CARSON:  Plaintiff calls Mr. Alexander

1    Goodstein, who is a PNC manager and was also a corporate

2    designee on various topics related to the accused PNC Mobile

3    Deposit System.  And we'll be calling him via video

4    deposition.

5              THE COURT:  All right.  Proceed with the witness by

6    deposition.

7              ALEXANDER GOODSTEIN, SWORN, BY VIDEO DEPOSITION,

8    Q.   Mr. Goodstein, you're employed by PNC.  Is that correct?

9    A.   Yes, that is correct.

10   Q.   You've been designated to speak on behalf of PNC as to

11   various topics relating to the lawsuit with USAA.  Is that

12   correct?

13   A.   That is correct.

14   Q.   Now, at some point, PNC decided to implement mobile

15   remote deposit capture.  Correct?

16   A.   Correct.

17   Q.   When did that decision -- when was that decision made?

18   A.   The decision was made in, I believe it was 2010 and went

19   live in 2011.

20   Q.   When did PNC begin to use the Mitek system?

21   A.   I believe it was in 2011, but I do not know the specific

22   date to that one.

23   Q.   Did you analyze whether there are any third-party

24   intellectual property that was covered -- that covered the

25   MRDC system you launched in 2016?

1    A.    I rely on our legal counsel and other members of PNC to

2    be able to determine whether or not there is any -- any patent

3    technology or anything like that that could be involved.

4    Q.    Did you, yourself, determine whether PNC was infringing

5    anyone's intellectual property when it launched its

6    auto-capture version of MRDC?

7    A.    I am not a patent expert, so I cannot determine whether

8    or not we would be infringing on anything like that.

9    Q.    All right.  You've been designated to speak on behalf of

10   PNC's position regarding USAA's patents in this --

11   A.    I don't --

12        THE COURT REPORTER:  I need the full question.  Hold

13   on.  Patents in?

14   Q.    -- this proceeding today.  Correct, sir?

15   A.    I don't believe I was selected as a PNC representative to

16   speak specifically about the patents or patent law.

17   Q.    When is the first time you reviewed USAA's patents?

18   A.    I was made aware of them at the beginning of the -- this

19   current lawsuit.  I did not review them in full detail.

20   Q.    Have you ever reviewed them in full detail?

21   A.    No.  I am not an expert in patents, patent law, being

22   able to read patents.  There's a lot of language in those that

23   I do not truly understand.

24   Q.    After reviewing the American Banker article and speaking

25   to NCR and Mitek, were you concerned at all that you may be

1   infringing the intellectual property of the United States

2   Services Automobile Association?

3   A.    After that meeting, I believe we were at a place where we

4   felt comfortable with continuing to use the auto-capture

5   functionality.

6   Q.    Do you remember if you felt comfortable or uncomfortable

7   after that meeting you had with NCR and Mitek?

8   A.    I -- I do not remember.  The meeting was four years ago.

9           MR. STONE:  I don't believe this was consistent with

10  the run sheets.

11          THE COURT:  Just a moment.  What is your objection,

12  Mr. Stone?

13          MR. STONE:  This is not consistent with the run

14  sheets and designations that the Court has previously reviewed

15  and approved.  This includes some testimony that is not in the

16  run sheets that I believe have been presented to the Court for

17  review.

18          THE COURT:  Well, I've reviewed designations and

19  counterdesignations where the parties are in disagreement.

20          MR. STONE:  Yes.

21          THE COURT:  I haven't previewed the entirety of the

22  deposition.

23          MR. STONE:  Understood, Your Honor.  But the ones we

24  had to provide you, this is now not consistent with the ones

25  that --

1          THE COURT:  Let me ask opposing counsel.

2      Is there some confusion about this material?  Is there a

3  possibility that it includes testimony that wasn't disclosed

4  to the other side?  What's your reaction to Mr. Stone's

5  objection?

6          MR. SHEASBY:  We have no reason to believe that is

7  the case, but I have a proposal which is we can play another

8  video, and I can sidebar with Mr. Stone when that other video

9  is being played to determine what his concern is, Your Honor.

10         MR. STONE:  If I could just see the run sheet that

11  they have to go with this, it may just be a single question,

12  Your Honor.  I don't know if there's more or less because I

13  have the run sheets that we were given earlier.

14         THE COURT:  I really don't like these interruptions.

15  It disrupts the jury's ability to follow the testimony and to

16  hear a clear narrative.  Let's see if we can't get to the

17  bottom of this right now.

18         MR. STONE:  Just this question, that's fine, Your

19  Honor.  Let's proceed.  Thank you.

20         THE COURT:  All right.  Then I'll consider the

21  objection's withdrawn.  I'll charge the time for that

22  objection to the Defendant.  Let's continue with the witness

23  by deposition.

24  Q.   In 2017, did anyone at PNC do anything whatsoever to

25  investigate whether it was using the intellectual property of

520

1    USAA?

2    A.    I cannot speak for every single person at PNC if they did

3    an investigation into the USAA claims.

4    Q.    I asked you whether you know of anyone.

5    A.    I do not know of anyone.

6    Q.    Now, when you joined PNC in 2009, PNC had a form of

7    internet deposit that used specialized check scanners that

8    were given to customers.  Correct?

9    A.    Yes, I believe so.

10   Q.    As the head of MRDC at PNC, you do not consider that an

11   acceptable alternative to mobile remote deposit capture.

12   Correct?

13   A.    They are not the same technology in my mind.

14   Q.    Do you know whether PNC's business would be viable if it

15   couldn't offer MRDC?

16   A.    I -- I don't think I could speak to all PNC dealings of

17   whether or not it would be viable, but PNC's mobile deposit is

18   only a small portion of the many, many products that PNC

19   offers.

20   Q.    Why would it be still viable?

21   A.    Customers still have many other channels to be able to

22   make a deposit.

23   Q.    Do you believe that the PNC auto-capture system doesn't

24   perform the function of automatically focusing and then

25   capturing the image of the check?

1   A.   I believe it does a level of focusing and eventually

2   captures an image in one way or another.

3   Q.   Fair point.  When you press the shutter button, the image

4   is saved in a file format.

5   A.   Correct.

6   Q.   That's capture.  Correct?

7   A.   That -- that would be a version of capture, yes.

8   Q.   Now, at some point in time, you were instructed to alter

9   the application.  Correct?

10  A.   Yes.  There was a period in time where we entered

11  discussions to determine -- to make changes to the mobile app.

12  Q.   What you and your managers did was -- you did three

13  things.  The first thing you did was you -- you, quote,

14  disabled auto-capture.  Correct?

15  A.   Correct.

16  Q.   And you understand that the auto-capture source code is

17  still in the application itself and on your server, and if

18  it's configured, it can be used again.  Correct?

19  A.   I, again, have not looked at the source code, but my

20  understanding would be, yes, that that is still in the source

21  code.

22  Q.   And so at any time, for example, after this lawsuit is

23  filed, PNC has the ability just by reconfiguring -- setting

24  out a new configuration file to activate auto-capture again.

25  Correct?

522

1    A.   If a decision were made at any point to turn it back on,

2    whether it would be now or after the lawsuit or ten years from

3    now, yes, it could be done based on how the code is

4    implemented today.

5    Q.   Now, the next thing you did was that you removed customer

6    views of photos before sending.  Correct?

7    A.   That is correct.

8    Q.   Exhibit 14 is a United States patent to USAA entitled

9    8,977,571.  And it says on lines 3 beginning, it says, the

10   monitoring criteria may be based on one or more of light

11   contrast on the image, light brightness of the image, position

12   of the image, dimensions, tolerances, character spacing,

13   skewing, warping, corner detection, and MICR (magnetic ink

14   character recognition) line detection, as described further

15   herein.  Do you see that passage here?

16   A.   Yes, I do.

17   Q.   Those are the criteria that PNC's mobile auto-capture

18   system was using to evaluate check quality.  Correct?

19   A.   I believe it was using some of these details, yes.

20   Q.   And for consumers to use the MRDC system, they have to

21   comply with the rules and procedures that PNC sets out.

22   Correct?

23   A.   Customers need to agree to an online banking disclosure,

24   as well as a mobile bank -- I'm sorry -- a mobile deposit

25   terms and conditions.

1    Q.   Exhibit 19 is a Futurion report.  This is a report you

2    evaluated as part of managing mobile remote deposit capture at

3    PNC.  Correct?

4    A.   Yes.  I believe I read through it.

5    Q.   So why don't we turn to page 3 of that document.  It

6    says, auto-capture should be viewed as a must-have feature for

7    top financial institutions.  Do you see that?

8    A.   Yes, I do see that here.

9    Q.   Right.  And my understanding is that you were aware that

10   that -- those statements were being made in the industry.

11   Correct?

12   A.   Yes.  I'm aware that that statement was being made.

13   Q.   And you still actually have auto-capture in your source

14   code.  Correct?

