```
1               IN THE UNITED STATES DISTRICT COURT
              FOR THE EASTERN DISTRICT OF TEXAS
2                     MARSHALL DIVISION

3   UNITED SERVICES AUTOMOBILE     (  CAUSE NO. 2:20-CV-319-JRG
                                   )  (Lead)
4   ASSOCIATION,                   (  CAUSE NO. 2:21-CV-110-JRG
                                   )
5           Plaintiff,             (
                                   )
6   vs.                            (
                                   )
7   PNC BANK, N.A.,                (  MAY 12, 2022
                                   )  MARSHALL, TEXAS
8           Defendant.             (  8:30 A.M.

9   _____

10

11

12                        VOLUME 4

13

14  _____

15                    TRIAL ON THE MERITS

16          BEFORE THE HONORABLE RODNEY GILSTRAP
             UNITED STATES CHIEF DISTRICT JUDGE
17

18  _____

19

20

21

22

23           SHAWN M. McROBERTS, RMR, CRR
                100 E. HOUSTON STREET
                MARSHALL, TEXAS  75670
24                 (903) 237-8546
             shawn_mcroberts@txed.uscourts.gov
25
```

1                          A P P E A R A N C E S

2          FOR PLAINTIFF:          IRELL & MANELLA, LLP -
                                   LOS ANGELES
3                                  1800 AVENUE OF THE STARS
                                   Suite 900
4                                  LOS ANGELES, CALIFORNIA  90067
                                   (310) 277-1010
5                                  BY:  MR. JASON SHEASBY

6                                  IRELL & MANELLA - NEWPORT BEACH
                                   840 NEWPORT CENTER DRIVE
7                                  SUITE 400
                                   NEWPORT BEACH, CALIFORNIA 92660
8                                  (949) 760-0991
                                   BY:  MS. LISA GLASSER
9                                       MS. REBECCA CARSON

10                                 PARKER BUNT & AINSWORTH
                                   100 E. FERGUSON, SUITE 418
11                                 TYLER, TEXAS  75702
                                   (903) 531-3535
12                                 BY:  MR. ROBERT BUNT

13         FOR DEFENDANT:          MUNGER TOLLES & OLSON LLP - LA
                                   350 S. GRANDE AVE., 50TH FLOOR
14                                 LOS ANGELES, CALIFORNIA  90071
                                   (213) 683-9255
15                                 BY:  MR. GREG STONE

16                                 WILMER CUTLER PICKERING HALE &
                                   DORR - WASHINGTON DC
17                                 1875 PENNSYLVANIA AVENUE NW
                                   WASHINGTON, DC 20006
18                                 (202) 663-6000
                                   BY:  MR. GREGORY LANTIER
19
                                   MUNGER TOLLES & OLSON -
20                                 SAN FRANCISCO
                                   560 MISSION STREET, 27TH FLOOR
21                                 SAN FRANCISCO, CA 94105
                                   (415) 512-4019
22                                 BY:  MS. BLANCA YOUNG

23                                 GILLAM & SMITH, LLP
                                   303 SOUTH WASHINGTON AVENUE
24                                 MARSHALL, TEXAS  75670
                                   (903) 934-8450
25                                 BY:  MS. MELISSA SMITH

911

1              OFFICIAL REPORTER:   SHAWN M. McROBERTS, RMR, CRR
                                    100 E. HOUSTON STREET
2                                   MARSHALL, TEXAS  75670
                                    (903) 923-8546
3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

# <u>INDEX</u>

**EXAMINATION**

**Witness Name**                                                              **Page**
BHARAT PRASAD
    BY DEPOSITION ..................................................... 7
MICHAEL BUECHE
    BY DEPOSITION ..................................................... 17
OMID KIA, Ph.D
    Direct By MR. STONE ............................................ 23
    Cross By MR. SHEASBY ........................................... 53
    Redirect By MR. STONE .......................................... 74
CHARLES OAKES
    BY DEPOSITION ..................................................... 80
NATHAN McKINLEY
    BY DEPOSITION ..................................................... 84
RON EPSTEIN
    BY DEPOSITION ..................................................... 94
CHRISTOPHER VELLTURO,Ph.D
    Direct By MR. STONE ............................................ 110
    Cross By MR. SHEASBY ........................................... 150
    Redirect By MR. STONE .......................................... 188

```
 1              THE COURT:  Be seated, please.

 2         Are the parties prepared to read into the record those

 3     items from the list of pre-admitted exhibits used during

 4     yesterday's portion of the trial?

 5              MR. BUNT:  Yes, Your Honor we are.

 6              THE COURT:  Please proceed.

 7              MR. BUNT:  Plaintiff used the following exhibits

 8     yesterday:  DX 1678, PX 13, PX 14, PX 43, PX 96, PX 150, PX

 9     158, PX 175, PX 219, PX 296, PX 299, PX 304, PX 814, PX 877,

10     PX 1080, PX 1481, and PX 1971.

11              THE COURT:  All right.  Does the Defendant have any

12     objection to that rendition?

13              MS. SMITH:  We do not, Your Honor.

14              THE COURT:  Does Defendant have a similar rendition

15     to read into the record?

16              MS. SMITH:  We do, Your Honor.

17              THE COURT:  Please proceed.

18              MS. SMITH:  PX 362, PX 926, DX 25, DX 692, DX 1231,

19     and DX 1419.

20              THE COURT:  Any objection, Mr. Bunt, from the

21     Plaintiff?

22              MR. BUNT:  No, Your Honor.

23              THE COURT:  All right.  Thank you, counsel.

24         All right.  Defendant, I assume you're prepared to go

25     forward with your next witness, and am I correct this will be
```

1    by deposition?

2         MR. LANTIER:  Yes, Your Honor.  We are prepared, and

3    it will be by deposition.

4         THE COURT:  All right.  Let's bring in the jury,

5    please.

6         (Whereupon, the jury entered the courtroom.)

7         THE COURT:  Good morning, ladies and gentlemen.

8    Welcome back.  Please have a seat.

9       Defendant, call your next witness, please.

10        MR. LANTIER:  Your Honor, PNC calls Bharat Prasad,

11   who at the time of his deposition was principal technical

12   architect of USAA.  His deposition will be played.

13        THE COURT:  Before we play the deposition, ladies

14   and gentlemen, I want to clarify something for you.  This

15   gentleman testified live in the Plaintiff's case in chief.

16   He's available to testify live in the Defendant's case in

17   chief, but the Defendants have opted to present his testimony

18   by deposition.

19       Given the designation applied to him at the time he was

20   deposed and the particular provisions of the Federal Rules of

21   Civil Procedure, I've determined that it's appropriate for the

22   Defendant to choose to present him by deposition in their case

23   in chief rather than calling him live.  But the fact that you

24   saw him live earlier in this trial and are now going to see

25   him by video deposition, I did not want it to be confusing to

1    you.  All right.

2         Let's proceed with the witness by deposition.

3         BHARAT PRASAD, BY SWORN VIDEOTAPE DEPOSITION,

4    Q.   So the first time you had the idea -- that USAA had the

5    idea of using a display on a mobile device with an integrated

6    camera to help the user take the picture was in the

7    October/November 2006 time frame, and you continued to develop

8    that into 2007.  Is that fair?

9    A.   I would -- I would say it's 2005.  The reason for that is

10   we knew that the display does not have to be a part of the

11   device.  Right?  We didn't have to have the same form factor

12   for both the display and the camera.  We knew that it can be

13   separate.  It doesn't have to be -- just like the scanner bed.

14   Right?  Deposit@Home was for scanners.  Scanner is a camera,

15   but scanner is not a display.  So scanner -- we knew that

16   scanner can be a camera.  And so the same concept came with

17   the display can be still your own home computer.  So I would

18   say that concept goes all the way back to 2005.

19   Q.   When did USAA employees first conceive of using a mobile

20   device with an integrated camera to take pictures of checks?

21   A.   So when you say integrated camera, you're talking about

22   single form factor?  Is that --

23   Q.   Yes.

24   A.   -- how I understand it?  Okay.  So a single form factor,

25   again we started looking at camera devices from

916

1    October/November 2006.  But if you look at the webcam capture

2    that happened by the member, that was integrated because the

3    webcam itself was integrated into the home computer.  Right?

4         So when the member took a check image in Deposit@Home,

5    that was specifically meant for scanners, but we knew that it

6    would work with cameras.  So that integrated system with the

7    webcam was in 2005.

8         Now, handhelds, like mobile devices with integrated

9    camera and -- you know, and screen, that was in the October

10   2006 time frame.

11   Q.   So you identified a TWAIN -- a TWAIN training library

12   document, and you identified a discussion about a customer

13   email -- or a -- sorry, a customer using a camera in 2006.

14        Are there any other documents you can identify for me

15   that show that USAA had conceived of using a digital camera as

16   opposed to a scanner to capture a check image before October

17   2006?

18   A.   I believe there was also an email exchange that I

19   remember between several people within USAA about the concept

20   of using a camera, why should not we use a camera instead of a

21   scanner to capture the check.  And that was more like an email

22   exchange at the time.  But that was email exchange among some

23   of the bank executives and the leadership.

24        But the core team, which included us, we knew the

25   possibility of that already in June 2005.  Right?  So it was

1   not news to us because we had already integrated a TWAIN

2   application to look at scanners and cameras.

3        So, for us, the camera concept was already there

4   well -- well in 2005.  But the actual work did not start just

5   because we wanted to restrict that application to scanners by

6   choice.

7   Q.   When did you actually show that by actually demonstrating

8   that -- that the software could take a picture of a check with

9   a camera, digital camera?

10  A.   Yeah.  So that was -- we didn't show the concept working

11  with an actual camera in October 2005.  We showed it with the

12  scanner.  The code that was written was working for both

13  scanners and cameras, as I said.

14       So the first time --

15  Q.   When did --

16  A.   -- when we saw -- when we saw the member actually use a

17  webcam -- and I don't know the time frame for that, the first

18  time when we saw a member actually use a webcam to deposit a

19  check, that was, I think, somewhere around the time when we

20  released the product to the member in August 2006.  And there

21  was a time frame from August 2006 when the members got the

22  product released and the member tried with the webcam.  That

23  was the first indication of someone actually using a camera to

24  deposit the check.  Right?

25       But when we did the prototype in October 2005, that was

1  completely already coded for both scanners and cameras.

2  Q.   Okay.  So the -- the customer was the first person to

3  actually use a camera that was separate from a -- from a

4  scanner to submit a check image taken by a camera?

5  A.   The customer was the first person to use it from a member

6  perspective, correct, yeah.

7  Q.   No one at -- no one at USAA had tried to submit a check

8  image using a webcam, for example, before the customer first

9  did so in October 2006?

10  A.   That would be correct, yeah.

11  Q.   Okay.  And so having looked at this would -- you would

12  agree that the -- that the time the -- that a customer of USAA

13  first actually used a digital camera to submit a check image

14  was around October 25th, 2006?

15  A.   Correct.  Well, this is the email that Chuck Oakes is

16  sending to two of his executives saying that we found that a

17  member used his camera.  Right?  But the actual date when the

18  member used this camera might before October 25th.  I don't

19  know when exactly it was.  It was after August -- sometime in

20  August, because that's when we released it to membership.  So

21  it must have been between August and October time frame.

22  Q.   So if you have a system in place for doing deposit of

23  checks with a scanner -- capturing images of checks with a

24  scanner, is it -- is it easy to also process images taken with

25  a handheld camera or mobile device?

1    A.    It's not.

2    Q.    Why do you say that?

3    A.    So the intent -- that -- what I say here as a concept is

4    no different means -- it's talking about, yeah, I want to use

5    now a mobile device to capture my check image.  That's --

6    that's where it ends.  But the actual internal concepts of

7    using a mobile device with a camera to do the same thing that,

8    you know, a desktop application tied to a scanner does is

9    completely different.  It's a different ball game completely.

10   Right?  Capturing an image from a camera that's tied to a

11   handheld mobile device introduces a lot of complexity around

12   how you capture it, how you process the check image to a

13   satisfactory position where you bring it to a banking system

14   that will accept the check image as a valid deposit and the

15   bank of -- the bank that produced the check will accept it as

16   a valid debit.

17        So those are the things you need to think of and how

18   complex it could be from -- moving from a scanner resolution

19   to a handheld camera resolution.

20   Q.    Tell me -- tell me more -- you say it's a completely

21   different ball game.  Can you -- can you tell me any more

22   about why it's so different to handle check images taken with

23   a camera versus a scanner?

24   A.    Yeah.  If you look at scanners today.  Right?  Or even in

25   2005 when we were doing it, it was a very controlled

1    environment.  So when I say controlled environment, a scanner

2    is a completely 2-D surface for all practical purposes.  You

3    place a document on a scanner bed, and you scan the image.

4    You are assured that is a 2-D image, and you're also assured

5    of certain very simple aspects that come with a 2-D image.

6    You know that is falling within the rectangle of the -- the

7    capture, the scanner bed.  And so you are having an easier way

8    and mechanism and also the lighting is controlled and the kind

9    of resolution that you get out of a scanner is very easily

10   controlled.

11        Now, you -- you take the same problem and try to

12   translate it to a camera that's tied to a mobile handheld

13   device--right?--like an iPhone, you're now talking about a 3-D

14   environment in which you are trying to capture a 2-D object,

15   like a check.  So the translation of the 3-D environment to a

16   two-dimensional object of a check goes through a complex set

17   of series of steps and processes and algorithms to make it

18   really happen.

19   Q.   And how hard a problem is that actually to solve?

20   A.   Extremely hard.

21   Q.   Why is that?

22   A.   So if you look at the -- the field of image processing

23   today--right?--image processing has been evolving ever

24   since -- I don't even know what the date is, but image

25   processing has been in academia for a long time.

1      People have been writing academic papers and all kinds of

2   articles and textbooks around how, you, image -- images can

3   be, you know, captured, extracted, information can be gathered

4   up of the images.  But you see the complexity of trying to do

5   something for humans, it's intuitive to say, oh, I can see a

6   check in an image just by our -- our brains and eyes can tell

7   it right away.

8      But for a computer or an algorithm or a code -- piece of

9   code to do the same thing is really extremely complex problem.

10  You need things like, you know, shaping algorithms,

11  histograms, you need things like skewing algorithms, and you

12  need ability to segment.

13     So there's a multi -- multiresolution or a segmentation

14  algorithm that needs to happen to separate out a region of

15  interest from the entire image.  So these are all pieces that

16  really go into -- really computational algorithms that you

17  need to write to extract something as simple as a check from

18  an image that might contain a table in a room, a coffee cup,

19  or whatever.  Right?

20  Q.   And if I could have you turn to the last page under the

21  heading Proposal, the proposal is to research the viability

22  for USAA to take check deposits via digital cameras.  Do you

23  see that --

24  A.   Yes, I do.

25  Q.   -- the first one?

1      And is that part of the -- is this the sort of research

2  project that you were telling me about a moment ago about all

3  the work that had to be done?

4  A.   Yes, sir.

5  Q.   Do you recognize Exhibit 9?

6  A.   Yeah.

7  Q.   It's labeled Deposit@Home Next Generation with your name

8  and December 3rd, 2007.  Do you see that?

9  A.   Correct.

10  Q.   And is this a presentation you gave in December 2007?

11  A.   Yes, I did.

12  Q.   Yeah.  Let me ask you this.  If you turn to the sixth

13  slide --

14  A.   It's slide number 6, you say?

15  Q.   Yeah.  And these were -- these were approaches that you

16  were still researching in December 2007?

17  A.   Yeah.  And this -- this is just one set -- this

18  particular slide only talks about the segmentation and edge

19  detection, but there are a lot more of the challenges, yeah.

20  Q.   A lot more challenges as well that you were

21  researching --

22  A.   Yeah.

23  Q.   -- in December 2007.  Is that correct?

24  A.   Correct, yeah.

25  Q.   And these are the kinds of areas where your team had to

 1    develop new -- new sort of algorithms to solve the problem?

 2    A.    Yeah, we had -- we had to write a lot of the coding to

 3    handle these things to a satisfactory level.

 4    Q.    And you see down at the bottom, there's two bullets, the

 5    last two.  One says TIFF conversions were good only 60 percent

 6    of the cases.  And MICR info was read only about 25 of the

 7    cases.  Do you see that?

 8    A.    I see, yeah, I do.

 9    Q.    And that wasn't -- that wasn't sufficient, in your view,

10    right to have a working -- to -- to -- for something that

11    would actually work well?

12    A.    This is -- this is research again.  Right?  We are doing

13    research at that point in time, and we are looking at reserves

14    and we are writing code to mitigate some of these things.  But

15    certainly this is not the code that's immediately going into

16    implementation or production.  This is just indicating at a

17    point in time what the research is seeing.

18    Q.    And have seen this document before, Exhibit 22?

19    A.    Yeah, I have seen this.

20    Q.    What is Exhibit 22?

21    A.    So this is actually a work action report, or what we call

22    a WAR.  So we used to produce these on a weekly basis.  So

23    this particular WAR is my report, work action report, from the

24    period October 24th through 28th.  And it basically talks

25    about the kind of work items I'm working on, what is the

924

1    action, what is the progress on some of these things.  So

2    that's what this report is.

3    Q.   And if you go down to the second bullet point under

4    accomplishments, do you see a section labeled home deposit?

5    A.   Yeah, I do.

6    Q.   And the first bullet point there is demo of prototype

7    shown to Chuck Oakes and John Brady.  Do you see that?

8    A.   Yeah.

9    Q.   Is that the prototype that you talked about a little bit

10   earlier today?

11   A.   Correct.

12           THE COURT:  Does that complete this witness by

13   deposition?

14           MR. LANTIER:  Yes, Your Honor, it does.

15           THE COURT:  Can you give me the allocated times

16   between Plaintiff and Defendant, please?

17           MR. LANTIER:  One moment, Your Honor.

18       Your Honor, the time for Plaintiff is 6 minutes and 47

19   seconds, and the time for PNC is 7 minutes and 47 seconds.

20           THE COURT:  All right.  Call your next witness,

21   please.

22           MR. LANTIER:  Thank you, Your Honor.  PNC calls Mr.

23   Michael Bueche, who at the time of his deposition was chief

24   architect and head of architecture and innovation at Silicon

25   Valley Bank.

 1              THE COURT:  Do you have the time splits for this

 2     witness in advance?

 3              MR. LANTIER:  I do, Your Honor.

 4              THE COURT:  Please go ahead and give them to me.

 5              MR. LANTIER:  The Plaintiff's time is 6 minutes and

 6     50 seconds, and PNC's time is 1 minute and 49 seconds.

 7              THE COURT:  All right.  Proceed with this witness by

 8     deposition, please.

 9              MS. CARSON:  Your Honor --

10              THE COURT:  Yes.

11              MS. CARSON:  -- we have a different allocation.  I

12     think the 6 minutes and 50 seconds is for the complete play.

13     So it should only be 5 minutes and 1 seconds for USAA.

14              MR. LANTIER:  That was a mistranscription on my

15     part.  I agree with Ms. Carson.

16              THE COURT:  All right.  Thank you for the

17     clarification.

18          Let's proceed with the witness by deposition.

19          MICHAEL BUECHE, BY SWORN VIDEOTAPE DEPOSITION,

20     Q.   Okay.  So you're one of the inventors on this patent,

21     this is the '571 Patent?

22     A.   I am an inventor on the '571 Patent.

23     Q.   Yeah.  What's your understanding of the industry term

24     auto-capture?

25     A.   Auto-capture is -- we invented at USAA is the active

1    opening of video stream, monitoring frames, looking for a

2    valid check image within view of the camera.  Once one of

3    those frames meets the minimum criteria for us to validate

4    that it is a check image, we then capture that frame

5    automatically without user input.

6         If the image within the frame is not a valid check image,

7    we use something called corrective feedback to allow the user

8    to either reposition the camera or reposition the check or put

9    it on a different background.

10        And then once -- as I mentioned, once a valid check image

11   is within view of the -- of the camera, the software

12   determines when to capture the image and then that gets

13   submitted for future processing, for future check processing.

14   So that whole process encompasses auto-capture.

15   Q.   And you understand that the '571 Patent relates to

16   auto-capture.  Right?

17   A.   The '571 Patent does detail out auto-capture.

18   Q.   And in 2007, USAA was testing whether it could use the

19   infrastructure it had developed for Deposit@Home to process

20   check images taken with digital cameras.  Right?

21   A.   USAA had been processing digital camera images before I

22   got there in 2007.  So I can't speak to when it started, but

23   it was well underway when I joined in July of 2007.

24   Q.   And did the experimentation involve writing code to try

25   doing auto-capture with different monitoring criteria?

927

1    A.    No.   I would say that we built a framework, and it's that

2    framework that's described in the patent, and what we were

3    doing is just tweaking and changing values.  So, for instance,

4    on a black background you might want to reduce the contrast

5    requirement or on a white background you might want to

6    increase the contrast.  So it's really the same algorithms.

7    We were just changing configuration parameters to figure out

8    the right configuration parameters to make those monitoring

9    criteria work their best.

10   Q.    Okay.  And so how -- how were the particular monitoring

11   criteria tested to find the right combination of monitoring

12   criteria to get a good check image?

13   A.    So we took thousands and thousands of check images and

14   ran them through an automated testing process, and then looked

15   at where did we have a passing check where we expected one or

16   where it failed where we expected a pass.  Right?  Typical

17   testing techniques.

18         And so we would -- we would run a series of experiments

19   through this automated testing with different monitoring

20   criteria and different configuration of those monitoring

21   criteria until we got into the success rate that was required

22   for production launch.

23   Q.    And when was that done?

24   A.    2012 and 2013.

25   Q.    And this is part of the experimentation that you were

1  telling me about a minute ago.

2  A.    Yeah.  Some of it happened in, as I mentioned, with our

3  limited budget in 2012, but the majority of it happened

4  in -- in 2013.

5  Q.    Okay.  And then you would just test with thousands and

6  thousands of images and see how the -- see how the algorithm

7  performed.

8  A.    Yes.  It's typical, when developing an algorithm, to

9  build a bunch of test data to test the performance of your

10  algorithm.  So that's what we were doing.

11  Q.    So around the third -- at -- at the third line of column

12  4, this is your patent, it says, the monitoring criteria may

13  be based on one or more of light contrast on the image, light

14  brightness of the image, positioning of the image, dimensions,

15  tolerances, character spacing, skewing, warping, corner

16  detection, and MICR (magnetic ink character recognition), line

17  detection, as described further herein.  Do you see that?

18  A.    Yes, sir, I see that.

19  Q.    Okay.  And nothing in here tells -- tells you which

20  combination of these different criteria would work well.

21  Correct?

22  A.    This patent lays out a framework that you could use for

23  auto-capture.  It would depend on your specific

24  implementation, which monitoring criteria to use within our

25  framework.

1    Q.   Are some of the criteria that are described here more

2    important than others for using to decide when to take an

3    image of a check that will be valid under Check 21?

4    A.   Again, I think that's up to the implementer to decide --

5    the implementer of our idea to decide which ones they care

6    about for whatever success rates they're driving for or

7    whatever types of check images that they're processing.  So

8    it's up to the implementer.

9    Q.   Okay.  And the particular monitoring criteria that USAA

10   selected to use for auto-capture, that it determined worked

11   well for getting valid check images, that's not disclosed in

12   any patent.  Correct?

13   A.   I'm sorry.  Are you asking have we disclosed which

14   specific algorithms we're using for monitoring an

15   auto-capture?  Is that your question?

16   Q.   Yes.  And I just want to confirm, first of all, that it's

17   not in this patent, the '571.

18   A.   We do not disclose in this patent which algorithms were

19   we're using for monitoring.

20   Q.   What is your general understanding of the impact that

21   auto-capture had on USAA's success/failure rates if all other

22   factors are -- are equal, meaning if you control for the

23   impacts of operating systems or characteristics of the phone

24   and things like that?

25   A.   Auto-capture, in my opinion, is a critical component to a

1   successfully working MRDC program application at scale.

2   Specifically, it significantly reduces the number of errors

3   that a user might introduce by taking bad pictures of -- of

4   checks.

5   Q.   Does your patent disclose sufficient information

6   for -- for someone else to implement auto-capture in their own

7   products?

8   A.   Yes.  The patent does disclose enough information to

9   implement our idea.

10            THE COURT:  Does that complete this witness by

11   deposition?

12            MR. LANTIER:  It does, Your Honor.

13            THE COURT:  All right.  Call your next witness,

14   please.

15            MR. STONE:  Thank you, Your Honor.  Defendant calls

16   Dr. Omid Kia, who will testify virtually, I guess is how we

17   describe it.

18            THE COURT:  All right.  Before we proceed, let me

19   explain to the jury, Doctor Kia could not be here physically,

20   but he is testifying remotely.  This is not a prerecorded

21   deposition.  This is his live testimony.  The only difference

22   is he's doing it over the monitoring and audio system in the

23   courtroom as opposed to sitting at the witness stand.

24        Do you have binders to distribute?

25            MR. STONE:  Yes, Your Honor.

1          THE COURT:  All right.  At this time I'll ask Doctor

2    Kia to be sworn by our Courtroom Deputy.

3          THE WITNESS:  Good morning.

4          THE CLERK:  Good morning.

5          (Whereupon, the oath was administered by the Clerk.)

6          THE COURT:  All right, Mr. Stone.  You may proceed

7    with direct examination when you're ready.

8          MR. STONE:  Thank you, Your Honor.

9                    OMID KIA, PhD, SWORN,

10   testified on direct examination by Mr. Stone as follows:

11   Q.   Good morning, Doctor Kia.

12   A.   Good morning, sir.

13   Q.   Where are you today?

14   A.   I am actually in Marshall, Texas, today.  I'm in a hotel

15   room.

16   Q.   And have you been there all week?

17   A.   I've been here all week, yes, sir.

18   Q.   And just in the hotel room or other places?

19   A.   Just in the hotel room.  I have not left the premises.

20   Q.   And are you unable to be with us here today?

21   A.   Yes.  I'm not able to.

22   Q.   Would you introduce yourself to the jury, please, Doctor

23   Kia?

24   A.   Yes, sir.  My name is Omid Kia.  I live in Maryland, a

25   suburb of Washington, D.C., and I have two very beautiful

1    children and they are both in college right now.

2    Q.   And what's your current occupation, Doctor Kia?

3    A.   I am currently a subject matter expert at Coastal

4    Communication Consultants where I'm placed as a scientist in

5    various Department of Defense research labs, performing

6    research and image processing and related fields.

7    Q.   What's your educational background, Doctor Kia?

8    A.   So I have a Ph.D. degree in electrical engineering from

9    the University of Maryland at College Park where I focused on

10   image processing and compression and all the related

11   technology around it.

12   Q.   And how much of your career has been spent on image

13   processing?

14   A.   Quite a lot.  During my Master's tenure, I decided that

15   image processing is where I want to be.  And since then, I've

16   dealt with a number of areas in image processing.

17   Q.   Did you prepare some slides to help illustrate your

18   testimony today?

19   A.   Yes, sir, I have.

20   Q.   Let me see if this will work, if I can bring up a slide

21   that shows your experience.

22             MR. STONE:  Let's go to the next slide, if we can,

23   Mr. Nickels.  Thank you.

24   Q.   (BY MR. STONE)  And on this slide, do we see a summary of

25   some of your experiences prior to your current job?

1   A.   Yes, sir.  These are some of the positions I've held in

2   various companies that I've worked for.

3   Q.   And did you -- were you involved with image processing in

4   all of these different positions?

5   A.   Yes, sir.  I was involved in image processing.  All of

6   them involved solving very hard problems.

7   Q.   Doctor Kia, have you done any work on processing images

8   of checks?

9   A.   Yes, sir, I have.  I have researched check images as a

10  specific type of a document where I would analyze the color

11  and the texture of a check in an effort to separate it from

12  the background.

13  Q.   And have you also done work professionally with digital

14  cameras?

15  A.   Yes, sir.  Not only have I made digital cameras, but I've

16  also assisted companies in design and developing researching

17  their digital cameras, I've modified digital cameras for

18  purposes that the product requires, and large array of digital

19  cameras for various purposes.

20       MR. STONE:  Your Honor, we would offer Doctor Kia as

21  an expert on image processing, including check image

22  processing and digital photography.

23       THE COURT:  Is there objection?

24       MR. SHEASBY:  No objection, Your Honor.

25       THE COURT:  Without objection, the Court will

934

1    recognize this witness as an expert in those designated

2    fields.

3         Please continue, counsel.

4              MR. STONE:  Next slide, please.

5    Q.   (BY MR. STONE)  Doctor Kia, were you asked to form

6    opinions as to the validity of the four patents that USAA is

7    asserting in this case?

8    A.   Yes, sir.  And those opinions are shown on the slide.

9    Q.   And would you summarize your opinions for the ladies and

10   gentlemen of the jury, please?

11   A.   Absolutely.  So it's my opinion that USAA's 2006 patents

12   and the '571 Patent, also known as the auto-capture patent,

13   are invalid for a lack of enablement, and also USAA's 2006

14   patents are invalid for a lack of lack of written description.

15   Q.   Doctor Kia, have you been able to observe the testimony

16   that has been taken in this case up until today?

17   A.   Yes, sir, I have.  The Court allowed me to view the

18   testimony transcript from the beginning of the court.

19   Q.   And have you seen -- have you seen the written transcript

20   as it occurred of the testimony from Monday forward until

21   today?

22   A.   Yes, sir, I have.  I followed the transcripts since

23   Monday.

24   Q.   And have you taken that into account in the testimony

25   you're going to give here today?

1    A.   Yes, sir, I have.

2         MR. STONE:  Let me turn to the next slide, if we

3    can.

4    Q.   (BY MR. STONE)  Does this set out the three topics that

5    you're going to speak to today?

6    A.   Yes, sir, those are.

7         MR. STONE:  Can we turn to the first topic?  The

8    next slide, please.

9    Q.   (BY MR. STONE)  Can you explain what the enablement

10   requirement is or what lack of enablement is?

11   A.   Absolutely.  A patent is required to have sufficient

12   information in the disclosure so that one of ordinary skill in

13   the art reading the specification when the application was

14   originally filed in 2006 to be able to make the claimed

15   invention without undue experimentation.

16   Q.   And you mentioned there a person of ordinary skill in the

17   art.  Do you have a definition of what a person of ordinary

18   skill in the art would be that is appropriate to apply to the

19   four patents in this case?

20   A.   Yes, sir, I do, and I have a slide for that.

21   Q.   Thank you, sir.  Did you also hear Doctor Bovik testify

22   to what he felt was the appropriate standard for a person of

23   ordinary skill in the art?

24   A.   Yes, sir, I did, and he had the same definition of one of

25   ordinary skill in the art as I do here.

1    Q.   And, Doctor Kia, are you a person of ordinary skill in

2    the art?

3    A.   Well, I am at least a person of ordinary skill in the

4    art, but my credentials and experience are much -- much

5    broader than that.  I have a Ph.D. degree in electrical

6    engineering, and I have 25 years of experience in the industry

7    and the field.

8    Q.   For purposes of the opinions that you have formed here

9    today, with respect to enablement, what part of the patent

10   applications filed in 2006 did you look at to assess whether

11   the enablement requirement was met?

12   A.   I looked at the portions of the written description where

13   the inventors described their invention and how it works.

14   Q.   Did you also look at the figures?

15   A.   I looked at the figures as well, yes.

16   Q.   And at what time period do you perform -- as of what time

17   period do you perform your analysis of whether the enablement

18   requirement is met?

19   A.   I performed my analysis at the time frame of 2006 when

20   the original application was filed, and I put myself in the

21   shoes of one of ordinary skill in the art reading that

22   specification.

23   Q.   And did the disclosures in USAA's 2006 patent

24   applications enable one of ordinary skill in the art to know

25   how to make a remote deposit system that could process check

1   images from mobile devices?

2   A.   No, not at all.

3          MR. STONE:  If we could go to the next slide,

4   please.

5   Q.   (BY MR. STONE)  We've heard a lot about this, Doctor Kia,

6   but -- so let me just ask you briefly.  Have we highlighted in

7   yellow two of the pieces of information from a check that are

8   crucial to be able to be read in a remote deposit system in

9   order for it to work?