15   A.   I have not reviewed the source code, but I believe that

16   it is still in my text source code.

17   Q.   And the document we're looking at, Exhibit 21, this is

18   feedback relating to the new version of the mobile deposit

19   function that PNC instituted that didn't have auto-capture.

20   Correct?

21   A.   Based on the dates here, this would be for versions

22   4.20.1 and 4.21.

23   Q.   Exhibit 27 is a document entitled Notice of Deposition of

24   PNC Bank.  Do you see that, sir?

25   A.   Yes, I do.

1    Q.   And if you look at topic No. 9 it says--and topic No. 9

2    is on page 12--the complete basis for why PNC contends it does

3    not infringe the USAA patents-in-suit.  Do you see that?

4    A.   I do see that here, yes.

5    Q.   Does this refresh your recollection that you've been

6    designated on topic 9 which is the complete basis for why PNC

7    contends it does not infringe the USAA patents?

8    A.   Yes, it shows that I'm listed to be the representative

9    for topic number 9.

10   Q.   You're senior manager relating to the mobile remote

11   deposit capture system.  Correct?

12   A.   Yes, I am.

13   Q.   You told -- you testified under oath you looked at the

14   patents.

15   A.   In the past.

16   Q.   Would it be fair to say that you don't know for sure one

17   way or another whether PNC infringes the patents-in-suit?

18   A.   I, again, am not a patent expert so, because of that,

19   I -- I can't make a comment of whether or not I know if PNC is

20   infringing on the claims by USAA.

21   Q.   And you're PNC's corporate representative on the complete

22   basis for why PNC contends it does not infringe the USAA

23   patents-in-suit.  Correct?

24   A.   That is what is listed as the designation, yes.

25   Q.   Did PNC develop the technology for its mobile deposit

1    feature in-house all by itself?

2    A.    No, PNC did not develop in-house -- well, the technology

3    in-house by itself.

4    Q.    Where did PNC get the technology from?

5    A.    PNC purchases the technology from third-party vendors.

6    Prior to 2017, we were utilizing a vendor named Fundtech.

7    It's also known by D&H, Finastra, BankServ, and they utilized

8    software from other vendors as well, such as Mitek.  And then

9    in 2017, we started to utilize a software suite purchased by

10   NCR.  And at that time, we were utilizing the Mitek mobile

11   deposit server, Mitek's MiSnap, NCR Aptra Passport, and NCR

12   Transaction Gateway.

13   Q.    Is NCR a well-known financial technology company?

14   A.    Yes, NCR is a well-known financial technology company.

15   Q.    Do other banks use NCR technology?

16   A.    Yes, other banks use NCR technology.

17   Q.    In the course of your work on PNC's mobile deposit

18   feature, have you ever set out to copy USAA's mobile deposit

19   feature?

20   A.    No, we have not.

21   Q.    In the course of your work on PNC's mobile deposit

22   feature, did you ever look at the mobile deposit feature in

23   any USAA mobile app?

24   A.    No, I have not.

25   Q.    Why not?

1    A.    I'm not a customer for USAA.  In order to be able to

2    utilize their app, you have to have a family member or be a

3    current and enlisted member in the military.  I've also not

4    looked at any other screens or anything related to the USAA

5    app.

6    Q.    In the course of your work on PNC's mobile deposit

7    feature, did you study any USAA patents?

8    A.    No, I did not.

9    Q.    Was there ever a time when you decided or recommended

10   that PNC should add a capability to its mobile app because

11   USAA is already offering that capability?

12   A.    No, I have not.

13   Q.    Were you involved in designing and developing version

14   4.20.1 of PNC's mobile app?

15   A.    Yes, I was.

16   Q.    Are you aware of any reason why removing the auto-capture

17   feature in the PNC mobile app could not have been done earlier

18   than it actually was?

19   A.    No, I am not.

20   Q.    And are you aware of any reason why removing the feature

21   that showed the image of the check to the customer before

22   uploading the check could not have been done earlier than it

23   actually was?

24   A.    No, I am not.

25   Q.    Since PNC rolled out version 4.20.1, what trends have you

527

1    noticed in the number of successful mobile check deposits by

2    PNC's customers?

3    A.    So, overall, the -- the total number of deposits has

4    continued to stay strong or even set near records.   June 2021

5    was our second highest month that we have ever seen in

6    completed mobile deposits.

7    Q.    Do you agree that auto-capture is required in order for a

8    bank to be able to deploy mobile remote deposits at scale?

9    A.    No, I do not believe that auto-capture is necessary.

10   Q.    Why do you say that?

11   A.    Because customers are still able to capture the images of

12   the check utilizing a manual shutter button.

13   Q.    Did you ask the engineers who actually built PNC's system

14   whether they accessed USAA's application?

15   A.    No, I did not.

16   Q.    Did you take any step whatsoever from the time you were

17   aware of USAA's patents, from the time you were aware that

18   Wells Fargo was found to infringe USAA's patents when it used

19   a Mitek system?   Did you take any --

20              MR. STONE:   Objection, Your Honor.

21              THE COURT:   Let's stop the tape, please.

22              MR. STONE:   The last two or three questions were not

23   part of what Irell Manella had understood was designated.

24              MS. GLASSER:   There is a redaction on that last

25   question.

528

```
1           MR. STONE:  These are not in the designations they
2   were provided.
3           MR. SHEASBY:  They were.
4           MR. STONE:  I apologize, Your Honor, for the
5   interruption, but I --
6           THE COURT:  All right.  Let's get to the bottom of
7   it.  What's the deal here?
8           MR. SHEASBY:  There's been a mistake.  There should
9   be an edited version that should be --
10          THE COURT:  Speak up, Mr. Sheasby.
11          MR. SHEASBY:  There should be an edited version for
12  this last question and answer.  It's the wrong version.  The
13  Judge asked us to modify it and we didn't modify it and just
14  no one caught it on the other side.
15          MR. STONE:  This was an earlier draft, Your Honor.
16  This whole issue was earlier dropped in the designations we
17  were provided.
18          THE COURT:  How much more of this witness'
19  deposition time is pending?
20          MR. SHEASBY:  This is the last question, Your Honor.
21          THE COURT:  All right.  Am I correct that you're
22  going to follow this with another deposition witness?
23          MR. SHEASBY:  Yes, Your Honor.
24          THE COURT:  Let's stop this, let's go to your next
25  deposition witness, and while that's running, you two
```

529

1    gentlemen confer about the situation and I'll take it up with

2    you later.  Okay?

3              MR. SHEASBY:  Thank you, Your Honor.

4              MR. STONE:  Thank you, Your Honor.

5              THE COURT:  Let's identify the next deposition

6    witness for the Plaintiff, please.

7              MS. CARSON:  And, Your Honor, I'll wait until we

8    resolve that issue to read into the record the time that

9    should be charged for the designations for the witness that

10   was just played.

11             THE COURT:  That's fine.  I've been keeping a record

12   of the time, including the dead time while we're waiting on it

13   to be loaded up with the sound, so -- but I'm happy to hear

14   your version when the time is appropriate.

15             MS. CARSON:  Thank you, Your Honor.

16             THE COURT:  Who's our next witness?

17             MS. CARSON:  USAA calls Mr. Thomas Trebilcock, who

18   is a PNC executive who is responsible for part of the mobile

19   deposit system, and he was also a corporate designee on topics

20   related to that, and we'll play that testimony via video

21   deposition as well.

22             THE COURT:  All right.  Proceed with this witness by

23   deposition.

24        THOMAS TREBILCOCK, SWORN, BY VIDEO DEPOSITION,

25   Q.   What is your role at PNC relative to mobile deposit?

1    A.   So I'm the group product manager for mobile banking in

2    emerging payments as part of retail bank here at PNC.

3    Q.   Did you have involvement in the original decision at PNC

4    to launch the accused product?

5    A.   We did -- I was part and parcel to making the decision to

6    offer the capability, the mobile capability -- the mobile

7    deposit capability, yes.

8    Q.   And were you personally involved in the decision to offer

9    the accused auto-capture release of the remote mobile deposit

10   in the 2016 time frame?

11   A.   Yes, I was part of that decision also.

12   Q.   Do you consider yourself to be source code proficient?

13   A.   Absolutely not, no.

14   Q.   Have you read any of the implementation source code for

15   the accused PNC mobile deposit application?

16   A.   I have not.

17   Q.   Have you read the USAA patents at issue in this case?

18   A.   Portions, yes.

19   Q.   When did you first review any of the USAA patents?

20   A.   I don't know a specific date, but of the portions that I

21   did review and did try to understand, I believe that was in

22   the January or maybe early February time frame of 2021.

23   Q.   Now, you've been designated to testify today both as an

24   individual and also as PNC's corporate representative on a

25   number of topics.  Correct?