10  A.   Yes, sir.  Those highlighted portions, the routing

11  number, account number, and the courtesy amount are crucial

12  for a transaction to complete.

13  Q.   And do those -- are those read by something we've heard

14  about during the course of this trial called OCR, or optical

15  character recognition?

16  A.   Yes, sir.  Once an image of a check is captured with

17  sufficient quality, a program like an OCR would decode those

18  and make it available to other systems.

19  Q.   When you say of sufficient quality, what are you

20  referring to?

21  A.   Well, OCRs are not perfect, and you have to have a

22  certain image quality for them to operate properly, so the

23  image needs to be of sufficient quality so that the OCR engine

24  can do its job.

25  Q.   Did USAA in 2006 have a remote deposit system?

1    A.    Yes, sir, they did.  They had a system called

2    Deposit@Home where the system utilized a scanner to take a

3    picture of the -- of a check like this, and from that scanner,

4    they provided the image to two different products that they

5    had purchased.  One was All My Papers, where the image would

6    be presented and the MICR line would be decoded.  The second

7    one is a product from Mitek, and that would decode the

8    courtesy amount, the amount that's written by the check owner

9    for the transfer of the funds.

10   Q.    Could they have used this system and produced acceptable

11   images using mobile phones in 2006?

12   A.    No, not at all.  The quality of mobile phones in 2006 was

13   not sufficient and it presented a range of challenges to solve

14   for it to be able to successfully decode those fields and be

15   depositable.

16   Q.    We've heard testimony in this case that moving from a

17   scanner to the use of mobile phones to capture check images

18   was a paradigm shift.  Would you agree or disagree with that

19   statement?

20   A.    I would agree with that.

21   Q.    We've also heard that it was described as a different

22   ball game completely to go from a scanner to a mobile phone.

23   Would you agree or disagree with that?

24   A.    I would agree with that as well.

25   Q.    We heard some testimony about a 3-d or a

1    three-dimensional environment and a 2-d environment as applied

2    to this issue of using mobile phones.  Can you explain what

3    the difference is between those two?

4    A.    Yes, sir.  I do remember that in the transcript.

5          The difference is that when the check is presented to a

6    scanner, it's a controlled environment and that's what

7    referring to as a 2-D environment.  When the check is placed

8    on top of the glass of the scanner, it is flat.  And when you

9    close the top, it is flat, it is registered with the scanner

10   as to where the focus of the image is, there's controlled

11   lighting, there is high resolution, and you get a very

12   predictable result by using a scanner; whereas, the 3-D

13   concept is -- stems from a consumer using a free-floating

14   image capture, such as one with a mobile device.  And as the

15   consumer positions that mobile device to take a picture of an

16   image, it is operating in an open 3-D space, so it would

17   result in a number of problems such as skew and warping and a

18   lot of other different problems.

19   Q.    If we can go to the next slide, please, Doctor Kia, and

20   then we'll go to the one after that, I think.

21   A.    Yes, sir.

22   Q.    What -- can you very quickly, because I know the jury has

23   already heard something about this, just tell us what we see

24   on the slide that is now on the screen, which is DDX 7.11?

25   A.    Absolutely.  So I'm showing a problem with background, so

```
 1    when a user is making an image and the background can bleed

 2    into the foreground just because the colors are very similar.

 3              MR. STONE:  If we go to the next slide, please.

 4              THE WITNESS:  So this is a --

 5    Q.   (BY MR. STONE)  Go ahead.  What do we see illustrated

 6    here, Doctor Kia?

 7    A.   We see a problem where the user is taking a picture from

 8    the angle, and that's what I'm showing as skewing.

 9    Q.   If we go to the next slide, what do we see depicted on

10    this one?

11    A.   And this is a problem with warping where the user is at

12    an angle, and it shows a trapezoid shape of the check.

13    Q.   And if we could go to the next one, if you would describe

14    for us what we see on this one.

15    A.   And this is -- I'm demonstrating lighting where a flash

16    of light is present on the check image, which is really

17    similar to if there was a shadow as well.  So lighting -- I'm

18    demonstrating lighting problem with this slide.

19    Q.   And what do we see illustrated on the next slide?

20    A.   And this is a problem that I'm demonstrating with

21    resolution, either with a camera that does not have sufficient

22    number of pixels on it or that the camera is moving when the

23    user is holding the mobile phone and it's moving or shaking.

24    Q.   Are the various issues or challenges that you've just

25    described for us ones that USAA would have encountered when
```

 1   they were trying to use mobile phones to obtain check images

 2   for deposit?

 3   A.   Yes, sir.  These are very real problems for them.

 4   Q.   Over the time period that USAA worked on this, did they

 5   ultimately develop solutions to these problems?

 6   A.   For almost -- they eventually developed solutions with

 7   the exception of the resolution, this one.

 8   Q.   And who -- was there ever a resolution of the resolution

 9   issue that is shown on this slide?

10   A.   Well, the devices such as Apple and Samsung, the iPhone,

11   and other mobile devices produced devices that can take a high

12   resolution images, and that is what solved this problem.

13   Q.   Are there various problems that might arise when you use

14   a mobile phone to try to obtain a check image that can be

15   deposited, ones that are predictable?

16   A.   No, they are very is unpredictable other than what type

17   of device the user may use, what mobile device, but also how

18   the user takes the picture of the check is extremely

19   unpredictable, as I discussed a few minutes ago.

20   Q.   What is required in order to solve the challenges or

21   problems of obtaining check images of sufficient quality using

22   a mobile phone?

23   A.   You have to develop new algorithms and you have to test

24   them to be able to come up with a solution that addresses

25   these challenges.

942

```
1    Q.   And have you been able to see the testimony of various

2    USAA engineers that has been presented at this trial regarding

3    the algorithms that they developed?

4    A.   Yes, sir, I've been present for that, and I know that

5    they developed algorithms to address these problems.

6    Q.   And have you also had the opportunity to review other

7    information, depositions, and documents about the algorithms

8    that were developed by USAA engineers?

9    A.   Yes, sir, I have seen a lot of evidence regarding that.

10   Q.   Would you tell the ladies and gentlemen of the jury,

11   please, Doctor Kia, what is an algorithm?

12   A.   An algorithm is a process whereby with one is --

13             THE COURT:  Just a moment.

14             MR. STONE:  Just a moment, Doctor Kia.

15             THE COURT:  What's your objection, counsel?

16             MR. SHEASBY:  There is no definition of algorithm --

17             THE COURT:  You're going to have to speak up, Mr.

18   Sheasby.

19             MR. SHEASBY:  There is no definition of algorithm in

20   his report, Your Honor.

21             THE COURT:  Response, Mr. Stone?

22             MR. STONE:  Yeah.  I think this is just clarifying

23   that subject that is well within the scope of his expertise

24   and is implicit in all of the discussion in his report as to

25   what an algorithm is.
```

1    THE COURT:   Implicit is not disclosed in his report.

2    I'm going to sustain the objection.

3    MR. STONE:   Thank you, Your Honor.

4    Q.   (BY MR. STONE)   Doctor Kia, would a person of ordinary

5    skill in the art in 2006 have known about the algorithms that

6    USAA developed to deal with these challenges?

7    A.   No, they would not.

8    Q.   Do the patent applications that were filed in 2006 teach

9    a person of ordinary skill in the art how to solve the

10   challenges that you have been describing for us?

11   A.   No.   The disclosure of the patents does not teach one of

12   ordinary skill in the art to do that.

13   Q.   Did those applications include descriptions of any

14   working examples of a remote deposit system that would use

15   mobile phones?

16   A.   No, there are no working examples with mobile devices.

17   Q.   How much experimentation did USAA engineers need to do in

18   order to solve the problems that you have identified here?

19   A.   They spent a lot of time, almost two years, to just get

20   to that.   USAA themselves spent a lot of time researching and

21   experimenting to come up with a solution.

22   Q.   Did you hear testimony during the course of this trial as

23   to when they started on their research?

24   A.   Yes.   They started on research, from testimony from Mr.

25   Medina, in early 2007, and it went on until 2009.   And that

944

1    was also corroborated by that testimony that I've seen from

2    Mr. Prasad and others, Mr. Morris.

3    Q.   Would the system that -- the Deposit@Home system have

4    worked without the -- or let me not limit it to Deposit@Home.

5    Would a remote deposit system have worked without the efforts

6    that were made to develop algorithms by USAA's engineers

7    following October 2006?

8    A.   Yeah.  No, they would not have worked.

9    Q.   And did any -- did the USAA engineers who have testified

10   here agree or disagree with your statement?

11   A.   They would agree.  I've seen testimony and heard

12   testimony from Mr. Medina that he mentioned this -- their

13   system would not work without the algorithms that he

14   developed.

15   Q.   Have you prepared a timeline that lists some of the key

16   events with respect to these three 2006 patents?

17   A.   Yes, sir, I have.

18            MR. STONE:  Could we pull up the next slide, please?

19   Q.   (BY MR. STONE)  What do we see on the timeline that is

20   now presented in the courtroom, Doctor Kia?

21   A.   What I'm showing here is the timeline from the original

22   patent application that was filed in October 31st, 2006, and

23   that one year and 10 months later, in September 2008, the

24   first mobile deposit prototype was available, as Mr. Prasad

25   testified.  And then much later, in August 11, 2009, the

945

 1    Deposit@Mobile was actually launched to the USAA members.

 2    Q.   I want to focus on the time period between the original

 3    patent applications and the first prototype, if I might, in

 4    September of 2008, if that's okay with you.

 5    A.   Yes, sir.

 6         MR. STONE:   Can we bring up the next slide?

 7    Q.   (BY MR. STONE)  So we have a number of events on this

 8    timeline, and I want to ask you, if you would, to please tell

 9    us what the early 2007 entry on this timeline refers to?

10    A.   The early 2007 is a evidence that I've seen from

11    deposition transcripts that Mr. Morris and in conjunction with

12    other USAA engineers such as Mr. Prasad were looking at the

13    mobile phones available at the time, and they concluded that

14    they cannot process mobile phone camera images in their

15    system.

16    Q.   And then we see the next entry is May of 2007.   What does

17    that refer to, Doctor Kia?

18    A.   That is referring to the document DX 1129.   It's a

19    presentation by Mr. Prasad that he proposed an activity for

20    researching the viability of mobile phones.

21         MR. STONE:   And let's just bring up, if we can, DX

22    1129 at page 5.

23    Q.   (BY MR. STONE)  Is this the portion of the exhibit, DX

24    1129, that you were referring to?

25    A.   Yes, sir.   This is page 5 of that report, and the second

946

 1    bullet indicates the item that I just mentioned.

 2              MR. STONE:  Can we go back to the timeline, please?

 3    And let's skip to the next one, December of 2011.

 4    Q.    (BY MR. STONE)  What does this refer to?

 5    A.    So this is, again, another presentation by Mr. Prasad.

 6    It is in DX 1110, and in December 2007 he presented this

 7    presentation for the current status of his research.  And with

 8    that, he mentions what I've highlighted there.

 9              MR. STONE:  Could we bring up DX 1110 at page 12,

10    please?

11    Q.    (BY MR. STONE)  And what do we see here, Doctor Kia, that

12    was relevant to your timeline?

13    A.    Yes, sir.  So on this page, Mr. Prasad is reporting the

14    results of his testing, that based on the 1200 unique color

15    images that was taken on the four cameras.  Three of them are

16    stand-alone cameras and one of them was iPhone.  And the

17    results at the very bottom, he mentions that the MICR

18    information was at only 25 percent of the cases, meaning 75

19    percent of those images could not read the MICR information

20    correctly.

21    Q.    Was the 25 percent success rate acceptable or

22    unacceptable to USAA at the time?

23              Yeah, Mr. Prasad mentioned that it is unacceptable

24    and that this was only a research --

25              THE COURT:  Just a moment.

947

1           MR. STONE:  Please stop, Doctor Kia.

2           MR. SHEASBY:  May I approach, Your Honor?

3           THE COURT:  Approach the bench, counsel.

4           (The following was had outside the hearing of the

5           jury.)

6           THE COURT:  Yes, Mr. Sheasby?

7           MR. SHEASBY:  This relates to the bench memo we

8    filed.  The commercial acceptability or unacceptability of our

9    product is absolutely irrelevant for enablement.  And Mr.

10   Stone is eliciting questions about whether it was commercially

11   appropriate for us or commercially sufficient for us, violates

12   black letter of federal law.  I'd like an instruction to

13   disregard this, sir.

14          THE COURT:  What's your response, Mr. Stone?

15          MR. STONE:  This relates to the efforts that went

16   into developing a prototype.  It has nothing to do with

17   commercialization.  Mr. Prasad's testimony was that this was

18   unacceptable in a research environment because they hadn't yet

19   achieved something that was even working.  This is all about

20   developing a work product prototype.

21       I'm not relating this to commercialization and, of

22   course, as the Court knows, the efforts it does take to get to

23   commercialization are relevant to enablement.  But I'm not

24   asking this witness about that.  I'm focused very much on the

25   period leading up to the prototype.

948

```
1                MR. SHEASBY:  What Mr. Prasad --

2                THE COURT:  Just a moment.  Are you intending to get

3      into commercialization of this?

4                MR. STONE:  I am not.

5                MR. SHEASBY:  Your Honor, what he's talking about

6      right now is the commercialization process, about -- talking

7      about what is acceptable or unacceptable to USAA goes to the

8      commercial standards of a company.  That is not the standard

9      for enablement.  And he can simply report on what the rate was

10     at the time, and he should move on, Your Honor.

11               MR. STONE:  There may be a factual dispute for the

12     jury to resolve as to whether Mr. Prasad's depo testimony

13     where he described this as research or his testimony in court

14     where he tried to recharacterize it as commercialization is in

15     dispute.  But that's a dispute for the jury to resolve.  I

16     believe this is all --

17               THE COURT:  Mr. Stone, I'll give you an option.

18     Either you can ask Doctor Kia to clarify that this is not

19     about commercialization and is about solely developing a

20     prototype, or I'll do it.

21               MR. STONE:  Okay.

22               THE COURT:  But I think it would be easier if you

23     will do it.

24               MR. STONE:  I will do it, Your Honor.

25               MR. SHEASBY:  In a non-leading manner, Your Honor.
```

```
 1              THE COURT:  If there's a subsequent objection,

 2    you'll have to make it.

 3              MR. SHEASBY:  Thank you.

 4              (The following was had in the presence and hearing

 5              of the jury.)

 6              THE COURT:  Let's proceed.

 7    Q.   (BY MR. STONE)  Doctor Kia, at the time in December of

 8    2007, where did this work fall in relation to the development

 9    of a prototype?

10    A.   The prototype was not available at this time.  A

11    prototype came, as I showed in my timeline, came later.

12    Q.   Is this in doing research or commercialization at USAA?

13    A.   This was done in research, as Mr. Prasad also testified.

14              MR. STONE:  Let's go if we can to the next slide.

15    Q.   (BY MR. STONE)  And this just goes back and puts us --

16    taking out the intervening events, this reminds us of how long

17    it was from the original patent application to the prototype

18    and then to the launch.  Do you see that?

19    A.   Yes, sir.

20    Q.   Let me ask you whether, considering the challenges that

21    you've described about implementing a mobile remote deposit

22    system, the state of the art in 2006, the amount of guidance

23    in the 2006 applications that were filed by USAA, and the

24    amount of experimentation that was required to implement such

25    a system, what is your conclusion as to whether or not the
```

1   asserted claims of these three patents, the 2006 patents, are

2   enabled?

3   A.   Yes.  Considering all the evidence I've seen and all

4   those factors, it's my opinion that the claims of the 2006

5   patents are not enabled.

6   Q.   Let me move you, if it's okay with you, Doctor Kia, to

7   your second topic.

8   A.   Yes, sir.

9   Q.   What do you -- what is the written description

10  requirement?

11  A.   The written description requirement is that the patent

12  has to provide sufficient information to put one of ordinary

13  skill in the art on notice that the inventors had actually

14  made the invention back at the time of the filing of their

15  application, which was 2006.

16  Q.   In 2006 when the applications were filed, did they

17  contain the words 'mobile device'?

18  A.   No, sir.  There's no mention of a mobile device in the --

19  in the applications.

20  Q.   Have you taken into account the Court's construction of

21  the term mobile device?

22  A.   Yes, sir, I have.

23         MR. STONE:  Could we bring up the next slide,

24  please.

25  Q.   (BY MR. STONE)  What do you show on your slide 7.35,

1    Doctor Kia?

2    A.    I show the Court's order for the construction of the term

3    mobile device to mean it's a handheld computing device.

4    Q.    And in your opinion, Doctor Kia, would the specifications

5    of the 2006 patent applications have conveyed to a person of

6    ordinary skill in the art reading those patents at that time

7    that USAA had invented the system for remote deposit using

8    check images obtained through the use of a handheld computing

9    device?

10   A.    No, not at all.

11   Q.    Can you tell us why not?

12   A.    Well, the most important reason is that the term mobile

13   device or handheld computing device does not appear anywhere

14   in the original applications that were filed in 2006.

15   Q.    One of the things we've looked at during the course of

16   this trial has been figure 1.  Would you look at figure 1 from

17   the three 2006 patents with me, please?

18   A.    Yes, sir.

19           MR. STONE:  If we can go two slides, I think.  One

20   more.

21   Q.    (BY MR. STONE)  What is depicted here in figure 1 in this

22   case, the '681 Patent, Doctor Kia?

23   A.    Yes, sir.  So this is -- figure 1 shows a user of the

24   account owner 110 operating the element 111, which is

25   identified in the disclosure as the general purpose computer,

1    and it's in communication using that lightning bolt to the

2    image capture device, a separate entity 112.

3          The general purpose computer is also in communication

4    with the same type of lightning bolt with the internet, which

5    is denoted by the cloud 120.

6    Q.   If the engineers at USAA had invented the use of mobile

7    phones to do remote deposit, what would you expect to see in

8    this figure or some other figure in the patent?

9    A.   I would expect to see a mobile device, specifically a

10   mobile device that has an integrated camera in it that is

11   communicating with the cloud, with the lightning bolt with the

12   cloud 120.

13   Q.   Would a person of ordinary skill in the art, Doctor Kia,

14   have thought that the reference to a stand-alone digital

15   camera in the patent disclosures for these patents indicated

16   that the inventors had invented using camera phones to capture

17   check images?

18   A.   No, not at all.

19   Q.   Did you consider figure 3 in coming to your opinions that

20   the written description requirement is not met?

21   A.   Yes, sir, I have.

22          MR. STONE:  Could we bring up the next slide,

23   please?  Or maybe we need to go -- we need to go to PX 2 at

24   page 16.  I'm sorry.  Thank you, Mr. Nickels.

25   Q.   (BY MR. STONE)  Doctor Kia, what we see on -- displayed

953

1   is PX 2 at page 16, and this is figure 3.  Is that right?

2   A.   That's correct.

3   Q.   Does this depict a mobile phone or cellular phone or

4   handheld computing device?

5             MR. SHEASBY:  Objection, Your Honor.

6             THE WITNESS:  No, sir, it does not.

7             MR. SHEASBY:  This is not in his report.

8             THE COURT:  What's your response to the objection,

9   counsel?

10             MR. STONE:  He reviewed all of the figures and

11   specifications and testified that he did not see any

12   references to any handheld device or mobile device.  That's

13   throughout his report.

14       This was a figure that we were pointed to by one of

15   USAA's witnesses, and so I'm specifically asking him about

16   this figure.  This is included in the specifications as to

17   which he gave opinions as to everything in those

18   specifications.

19             MR. SHEASBY:  Your Honor, he did not in his report

20   say that figure 3 did not disclose integrated device.

21             THE COURT:  I understand.

22             MR. STONE:  He discusses -- it's also at paragraph

23   89 where he does discuss figure 3 specifically.

24             MR. SHEASBY:  He can say what's in paragraph 89,

25   Your Honor.  We do not object to that.

1      MR. STONE:  Your Honor, this is within the scope of

2  all of the conclusions in his report, including his general

3  conclusions.

4      THE COURT:  I'm sorry, Mr. Stone.  You can't just

5  end a report of an expert with a conclusion and then anything

6  you want to put before the jury that's not expressly included

7  in that report say it's within the scope of the conclusions.

8  That's not adequate notice.

9      I'm going to sustain the objection.

10      MR. STONE:  Thank you.

11  Q.    (BY MR. STONE)  In your report, Doctor Kia --

12      MR. SHEASBY:  Just for clarification, his answer we

13  request be struck, but his answer also --

14      THE COURT:  I'll strike his answer to the question

15  as part of the ruling.  Let's proceed.

16  Q.    (BY MR. STONE)  In your report, Doctor Kia, you describe

17  figure 3 as a schematic illustration of an exemplary image

18  capture device architecture.  Is that correct?

19  A.    Yes, sir, that's correct.

20  Q.    And in here you say it shows -- it has its own processor

21  and memory.  Correct?

22  A.    Yes, sir, that's correct.

23  Q.    Thank you.

24      I want to go to your next topic if we -- oh, let me

25  conclude with this topic.  Sorry, Doctor Kia.

1          Have you reached a conclusion as to whether the

2     disclosures in the three 2006 patent applications that are at

3     issue here, the two 2006 patent applications that are at issue

4     here, reveal that the engineers at USAA had invented a remote

5     deposit system using a mobile device with a camera to someone

6     of ordinary skill in the art reading the applications or -- at

7     that time?

8     A.   No.  One of ordinary skill in the art would not

9     understand that the inventors had invented this system.

10    Q.   And in your opinion, Doctor Kia, is the invention of a

11    use of a mobile phone to capture check images for use in a

12    remote deposit system, is that described in the 2006 patent

13    applications?

14              MR. SHEASBY:  Your Honor --

15              THE WITNESS:  We --

16              MR. SHEASBY:  I object as to the reference to mobile

17    phone.  The claims don't say mobile phone.  They say mobile

18    device.

19              MR. STONE:  I think they say a handheld mobile

20    device and let me rephrase.

21              THE COURT:  That's fine.

22    Q.   (BY MR. STONE)  Doctor Kia, are the 2006 patent

23    applications in your opinion ones that disclose to a person of

24    ordinary skill in the art that the USAA engineers had invented

25    a remote deposit system that allowed the use of handheld

1    computing devices to capture check images for deposit into a

2    remote deposit system?

3    A.    In my opinion, no, it does not.

4    Q.    Thank you, Doctor Kia.

5          Let's go to your next slide, if we can, and your third

6    and final opinion, if we can.  Let me ask you about --

7    A.    Yes, sir.

8    Q.    -- lack of enablement, if that's okay with you.

9    A.    Yes, sir.

10   Q.    Does this -- this relates to what you show here to the

11   '571 Patent.  Is that correct?

12   A.    That's correct.  Also referred to as the auto-capture

13   patent.

14   Q.    And can we go to your next slide?

15         Does this set out an exemplary claim from the '571

16   Patent?

17   A.    Yes, sir.  It is a mobile device taking a picture of a

18   check for deposit, and it says that a mobile device would

19   monitor an image of the check in a field of view of a camera

20   of a mobile device and capture the image of the check with a

21   camera when the image of the check passes the monitoring

22   criterion.

23   Q.    And does the -- when was the '571 Patent applied for?

24   A.    It was applied for in August of 2009.

25   Q.    And does it contain a list of various monitoring

1    criterion?

2    A.    Yes, sir.  In the disclosure, it has a long list of

3    criterion.

4    Q.    Can we go to your next slide?

5          And what does this tell us -- did the Court order what

6    the construction of the phrase 'passes the monitoring

7    criterion' would be?

8    A.    Yes, sir.  The Court has ordered that the term 'passes

9    the monitoring criterion' to mean determining that a

10   particular monitored criterion is in a pre-determined range.

11   Q.    Did you determine whether or not the -- did you determine

12   what the challenges would be to somebody in developing an

13   auto-capture system as of 2009?

14   A.    Yes, sir, I have.

15   Q.    Could we go to your next slide, please, Doctor Kia?

16         Is this the list of the monitoring criterion you

17   mentioned earlier?

18   A.    Yes, sir.  This lists the monitoring criterion that in

19   the written description is basically a long list of criteria

20   that addresses image quality --

21   Q.    Sorry, Doctor Kia.  Can we go -- I didn't mean to

22   interrupt you, but I just needed a yes or no to that question.

23   A.    Sorry.

24   Q.    Can we go to your next slide, please, Doctor Kia.

25         Does this summarize the challenges of implementing an

958

1    auto-capture system as of 2009?

2    A.    Yes, sir.  Combination of the monitoring criterion that

3    one of ordinary skill in the art needs to determine and then

4    the appropriate ranges to apply for the selected criterion.

5    Q.    And how difficult was it in 2009 to solve these two

6    challenges?

7    A.    It was extremely difficult.

8    Q.    Does the specification of the '571 Patent describe what

9    combination of monitoring criteria should be applied to obtain

10   a check image that can be deposited in a remote deposit

11   system?

12   A.    No, sir, it does not.

13   Q.    Does the patent specification describe what are the

14   appropriate ranges or pre-determined ranges for the selected

15   criteria to achieve an acceptable check image for deposit in a

16   remote deposit system?

17   A.    No, sir, there is no pre-determined ranges specified in

18   the specification on the patent.

19   Q.    And does the '571 Patent application or specification

20   disclose any working examples of how one might implement

21   auto-capture?

22   A.    No, there is no working example.

23   Q.    Did USAA engineers have to engage in a period of

24   experimentation to implement the auto-capture functionality

25   that is described in the '571 Patent application?

959

1    A.    Yes, sir.   As we heard from Mr. Bueche's testimony just

2    earlier that they had to do work on thousands and thousands of

3    images were his words to come up with a set of algorithms that

4    can do this.

5    Q.    Let me go to the next slide, if we might, Doctor Kia.

6         What is depicted on this slide, which is page 3 of DX

7    1263?

8    A.    Yes.   Based on evidence, sometime in 2012 the current

9    status of the auto-capture was presented, and at the time it

10   was called the hover capture process.   And this is a block

11   diagram, very, very high block diagram of the process as of

12   that time.

13   Q.    And if we go to the next slide, what have you highlighted

14   here?

15   A.    So since this is a very high-level block diagram, I

16   extracted sections of it to show what they're attempting to

17   do, and it is important to know that this is very high level

18   and each one of those boxes contains their own algorithms that

19   are also very -- very difficult to come -- come by.

20   Q.    If we go to your next slide, what do we see on this one?

21   A.    So this is the algorithm for the green box in the

22   previous side.   It was antishake, and it's a criteria that

23   USAA applied to determine if the phone is moving in an attempt

24   to guarantee that the image is of a higher quality.

25   Q.    Did the '571 Patent application or specification disclose

1   any of the algorithms that you have just shown us from DX

2   1263?

3   A.   No, they do not describe the hover capture and they do

4   not describe any of the highlighted sections that -- that I

5   show.

6   Q.   Did it disclose anything to do with an antishake

7   algorithm?

8   A.   No, there was no antishake algorithm disclosed in the

9   disclosure.

10   Q.   When was it that USAA finally launched the Deposit@Mobile

11   service?

12   A.   Finally they launched it in May of 2013.

13   Q.   In your opinion, Doctor Kia, in light of the challenges

14   that you've summarized in implementing the invention that is

15   claimed in the '571 Patent, the state of the art as of 2009,

16   the amount of guidance that is provided in the application for

17   that patent, and the amount of experimentation that was

18   required to implement it, what is your opinion as to whether

19   or not the claims of the '571 Patent satisfy the enablement

20   requirement?

21   A.   Yes.  So looking at all of the evidence and considering

22   all the factors, my opinion that the claims of the '571 Patent

23   are not enabled.

24   Q.   Thank you, Doctor Kia.

25        MR. STONE:  Pass the witness, Your Honor.

1          THE COURT:  Cross-examination?

2          MR. SHEASBY:  Yes, Your Honor.

3          THE COURT:  Please proceed.  Proceed when you're

4    ready, Mr. Sheasby.

5          MR. SHEASBY:  Thank you, Your Honor.

6                    CROSS-EXAMINATION

7    BY MR. SHEASBY:

8    Q.   Good morning, Doctor Kia.

9    A.   Good morning, sir.

10   Q.   It's nice to see you again.

11   A.   Likewise.

12   Q.   We've spoken before?

13   A.   Yes, sir, we have.

14   Q.   Now, the standard to prove that a patent is invalid is

15   clear and convincing evidence.  Correct?

16   A.   I would agree with that, yes.

17   Q.   PNC has the sole burden to prove invalidity by clear and

18   convincing evidence.  Correct?

19   A.   That's my understanding, yes.

20   Q.   Now, Professor Kia, when we spoke last, before you were

21   hired by PNC's lawyers, you could not recollect ever having

22   analyzing a patent to determine if it was enabled or satisfied

23   written description.  Correct?

24   A.   I believe I have never done that.  And it's Doctor Kia,

25   not Professor Kia.

1    Q.   I'm sorry, Doctor Kia.  To me, you'll be Professor Kia

2    always.

3    A.   Okay.  Thank you.

4    Q.   So just to be clear, before you were hired by PNC's

5    lawyers, you had never performed an analysis of written

6    description or enablement.  Correct?

7    A.   That sounds correct, yes.

8    Q.   Before you were hired by PNC's lawyers, and, in fact,

9    through the time of your expert reports and deposition, you

10   had never actually spoken to a living individual who had built

11   a mobile remote deposit capture system.  Correct?

12   A.   That sounds correct.  I can't classify a living person,

13   but I don't understand what you mean by that, but generally

14   that's correct.

15   Q.   What I mean by living person is someone who's alive,

16   someone that you actually spoke to, someone that you

17   interacted with.  You never spoke to any human being that's

18   actually built a mobile remote deposit capture system.

19   Correct?

20   A.   Yes, that's correct.

21   Q.   And enablement and written description are patent law

22   concepts.  Correct?

23   A.   Yes, sir, those are correct.

24   Q.   And the patent examiners would be more knowledgeable than

25   you in terms of applying patent law to United States -- to the

963

1    USAA applications.  Correct?

2    A.   Yes, sir, they would know more about the law.  I would

3    know more about the science and technology.

4              MR. SHEASBY:  I move to strike the last portion of

5    the answer as non-responsive, Your Honor.

6              THE COURT:  Sustained.

7        Try to limit your answers to the questions asked, Doctor

8    Kia.

9              THE WITNESS:  Yes, sir.

10             THE COURT:  Let's proceed.

11   Q.   (BY MR. SHEASBY)  And, in fact, there are five patents at

12   issue in this case.  Correct?  Four, excuse me.  There are

13   four patents at issue in this case.

14   A.   Yes, sir, four.

15   Q.   Which means that it's your testimony to the ladies and

16   gentlemen of the jury, that at least four United States patent

17   examiners got it wrong.  Correct?

18   A.   Yes, sir.

19   Q.   And they didn't just get it wrong once because validity

20   has to proceed by analyzing each and every claim separately.

21   Correct?

22   A.   That's correct.

23   Q.   You showed the ladies and gentlemen of the jury a grand

24   total of one patent claim in your presentation.  Correct?

25   A.   That is correct, sir.

```
 1              MR. SHEASBY:  And if we go to PDX 13.37, Mr. Huynh.
 2   Q.   (BY MR. SHEASBY)  These are the separate independent
 3   inventions.  Each claim is a USAA invention.  Correct?
 4   A.   That's correct.
 5              MR. STONE:  Your Honor --
 6              THE COURT:  Just a moment.
 7              MR. STONE:  -- objection.  Beyond the scope of the
 8   direct.  Unrelated to these patents which are not the four
 9   patents in this case and outside the scope of anything in his
10   report.  He obviously just addressed the four patents here.
11              THE COURT:  I'm not following, Mr. Stone.  These
12   four patents on the screen are the four Patents-in-Suit.
13              MR. STONE:  I apologize, Your Honor.  My mistake.  I
14   apologize.
15              THE COURT:  All right.  Let's proceed.
16   Q.   (BY MR. SHEASBY)  Each claim in the patent is treated
17   under the law as a distinct invention.  Correct?
18   A.   Correct.
19   Q.   For the analysis of validity, we must analyze each claim
20   distinctly.  Correct?
21   A.   Yes, sir.
22   Q.   You did not show claim 1 of the '432 Patent to the jury?
23   A.   No, sir, I did not.
24   Q.   You didn't show claim 3, you didn't show claim 5, you
25   didn't show claim 21.  Correct?
```

965

1   A.   Yes, sir, that's correct.

2   Q.   And I would be giving -- you would be giving me the same

3   answers for the '681 Patent, the same answers for the '605

4   Patent.  Correct?

5   A.   Yes, sir, that's correct.

6   Q.   And the same answers for claims 2, 9, and 12 through 13

7   of the '571 Patent.  Correct?