1    A.    Yes, that's correct.

2    Q.    And one of the topics that your counsel provided to you

3    and told you that you would be the PNC corporate

4    representative on was topic 35, the date on which PNC first

5    reviewed USAA's Deposit@Home or Deposit@Mobile applications

6    and all facts relating to this review.  Correct?

7    A.    Correct.

8    Q.    Now, what was the date on which PNC first reviewed USAA's

9    Deposit@Home or Deposit@Mobile application?

10   A.    We have never reviewed the Deposit@Home application from

11   USAA.

12   Q.    Exhibit 1 is PNC_0046237.  So the document we're looking

13   at now is actually a document that you authored back in --

14   about 10 years ago.  Correct?

15   A.    That's correct.

16   Q.    But what it's showing on the front is not a PNC mobile

17   app, but, rather, the USAA Deposit@Mobile application.

18   Correct?

19   A.    I don't know.  I mean, this is obviously -- well, I do

20   know and I do recall having gathered this from either a Google

21   search or some publicly-available source.  Not having access

22   to the USAA app itself, I mean, even today, I can tell that

23   this is a -- what we would refer to as a mock-up, a cartoon

24   experience that is synthetic.  The check is clearly not real,

25   and this is something that I do recall having searched for,

1    artwork that was related to the topic at hand.  But I don't

2    have any knowledge of what this might actually look like

3    within the USAA mobile app.

4    Q.    And do you have any specific recollection, as you sit

5    here today, of how this USAA Deposit@Mobile image ended up on

6    the front page of the PNC mobile banking document?

7    A.    I would have placed it there myself.

8    Q.    So in terms of your team at PNC, did you undertake any

9    steps to determine what patents USAA held in the space before

10   PNC launched its accused product?

11   A.    Our team would not have -- that would not be something

12   typically that we would do or not.  We were not equipped to --

13   I'm not even sure where to go to look for that information.

14   So that's not something that we would typically do.

15   Q.    So in terms of what you believed and wrote before PNC

16   launched its accused product, you described the competitive

17   landscape as including USAA.  Correct?

18   A.    That's correct.  That is written on the page.

19   Q.    And in terms of PNC's belief and your own personal

20   belief, at the time PNC launched the accused product, that

21   belief was that USAA was first to launch MRDC.  Correct?

22   A.    At the time, that is my -- that was my understanding.

23   Q.    Do you recall what the business case was for PNC

24   launching the auto-capture MRDC in the 2016-2017 time frame?

25   A.    I don't recall the business case, and I'm not sure there

1    may have been one.  In the normal course of a service or a

2    capability, especially in the digital space that we purchased,

3    there would be a -- you know, a continual product evolution.

4        My suspicion is that this was a kind of a routine update,

5    upgrade, to an existing product that we offered, and this

6    would have been a new capability set against the service that

7    we had been using for -- you said 2016.  So, you know,

8    five-plus years prior.

9    Q.   But do you recall now what each specific motivation was

10   on the part of PNC for adopting the auto-capture enhancement?

11   A.   No.  But the motivations that you had mentioned in your

12   prior question, you know, would sound reasonable.

13   Q.   And the three that I mentioned were increase first-time

14   capture rate, increase customer adoption, and increase overall

15   deposit success rates?

16   A.   Yes.

17   Q.   Was there any time between 2016 and the filing of this

18   lawsuit that PNC ever considered removing auto-capture?

19   A.   Again, I would say that downgrading a recommended

20   enhancement or version that included a feature would be very

21   unusual.  So I don't recall ever having considered that as

22   even an option.

23   Q.   So, Mr. Trebilcock, have you ever accessed USAA's mobile

24   app?

25   A.   I have not.

1    Q.    When PNC implemented mobile deposit, did it copy USAA's

2    technology?

3    A.    It did not.

4    Q.    Did PNC develop the mobile deposit functionality for the

5    PNC app itself, or did it have assistance from a vendor?

6    A.    With the original implementation, we had the assistance

7    of a vendor, and then, subsequently, we developed our own in

8    2016, '17.

9    Q.    Do you have any reason to believe that the vendors that

10   supplied PNC with mobile deposit technology copied USAA's

11   technology?

12   A.    I have no reason to believe that.

13   Q.    To your knowledge, did anyone on behalf of USAA reach out

14   to PNC to discuss licensing USAA's patents?

15   A.    I have no knowledge of anyone reaching out to PNC from

16   USAA.

17   Q.    Do you think it's important as a bank to avoid

18   infringement of intellectual property belonging to other

19   banks?

20   A.    Well, yes.  That's -- that's a legitimate concern, and I

21   believe that PNC does attempt to do that.

22   Q.    So Exhibit 1 is an email at the top from you to Mr. Kunz

23   from 2009.  Correct?

24   A.    Correct.

25   Q.    And the subject is Re:  Forward:  When will our iPhone

1    app do this.  Correct?

2    A.   That's correct.

3    Q.   And if you go to the second page, it's an email from a

4    the vice president of PNC with a link stating, Great ideas

5    tend to make so much sense that you wonder why they took so

6    long.  Here's another.

7         And then it describes the USAA iPhone app.  Correct?

8    A.   That's correct, yes.  It appears to be a quote from an

9    article, gizmodo.com article.  Okay.  Yes.

10   Q.   And so Mr. Kunz takes this article about the USAA mobile

11   deposit app and he forwards it to you, stating, agree we

12   should pursue this.  Correct?

13   A.   Yes.  That's what he said, in addition to, would pursue

14   with Rege Rennerson (ph), yes.

15   Q.   And you understood that when he said, we should pursue

16   this, he's referring to the concept in the USAA iPhone app.

17   Correct?

18   A.   That appears to be the case.

19   Q.   And you reply, and you actually tell Mr. Kunz, I've seen

20   the app.  Correct?

21   A.   Yes, that's -- that's what it says.

22   Q.   And when you say, I've seen the app, you were referring

23   to the USAA app.  Correct?

24   A.   I'm not certain, but that is -- that could be the case.

25   I might have seen it in the -- one of the app stores where it

1    was publicly available.

2    Q.   Well, let's just be totally clear.  So Exhibit 3 is an

3    email you sent about two months after receiving emails

4    regarding press about USAA's mobile deposit application and

5    feedback from a person who said they would love to be able to

6    have the USAA mobile deposit technology at PNC.  Correct?

7    A.   Correct.

8    Q.   And what you're saying to Mr. Arnold two months after

9    that is, Tom Kunz asked that I reach out to you about mobile

10   remote deposit capture.  Correct?

11   A.   That's correct.

12   Q.   And you maintain under oath that you have never looked at

13   any of the USAA mobile deposit features.  Is that correct?

14   A.   That's correct.  I've never looked at the mobile deposit

15   app or any of the features contained within the app other than

16   what -- those that are disclosed publicly in the form of the

17   app stores and any other publicly-available information.

18   Q.   Now, at your prior deposition, I believe you said that

19   you didn't think you had heard the words Deposit@Mobile or

20   Deposit@Home until this litigation.  Is that correct?

21   A.   Yeah, that's correct.  I wasn't familiar with the product

22   names that the USAA had applied to its -- to the service.  I

23   wasn't familiar with that, with those names.

24   Q.   Exhibit 25 is an email from you to Mr. Kunz sent in March

25   2017.  Correct?

537

```
1    A.   Yes.

2    Q.   And you state, USAA calls their service Deposit@Mobile.

3    Correct?

4    A.   Yes.

5    Q.   Does that refresh your recollection that you did know

6    what USAA called its service and that it called it

7    Deposit@Mobile at the time you were launching the accused

8    products?

9    A.   It doesn't refresh my memory, but I -- apparently I did

10   know that that was the name at the time.  And, again, it is

11   fairly descriptive, so that's not surprising.

12   Q.   Would it surprise you to see emails from around this time

13   period in which you also specifically referred to USAA's

14   Deposit@Home trademark?

15   A.   No, I guess -- I guess not.

16   Q.   In fact, would you be surprised to see -- so I think at

17   your first deposition you said you didn't think you had seen

18   screenshots from the actual mobile app.  Does this refresh

19   your recollection that you may, in fact, actually have done

20   so?

21   A.   I don't think I was asked did I see any screenshots.  I

22   think I was asked had I seen the mobile app.  And to

23   that -- to that I would have -- I would confirm again, I did

24   not see the app.

25   Q.   Marking as Exhibit 8 PNC EM 923450.
```

```
 1         And what Mr. Wallach says in his email that was forwarded

 2    to you, so USAA has rolled out a new capability in their

 3    mobile app.  Correct?

 4    A.   Let me find your reference.  Yes, that looks to be the

 5    case.

 6    Q.   And he says, can we do this?  If so, how fast could we

 7    roll it out?  Correct?

 8    A.   Yes.  Yes.  I see that.

 9    Q.   So does this refresh your recollection that in the 2016

10    time frame, you and others on your team were receiving

11    screenshots from USAA Deposit@Mobile users?

12    A.   Well, this has nothing to do with Deposit@Mobile, though.

13    This is referring to a service provided by apparently Daon

14    that is a second-factor authentication methodology that it

15    looks to be -- if I'm reading the Nick Hallas from Daon email

16    correctly, this is a service that they are providing to USAA.

17    Again, you know, just taking the -- his comments at their face

18    value.

19         So this looks like a second form of authentication.

20    Q.   Do you personally know if anyone at PNC did anything to

21    see if PNC was clear to offer mobile deposit without

22    infringing patents?

23    A.   I don't recall specifically.

24    Q.   Did you not copy-paste in the USAA terms and conditions

25    into one or more PNC documents?
```

```
 1    A.    I believe I used the USAA and other banks' terms and

 2    conditions as source material for my own -- or for awareness.

 3    Q.    When did PNC first introduce mobile deposit?

 4    A.    April of 2011.

 5    Q.    Did PNC design the mobile functionality for the PNC

 6    mobile app?

 7    A.    No.  We relied on a vendor solution.

 8    Q.    Who was that?

 9    A.    mFoundry.

10    Q.    Did mFoundry's solution utilize software from Mitek?

11    A.    Yes.

12    Q.    Did PNC employees have any role in designing the Mitek

13    software for mobile deposit?

14    A.    No.

15    Q.    Did you tell mFoundry to look at USAA's app for

16    inspiration in designing mobile deposit for PNC?

17    A.    No.

18    Q.    Did you tell mFoundry how to design or sequence any of

19    the steps for mobile deposit?

20    A.    No.

21    Q.    Who was the point of contact with mFoundry about what

22    they should be doing to develop mobile deposit for PNC?

23    A.    Me.

24    Q.    At the time, what did you understand Fundtech's

25    representation to be?
```