8   A.   Yes, sir, that's correct.

9   Q.   Now, you have 17 of your own United States patents.

10   Correct?

11   A.   Yes, sir, that sounds about right.

12   Q.   And when we spoke last, you could not identify a single

13   one in which you describe a commercial embodiment of the

14   product.  Correct?

15   A.   That sounds about right, yes.

16   Q.   And to be clear, you do not need a commercial prototype

17   in an application to satisfy enablement.  Correct?

18   A.   I'm sorry.  I didn't understand the question.  Can you

19   repeat that?

20   Q.   I will absolutely repeat it, Doctor Kia.  You do not need

21   a commercial prototype in a patent application to satisfy

22   enablement.  Correct?

23   A.   Well, I don't know how to answer that, because I don't

24   know what the commercial prototype would entail.

25   Q.   You do not need a commercial embodiment in the

1    application to satisfy enablement.  You just need sufficient

2    explanation for a person of ordinary skill in the art to

3    understand what to do.  Correct?

4    A.   That's correct, yes.

5    Q.   You do not need to have an actual physical product or

6    prototype in order to satisfy written description or

7    enablement.  Correct?

8    A.   Well, again, that depends on what is contained in the

9    product -- the terms you just mentioned.  Yeah, it depends on

10   what is disclosed to one of ordinary skill in the art.  It's

11   whether he would be able to make what is claimed.

12   Q.   That's exactly my point.  You don't need to have a

13   physical product in order to satisfy written description or

14   enablement; you only need a description of how it would work.

15   Correct?

16   A.   That's correct.

17   Q.   You testified under oath that you were a person of

18   ordinary skill as defined in 2006.  Correct?

19   A.   That's correct.

20   Q.   You believe that in 2006, before USAA even filed its

21   patents, you would have had the ability to create a system

22   that used the handheld device to capture images of checks and

23   deposit them at a bank.  Correct?

24   A.   I would have the capability, but I'm one of much more

25   than ordinary skill in the art, and I would be able to do it

1    after a lot of experimentation.

2    Q.   Well, let's go to your deposition, Doctor Kia.  You

3    should have a binder in front of you that has your deposition

4    in it.

5    A.   Actually the box was delivered.  I have not opened it yet

6    since you did not give me instructions to open it.

7    Q.   Okay.  Well, you should open it, Doctor Kia.  Please do

8    so.

9    A.   Okay.  Excuse me one second.

10          MR. SHEASBY:  And, Mr. Huynh, while he's --

11          THE WITNESS:  I have deposition transcript of

12   cross-examination of Dr. Omid Kia.  Is that the one?

13   Q.   (BY MR. SHEASBY)  Yes, sir.

14   A.   Okay.

15   Q.   And turn to page 139:24, to 140:20.

16   A.   139:24 to what line?

17   Q.   To 140:20, sir.  And actually to be more precise, it's

18   140:6 through 140:20.  That will probably be a more precise

19   pin cite, sir.

20   A.   Okay.  Thank you.  Yes, sir.

21   Q.   You believe that in 2006, before USAA filed its

22   patents -- well, did you give the testimony that was

23   just -- that -- that I just read -- that you just read?

24   A.   Yes, I did give that testimony, and I stand by it, yes.

25   Q.   You believe that in 2006 before USAA filed its patents,

1    you would have had the ability to create a system that uses a

2    handheld device to capture images of checks and deposit them

3    at a bank.  Correct?

4    A.   Yes, sir.

5    Q.   And in 2006, you were a person of ordinary skill as

6    defined in the 2006 patent.  Correct?

7    A.   Actually, I exceeded those in 2006 still.

8    Q.   Okay.

9              MR. SHEASBY:  So why don't we pull up right now

10   lines 18 through -- 140, lines 6 through 140, lines 20, Mr.

11   Huynh.

12             MR. STONE:  No inconsistency, Your Honor.

13             THE COURT:  Pull the deposition off the screen,

14   please.

15             MR. SHEASBY:  Pull it off, Mr. Huynh.

16             THE COURT:  What's the basis to publish this to the

17   jury, given his answers, Mr. Sheasby?

18             MR. SHEASBY:  At deposition under oath, he testified

19   without qualification he was a person of ordinary skill --

20             MR. STONE:  I'm --

21             MR. SHEASBY:  Well, I am happy to do it at sidebar,

22   Your Honor.

23             THE COURT:  You're telling me -- well, you're

24   telling me there's an inconsistency between his testimony in

25   the deposition and testimony today.

1          MR. SHEASBY:  Absolutely, Your Honor.

2          THE COURT:  All right.  Well, I'll let you publish

3    it to the jury and let the jury decide.

4          MR. STONE:  Thank you, Your Honor.

5    Q.   (BY MR. SHEASBY)  Question:  "In 2006 before USAA filed

6    its patents, would you have the ability to create a system

7    that used a handheld device to capture images of checks and

8    deposit them at a bank?

9          "When you're asking you, you're asking me personally.

10         "Yes, sir.

11         "Well, I was not tasked or I was not in a situation that

12   would require me to develop it, but if I -- if I were, I

13   believe I could do it, yes.

14         "You were a person of ordinary skill, as you defined it,

15   in 2006."

16         Answer:  "Yes."

17         Did I read your testimony correctly, Doctor Kia?

18   A.   Yes, sir, you did.

19   Q.   Now, in 2006, you had never built a mobile remote deposit

20   capture system.  Correct?

21   A.   That's correct.

22   Q.   And in 2006, you had never designed a mobile

23   remote -- excuse me.  In 2006, you could not identify one

24   downloaded application that you have created that was released

25   to consumers for use on a consumer mobile device.  Correct?

1    A.   That's correct.

2    Q.   Never built a mobile remote deposit capture system, never

3    launched a commercial application on mobile devices.   Correct?

4    A.   I believe you said in 2006, yes, that's correct.

5    Q.   And in 2006, you had the ability to create a system that

6    used a handheld device to capture images of checks and deposit

7    them at a bank.   Correct?

8    A.   That's correct with my understanding, yes.

9    Q.   Now, one of the statements you made to the jury was that

10   in 2006, there were not handheld devices with cameras that had

11   sufficient resolution to capture financial documents.

12   Correct?

13   A.   Not sufficient resolution and also quality of images,

14   that's correct.

15   Q.   The reality is that in 2006, Nokia phones, for example,

16   and camera-equipped mobile phones could take photos of

17   financial documents, identify digital codes imprinted on them,

18   and transmit the information.   Correct?

19   A.   I don't understand where you're reading that from.   Is

20   that -- where is that coming from?   I don't understand.

21   Q.   Sir, before 2006, nokia phones, camera-equipped mobile

22   phones can take photos of financial documents, identify

23   digital codes imprinted on them, and transmit the information.

24   Correct?

25   A.   Yes, that's correct.   I think your audio went out.   Yes,

1    that's correct.

2    Q.    So for the ladies and gentlemen of the jury, before 2006,

3    camera-equipped mobile phones had the capability to take

4    pictures of financial documents, identify digital codes, and

5    transmit that data to banks.  Correct?

6    A.    Yes, sir, that's correct.

7    Q.    Now, you stated that it took approximately two years for

8    USAA to release its optimized application for the iPhone.

9    Correct?

10   A.    It took -- well, there was two parts I mentioned.  One

11   was the prototype, one was a release to customers.  Which one

12   of those are you referring to?

13   Q.    Sir, you testified that it took two years for USAA to

14   release its optimized application for iPhone.  Correct?

15   A.    That's correct, yes, sir.

16   Q.    The application, you heard from Mr. Prasad and Mr.

17   Wilkinson, was the number one banking application on the Apple

18   iStore when it was released.  Correct?

19   A.    I didn't -- did not form any opinion on that.  I do not

20   know.

21   Q.    You heard Mr. Wilkinson and Mr. Prasad testify to that

22   under oath.  Correct?

23   A.    That's correct.  I heard them testify to that effect.

24   Q.    Does the United States patent law require you to put in

25   your application the number one application for iPhone banking

1    apps in order to satisfy the validity standard?

2    A.    No, not at all, sir.

3    Q.    And the question, and I think you said this to the ladies

4    and gentlemen of the jury, you said the question to be

5    answered is whether the amount of experimentation to create a

6    working system, just a working system, could not have been

7    undue.  Correct?

8    A.    That's correct.

9    Q.    Now, you've done some projects.  Correct?

10   A.    Yes, sir, I have.

11   Q.    And you agree that USAA shouldn't be held to any higher

12   standard than you're held to or anyone else is held to.

13   Correct?

14   A.    Yes, sir, that's correct.

15   Q.    For example, when you were a graduate student, Nokia

16   approached your advisor asking you about a camera on a phone

17   for video conferencing, and your part involved working on the

18   video codec and interface with the camera.  Correct?

19   A.    Yes, sir, that's correct.

20   Q.    You worked on a proof of concept project for Nokia, and

21   just your part of that project took two to three years.

22   Correct?

23   A.    The entirety of the project, yes.  It sounds about the

24   right portion.

25   Q.    Sir, your part alone took two to three years.  Correct?

1    A.   That's correct.

2    Q.   In your report, you don't describe your project for Nokia

3    as undue experimentation.  Correct?

4    A.   No, sir, I don't.  I --

5    Q.   Thank you.

6    A.   -- don't -- okay.

7    Q.   You also worked on another project to enable video to be

8    served on mobile devices.  Correct?

9    A.   Yes, sir.

10    Q.   And just your portion of that project took roughly two

11    years.  Correct?

12    A.   That's correct, yes, sir.

13    Q.   Another project you worked on as a member of a team was

14    using video on mobile phones to make more accurate, more on

15    time weather notifications.  Correct?

16    A.   Yes, sir, that's correct.

17    Q.   From the time you pitched the idea to the time you left

18    the company and it wasn't even done yet, you worked on it for

19    two years and then other members of the team worked on it for

20    another two or three years.  Correct?

21    A.   Yes, that's my understanding.

22    Q.   And you implemented a voice recognition system that would

23    run on mobile phones for health records.  It never even

24    reached commercialization, but it took you two years to

25    implement that app.  Correct?

1    A.   That's almost correct.  I'm not sure if I can classify it

2    as voice -- voice recognition, but maybe voice classification.

3    It's similar.

4    Q.   It took you two years, and you didn't even reach full

5    commercialization.  Correct?

6    A.   Yes, sir, that's correct.

7    Q.   You didn't discuss any of those projects with the ladies

8    and gentlemen of the jury.  Correct?

9    A.   That's correct, I did not.

10   Q.   And in your report you don't identify any of those

11   projects as being undue experimentation.  Correct?

12   A.   Yes, sir, I don't.

13   Q.   And you filed patents on some of those projects.

14   Correct, sir?

15   A.   I filed patents after I found out how to do it and how to

16   describe it to the others.  I didn't do it before the undue

17   experimentation.  I did it after I finished my

18   experimentation.

19   Q.   You filed your patent applications at the end of the

20   commercial development of your projects?

21   A.   No, sir.

22   Q.   Thank you.

23        Now, you also showed the ladies and gentlemen of the jury

24   PX 1409.

25             MR. SHEASBY:  And let's pull that up, PX 1409.

1    Q.   (BY MR. SHEASBY)   This is a presentation you showed to

2    the jury.  Correct?

3    A.   Yes, sir, that's correct.

4         MR. SHEASBY:   And let's scroll down, Mr. Huynh.   One

5    more.  One more.  One more.  One more.  One more.  One more.

6    One more.  Keep going.  You'll get there.  Keep going.  Keep

7    going.  Right there.  Thank you.

8    Q.   (BY MR. SHEASBY)   You showed this document and you said

9    in 2007 of December, USAA's system was working only 25 percent

10   of the time.  Correct?

11   A.   That's not exactly accurate, no.

12   Q.   You said the MICR information was only being read 20

13   percent of the time as of the date of this document.  Correct?

14   A.   That's not entirely accurate, no.

15   Q.   And it's not entirely accurate because, in reality, at

16   the time of this document, if you turn to the next page, the

17   MICR reading was a hundred percent successful as of the time

18   of this document.  Correct?

19   A.   That's not what I think is entirely accurate, but I

20   understand that, after that, they reported that they did a

21   MICR reading of a hundred percent after they tried to fix one

22   of the OCR engines.

23   Q.   Well, to be clear, why don't we pull up Mr. Prasad's

24   deposition -- testimony under oath earlier this week.  It's

25   day 2, page 298, lines 5 through 10?

1     MR. STONE:  Your Honor, I object to the use of the

2  transcripts in accordance with the Court's prior direction.  I

3  think it's an improper use of them.

4     MR. SHEASBY:  Your Honor, I believe I am entitled to

5  refer to any evidence that was in record in this case.  This

6  is not a deposition.

7     THE COURT:  You can certainly refer to it.  I don't

8  know that there's a basis for you to publish it in written

9  form.

10     MR. SHEASBY:  Well, Your Honor, I'm impeaching his

11  recollection based on what Mr. Prasad testified.

12     THE COURT:  You can't impeach him with a prior

13  statement of another person.  It's not inconsistent.

14  Q.   (BY MR. SHEASBY)  The ladies and gentlemen of the jury,

15  when they deliberate, they can determine whether Mr. Prasad

16  testified that, as of the date of this document, the MICR line

17  was being read a hundred percent of the time.  Correct?

18  A.   I don't know how to answer that question for you, because

19  as of the date that the previous page was published, it's

20  recorded that there was only 25 percent success rate in the

21  MICR line read.

22  Q.   And the next page, Mr. Prasad testified there was a

23  hundred percent.  Correct?

24  A.   Are we looking at that page?  A hundred percent -- are we

25  talking about a hundred percent of the five samples?

1  Q.   I think you've answered the question sufficiently, Doctor

2  Kia.  Thank you.

3      Now, the -- in October 31st of 2006, USAA filed mobile

4  phone check image patent applications.  Correct?

5  A.   I don't understand how to classify your question.

6  Q.   The patent applications -- I'm happy to clarify, Doctor

7  Kia.  I appreciate it.

8  A.   Thank you.  Yes.

9  Q.   In October 31st of 2006, the patent applications that

10  USAA filed were for mobile phone check images.  Correct?

11  A.   Again, I don't understand the mobile phone classification

12  for that.  I know that USAA filed applications which I

13  referred to as the 2006 patents, October 31, 2006.

14  Q.   And those are the mobile phone check image patent

15  applications.  Correct?

16  A.   Yes.  So later on when mobile phones were introduced as

17  claims, yes, they became the mobile phone remote deposit check

18  applications.

19  Q.   Well, in 2006, they were the USAA mobile phone check

20  image patent applications.  Correct?

21  A.   Again, I don't understand your classification with mobile

22  phone.

23  Q.   Okay.

24      MR. SHEASBY:  Why don't we pull up DDX 1.49.

25      And I can show it on the elmo if you are having trouble,

1    Mr. Huynh.  Are you ready?  It's the Defendant's

2    demonstratives.  We'll come back to that.

3         Can we go back to the screen for Professor -- Doctor Kia?

4    Q.  (BY MR. SHEASBY)  There you are.  Welcome back, Doctor

5    Kia.

6    A.   Thank you.  Good to be back.

7    Q.   The second issue you spoke about was what you call

8    'written description'.  You're saying, and I wrote your words

9    down, you would expect to have seen a description of the

10   integrated device with a camera in it in the 2006 application.

11   Correct?

12   A.   Yes, sir, that's correct.

13   Q.   And your counsel showed you figure 3 from that

14   application.  Correct?

15   A.   Yes, sir, that's correct.

16             MR. SHEASBY:  Let's go to Prasad demonstratives,

17   page 12.

18   Q.  (BY MR. SHEASBY)  So this is figure 3 from PX 002, which

19   is the '605 Patent.  Correct?

20   A.   Yes, sir, that's correct.

21   Q.   And the ladies and gentlemen of the jury can go back and

22   look at this figure in their deliberations.  Correct?

23   A.   Yes, sir, that's correct.

24   Q.   Figure 3 of the '605 Patent is described as a schematic

25   -- in your report -- let me stop this.

1      Mr. Stone read a portion of your report discussing this

2  figure to you in his examination of you.  Correct?

3  A.   Yes, sir, I recall that.

4  Q.   He didn't read the entire portion of what was in your

5  report discussing this figure, did he?

6  A.   No, he did not read the entire report or a portion of the

7  report.

8  Q.   The entire portion of the report discussing figure 3 of

9  the '605 Patent states as follows:  "Figure 3 of the '605

10  Patent described as a schematic illustration of an exemplary

11  image capture architecture"--and these are your words, Doctor

12  Kia--"shows a self-contained device with its own processor and

13  memory."

14      Correct?

15  A.   That sounds correct, yes.

16  Q.   Let's turn now to the '571 Patent.  Your testimony was,

17  once again, the Patent Office got it completely wrong and the

18  monitoring criteria that are listed in the '571 Patent would

19  not teach a person of ordinary skill in the art how to just

20  even make a system that even worked once.  Correct?

21  A.   Well, I mean, making the system is paramount.  One of

22  ordinary skill in the art is supposed to be able to make the

23  system.

24  Q.   Sure.  And your testimony is that a person of ordinary

25  skill in the art would not be able to do that.  Correct?

980

 1    A.   That's correct, yes, sir.

 2    Q.   Okay.

 3              MR. SHEASBY:  Let's go to Conte PDX 5.101.  Go up.

 4    One more.  There.  Great.  Go down one.

 5    Q.   (BY MR. SHEASBY)  In the system that was created by PNC

 6    that is accused of infringing the claims at issue in this

 7    case, you heard Doctor Bovik admit and Professor Conte testify

 8    that the infringing system uses every single one of the

 9    monitoring criteria listed in USAA's patents.  Correct?

10    A.   I heard that testimony; yes, that's correct.

11    Q.   There is no reference to PNC using antishake.  Correct?

12    A.   I do not recall them talking about it.  I did not perform

13    an infringement analysis or analyze the patent in that regard,

14    no.

15    Q.   It would be fair that the ladies and gentlemen of the

16    jury, when weighing the credibility of your testimony, can

17    take into account that the monitoring criteria used by PNC are

18    the verbatim criteria expressly set out in the patent.

19    Correct?

20    A.   Well, I'm sorry, but I did not analyze PNC product

21    against the claims.  I did not form any opinion of what the

22    PNC products do.

23    Q.   I understand that, Doctor Kia.  The ladies and gentlemen

24    of the jury, as a matter of common sense when weighing your

25    opinion, can take into account that PNC's infringing product

1    uses verbatim every single one of the monitoring criteria

2    listed in the '572 [sic] Patent.  Correct?

3    A.   Well, again, almost the same answer.  I just listened to

4    the testimony.  I did not analyze the PNC product of what it

5    does, what it doesn't do.  I formed no opinion on that.

6              MR. SHEASBY:  Your Honor, may I approach counsel

7    table briefly?

8              THE COURT:  You may.

9    Q.   (BY MR. SHEASBY)  Doctor Kia, who in my heart will always

10   be Professor Kia, thank you for your time.

11             MR. SHEASBY:  I pass the witness.

12             THE WITNESS:  Thank you, sir.

13             THE COURT:  All right.  Is there redirect,

14   Mr. Stone?

15             MR. STONE:  Yes, Your Honor.  Thank you.

16             THE COURT:  Approach the bench briefly, counsel.

17             (The following was had outside the hearing of the

18             jury.)

19             THE COURT:  What do you estimate the time of your

20   redirect to be?

21             MR. STONE:  Seven minutes at most.

22             THE COURT:  Will you have additional cross?

23             MR. SHEASBY:  Highly unlikely.

24             THE COURT:  Because we're coming up on two hours,

25   and if we're going to go much longer, I need to give the jury

982

1    a recess.

2              MR. STONE:  I mean, if I hit 10 minutes, I would be

3    very surprised.

4              THE COURT:  All right.  Let's go.

5              (The following was had in the presence and hearing

6              of the jury.)

7              THE COURT:  All right.  Let's proceed with redirect

8    by the Defendant.

9                        REDIRECT EXAMINATION

10   BY MR. STONE:

11   Q.    Doctor Kia, can we bring up your demonstrative DX 7.6?

12   It will come up on the screen in front of you, I think.

13   A.    Oh, okay.  Thank you.

14   Q.    Would you tell the ladies and gentlemen of the jury what

15   background in terms of education and experience a person of

16   ordinary skill in the art would have?

17   A.    In my opinion, a person of ordinary skill in the art

18   would have a Bachelor's degree in electrical engineering,

19   computer science, computer engineering, or some related field,

20   or some similar field, plus experience -- two-plus years

21   experience in the field of image capture/scanning technology

22   involving processing and communication of image data in a

23   client and a server.

24   Q.    When you were asked the question by Mr. Sheasby as to

25   whether or not you would be able to make a remote deposit

1  system that used mobile phones to capture check images, you

2  indicated that you would have been able to do that back in the

3  time frame in 2006.  Right?

4  A.   Yes, sir, I do recall that.

5  Q.   And was that because of any information contained in the

6  2006 patents filed by USAA?  Did you need any of that

7  information to be able to do that?

8  A.   No.  I had experience and qualifications that I could do

9  it on my own.

10  Q.   And would a person of ordinary skill in the art have been

11  able to do it on their own at that time?

12  A.   No, they would not.

13  Q.   And is there anything that's contained in those 2006

14  patent applications that would make it possible for somebody

15  of ordinary skill in the art to have developed a working

16  system using mobile phones to capture check images at that

17  time without engaging in undue experimentation?

18  A.   No, not at all.  There exists no such disclosure that

19  would help out one of ordinary skill in the art to do that.

20  Q.   Doctor Kia, you were asked by Mr. Sheasby about patent

21  examiners.  Do you recall that?

22  A.   Yes, sir, I do.

23  Q.   Do you know more about science and technology in the

24  field of image processing, as you understand the

25  qualifications of patent examiners, than they do?

1   A.   Yes, sir, I would qualify to know more about science and

2   technology than the patent examiner.

3   Q.   And were the patent examiners who looked at the patents

4   that are asserted in this case, were they shown the -- some of

5   the exhibits that we've talked about in this case?

6            MR. SHEASBY:  Your Honor, I object.  It's not in his

7   report.

8            MR. STONE:  Proper subject of redirect in light of

9   the cross-examination, which also went beyond the report.

10           MR. SHEASBY:  I disagree with that, Your Honor.

11  This is a very -- may we have a sidebar?

12           THE COURT:  If this is not in his report, it's not

13  subject to being taken up on his examination.

14      Approach the bench.

15           (The following was had outside the hearing of the

16           jury.)

17           THE COURT:  Tell me how, Mr. Stone, the door's been

18  opened by --

19           MR. STONE:  Because he asked him about the patent

20  examiners and asked him whether the fact that there's four

21  patent examiners that reviewed this, that they had all the

22  information they needed, trying to get a sort of super

23  presumption of validity out of the testimony that there were

24  four patent examiners, an issue we've already argued.  But,

25  most importantly, that these patent examiners didn't have the

1    information that this jury has, and that's the point I want to

2    make.

3              MR. SHEASBY:  He has no factual basis to find that.

4    That is not in his report.  That's exactly my point.

5              MR. STONE:  Nor was the basis for the cross.

6              MR. SHEASBY:  What was in front of the examiners is

7    not in his report, and I can tell you it's going to open up a

8    can of worms because there was a lot of material --

9              THE COURT:  I don't need any more explanation.

10   We're not going to go there if it's not in his report.  I

11   don't think that what Plaintiff elicited on direct opens the

12   door to challenging what the examiners would have before them.

13             MR. STONE:  Thank you, Your Honor.

14             MR. SHEASBY:  Thank you, Your Honor.

15             (The following was had in the presence and hearing

16             of the jury.)

17             THE COURT:  All right.  Objection sustained.

18        Let's proceed.

19   Q.   (BY MR. STONE)  Doctor Kia, with respect to your projects

20   that you were asked about by Mr. Sheasby and your patents that

21   you were asked about by Mr. Sheasby, did -- when did you file

22   the patent applications that resulted in the patents that he

23   asked you about?

24   A.   All of my patents were triggered by event of me being

25   able to describe in a way that would work.  So I waited till I

1    did enough experimentation, enough research, I knew how to

2    make the device, and I would be able to describe how I would

3    make the device before I filed any application.

4    Q.    Thank you.

5              MR. STONE:  No further questions, Your Honor.

6              THE COURT:  You pass the witness?

7              MR. STONE:  I do.  I pass the witness.

8              THE COURT:  Is there further cross-examination?

9              MR. SHEASBY:  No, Your Honor.  No further

10   cross-examination.

11             THE COURT:  All right.  Doctor Kia, that completes

12   your testimony.  We thank you for your participation.

13             THE WITNESS:  Thank you, sir.  It was a pleasure.

14             THE COURT:  Ladies and gentlemen of the jury, we're

15   going to take a recess at this time.  If you will, simply

16   close your notebooks and leave them there in your chairs,

17   follow all my instructions, including not to discuss the case

18   with each other, and we'll be back shortly to continue.

19        The jury's excused for recess.

20             (Whereupon, the jury left the courtroom.)

21             THE COURT:  Be seated, please.

22        Counsel, for your information, Plaintiff has remaining

23   2 hours and 43 minutes, Defendant has remaining 2 hours and 28

24   minutes.

25        I'd like you to take a short break, and then I'd like to

1      see lead and local counsel in chambers.

2          Court stands in recess.

3                          (Brief recess.)

4              THE COURT:  Be seated, please.

5          Mr. Stone, is the Defendant prepared to call its next

6      witness?

7              MR. STONE:  We are, Your Honor.

8              THE COURT:  And that witness will be?

9              MR. STONE:  With the Court's permission, Mr. Lantier

10     is handling the depositions, but it will be Mr. Charles Oakes.

11             THE COURT:  All right.  If you will, Mr. Lantier,

12     when you identify these deposition witnesses, go ahead and

13     give us the time splits at that time.

14             MR. LANTIER:  Yes, sir.

15             THE COURT:  All right.  Let's bring the jury in,

16     please, Mr. Fitzpatrick.

17             (Whereupon, the jury entered the courtroom.)

18             THE COURT:  Please have a seat, ladies and

19     gentlemen.

20         Defendant, call your next witness.

21             MR. LANTIER:  The next witness is Charles Oakes, who

22     at the time of his deposition was the former IT director of

23     research and development at USAA.

24         The time breakdown is PNC, 1 minute, 57 seconds; USAA, 5

25     minutes, 5 seconds.

1       THE COURT:  Proceed with this witness by deposition,

2   please.

3           CHARLES OAKES, SWORN, BY VIDEOTAPE DEPOSITION,

4   Q.   Will you please state your name for the record?

5   A.   Charles Oakes.

6   Q.   And USAA is your current employer.  Correct?

7   A.   No, I'm retired from USAA.

8   Q.   When did you retire, sir?

9   A.   April 1st, 2016.  It's been over three years.

10  Q.   And what have you been doing in your retirement?

11  A.   Playing golf, teaching golf.  I teach junior golf at my

12  church.  Doing ministry work with my church.  Doing a lot of

13  reading and gardening and enjoying retirement life.

14  Q.   As of October 25, 2006, would Deposit@Home and the

15  Deposit@Home product only work with devices that were

16  associated with TWAIN drivers?

17  A.   We knew that any type of device that we would be able to

18  capture an image, would be able to be processed through the

19  Deposit@Home system.  The reason for that, it was just an

20  image.

21       Whether you use a camera without a TWAIN driver, or if

22  you use a web cam, if you use video, use the scanner itself,

23  TWAIN drivers at that point in time, we knew that any type of

24  image that we could capture could go through our system.

25  Q.   Do you recall why in this email you called out the fact

989

1    that a TWAIN driver was used?

2    A.    I don't really recall, other than it -- because Mike

3    Morris was the one who saw it at first, and that's

4    where -- the possibility of where I came up with a TWAIN

5    driver.   We know there had to be a TWAIN driver because of the

6    model of the -- of the webcam.

7    Q.    In October of 2006, there wasn't any active project at

8    USAA that involved using a camera phone to capture a check

9    image.   Correct?

10   A.    There wasn't a development project, but we were working

11   on a project in research.   There is a difference between the

12   two.

13   Q.    Prior to October 2006, had USAA done any research using a

14   camera phone, not a normal digital, like, Canon camera, to

15   capture an image of a check?

16   A.    We were looking -- there were cameras -- camera phones at

17   that point in time.   There was like the Simian, there was

18   the Nokia-type devices that we were starting to take a look at

19   to see what we could do in a mobile world.

20   Q.    So prior to that October 2006 email, what, if any, work

21   in research had USAA done on mobile phones and their ability

22   to take an image of a check?

23   A.    Well, again, we were -- we were looking at the various

24   phones that were available at that time to determine what it

25   was going to be able to take to be able to capture an image

990

1    and to be able to control that image and to be able to pass it

2    on.

3    Q.    Do you recall whether prior to that email, anyone at USAA

4    had actually taken a check image with a mobile phone camera?

5    A.    That, I don't recall if we could or not at that point in

6    time.  Let me -- let me clarify -- can I clarify that or not?

7    Well, as far as being able to take a picture using a check on

8    a mobile phone, that wasn't the issue.  It was the issue was

9    being able to get the image off of the phone in a way that we

10   could process it downstream.

11        So I thought that's what your question was.  I may have

12   misunderstood it.

13   Q.    Prior to October 2006 to this email --

14   A.    Uh-huh.

15   Q.    -- my question is, do you recall anyone at USAA actually

16   taking a picture of a check using a mobile phone camera?

17   A.    In the research area, being able to take a picture of a

18   check?

19   Q.    Yes.

20   A.    Yes, but not processing it.

21   Q.    So you recall folks in your research area taking a

22   picture of a check using a mobile phone camera prior to

23   October 2006.

24   A.    Yes, I do remember that.  Taking a picture, but not

25   processing it.  You can take a picture of anything with the

```
 1   mobile phones that were out during that time period.

 2   Q.   So prior to October 2006, USAA had done -- had not done

 3   any work on processing an image of a check taken with a mobile

 4   phone.  Correct?  Is that fair?

 5   A.   As far as processing it through the entire application at

 6   that point in time, no, other than the one October in 2006 --

 7   Q.   Which was a webcam?

 8   A.   -- that I remember, which was a webcam.  That's true.

 9   Q.   So is it fair to say that the Deposit@Home patents, the

10   2006 patents, claim a specific way to do remote check deposit

11   using consumer electronics?  Is that fair?

12   A.   In the specifications associated on gives us a blueprint

13   of using image type of -- capture types devices to be

14   able -- from a consumer standpoint, to be able to deposit a

15   check.

16   Q.   If an engineer read your patents, the specifications,

17   would they understand how to build a mobile deposit system

18   using your inventions?

19   A.   The specifications on there is -- again, is a blueprint

20   on how to build it.

21             THE COURT:  Does that complete this witness by

22   deposition?

23             MR. LANTIER:  Yes, Your Honor.

24             THE COURT:  Call your next witness, please.

25             MR. LANTIER:  PNC calls Nathan McKinley, who at the
```

1   time of his deposition was vice president corporate

2   development at USAA.

3       The run time for PNC is 4 minutes and 21 seconds, and the

4   run time for USAA is 4 minutes and 16 seconds.

5           THE COURT:  Please proceed with this witness by

6   deposition.

7           NATHAN McKINLEY, SWORN, BY VIDEOTAPE DEPOSITION,

8   Q.   Can you please state your name for the record?

9   A.   Sure.  It's Nathan McKinley.

10  Q.   You're employed by USAA?

11  A.   Yes, ma'am.

12  Q.   Why is that?

13  A.   Well, I -- I view banks who actively market military as

14  our top competitors.  And so I -- when I look at this list,

15  Navy Federal Credit Union, I would say top competitor.

16  Pentagon Federal, top competitor.  PNC Bank, top competitor.

17  People who actively target the military, I view them as a top

18  competitor.