 1    A.    Reputable within the industry, and had been a PNC vendor

 2    for years prior to 2011.

 3    Q.    Would you have used them if they had a reputation of

 4    stealing other company's intellectual property?

 5    A.    No.

 6    Q.    When did PNC first introduce auto-capture?

 7    A.    I believe late 2016, if memory serves.

 8    Q.    And did PNC develop the auto-capture functionality

 9    itself?

10    A.    No, we did not.  We relied on a third party.

11    Q.    And who was that third party?

12    A.    Or, excuse me, a fourth party.  Mitek would have been the

13    fourth party to, at the time, both Fundtech and NCR.

14    Q.    Was Mr. Wallach part of your team at PNC?

15    A.    He was not.

16    Q.    Did Mr. Wallach have any role specific to mobile deposit?

17    A.    He did not.

18    Q.    You said PNC implemented mobile deposit when?

19    A.    In 2000 April -- or April of 2011.

20    Q.    Was Mr. Wallach a PNC employee at that time?

21    A.    He was not.

22    Q.    And you said that PNC implemented auto-capture in about

23    2016.  Is that right?

24    A.    That's correct.

25    Q.    Was Mr. Wallach involved in implementing auto-capture?

1   A.   He was not.

2   Q.   What functionality is shown in the screenshots in Mr.

3   Wallach's email?

4   A.   Something to do with authentication, and I think it is

5   a -- it referred to as a one-time pass code or a secondary

6   form of authentication.

7   Q.   Is that functionality specific to mobile deposit?

8   A.   No, it is not part of mobile deposit.

9   Q.   You were shown some documents where people forwarded you

10  articles and things like that.  Do you recall that?

11  A.   Yes.

12  Q.   How frequently do people forward you articles about

13  something someone else is doing in the digital banking space?

14  A.   Very frequently.

15  Q.   Do people only forward you articles about USAA?

16  A.   No, they do not.  And nor do they keep their, you know,

17  articles contained to financial services.  It's oftentimes

18  about all digital capabilities across several industries.

19  Q.   Now, do you try to follow what's happening in the digital

20  banking industry?

21  A.   I do.

22  Q.   And why do you do that?

23  A.   In order to remain aware of what is capable -- what the

24  technology permits, what customers expect, and what is

25  available.

542

```
1   Q.   Have you ever taken a picture of a check using USAA's
2   mobile app?
3   A.   I have not.
4            THE COURT:  Does that complete this witness by
5   deposition?
6            MS. CARSON:  Yes, Your Honor.
7            THE COURT:  Before you announce the next deposition
8   witness, do we have any resolution on the preceding
9   deposition?
10           MR. STONE:  I would like to approach, Your Honor.
11           THE COURT:  Mr. Stone, please don't interrupt me.
12   When I'm still talking, please be quiet.  When I finish, I'll
13   be happy to hear from you.
14           MR. STONE:  I apologize, Your Honor.
15           THE COURT:  All right.  Is there a resolution or is
16   there still an issue?
17           MR. SHEASBY:  There is still an issue, Your Honor.
18           MR. STONE:  There is still an issue.
19           THE COURT:  All right.
20           MR. SHEASBY:  I have a proposal actually which is --
21           THE COURT:  The two of you approach the bench, and
22   I'll decide if this is appropriate to be discussed in open
23   court or not.
24           (The following was had outside the hearing of the
25           jury.)
```

1        MR. STONE:  Your Honor, the testimony that was

2   played from Mr. Trebilcock was a clear violation of MIL 1A,

3   and it also was a violation of a clear argument and direction

4   from Judge Payne as to how that transcript should be redacted.

5        The redactions which were supposed to remove any

6   reference to the Wells Fargo verdict were not made.  They've

7   had the run sheet and had an opportunity to review it.  It is

8   clearly an intentional or grossly negligent act to allow the

9   violation to have occurred.  It not only referenced the Wells

10  Fargo verdict which the Court has clearly ruled should be out;

11  it also related that verdict to Mitek which, as you know, has

12  been an issue.

13       At this point in light of that violation, the jury has

14  been irretrievably and irreversibly prejudiced by hearing that

15  information, and so PNC Bank moves for a mistrial on the basis

16  of that violation of the MIL.

17       THE COURT:  What's the Plaintiff's response?

18       MR. SHEASBY:  Your Honor, there was clearly an error

19  in the editing.  Neither of us caught it because both of us

20  saw the run sheets this morning.  Judge Payne did allow that

21  questioning and answering, but there was a portion of it he

22  did ask to be removed.  As soon as we saw the error, we jumped

23  up and spoke over it.  I don't think the jury heard anything

24  that was going on at that time.

25       We're not going to play the quote right now.  We will

544

1    meet and confer with them and may recall the witness, but the

2    Judge did approve this quote.  He did ask for certain editing.

3    There was obviously an error.  Neither party caught it.  I

4    completely acknowledge that, Your Honor, but I see no basis

5    to -- to indicate a mistrial.

6         And I don't think the jury heard the quote because we

7    stood up and spoke over it, Your Honor.

8              MR. STONE:  Your Honor, the quote, as you know, is

9    both oral and on the screen at the bottom.  The jury both

10   heard it and saw it.

11        They -- we have been irretrievably and unfairly

12   prejudiced by this violation.  It is one of the most sensitive

13   issues in the case, and both Your Honor and Judge Payne have

14   been very attuned to what he ordered, specific redactions.

15   And those specific redactions were not made and unredacted

16   testimony was presented to the jury.  And that is totally

17   unfair to us, very prejudicial, and it can't be --

18             THE COURT:  All right, Mr. Stone.  I understand your

19   position.

20        Is there a simple way for you to produce for me a written

21   version of what was included in that video deposition that, by

22   the admission of both of you, should not have been?

23             MR. SHEASBY:  Yes, Your Honor.

24             THE COURT:  I'd like to review the actual text of

25   what was included that, by undisputed error, should not have

1    been included.

2              MR. SHEASBY:  I understand, Your Honor.

3              THE COURT:  I don't accept that it was malicious.  I

4    don't accept, at least at this point, that it was grossly

5    negligent.  And I'm going to reserve judgment on the degree,

6    if any, prejudice to the Defendant until I can study the

7    actual language and text of what was played that should not

8    have been.

9              MR. SHEASBY:  I understand, Your Honor.

10             THE COURT:  If you give me that, I will look at it

11   overnight and I will carry the motion and give you a ruling no

12   later than tomorrow morning.

13             MR. STONE:  I will also note, Your Honor, it's also

14   in today's transcript, so the language that was actually heard

15   by the reporter and taken down, either heard or seen.

16             THE COURT:  And I don't care whether it comes from

17   the transcript or it comes from a run sheet you-all have

18   exchanged.  I want you to meet and confer and hopefully you

19   can agree on what was presented that shouldn't have been and

20   give me the printed text of it for me to review.

21             MR. SHEASBY:  Thank you, Your Honor.

22             MR. STONE:  Judge Payne made clear what it couldn't

23   be, so I think it should be easy to make that agreement.

24             THE COURT:  All right.  Then I'll look for that from

25   you-all before we leave today.  Now, do we have additional

1    deposition witnesses?

2              MR. SHEASBY:  We do have one more deposition

3    witness.