19  Q.   Is there an industry standard for calculating the cost to

20  process a deposit at a teller window?

21  A.   Well, we have looked at a few studies such as -- like the

22  Javelin study from 2013 puts the deposit at $4.25 for a teller

23  window.

24       And then there's another study that was done by Jack

25  Henry for ProfitStars, and that puts the deposit at a teller

993

```
1    window of $4.  And so it does seem a little light to me on
2    the -- on the $1.40.
3    Q.   But what you cannot tell me is that mobile remote deposit
4    capture is the reason why those people have more products.
5    Correct?
6    A.   I can only tell you the data that I've got, and the data
7    that I have suggests to me if you use remote deposit capture,
8    you are more engaged.  You know, there's ecosystem effects
9    here.  Right?  So you're more sticky.  You're engaged with the
10   bank.  And a lot of folks, I would imagine, would consider
11   that the primary banking relationship.  And then what do they
12   do?  They buy more products.  They are more engaged with the
13   organization if remote deposit capture is active.
14   Q.   And -- and is it true that USAA has no data whatsoever on
15   the percentage of members who decided to bank with USAA
16   because mobile deposit has a feature that automatically
17   captures the picture of the check?
18   A.   I haven't seen any specific data to answer that exact
19   question outside of the data that I've already provided.
20   Q.   And so you're testifying today as USAA's corporate
21   representative on the value of each of the USAA
22   patents-in-suit and any related patents.  Correct?
23   A.   Yes, ma'am.
24   Q.   And you are also testifying today as USAA's corporate
25   representative on the value that USAA assigns to features
```

1  allegedly covered by the USAA patents-in-suit.  Correct?

2  A.   Yes, ma'am.

3  Q.   But sitting here as USAA's corporate representative,

4  you're not aware of USAA itself having put a value on the

5  feature of a mobile deposit system that presents the photo of

6  the check to the customer before it's submitted for deposit.

7  Correct?

8  A.   I'm not aware.

9  Q.   Has USAA analyzed if customers will stop using mobile

10 deposit if they don't see a photo of the check before it's

11 submitted for deposit?

12 A.   I'm not aware of that.

13 Q.   Has USAA analyzed whether customers will leave USAA if

14 they don't see a photo of the check before it's submitted for

15 deposit?

16 A.   Not -- not that I'm aware of.  But I can tell you, being

17 able to deposit a check remotely is a must-feature -- a

18 must-have feature.  In a -- in a digital world, you know, from

19 a banking perspective, it's a -- it's a must-have.

20 Q.   And my question was, has USAA analyzed whether customers

21 will leave USAA if they don't see a photo of the check before

22 it's submitted for deposit?

23 A.   I'm not aware of a study that was done if USAA members

24 would leave if we didn't have that feature.

25 Q.   Now, USAA has a very large portfolio of patents related

1   to the remote deposit capture.  Correct?

2   A.    We do, yes, ma'am.

3   Q.    How many issued patents are in that portfolio today?

4   A.    Over a hundred.

5   Q.    And how many pending patent applications are in that

6   portfolio?

7   A.    My understanding, at last count, it's over 50.

8   Q.    Do all of USAA's RDC patents have value?

9   A.    In my opinion, they do.

10  Q.    Are some of them more valuable than others?

11  A.    Yes.  I mean, certainly if a patent was related -- I

12  don't know.  I'll use the car example.  If you have a patent

13  and -- for a mirror versus a patent for the engine, you know,

14  you would make the argument that that patent that represents

15  the engine could be more valuable because you can still go

16  down the highway with it.

17  Q.    And the ones that have features that are nice to have are

18  less valuable than the ones that are covering the core

19  technology.  Correct?

20  A.    It depends.  It depends on the bank doing the licensing.

21  Q.    Are you aware of -- is there any license that USAA has

22  given to just the six patents that are asserted against PNC in

23  this case?

24  A.    No.  We have two agreements so far.

25  Q.    And both of those agreements cover USAA's entire RDC ?

1

2

3                          (Redacted.)

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

 1              MR. LANTIER:  Your Honor, that completes this

 2    witness.  There was one more witness by deposition, and the

 3    parties would request that Your Honor keep the courtroom

 4    sealed for the playing of this deposition.

 5              THE COURT:  All right.  You agree with that,

 6    Mr. Sheasby?

 7              MR. SHEASBY:  Yes, Your Honor.

 8              THE COURT:  All right.  Let's proceed with the next

 9    deposition.  If you'll introduce the witness and give us the

10    times.

11              MR. LANTIER:  Yes, Your Honor.

12        PNC calls Mr. Ron Epstein, who at the time of his

13    deposition was managing partner of Epicenter IP Group, LLC.

14        The run times are for PNC, 4 minutes and 52 seconds, and

15    for USAA, 4 minutes and 27 seconds.

16              THE COURT:  Let's proceed, please.

17              RON EPSTEIN, SWORN, BY VIDEO DEPOSITION,

18    Q.   Can you please introduce yourself for the record?

19    A.   My name is Ron Epstein.

20    Q.   And are you the founder and managing partner of Epstein

21    Law?  I'm sorry, Epicenter Law?

22    A.   Yes, I'm the managing partner of Epicenter Law.

23    Q.   Kind -- what does Epicenter Law handle?

24    A.   Primarily patent licensing disputes.  Well, patent

25    licensing in general, and advising companies, both

1    patentholders and defendants, in negotiating patent licenses.

2    Q.    So when you're retained to negotiate a license on behalf

3    of your client, is your job to get the best possible deal for

4    your client that you can?

5    A.    The best possible result, yes.

6    Q.    So USAA was a client of Epicenter Law.  Is that correct?

7    A.    That's correct.

8    Q.    And what did you say the portfolio was worth?

9    A.    More.

10   Q.    How much more?

11   A.    I don't recall the specifics.

12   Q.    Is it --

13   A.    But it's one of the most valuable patent portfolios I

14   have ever been involved with, and I've been involved with

15   multiple $100 million-plus patent portfolios.

16   Q.    So in or around September 6th of 2006, Epicenter Law was

17   retained by USAA to undertake this licensing effort on USAA's

18   behalf?

19   A.    We certainly memorialized -- yeah, we memorialized the

20   relationship in a contractual form around September 6.

21   Q.    Were you involved in preparing this document?

22   A.    I don't believe I participated in this particular one.

23   Q.    Exhibit 11.  Do you have Exhibit 11 in front of you?

24   A.    Yeah.

25   Q.    So does this indicate that USAA made an offer to Dollar

1   Bank at $450,000?

2   A.   Yeah, it appears so.

3   Q.   Okay.  USAA authorized Epicenter to make an offer to

4   Dollar Bank at 455 -- $450,000?

5   A.   I believe that's correct, yeah.

6   Q.   And that would have been an offer for the entire USAA

7   patent portfolio?

8   A.   That's right.

9   Q.   And that would have been a lump sum?

10  A.   That's what I believe, yeah.

11  Q.   So if Dollar Bank had said, Great, $450,000 for a license

12  to the whole USAA RDC patent portfolio, sounds good to us,

13  USAA was prepared to take that deal?

14  A.   I believe so.

15  Q.   Did Epicenter make any licensing proposal to any

16  financial institution that used a license calculation based on

17  benefits to the financial institution other than cost savings?

18  A.   Typically we highlighted that there were a great number

19  of benefits to the financial institution, but for simplicity

20  of ongoing negotiation, we'll focus on the most concrete one,

21  which is cost savings.

22  Q.   And the only licensing proposals that USAA made to any

23  financial institutions were based on cost savings benefits.

24  Correct?

25  A.   So we would make the point, there's a number of areas of

1    value you're getting here, but for purposes of constructing a

2    number we'd be willing to give you a license for, rather than

3    pursue some alternative way of dispute resolution, we will

4    focus just on cost savings, not on any other form of value.

5    Q.   And, therefore, in preparing these proposals, the only

6    benefit that was quantified and included in the license

7    calculation was cost savings.  Correct?

8    A.   For purposes of these license numbers, that's right,

9    yeah.  What you do on licensing is to create a much simpler

10   model, easier to understand, as an alternative to that

11   pathway--right?--and create an advantage to do the licensing

12   path rather than the litigation path.

13   Q.   I want to look at the next page of Exhibit 10, the second

14   bullet that says, "Cost savings attributed to USAA patented

15   inventions."

16        Do you see that?

17   A.   Yeah.

18   Q.   And then it says, "Assume 50 percent of total cost

19   savings."

20   A.   Yep.

21   Q.   Do you see that?

22   A.   Yep.

23   Q.   Tell me what that's intended to convey.

24   A.   So a license is a negotiation to sell a particular

25   risk--right?--and the risk is if we go to trial, you're going

1    to have to pay the full amount of damages as required under

2    damages law under the *Georgia-Pacific* factors.

3         In licensing, you'll pay a subset of that because you're

4    giving discounts for ambiguities that are not being resolved

5    the way they would be resolved in a trial.

6         One of the ambiguities that would not be resolved in a

7    face-to-face negotiation that would be resolved in a trial is

8    what percentage of the cost savings is properly attributable

9    to the patent owner.

10        We can argue using existing case law, 70, 80, 90 percent.

11   Other people want to argue, 5, 10, 20 percent.  We throw 50

12   percent in there as a medium to sort of help scope the

13   situation as a reasonable compromise, or at least from a --

14   from a -- as a negotiation tactic.  We throw that 50 percent

15   in because it's sort of the average of everybody -- it's in

16   the middle of everybody's stated numbers.

17   Q.   Let's look at the attachments which we marked as Exhibit

18   14.  Okay.  And this is another document that's a license

19   calculation.

20        Do you see that?

21   A.   The second page?  Yes.

22   Q.   The whole document, it's three pages long, and it looks

23   very similar to the one that we just looked at for Dollar

24   Bank.  Correct?

25   A.   That's right.

1   Q.   And it uses a similar methodology to the one we looked at

2   for Dollar Bank.  Correct?

3   A.   That's correct.

4   Q.   Focused on cost savings.  Right?

5   A.   Yes.

6   Q.   And here, if you look at page 2, the proposed license to

7   SunCoast was $2 million.

8        Do you see that?

9   A.   I do.

10  Q.   And that was a lump sum?

11  A.   I believe so, yes.

12  Q.   And that was for the entire USAA RDC portfolio?

13  A.   That's correct.

14  Q.   So if SunCoast had said, We'll take it, $2 million for

15  lump sum for a license to the entire RDC portfolio, USAA was

16  prepared to do that deal.  Right?

17  A.   So if SunCoast said yes, we could have closed -- I

18  believe we would have closed the deal for $2 million, yeah.

19  Q.   Now I want to ask you about Exhibit 2, which is the

20  retention agreement between Epicenter and USAA.

21  A.   I have it up.

22  Q.   Okay.  Thank you.

23       And if you can turn to the success fee tier schedule,

24  please, which is on page 4 of the PDF.

25       Okay.  The basic idea under this fee structure is that

1   the more revenue that is generated under these license

2   agreements, the more you earn in success fee.  Right?

3   A.   Yes.  There's -- I earn success fees and they've incented

4   me to help them get as much money as possible.

5   Q.   When you're considering what would be a reasonable

6   licensing fee for a bank or financial institution, do you take

7   into consideration whether they are competitors or major

8   competitors of USAA?

9   A.   Absolutely.

10  Q.   How does that impact the negotiation?

11  A.   USAA is less -- it would raise the price.  We would have

12  different lower discounts off of liability at trial for those

13  kinds of deals.

14  Q.   To your knowledge, are Dollar Bank or SunCoast Bank

15  considered significant competitors of USAA?

16  A.   No one at USAA has ever told me that they view them as

17  significant competitors.

18  Q.   What about PNC Bank?  Do you have an understanding as to

19  whether PNC is a significant competitor of USAA?

20  A.   I've been told that some members of USAA view PNC Bank as

21  a significant competitor, yes.

22  Q.   I'll use the phrase 'general framework'.  I think that's

23  what was used a couple of times today.  Do you have in mind

24  this -- you talked about kind of having a general framework

25  for presenting proposals for licensing like the ones that we

1    looked at for Dollar Bank and SunCoast bank.  Do you know what

2    I'm talking about?

3    A.    Yes.

4    Q.    Is that general framework applicable to banks of every

5    size, sort of going all the way up to the trillion-dollar-plus

6    or second-tier banks?

7    A.    Yes.

8           THE COURT:  Does that complete this witness by

9    deposition?

10          MR. STONE:  It does, Your Honor.

11          THE COURT:  All right.  Ladies and gentlemen of the

12   jury, we are --

13       First of all, I'm going to unseal the courtroom and

14   direct the Court Security Officer to invite the public to

15   return.

16                     (Courtroom unsealed.)

17          THE COURT:  Having done that, I'm going to ask you

18   to have lunch.  Please take your notebooks with you to the

19   jury room.  I understand lunch is either there or on its way.

20   The next witness is going to be of some length, and I don't

21   want to start them at 20 minutes until 12:00, so that's why

22   we're going to break now.

23       Please follow all my instructions, including not to

24   discuss the case among yourselves.  And we'll attempt to

25   reconvene as close to 12:30 as we can.

1        With that, ladies and gentlemen, the jury's excused for

2   lunch.

3            (Whereupon, the jury left the courtroom.)

4            THE COURT:  All right.  Be seated, please.

5        For your information, counsel, Plaintiff has remaining

6   2 hours and 28 minutes.  Defendant has remaining 2 hours and

7   14 minutes.

8        And as requested by counsel, we'll take an early lunch so

9   that you can work through your adjustments to the slides and

10  materials for the next witness.

11       Anything else we need to be aware of or take up before we

12  break for lunch?

13           MR. SHEASBY:  Your Honor, I just have one request to

14  minimize the amount of my standing up and objecting.  Can I

15  ask that they send me copies of the slides that --

16           THE COURT:  I want both sides to fully meet and

17  confer, show each other what you've got.  If there's a

18  problem, I'll hear about it, but we're not going to hide

19  anything or fail to disclose anything.

20           MR. STONE:  Absolutely.

21           THE COURT:  All right.  We stand in recess for

22  lunch.

23                    (Lunch recess.)

24           THE COURT:  Be seated, please.

25       Defendant, are you prepared to go forward with your next



(Redacted.)

1    MR. SHEASBY:  Yes, Your Honor.  Actually can we take

2    this slide down?  Can we at least not show it to the gallery?

3    MR. STONE:  I apologize.  Yes, we should take it

4    down.

5    THE COURT:  Tell me what your problem with the slide

6    is.

7    MR. SHEASBY:  So the number 2.75 is not in the

8    report, a calculation based on the 2.75 is not in the report,

9    the 6 percent is not in his report.  I looked at these

10   paragraphs, and he should say what's in these paragraphs.  He

11   should not say different numbers than what's in his

12   paragraphs.

13   THE COURT:  So you don't agree with Mr. Stone that

14   this is merely an adjustment of what's in his prior report to

15   factor out the two dropped patents.

16   MR. SHEASBY:  I do not because he never did the

17   calculations in the original report.

18   THE COURT:  Is that true, Mr. Stone?

19   MR. STONE:  He did not do the division of 400 by

20   2.75 in his original report.  He simply said that is what you

21   do.  So he doesn't do that arithmetic calculation, but there's

22   nothing about an arithmetical calculation that necessitates

23   doing all of the computations for the other side is my view,

24   Your Honor.

25   THE COURT:  Did he say in his report that you would

1    divide by that?

2            MR. STONE:  Yes, he did, Your Honor.

3            THE COURT:  He just didn't carry out the

4    mathematical computation?

5            MR. STONE:  Yes, he did, Your Honor.  That's in

6    Paragraph 382 of his report, I believe.

7            MR. SHEASBY:  And just -- I'll let you rule, Your

8    Honor.  I apologize.

9            THE COURT:  This is 382.  Is that correct?

10        All right.  I've read Paragraph 382.  What else do I need

11   to hear that I haven't already heard from you-all?

12           MR. STONE:  I think the only other thing is the

13   calculation with the numbers that are appropriate now that the

14   two patents were dropped is also laid out in greater detail or

15   the arithmetic is done in the supplemental report which we

16   provided to USAA's counsel on Saturday.

17           THE COURT:  Well, and as I mentioned when we

18   discussed a similar matter in chambers, a supplemental report

19   filed without leave of Court Saturday before jury selection on

20   Monday is not appropriate and is not timely and is not

21   something that the other side can be said to have been placed

22   on fair notice of.

23        And PNC acknowledged to me in chambers that the

24   supplemental report from this witness was not authorized by

25   the docket control order, was not within that time period, and

1

2

3                          (Redacted.)

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1   leave.  I didn't appreciate that we needed to.  I take full

2   responsibility for not having done that.  But we did do the

3   calculations as quickly as they could be done once the two

4   patents were withdrawn?

5           THE COURT:  Well, as I told you in chambers, I

6   understand the chaotic nature of trial preparation as you come

7   down to jury selection, although I wonder what in the world

8   would have happened if this case had really gone to trial in

9   April like it was supposed to have.

10      But, nonetheless, I can't allow a supplemental report

11  filed on the eve of trial without approval of the Court to be

12  binding on the other side or else there would be a deluge of

13  last-minute supplemental reports on everything, and I just

14  can't do that.

15          MR. STONE:  And I -- Your Honor, I appreciate that,

16  and I really -- I truly apology to the Court, and I'm not

17  saying it should be binding on the Plaintiff.  I am saying

18  it's a very short report of about one-and-a-half or two pages

19  in length, and the calculations in it are quite simple because

20  all we're doing is arithmetic.

21          THE COURT:  Let's see if we can't bring this to a

22  close because we're using your time here.

23      What's your response to Mr. Stone's argument

24  incorporating the mathematics that are in the footnotes, Mr.

25  Sheasby?

1          MR. SHEASBY:  So I think his point is reasonable.

2    What's not in there is the final numbers, and that was the

3    only thing we are objecting to.

4          THE COURT:  Can I see the slide again, the proposed

5    slide?

6       All right.  I think, in light of everything I've heard

7    and particularly the footnotes that are in the report relating

8    to paragraph 382, and given that there is no structural change

9    here, it does simply reflect the dropping of those patents.

10      I'm going to overrule the objection and permit this

11   demonstrative.

12         MR. SHEASBY:  Thank you, Your Honor.

13         MR. STONE:  Thank you, Your Honor.

14         THE COURT:  All right.  Are we ready to bring in the

15   jury and begin with the next witness?

16         MR. STONE:  Yes, Your Honor.

17         THE COURT:  Let's bring in the jury, please.

18         (Whereupon, the jury entered the courtroom.)

19         THE COURT:  Welcome back, ladies and gentlemen.

20   Please have a seat.  We'll continue with the Defendant's case

21   in chief.

22      Defendant, call your next witness.

23         MR. STONE:  The Defendant PNC Bank calls Christopher

24   Vellturo.

25         THE COURT:  All right.  If you'll come forward, sir,

1    and be sworn.

2              (Whereupon, the oath was administered by the Clerk.)

3              THE COURT:  Please have a seat on the witness stand.

4        If you'd like to pour some water, there are cups and a

5    carafe of water there.  If not, that's fine.

6              THE WITNESS:  Thank you, Your Honor.

7              THE COURT:  Mr. Stone, you may proceed with direct

8    examination when you're ready.

9              MR. STONE:  Thank you, Your Honor.

10             CHRISTOPHER VELLTURO, PhD, SWORN,

11   testified on direct examination by Mr. Stone as follows:

12   Q.   Doctor Vellturo, would you introduce yourself, please, to

13   the ladies and gentlemen of the jury?

14   A.   Sure.  I'm Chris Vellturo.

15   Q.   And what is your role in this case, Doctor Vellturo?

16   A.   So I'm here to assist the jury, applying my training and

17   my experience, on issues, should the jury decide that they

18   need to address them, related to damages.

19   Q.   And have you prepared some slides to help us all

20   understand your testimony?

21   A.   Yes.

22             MR. STONE:  Could we bring those up?

23   Q.   (BY MR. STONE)  And the first slide that we have up, what

24   does this show us about your qualifications for the testimony

25   you're prepared to give today?

1    A.   Well, this is pretty much the qualifications I brought

2    with me here.  I have a college degree in mathematics and

3    economics from Brown University in Rhode Island, and then I

4    have a Ph.D. in economics from Massachusetts Institute of

5    Technology--that's MIT--in Massachusetts.

6         I taught while I was there.  I've taught at the business

7    school of Boston University since then.  Published a bunch of

8    papers, done a lot of testimony.

9    Q.   And in this case you're testifying for the Defendant PNC

10   Bank, but have you testified in other cases for the

11   plaintiffs?

12   A.   I have.  It's about 50/50 defendants and plaintiffs.

13   Q.   What did you do after getting your Ph.D.

14   A.   So I -- I went to work.  I had two small children by that

15   point in time.  I went to work and started doing both

16   consulting and teaching, and that was 35 years ago, still

17   doing it.

18   Q.   Do you have expertise in valuing patents and evaluating

19   damages in patent cases?

20   A.   Yes, I do.

21   Q.   Could you briefly tell us what your experience has been

22   there?

23   A.   Well, I've looked at the value of patents in situations

24   like this, and then I've also been brought in as a consultant

25   to work with companies that are designing or implementing

1    licensing programs.

2         In that context, I've been kind of the central involved

3    person in developing the program about between 12 and 20

4    times.  But, more broadly, I've been brought in to work on

5    licensing issues several dozen times.

6    Q.   Are you being compensated for your work on this case?

7    A.   Yes.

8    Q.   And does your compensation depend in any way on the

9    outcome of this case?

10   A.   No.

11   Q.   Does it depend in any way on the substance of your

12   testimony?

13   A.   It does not.

14        MR. STONE:  Your Honor, at this time we would offer

15   Doctor Vellturo as an expert in economics, the valuation of

16   patents, patent damages, and the determination of a reasonable

17   royalty.

18        THE COURT:  Is there objection?

19        MR. SHEASBY:  No objection, Your Honor.

20        THE COURT:  Without objection, the Court will

21   recognize this witness as an expert in those designated

22   fields.  Please continue.

23   Q.   (BY MR. STONE)  If we could go to the next slide if

24   that's okay with you, Doctor Vellturo.

25        Can you tell us what your assignment was in this case?

1    A.   Well, as you've heard several times over the past week,

2    to the extent damages are awarded here, they are awarded as a

3    reasonable royalty.  I'll speak a little more about what that

4    means shortly.  So I've been asked to determine a reasonable

5    royalty.

6        I was also asked to look at USAA's damages claims as we

7    heard earlier this week and apply my expertise to that.

8    Q.   And under what circumstances does your testimony here

9    become something the jury needs to address?

10   A.   Right.  So I think, as you've heard several times again

11   during this trial, damages are only owed if there's a finding

12   of infringement and that the patents are not invalid.  So my

13   work only applies under those findings.

14   Q.   By testifying here today, are you in any way suggesting

15   anything about either whether the patents are valid or whether

16   they're infringed?

17   A.   No.  If I don't assume those things, I have nothing to

18   do.

19   Q.   Okay.  Before we go into the details of your analysis,

20   would you summarize your conclusions for the jury, which I

21   think are up on the next slide?

22   A.   Right.  So I've done several different analyses, which

23   I'm going to go through today, and they all point in the same

24   direction.

25       We have direct evidence of what happens when the patented

1    features are removed, and that's really central to my

2    analysis.  And that indicates the value of the inventions,

3    which is a central controller of a license to the inventions,

4    is $8 million in total.

5         In addition to that, I looked at the licenses associated

6    with this case, and I found those licenses provided both a

7    per-unit number in the range of about 3 cents per mobile

8    deposit; or if you think about them in dollars, it's again a

9    very similar number--as I said, about $8.8 million.

10        I considered those in the context of what I knew about

11   what it costs for a fully built-out MRDC system.  That should

12   sound familiar.  That's the NCR agreement which I'll speak

13   to momentarily.  And that's 12 cents per mobile deposit.  And

14   my royalty numbers in that context make perfect sense.  So

15   that all kind of squares together.

16        And so what I find is a reasonable royalty here is $10.5

17   million.  If we discount that to the dollars that would be

18   owed at the time of the negotiation, that would be $8 million.

19   And I'll explain how I do that in a moment as well.

20   Q.   Were you here during the testimony of Mr. Kennedy, who is

21   USAA's damages witness?

22   A.   Yes.  I've been here for the whole trial.

23   Q.   And do you have a -- did you find some areas in which you

24   and he had agreement?

25   A.   Most definitely.

```
 1   Q.   Do you have a slide that shows the areas of your

 2   agreement?

 3   A.   I do.

 4   Q.   Could you explain to us what your areas of agreement are?

 5   A.   Well, they relate to how you go about doing this.  The

 6   first one is this idea of a hypothetical negotiation where, to

 7   figure out what a reasonable royalty is, you set the two

 8   parties down and say, you need to work out a license to this

 9   technology as PNC is alleged to have used it.  That's right.

10   That's the way you need to think about it.

11        The Georgia-Pacific factors need to be applied.  That's

12   right.  That's the way to think about it.

13        The damages should be apportioned to be specific to the

14   value of these two features.  That's right, and that's what --

15   that's what I do.

16             MR. SHEASBY:  Your Honor, I object to that

17   testimony.  You don't apportion to the features.  You

18   apportion to the patents.  That's an improper statement of the

19   law.

20             THE COURT:  Well, you may not agree with his

21   testimony and you can certainly address it on

22   cross-examination, but that's not a valid evidentiary

23   objection.

24             MR. SHEASBY:  Thank you, Your Honor.

25   Q.   (BY MR. STONE)  Please continue, Doctor Vellturo.
```

1   A.   Right.  And then the last one, which probably doesn't

2   come as a surprise, is that PNC's implementation of version

3   4.20.1, which has the features removed, tells you a lot about

4   the value of the asserted patents because the patents relate

5   to those features.

6   Q.   And do you and Mr. Kennedy agree that version 4.20.1 does

7   tell you a lot about the value of the asserted patents, the

8   four patents at issue in this case?

9   A.   Yeah.  That's what that bullet point says.

10  Q.   Okay.  And what is the basis for your conclusion that you

11  and he agree on that?

12  A.   He said it at trial yesterday.

13  Q.   In this case, does USAA seek damages for the time period

14  after version 4.20.1 was implemented?

15  A.   No.

16  Q.   Do you have a slide that shows what changes were made in

17  version 4.20.1 --

18  A.   Yes, I do.

19  Q.   Okay.  Let's take a look at that.  Can you just remind

20  the jury what the features are that were taken out between the

21  prior version and the 4.20.1 version.

22  A.   Right.  So in the middle of 2021, PNC replaced its

23  existing mobile app with mobile app we've all heard is version

24  4.20.1.  What was removed between those two versions was

25  customers could no longer perform auto-capture and customers

1   were no longer shown a picture of the check.  Those are the

2   two features we talked about extensively here.

3   Q.   And why are these changes relative to your determination

4   of a reasonable royalty?

5   A.   Right.  Because remember the parties are sitting down at

6   the table and trying to decide what's a reasonable royalty,

7   and what a reasonable royalty means is it's a royalty that

8   both sides can live with.

9        And on the PNC side, PNC is basically sitting there

10  saying, well, I have a choice at this negotiation.  I can

11  either get a license and continue to use the patented features

12  in my system, or if I don't get the license because I think

13  the price is too high, for example, I can move over to 4.20.1.

14       And so the difference in the value between those two is

15  really the centerpiece of the negotiation in terms of what the

16  value of the invention is and what PNC would pay.

17  Q.   Can we go to your next slide, please?

18       What are you showing us here?

19  A.   So these are the three components of the value that a

20  license to the patents-in-suit would bring to PNC.

21  Q.   Are these costs that PNC would not have incurred if it

22  had instead obtained a license?

23  A.   Right.  So sitting at the table, PNC is saying, I can get

24  a license and continue doing what I'm doing with the accused

25  system, but if I don't like the price of that license, I'm

1    going to need to move to 4.20.1 and I'm going to incur certain

2    costs that would be higher because I don't have the license.

3    Q.   So what's the first one, the development and

4    implementation costs?

5    A.   Well, that's the cost of getting the revised software

6    completed and out the door.  And, I mean, this is a very

7    interesting case for an economist, which is usually I have to

8    estimate those numbers because it didn't actually happen.  But

9    here it actually happened, so I have those dollars, and I

10   added them up and it's $354,000.  Ms. Larrimer testified

11   essentially to that number yesterday.

12   Q.   And what's your second item, additional transaction

13   costs?

14   A.   Well, additional transaction costs is, well, if I move to

15   version 4.20.1, are some customers that used to use mobile

16   deposit going to move to more expensive ways of depositing for

17   PNC, like an ATM and like a teller?  And so I account for

18   those costs, too.

19   Q.   And how did you do that?

20   A.   I did what's called a before-and-after study, and I did a

21   really big one.

22   Q.   How big?

23   A.   I took data points on actual transactions at PNC from

24   before the change to 4.20.1 and after the change.  I looked at

25   all of those transactions, and that was 200 million

1   transactions that I studied.

2   Q.   And what did you find?

3   A.   So here's what I did.  I'm like, well, you heard from Ms.

4   Larrimer yesterday, and I had seen it in the data, is that if

5   you just eyeball the data, you really don't see any change in

6   terms of how often people are using mobile deposit before the

7   change and after the change.

8        And so what I've learned throughout my years as an

9   economist who deals with a lot of data is sometimes your

10  eyeball can deceive you.  So you want to dig into the details

11  about what exactly is going on and make sure your casual

12  observation really fits the facts.

13       So what I did is, I said, all right, I have all this

14  data, I have it from before, I have it from after, but other

15  things changed between those two periods and I need to take

16  account of that.  For example, we were in the middle of COVID

17  during this period, and that affects how people decide whether

18  to deposit mobilely or deposit in another direction.

19       Things that are pretty basic affect whether you decide to

20  do it mobilely or do it in an ATM or branch.  What day of the

21  week is it?  Is your bank open?  What month of the year is it?

22  There are a lot more checks that come in in June and December,

23  graduation and holidays, for example, and you need to account

24  for all those things.

25       And so I built a giant statistical model with 200 million

1028

 1    data points to control for all that stuff to make sure I

 2    understood exactly what the effect of the change was.

 3    Q.    And do you have a chart that summarizes what you found?

 4    A.    I do.

 5    Q.    Can we go to that?  What does this chart show us, Doctor

 6    Vellturo?

 7    A.    So this is the structure of many charts I'm going to show

 8    you today.  It's showing you what happened when the accused

 9    system was being used by customers and after when 4.20.1 came

10    in and the features were removed.

11        So what you can see is that in the period before, in

12    about 30.65 percent of the instances where customers went to

13    make a transaction with a check at PNC, about 30.65 percent of

14    the time they used mobile deposit.  Did that number change

15    when 4.20.1 was implemented?  And the answer is, it actually

16    did.  It did go down, but it went down by a really small

17    amount, about a half a percentage point.

18        And just to give you some context for that, here's the

19    way to think about it.  In the period with the old accused

20    system, out of 200 people that would have during that time

21    period used mobile deposit for their checks, in the world

22    where 4.20.1 was brought in afterwards, of those 200 people,

23    199 of them would still use mobile deposit and one would go to

24    an ATM or a teller.

25    Q.    And did you compute the financial costs to PNC of what

1    you saw as a result of running your regression model?

2    A.    I did.  So what I did is I look at how much of that

3    volume -- if that volume moved to those more expensive

4    channels, what would that mean as higher costs to PNC.

5    Q.    And we heard some testimony from Mr. Kennedy about what

6    the two different numbers that he talked about were, the

7    benefit of $3.88 or $3.87 and roughly a dollar, I think was

8    the other number he used.

9          Which of those did you use for purposes of calculating

10   the additional costs?

11   A.    I used the higher number, the $3.88.

12   Q.    Okay.  And then if we can go to the next slide.  How did

13   you -- then the next one after this.

14   A.    Right.  So, by the way, just to be clear, that 4.7

15   million there, that's the total when I do all that math out.

16   Q.    Oh.  Sorry.  That's what I was going to ask you.

17   A.    Oh, okay.

18   Q.    So the additional transaction costs that you computed

19   using Mr. Kennedy's number on a per-transaction benefit and

20   using your regression analysis adds up to what?