4              THE COURT:  Let's get that deposition witness

5    presented.

6              MR. SHEASBY:  Thank you, Your Honor.

7              MR. STONE:  Thank you, Your Honor.

8              (The following was had in the presence and hearing

9              of the jury.)

10             THE COURT:  All right.  Ms. Carson, do you have an

11   additional deposition witness for the Plaintiff to introduce

12   to the jury?

13             MS. CARSON:  Yes, Your Honor.  The next witness will

14   be Mr. Thomas Kunz.  He is also a PNC executive, and he was

15   also a corporate designee.

16             THE COURT:  Please proceed with this witness by

17   deposition.

18             THOMAS KUNZ, SWORN, BY VIDEO DEPOSITION,

19   Q.   Your position is executive vice president of PNC.  Is

20   that correct?

21   A.   That's correct.

22   Q.   And in that capacity, you have responsibility both for

23   business and for technology functions.  Is that also correct?

24   A.   Not the technology functions.  Business functions.

25   Q.   You are testifying today as yourself and also as PNC's

1    designated corporate representative.  Correct?

2    A.    Yes.

3    Q.    Now, one of the topics you're designated as PNC's

4    representative is topic 2 concerning all facts relating to

5    PNC's decision to offer the accused system service.  Correct?

6    A.    Yes.

7    Q.    Why did PNC decide to offer a remote mobile deposit

8    application, the accused product in this case?

9    A.    Mobile remote deposit is a convenience for our customers,

10   and as I recall, we introduced it in 2011.

11   Q.    And did PNC do an analysis of the business and financial

12   benefits to PNC of offering the accused product at the time it

13   introduced it?

14   A.    Not to my knowledge on the -- on the benefit side, and we

15   think -- we think of it is a -- a convenience, along with our

16   other ways that a customer can make deposits into our company

17   with this, whether that's direct deposit or physical deposits

18   at a branch, an ATM, or -- or mobile.  So that's -- that's

19   sort of how we -- how we thought of it.

20   Q.    Do you personally have a view about whether PNC would

21   need significant additional branch infrastructure if it didn't

22   have the accused product?

23   A.    I personally do not believe that.  I think what we're

24   seeing is there's -- there's many things that go on in a -- in

25   a branch.  Deposits are one of those.  One of the things you

548

1    can't do in a mobile deposit is handle cash or multiple

2    checks.

3        It -- so we could -- the volume that we currently do

4    could -- could easily be accommodated by the branches we

5    currently have.

6    Q.   Okay.  I'm going to ask you -- there's an Exhibit 2 in

7    your folder.  This is PNC 0000162.

8        So do you see in this PNC investor document where it

9    states, By migrating routine service transactions to other

10   channels and optimizing the number of branches we have, we

11   expect savings in the hundreds of millions of dollars over the

12   next five years?

13   A.   Yes, that is what it states, yes.  I see that.

14   Q.   And to your knowledge, as PNC's corporate representative,

15   that statement was accurate regarding PNC's expectations in

16   2012.  Correct?

17   A.   I -- I believe that it was.

18   Q.   And to your knowledge, as PNC's corporate representative,

19   that statement is correct today, that PNC can save hundreds of

20   millions of dollars when it migrates routine service

21   transactions to other channels.  Correct?

22   A.   I don't have anything that would size it to say that it's

23   hundreds of millions of dollars over the next five years.

24   Q.   And who at PNC would know the answer to the question of

25   approximately how many branches have been closed and how many

1  teller positions were eliminated by PNC because of its use of

2  the accused product?

3  A.    I don't know that -- Ms. Glasser, I don't know that

4  anybody would be able to associate it to the mobile deposit

5  level because we -- to my knowledge, we don't look at it that

6  way.

7  Q.    Which elements of the USAA Deposit@Mobile application

8  were used as inspiration for the design effort at PNC?

9  A.    To my knowledge, none.  This is a service that was

10  provided to us by a vendor and -- and then we integrated and

11  we worked with the vendor to integrate it.  BankServ,

12  Fundtech, as I recall, they were referred to at this -- at the

13  time.

14  Q.    Do you know how extensive the use was by the PNC

15  engineers of the USAA deposit mobile application in making

16  decisions about how to customize the PNC system?

17  A.    To my knowledge, that didn't occur.

18  Q.    Did you do anything to investigate that one way or the

19  other?

20  A.    I did not.

21  Q.    Back in 2017, you were aware that USAA had patents.

22  Correct?

23  A.    No.

24  Q.    All right.  Let's go ahead and view Exhibit 7.  Exhibit 7

25  is PNC EM 0416098.

1      Do you recognize Exhibit 7 as an email sent from Chad

2   Ballard to you on May 23rd, 2017 at 2:00 a.m.?

3   A.   I recognize that that's what this is, yes.

4   Q.   Do you recall learning in 2017 about the USAA mobile

5   remote deposit patents?

6   A.   I do -- I do recall reading in 2017 that USAA claimed

7   they had patents, yes.

8   Q.   Did you take any steps to try to avoid infringing upon

9   the USAA patents?

10  A.   I did not.

11  Q.   Sir, did you personally do anything to determine whether

12  the new version of the PNC app, the one that was launched in

13  the spring and summer of 2011, whether that one infringed

14  claims of other USAA patents?

15  A.   No, I -- I -- I did not.

16  Q.   Do you recall discussing the USAA patents with a senior

17  executive at PNC named Thomas Trebilcock?

18  A.   I -- I do recall discussing them with Tom, and -- I -- I

19  just recall talk -- talking to him and mentioning that, you

20  know, that I read it and he read it, too, and that's -- that's

21  the extent of my recollection.

22  Q.   And, to your knowledge, did Mr. Trebilcock do anything to

23  try to avoid infringement?

24  A.   To my knowledge, no.

25  Q.   Okay.  Marking as Exhibit 8, PNC EM 484518.

551

1      And does this refresh your recollection that what you did

2  when you learned about the USAA remote deposit patents, at

3  least from this article, is that you forwarded some

4  information to Mr. Trebilcock and Mr. Foell to let them know

5  about it?

6  A.   I don't recall it, but yes, this was what -- that's what

7  this artifact says that I did.

8  Q.   And when you had discussions with Mr. Trebilcock and Mr.

9  Foell, did any of the three of you identify any defenses to

10  infringement of the patents referenced in the article?

11  A.   I did not.

12  Q.   Have you personally investigated whether any viable

13  alternative exists to the USAA patents that do not infringe

14  either USAA patents?

15  A.   I have not.

16  Q.   Now, Mr. Kunz, you are the PNC corporate designee on

17  topic 8, all viable and non-infringing alternatives to the

18  USAA patents-in-suit.   Correct?

19  A.   I believe that's correct, yes.

20  Q.   Mr. Kunz, you were asked about the decision that PNC made

21  to offer mobile deposit to customers back in 2017.   Do you

22  recall that?

23  A.   I do.

24  Q.   Was that decision driven by cost savings?

25  A.   The -- the decision was not driven by cost savings; it

1    was driven by a convenient service that we wanted to offer to

2    customers in addition to the other ways they can make -- make

3    a deposit.

4    Q.   When PNC implemented mobile deposit, did it copy USAA's

5    technology?

6    A.   It did not.

7    Q.   Did PNC develop the mobile deposit functionality for the

8    PNC app by itself?

9    A.   No, we worked with a supplier, a company named BankServ,

10   which eventually became Fundtech, as I recall.  And

11   they -- they offered the service to us.  That's -- that's how

12   we began to incorporate it into our mobile app.

13   Q.   To your knowledge, before USAA sued PNC, did anyone ever

14   reach out to PNC on behalf of USAA to discuss a license to

15   USAA's patents?

16   A.   They did not.

17   Q.   Were you surprised when you learned that USAA had sued

18   PNC?

19   A.   I was.

20   Q.   Approximately how many mobile deposits a month was PNC

21   handling when it added the auto-capture feature?

22   A.   I recall it being around one and a half million a month,

23   in that -- that kind of range.

24   Q.   Was PNC struggling to handle those volumes without

25   auto-capture?

1    A.    My recollection, we were not.

2    Q.    Was it cost prohibitive for PNC to handle those volumes

3    without auto-capture?

4    A.    It was not.

5    Q.    Now, was auto-capture one of the features that PNC

6    removed when it released 4.20.1 earlier this year?

7    A.    Yes, it was.

8    Q.    Approximately how many mobile deposits a month has PNC

9    been handling on average since 4.20.1 was rolled out earlier

10   this year?

11   A.    About 2.8 million.

12   Q.    Is PNC struggling to handle those volumes without

13   auto-capture?

14   A.    We are not.

15   Q.    Is it cost prohibitive for PNC to handle those volumes

16   without auto-capture?

17   A.    It is not.

18   Q.    Do you think auto-capture is a must-have feature?

19   A.    I -- I think it's a -- a convenient feature that -- to be

20   a bank that -- that competes against some of the largest banks

21   in the United States, you need to have that feature.