21   A.    4.7 million.

22   Q.    The third item on your chart is added labor costs.  What

23   does that reflect?

24   A.    Well, Ms. Larrimer spoke to this a bit yesterday, and I

25   looked at the mathematics here as well.  The switch to 4.20.1

1   led to more adjustments and disputes on mobile deposits and is

2   what Ms. Larrimer said is she needed to bring in eight

3   additional customer service people to manage those issues.

4   That costs money.  That costs about between $400,000 and

5   $500,000 a year.

6        You notice my number is 10 times that number because if

7   you make this move and don't take a license, you've got to do

8   it year after year.  So that's where the 5.4 million comes

9   from.

10  Q.   And did you look at the number of increases in these Reg

11  E disputes that I think Ms. Larrimer was asked about

12  yesterday?

13  A.   I did.  I wanted to see if they were significant.

14  Q.   And do you have a chart that summarizes what you found?

15  A.   I do.

16  Q.   Could we go to that chart?  Thank you.

17       So what do we see on this chart, which is DDX 9.14.

18  A.   Well, under 4.20.1, there were about 31,000 Reg E

19  disputes for the period I had.  And I have annualized all of

20  this, but it's apples to apples.  So there were 31,000

21  disputes, and it's important to put that in context.  That's

22  among 4 million annual mobile account users.  So people at

23  some point during the year that make a mobile deposit.

24  Q.   How often -- how often would an individual expect that

25  they might encounter one of these disputes?

1    A.   All right.  So that means in any given year, a little

2    under one percent, or less than one in a hundred of the

3    accounts, would experience an event.  Now, you can actually do

4    the mathematics out here, and it can tell you if the -- if one

5    out of every one hundred accounts in any given year sees an

6    event, how long would it take for the average account to see

7    an event.  And it's actually once every 125 years.  This is

8    rare stuff.

9    Q.   Do you have a slide that summarizes your conclusions

10   about the costs to PNC of moving to 4.20.1?

11   A.   I do.

12        MR. STONE:  Could we bring that up, please?

13   Q.   (BY MR. STONE)  So can you explain to the jury what

14   you've done to come to these total costs to PNC?

15   A.   Well, I added the first three numbers together, $354,000,

16   $4.7 million, and 5.4 million, and that gives the cost to PNC

17   of $10.5 million.

18   Q.   And then you have a line that says, discounted to net

19   present value.  If you would, please explain what that means.

20   A.   Okay.  So what PNC would be paying for a license, it

21   would pay all up front at the time of the negotiation, in this

22   case 2006.  But the dollars associated with the savings that

23   it would get through the license, those dollars occur out into

24   the future and actually some of it way out in the future.

25        And so the question is, how do you compare those numbers

1    to make sure you're doing it right.  And so here's the basic

2    concept.  If I were to give you a dollar today or I were to

3    promise you a dollar tomorrow, dollar five years from now,

4    which one is more valuable to you when I'm making the offer to

5    you?

6         Obviously, the dollar is worth a dollar.  I'm handing you

7    a dollar.  And what I can do with that dollar if I give it to

8    you today is you can put it in a savings account and you can

9    earn interest on it.  And so in five years' time, you don't

10   have a dollar anymore.  You've got a dollar 20 or a dollar 30.

11        If I'm going to give you a dollar five years from now,

12   you can't do that because I'm not giving it to you for five

13   years.  So that's part one.  And then part two is I may not be

14   around to give you the dollar in five years.  And so in that

15   sense dollars that come later are worth more than dollars that

16   come sooner, and this discounting just takes cares of that.

17   Q.   And did Mr. Kennedy agree with you that you should do a

18   discount to net present value?

19   A.   Yeah, this is very common and we both did it.

20   Q.   Did you also look at the impact of this 4.20.1 version on

21   PNC's business?

22   A.   I did.

23              MR. STONE:  Can we bring up the next chart?

24   Q.   (BY MR. STONE)  What is this -- what do we see on 9.21?

25   A.   So this is a listing of total accounts at PNC on a

1  month -- actually on a quarter-by-quarter basis from 2014 to

2  2021, both total accounts and checking accounts.

3  Q.   And what was the source of the data on this chart?

4  A.   These data came from what's called DX 0679.  You can see

5  that in the bottom left-hand corner.  So if you if you want to

6  see the data, that's where it is.

7  Q.   And did you look here at what happened when various

8  changes were made with respect to the app?

9  A.   I did.  I mean, you can see they're pretty consistent.

10  They're rising slowly and pretty much at the same rate the

11  whole time.

12       MR. STONE:  Can we bring up the next slide, please?

13  Q.   (BY MR. STONE)  What does this show us here?

14  A.   Well, this is when PNC removed the accused features.  And

15  if it had a dramatic effect on their business, they'd have a

16  lot more trouble keeping accounts and customers and a lot more

17  trouble tracking customers.  But it didn't do that.  The

18  numbers continue right on trend.

19  Q.   And did you look at things other than just the number of

20  checking accounts and the total number of accounts?

21  A.   Yes.

22  Q.   What else did you look at?

23  A.   I looked at the number of accounts using mobile deposit.

24       MR. STONE:  Can we go to your next slide, please?

25  Q.   (BY MR. STONE)  What does this show us here?

1    A.   Right.  So this slide, the orange line at the top is

2    actually the same line we just looked at.  That's the total

3    number of accounts.  The blue line at the bottom is telling

4    you the number of accounts in a given month that used mobile

5    deposit.

6    Q.   And so what percentage of the total accounts at PNC over

7    this period of time used mobile deposit?

8    A.   It changes a little bit but not a whole lot.  And so if

9    you take a number from the blue line in a given month and

10   divide it by the number on the orange line, you get about

11   eight percent, about one out of every 12.

12   Q.   We have here another line drawn that I guess is red.

13   What does that reflect?

14   A.   So remember that there was a time where PNC had mobile

15   deposit app that didn't have auto-capture.  And then in 2016,

16   they introduced auto-capture.  Actually technically MiTek

17   introduced auto-capture.  And what you can see here is I drew

18   a line where that happened.  And I wanted to see, did

19   auto-capture make a big difference in terms of how many people

20   were using mobile deposit.

21        So I looked at the blue line and said, is there a real

22   change in the blue line when mobile deposit comes up, and I

23   don't see one.

24   Q.   And do you mean mobile deposit or auto-capture.

25   A.   Well, I don't see a change in the mobile deposit volume

1    when auto-capture is brought in.

2    Q.   Thank you.  I might have misheard you.

3         And then did you also look at when 4.20.1 was introduced?

4    A.   Right.  So we can do another before-and-after study,

5    which is what happened before the patented features were

6    dropped and what happened after the patented features were

7    dropped.  And that's the second red line.  And you can see

8    same conclusion, things are running along at exactly the same

9    pace.

10   Q.   Did you do any other before-and-after studies of metrics

11   that you might use to look at the impact on PNC's business?

12   A.   Yes.

13   Q.   What else did you look at?

14   A.   I looked at app store ratings.

15        MR. STONE:  Can we go to the next slide?

16   Q.   (BY MR. STONE)  What do we see on this slide, Doctor

17   Vellturo?

18   A.   Right.  So here the left-hand panel is ratings for IOS,

19   and this is a before-and-after study.  With the features,

20   which is before the change, the App Store rating was 4.78

21   stars.  After the features were removed, it actually went up a

22   little bit to 4.85 stars.  And if you look over on the Android

23   side, again, the ratings didn't decline there, either.

24   Q.   What's the value to you in calculating a reasonable

25   royalty of looking at these before-and-after studies?

1036

1  A.   Well, it really gets to the heart of the issue, right,

2  which is we are trying to understand the value of these

3  patented inventions.  And the accused system in the before

4  period has the patented -- the alleged patented features in

5  it, and the system after doesn't.

6       And so when I compare those two to each other, it gives

7  me a very direct measure of exactly what the issue is here,

8  which is, what kind of value do these patented features bring

9  to a mobile deposit system.  So that's why it was so

10 important.

11 Q.   Can we go to your next slide?

12      Does this summarize your findings on the real-world

13 effect of removing the patented features?

14 A.   Right.  So the first one is that about one in 200 mobile

15 deposits that was done before under the accused system, maybe

16 one in about 200 after the features were removed left mobile

17 deposit and went to another mechanism.  That's the first

18 point.

19 Q.   What's the second one?

20 A.   The second point is, as we saw, there was no impact on

21 customer accounts or accounts using mobile deposit.  And then,

22 last, in terms of consumer ratings, there was no change in the

23 ratings.

24 Q.   Now, you were here for Doctor Conte's testimony where he

25 said that 4.20.1 still infringes the auto-capture patent

1   because there is code in the computer or in software somewhere

2   that is still in PNC's system that relates to auto-capture.

3   Do you recall that testimony?

4   A.   Yes.

5   Q.   If he's right about that, does that change your analysis

6   in any way?

7   A.   It does not.

8   Q.   Why not?

9   A.   Because, remember, I'm trying to capture the value in

10  this case of auto-capture as it's being used by customers.

11  The fact that it resides in any computer code anywhere doesn't

12  matter if the customers can't use it because that's where the

13  value comes from the feature, from the customers using it.

14  And here, whether it continues to infringe or not, I can

15  directly observe what customers thought and did when they no

16  longer had access to auto-capture.  They couldn't use it.

17  Q.   Yesterday Mr. Sheasby asked Doctor Bovik about three

18  other patents, not the four patents in this case but three

19  other patents.  What impact, if any, does it have on your

20  analysis if the three other patents are potentially infringed

21  by 4.20.1?

22          MR. SHEASBY:  Your Honor, I don't believe that's in

23  his report.  I think in his report he just acknowledged their

24  existence and chose not to consider them.

25          THE COURT:  Mr. Stone?

1     MR. STONE:  Obviously it's an issue that arose after

2  he did his report, but I'll just ask him the reasons why he

3  didn't consider them, Your Honor.

4     MR. SHEASBY:  If it was an issue that come up after

5  his report, I object to that, and he should stay within the

6  four corners of his report.

7     THE COURT:  Well, given that exchange, I'll sustain

8  the objection.  It doesn't mean you can't within the four

9  corners of the report address it at a higher level.

10     MR. STONE:  Thank you, Your Honor.  I appreciate

11  that.

12  Q.  (BY MR. STONE)  Doctor Vellturo, why was it that you

13  didn't consider any other patents outside the four in this

14  case as to whether or not they were infringed for purposes of

15  your analysis of a reasonable royalty?

16     MR. SHEASBY:  Your Honor, can I approach?

17     THE COURT:  Approach the bench.

18     (The following was had outside the hearing of the

19     jury.)

20     MR. SHEASBY:  In his report, he said he did not

21  consider them because they are part of another litigation.

22  And so I'm totally fine if Mr. Stone wants to open that door,

23  but I just want to be clear I'm absolutely going to open that

24  door if he goes here.

25     THE COURT:  Well, if he testifies contrary to

1  something that's in his report, I will expect you to impeach

2  him with his report during cross-examination.

3  MR. SHEASBY:  Okay.  I just want to be clear I'm

4  allowed to bring up -- isn't there a portion in his report

5  that actually says -- explains something different from

6  litigation as the reason?

7  MR. STONE:  They're not relevant to this case.

8  MR. SHEASBY:  So then I object to the question.

9  It's not in his report other than litigation, and so he

10  shouldn't be able to give any explanation other than he didn't

11  do it because counsel asked him not to.

12  MR. STONE:  Your Honor, he didn't do it because he

13  thinks it has no impact on the calculations here.

14  MR. SHEASBY:  That's not -- that's not --

15  MR. STONE:  But I'm not going to open the door to

16  the other litigation.

17  THE COURT:  All right.  Then let's go forward.

18  MR. STONE:  Thanks.

19  (The following was had in the presence and hearing

20  of the jury.)

21  THE COURT:  Let's proceed.

22  Q.  (BY MR. STONE)  Is the -- in calculating the reasonable

23  royalty in this case, did you focus on the four patents that

24  are in this case?

25  A.  And their value as manifested in the two features, yes.

1   Q.   Okay.  And so the -- it's the value of the two features

2   that are covered by the four patents in this case that is the

3   basis for your reasonable royalty?

4          MR. SHEASBY:  Your Honor, I object.  The patents

5   don't cover two features.  That's a misstatement of the law.

6          MR. STONE:  Your Honor, we --

7          THE COURT:  As I've said earlier, if he wants to

8   characterize it that way, you can address it on

9   cross-examination.

10         MR. SHEASBY:  Thank you, Your Honor.

11  Q.   (BY MR. STONE)  Did you do anything in addition to

12  calculating the value of the four patents in this case based

13  upon the difference in results, the before and after, of

14  4.20.1?

15  A.   Yes.

16  Q.   What was the other analysis you did?

17  A.   I looked at the licenses that were available to me that

18  were relevant in figuring this same question out.

19  Q.   And do you -- is that independent from your valuation of

20  4.20.1?

21  A.   It's completely separate.  It was -- this was based on

22  licenses I had and not on all those before-and-after studies

23  we just did.

24  Q.   And do you have a slide that summarizes the different

25  licenses that you looked at?

1   A.    I do.

2         MR. STONE:  If we could bring that up.

3   Q.    (BY MR. STONE)  What are the four licenses that you

4   looked at?

5   A.    They are the NCR agreement, the Bremer license agreement,

6   Wells Fargo, the Wells Fargo license agreement, and then

7   offers USAA made to Dollar Bank and SunCoast Bank.

8   Q.    And what is the NCR agreement, if you could remind us of

9   that briefly?

10  A.    Right.  So I think I have a slide on this.

11        The NCR agreement is the agreement under which PNC gets

12  all of its mobile deposits software and services from NCR.

13  That includes a fully-developed system for doing mobile

14  deposit, includes the software that sits up on the computers

15  at PNC, it includes the software that sits on your phone when

16  you download the app, it's the maintenance and support of all

17  of that, and it's all the intellectual property that NCR has

18  or that its suppliers have.  You get rights to all that.

19  Q.    What's that cost to PNC?

20  A.    It's 12 cents per mobile deposit.

21        MR. STONE:  Your Honor, we'd request that we seal

22  the courtroom for the next line of questioning if we could?

23        THE COURT:  Based on counsel's request and to

24  protect confidential information, I'll order the courtroom

25  sealed.

1    I'll direct that all persons present who are not subject

2    to the protective order that's been entered in this case

3    should excuse themselves and remain outside the courtroom

4    until it's reopened and unsealed.

5                    (Courtroom sealed.)

6             THE COURT:  All right.  The courtroom is sealed.

7         Mr. Stone, you may proceed.

8    Q.   (BY MR. STONE)  Doctor Vellturo, can we go to your next

9    slide, please?  What does this slide show us?

10   A.   This shows details of the license that USAA granted to

11   Bremer.

12   Q.   And what are the important constituents of that license

13   agreement?

14   A.   First, let me talk very briefly about Bremer Bank.

15   Bremer Bank is a bank in the Midwest, and it's a full service

16   bank.  It offers all the checking and savings services you

17   would expect.  It offers home loan mortgages, home equity

18   mortgages.  It also offers financial services.  If you want an

19   investment advisor or if you want to invest your -- your

20   savings through them.  So it's a full-service bank.

21   Q.   And what were the key elements of that license agreement

22   between Bremer and USAA?

23   A.   So the key bottom line number is that Bremer obtained a

24   license to USAA's mobile deposit patent portfolio, which I'll

25   speak to in a moment, and in return they paid 58 cents per

1    mobile transaction, I'm sorry, per mobile deposit.

2    Q.   And what rights to how many patents did they get under

3    that license agreement?

4    A.   They got rights to 107 patents, including the four

5    patents at issue here today.

6    Q.   And how do you apportion the 58 cents per deposit amongst

7    those 107 patents?

8    A.   Right.  Well, you can't attribute the 58 cents in its

9    entirety to the four patents.  There are another 103 patents.

10   So how do you solve that problem?  And it's a problem

11   economists have dealt with for a long time.  And there's a

12   method we use, and it's called a patent citation analysis.

13   And let me explain how it works.

14        Patents are not all created equal.  That's why they're

15   patents.  Some patents have relatively little value and some

16   have a lot of value.  Mr. Kennedy spoke to this yesterday when

17   he kind of said there's this curve where some patents are, you

18   know, have a little bit of value and others have a lot.  So

19   we're going to take advantage of that in this patent citation

20   analysis.

21        The key idea behind this analysis is, how do you know

22   whether a patent is really valuable or not.  Well, if a

23   patent's really valuable, then other people look at that

24   patent and say, hey, that's a pretty valuable patent.  Let me

25   start doing some more work in that area and develop my own

1    patents that kind of feed off the idea of that first patent.

2        When that happens, those patents that come later when

3    they file for their patents with the Patent Office, they have

4    to refer back to the patents that kind of inspired them or got

5    them where they are today.  And if you're an important patent,

6    a lot of people refer to your patent because it inspired them

7    to do their work.  And if your patent's not very important,

8    not a lot of people do it.

9        Now, you got to be careful.  Right?  Because for at least

10   two reasons.  One is a patent might just be older.  Right?

11   And so people have more time to refer to that patent.  So you

12   want to make sure you account for the age of the patent.  And

13   I do.

14       And the second one is patents are in all kinds of

15   different industries or, here, I call it field of use.  And

16   some industries just have a lot more innovation than others.

17   So you need to control for that, too.  And I do.  And when you

18   make that controlling, when you do all of that controlling and

19   look at the curve that tells you, you know, where patents

20   typically fall in terms of their relative value, you can

21   actually figure out what the value of each of the patents in a

22   portfolio like this is relative to one another.  And I did.

23   Q.   And did you figure out the relative value of the 107

24   patents that were licensed to Bremer?

25   A.   Well, most importantly, I figured out the relative value

1

2

3

4          (Redacted.)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1    are most significantly competitive with us at USAA.  And what

2    they're looking at here is they are saying, let's look at our

3    account holders and let's ask them, which is what this is,

4    it's a survey, let's ask them, if you have another bank

5    account, who is it with?  Because obviously if they've got

6    accounts at both places, that means you are closer

7    competitors.  And the top bank by substantial amount was Wells

8    Fargo at 19 percent.  PNC is on the list, but it's vastly

9    lower at 3 percent?

10   Q.   Okay.  Let me --

11   A.   I'm sorry.  You know, I just -- I jump ahead, but that

12   tells you that when you think about the relative competition

13   to USAA, Wells Fargo is a much stronger competitor in USAA's

14   view than PNC is.

15   Q.   Did you also look at two offers that USAA made to other

16   banks?

17   A.   Yes.

18   Q.   And could we go to your next slide and can you summarize

19   for us what you have here as the offer to Dollar Bank?

20   A.   Right.  So USAA made an offer to Dollar Bank for a

21   license to all of its remote deposit patents, and that offer

22   was made at $450,000.

23   Q.   And what about SunCoast?  What was the offer to SunCoast?

24   A.   The offer to SunCoast was the same for the whole remote

25   deposit portfolio, and it was for $2 million.

1    MR. STONE:  If we can then go to the next slide.

2    Sorry.

3    Q.   (BY MR. STONE)  We see here something referred to as the

4    *Georgia-Pacific* factors.  We heard about this from Mr.

5    Kennedy.  What are they?

6    A.   So these are 15 factors that the courts over the years

7    have identified as meaningful items to look at and consider

8    when doing a reasonable royalty analysis like this.  And I --

9    and I considered them all.

10   Q.   And you have them grouped here into four different

11   groups.  Why did you do that?

12   A.   It takes less time, first of all.  Going through all 15

13   would not be fun.  But they have very common characteristics

14   to each other.  Mr. Kennedy talked about this, and he was

15   right.

16        Factors 1, 2, 4, 12, and 14 relate to licensing history.

17   Factors 3, 5, 7, and 14 relate to the nature of the parties

18   and how they relate to each other.  6, 8, 9, 10, 11, 13, and

19   14 relate to the patented invention itself, who uses it, what

20   benefits they get, what alternatives they are.  And then the

21   last one is, at the end of the day what's a reasonable number.

22   And so I did them all.

23        We basically have done them all already.  Right?  We did

24   the licensing work, we just finished that.  In terms of the

25   value of the invention, we did that during my before-and-after

1    cost study.  The relationship to the parties, we just did

2    that, too.  So most of this I've already taken care of.

3    Q.    Did you also, in addition to this analysis, look at what

4    Mr. Kennedy presented and sort of analyzed that to see if you

5    agreed or disagreed with it?

6    A.    I did.  That's USAA's claim.  That's my second

7    assignment.

8    Q.    And what did you conclude about his estimate of a

9    reasonable royalty?

10   A.    It's -- it really doesn't hold together, given the nature

11   of the two inventions.  Centrally here, these are two features

12   of mobile deposit which is a feature of the mobile app, which

13   is a feature of electronic banking, which is a feature of the

14   overall banking relationship that customers have with PNC.

15        And so when you think about it that way and look at the

16   before-and-after study, the idea of $300 million just doesn't

17   stand up.

18   Q.    Could we go to your next slide?

19   A.    Right.

20   Q.    What do we see shown here?

21   A.    So the first bar I have here looks at actual average

22   monthly deposits of -- for the period June to October 2020.

23   Q.    And why do you use that period?

24   A.    Well, that's the accused period in -- where the accused

25   system is still being used.

1  Q.   And then do you have data for what happened in that same

2  set of months afterwards?

3  A.   Yeah.  We'll get to that in a moment.

4  Q.   Okay.  So what did -- what did Mr. Kennedy's models

5  predict would happen?

6  A.   So Mr. Kennedy's models predicted that without the

7  patented inventions, the MRDC systems or the remote deposit

8  capabilities that PNC could offer would be pretty poor, and

9  that the number of deposits would drop, mobile deposits would

10  drop a lot.

11       And, again, we have the data from the actual world to

12  tell us whether that happened or not, and the bars show you

13  how his -- his approach, how far we should expect those

14  numbers to fall.

15  Q.   And what actually happened during the months of June

16  through October 2021?

17  A.   They didn't fall.  As Ms. Larrimer told you yesterday,

18  they stayed high and they've continued to stay high.

19  Q.   What does that lead you to conclude about Mr. Kennedy's

20  models?

21  A.   It just -- it doesn't capture the value of these

22  features.  When these features were removed, there wasn't this

23  wholesale collapse in the use of mobile deposit at PNC.  It

24  basically stayed the same.  A little change.  I mean, I didn't

25  want to do all that work to say there is no change.  There is

1    a little change.

2    Q.    Doctor Vellturo, we also heard from Mr. Kennedy that

3    there might be a number of branches that were closed because

4    of people stopping depositing in branches and starting to

5    deposit mobilely.  So he said if we take away the ability to

6    deposit mobilely, that would bring these checks back to the

7    branches.  Do you recall that testimony?

8    A.    Yes.

9    Q.    Did you look at what the effect would be if you assumed

10   that all of PNC's mobile deposits stopped being mobile

11   deposits and went back instead to being deposits at a branch?

12   A.    Yes.

13   Q.    Do we have a slide that summarizes that analysis?

14   A.    I do.  And some of this you went through with Mr. Kennedy

15   yesterday, so I'm going to try to summarize it so we don't

16   have to go over old ground.

17          But the average monthly checks that are handled by remote

18   deposit at PNC, it's about 2.6 million checks a year at its

19   absolute most highest month ever.  In their lowest month ever,

20   PNC had about 2100 bank branches.  When you think about how

21   often a bank branch is open, which is like 22 to 26 days a

22   month, you can actually figure out how many more checks does

23   this mean a given branch would have to handle in a given day.

24   And that number is about 50, between 48 and 57.

25          As I think we heard some testimony yesterday there is

1    about a minute is the time period it takes to process a

2    deposit at a teller, so that would mean the teller at each

3    branch on average would be busy for about an extra hour.

4        So this really doesn't suddenly create this wholesale

5    opportunity to close tons of branches because branches are

6    important for a whole bunch of other reasons you don't want to

7    close them.

8    Q.   What if it took four minutes as we heard from Mr. Kennedy

9    to deposit a check.  Would that change your conclusion?

10   A.   No.

11   Q.   Let me ask you if we can sort of summarize some of what

12   you've done.  And can you see the easel from where you are,

13   Doctor Vellturo?  Can you see it okay?

14   A.   Let me slide a bit.

15             THE COURT:  You're welcome to stand up if it would

16   help.

17             THE WITNESS:  Thank you, Your Honor.

18   Q.   (BY MR. STONE)  We've seen two kinds of license

19   agreements or royalties.  One is a lump sum and one is a

20   per-transaction number.  Is that right?

21   A.   Yes.

22   Q.   And can we compare the various numbers to what was Mr.

23   Kennedy's analysis and to compare them to what you found in

24   your various analysis?

25   A.   Yes.

1

2

3                          (Redacted.)

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1    that a fair way to represent that on this chart?

2    A.    Sure.

3    Q.    Okay.  And what else do we have on a per transaction

4    basis?

5    A.    Well, we have the two offers that USAA made to the

6    Florida banks.  Mr. Epstein spoke about the fact that USAA was

7    ready to sign those agreements if the parties agreed.  So it

8    was a bona fide offer, they were ready to sign, and that was

9    about 6 cents a transaction for the whole portfolio.

10   Q.    Okay.  And the Bremer agreement was just for the four

11   patents in this case?

12   A.    That's right -- well, I derived the 3 cents by accounting

13   for the fact that there were other patents in there.  That was

14   my citation analysis that we went through.

15   Q.    And so the dollar and SunCoast ones were for what was

16   then the entire portfolio?

17   A.    That's right.

18   Q.    And what figure does Mr. Kennedy put forth as what he

19   thinks would be a reasonable royalty on a per-transaction

20   basis?

21   A.    It's just north of $3 per mobile transaction.

22   Q.    I'll just put $3.  And do we also know what the cost is

23   of the entire system that is provided by NCR?

24   A.    That's true.  NCR, where you get all the software you

25   need for a mobile banking system, that was 12 cents per

1057

```
1    transaction.

2    Q.   So do the two demonstratives that we have just shown

3    compare your analysis to the analysis done by Mr. Kennedy?

4    A.   Yes.

5    Q.   In your opinion, Doctor Vellturo, what is a reasonable

6    royalty if the jury in this case was to find the patents valid

7    and infringed?

8    A.   On a discounted basis, that number is $8 million as a

9    lump sum payment.  And on a non-discounted basis, it's $10.5

10   million.

11   Q.   Now, if you were to allocate that $8 million on a

12   discounted basis, how much would you attribute to the three

13   patents that we sometimes call the 2006 patents and how much

14   would you apportion to the 2009 patent that we sometimes call

15   the auto-capture patent?

16   A.   Right.  So the patent citation analysis is really helpful

17   here, too, because I can look at the value of each of the

18   patents individually, and here I represent that.

19        With respect to the 2006 patent family, the value of the

20   '432 Patent is less than one percent.  That's one of those

21   lesser patents we talked about.  The '605 Patent is 41

22   percent.  The '681 Patent is also 41 percent, and the '571 is

23   18 percent.

24   Q.   And do these percentages, are they applied to the $8

25   million if you reduce it to net present value?
```

1    A.    That's right.

2    Q.    And are they applied to the 10.5 million if you don't

3    take into account net present value or the desirability of

4    getting money today as opposed to money out in the future?

5    A.    Yes.

6    Q.    Thank you.

7              MR. STONE:  Pass the witness, Your Honor.

8              THE COURT:  Cross-examination?

9              MR. SHEASBY:  Your Honor, I'm going to pass out a

10   set of binders to my co-counsel.

11             THE COURT:  That's fine.  Are you going to use this

12   chart, Mr. Sheasby?

13             MR. SHEASBY:  I am not, and I will remove it.

14             THE COURT:  Turn it to a clean sheet, please.

15        Do we need to maintain the seal on the courtroom for

16   cross?

17             MR. SHEASBY:  We do, Your Honor.

18             THE COURT:  All right.  Let me know if we get to a

19   point where it can be unsealed.

20                        CROSS EXAMINATION

21   BY MR. SHEASBY:

22   Q.    Good afternoon, Doctor Vellturo.

23   A.    Good afternoon, Mr. Sheasby.

24   Q.    It's nice to speak with you again.  We've actually gotten

25   to chat twice before.  Correct?

1    A.    That's true.

2    Q.    And I want to start out by speaking about areas of

3    agreement.  So my ear was pricked.  You said there were a list

4    of things that you and Mr. Kennedy who did a damage analysis

5    on behalf of USAA have -- you agree on.  You gave a list, but

6    I noticed that there are some things that weren't on the list.

7    So I want to go over them.  We can talk about them.

8              MR. SHEASBY:  So let's go to PDX 10.5, Mr. Huynh.

9    This is Mr. Kennedy's demonstratives.

10   Q.    (BY MR. SHEASBY)  So another area where you and Mr.

11   Kennedy agree is that there -- if the jury finds infringement

12   in 2021, there are over 900,000 accounts using the infringing

13   MRDC system per month.  Correct?

14   A.    I think -- with respect to all the patents, I believe

15   that's correct.  I'd have to go back and look whether that

16   applies if only some of the patents infringe.

17   Q.    With respect to all the patents --

18   A.    Okay.

19   Q.    -- it's 900,000 per month.  Correct?

20   A.    That's accounts.  I'm just reading the chart.  I see

21   that.

22   Q.    And you agree with that.  Correct?

23   A.    That sounds right.

24   Q.    And over the infringement period in this case which

25   you're required to assume.  Correct?

1    A.   Yes, that's right.

2    Q.   There is over 105,800,000 infringing MRDC deposits.

3    Correct?

4    A.   Right.  They're accused.  I understand.

5    Q.   Well, they're not accused.  You must assume they are

6    infringing.

7    A.   Oh, I'm sorry.  They are accused in this case.  For the

8    purposes of my work, I assume there's infringement.  So fair

9    enough.

10   Q.   And the dollar amounts of those infringing MRDC deposits

11   is $54,489,167,000 [sic].  Correct?

12   A.   I'm not sure you read that exactly correct.  I mean, I

13   see the number.

14   Q.   It's $55 billion and a number of digits after that.

15   Correct?

16   A.   That's the amount of dollars that went into people's bank

17   accounts.

18   Q.   Using the infringing system.

19   A.   Right.  Using the accused mobile deposit system.

20   Q.   Which you're required to assume is infringing.

21   A.   Agreed.

22   Q.   And there is also another area in which you and Mr.

23   Kennedy agree.

24        MR. SHEASBY:  Let's go to the next slide, Mr. Huynh.

25   Q.   (BY MR. SHEASBY)  The standard for damages is

1  promulgated, which means it's handed down by our United States

2  Congress.  Correct?

3  A.    Yes.

4  Q.    And the standard for damages is not a reasonable royalty;

5  it's no less than a reasonable royalty.  Correct?

6  A.    I see that language, yes.

7  Q.    And, in fact, in other fora, you've taken the position

8  that the jury is entitled to award damages higher than a

9  reasonable royalty.  Correct?

10  A.    In some instances, the plaintiff is seeking what are

11  called lost profits damages, and those are very commonly

12  higher than a reasonable royalty.  USAA is not seeking that

13  here.

14  Q.    Well, to be clear, you've testified that a reasonable

15  royalty should be the floor that the damages can't go below,

16  though they may be higher.  Correct?

17  A.    Yes.

18        MR. SHEASBY:  And let's go to black, Mr. Huynh.

19  Q.    (BY MR. SHEASBY)  Some patents can be worth hundreds of

20  millions of dollars.  Correct?

21  A.    It's rare, but it happens.

22  Q.    Some patents can be worth hundreds of millions of

23  dollars.  Correct?

24  A.    Correct.

25        MR. SHEASBY:  And let's go to PDX 1.14, Mr. Huynh.

1   Q.   (BY MR. SHEASBY)  So this is one of the claims of the

2   patents-in-suit.  Correct?

3   A.   You're representing to me this is the entire claim?

4   Q.   This is the entire claim.  I can represent that to you,

5   Doctor Vellturo.

6   A.   I see it.

7   Q.   And you said something.  You said this is one of those

8   not so valuable patents.  Correct?  '432 Patent?

9   A.   Yes.

10   Q.   And you said the '432 Patent only covered a

11   feature-correct?--which is presenting a check.

12   A.   Well, those three patents together cover that feature in

13   the 2006 family.