22   Q.    Do you think it's a must-have feature to have

23   auto-capture in your mobile app today?

24   A.    I do not.

25   Q.    And why is that?

1    A.   I think we're -- we're proving that -- that we're able to

2    handle the volumes and create a good customer experience

3    without it.

4    Q.   I'd like you to think back to the 2016 time period, if

5    you might.   In 2016, did PNC have the materials, equipment,

6    and know-how to remove the features that were taken out in

7    version 4.20.1?

8    A.   Yes, we would have known how to do that in 2016.

9    Q.   And is that true at all times in between 2016 and when

10   4.20.1 rolled out?

11   A.   Yes.

12   Q.   Since the rollout of version 4.20.1, what has happened

13   with the volume of checks being deposited successfully by PNC

14   customers through the mobile app?

15   A.   It's -- it's continued the -- the same growth that we saw

16   prior.   So we continue to see the number of deposits grow and

17   -- and the number of customers using it grow.

18   Q.   And regardless of whether PNC could have made all these

19   changes back in 2016, what we know is that PNC chose not make

20   any of these changes in 2016, 2017, 2018, 2019, and 2020.

21   Correct?

22   A.   That's correct.

23   Q.   So you testified a moment ago in response to your counsel

24   that PNC knew how to remove all these features way back in

25   2016.   Correct?

1    A.   We -- I believe I testified to we could have done those

2    in 2016.

3    Q.   You also were asked a few questions about USAA and

4    Deposit@Mobile.  Do you recall that?

5    A.   Yes.

6    Q.   You don't know whether the person who was referencing the

7    USAA Deposit@Mobile application in designing the PNC product,

8    you don't know if that person did anything to try to avoid

9    infringement.  Correct?

10   A.   That -- that's correct.

11   Q.   Now, did you or, to your knowledge, anyone at PNC reach

12   out to USAA to determine whether PNC should be paying for its

13   use of the USAA patents?

14   A.   To my -- I'm not aware.  To my knowledge, no.

15            THE COURT:  Does that complete this witness by

16   deposition?

17            MS. CARSON:  Yes, Your Honor.

18            THE COURT:  All right.  Do I understand there's one

19   more deposition witness to present?

20            MS. CARSON:  No, Your Honor.

21            THE COURT:  There's not.  All right.

22        All right.  Let's bring up the lights, please.

23        Plaintiff, are you prepared to call your next witness?

24            MR. BUNT:  Yes, Your Honor.  We would call Mr. David

25   Kennedy.

556

1          THE COURT:  All right.  Mr. Kennedy will come

2     forward and be sworn, please.

3          I doubt we will finish this witness today, but we'll get

4     started.

5          If you'll come forward, please, Mr. Kennedy.

6               (Whereupon, the oath was administered by the Clerk.)

7               THE COURT:  Please have a seat on the witness stand,

8     sir.

9               MR. SHEASBY:  May I distribute binders?

10              THE COURT:  You may distribute witness binders.

11              MR. SHEASBY:  Thank you, Your Honor.

12              THE COURT:  All right, Mr. Bunt.  You may proceed

13    with direct examination of the witness.

14              MR. BUNT:  Thank you, Your Honor.

15                    <u>DAVID KENNEDY, SWORN</u>,

16    testified on direct examination by Mr. Bunt as follows:

17    Q.   Mr. Kennedy, could you please introduce yourself?

18    A.   Sure.  Good afternoon.  My name is David Kennedy.  I'm a

19    managing director at Berkeley Research Group.

20    Q.   Where are you from, Mr. Kennedy?

21    A.   Well, from June through October we lived -- my wife and I

22    have lived in a little small town in Western Montana, and we

23    raise and train horses, and then before the snow gets too

24    deep, we get them off the mountain and we have a little place

25    north of town here about 45 minutes we spend the winter.

1    Q.   Why are you here today?

2    A.   I'm here to calculate a fair amount that PNC should pay

3    for its use of the USAA's patented technology.

4    Q.   And would that payment be called a license?

5    A.   Yes, it would be a license.

6    Q.   And can you tell us, generally, what is a patent license?

7    A.   So it gives you the right to use somebody else's

8    property, patented property.  It's like a hunting lease; you

9    pay for someone's land to use it.  You don't own it, but you

10   can use it.  And if you don't pay, you're trespassing; where

11   with patents, if you don't pay, you are infringing.

12            MR. BUNT:  Mr. Huynh, if we could have the first

13   slide?

14   Q.   (BY MR. BUNT)  Mr. Kennedy, could you tell the jury a

15   little bit about yourself, about your background?

16   A.   Sure.  I went to the University of Georgia, and worked in

17   construction and as a mechanic a couple of different jobs,

18   worked my way through school.  I got a degree in accounting

19   and became a certified public accountant.

20   Q.   I see that you have IAM 300 on your slide.  What does

21   that refer to?

22   A.   Yeah.  Intellectual Asset Management for the last 10

23   years Has recognized me as one of the world's leading IP

24   strategists.

25   Q.   Do you have any real-world experience that makes you

1    uniquely qualified to value patents?

2    A.    I do.  I've negotiated over 200 license agreements in the

3    real world where I'm at the negotiating table and determining

4    what's going to be paid and what the value of technology is,

5    and I think that helps me do something really important here

6    and that's to put myself in the shoes of the parties and

7    figure out what should be a fair rate that they pay at the end

8    of a negotiation or this case.

9    Q.    You have listed on this slide experience working for the

10   Department of Justice.  Can you explain that experience?

11   A.    Sure.  They've hired me on numerous occasions to

12   determine reasonable royalty rates where the U.S. government

13   is using patented technology and they need to pay a royalty,

14   so they help me figure out -- I help them figure out what they

15   should pay to the patentholder.

16   Q.    Have you also done work for the Department of Justice as

17   a bank valuation expert?

18   A.    I have.  They've hired me on numerous occasions to --

19   when the government has to step in to protect depositors, so

20   they'll hire me to value the banks, value deposits, look at

21   the type of revenue, the type of earnings that those assets

22   might earn, and try to resolve a bank that's been taken over.

23   Q.    How many banks or financial institutions have you valued

24   for United States government?

25   A.    It's over 50.

```
 1    Q.   Do you have other banking experience as well?

 2    A.   I do.  I was part of PriceWaterhouseCoopers' Financial

 3    Institutions Group, and they are a large international

 4    accounting and consulting firm.  I was there for seven years

 5    and I was part of the financial institution's practice, and I

 6    advised clients on the value of institutions and on mergers

 7    and acquisitions, what the value of the deposits would be.

 8              MR. BUNT:  Mr. Huynh, if we can have the next slide.

 9    Q.   (BY MR. BUNT)  Mr. Kennedy, can you tell us who you've

10    done licensing work for?

11    A.   These are some people I've done work for and negotiated

12    against; some very large technology companies, but I've also

13    worked for universities and individual patentholders and other

14    companies that have patent portfolios.

15    Q.   Have you done any work for Citibank?

16    A.   I have.  Citibank hired me to design a licensing program

17    for them to make sure they were getting all the royalties they

18    were due from their patents, and to try to license their

19    patents outside litigation.

20    Q.   How often do you provide expertise for patentowners like

21    USAA versus accused infringers like PNC?

22    A.   It's about 50/50.  I'm doing a few cases now with the

23    Department of Justice on the defense side, and I've got a few

24    for patentholders or patentowners like USAA right now.

25    Q.   Does the amount you get paid depend on who wins this
```

1    case?

2    A.    No.

3    Q.    Have you ever worked with Wilmer Hale, one of the law

4    firms representing PNC?

5    A.    I did.  One of the first large patent cases was one that

6    Wilmer Hale hired me on as a licensing expert.

7    Q.    What materials did you consider in reaching your

8    conclusions?

9    A.    All of the materials that we've been seeing in this

10   trial.  I've also looked at PNC and USAA internal financial

11   records, analyst reports, publicly available information, and

12   information that -- like emails and studies that the parties

13   conducted talking about the value of this technology.

14   Q.    Did you have access to PNC's internal financial

15   information?

16   A.    Yes, I did.

17             MR. BUNT:  Your Honor, at this point we would offer

18   Mr. Kennedy as an expert on economic analysis, the valuation

19   and licensing of intellectual property, and the calculation of

20   patent damages.

21             THE COURT:  Is there objection?

22             MR. STONE:  There is not, Your Honor.

23             THE COURT:  Without objection, the Court will

24   recognize this witness as an expert in those designated

25   fields.

561

1           Please continue.

2                MR. BUNT:  Your Honor, I'm about to have to move

3     into a different topic and to seal the courtroom.  I don't

4     know if you wanted to take a break or if I should continue.

5                THE COURT:  Let's continue, Mr. Bunt.

6                MR. BUNT:  All right.  Then I would ask that we seal

7     the courtroom, Your Honor.