14   Q.   The claim and our property right is defined by every

15   single element in this patent claim.  Correct?

16   A.   I disagree with that.

17   Q.   You disagree that USAA's property right is what's defined

18   by the claim of this patent?

19   A.   I don't disagree with that.  That's certainly true.

20   Q.   Our property right, the metes and bounds of the property

21   we own, are defined by the scope of this claim.  Correct?

22   A.   I'm not a lawyer, but that's my understanding.

23   Q.   And, in fact, you cannot identify anything that is

24   necessary from mobile remote deposit capture that is not

25   covered by the claims of the USAA patents.  Correct?

1   A.   I disagree with that.

2   Q.   Sir, you cannot identify anything that is necessary for

3   mobile remote deposit capture that is not covered by the

4   claims of USAA's patents.  Correct?

5   A.   I'm sorry.  I just don't really think about it that way.

6   I think what can you do with the patented invention that you

7   can't do without it, and that's the way I think about it.  And

8   I'm not sure that squares with what you're asking me --

9   Q.   Okay?

10   A.   -- so I'm not sure how to answer your question.

11   Q.   Why don't we look at your deposition --

12   A.   Okay.

13   Q.   -- and see how you answered it then.  It's volume 2,

14   lines 366:25 to 367, lines 24?

15          THE COURT:  Let me caution you gentlemen to make

16   sure you don't speak over each other --

17          THE WITNESS:  Yes, Your Honor.

18          THE COURT:  -- as you go back and forth.

19          THE WITNESS:  I'm sorry.  Mr. Sheasby, where are you

20   directing me?

21   Q.   (BY MR. SHEASBY)  366, line 25, to 37, line 4.

22   A.   I see that testimony.

23   Q.   All right.  Let's publish it.

24          MR. STONE:  Your Honor, object.  It's not at all

25   inconsistent with what he just said.

1    MR. SHEASBY:  I believe it is inconsistent.

2    THE COURT:  Once you've refreshed his recollection,

3  you need to ask the question again.  And if he gives an answer

4  inconsistent with his prior statement, then you can ask for

5  leave to publish it.

6  Q.  (BY MR. SHEASBY)  So the truth is, you can't identify

7  anything that is necessary for MRDC that is not covered by the

8  claims of USAA's patents.  Correct?

9  A.  And as I said, I think, three or four questions ago, you

10  know, I'm not a technical expert, but as an economist thinking

11  about the value of a claim, that's not how I think about it.

12  Q.  Okay.

13  A.  As I said here in my deposition, I said, I don't

14  understand your question.

15  Q.  So let's publish it then.

16  A.  Okay.

17    MR. STONE:  Your Honor, it's not inconsistent with

18  the answer he just gave.  I object to publishing it.  May we

19  approach?

20    THE COURT:  Yes, you may approach the bench.

21    (The following was had outside the hearing of the

22    jury.)

23    THE COURT:  I don't have the deposition.  If his

24  answer was, I don't understand the question, I don't know how

25  that could be an inconsistent answer.

1    MR. SHEASBY:  His answer was, I can't answer the

2    question.

3    MR. STONE:  Here's his answer at the very top.  My

4    concern with any publication, I have an additional concern

5    which is the next question and answer --

6    MR. SHEASBY:  We won't publish that, Your Honor.

7    MR. STONE:  -- which is highly prejudicial.

8    MR. SHEASBY:  We would not publish that.

9    THE COURT:  All right.  I'll grant leave to publish

10   page 367, lines 1 through 4.

11   MR. SHEASBY:  Thank you.

12   THE COURT:  Nothing else.

13   MR. SHEASBY:  And with your permission, I'm going to

14   go back and make sure that's all that's published.

15   THE COURT:  That's fine.

16   MR. SHEASBY:  Thank you, Your Honor.

17   (The following was had in the presence and hearing

18   of the jury.)

19   MR. SHEASBY:  Madame Courtroom Deputy, could you

20   turn off the system so we could prepare for the minor portion?

21   Thank you.

22   (Pause in proceedings.)

23   MR. SHEASBY:  Let's publish that, Mr. Huynh.  We

24   need to do one more line above that, Mr. Huynh.

25   Can you put it back down just briefly?

 1          I apologize for the delay, Your Honor.  We're now

 2     prepared.

 3               THE COURT:  You may publish this excerpt from his

 4     deposition.

 5     Q.   (BY MR. SHEASBY)  Question:  "What is necessary for

 6     mobile remote deposit capture that is not covered by the

 7     claims of USAA's patents?"

 8          Answer:  "I don't interpret claims of patents.  I can't

 9     answer that question for you."

10          Did I give your testimony accurately?

11     A.   Yes.

12     Q.   Now, there actually is someone who has expertise in the

13     banking industry whose opinions you relied on.  Correct?

14     A.   Yes.

15     Q.   His name was Mr. Webster.  Correct?

16     A.   Yes.

17     Q.   Mr. Webster's not going to testify today.  Correct?

18     A.   I don't know.

19               MR. SHEASBY:  So let's go back up to PDX 1.14.

20     Q.   (BY MR. SHEASBY)  So when the jury considers your

21     credibility as a witness, they can take into account whatever

22     instructions the Judge gives them as to what defines the scope

23     of our invention.  Correct?

24     A.   Well, I'm not really the expert on the scope of the

25     invention so I'm not sure how my credibility would factor into

1    that issue.  But, of course, the jury, as I understand it, has

2    latitude to decide the credibility of my testimony.

3    Q.   And just to be clear, you said to the ladies and

4    gentlemen of the jury you're not an expert on the scope of

5    these claims.  Correct?

6    A.   I'm not a technical expert on the claims.  That's not

7    what I'm here to do, as I said at the start of my testimony.

8    Q.   You're not an expert on the scope of the claims, are you,

9    Professor Vellturo?

10   A.   I am not.

11           MR. SHEASBY:  Let's take that down.

12   Q.   (BY MR. SHEASBY)  Now, I want to talk about this

13   alteration that was made after PNC was formally served in

14   federal court with a patent infringement lawsuit.  And just to

15   level set, the damages that the jurors will award are for the

16   period before this modification occurred.  Correct?

17   A.   And -- I'm sorry.  I'm -- I want to make sure we're clear

18   on what this modification means in your question.  Do you mean

19   4.20.1?

20   Q.   Yes, sir.

21   A.   Yeah.  My understanding is there are no damages that USAA

22   is seeking on transaction volumes that were undertaken through

23   4.20.1.

24   Q.   In this case.

25   A.   In this case, yes.

1    Q.   And you referred to 4.20.1 in your expert report as a

2    non-infringing alternative.  Correct?

3    A.   I referred to it that way at some point.  I think it's in

4    my report.

5    Q.   Would you take my representation that again and again and

6    again you refer to 4.20.1 as a non-infringing alternative in

7    your report?

8    A.   That was my understanding for part of the work I did.

9    Q.   The truth is you don't know whether there are USAA

10   patents that 4.20.1 infringes.  Correct?

11   A.   I don't do infringement.  I wouldn't know because I'm not

12   a technical expert so I don't know.

13   Q.   There was a technical expert in this case for PNC.  His

14   name was Doctor Bovik.  Correct?

15   A.   Well, there is.  He is still here.  I see him.

16   Q.   He testified yesterday?

17   A.   I saw him, yes.

18   Q.   You did not -- you actually claim that PNC's technical

19   experts told you that 4.20.1 was a non-infringing alternative.

20   Correct?

21   A.   That's what I recall, yes.

22   Q.   But the reality is under oath yesterday, Doctor Bovik

23   testified that he did not render an opinion that 4.20.1 is a

24   non-infringing alternative.  Correct?

25   A.   I don't remember the exact testimony, but as I indicated

 1   earlier, I don't need that fact for my model to work.

 2          MR. SHEASBY:  Your Honor, I move to strike

 3   everything after, I do not remember the exact testimony.

 4          THE COURT:  I'll sustain that.  The witness needs to

 5   limit his answers to the questions asked.

 6          THE WITNESS:  Yes, Your Honor.

 7          THE COURT:  Let's proceed.

 8          MR. SHEASBY:  May I refresh the witness'

 9   recollection about the testimony that occurred yesterday, Your

10   Honor?

11          THE COURT:  How do you propose to do that?

12          MR. SHEASBY:  Publish the testimony, Your Honor.

13          MR. STONE:  Objection, Your Honor.  This was

14   something we were not permitted to do earlier.  I don't think

15   it would be fair now to allow others to do something that we

16   were not allowed to do.

17          THE COURT:  The jury heard Doctor Bovik's testimony

18   yesterday.  And if this witness doesn't remember what Doctor

19   Bovik said, I don't see any basis for you to publish any

20   documents.

21          MR. SHEASBY:  I understand your instruction.  Thank

22   you, Your Honor.

23          MR. STONE:  Thank you, Your Honor.

24          THE COURT:  All right.  Let's move on.

25   Q.   (BY MR. SHEASBY)  So just so the record is clear, you sat

1    through the entire testimony yesterday.  Correct?

2    A.   Yes.

3    Q.   And you don't remember Doctor Bovik saying that he didn't

4    render an opinion that 4.20.1 is a non-infringing alternative.

5    A.   I don't remember him specifically saying that.

6    Q.   But you do remember testifying under oath that you relied

7    on him for the conclusion that 4.20.1 is a non-infringing

8    alternative.

9    A.   Right.  I'm not a technical expert.

10   Q.   In your entire career, you have never used as a

11   non-infringing alternative a product that's been accused of

12   infringement by a plaintiff.  Correct?

13   A.   I don't remember whether that happened one way or the

14   other.  I've been around for a long time.

15        MR. SHEASBY:  And why don't we pull up PDX 14.29.

16   29, Mr. Huynh.  Thank you.

17   Q.   (BY MR. SHEASBY)  You were here for Professor Conte's

18   testimony.  Correct?

19   A.   Yes.

20   Q.   Do you remember what Professor Conte said in his

21   testimony?

22   A.   Not exactly, but in substance I believe so.

23   Q.   You remember Professor Conte showing the slide of these

24   three USAA patents.  Correct?

25   A.   I do.

```
 1   Q.   And do you remember him testifying that this 4.20.1

 2   system does not avoid infringement because of these three

 3   patents?

 4            MR. STONE:  Objection, Your Honor.  It's a MIL --

 5   MIL violation and --

 6            THE COURT:  Approach the bench.

 7            (The following was had outside the hearing of the

 8            jury.)

 9            THE COURT:  You guys are about to wear me out.  You

10   know that?

11            MR. STONE:  Sorry, Your Honor.

12            THE COURT:  What's the MIL violation you are

13   asserting?

14            MR. STONE:  He's now bringing into this PNC 3 issues

15   as to whether or not these patents are infringed by the

16   current app that is deployed by PNC Bank.  That's not an issue

17   in this case and we have clear direction not to bring in

18   whether there's infringement from PNC 3 issues in this case.

19   We're trying four patents here, not these three other

20   Defendants.

21            THE COURT:  Defendants MIL 1B says there is to be no

22   testimony regarding the existence of the PNC 3 or BBVA cases.

23   I haven't heard anything about PNC 3 cases.  I've heard about

24   patents that, though it's not been mentioned to this jury, are

25   the patents at issue in PNC 3.  I don't find there's been a
```

1    MIL violation.

2              MR. STONE:  Further, Doctor Conte's report clearly

3    does not allow him to say that these patents are infringed by

4    4.20.1 and he didn't say that.  And now they're asking

5    questions about whether or not they infringe.

6              MR. SHEASBY:  I actually used the exactly language

7    in Professor Conte's report, they do not avoid infringement.

8              THE COURT:  All right.  I'm going to overrule the

9    objection.

10             MR. SHEASBY:  Thank you, Your Honor.

11             (The following was had in the presence and hearing

12             of the jury.)

13             THE COURT:  All right.  Objection's overruled.

14   Let's proceed.

15             MR. SHEASBY:  Let's pull back up the --

16   Q.   (BY MR. SHEASBY)  Now, these are three patents that are

17   different from the patents-in-suit.  Correct?

18   A.   Yes.

19   Q.   They're owned by USAA.  Correct?

20   A.   I see that, yes.

21   Q.   They're actually in the same 2006 patent family.

22   Correct?

23   A.   I don't remember.  I think so.

24   Q.   And why don't we look at one of those.

25             MR. SHEASBY:  Let's turn to PX 1377.

1    Q.   (BY MR. SHEASBY)  And it was issued on December 29th,

2    2015.  Do you see that?

3    A.   Yes.

4    Q.   To USAA.  Do you see that?

5    A.   I do.

6    Q.   And it has Mr. Oakes' name and Mr. Prasad's name.  Do you

7    see that?

8    A.   I used to.  You crossed them out, but -- yes, there you

9    go.  Yes, I see them.

10   Q.   It's a reasonable request, Doctor Vellturo.  It's a

11   reasonable request.  And let's --

12           THE COURT:  Mr. Sheasby, you don't need to make

13   statements about what is and isn't a reasonable request.

14   Sidebar comments from the podium are not permitted.

15           MR. SHEASBY:  Thank you, Your Honor.

16           MR. SHEASBY:  Let's go to --

17           THE COURT:  Ask the witness questions.

18           MR. SHEASBY:  Let's go to page 24.

19   Q.   (BY MR. SHEASBY)  And I'll just -- this is claim 1 of the

20   '136 Patent.  Correct?

21   A.   That appears to be claim 1, yes.

22   Q.   And if I remember correctly, you focused on, in this

23   4.20.1 application, the absence -- the deactivation of

24   auto-capture and the absence of display of images.  Correct?

25   A.   Well, the absence of displaying a photo of the check to

1    the user before it's submitted.

2    Q.   And does this claim of the '136 Patent say anything about

3    auto-capture or display of the photo to the user before it is

4    submitted?

5    A.   I don't see language specific to that, but I am not a

6    reader of patents from a technical standpoint.  I read them as

7    a layperson, just like anyone else would.

8    Q.   You read them just like the jury will.  Correct?

9    A.   Yeah.

10   Q.   You're not technically capable of telling me what mobile

11   remote deposit capture systems are commercially acceptable

12   that do not infringe USAA's patents.  Correct?

13   A.   I don't bring technical capability to this case.  I'm --

14   I'm here as an economist and a licensing professional.

15   Q.   And you agree that the jury, in weighing your testimony,

16   can consider the fact that you repeatedly in your report

17   define 4.20.1 as a non-infringing alternative.  Correct?

18   A.   I don't agree with that.  My report is pretty clear that

19   it's my understanding from technical experts that it's a

20   non-infringing alternative.  I don't, as an economist, decide

21   what infringes and what doesn't.  That's not what I was here

22   for this morning, this afternoon, and I -- I don't do that in

23   my reports.

24   Q.   Your opinion is only as good as the input you receive

25   from other folks.  Correct?

1    A.    In some regards, yes.

2    Q.    And one of the inputs you received from Doctor Bovik is

3    that 4.20.1 is a non-infringing alternative.  Correct?

4    A.    That's one input I received.

5    Q.    And so the jury can consider whether that input was

6    accurate.  Correct?

7    A.    Well, I addressed that in my direct testimony.  My

8    ultimate finding is not dependent on that.

9            MR. SHEASBY:  That was non-responsive.  I move to

10   strike.

11           THE COURT:  Sustained.

12       That was not what the question called for, Doctor

13   Vellturo.  You need to limit your answers to the questions

14   asked.

15           THE WITNESS:  Yes, sir.

16   Q.    (BY MR. SHEASBY)  The jury can consider the quality of

17   the input that you relied on that you assumed 4.20.1 as a

18   non-infringing alternative.  Correct?

19   A.    Yes.

20   Q.    Now, you had some slides where you talked about the

21   period before and after this 4.20.1 modification was released.

22   Correct?

23   A.    Yes.

24   Q.    And you showed, for example --

25           MR. SHEASBY:  I'm going to have to do this on the

1    elmo.

2    Q.   (BY MR. SHEASBY)  You showed, for example, this slide

3    which was a before and after.  Correct?

4    A.   Yes.

5    Q.   And I notice you didn't have any dates on the before and

6    after period.  No dates there.  Right?

7    A.   That's true.

8    Q.   You showed this slide, and it shows that that PNC removed

9    the disputed features--and I think that's your language for

10   the release of the 4.20.1--in the second quarter of 2021.

11   Correct?

12   A.   Yes.

13   Q.   And I notice that your lines go out just through the

14   third quarter of 2021.  Correct?

15   A.   Yes.

16   Q.   Your lines don't extend beyond the third quarter of 2021.

17   Correct?

18   A.   These lines do not.

19            MR. SHEASBY:  Let's go to PDX 14.30.

20   Q.   (BY MR. SHEASBY)  So this is PX 599.  It's an internal

21   PNC document.  And it depicts the net promoter score that

22   occurred with the mobile device in the period around the

23   launch of that 4.20.1.  Correct?

24   A.   Yes, some of these months are from that period.

25   Q.   Some of these months are before, some of these months are

1   after.  Correct?

2   A.   They're mostly from after.  The June 2021 is kind of a

3   transitional month where some people had 4.20.1 but not

4   everyone had it yet.

5   Q.   So this is before.  Correct?

6   A.   Yes.

7   Q.   And what we see is that by October 2021, there is a 20

8   point decrease in net promoter score and a hundred percent

9   increase in the number of negative detractors.  Correct?

10  A.   I see the drop from September to October.

11  Q.   Thank you.

12       And to be as precise as we can, I think what you're

13  saying is -- to the ladies and gentlemen of the jury is you

14  didn't see anything in the financials from before versus after

15  the launch of this 4.20.1.  Fair?

16  A.   I didn't understand that question.  I'm sorry.

17  Q.   You testified to the ladies and gentlemen of the jury

18  that you didn't see any meaningful changes in PNC's financials

19  from before 4.20.1 versus after 4.20.1.  Fair?

20  A.   That related to the change in the use -- in the type of

21  remote deposit.  So it wasn't a global statement.  It was with

22  respect to remote deposit.

23  Q.   Well, to be clear, the figure you showed the

24  jury -- let's go back to the elmo -- was total accounts and

25  checking accounts, and you said there was no change in total

1078

1    accounts and checking accounts.  Correct?

2    A.    Right.

3    Q.    Not specific to MRDC accounts.  You told the jury about

4    total accounts and checking accounts.  Correct?

5    A.    In this slide, yes.

6    Q.    And you said, no change from before or after in these

7    financials.  Correct?

8    A.    That's what I said.

9    Q.    And to be as precise as we can, the transition to this

10   4.20.1 application was complete by the end of the second

11   quarter of 2021.  Correct?

12   A.    End of July sounds right.

13   Q.    And you didn't disclose in your report --

14   A.    I'm sorry.  I'm sorry.  The end of the second quarter is

15   the end of June.  That's my mistake.

16   Q.    And you don't disclose in your report that PNC's deposits

17   decreased by $4 billion from the third quarter of 2021 as

18   opposed to the second quarter of 2021.  Correct?

19   A.    That's not in my report.

20         MR. SHEASBY:  And if we look at PX 1476, and let's

21   scroll down to PDF page 4, Mr. Huynh.

22   Q.    (BY MR. SHEASBY)  So this 4.0, in parentheses, meaning

23   there was a $4 billion decrease in net deposits from July

24   30th, 2021, to 9/30/2021.  Correct?

25   A.    I see that drop.

1    Q.   And it's actually only a small portion of PNC's total

2    deposits.  It's only about one percent.  Correct?

3    A.   I -- that's not quite right, sir.  I'm sorry.

4    Q.   No problem.  What does that one percent number mean?

5    A.   So that one percent number is a drop.  But during this

6    period, it -- the deposit base is changing because -- I'm

7    sorry.  I thought you want an explanation.  Do you want me to

8    stop?

9         MR. SHEASBY:  I move to strike as non-responsive.

10        THE COURT:  I'll overrule.  He's attempting to

11   answer your question.

12        Go ahead and finish the answer, please.

13        THE WITNESS:  Right.  So in the third quarter of

14   2021, PNC is in the process of acquiring another fairly large

15   bank, BBVA.  And what you're seeing here, and the audio to

16   this earnings call tells you this, that there were customers

17   of BBVA that, when the merger was completed, moved their

18   balances elsewhere.  That's what's causing this, and that's

19   exactly what the representatives of PNC said in that audio.

20   Q.   (BY MR. SHEASBY)  So let's be clear.  What you just said,

21   none of that is in your report.  Correct?

22   A.   That's true.

23   Q.   None of it was what you told me at your deposition.

24   Correct?

25   A.   I didn't tell you that in my deposition.

1  Q.   And, in fact, what we know is that there was a 4 billion

2  drop between 9/30/2021 and 6/30/21.  Correct?

3  A.   As reported, yes.

4  Q.   And there was an event that occurred between 9/30/21 and

5  6/30/21, and that was the release of 4.20.1.  Correct?

6  A.   No, that's not correct.  By 6/30 -- by June 30th, 2021,

7  version 4.20.1 had already been released.

8  Q.   So in the quarter where we saw this $4 billion change,

9  that was right after the release of 4.20.1.  Correct?

10  A.   This change is from the second quarter to the third

11  quarter, and 4.20.1 was introduced and largely brought into

12  being during the second quarter, during part of it.

13  Q.   Now, why don't you look at IX 27, which is tab 34 in your

14  B binder.  Why don't you turn to page 6 of that?

15        MR. SHEASBY:  And let's keep this page up.  Let's

16  keep that page up.

17        THE WITNESS:  I'm sorry.  Where I am going?  I

18  apologize.

19  Q.   (BY MR. SHEASBY)  You have a binder that says B on it.

20  A.   I'm sorry.  I have it.

21  Q.   No problem.  Turn to tab 34.

22  A.   I'm at tab 34.

23  Q.   And if you turn to page 6?

24  A.   Yes.

25  Q.   This reports on the change in deposits from the third

1   quarter versus the -- the fourth quarter versus the third

2   quarter of 2021.  Correct?

3   A.   That's one of the things it shows, yes.

4   Q.   It shows another $5 billion decrease in deposits.

5   Correct?

6   A.   Yes, and we talked about that.

7   Q.   So you didn't disclose to the jury that there was a $4

8   billion drop in deposits in your direct testimony.  Correct?

9   A.   That was not part of my direct testimony.

10  Q.   You didn't analyze it in your report.  Correct?

11  A.   It was not in my report.

12  Q.   And you agree the jury can look at PX 1470.4 when they

13  assess your credibility.  Correct?

14  A.   I'm not the expert in what's admitted and what's not.

15  I'm assuming that if it has a PX number, it's been admitted

16  and the jury can look at it.

17  Q.   And you performed for this part of your analysis on the

18  impact of 4.20.1 something called a regression analysis.

19  Correct?

20  A.   Yes.  That's the big study I referred to.

21  Q.   You didn't explain what the regression was, but you told

22  the jury you did a regression.

23  A.   I thought I did explain it, but you're entitled to your

24  view.

25  Q.   Your regression didn't take into account the option of

1    checks being deposited at a bank other than PNC.  Correct?

2    A.    That's true.

3    Q.    So when the jury looks at your slides, you say accounts

4    are the same, no problem, but you didn't take into account the

5    fact that a customer could choose to deposit their check at

6    another bank.  Correct?

7    A.    I took that into consideration.  I saw data on that exact

8    issue, and actually I reported it to the jury during my

9    testimony.

10   Q.    Your regression doesn't take into account the option of

11   checks being deposited at a bank other than PNC.  Correct?

12   A.    My regression doesn't do that.  That's true.

13   Q.    And the jury can also take that into account when

14   assessing the credibility of your opinions.  Correct?

15   A.    Sure.

16   Q.    Now, you also did some analysis based on some agreement

17   in this case.  Correct?

18   A.    Yes.

19   Q.    Doctor Vellturo, you and I have something in common and

20   it's not that I have a PhD from MIT.  Do you know what it is?

21   A.    I'd rather not guess.

22   Q.    We both have daughters.  We both have lots of

23   auto-captures.  Correct?

24   A.    I forget.  Do you have two?

25   Q.    I have two, and I raised one.  So I've got three.

1    A.    Three, and I have five.

2    Q.    And when you were -- when the kids were little, did you

3    ever play a game called One of These Things Are Not Like The

4    Other?

5    A.    I think we watched Sesame Street together where we saw

6    that game, but I don't remember us actually playing it

7    independently.

8    Q.    So one of the things that you try to do is you try to

9    analogize agreements with Bremer Bank and offers to Dollar and

10   SunCoast to the hypothetical negotiation between USAA and PNC.

11   Fair?

12   A.    I undertake an exercise along those lines, yes.

13            MR. SHEASBY:  So let's have PDX 14.8.

14   Q.    (BY MR. SHEASBY)  PNC is 37 times larger than Bremer.

15   Correct?

16   A.    Using what measure?  I can't tell -- I'm sorry.  I see

17   the 37.

18   Q.    Assets.

19   A.    So that's what size of banks means?

20   Q.    Yes, sir.

21   A.    Okay.  With that representation, I see that difference.

22   Q.    You have no reason to doubt it.  Correct?

23   A.    I haven't studied that specifically.

24   Q.    You didn't study the difference in size between PNC Bank

25   and Bremer?

1  A.   The per-unit rate takes care of that for me so I didn't

2  need to study it.

3         MR. SHEASBY:   I move to strike as non-responsive,

4  Your Honor.

5         THE COURT:   Did you study or did you not study it?

6  Why you didn't study if you didn't is not what the question

7  called for.   The question was, did you study it or did you

8  not, and that's the one you should have answered.

9      I'll sustain the objection.   Restate the question or move

10  on, counsel.

11  Q.   (BY MR. SHEASBY)   Did you or did you not study the

12  difference in the size of Bremer and PNC?

13  A.   I studied differences in aspects of the two banks,

14  including size.

15  Q.   Do you have any factual basis to disagree with the fact

16  that PNC is 37 times larger than Bremer?

17  A.   Larger in terms of assets?

18  Q.   Yes, sir.

19  A.   I don't.

20  Q.   Do you have any factual basis to disagree with the fact

21  that PNC has 12 times more mobile accounts than Bremer?

22  A.   I don't know where this Bremer number comes from, but I

23  do recognize the PNC number.   So I can't answer your question

24  entirely, but I do recognize the 940,000 number.

25  Q.   Did you investigate the number of mobile deposit accounts

1  that Bremer has?

2  A.   I don't remember whether I looked at that specifically or

3  not.

4  Q.   Okay.  And the Bremer agreement was 50 cents per unit.

5  Correct?

6  A.   No.

7  Q.   The Bremer agreement was approximately 51 cents per check

8  deposit?

9  A.   No.

10 Q.   There was a running royalty in the Bremer agreement?

11 A.   Yes.

12 Q.   What was the running royalty?

13 A.   58 cents.

14 Q.   And you didn't investigate whether PNC has 12 times more

15 mobile accounts than Bremer and is 37 times larger than

16 Bremer.  Correct?

17 A.   I don't remember studying those two statistics in my

18 work.

19 Q.   And you said something --

20        MR. SHEASBY:  Well, let's go to 14.9.

21 Q.   (BY MR. SHEASBY)  Do you have any factual basis to

22 disagree with the fact that PNC is 60 times larger than Dollar

23 Bank and SunCoast Bank?

24 A.   No.

25        MR. SHEASBY:  Now, let's go back one slide.

(Redacted.)

1   Q.   Now, Bremer was not accused of infringing a single patent

2   when it executed its license agreement.  Correct?

3   A.   Correct.

4   Q.   Bremer didn't concede infringement or validity.  Correct?

5   A.   Correct.

6   Q.   In fact, there's no evidence that Bremer was using any of

7   these patents when it voluntarily took a license agreement.

8   Correct?

9   A.   I don't know one way or the other whether they were using

10  the inventions.

11  Q.   And you certainly didn't investigate that in preparing

12  your report.  Correct?

13  A.   I'm not a technical expert.  I did not.

14  Q.   You didn't ask any other expert to assist you in that

15  process.  Correct?

16  A.   I did not.

17  Q.   Now, this patent citation analysis is something that you

18  say economists use to value patents.  Correct?

19  A.   It appears in the economics literature largely.  I think

20  it's in some licensing journals, too.

21           MR. SHEASBY:  I move to strike as non-responsive

22  after 'yes', Your Honor.

23           THE COURT:  I'll strike the entire answer.  He

24  doesn't answer anywhere what you've asked for.  He offers an

25  explanation that the question doesn't call for.

1      Once again, Doctor Vellturo, you're going to have to

2   limit your answers to the questions asked.  This is not the

3   first time you've testified in an open court setting.  You

4   know Mr. Stone's going to get a chance to follow up with

5   anything that he believes needs to be readdressed after you

6   answer the questions that are called for.  So please limit

7   your answers to the questions called for.  All right?

8            THE WITNESS:  Yes, sir.

9            THE COURT:  Go ahead, counsel.

10  Q.   (BY MR. SHEASBY)  You testified to the ladies and

11  gentlemen of the jury that this is something economists use.

12  Correct?

13  A.   Yes.

14  Q.   Now, you've also participated in some licensing

15  negotiations.  Correct?

16  A.   Yes.

17  Q.   And you've participated on behalf of a licensee, the

18  person paying the money.  Correct?

19  A.   Yes.

20  Q.   And in every time that you've participated in a license

21  agreement in which you are representing the party paying the

22  money, a patentholder has never accepted your patent citation

23  analysis.  Correct?

24  A.   I don't remember them doing that.

25  Q.   Okay.  So to be clear, you presented to the jury a patent

1    citation analysis.  Correct?

2    A.   Yes.

3    Q.   You said it's something that economists use.  Correct?

4    A.   Yes.

5    Q.   USAA, are they economists or are they an insurance

6    mutual?

7    A.   They're not economists.

8    Q.   Is PNC an economist or are they a national retail bank?

9    A.   They are a national retail bank.

10   Q.   And this patent citation analysis in the real world, you

11   have never observed a patentee accepting it when you were

12   representing the licensee.  Correct?

13   A.   I don't remember that happening.  I'm sorry.  I don't

14   remember that happening.

15   Q.   You have never valued intellectual property that covers

16   consumer banking technology.  Correct?

17   A.   Correct.

18   Q.   You -- before this case, you had never done any research

19   studies directly on mobile banking.  Correct?

20   A.   I need -- I'm sorry.  I need to understand what you mean

21   by mobile banking.

22   Q.   Before this case, you have not done research studies

23   directly on mobile banking.  Correct?

24   A.   If you leave out ATMs, the answer is yes.

25   Q.   Sir, you have never directly done any work on mobile

 1    banking research projects.  Correct?

 2    A.    Yes.

 3    Q.    And you're not a person of ordinary skill in the art.

 4    Correct?

 5    A.    Agreed.

 6    Q.    And you estimate that you've participated in the

 7    negotiation of approximately 12 licenses.  Correct?

 8    A.    I've participated in more than 12.

 9    Q.    Your estimate is that you participated in 12 license

10    agreements, license negotiations.  Correct?

11    A.    No, that's not the right number.

12    Q.    All right.  Why don't we turn to your deposition.  This

13    is your first volume at lines 10 -- page 10, line 10 through

14    21.

15    A.    I'm sorry.  What page?

16    Q.    Page 10, lines 10 through 21.

17    A.    Okay.

18    Q.    Your estimate is that you participated in 12 license

19    negotiations.  Is that correct?

20    A.    Given the limits you applied to my experience in that

21    question, 12 was the correct number.

22    Q.    And the question was you participated in 12 license

23    negotiations.  That was the question.  Correct?

24    A.    I see that testimony, yes.

25    Q.    So for the ladies and gentlemen of the jury, the answer

1    under oath in your deposition was that you participated in 12

2    license negotiations.   Correct?

3    A.    That's what this page of my deposition says, yes.

4    Q.    And you know that Mr. Kennedy has participated in over

5    200 licensing negotiations.   Correct?

6    A.    I heard that earlier, yes.

7    Q.    You can be a fabulous economist but not necessarily be an

8    expert in license negotiations.   Correct?

9    A.    That's possible.

10   Q.    For example, my wife and I have an OB we love.   But when

11   our kids are sick, we don't take them to the OB.   Perhaps

12   you've had that same experience.