8                THE COURT:  Based on counsel's request to protect

9     confidential information, I'll order the courtroom sealed, and

10    I'll direct that all persons not subject to the protective

11    order that's been entered in this case should excuse

12    themselves and remain outside until the courtroom is reopened

13    and unsealed.  This will also seal this portion of the

14    transcript.

15                      (Courtroom sealed.)

16                MR. SHEASBY:  USAA is in compliance, Your Honor.

17                THE COURT:  All right.  The courtroom is sealed.

18        Mr. Bunt, please continue.

19                MR. BUNT:  Thank you.

20        Mr. Huynh -- you're already there.

21    Q.   (BY MR. BUNT)  How much did PNC -- Mr. Kennedy, how much

22    did PNC benefit from using the product accused of infringement

23    in this case?

24    A.   So my analysis shows that from April 2016, when

25    infringement began, through July 27th, 2021, PNC benefited to

1    the amount of $604,600,000.

2    Q.   Why are there no damages for PNC's use of the system

3    before that date?

4    A.   So they filed their patents before that date, but

5    Congress doesn't allow a collection of royalties before the

6    patents are actually issued where they start infringing.  So

7    they were filed very early on, as you've heard.

8              MR. BUNT:  If we can have the next slide.

9    Q.   (BY MR. BUNT)  Can you describe the impact that PNC's use

10   of USAA's patents had on their business?

11   A.   So by having access to their financial records and

12   business records, I was able to see that there's more than

13   900,000 per month of accounts that are using the infringing

14   MRDC technology in 2021, and then the total number of

15   infringing MRDC deposits over the damages period is

16   105,800,000 deposits.  And the amount of money that was

17   deposited with those -- that number of deposits was

18   $55,489,167,000.

19   Q.   What's your guiding principle on how much PNC should pay?

20   A.   It's the patent statute, and particularly important is,

21   in no event, less than a reasonable royalty for the use made

22   of the invention by the infringer.

23   Q.   How did you go about calculating that royalty?

24   A.   So the Court asks us to follow the *Georgia-Pacific*

25   factors.

1    Q.    And are there 15 of those?

2    A.    Yes.

3    Q.    And how did you go about that analysis?

4          MR. BUNT:  If we could have the next -- thank you,

5    Mr. Huynh.

6          THE WITNESS:  Sure.  So the first 14 factors are

7    considered and you determine how they impact the negotiation,

8    and we'll go through those.  And then the 15th factor is a

9    hypothetical negotiation, and that's assumed to occur at the

10   date of first infringement back in 2016 and 2018 for the two

11   different patent families.

12   Q.    (BY MR. BUNT)  And why are we talking about the

13   hypothetical negotiation instead of a real one?

14   A.    Well, because, as we heard, PNC launched its product

15   without a license to the USAA's patents, so now we are in

16   litigation to figure out what they should have paid.

17   Q.    Are there any assumptions that you have to make for this

18   hypothetical negotiation?

19   A.    Yeah, there's three very key assumptions, and the first

20   one here you see is that PNC and USAA will reach an agreement.

21   Nobody can walk away, like you can in the real world.  So

22   that's something that you have to consider when you're

23   conducting this hypothetical negotiation.  And the second

24   thing is PNC and USAA had access to all relevant information.

25   Q.    And then how about the third thing?

564

1    A.    PNC and USAA, they have to assume that USAA's patents are

2    valid and they are infringed.  So that's an assumption that I

3    have to make in this hypothetical negotiation.

4    Q.    And when would this hypothetical negotiation take place?

5    A.    In 2016 and 2018 for the two different patent families.

6    Q.    What is *Georgia-Pacific* factor No. 1?

7    A.    So this asks an expert to consider the rates received by

8    the patentee, in this case USAA, for licensing the

9    patents-in-suit.

10   Q.    And do you have to look at how comparable these licenses

11   are?

12   A.    Yes.  That's critical.  You have to decide whether that

13   situation and those parties were comparable to the parties

14   here.  There might be a license agreement, but if they're not

15   comparable, then you should not use that to set the rate in

16   this hypothetical negotiation.

17   Q.    What approach has USAA taken to licensing its MRDC

18   patents?

19   A.    Well, my understanding is their approach is on an

20   institution-by-institution level.  Depending on how big a bank

21   is, or how much use they make out of the technology, or how

22   much value they get out of it, they're going to see a

23   different licensing amount.  And smaller banks especially

24   would be not as comparable, those kind of agreements, to the

25   larger banks.

1

2

3                                (Redacted.)

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

566

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1    Okay.  And then the second factor you had here when you

2    were comparing the Wells license to the PNC hypothetical

3    license, what was that?

4    A.   So that's -- Wells Fargo was disputing the validity and

5    infringement, and PNC in the hypothetical negotiation cannot.

6    They have to -- we have to assume the patents are valid and

7    they are infringed.  So that's a big difference right there.

8    And I've seen that difference in negotiations cause as much

9    of -- from 50 to 75 percent or more premium to be paid if --

10   or discount to be given if the patents are not agreed to be

11   valid and infringed.

12   Q.   Is that assumption of infringement and validity something

13   that PNC's damage expert will have to take into account as

14   well?

15   A.   He should, yes.

16   Q.   All right.  And then the third factor you list here.

17   A.   So Wells Fargo at the time had -- it was called a consent

18   decree, and it was the Federal Reserve had restricted their

19   growth.  They couldn't grow anymore.  So they couldn't use

20   this mobile remote deposit capture to add deposits and grow.

21   PNC is able to use it to grow.  And so that's a big

22   difference.  Wells Fargo didn't get any value of the ability

23   to grow more by getting more deposits.  PNC did.  So there's a

24   difference there that would need to be factored into that

25   rate.

1    Q.    Were there other agreements that USAA entered into that

2    would have been relevant to the hypothetical negotiation?

3    A.    Yes; there were two--one with a company I'll refer to as

4    Bremer and another one company called Assurant.

5              MR. BUNT:  Mr. Huynh, if we could have that next

6    slide.

7    Q.    (BY MR. BUNT)  What did you conclude about how the Bremer

8    and Assurant licenses would be used during the hypothetical

9    negotiation?

10   A.    So, first, Assurant and Bremer don't have the assumption

11   of validity and infringement.  Those were licenses that were

12   voluntarily entered into, so they didn't have to argue about

13   validity and infringement; and PNC, of course, has to assume

14   that.  That's the big adjustment that I talked about before.

15   Q.    Were Bremer and Assurant competing with USAA?

16   A.    No.  Bremer and Assurant were not targeting military

17   families, like we know that PNC had that as a targeted

18   consumer base.  So they were going after USAA's customers,

19   which that's going to impact the rate.  You're going to have

20   to pay more if you're going to compete and go after my

21   customers with my patented technology.

22   Q.    By the way, is Assurant a bank?

23   A.    No, that's another difference.  Assurant is a company

24   that USAA has a long-standing business relationship with, and

25   that generally leads to a lower rate.  So that leads to

1    non-comparability, too.

2    Q.    What was the other difference you have listed at the

3    bottom of this slide?

4    A.    So I believe that PNC received greater financial benefits

5    because of their size and their wide range of products.  And

6    we'll go through what those benefits are, but a company like

7    Assurant who's not even a bank, or a company like Bremer who's

8    much smaller, would not be able to get the same kind of

9    overall benefits that PNC is able to get.

10   Q.    Do you have a slide on the size differential between PNC

11   and Bremer?

12   A.    I do, yes.  You can see that PNC is 37 times larger than

13   Bremer from an asset standpoint and 12 times larger than

14   Bremer as far as MRDC accounts.

15   Q.    What did you conclude about using these license

16   agreements for the hypothetical negotiation?

17   A.    I concluded that they would not be used to set the rate.

18   They would be discussed because they involve the same patents,

19   but the differences are just too great to use this as a

20   benchmark to get to a license for someone like PNC.

21   Q.    Did USAA negotiate with other banks?

22   A.    There is a couple of others, yes--Dollar Bank and

23   SunCoast Bank.

24   Q.    And did those result in a license?

25   A.    No.  They were negotiating, or offers, but it did not

1    result in a license.

2    Q.   And would those offers influence the hypothetical

3    negotiation?

4    A.   No.  Since they were not completed license agreements,

5    they couldn't be used as comparable license agreements.

6    Q.   Were those banks smaller than USAA and PNC?

7    A.   They were.  I calculated the differences, but it was --

8    they were -- PNC's over 60 times larger than both of those

9    banks, so that impacts any ability to use them as some type of

10   comparable, not to mention that they did not enter into a

11   license agreement; it was just an offer.

12        MR. BUNT:  If we can go to the next slide.

13   Q.   (BY MR. BUNT)  Turning now to *Georgia-Pacific* factor

14   No. 2, can you explain to the jury what that factor is?

15   A.   So this is where we do the same thing--we look at PNC to

16   see what kind of licenses they might have entered into, of

17   course not involving the patents-in-suit, but are they

18   comparable enough that they should be discussed at the

19   hypothetical negotiation.