13   A.    When our children are sick, I don't take them to the OB.

14   That's true.

15   Q.    You take them to an expert.   Correct?

16   A.    I take them to a different doctor, yes.

17   Q.    A doctor who's an expert in the issue that ails them.

18   Correct?

19   A.    Or general practitioner, depending on the nature of what

20   they need help with.

21   Q.    Your resume is nine pages long, but nowhere in it do you

22   purport to be a licensing expert.   Correct?

23   A.    True.

24   Q.    And the damages issue that we're faced with in this case

25   is a hypothetical negotiation.   Correct?

1

2

3               (Redacted.)

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1  and center than that, Mr. Sheasby, and I'm telling you, stop

2  it?

3          MR. SHEASBY:  Okay.  I'll move on.  Thank you, Your

4  Honor.

5          (The following was had in the presence and hearing

6          of the jury.)

7          MR. SHEASBY:  Let's take that down.

8  Q.   (BY MR. SHEASBY)  The same patents can have different

9  value in the hands of different companies.  Correct?

10 A.   Yes.

11 Q.   And you talk about an agreement with NCR.  Correct?

12 A.   Yes.

13 Q.   It's 12 cents--correct?--per unit.  That's what you

14 testified to the jury?

15 A.   Per mobile deposit, that's the unit, yes.

16 Q.   And you don't know if NCR has the patent rights to allow

17 PNC to use the MRDC system it is using.  Correct?

18 A.   I don't know.

19 Q.   And there's not sufficient information available for you

20 to know how much more NCR would charge if they actually had

21 the patent rights that would allow PNC freedom to operate an

22 MRDC system.  Right?

23 A.   I don't have that information.

24 Q.   So when -- you showed the ladies and gentlemen of the

25 jury this 12 cent per unit number--correct?--and Mr. Stone

1    actually wrote it up on the white board.  Correct?

2    A.    Yes.

3    Q.    You're not aware of a single patent that NCR holds that

4    gives rights to the MRDC system.  Correct?

5    A.    I don't know one way or the other as I sit here.

6    Q.    You don't know if PNC has any identifiable or appreciable

7    research and development budget.  Correct?

8    A.    Correct.

9    Q.    And you agree that PNC's statements to investors state

10   that innovation is imperative and essential to their base.

11   Correct?

12   A.    I remember seeing that, yes.

13   Q.    In fact, PNC publicly states to its investors that with

14   regards to its business everything it does is dependent on

15   technology.

16   A.    I remember seeing that.

17   Q.    And you don't know how long it takes for customers to

18   turn based on the loss of a feature or product at a bank.

19   Correct?

20   A.    I don't.

21   Q.    And you don't know what the impact would be on customer

22   retention if PNC had to cease using all of USAA's patents.

23   Correct?

24   A.    I haven't studied that question.

25            MR. SHEASBY:  I pass the witness.

1        THE COURT:  Is there redirect by the Defendant?

2        MR. STONE:  There is, Your Honor.  Thank you.

3        THE COURT:  All right.  Do we need to maintain the

4   courtroom as sealed for the redirect?

5        MR. STONE:  I don't believe so.

6        THE COURT:  Then I'll order the courtroom unsealed

7   and direct the Court Security Officer to invite the public to

8   return.

9        And we'll proceed with redirect as soon as you're ready,

10  Mr. Stone.

11       MR. STONE:  Thank you, Your Honor.

12                    (Courtroom unsealed.)

13                    REDIRECT EXAMINATION

14  BY MR. STONE:

15  Q.   Doctor Vellturo, you were shown a set of materials that

16  go along with an investor call.  Do you recall that?

17  A.   Yes.

18  Q.   We have the transcript from that investor call.

19       MR. STONE:  Could we bring that on the screen?

20       MR. SHEASBY:  Your Honor, it's hearsay and I object.

21       MR. STONE:  Your Honor, it has the transcript where

22  it is explained exactly where the numbers came from that he

23  was asked about and he said in his cross examination-testimony

24  that he listened to the transcript.

25       MR. SHEASBY:  I have no problem with --

```
 1              THE COURT:  Just a minute.  What's the source of

 2    this?  This is not a pre-admitted exhibit?

 3              MR. STONE:  No.  It's a publicly-available document

 4    just like materials --

 5              THE COURT:  And you're using it for what purpose?

 6              MR. STONE:  To respond to the document that was also

 7    not pre-admitted that Doctor Vellturo was shown.

 8              MR. SHEASBY:  To be clear, the document I showed was

 9    a pre-admitted exhibit, Your Honor.

10              MR. STONE:  The document was --

11              MR. SHEASBY:  I object to this even being published

12    now, Your Honor.

13              MR. STONE:  The document was not a pre-admitted

14    exhibit, I don't believe.  It doesn't have an exhibit number

15    on it.

16              MR. SHEASBY:  It was in fact pre-admitted.

17              MR. STONE:  I take it back.  It was pre-admitted.

18              THE COURT:  Bring me the document that you want to

19    publish.  Let me see it.

20              MR. STONE:  I don't have it in hard copy, Your

21    Honor.  I will just show you the text of it.

22              (The following was had outside the hearing of the

23              jury.)

24              THE COURT:  Why hasn't the door been opened to this

25    with what you asked?
```

1    MR. SHEASBY:  He already gave the explanation, and I

2  have no problem with giving him the same explanation.

3  My -- the document is hearsay and it hasn't been produced.

4     So the issue is not him giving the explanation and I

5  didn't even dispute that he gave that explanation.  He's happy

6  to give the same explanation again, but that doesn't mean you

7  can publish hearsay to the jury.  That's my only objection.

8     I don't mind if he says, I saw a document that said it.

9  No problem with that at all.

10    THE COURT:  So he can recite hearsay, but he just

11 can't show a hard copy of hearsay.  Is that your argument?

12    MR. SHEASBY:  Well, he can inform what he read from

13 a document and give his opinion of it.  That's what experts do

14 all the time.  But I don't think he should show hearsay.

15    MR. STONE:  Your Honor, this is not being offered

16 for the truth.  It's being offered to explain exactly how he

17 previously answered the question that was asked him.

18    THE COURT:  I think the door's been opened.  You can

19 use the document.

20    MR. STONE:  Thank you, Your Honor.

21    (The following was had in the presence and hearing

22    of the jury.)

23    THE COURT:  Counsel, reapproach the bench, please.

24    (The following was had outside the hearing of the

25    jury.)

1          THE COURT:  Just so there's no doubt in the record,

2     here is a hard copy of the email that was received earlier

3     today.  Again, the email addressed to me shows it was copied

4     to both of you.

5          MR. SHEASBY:  I just got it, Your Honor.

6          THE COURT:  All right.  Let's proceed.

7          MR. SHEASBY:  I'd like to be able to review this

8     document before he shows it to the jury.

9          THE COURT:  No.  We're going to show it to the jury.

10    You can address it in additional cross if you want to.

11          (The following was had in the presence and hearing

12          of the jury.)

13          THE COURT:  Let's proceed, Mr. Stone.

14          MR. STONE:  Thank you, Your Honor.

15     Can we bring back up the transcript?  Can we go to the

16    discussion of the increases and decreases in terms of

17    assets -- or deposits?  Sorry.

18    Q.   (BY MR. STONE)  Do you recall being asked about the

19    slides that went with this transcript, Doctor Vellturo?

20    A.   Yes.

21    Q.   Did you either review the transcript of this call or

22    listen in on it at the time when it occurred?

23    A.   I reviewed the transcript.

24    Q.   If you see here in the transcript what it says is, Inside

25    of this PNC legacy deposits -- what does a PNC legacy refer

1  to?  I'm directing you to the second sentence.  It says PNC

2  legacy, and then it goes on to talk about BBVA-USAA deposits.

3  Do you see that?

4  A.   I see legacy deposits, yes.  Legacy deposits are deposits

5  associated with accounts that in the previous year and in the

6  current year, in both years they were PNC customers.

7  Q.   And what does it say happened with respect to the amount

8  of deposits with respect to PNC legacy accounts?

9  A.   They increased by $5.4 billion.

10  Q.   And then what happened in about September of 2021 with

11  respect to a bank acquisition that you referred to earlier?

12  A.   PNC acquired another bank and a fairly sizable one known

13  as BBVA.

14  Q.   And when they acquired BBVA in about September of 2021,

15  what happened with respect to some of the deposits that had

16  been with BBVA and then were transferred to PNC in connection

17  with that acquisition?

18  A.   Those deposits went down.

19  Q.   And is that described in this transcript?

20  A.   Yes.

21  Q.   And so when you were asked earlier what accounted for the

22  $4 billion drop in total deposits at PNC comparing the two

23  quarters, what was your explanation before?

24  A.   That that related to the transaction with BBVA, that

25  there were a bunch of non-legacy accounts, that is, accounts

1    that previously were at BBVA, that had -- that weren't

2    depositing as much or had moved their deposits elsewhere.

3    Q.   Okay.  So among PNC customers who had been with PNC

4    during the preceding time period, what happened with their

5    deposits?

6    A.   They went up.

7              THE COURT:  All right, Mr. Stone.  We need to move

8    on.

9              MR. STONE:  Thank you, Your Honor.

10   Q.   (BY MR. STONE)  Earlier today you were asked by Mr.

11   Sheasby about whether -- you were asked -- it was -- you were

12   asked about data that cut off in October of 2021.  Correct?

13   A.   Yes.

14   Q.   Do you have data past October of 2021?

15   A.   I do.

16   Q.   Have you analyzed that data?

17   A.   Yes.

18   Q.   Is there a reason you haven't presented the data from

19   subsequent time periods in this case?

20   A.   That data wasn't available to me to use at this trial.

21   Q.   Was that because of objections that were made by USAA to

22   the use of data --

23             MR. SHEASBY:  Your Honor, I object, and I seek a

24   sanction.  It's a violation of a MIL and it's not accurate.

25   It is completely improper.

1          THE COURT:  Just a minute, Mr. Sheasby.  I sustain

2    the objection.

3          You are going into discovery issues before the Court, and

4    that's not proper, Mr. Stone.  So I'm going to instruct you to

5    move on to your next question.  You are not to inquire --

6    there are enough disputes between both sides against each

7    other as to how this case got put together.  We are not going

8    to reopen those.  They're not appropriate and they are

9    irrelevant for this jury.

10         So don't touch on those issues again, but let's move

11   forward.

12   Q.   (BY MR. STONE)  Did the data that you looked at through

13   October, was that consistent and supportive of all the

14   opinions you gave here today?

15   A.   Yes.

16   Q.   Have you been -- can you use data after October for

17   purposes of your opinion?

18   A.   Here, I understand not.

19   Q.   Okay.  You were asked about the patent citation analysis

20   earlier.  Do you recall?

21   A.   Yes.

22   Q.   And you were asked about whether you used it in

23   connection with negotiations of patent licenses.  Correct?

24   A.   Specific to licensees, correct.

25   Q.   Yes.  Specific to licensees.  And is there -- would it be

1   useful in the context of those types of license agreements to

2   use your patent citation analysis there?

3   A.   Typically you don't need it.

4   Q.   Why's that?

5   A.   Because most of those licenses are portfolio licenses

6   where you're getting rights to all the patents that someone

7   has.  In that context, you don't really need to understand the

8   value of one patent over the other; the license is going to

9   cover all the patents.

10  Q.   Have you testified to patent citation analyses in court

11  before?

12  A.   I have.

13  Q.   Have you written about it in other instances outside of

14  court?

15  A.   Yes.

16  Q.   When you've testified about it in court, have you on

17  occasion testified, at least one occasion presented that

18  analysis on behalf of a client of Irell & Manella, Mr.

19  Sheasby's firm?

20  A.   Yes.

21  Q.   And did you present it in the context of putting a value

22  on patents with respect to a reasonable royalty to be

23  determined in connection with a hypothetical negotiation?

24  A.   Yes.

25  Q.   On about how many occasions have you analyzed what would

```
 1   happen in a hypothetical negotiation which is what we apply in

 2   court?

 3   A.   I have evaluated at least 200 hypothetical negotiations.

 4   Q.   Earlier today, when Judge Gilstrap asked if USAA had any

 5   objection to you being recognized as an expert in the field of

 6   valuing patents and patent licensing, what was Mr. Sheasby's

 7   response?

 8   A.   I recall there was no objection.

 9   Q.   All right.

10        MR. STONE:  I have no further questions, Your Honor.

11   Thank you.

12        THE COURT:  You pass the witness?

13        MR. STONE:  Pass the witness.

14        THE COURT:  Is there additional cross-examination?

15        MR. SHEASBY:  No additional cross-examination, Your

16   Honor.

17        THE COURT:  All right.  You may step down, Doctor

18   Vellturo.

19        THE WITNESS:  Thank you, Your Honor.

20        THE COURT:  You're welcome.

21      Ladies and gentlemen, it's been more than two hours since

22   we came back from lunch.  We are going to have a recess.

23      If you will simply close your notebooks and leave them in

24   your chairs, follow all my instructions, including not to

25   discuss the case among each other, we will be back shortly to
```

 1    continue.

 2          The jury's excused for recess at this time.

 3                (Whereupon, the jury left the courtroom.)

 4          THE COURT:  I want to see Mr. Sheasby, Mr. Bunt, Mr.

 5    Stone, and Ms. Smith in chambers.

 6          We stand in recess.

 7                        (Brief recess.)

 8          THE COURT:  Be seated, please.

 9          Am I correct, Mr. Stone, the Defendant's going to rest

10    its case in chief at this point?

11          MR. STONE:  You are correct, Your Honor.

12          THE COURT:  Let me bring the jury in and we will get

13    it on the record.

14          Let's bring the jury in, please.

15                (Whereupon, the jury entered the courtroom.)

16          THE COURT:  Please be seated, ladies and gentlemen.

17          Defendant, call your next witness.

18          MR. STONE:  Your Honor, at this time Defendant PNC

19    Bank rests.

20          THE COURT:  All right.  The Defendant has now rested

21    its case in chief.  Does the Plaintiff have rebuttal witnesses

22    to present?

23          MR. SHEASBY:  Your Honor, USAA has no additional

24    witnesses to present.

25          THE COURT:  All right.  Am I correct that both

1    sides, subject to final instructions to the jury and closing

2    arguments, rest and close?

3            MR. STONE:  Yes, Your Honor.

4            MR. SHEASBY:  Yes, Your Honor.

5            THE COURT:  All right.  Ladies and gentlemen of the

6    jury, that means you have now heard all the evidence in this

7    case.  It also means that I'm about to let you go home a lot

8    earlier than usual.

9        There are some matters I have to take up with counsel

10   that do not require your presence before I'll be prepared to

11   give you my final instructions on the law, and I expect that I

12   can take care of that this afternoon and this evening to be

13   ready to do that in the morning with you.  At least that's my

14   best projection.

15       So that means I'm going to release you for the evening in

16   just a couple of minutes.  You'll be free to go and have a

17   short day today.  I'm going to want you back in the morning.

18   I don't think I need you here at 8:30.  I'm going to ask you

19   to be here at 9:30 in the morning.  So you'll be able to come

20   a little later tomorrow.

21       Now, I want you to understand, that is an educated guess.

22   It is not a guarantee.  I may be ready to go waiting on you at

23   9:30.  You may have to wait 10 or 20 or 30 minutes on me

24   tomorrow.  But it's my best estimate as to when everything

25   will be prepared so that I can present you with my final

1107

1    instructions, which as I've told you, is sometimes called the

2    Court's charge to the jury.

3         After I do that, then you'll hear closing arguments for

4    the attorneys for the parties.  And once you've heard closing

5    arguments from the attorneys for the parties, then I will

6    instruct you to retire to the jury room and to deliberate on

7    your verdict.  And I will send back with you a written

8    document containing various questions that you are to answer.

9    And as I've explained to you, that document is called the

10   verdict form, and your answers to those questions in that

11   document will need to be unanimous.

12        And when you have returned your verdict with unanimous

13   answers to all the questions in that verdict form, then I will

14   review the verdict.  If I find it comports with my

15   instructions, I'll accept the verdict, and that will bring the

16   case to a close.  But we are -- to use a horse-racing term, we

17   are coming around the clubhouse turn.  The end is in sight.

18        So that means that I'm going to reurge one more time to

19   make sure that you don't violate any of my instructions,

20   including not discussing this case with anyone in any way.  It

21   would be an absolute travesty to have this much time, effort,

22   and expense wasted if somebody were to violate that important

23   and fundamental instruction.  So please keep that and all my

24   other instructions in mind.

25        If you will, simply close your notebooks and leave them

1    on the table in the jury room, have a good evening.  Please be

2    back prepared to go by 9:30 in the morning.  And with that,

3    ladies and gentlemen of the jury, you are excused for the day.

4              (Whereupon, the jury left the courtroom.)

5              THE COURT:  Be seated, please.

6         Counsel, as I indicated to you earlier, it is my practice

7    to take up and consider motions presented by either party

8    pursuant to Rule 50(a) of the Federal Rules of Civil Procedure

9    after all the evidence has been presented.  We are at that

10   point.  Just a couple of comments, and then I'm going to take

11   another short recess.  And when I come back, we will take up

12   motions under 50(a).

13        I understand the Rules of Civil Procedure require that

14   you have to urge an issue under Rule 50(a) so that it is

15   preserved in case you are given an opportunity or need an

16   opportunity to urge it again under Rule 50(b).  Please don't

17   start your argument with, This is a patent case.  I've been

18   here the whole trial.  I know the evidence.  I've heard the

19   witnesses.

20        To the extent you can get down to the real brass tacks of

21   what the issue is and why you believe it should be granted or

22   shouldn't be granted, we'll all be better off if we can

23   streamline this process.

24        So I understand it's often the case that attorneys who

25   aren't lead counsel get to make these motions, and I'm happy

1   to give you that opportunity, as the rules permit.  But let's

2   try to do it in a way that's focused and streamlined so that I

3   can hear your arguments and I can give you rulings as

4   expeditiously as possible.

5        Also, it is my practice, as I suspect many of you already

6   know, that if you're going to present closing arguments

7   tomorrow, you're not required to be present during the process

8   where 50(a) motions are urged and heard.

9        I am assuming Mr. Sheasby and Mr. Stone will present

10   closing arguments for the parties.

11        Can you confirm that's either correct or incorrect?

12        MR. STONE:  That's correct for myself, Your Honor.

13        MR. SHEASBY:  Your Honor, Mr. Bunt and I will be

14   presenting closing tomorrow on behalf of USAA.

15        THE COURT:  All right.  Then the three of you

16   gentlemen are not required to be here once I come back on the

17   bench and we take up matters under Rule 50(a).

18        MR. SHEASBY:  Your Honor, may I ask guidance on an

19   issue relating to closings?

20        THE COURT:  You may.

21        MR. SHEASBY:  So there's some ambiguity as to what

22   has to be exchanged.  There's been a lot of statements made on

23   the record that people have objected to, colloquy, like, USAA

24   didn't pull things out.  I would request that if they're going

25   to show the jury a portion of the transcript or a portion of a

1    document, we should exchange that in advance.  I don't want

2    there to be any surprises or need for objections for

3    completeness.  I think the rule should be if we're going to

4    show something to the jury, we should exchange.

5              THE COURT:  Mr. Stone, do you have a response?

6              MR. STONE:  We're agreeable to that, Your Honor.

7              THE COURT:  I'll say this.  I've never seen a lawyer

8    object in closing to his opponent's argument that the

9    objecting party didn't get hurt by the objection more than the

10   party who was the subject of it.  Juries don't like lawyers to

11   interrupt each other when they're presenting closing

12   arguments, and I don't like it, either.

13       Now, if you believe a violation of the law or procedure

14   that is so material that it can't be overlooked has taken

15   place, I'm not telling anybody you can't make such an

16   objection.  But I think both the jury and I know the Court

17   will appreciate a full exchange and meeting and conferring

18   between the parties as to what you're going to say and what

19   you're going to show so that the possibility of that is

20   minimized.

21       I think you'll present a better closing, I think the jury

22   will appreciate it, and I would urge you to approach it in

23   that way.  We don't need any of this finger-pointing you

24   didn't give me this, yes, I did give you that, you were too

25   stupid to see it kind of arguments in front of the jury.

1111

1    We've had enough of them behind closed doors.

2         Is there any other guidance that's needed at this

3    juncture?

4              MR. SHEASBY:  Nothing from Plaintiff, Your Honor.

5              THE COURT:  All right.  Anything from Defendant?

6              MR. STONE:  No, Your Honor.  Thank you.

7              THE COURT:  I do want to touch on one other matter,

8    and that has to do with the charge.

9         Ordinarily my practice is to, after motions under Rule

10   50(a) are presented and ruled on, to conduct what I call an

11   informal charge conference where I meet with counsel off the

12   record and review the various points of disagreement and

13   opposition in their latest submitted iteration of both the

14   charge and the verdict form.

15        I directed that a new iteration be submitted to the Court

16   on both of those documents by 3:00 Wednesday.  It came in

17   about 3:15.  I've had an opportunity to look at it.

18        With regard to the document concerning the Court's final

19   instructions to the jury, it's 73 pages long.  It's full of

20   copious footnotes.  The parties have put their competing

21   submissions, highlighted them in both green and blue, and

22   there's hardly a page that's white among these 73.  Almost

23   every page is green and blue.

24        I've looked at these various areas of disagreement.  I

25   candidly don't think the Court would benefit by having an

1112

1    informal charge conference with you.  I think I understand the

2    various positions based on both the evidence, your arguments,

3    and the explicit footnotes and annotations that you've put in

4    the submission from both sides.

5        So I'm going to dispense with the informal charge

6    conference.  I'm going to spend that time working on what I

7    believe to be a fair and appropriate charge and verdict form

8    based on the evidence and the law.  My intention is to do that

9    this evening and to have it delivered to both sides

10   electronically.  My best target is by 7:00 in the morning.

11       And at 8:15, I intend to convene a formal charge

12   conference here on the record and I'll hear your objections as

13   to any and all matters, both included and excluded, from the

14   documents that you receive at 7:00.  And if I'm persuaded that

15   any of those objections are valid, I'll make the appropriate

16   changes.  If not, I won't.

17       But I honestly don't think -- you are so many lightyears

18   apart and you're so dug in in your various positions as

19   indicated by the submission I have in front of me, I just

20   don't see that I would benefit.  If there were some close

21   issues that I thought you were close on, I might feel

22   otherwise, but that's not the case here.

23       So we'll complete the 50(a) motion practice.  Then I'm

24   going to adjourn for the evening, release you for the evening,

25   and I'm going to work on the charge and the verdict form for

1    as many hours as it takes for me to feel comfortable with it.

2    I'll send it to you tomorrow morning and I'll give you more

3    than an hour to review it.  I think that's certainly adequate.

4    You're all familiar with the issues.  You're all familiar

5    what's within your latest submission.  You'll see what I've

6    included in mine.  You'll see if I've done it differently.

7    You'll see if I've left it out.  It won't take you long to

8    sort through it.

9         And then we'll convene a formal charge conference at

10   8:15.  That should give me time to complete that process and

11   to make any resulting changes to either document so that I can

12   then produce eight copies of the final jury instructions and a

13   clean copy of the verdict form that I will send back with the

14   Court Security Officer when the jury retires to deliberate on

15   their verdict.

16        I've told them 9:30.  That's a guess.  But sometime

17   mid-morning tomorrow, we should be able to begin my final

18   instructions to the jury, followed by counsel's closing

19   arguments.  I would hope the case can get to the jury close to

20   lunchtime.  And with that, I would hope we'll see a verdict

21   sometime tomorrow afternoon.  That's what I project, and I

22   want to make you aware of what the Court's thinking is and

23   where I'm headed.

24        All right.  I'm going to take about a 10-minute recess.

25   I'm going to come back.  Those of you that are tasked with

1   presenting motions under Rule 50(a), I will take those up with

2   you then.  Those of you that are not assigned any

3   responsibilities in that regard are not required to be here

4   unless you just want to be.

5       And for those of you that have not practiced before me

6   before, when we begin the 50(a) practice or 50(a) process, I

7   typically ask for a single spokesperson from each side to go

8   to the podium and identify for me topically the matters upon

9   which you care to move under Rule 50(a).

10      I find -- and one of the reasons I do this after all the

11  evidence has been presented, I find there are often mirror

12  image opposite motions where the plaintiff seeks to have the

13  Court find and enter judgment as a matter of law that the

14  asserted claims have been infringed, and the defendant seeks

15  an order of the Court finding as a matter of law that the

16  asserted claims have not been infringed.

17      And I can much more efficiently hear competing arguments

18  in opposite directions on those two motions in a companion

19  format than I can splitting them up at various times in the

20  process and hearing the same thing more than once, just

21  presented in the opposite direction.

22      So that's my practice, and that's the way I'll intend to

23  do it.  And I'll hope that there will be a representative from

24  both sides that can identify the subject matter of any such

25  motion practice.  And then once the topics to be urged under

1    Rule 50(a) are identified to me, then I'll hear argument in

2    whatever format I think is the most efficient.

3         And I certainly understand there may be various counsel

4    assigned various motions, and I'll expect to see different

5    people come and go to present arguments when we get to that

6    point.  Are there any questions?

7              MR. SHEASBY:  No questions for Plaintiff, Your

8    Honor.

9              MR. STONE:  No questions, Your Honor.  Thank you.

10             THE COURT:  All right.  I'll be back in about 10

11   minutes.  We'll begin the 50(a) practice at that time.

12   Between now and then, we stand in recess.

13                       (Brief recess.)

14             *THE COURT:*  Be seated, please.

15        All right, counsel.  The Court will now proceed to hear

16   from the parties pursuant to any motions that either may care

17   to make pursuant to Rule 50(a) of the Federal Rules of Civil

18   Procedure.

19        Let me ask if I can have one person from each side go to

20   the podium, and we'll identify topically the subject matter of

21   any motions either side cares to offer, and then I'll come

22   back and, knowing that, we'll structure argument on those

23   motions.

24        Let's start with the Plaintiff's side.  What motions, if

25   any, does Plaintiff care to make pursuant to Rule 50(a)?

 1          MR. PAYNE:  Good afternoon, Your Honor.  Stephen

 2   Payne for USAA.

 3          USAA is bringing Rule 50(a) motions on four topics

 4   today:  infringement, willfulness, validity, and damages, Your

 5   Honor.

 6          THE COURT:  All right.  Thank you, Mr. Payne.

 7      Let me hear from the Defendant.  What motions or matters

 8   does it care to move for under Rule 50(a)?

 9          MR. LAWTON:  Good afternoon, Your Honor.  Adam

10   Lawton on behalf of PNC.

11      PNC intends to present four, what I think Your Honor

12   would call, mirror image motions on non-infringement,

13   invalidity, willful infringement, and damages, as well as a

14   fifth.  I think this is a separate fifth motion with respect

15   to 4.20.1, that it does not infringe the asserted patents.

16          THE COURT:  All right.  Thank you, counsel.

17      Let me ask you this before we launch into actual

18   argument.  Is there disagreement between the parties as to the

19   import and substance of Judge Payne's summary judgment order

20   regarding version 4.20.1 as with regards to whether it does or

21   does not infringe the asserted patents?

22      Mr. Payne, it seems pretty clear to me this issue may

23   have already been ruled on.

24          MR. PAYNE:  Your Honor, the ruling --

25          THE COURT:  Go to the podium, please.

1          MR. PAYNE:  Your Honor, there was a summary judgment

2     ruling about three of the Patents-in-Suit, the '432, the '681,

3     and the '605.  There was one patent, the '571, that's asserted

4     here where Judge Payne did find there was a genuine dispute.

5          THE COURT:  So is this issue about the '571 Patent

6     and whether or not it's infringed by the 4.20.1 version, or do

7     we have an open question as to the -- what I'm calling the

8     MRDC 2006 family of patents?  I just want to know the scope of

9     the dispute here.

10         MS. CARSON:  May I speak, Your Honor?

11         THE COURT:  You may.

12         MS. CARSON:  Rebecca Carson for USAA.

13       I think the issue is that the 4.20.1, the parties have

14    agreed that that product is not at issue in this case for

15    purposes of infringement.  So it's USAA's position that it's

16    not appropriate to have a judgment because we haven't

17    presented a case that that product infringes those patents.

18    So it's not a live issue in the case.  The parties have agreed

19    for purposes of infringement, that's not at issue in this

20    case.

21       The only reason it's at issue is because they have

22    proposed it as a non-infringing alternative.  So in terms of

23    the ultimate issue, that's an issue that's sort of subsumed in

24    the damages aspect and in the aspect of whether it's an

25    non-infringing alternative.  And certainly we dispute whether

 1    it's a non-infringing alternative for all the reasons that

 2    we've been talking about this week.

 3              THE COURT:  I understand the version 4.20.1 is going

 4    to be disputed in this case and has been disputed in this case

 5    as to whether or not it is or is not a non-infringing

 6    alternative.

 7         But as to its posture as an infringing product concerning

 8    at least the MRDC patents, my reading of Judge Payne's

 9    document 522 order is that he reaches the conclusion that it's

10    not.

11         But if you feel differently or you read the order

12    differently, that's what I want to know; or, alternatively, if

13    this is about whether that version violates or infringes,

14    rather, the '571 Patent, which is the fourth patent at issue

15    in this case and is not a part of those MRDC family of

16    patents, I just want some targeting narrowing of what really

17    is the issue, how broad, how narrow it is.

18              MS. CARSON:  Sure.  So we do think there is a

19    genuine dispute of fact as to the '571 Patent even in view of

20    Judge Payne's order.  Judge Payne did issue an order as to

21    that 2006 MRDC patents.  I was just noting for the record that

22    we dispute whether it's appropriate to have a judgment of

23    infringement or no infringement as to those patents because,

24    from USAA's perspective, that's not an issue in this case.

25    That product wasn't accused in this case.

1          THE COURT:  I understand.

2      Let me ask the Defendant to weigh in on this issue.  It's

3  your motion, so tell me exactly the breadth or the narrowness

4  of what you're asking the Court to decide here.

5          MR. LAWTON:  Sure, Your Honor.  And I apologize that

6  this is maybe a non-traditional motion.

7          THE COURT:  This might be said to be a

8  non-traditional case, but anyway.

9          MR. LAWTON:  We would be asking for judgment as a

10  matter of law that -- let me back up.

11      I agree with Your Honor that Judge Payne's pretrial

12  ruling has resolved the question with respect to the three --

13  what we call the 2006 MRDC patents.  We would be asking for

14  judgment as a matter of law that version 4.20.1 has not been

15  shown to infringe the '571 Patent and has not been shown to

16  infringe any unasserted patents.

17          THE COURT:  Okay.  All right.  That clarifies it for

18  me, counsel.  Thank you.

19          MR. LAWTON:  Thank you, Your Honor.

20          THE COURT:  All right.  With that input, what I'd

21  like to do is hear from both sides on the

22  infringement/non-infringement issue.

23      I'll hear from Plaintiff first as to the basis of their

24  motion that judgment as a matter of law should be entered that

25  the asserted claims are infringed by the Defendant's accused

1    product.

2         And then I'll hear from Defendants as to why the Court

3    should enter judgment as a matter of law that there is no

4    infringement of the accused product by the asserted claims.

5         Let me hear from Plaintiff first.

6              MR. PAYNE:  Yes, Your Honor.

7         Plaintiffs move for judgment as a matter of law that no

8    reasonable jury could find that PNC has not literally

9    infringed the patents-in-suit.  PNC does not dispute that the

10   accused product practices each and every element of the claims

11   except for the elements related to a customer mobile device,

12   checking for errors in claim 1 of the '432 Patent, and the

13   elements about taking and presenting photos in the '605 and

14   '681 Patents.

15        The sole non-infringement argument advanced by PNC as to

16   claim 1 of the '571 Patent is that PNC does not make, use,

17   offer for sale, or in any way make available mobile devices to

18   their customers.  This argument fails as a matter of law

19   because claim 1 of the '571 Patent is a storage medium claim

20   that does not require the presence of a mobile device for

21   infringement.

22        The same is true for claim 30 of the '681 Patent.  PNC's

23   argument that it does not supply mobile devices also fails to

24   meet the applicable Federal Circuit legal standard for

25   infringements.

1    Further, there was substantial evidence at the trial from

2    the testimony of Doctor Conte, Mr. Wilkinson, Mr. Prasad, Mr.

3    Goodstein, Mr. Trebilcock, Mr. Kunz, Ms. Larrimer, and Doctor

4    Bovik that has shown that the accused products practice each

5    and every element of the asserted claims.