20   Q.   And how many patents PNC -- I'm sorry.  How many PNC

21   licenses are relevant to your analysis?

22   A.   I don't think any are comparable.  One is relevant--PNC

23   has indicated they believe it's relevant--is an agreement with

24   NCR.

25   Q.   Why do you believe it's not comparable?

1   A.   Well, it's not a patent license agreement.  It's a

2   software license and a services agreement.  We heard them

3   talking about witnesses talking about or documents about how

4   NCR and Mitel [sic] or someone they contract with.  So when

5   someone is working for you, that impacts the arms length

6   nature of the transaction.  But the main thing is it's a

7   software license, not a patent license.

8   Q.   And in your real-world experience of negotiating more

9   than 200 license agreements, have you ever seen a software

10  license like this one be used as a comparable agreement in a

11  negotiation like the one between USAA and PNC?

12  A.   Never.

13  Q.   Let's turn now to *Georgia-Pacific* factors 3, 4, and 5,

14  and if you could tell the jury, what are those factors?

15          THE COURT:  I'm going to interrupt at this point,

16  counsel.  I knew when we started with Mr. Kennedy we weren't

17  going to finish him today, but I thought it was important for

18  us to get started with him.

19      We're going to recess for the day at this point, ladies

20  and gentlemen.  We'll pick back up with the Plaintiff's direct

21  examination of Mr. Kennedy in the morning.

22      If you will, take your notebooks as you leave the

23  courtroom and leave them closed on the table in the jury room.

24  Please follow all the instructions I've given you about your

25  conduct, including not to discuss the case with anyone,

573

1    including yourselves.  You did a great job being here on time

2    this morning.  If you'll do the same thing, we'll target for

3    8:30 in the morning to begin again.

4        I'm going to order the courtroom unsealed and that will

5    reopen the record.

6                    (Courtroom unsealed.)

7            THE COURT:  And with that, ladies and gentlemen,

8    you're excused until tomorrow morning.

9            (Whereupon, the jury left the courtroom.)

10            THE COURT:  Be seated, please.

11        Mr. Kennedy, you can step down.

12            THE WITNESS:  Thank you, Your Honor.

13            THE COURT:  You're welcome.

14        Ms. Carson, I would like your best information on the

15    updated time splits for these depositions we've had today, if

16    you can give me those.

17            MS. CARSON:  Sure, Your Honor.

18        We have the time divisions that we had agreed to with

19    PNC's counsel.  So for Mr. Goodstein, it was 7 minutes and 35

20    seconds of designations for USAA and 7 minutes and 33 seconds

21    of designations for PNC.

22        And then for Mr. Trebilcock, there were 8 minutes and 58

23    seconds for USAA and 10 minutes and 33 seconds for PNC.

24        And then for the final one, Mr. Kunz, there were

25    4 minutes and 14 seconds for USAA and 8 minutes and 22

1    seconds for PNC.

2           THE COURT:  All right.  Thank you for that update.

3           MR. STONE:  It's not in the agreement with the times

4    calculated on the run sheets the parties have previously

5    exchanged, Your Honor.

6           THE COURT:  And it's not a statement by the Court

7    that I'm going to accept those on their face value.  I've been

8    keeping time throughout the process, and some of these

9    deposition witnesses we had fairly material delays while we

10   had problems and I'm going to count that time, too.  So the

11   Court is the timekeeper.  The Court will enter the appropriate

12   time here.  I just wanted the benefit of what Ms. Carson was

13   able to give me for comparison purposes.  That's all.

14          MR. STONE:  Thank you, Your Honor.

15          THE COURT:  All right.  Thank you, Ms. Carson.

16          MS. CARSON:  You're welcome.

17          THE COURT:  All right.  Mr. Sheasby, Mr. Stone, do

18   you have the agreed-upon extraneous text from the Trebilcock

19   deposition that we talked about at the bench?

20          MR. SHEASBY:  Yes, Your Honor.

21          THE COURT:  Is this agreed by both sides?

22          MR. STONE:  Yes, it is agreed.

23          THE COURT:  All right.  If you'll approach and give

24   it to the Courtroom Deputy, I'll consider it overnight and

25   we'll take it up in the morning.

1          MR. SHEASBY:  Thank you, Your Honor.

2          THE COURT:  Now, we also have a motion to quash with

3   regard to Mr. Morris who was subpoenaed to appear for

4   tomorrow.  I'm going to look at that briefing overnight.

5      I need an indication from Defendants, if I do not quash

6   the subpoena, when he would go on in the course of the trial;

7   your best estimate.

8          MR. STONE:  My best estimate given right where we

9   are right now is late tomorrow.

10         THE COURT:  All right.

11         MR. STONE:  I mean, we would obviously accommodate

12  his schedule if we need it.  I read his declaration that he

13  filed attached to the motion, and we could take him out of

14  time if necessary, but our plan otherwise would have been

15  probably, given the schedule right now, late tomorrow in the

16  afternoon.

17         MR. SHEASBY:  And, Your Honor, if I could just speak

18  to that.

19      Mr. Morris is very upset.  He drove out here as soon as

20  he got the subpoena, so he's waiting here for your ruling.

21  The point is that if you order him to appear, he will be

22  available when they call him.

23         THE COURT:  I understand.  I expect anybody

24  subpoenaed to be available when they're called.

25         MR. SHEASBY:  He's not looking to go out of order.

576

1    He will be prepared to follow your order exactly.

2         THE COURT:  All right.  Well, I have obviously not

3    had a chance to review the briefing on this since we've been

4    in trial all day.  I'll do that overnight and I'll take it up

5    with counsel in the morning.

6         Mr. Morris doesn't need to be here at least this evening.

7    He doesn't need to be here not any earlier than the middle of

8    the day tomorrow.  We'll talk in the morning, if he is going

9    to appear live, how to schedule that.  We'll make that a part

10   of those discussions.

11        All right.  I've already talked to you about submitting

12   updated joint proposals on the charge and verdict form by

13   tomorrow afternoon.  And I will trust that you will continue

14   to meet and confer, as you have last night.  And, effectively,

15   the majority of those issues can be worked out, but to the

16   extent they're not, I'll be available to take those up in the

17   morning as well.

18        Is there anything else either side is aware of that needs

19   to be raised with the Court?

20        MR. BUNT:  Yes, Your Honor.  I'd like some

21   clarification from you.  I don't want to stray across any

22   rules or guidelines the Court has.

23        Is it -- am I allowed to speak with Mr. Kennedy this

24   evening since he's still during direct?  I know Your Honor has

25   previously ruled in another case of mine that once a witness

1    has been passed, then there should be no further

2    communications with their counsel.  Since he's still on the

3    stand, am I allowed to speak with him?

4            THE COURT:  Is he not fully prepped when you put him

5    on today, Mr. Bunt?

6            MR. BUNT:  He is fully prepped, but I'm always happy

7    to talk to my witnesses as much as I can.

8            THE COURT:  I'm confident you fully prepped him

9    before he was called today.  Now that he started testifying,

10   he needs to be off limits until he's finished testifying.

11           MR. BUNT:  I will certainly do that, Your Honor.

12           THE COURT:  All right.  I hope that provides you

13   some guidance.

14           MR. BUNT:  It does, Your Honor.

15           THE COURT:  Anything else either Plaintiff or

16   Defendant's aware of that you need to raise with me?

17           MR. STONE:  Not from the Defendant, Your Honor.

18           MR. SHEASBY:  Your, Honor we're going to get you

19   that bench memo tonight about the patents that are related to

20   the --

21           THE COURT:  That's the one Ms. Glasser's mentioned?

22           MS. GLASSER:  Yes, Your Honor.

23           THE COURT:  Good.  I just need a few more things to

24   read.

25       All right.  I will see counsel in the morning.  I'll be

1    in chambers, as usual, by 7:30, and we stand in recess until

2    tomorrow.

3            MR. SHEASBY:  Thank you, Your Honor.

4            (The proceedings were concluded at 6:20 p.m.)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          I HEREBY CERTIFY THAT THE FOREGOING IS A

2     CORRECT TRANSCRIPT FROM THE RECORD OF

3     PROCEEDINGS IN THE ABOVE-ENTITLED MATTER.

4     I FURTHER CERTIFY THAT THE TRANSCRIPT FEES

5     FORMAT COMPLY WITH THOSE PRESCRIBED BY THE

6     COURT AND THE JUDICIAL CONFERENCE OF THE

7     UNITED STATES.

8

9     S/Shawn McRoberts              05/10/2022

10    _____DATE_____
      SHAWN McROBERTS, RMR, CRR
11    FEDERAL OFFICIAL COURT REPORTER

12

13

14

15

16

17

18

19

20

21

22

23

24

25