6    For example, Doctor Conte demonstrated that the accused

7    product checks for errors as claimed in the '432 Patent, and

8    takes and presents photos to the customer as claimed in the

9    '605 and '681 Patents.

10    Further, the testimony of Doctor Conte has shown that the

11    PNC mobile deposit application infringes under the doctrine of

12    equivalents because it performs substantially the same

13    function as the asserted claims in substantially the same way

14    to obtain substantially the same result.

15    PNC did not dispute the doctrine of equivalents for the

16    '432 Patent except on the legally erroneous basis that they

17    were not equivalent in 2006.

18    And, therefore, Plaintiffs respectfully request that the

19    Court enter judgment in USAA's favor on the issue of

20    infringement and hold that Defendants have infringed the

21    patents-in-suit.

22    THE COURT:  Thank you, counsel.

23    Let me hear opposing argument from the Defendant.

24    MR. LAWTON:  Thank you, Your Honor.

25    And just a preliminary note.  In addition to arguing this

1   motion orally, we plan to present a written motion tonight

2   after the transcript of today's trial day becomes available.

3            THE COURT:  That's fine, but I don't intend to

4   withhold my ruling until you've had a chance to file something

5   in writing.

6            MR. LAWTON:  I understand.  Thank you, Your Honor.

7       So PNC moves for judgment as a matter of law that its

8   accused app or accused system does not infringe any of the

9   asserted patents.

10      First, as to all asserted patents, USAA has failed to

11  prove direct infringement.  The claims require, among other

12  things, a customer's mobile device or a computer-readable

13  medium running software.  It is undisputed that PNC does not

14  make, use, sell, or import mobile devices or the

15  computer-readable medium contained within mobile devices.

16      Software on PNC's servers, when executed, does not

17  perform the steps required by USAA's computer-readable medium

18  claims.  USAA has abandoned any claim of indirect

19  infringement, so all that's left is their attempts to show

20  divided infringement.  But they have failed to show that PNC

21  directs or controls its customers, or conditions any kind of

22  benefit on using its mobile app, or puts the claimed system as

23  a whole into service, or combines all of the claim elements.

24  On the contrary, customers can deposit checks into their

25  accounts and enjoy the full benefits of PNC's banking services

1    by going to a branch or an ATM.

2        There is no requirement to download the app.

3    Accordingly, there is no divided infringement and thus no

4    direct infringement.

5        Second, as to the '432 Patent, PNC does not practice

6    checking for errors limitation as claimed.  As Doctor Bovik

7    explained, the checking for errors in the accused system

8    happens on the server, not the phone.  The server finds the

9    error, it sends a message to the phone which receives it and

10   acts on it say by displaying an error code.  That's not

11   checking for errors.  It's acting on an error already found by

12   the server.

13       The only analysis that USAA pointed to that happens on

14   the phone is deposit limit check, also called the RDC velocity

15   limit check.  But that is not checking for errors as claimed

16   because it occurs before the check image is even captured and

17   prohibits the customer from taking any check picture if the

18   limit is exceeded.

19       There is no DOE infringement because finding that

20   checking for errors on the server isn't equivalent would

21   vitiate the claim limitation which specifically requires that

22   error checking happen on a mobile device, not the separately

23   recited bank computer.

24       There's a separate prosecution history estoppel argument,

25   which I understand the Court will take up post-verdict if

1    needed, but I wanted to note it briefly for the record.

2        The checking for errors limitation was added during

3    prosecution in a narrowing amendment.  USAA cannot rebut the

4    presumption that the amendment was made for a purpose related

5    to patentability, and USAA cannot rebut the resulting

6    presumption that it surrendered equivalence to the claim

7    limitation.

8        Third, with respect to the '605 and '681 Patents, the

9    Court has heard a lot of the requirement of capturing the

10   photos, plural, and after that, presenting them.  In other

11   words, take, take, show, show.  And that is not what PNC does

12   or did.

13       Swapping the order takes it out of the realm of literal

14   infringement, and it's also not DOE infringement, either,

15   because, as Doctor Bovik explained, PNC's way is not only a

16   different way of capturing images, it is indeed a better way

17   because it avoids taking the second photo if, after seeing the

18   first, the customer decides that there is something wrong with

19   it.  So that is a different way of producing a different

20   result.

21       USAA's theory of equivalence also vitiates the claim

22   limitations which have a specific temporal requirement.  And,

23   again, for both patents, prosecution history estoppel bars

24   infringement under the DOE for the same reasons that I

25   described with regard to the '432 Patent and USAA cannot rebut

 1    the presumption of surrender for those claim limitations.

 2         Fourth, with respect to the '571 Patent, the evidence

 3    does not support a finding that the limitation of image

 4    monitoring or capture module as construed by the Court is

 5    found in the accused product.

 6         And so for those reasons, PNC respectfully moves for

 7    judgment as a matter of law of no infringement on all asserted

 8    patents.

 9              THE COURT:  Thank you, Mr. Lawton.

10         Let me now hear competing argument from the parties

11    regarding the issues of validity or invalidity.

12         Plaintiffs moved for judgment as a matter of law that the

13    asserted patents are valid as a matter of law.  Defendant has

14    correspondingly moved for judgment as a matter of law that the

15    asserted claims of the patents-in-suit are invalid under both

16    the theories of enablement and written -- lack of written

17    description.

18         Let me hear -- since Defendant has the burden on that

19    issue, let me hear from Defendant first, and then I'll hear

20    following argument, responsive argument, from the Plaintiff.

21              MR. LAWTON:  Thank you, Your Honor.

22         PNC moves for judgment as a matter of law that the 2006

23    patents are invalid for lack of enablement and inadequate

24    written description, and that the '571 Patent is invalid for

25    lack of enablement.

1126

1    First, with regard to the 2006 patents, no reasonable

2    jury could find that the patents are enabled.  The *In Re Wands*

3    factors that the Federal Circuit has laid out and which Doctor

4    Kia's testimony spoke about today demonstrate this.

5    None of USAA's conception evidence was corroborated, and

6    uncontroverted testimony shows that there were key

7    technological challenges in 2006 in moving from a flat-bed

8    scanner deposit system, which USAA had been using, to a

9    mobile-based system.  USAA's own experts described these

10   challenges in depth and described the nature of the invention

11   as a paradigm shift.

12   Given this so-called paradigm shift, USAA's patent

13   specifications had to disclose guidance and direction on how

14   to implement a mobile phone-based system, and they did not.

15   The 2006 claims broadly claim a remote deposit system that can

16   deposit checks on mobile devices under varying unpredictable

17   conditions, including different lighting and orientation,

18   which is an extremely broad scope.

19   One would expect, given the paradigm shift and all of the

20   various unpredictable factors that can affect remote check

21   deposit in an uncontrolled environment, for USAA to have

22   provided specific instructions and guidance on how a person of

23   ordinary skill could account for these factors and broadly

24   achieve mobile deposit successfully, but USAA did not.

25   As we heard, USAA's patent specifications do not disclose

1    a working example or even mention mobile devices.  All they

2    disclosed were generic instructions.  They did not disclose

3    the custom algorithms that USAA witnesses admitted were

4    necessary to develop a working system and to overcome all the

5    challenges of capturing a check image of sufficient quality in

6    an uncontrolled environment.

7         Finally, on the issue of enablement for the 2006 patents,

8    the timeline of events clearly shows a significant amount of

9    undue experimentation.  USAA essentially invented or developed

10   mobile phone deposit after it filed its 2006 patent

11   applications.

12        It has attempted to frame its post-filing work as simply

13   commercialization work.  But no reasonable jury could agree,

14   given that USAA has not done research and had not done

15   research on how to implement a mobile deposit system before

16   the filing of the 2006 applications.  Its witnesses admitted

17   that USAA had to do work in 2007 to even determine the

18   viability of remote check deposit with mobile devices, and in

19   December 2007 USAA was still in the research phase as it had

20   only a 25 percent success rate in reading critical check

21   information.

22        USAA's engineers were persons of ordinary skill, and they

23   had to do serious work to develop custom algorithms to handle

24   all of the complex issues they were facing with check capture

25   sufficiently for a mobile device-based system.

1    On the issue of inadequate written description for the

2    2006 patents, uncontroverted evidence shows that the

3    specification does not mention a mobile device, and the

4    specification does not otherwise describe the invention being

5    implemented on mobile devices.  The patent figures

6    illustrating the system show a computer communicating with

7    separate image capture devices.

8    Moving on to the '571 Patent, the auto-capture patent,

9    this patent is also invalid for lack of enablement because of

10   the same factors described earlier.  Again, none of USAA's

11   evidence of conception was corroborated.  The specification,

12   moreover, lists a broad list of monitoring criteria for

13   successful auto-capture, but there is no direction or guidance

14   on how the criteria operate.

15   As Doctor Kia testified, a person of ordinary skill

16   attempting to implement the claimed invention would need

17   instruction on, number one, the mix of monitoring criteria to

18   apply that would result in a check image that likely would be

19   acceptable deposits -- accepted for deposits; and, number two,

20   the pass-and-fail ranges for any necessary monitoring

21   criteria.  The specification provided neither of those things.

22   The specification did not even disclose the critical

23   algorithm for measuring the amount of shaking during image

24   capture.  That is especially problematic for enablement

25   because the evidence showed how nascent and difficult

1129

1    auto-capture was in 2009.

2        Given these circumstances, it was not enough for the

3    specification to simply list well-known image-monitoring

4    criteria at a high level because a person of ordinary skill

5    would not have had the prior independent knowledge to

6    implement the right permutation of the criteria and specify

7    their specific ranges to successfully implement auto-capture

8    without undue experimentation.

9        Finally, it's undisputed that USAA did not have a working

10   auto-capture example for years after it filed the 2009

11   application, and then it had to spend years researching and

12   experimenting on thousands of check images to even make things

13   work.  No reasonable jury could find that USAA was simply

14   commercializing its product after invention during that time.

15             THE COURT:  Thank you, counsel.

16       Let me hear corresponding argument from Plaintiff on the

17   validity issue.

18             MR. PAYNE:  Yes, Your Honor.

19       Plaintiffs would oppose Defendant's motions and

20   respectfully move under Rule 50(a) for judgment as a matter of

21   law with respect to the Defendant's affirmative invalidity

22   defenses of written description and enablement.  No reasonable

23   jury could find based on the evidence presented that Defendant

24   has established and met its burden of proof with respect to

25   its defenses.

1      I'll start with the issue of written description.  As to

2  that issue, PNC does not assert a written description defense

3  as to the '571 Patent.

4      As to the 2006 patents, PNC has the burden of proving

5  lack of written description by clear and convincing evidence.

6  The determination of whether a patent is invalid is a question

7  of fact review for substantial evidence, and no reasonable

8  jury could find, based on the evidence presented, that the

9  asserted claims of the 2006 patents lack written description

10 support.

11      For example, Defendant presented the testimony of Doctor

12 Kia regarding written description, who opined that there is no

13 written description support in the patent for an integrated

14 device with a camera, but Doctor Kia admitted on cross

15 examination that figure 3 of the '605 Patent discloses such a

16 device.

17      Written description has further been shown by evidence of

18 the content of the specification, the Patent Office's

19 determination that the applications were supported by the

20 original 2006 specification and the testimony of

21 Mr. Wilkinson, Mr. Prasad, Mr. Oakes, Mr. Medina, and

22 Mr. Bueche.  For example, Mr. Prasad testified as to

23 techniques and instructions that are disclosed in the 2006

24 patents to ensure successful deposit with digital cameras.

25      Because PNC has not introduced substantial evidence

1    supporting a finding that the patent specifications lack

2    written description support, USAA respectfully requests that

3    judgment be entered in its favor that the patents-in-suit are

4    not invalid for lack of written description.

5        To move to the enablement issue, Your Honor, as to that

6    issue, no reasonable jury could find, based on the evidence

7    presented, that the asserted claims of the patents-in-suit are

8    not enabled.  Enablement is judged at the date of filing, not

9    in light of later developments.  And Title 35 requires only

10   that the inventor enable one of skill in the art to make and

11   use the full scope of the claimed invention; it does not

12   require that a patent disclosure enable one of ordinary skill

13   to make and use a perfected commercially viable embodiment.

14       Enablement is a -- excuse me.  Defendant presented the

15   testimony of Doctor Kia regarding enablement, and Doctor Kia

16   admitted that in 2006 before USAA filed its patents he would

17   have had the ability to create a system that used handheld

18   devices to capture images of checks and deposit them at a

19   bank.  That testimony was earlier today.  Mr. Prasad also

20   testified that USAA's system functioned with digital cameras

21   in 2006.

22       Regarding the '571 Patent, as an example, Mr. Prasad

23   testified to the capabilities provided by the '571 Patent, and

24   Doctor Conte testified about the specific disclosures related

25   to monitoring criterion in the specification and this is, of

1    course, in addition to the evidence of the specification

2    itself.  PNC's expert Doctor Bovik admitted, and USAA's expert

3    Doctor Conte testified, that all of the monitoring criteria

4    disclosed in the '571 patent specification are used in PNC's

5    infringing product.  Enablement has further been shown by

6    evidence of the testimony of Mr. Wilkinson, Mr. Prasad,

7    Mr. Oakes, Mr. Medina, and Mr. Bueche, and their testimony

8    shows that undue experimentation was not required.

9         And the only evidence presented by PNC does not relate to

10   what is enabled by the specification, but, rather, to creation

11   of a commercial product, which USAA respectfully submits is

12   not relevant to the enablement legal standard.

13        And USAA requests that judgment be entered in its favor

14   on the issue of enablement.

15             THE COURT:  All right.  Thank you, Mr. Payne.

16        Let's turn next to the competing positions between the

17   parties concerning the issue of willful infringement.

18        Let me hear from the Plaintiff on this first, please.

19             MR. PAYNE:  Thank you, Your Honor.

20        Plaintiff moves for judgment as a matter of law that no

21   reasonable jury could find that PNC has not willfully

22   infringed the asserted claims of the patents-in-suit, and

23   willfulness is shown by the testimony of Mr. Wilkinson,

24   Mr. Prasad, Doctor Conte, PNC's own executives Mr. Goodstein,

25   Mr. Trebilcock, Mr. Kunz, Ms. Larrimer, and by other witnesses

1  in the case, including Mr. Kennedy, Doctor Bovik, Mr. Medina,

2  Mr. Bueche, Mr. McKinley, and others.

3      USAA has introduced substantial evidence that PNC

4  willfully infringed the patents-in-suit, including, for

5  example, evidence that PNC examined USAA's system and

6  leveraged design learnings when creating its own infringing

7  system, that PNC knew of USAA's patents, and that PNC acted

8  with reckless or callous disregard of or with indifference to

9  the rights of USAA.

10      As example -- as further examples, PNC's witnesses

11 admitted to being aware prior to the litigation of USAA's

12 patents and USAA's patented Deposit@Mobile application and the

13 prior litigation concerning the same patent families at issue.

14 This is also shown by PNC documents and evidence that were

15 presented at the trial.

16      Pnc has not introduced substantial evidence from which a

17 reasonable jury could conclude that PNC did not willfully

18 infringe the patents-in-suit, and so Plaintiffs would

19 respectfully request that the Court enter a judgment in its

20 favor on the issue of willful infringement.

21          THE COURT:  Let me hear from the Defendant on this

22 matter.

23          MR. LAWTON:  PNC respectfully moves for judgment as

24 a matter of law of no willful infringement or, in the

25 alternative, no willful infringement of the asserted patents

1    before November 2019.  The jury does not have a legally

2    sufficient evidentiary basis to find that PNC willfully

3    infringed any or all of the asserted patents.

4         To show willful infringement, USAA must at a minimum

5    prove that PNC knew of the specific patent that is at the

6    alleged to have willfully infringed.  For the period before

7    November 2019, USAA presented no evidence that PNC knew of any

8    of the specific asserted patents.  Knowledge that USAA had a

9    patent portfolio is insufficient.  Knowledge of family member

10   patents is insufficient.  Knowledge that USAA offered check

11   deposit capability in a mobile app and that it claims to have

12   had patents on it is insufficient as well.

13        For separate and independent reasons for both the periods

14   before and after November 2019, judgment as a matter of law of

15   no willful infringement is warranted because USAA has not

16   introduced any evidence that PNC deliberately and

17   intentionally infringed any patent claim of which it is aware,

18   as needed to support a finding of willful infringement.  On

19   the contrary, the evidence compels a reasonable jury to find

20   all of the following:

21        No. 1.  PNC launched its mobile deposit feature before

22   any of the asserted features existed.

23        No. 2.  PNC used solutions offered to it by reputable

24   vendors and did not copy USAA's patents, USAA's source code,

25   or USAA's system.

1    No. 3.  USAA's public statements in 2017 that it had sent

2    letters to banks about licensing its mobile deposit patents,

3    combined with the fact that PNC received no such letter,

4    combined with the fact that PNC got reassurance from its

5    vendor NCR, led PNC to genuinely believe that it was not

6    infringing any of USAA's patents.

7        No. 4.  The Wells Fargo lawsuits did not put PNC on

8    notice of any alleged infringement.  Wells Fargo's and PNC's

9    systems are different, and use of Mitek software is not enough

10   to infringe because the software is customizable and was

11   customized by Wells Fargo.

12       No. 5.  PNC's conduct demonstrates its good faith.  Once

13   USAA identified the accused features, PNC promptly removed

14   them.  The Court determined pretrial that those changes

15   avoided three of the asserted patents.

16       As to the fourth patent, which is the '571 Patent, PNC's

17   new app avoids infringement of that patent as well because

18   there is no capability for users to use the product to perform

19   the claim limitations.

20       Finally on this point, the reasonableness of an accused

21   infringer's defenses can defeat a willfulness claim.  PNC's

22   invalidity and non-infringement defenses here are reasonable

23   and asserted in good faith even if they do not ultimately

24   succeed.

25       And for these reasons, we respectfully request judgment

1    as a matter of law of no willful infringement.

2         THE COURT:  Thank you, counsel.

3        Let's turn to the competing issues regarding the topic of

4    damages.

5        Let me hear from the Plaintiff on this first.

6         MR. PAYNE:  Yes, Your Honor.

7        Plaintiffs have motions on two related aspects of

8    damages--one for a damages award, and second, that version

9    4.20.1 is not a non-infringing alternative.  I'll start with

10   the reasonable royalty.

11       Plaintiffs move for judgment as a matter of law on past

12   damages together with interest and costs as fixed by the Court

13   under 35 U.S.C. § 284.  USAA has proven as a matter of law by

14   substantial evidence that they are owed damages for PNC's

15   infringement of the patents-in-suit.

16       Plaintiff's damages expert Mr. Kennedy testified in this

17   case that he calculated a reasonable royalty based on the

18   apportioned value of the patented technology and comparable

19   licenses.  Mr. Kennedy also testified on the cost savings

20   attributable to the patents-in-suit.  Based on all of this

21   evidence, Mr. Kennedy testified that a reasonable royalty

22   would be $300.4 million for 105.8 million infringing check

23   deposits during the damages period, broken down to

24   $115.5 million for the '681, '605, and '432 patents, and

25   $184.8 million for the '571 Patent, with an average of $3.06

1    per infringing mobile check deposit.

2          Mr. Kennedy relied, in addition to his own expert

3    analysis, on the testimony of the trial and deposition

4    testimony of numerous witnesses in the case, including

5    Mr. Wilkinson, PNC executives including Mr. Goodstein,

6    Mr. Kunz, and Mr. Trebilcock, USAA witnesses such as

7    Mr. McKinley, PNC's internal documents and financial data

8    regarding the value of the patented technology to PNC, and

9    comparable license agreements.

10         USAA requests that the Court should enter judgment as a

11   matter of law for the amount of $300.4 million in past

12   damages.  And this award is also supported by the testimony of

13   Mr. Wilkinson regarding the USAA licensing efforts, the value

14   of the patents, patent marking, and admissions by PNC

15   witnesses including Ms. Larrimer and Mr. Vellturo.

16             THE COURT:  All right.  Thank you Mr. Payne.

17        I'm sorry.  You're not finished?

18             MR. PAYNE:  Sorry, Your Honor.  I can turn to the

19   issue of 4.20.1 --

20             THE COURT:  I didn't mean to preempt your argument.

21   Go ahead and finish and turn to that, please.

22             MR. PAYNE:  Yes, Your Honor.

23        USAA also moves that no reasonable jury could find based

24   on the evidence presented that the version 4.20.1 is a

25   non-infringing alternative to the patents-in-suit.  As the

1  party contending that it has an alternative, PNC has the

2  burden to prove that version 4.20.1 is available to it, and

3  under Federal Circuit law a proposed alternative that is

4  covered by patents outside of the lawsuit, even though the

5  alternative does not -- even though the alternative may or may

6  not infringe the asserted patents is unavailable.  And that's

7  the *AstraZeneca* case, 78 F.3d, 1324 from the Federal Circuit.

8       USAA has presented evidence from Doctor Conte,

9  Mr. Wilkinson, Mr. Prasad, and PNC's own witnesses Mr. Kunz,

10  Mr. Goodstein, Ms. Larrimer, that version 4.20.1 is covered by

11  USAA's '598, '638, and '136 patents.  For example, Doctor

12  Conte testified that this alternative does not avoid

13  infringement.  USAA owns other patents in the 2006 family, the

14  '598, the '638, and '136 Patents, and they do not require any

15  of auto-capture, retake photo screen, or keypad entry of an

16  amount.  And that's page 454 of the trial transcript.

17       Doctor Bovik, PNC's expert on non-infringement, did not

18  render any opinions on these patents, and that's pages 884 to

19  885 of the transcript.

20       Pnc's corporate representative Ms. Larrimer testified

21  that, quote, "It doesn't solve the problem if the new product

22  infringes other USAA patents."  That's the question.

23       The answer is, "Yes."  It's page 758 of the transcript.

24       PNC did not introduce evidence, much less substantial

25  evidence, that version 4.20.1 is not covered by the '598, '638

1    and '136 Patents.

2         I'll also, because it may come up from the Defendant,

3    address the '571 Patent, Your Honor.

4              THE COURT:  That's fine.

5              MR. PAYNE:  It's USAA's position that version 4.20.1

6    also infringes the '571 Patent because it is not disputed that

7    the code for performing auto-capture remains present on -- in

8    the PNC accused product.  Doctor Conte testified to that and

9    Doctor Bovik did not dispute it, nor did PNC's own witness.

10   Mr. Goodstein testified that the code remained present.  And

11   under Federal Circuit case law, including *Finjan*, the code

12   need not be activated to infringe.

13        And so USAA would submit that there is infringement as to

14   the '571 Patent as a matter of law, and because PNC has not

15   introduced substantial evidence supporting a finding that

16   version 4.20.1 was available, USAA would request that judgment

17   be entered in its favor that 4.20.1 was not an available

18   non-infringing alternative.

19             THE COURT:  All right.  Thank you.

20        Let me hear from Defendant on the damages issue as well

21   as the version 4.20.1 matter.

22             MR. LAWTON:  PNC moves for judgment as a matter of

23   law that USAA failed to present a legally or factually

24   sufficient evidentiary basis for the damages it seeks, and

25   that in the event of liability, the Court should award an

 1    amount no more than that supported by proper and reliable

 2    evidence.

 3         USAA is seeking a reasonable royalty in this case, not

 4    lost profits.  USAA has not proven entitlement to lost

 5    profits.  And as for reasonable royalties, the opinions of

 6    USAA's damages expert Mr. Kennedy violated the legal standards

 7    for reasonable royalties in multiple ways.

 8         First, Mr. Kennedy used a legally impermissible royalty

 9    base.  He did not base his royalty on the smallest saleable

10    patent practicing unit.  His royalty base included profits

11    from unpatented products and services.  There is no economic

12    basis for his having done so, whether under the entire market

13    value rule, a theory of convoyed sales, a theory of so-called

14    pull-through profits, a theory of ecosystem benefits, or

15    otherwise.

16         The controlling authorities that render Mr. Kennedy's

17    opinion on this point legally relevant include *Rite-Hite*

18    *versus Kelley*, which is 56 F.3d 1538, *American Seating versus*

19    *USSC*, 514 F.3d 1262, and *DePuy Spine versus Medtronic*, 567

20    F.3d 1314.

21         Second, Mr. Kennedy artificially inflated his royalty

22    base by double-counting or triple- or quadruple-counting the

23    alleged benefits of the patented technology, including by

24    double-counting the alleged cost savings that he says PNC

25    realizes by offering mobile check deposit.

1

2

3                                    (Redacted.)

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1    Finally, USAA did not present any evidence of damages

2    tied to PNC's having the PNC mobile app on PNC's own computers

3    or servers as distinct from use by customers.  Therefore, even

4    if PNC's own servers or computers storing the PNC mobile app

5    for MRDC is infringing, that alleged infringement cannot

6    support any of Mr. Kennedy's damages opinion.

7    For those reasons, we request that the Court grant

8    judgment as a matter of law that, in the event of liability,

9    USAA is entitled to no more than a nominal royalty supported

10   by the record.

11   With the Court's permission, I can move on to version

12   4.20.1.

13   THE COURT:  Please do.

14   MR. LAWTON:  USAA has failed to provide sufficient

15   evidence for a reasonable jury to rule for it on the issue of

16   whether 4.20.1 is a non-infringing alternative.

17   I would begin on one issue on which there is actually no

18   evidence at all in USAA's favor, and that is the fact that

19   PNC's redesigned app version 4.20.1 does not infringe any of

20   the four asserted patents.  The Court has already resolved

21   this issue as to the 2006 MRDC patents, '432, '605, and '681,

22   but USAA offered no evidence of infringement of the '571

23   Patent either.  Doctor Conte agreed that version 4.20.1 does

24   not in its default configuration infringe the '571 Patent.

25   USAA's sole theory was that the code could be modified to

1144

1    reenable the auto-capture feature, but whether PNC could do

2    that is not the issue.  PNC's customers using version 4.20.1

3    as distributed cannot, and that means that the app as

4    distributed to customers is not even capable of infringing.

5    Even Doctor Conte didn't suggest that version 4.20.1 is

6    capable of infringing.

7         In a raft of Federal Circuit cases, not just *Finjan*

8    *versus Secure Computing* or *VirnetX versus Apple*, but also

9    *Nazomi Communications, Typhoon Touch Technologies*, and *Fantasy*

10   *Sports*, and others, confirm that the mere fact that code could

11   be modified to infringe is not enough.

12        So the Court should hold as a matter of law and instruct

13   the jury that 4.20.1 is a non-infringing alternative to all

14   four asserted patents.

15        The Court should also hold that version 4.20.1 is a

16   non-infringing alternative as to any unasserted patents, most

17   notably the PNC 3 patents that are asserted in another

18   litigation.  In the first place, whether version 4.20.1

19   infringe or infringes unasserted patents would not be relevant

20   to the value of the asserted patents, which is the only

21   valuation exercise at issue in this case.

22        Also, Doctor Conte did not offer any element-by-element

23   non-conclusory analysis regarding infringement of the PNC 3

24   patents.  USAA did and has done its level best to shift the

25   burden to PNC to disprove infringement, but that is not the

1  law.  USAA bears the burden to prove infringement and bears

2  the burden of proof in every way relevant on infringement, on

3  damages, and the lack of a non-infringing alternative.

4      We have cited multiple authorities in our briefing to the

5  Court and will this evening again.  USAA's *AstraZeneca* case is

6  inapposite for reasons we have explained and will include

7  again in our brief this evening.

8      And if the Court has no further questions, that is the

9  end of my presentation.

10      THE COURT:  All right.  Thank you, counsel.

11      With regard to these various matters that have been

12  raised and presented by counsel this afternoon, the Court

13  finds and rules as follows:

14      Concerning Plaintiff's motion to establish and find as a

15  matter of law that the asserted claims have been infringed by

16  the accused products, the Court denies that motion.  As to the

17  Defendant's motion that the Court should enter judgment as a

18  matter of law that its accused products do not infringe the

19  asserted claims, the Court denies that motion.

20      With regard to the Defendant's motion that the asserted

21  claims are invalid under a combination or in separate order of

22  theories of lack of enablement -- excuse me -- lack of

23  enablement or lack of written description, the Court denies

24  that motion.  Likewise, the Court denies the Plaintiff's

25  motions that the Court should enter judgment as a matter of

 1    law finding that the asserted claims of the patents-in-suit

 2    are valid as a matter of law.

 3          The Court denies the parties' competing motions with

 4    regard to willful infringement and believes that that is best

 5    appropriately determined by the jury, and that judgment as a

 6    matter of law is inappropriate either that there is no willful

 7    infringement or that there is willful infringement in this

 8    case.

 9          With regard to the damages issues, including the issues

10    related to version 4.20.1 and whether it is or is not a

11    non-infringing alternative, with regard to the issue of

12    damages, the Plaintiff's motion and the Defendant's competing

13    motion in that regard are denied.

14          In short, counsel, all the various motions presented by

15    both parties pursuant to Rule 50(a) are denied by the Court.

16          That completes motion practice under Rule 50(a).  As I

17    indicated earlier, the Court now will turn back to its efforts

18    to digest, review, and from that process generate an

19    appropriate final jury instruction and verdict form,

20    considering the 70-plus page submission from the parties that

21    came in Wednesday afternoon, as well as the evidence the

22    Court's heard throughout the trial, and I hope to have that

23    deliverable to you by email at 7:00 tomorrow morning.  And I

24    intend to have you here by 8:15 and go on the record to take

25    up any formal objections to the charge and the verdict form

1    that either party feels are appropriate and necessary

2    considering the interests of their respective clients.

3         Are there questions before we recess for the evening?

4         Go ahead, Ms. Smith.

5              MS. SMITH:  Your Honor, I know that cameras aren't

6    typically allowed in a federal courthouse, but I would like to

7    use my camera to take a picture of the flip chart, with leave

8    of the Court; the writing that we wrote on the flip chart,

9    please, Your Honor.

10             THE COURT:  I assume that photograph or photographs

11   may make their way to a slide that will be used in closing

12   arguments?

13             MS. SMITH:  It's quite possible, Your Honor.

14             THE COURT:  Plaintiff have any opposition to that?

15             MS. CARSON:  Not at this time, Your Honor.

16             THE COURT:  All right.  I'll grant leave to let

17   either side take whatever photographs that they want -- they

18   may want of any of the pages of the flip chart that have been

19   used to generate demonstratives over the course of the trial.

20   And each are free to use them in whatever way they believe is

21   appropriate, subject to objection from the other party.  But I

22   won't preclude the use of -- I assume it will be cell phone

23   cameras to take those pictures.

24             MS. SMITH:  Yes, Your Honor.  And I don't know

25   exactly what we have up our sleeve.  I just got an email

1    asking for a photograph of what we had drawn.

2            THE COURT:  That's fine.

3        And Ms. Carson, if you'd feel better, why don't you both

4    take the same pictures of same pages before you leave here

5    this evening.  If you need them, you'll have them; if you

6    don't, you won't.

7            MS. CARSON:  Sounds good, Your Honor.

8            THE COURT:  Is there anything else?

9            MS. CARSON:  Nothing from Plaintiff.

10           MS. SMITH:  No, Your Honor.  Thank you.

11           THE COURT:  All right, counsel.  I will see you in

12   the morning at 8:15 to take up a formal charge conference, and

13   until that time, unless there's something else, you are

14   excused.

15       And the Court stands in recess.

16           (The proceedings were concluded at 4:45 p.m.)

17

18

19

20

21

22

23

24

25

1              I HEREBY CERTIFY THAT THE FOREGOING IS A

2              CORRECT TRANSCRIPT FROM THE RECORD OF

3              PROCEEDINGS IN THE ABOVE-ENTITLED MATTER.

4              I FURTHER CERTIFY THAT THE TRANSCRIPT FEES

5              FORMAT COMPLY WITH THOSE PRESCRIBED BY THE

6              COURT AND THE JUDICIAL CONFERENCE OF THE

7              UNITED STATES.

8

9              S/Shawn McRoberts          05/12/2022

10             _____DATE_____
               SHAWN McROBERTS, RMR, CRR

11             FEDERAL OFFICIAL COURT REPORTER

12

13

14

15

16

17

18

19

20

21

22

23

24

25