IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
MARSHALL DIVISION

| | | |
|---|---|---|
| UNITED SERVICES AUTOMOBILE | ( | CAUSE NO. 2:20-CV-319-JRG |
| | ) | (Lead) |
| ASSOCIATION, | ( | CAUSE NO. 2:21-CV-110-JRG |
| | ) | |
| Plaintiff, | ( | |
| | ) | |
| vs. | ( | |
| | ) | |
| PNC BANK, N.A., | ( | MAY 13, 2022 |
| | ) | MARSHALL, TEXAS |
| Defendant. | ( | 8:00 A.M. |

_____

VOLUME 5

_____

TRIAL ON THE MERITS

BEFORE THE HONORABLE RODNEY GILSTRAP
UNITED STATES CHIEF DISTRICT JUDGE

_____

SHAWN M. McROBERTS, RMR, CRR
100 E. HOUSTON STREET
MARSHALL, TEXAS  75670
(903) 237-8546
shawn_mcroberts@txed.uscourts.gov

```
 1                    A P P E A R A N C E S

 2        FOR PLAINTIFF:        IRELL & MANELLA, LLP -
                                LOS ANGELES
 3                              1800 AVENUE OF THE STARS
                                Suite 900
 4                              LOS ANGELES, CALIFORNIA  90067
                                (310) 277-1010
 5                              BY:  MR. JASON SHEASBY

 6                              IRELL & MANELLA - NEWPORT BEACH
                                840 NEWPORT CENTER DRIVE
 7                              SUITE 400
                                NEWPORT BEACH, CALIFORNIA 92660
 8                              (949) 760-0991
                                BY:  MS. LISA GLASSER
 9                                   MS. REBECCA CARSON

10                              PARKER BUNT & AINSWORTH
                                100 E. FERGUSON, SUITE 418
11                              TYLER, TEXAS  75702
                                (903) 531-3535
12                              BY:  MR. ROBERT BUNT

13        FOR DEFENDANT:        MUNGER TOLLES & OLSON LLP - LA
                                350 S. GRANDE AVE., 50TH FLOOR
14                              LOS ANGELES, CALIFORNIA  90071
                                (213) 683-9255
15                              BY:  MR. GREG STONE

16                              WILMER CUTLER PICKERING HALE &
                                DORR - WASHINGTON DC
17                              1875 PENNSYLVANIA AVENUE NW
                                WASHINGTON, DC 20006
18                              (202) 663-6000
                                BY:  MR. GREGORY LANTIER
19
                                MUNGER TOLLES & OLSON -
20                              SAN FRANCISCO
                                560 MISSION STREET, 27TH FLOOR
21                              SAN FRANCISCO, CA 94105
                                (415) 512-4019
22                              BY:  MS. BLANCA YOUNG

23                              WILMER CUTLER PICKERING
                                HALE & DORR, LLP - BOSTON
24                              60 STATE STREET
                                BOSTON, MASSACHUSETTS  02109
25                              (617) 526-6806
                                BY:  MR. ANDREW DANFORD
```

1152

```
 1                                GILLAM & SMITH, LLP
                                  303 SOUTH WASHINGTON AVENUE
 2                                MARSHALL, TEXAS  75670
                                  (903) 934-8450
 3                                BY:  MS. MELISSA SMITH

 4          OFFICIAL REPORTER:    SHAWN M. McROBERTS, RMR, CRR
                                  100 E. HOUSTON STREET
 5                                MARSHALL, TEXAS  75670
                                  (903) 923-8546
 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1    THE COURT:  Counsel, before we move on to other

2    matters, I want to take up with you the motions that have been

3    filed overnight, and I'm going to do this on the record.  I

4    want to take up first the motion filed by Wells Fargo for a

5    protective order.

6        Have you-all discussed this and do you have any areas of

7    agreement with regard to this motion or all matters raised in

8    the motion in dispute between the parties?

9        MR. SHEASBY:  I did speak with Ms. Smith yesterday,

10   and I can report Ms. Smith and I did reach agreement, which is

11   to say, in the closing there will be no reference to the Wells

12   Fargo number and the number will be redacted from the slides.

13   So there will be no conceivable way for anyone to see the

14   number.

15       THE COURT:  So you're telling me there may be a

16   reference to the negotiated license itself, but the

17   particulars of the negotiated license won't be mentioned.

18       MR. SHEASBY:  That's correct, Your Honor.

19       THE COURT:  Well, the motion asks for the courtroom

20   to be sealed prior to any use of or reference to terms of the

21   settlement agreement.  I would assume that would allow a

22   reference to the fact that a license agreement was negotiated

23   and settled upon without referring to the actual terms of it.

24       MR. SHEASBY:  That's correct.  That's our intention

25   to comply with the area of request.

1

2

3                          (Redacted.)

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1    or to the extent it's been done and something has slipped

2    through the cracks, I'm going to order the pretrial and the

3    trial transcripts be redacted as to any specific terms from

4    the license agreement.

5        Her motion keeps referring to this as a settlement and

6    you-all have used the word 'settlement' at various times and,

7    in fact, the word 'settlement' is included on some of the

8    disputed demonstratives for closing.  I am not comfortable

9    with using the word 'settlement'.  Settlement to me implies

10   settle a dispute or settling a lawsuit.  It doesn't imply

11   finalizing a negotiation of a license.

12       So I think we all need to be careful to avoid the word

13   'settlement' and talk about a negotiated license.  And I'm

14   going to instruct you to avoid the use of the word

15   'settlement' when referring to the Wells Fargo license in your

16   closings.

17       All right.  The third thing they ask for is that Wells

18   Fargo be permitted to redact information from the final

19   hearing and trial transcripts, and I'm not about to let any

20   third party come in and take over the Court's transcripts and

21   decide unilaterally what to redact and what not to redact.

22   And I'm going to deny that.

23       And the fourth item they ask for is any filings with the

24   Court referring to the terms of the settlement also be filed

25   under seal.  The only problem with this is I can't sit here

1    and instruct the clerk these 15 filings refer to the license

2    agreement, therefore they need to be under seal and these 27

3    don't.

4         I think both sides in this case need to meet and confer

5    and agree upon a list of filings with the Court that fall

6    within this fourth category.  And upon presentment of an

7    agreed list of filings that fall within this category, then I

8    can direct the clerk to place those under seal.

9              MR. SHEASBY:  And, Your Honor, that should have

10   already been done.

11             THE COURT:  And it may have already been done, but

12   to the extent it hasn't, I want both sides to review the

13   filings in this case and make sure there's not something

14   that's inadvertently not been sealed heretofore that needs to

15   be.

16             MR. SHEASBY:  I understand.

17             THE COURT:  Now, I'll also note for the record that

18   Wells Fargo didn't send a representative or counsel to

19   participate in this process and merely filed this order in the

20   case from their counsel in North Carolina, and there's nobody

21   here nor have they asked to conduct a telephonic or remote

22   hearing, they haven't asked to participate in this process at

23   all.  And they're well aware of the timing of the trial and

24   the fact that this matter is going to the jury today.

25        So I see no basis that Wells Fargo can complain or should

1158

1    be able to complain about anything less than they've asked for

2    here, given that they simply dropped this in the middle of

3    this case and have done nothing more, made no effort to argue

4    or to do anything participatory regarding this motion.

5        So my intention and my order in this regard is that the

6    parties may not specifically refer to the precise terms of the

7    USAA/Wells Fargo patent license agreement during the remainder

8    of the trial.

9        I will permit, as Mr. Lantier for PNC requested,

10   references to argument containing statements, You've heard

11   evidence about the number of patents, you've heard evidence

12   about the time period that this license agreement would cover.

13   Those two areas I think are fine if they're done generically

14   and are referring back to prior testimony without then

15   drilling down as to the specific number of patents or the

16   specific time period.

17           MR. LANTIER:  Your Honor --

18           THE COURT:  Yes, sir.

19           MR. LANTIER:  I'm sorry, Your Honor.  I did not mean

20   to interrupt you.  I suggested earlier you said it could be a

21   significant number of patents.

22           THE COURT:  I don't recall saying 'significant'.  I

23   said you can refer to a number of patents.

24       I'm going to grant the second area of relief and order

25   the pretrial and trial transcripts sealed as to any portions

1    thereof that refer to the specific terms of the patent license

2    agreement between USAA and Wells Fargo and then that sealing

3    take place before any public release of those transcripts.

4         I'm going to deny Wells Fargo's third request to

5    unilaterally itself determine what should be redacted from the

6    transcripts.

7         I'm going to grant the fourth area of relief, and in so

8    doing, I'm going to direct PNC and USAA through their counsel

9    to meet and confer and present the Court with an agreed list

10   of the filings in this case that should under the motion for

11   protective order be sealed by the clerk, after which I'll then

12   direct the clerk to be sure that those filings are under seal.

13   And you-all should do that within 72 hours of a return of a

14   verdict in this case.

15        That's the Court's ruling on the Wells Fargo motion for

16   protective order.

17        Now, we have a lot of ground to cover since I've been

18   presented with quite a few disputes regarding demonstratives

19   to be used in closing.  We still have to conduct a formal

20   charge conference, so I'm going to go through the remaining

21   motions quickly.

22        I've reviewed these carefully.  I've looked at the

23   briefing on both sides.  These are three motions that were

24   filed last night.  I'm not going to ask for argument on them

25   because I'm persuaded I don't need argument on them.  They all

1160

1    deal with matters that took place during the trial over which

2    the Court presided and is intimately familiar.

3        So with regard to PNC's motion for curative jury

4    instruction, Document 703, that motion is denied.

5        PNC never raised an objection at the time this occurred

6    during the trial, and the requested instruction far exceeds

7    any level of prejudice that might have occurred, in my view.

8    So that motion is denied.

9        The Defendant PNC'S motion to preclude USAA from

10   asserting or implying copying during closing argument, I have

11   searched my memory and I have queried my staff and I don't

12   think anybody recalls the word 'copying' being used during the

13   trial.  There are certainly testimony about things that could

14   be characterized as copying, and copying, to the extent it

15   exists, is a relevant consideration with regard to the issue

16   of willfulness.

17       Does the Plaintiff intend to use the word 'copying' per

18   se in its closing argument?

19            MR. SHEASBY:  No.

20            THE COURT:  All right.  With that understanding, I'm

21   going to deny the Defendant's motion:  Certainly the plaintiff

22   can argue whatever it wants to about the evidence that's

23   presented and characterize it as it believes best serves its

24   purposes as can the Defendant and as is to be expected in any

25   closing argument.

1     All right.  With regard to the Plaintiff's requested

2    motion to preclude the Defendants from arguing that no mobile

3    device is required to infringe the '571 Patent or claim 30 of

4    the '681 Patent as document 699, that motion is denied.

5          Both sides can argue this point, both sides have

6    presented evidence on this point, the Court is going to

7    instruct the jury on what is appropriate for infringement and

8    what the standards are they are to apply in reaching their

9    decision on that issue.

10         And I think the Court's instructions and -- I think the

11   Court's instructions are appropriate, and I'm not going

12   to -- this is effectively a motion to ask the Court to

13   intervene and to circumscribe what can be argued or presented

14   at closing, and I'm not going to do that.  This motion is

15   denied.

16         All right.  I'm prepared to turn to the overnight

17   disputes.

18              THE COURT:  Be seated, please.

19         Counsel, the Court now intends to conduct a formal charge

20   conference in the USAA/PNC case.

21         Previously, the parties submitted proposed final jury

22   instructions and a proposed verdict form.  Prior to the trial,

23   during the course of the trial, and in light of the evidence

24   presented, the Court felt that an updated and renewed

25   submission jointly from the parties would be helpful, and I

1    ordered the parties to jointly meet and confer and submit an

2    updated and revised joint proposal concerning the final jury

3    instructions and verdict form.

4        That was received shortly after 3:00 on Wednesday.  That

5    document, at least as to the proposed charge, 73 pages in

6    length, set forth numerous areas of disagreement.  The Court

7    reviewed that submission as well as the parties' updated

8    submission concerning the verdict.

9        The Court carefully considered the commentary included in

10   the submissions by way of footnotes, cases cited, authorities

11   relied upon.  The Court carefully considered the proposed

12   instructions from both Plaintiff and Defendant.

13       In many cases, the Court adopted a different construction

14   than either party submitted or a modified version of what

15   either party submitted.  In some cases, the Court adopted a

16   proposal from one party or the other.  But, in essence, the

17   Court has arrived at what it believes to be a fair and

18   balanced and appropriate set of final jury instructions and a

19   verdict form for use in this trial.

20       That version of the verdict form and verdict -- excuse

21   me, that version of the final jury instructions and verdict

22   were delivered to the parties electronically this morning at

23   7:00.  It is now 8:44.  The Court is satisfied that both sides

24   have had an ample opportunity to review these documents as

25   generated by the Court in light of their earlier submissions,

1    and the Court will now conduct a formal charge conference on

2    the record where either party may lodge what objections it

3    believes are appropriate and necessary to protect the

4    interests of their respective clients.

5        Counsel, my practice in this regard has uniformly been to

6    have a single spokesman for each party go to the podium and

7    stand there together, and I will review these two documents,

8    beginning with the final jury instruction and followed by the

9    verdict form, on a page-by-page basis so that we do not

10   overlook or miss anything.

11       And at any point along that way when I get to a page, if

12   you believe that something has been included that is improper

13   or you believe something omitted which was necessary, then you

14   are free to make any objections on the record that you feel

15   are appropriate.  But by beginning at the first page and

16   walking through page by page the entirety of each document,

17   the Court is satisfied that it has the best chance of

18   being -- has the best chance of avoiding any unintended

19   omissions or missing anything that is important to be raised

20   by either party.

21       So with that, whoever is going to speak for Plaintiff and

22   whoever is going to speak for Defendant, please go to the

23   podium, and we'll begin the process with the final jury

24   instructions.

25       We'll begin with the cover page, or page 1, of the final

1164

1    jury instructions, and I'll ask if there is objection from

2    either the Plaintiff or the Defendant as to anything on page 1

3    of these final jury instructions.

4              MS. GLASSER:  No, Your Honor, not from Plaintiff.

5              MR. DANFORD:  Good morning, Your Honor.  Andrew

6    Danford for PNC.  No objection to page 1.

7              THE COURT:  All right.  Turning then to page 2, is

8    there objection here from either party?

9              MS. GLASSER:  No objection.

10             MR. DANFORD:  No objection, Your Honor.

11             THE COURT:  Turning then to page 3, is there any

12   objection from either party?

13             MS. GLASSER:  No objection.

14             MR. DANFORD:  No objection.

15             THE COURT:  Turning next to page 4 of the final jury

16   instructions, is there any objection?

17             MS. GLASSER:  No objection.

18             MR. DANFORD:  No objection.

19             THE COURT:  Turning then to page 5, is there any

20   objection?

21             MS. GLASSER:  No objection.

22             MR. DANFORD:  No objection.

23             THE COURT:  Turning next to page 6 of the final jury

24   instructions, is there objection from either party?

25             MS. GLASSER:  No objection.

1165

1    MR. DANFORD:  No objection.

2    THE COURT:  Turning next to page 7, is there any

3  objection here from either party?

4    MS. GLASSER:  No objection.

5    MR. DANFORD:  Your Honor, PNC objects to the

6  language on page 7, each claim is effectively treated as if it

7  were a separate patent.  The reason we object here is there

8  has been discussion at this trial about a large number of

9  patents, hundreds of patents, from USAA.  There only are four

10  patents at issue, and we think that in the context of the way

11  that the arguments have been presented at this trial, it would

12  be confusing to add that language here.

13    THE COURT:  Thank you, counsel.  That objection is

14  overruled.  Is there anything further on page 7?

15    MR. DANFORD:  Nothing further.

16    THE COURT:  Turning then to page 8, is there any

17  objection here from either party?

18    MS. GLASSER:  No objection.

19    MR. DANFORD:  No objection.

20    THE COURT:  Turning then to page 9, is there any

21  objection from either party?

22    MS. GLASSER:  No objection.

23    MR. DANFORD:  No objection.

24    THE COURT:  Turning next to page 10, is there any

25  objection?

1        MS. GLASSER:  No objection.

2        MR. DANFORD:  No objection.

3        THE COURT:  Turning next to page 11, is there

4   objection here?

5        MS. GLASSER:  No objection.

6        MR. DANFORD:  Your Honor, PNC has an objection here,

7   and we object to the statement that "a device infringes if it

8   is reasonably capable of satisfying the claim elements.'

9        And we believe, based on the evidence and arguments that

10  have been presented in the case, the jury should be instructed

11  as follows:  "The '571 Patent recites claims directed to

12  computer-readable instructions that, when executed by a

13  processor, cause the processor to perform certain actions.

14  Those claims are infringed only if the accused product is

15  designed in such a way as to enable the user to perform the

16  claimed actions without having to modify the product software

17  code.  If the code would need to be modified to perform the

18  actions listed in the '571 Patent claims, then the claims are

19  not infringed."

20       And we believe that those -- that instruction is

21  supported by the law cited in the footnotes, in particular the

22  *Nazomi* case, *Typhoon Touch, Finjan, Fantasy Sports, and*

23  *Telemac.*

24       THE COURT:  Thank you, counsel.  That objection is

25  overruled.  Is there anything further on page 11.

1167

1       MR. DANFORD:  For the same reasons, we object to the

2   statement that a device infringes if it is reasonably capable

3   of satisfying the claim elements without explaining that a

4   device whose source code would need to be modified in order to

5   infringe is not reasonably capable of infringing.

6       THE COURT:  Likewise, that objection is overruled.

7   Anything further on page 11?

8       MR. DANFORD:  Nothing further on page 11.

9       THE COURT:  Let's turn then to page 12 of the final

10  jury instructions.  Is there objection here from either

11  Plaintiff or Defendant?

12      MS. GLASSER:  Your Honor, USAA has an objection to

13  the portion discussing the direction and control test.

14  Specifically, given the way that the evidence went in in this

15  case and the Federal Circuit case law, USAA believes that the

16  jury should be instructed that the accused infringer does not

17  have to have made each component as long as it combines the

18  components and as well that there's no requirement of having

19  physical control.

20      THE COURT:  All right.  That objection is overruled.

21  Is there anything from Defendant regarding page 12?

22      MR. DANFORD:  Yes, Your Honor.

23      PNC objects to the Court's instruction to the extent that

24  it does not provide an adequate definition of direction and

25  control.  And we believe that the Court should instruct the

1    jury as follows to give that guidance:  "To prove that PNC

2    directed or controlled the acts of a third party, USAA must

3    prove either that, one, a third party is the agent of PNC or

4    is contractually obligated to PNC to carry out the claim

5    steps; or, two, the third party performed the claim steps in

6    order to receive a benefit from PNC and that PNC established

7    how or when the claim steps were performed."

8        And we think without that detail, the jury's left without

9    guidance as to what the meaning of direction or control is.

10            THE COURT:  Thank you, counsel.  That objection is

11   overruled.  Anything from either party remaining on page 12?

12            MR. DANFORD:  Your Honor, this is an issue that

13   spans from page 12 to page 13, and it's with respect to the

14   doctrine of equivalents.  I'm happy to address it now.  It's

15   going to run over the page, but we object to the phrase, "An

16   accused product is equivalent to element or limitation," on

17   line 2 of page 13, the instruction begins on the prior page.

18   "The doctrine of equivalents does not compare a product to an

19   element or limitation as the language might suggest to the

20   jury that infringement can be found if the product satisfies

21   only one claim limitation."

22       And we request request that the Court should instruct as

23   follows:  "Under the doctrine of equivalents, a product

24   infringes a claim if the accused product contains elements

25   that are literally met or are equivalent to every element of

1    the claim."

2         THE COURT:  All right.  Thank you, counsel.  That

3    objection is overruled.

4       Before we formally turn to page 13, I'll ask again, is

5    there anything from either party that you care to raise that

6    has not already been raised reflected on page 12 of the

7    instructions?

8         MS. GLASSER:  No, Your Honor.

9         MR. DANFORD:  Nothing further from PNC.

10        THE COURT:  Okay.  Then let's turn to page 13.  And

11   in addition to what's already been raised, are there any other

12   objections on page 13?

13        MS. GLASSER:  No objection.

14        MR. DANFORD:  Yes, Your Honor.

15      PNC has an objection to the willfulness instruction on

16   page 13, and we specifically object to the paragraph that is

17   the last full paragraph on the page:  "You may find that PNC's

18   actions were willful if PNC acted in reckless or callous

19   disregard of or with indifference to the rights of USAA.  A

20   Defendant who is indifferent to the rights of another when it

21   perceives and disregards a high or excessive danger of

22   infringement it is known to or was apparent to a reasonable

23   person's position."

24      We believe that that instruction misstates the law of

25   willfulness and that it omits the specific intent requirement

1    of deliberate or intentional conduct, which is reflected in

2    the prior paragraph.

3           THE COURT:  All right.  That objection is overruled.

4    Is there anything else on page 13?

5           MR. DANFORD:  Not on page 13, Your Honor.

6           THE COURT:  Anything from Plaintiff on page 13?

7           MS. GLASSER:  No, Your Honor.

8           THE COURT:  Let's turn to page 14.  Are there

9    objections here from either party?

10          MS. GLASSER:  No objection.

11          MR. DANFORD:  Yes, Your Honor.

12       With respect to the issue of willfulness, this is that

13   instruction that carries over from page 13, at the end of that

14   paragraph at the top of page 13, there is an instruction on

15   willful blindness, but the jury has not been provided with any

16   direction as to what the standard for willful blindness is.

17       And so if there is going to be an instruction of willful

18   blindness, we believe that the jury should be instructed that

19   willful blindness requires taking active steps to avoid

20   knowing a fact.  And that's based on the willful blindness

21   standard as set forth in the Supreme Court's Global Tech

22   decision.

23          THE COURT:  All right.  That objection is overruled.

24   Is there anything else on page 14?

25          MS. GLASSER:  Not from Plaintiff, Your Honor.

1          MR. DANFORD:  With respect to the issue of written

2    description, which is an issue on page 13 and 14, Your Honor,

3    we object to the exclusion of -- from our proposal that there

4    is no presumption that the Patent Office considered whether a

5    patent application satisfies the written description

6    requirement.  Rather, whether the Patent Office considered any

7    particular issue can only be determined by reviewing the

8    patent's prosecution history.

9          The question is not whether a claimed invention is an

10   obvious variant of that which is disclosed in the

11   specification.  The specification must describe the claimed

12   invention in a way that a person of ordinary skill in the art

13   would understand that the larger category being claimed has

14   been invented, not just a single example.  The inventor's

15   possession of the invention outside the specification is not

16   sufficient to satisfy the written description requirement.

17   Rather, the specification itself must demonstrate that the

18   inventor possessed the full scope of the claimed invention

19   such that one skilled in the art reading the original

20   disclosure could reasonably discern that the inventor

21   possessed the full scope of the claimed invention at the time

22   the patent application was filed

23          THE COURT:  All right.  That objection is overruled,

24   although I will note that the written description instructions

25   are not fully contained on page 14.  They are on the following

1    pages.  But we will get there.

2        Again, for purposes of being careful and for

3    completeness, does either party have any other objections to

4    any other matter either included on or omitted from page 14?

5              MS. GLASSER:  No, Your Honor.

6              MR. DANFORD:  No, Your Honor.

7              THE COURT:  In addition to what's already been

8    heard, does any party have an objection to anything either

9    included within or excluded from page 15?

10             MS. GLASSER:  Your Honor, USAA objects to the

11   omission of any instruction making clear to the jury that it's

12   not necessary for the specification to describe concepts that

13   are already well known in the art.  In view of the way PNC put

14   on its case, USAA believes that that omission is prejudicial.

15             THE COURT:  That objection is overruled.  Is there

16   any other objection from either party on page 15?

17             MR. DANFORD:  No, Your Honor.  I'll just clarify for

18   the record that I misspoke earlier in that written description

19   began on 14 and then went to 15.

20             THE COURT:  That's not the problem.  I want to be as

21   clear as you do.  All right.  Then let's turn to page 16 of

22   the final jury instructions.  Are there any objections here

23   from either party?

24             MS. GLASSER:  Yes, Your Honor.  USAA objects to the

25   omission of instruction to the jury that commercial success

 1    optimization or other steps relating to commercialization of a

 2    product are not part of the enablement requirement.

 3         In particular, USAA believes that, in view of the

 4    evidence put on by PNC, it was extremely important to include

 5    language such as set forth by the Federal Circuit in the *Engel*

 6    case or the *CMFT* case, making clear to the jury that it is

 7    inappropriate to approach the enablement inquiry from the

 8    perspective of optimization or commercialization.

 9         THE COURT:  All right.  That objection is overruled.

10    Anything further from either party on page 16?

11         MR. DANFORD:  Yes, Your Honor.

12         PNC objects to the omission of certain instructions that

13    PNC proposed on enablement, and in particular we object to the

14    omission of the following instruction:  "The amount of

15    experimentation is undue where there is evidence of the

16    patentee's own failures to make and use the later claimed

17    invention at the time of the application.  The amount of

18    experimentation necessary for the patentee to develop a

19    working embodiment of the claimed invention is relevant to

20    whether undue experimentation is required to make and use the

21    claimed invention.  A patent is not enabled where it discloses

22    only a starting point or a direction for further research or

23    it at the time of filing acknowledged necessary claimed

24    invention did not exist."

25         We believe that those instructions are particularly

 1    relevant given the evidence that was presented in this case.

 2              THE COURT:  Thank you, counsel.  That objection's

 3    overruled.

 4         Anything else from either party on page 16?

 5              MS. GLASSER:  No, Your Honor.

 6              MR. DANFORD:  Nothing further.

 7              THE COURT:  Turning then to page 17, are there

 8    objections here from either party?

 9              MS. GLASSER:  No, Your Honor, not from USAA.

10              MR. DANFORD:  No objection from PNC.

11              THE COURT:  Turning then to page 18, are there

12    objections here from either party?

13              MS. GLASSER:  No objections.

14              MR. DANFORD:  No objection, Your Honor.

15              THE COURT:  Turning then to page 19, is there

16    objection here from either party?

17              MS. GLASSER:  No, Your Honor.

18              MR. DANFORD:  Your Honor, PNC has two objections to

19    the damages instruction on page 19, and we object to the

20    omission of instructions on two issues.

21         The first issue is we believe the jury should have an

22    instruction on the entire market value rule.  And, in

23    particular, we believe that the jury should be instructed, "In

24    order to recover damages as a portion of revenues or profits

25    attributable to these other products, USAA must establish that

1  it is more likely than not that the patented feature is the

2  sole driver of customer demand for these other products such

3  that it creates the basis for customer demand or substantially

4  creates the value of those products."

5      Separately, we would request an instruction on convoyed

6  sales and, in particular, "To recover royalties for convoyed

7  sales of any collateral products, USAA must prove that the

8  collateral products are so closely related to mobile check

9  deposit that they effectively act or are used together for a

10 common purpose.  In other words, mobile deposit and the

11 collateral product must together constitute a functional unit.

12 USAA may only add the value of collateral products into its

13 royalty base if that connection exists."

14     And, Your Honor, we believe both of those instructions

15 are required, given the way that USAA presented its damages

16 evidence in this case.

17         THE COURT:  All right.  That objection is overruled.

18 Is there anything further from either party on page 19?

19         MR. DANFORD:  Nothing further.

20         MS. GLASSER:  Not from Plaintiff, Your Honor.

21         THE COURT:  Turning then to page 20, is there any

22 objection here from either party?

23         MS. GLASSER:  No, Your Honor.

24         MR. DANFORD:  No objection to page 20, your Honor.

25         THE COURT:  I'll note for the record, counsel, that

1    pages 19 and 20 contain recital of all 15 of the

2    *Georgia-Pacific* factors.  Given your failure to object, I

3    assume both sides do not object to the Court charging the jury

4    on all 15 of the factors.

5              MS. GLASSER:  Yes, Your Honor.

6              MR. DANFORD:  No objection from PNC.

7              THE COURT:  Okay.  Then let's turn to page 21.  Is

8    there objection here from either party?

9              MS. GLASSER:  Your Honor, USAA objects to the

10   statement that USAA has the burden, the responsibility, to

11   show that there were no acceptable non-infringing substitutes.

12   That suggests that USAA had an affirmative burden to

13   demonstrate the absence of substitutes which is not a correct

14   statement of the law for a reasonable royalty case.  And so

15   USAA believes that that statement should be deleted.

16       And, additionally, USAA objects to the admission [sic] of

17   an instruction indicating that PNC bears the burden of showing

18   that its proposed alternative was available.

19             THE COURT:  That objection is overruled.  Anything

20   else on page 21 from either party?

21             MS. GLASSER:  Yes, Your Honor.  So at the very

22   bottom of the page, the instruction states, "If you find USAA

23   or its licensees failed to properly mark their respective

24   products," and it goes on, and then it says, "You may only

25   award damages to USAA for infringement that occurred after the

 1    date USAA gave actual notice."  And we believe that it should

 2    say, USAA began marking or gave actual notice, because the

 3    notice statute is clear that you can commence the damages

 4    period either by constructive or by actual notice.

 5          THE COURT:  That objection is overruled in light of

 6    the evidence presented in this case.

 7          Anything else from either party on page 21?

 8          MR. DANFORD:  Yes, Your Honor.  PNC objects to the

 9    phrase 'acceptable non-infringing substitutes or alternatives

10    to the patented invention,' and in particular we're objecting

11    to the word 'acceptable' in this context.  We believe it's

12    error to require that an alternative be acceptable for a

13    reasonable royalty analysis where there's case law that states

14    that courts consider the next best available alternative which

15    is not necessarily an acceptable alternative.  And that's from

16    the *Salazar versus HTC* case that was cited in the parties'

17    briefing to the Court.

18        We further object to the sentence, "a substitute or

19    alternative that infringes other patents held by the Plaintiff

20    cannot be used by the Defendant as a non-infringing substitute

21    or alternative."  We believe that the case law on reasonable

22    royalties establishes that damages for other patents should be

23    determined in another suit involving the patents, and the only

24    issue in this case is the value of the particular four patents

25    asserted in this litigation, and the infringement of

1    unasserted claims or unasserted patents is irrelevant to the

2    determination of a royalty for the four patents-in-suit.

3              THE COURT:  All right.

4              MR. DANFORD:  We have a further objection on the

5    marking.

6              THE COURT:  Let me let you go ahead and finish that.

7              MR. DANFORD:  We believe on page 21 that the Court

8    should add the following sentence:  "This type of notice

9    starts from the date USAA began to mark substantially all

10   products that used the invention with the numbers affixed of

11   the asserted patents."

12       And, currently, the jury's told that marking was all or

13   nothing, but it's disputed as to whether the product was first

14   marked or as to when the product was first marked, and the

15   jury should know that it should not award damages from any

16   earlier point than was actually marked.

17             THE COURT:  Does PNC have any other objections to

18   anything reflected on page 21 of the final jury instructions?

19             MR. DANFORD:  No other objections.

20             THE COURT:  The objections enumerated by PNC

21   regarding page 21 are overruled.

22       We'll turn then to page 22.  Are there any objections

23   here from either party?

24             MS. GLASSER:  No, Your Honor.

25             MR. DANFORD:  No objection, Your Honor.

```
 1              THE COURT:  Turning then to page 23, are there
 2    objections here from either party?
 3              MS. GLASSER:  No, Your Honor.
 4              MR. DANFORD:  No, Your Honor.
 5              THE COURT:  Turning then to page 24, which is the
 6    last page of the final jury instructions, is there objection
 7    here from either party?
 8              MS. GLASSER:  No, Your Honor.
 9              MR. DANFORD:  No, Your Honor.
10              THE COURT:  All right.  Let's next turn to the
11    verdict form.  We'll follow the same procedure.  Beginning on
12    the cover page, or page 1, of the verdict form, is there
13    objection here from either party?
14              MS. GLASSER:  I apologize, Your Honor.  I had the
15    wrong copy of verdict form.  Will you indulge me to get the
16    right one?
17              THE COURT:  I certainly will, counsel.  Let me know
18    when you're ready.
19              MS. GLASSER:  Sorry about that.  Thanks so much.
20              THE COURT:  I'll ask again, regarding the verdict
21    form, is there any objection from either party as to the cover
22    page, or page 1?
23              MS. GLASSER:  No, Your Honor.
24              MR. DANFORD:  No objection.
25              THE COURT:  Turning then to page 2 where various
```

1    definitions are included, is there objection here from either

2    party?

3              MS. GLASSER:  No, Your Honor.

4              MR. DANFORD:  No objection.

5              THE COURT:  Turning to page 3 where various

6    instructions are included, is there objection here from either

7    party?

8              MS. GLASSER:  No, Your Honor.

9              MR. DANFORD:  No, Your Honor.

10             THE COURT:  Turning to page 4 where Question 1 of

11   the verdict form is situated, is there objection here from

12   either party?

13             MS. GLASSER:  No, Your Honor.

14             MR. DANFORD:  Yes, Your Honor.

15        PNC has two objections to the way the Question 1 is

16   presented to the jury.  We believe that Question 1 needs to be

17   broken out claim by claim for each patent or on a

18   patent-by-patent basis.  There are different arguments and

19   issues for each of the patent claims, and we don't think that

20   this is adequately resolved by an all-encompassing

21   interrogatory to the jury.

22        And the other issue is that we believe that it's

23   necessary, given the evidence and arguments and decisions made

24   prior to trial, that we include separate interrogatories

25   within the infringement issue as to literal infringement and

1181

1    doctrine of equivalents.

2        This is an issue that Judge Payne specifically recognized

3    when deferring on the issue of prosecution history estoppel

4    with respect to the doctrine of equivalents arguments that

5    have been presented here, and I think that in order to

6    adequately address those issues post trial as Judge Payne has

7    suggested, we need an interrogatory that breaks out separately

8    doctrine of equivalents from literal infringement so that we

9    can determine whether that remains a live issue post trial.

10        THE COURT:  All right.  Those objections are

11   overruled.  Is there anything further from either party on

12   page 4?

13        MS. GLASSER:  Not from Plaintiff, Your Honor.

14        MR. DANFORD:  Not from Defendant, Your Honor.

15        THE COURT:  Then we'll turn to page 5 of the verdict

16   form where Question 2 is situated.  Is there any objection

17   here from either party?

18        MS. GLASSER:  Not from Plaintiff, Your Honor.

19        MR. DANFORD:  Your Honor, PNC has an objection to

20   question -- I'm sorry.  We're still on page 4, Your Honor, or

21   are we on page 5?

22        THE COURT:  I've asked twice, but if there's

23   anything you haven't given me that you want to regarding page

24   4 And Question 1, I'll go back.  Otherwise, we're on page 5

25   and Question 2.

1           MR. DANFORD:  Your Honor, sorry.  I lost the thread.

2    If we're on page 5, we do have an objection to Question 2 on

3    page 5.

4           THE COURT:  Please state your objection.

5           MR. DANFORD:  The objection is this:  We had

6    requested an interrogatory with respect to invalidity that

7    separately broke out the issue of enablement from written

8    description.  And I think that, given the different arguments

9    and issues and the fact that these issues pertain differently

10   to the different patents and asserted claims, that we do need

11   that level of specificity addressing PNC's two invalidity

12   theories separately.

13          THE COURT:  All right.  That objection is overruled.

14   Is there anything further from either party on page 5 of the

15   verdict form?

16          MS. GLASSER:  No, Your Honor.

17          MR. DANFORD:  No, Your Honor.

18          THE COURT:  Turn then to page 6 where Question 3 is

19   situated.  Is there objection here from either party?

20          MS. GLASSER:  No, Your Honor.

21          MR. DANFORD:  With respect to Question 3 on page 6,

22   PNC reiterates the same objection that it had with respect to

23   claim -- Question 1, that we believe that the issue of willful

24   infringement needs to be broken out separately for each patent

25   claim.  Again, the issue of -- we believe the issue of

1    infringement needs to be resolved separately on a

2    claim-by-claim basis, and that would carry over to the issue

3    of willfulness as well.

4            THE COURT:  All right.  Anything further from

5    Defendant on page 6?

6            MR. DANFORD:  No, Your Honor.

7            THE COURT:  The objections of PNC with regard to

8    page 6 of the verdict form are overruled.

9        We'll turn next to page 7 of the verdict form where

10   Question 4 is found.  Is there objection here from either

11   party?

12           MS. GLASSER:  No, Your Honor.

13           MR. DANFORD:  Yes, Your Honor.

14       PNC objects to this black box interrogatory with respect

15   to the issue of damages, and we believe the damages should at

16   the very least be broken out on a patent-by-patent basis.

17   That conforms with the way that the evidence was presented at

18   trial.  And failing to break out the issue of damages this way

19   will require a new trial on damages should there be any issues

20   affecting the issues of liability through post trial or events

21   at the Patent Office.

22           THE COURT:  All right.  That objection is overruled.

23   Is there anything further from either party on page 7?

24           MR. DANFORD:  No, Your Honor.

25           MS. GLASSER:  No, Your Honor.

 1                  THE COURT:  Turning to page 8 of the verdict form,

 2      which is the final page, is there objection here from either

 3      party?

 4                  MS. GLASSER:  No, Your Honor.

 5                  MR. DANFORD:  No, Your Honor.

 6                  THE COURT:  All right.  That completes the final and

 7      the formal, rather, charge conference.

 8          As I indicated to you earlier at multiple times in the

 9      trial, it's my practice to provide each member of the jury

10      with their own printed or hard copy of the final jury

11      instructions.  I do that so that I can encourage them to

12      listen to my oral presentation as opposed to feeling compelled

13      to take notes.

14          It will take me a few minutes to print those eight copies

15      of the final jury instructions.  And when that's been

16      completed and I'm ready to return, I'll expect counsel to be

17      present, bring in the jury, and proceed with my instructions

18      and closing arguments.

19          Is there anything else that needs to be raised to this

20      Court by either party?

21                  MR. LANTIER:  Yes, Your Honor, just briefly.

22                  THE COURT:  Go to the podium, Mr. Lantier.

23                  MR. LANTIER:  Your Honor, in connection with the

24      parties' demonstrative exhibits, PNC objected to any

25      statements during closing argument that PNC has only

1    temporarily disabled auto-capture or has an intention to

2    reenable it.  Your Honor has overruled that objection.  I just

3    wanted to note it for the record.

4        And the second one that I wanted to note was that in

5    connection with those demonstrative exhibits, PNC objected to

6    any statement during oral argument that version 4.20.1

7    infringes the '571 Patent or the PNC 3 patents.  And again,

8    Your Honor has already overruled that objection, and I am just

9    noting it for the record.

10           THE COURT:  I don't know if I completely agree with

11   your recitation.  I have instructed the parties that the

12   separate lawsuit commonly referred to by the parties as PNC 3,

13   together with other different litigation, is not to be

14   referred to before the jury in this case, and I'm certainly

15   not varying from that instruction.

16       I think that's inherently confusing, and I don't expect

17   there to be references to other lawsuits, whether they involve

18   USAA patents or other parties and other patents before this

19   jury.

20           MR. LANTIER:  You are correct, Your Honor.  And I

21   was using PNC 3 patents to shorthand the '638 Patent, the '598

22   Patent, and the '136 Patent.

23           THE COURT:  There is a demonstrative presented for

24   use by the Plaintiff that we've all looked at that shows the

25   cover of those three patents.  It was the same demonstrative

1    used before the jury during trial, and I'm permitting that

2    same demonstrative be used in closing as was used in the

3    presentation of evidence before the jury.

4              MR. LANTIER:  Yes, Your Honor.

5              THE COURT:  Okay.  All right.  The Court stands in

6    recess.

7                        (Brief recess.)

8              THE COURT:  Be seated, please.

9         Are the parties prepared to read into the record any

10   items from the list of pre-admitted exhibits used during

11   yesterday's portion of the trial?

12             MR. BUNT:  Yes, Your Honor, we are.

13             THE COURT:  Please proceed.

14             MR. BUNT:  Yesterday, Your Honor, USAA used DX 1236,

15   which we are asking that the Court seal; PX 197; PX 1168; PX

16   1470, which we ask that the Court seal; and PX 1476.

17             THE COURT:  Any objection from Defendant as to that

18   rendition?

19             MS. SMITH:  No, Your Honor.  But we'd ask that under

20   the Court's standing order that parties be allowed to meet and

21   confer and submit a sealed exhibit list.

22             THE COURT:  That's permitted.

23        Does Defendant have items from the list of pre-admitted

24   exhibits used during yesterday's portion of the trial to read

25   into the record?

1          MS. SMITH:  We do, Your Honor.

2          THE COURT:  Please proceed with that.

3          MS. SMITH:  Thank you.  DX 328, DX 343, DX 361, DX

4    365, DX 639, DX 679, DX 1220, DX 1236, DX 1239, DX 1241, DX

5    1263, DX 1348, PX 2, and PX 1470.

6          THE COURT:  Any objection from Plaintiff, Mr. Bunt?

7          MR. BUNT:  No, Your Honor.

8          THE COURT:  Thank you, counsel.

9      Ladies and gentlemen, I'm about to bring in the jury and

10   proceed with the Court's final instructions to them, followed

11   by counsels' closing arguments.

12     I want all of you to be aware that the Court considers

13   this portion of the trial to be the most serious part of a

14   very serious process.  Therefore, I don't want any disruptions

15   during my instructions -- my final instructions to the jury or

16   counsels' closing arguments.  If you have an electronic device

17   on your person, either power it off or make sure beyond a

18   doubt it is on silent.

19     If you have anything you need to take out of this room,

20   get up and take it out now.  I don't want people getting up

21   walking out and coming back in.  I want you to sit there

22   quietly, attentively, and respectfully throughout my final

23   instructions to the jury and counsels' closing argument.

24     At a different time and place, I had a judge tell me when

25   I was in practice, he told those in the gallery, I want you to

1    sit there like it's Easter Sunday and your mother is on one

2    side of you and your grandmother is on the other.  So behave

3    yourselves.

4         All right.  Counsel, are we prepared to go forward?  Is

5    there anything else you're aware of that needs to be taken

6    care of before I bring in the jury?

7              MR. SHEASBY:  Nothing from the Plaintiff, Your

8    Honor.

9              MR. STONE:  Nothing from the Defendant, Your Honor.

10             THE COURT:  Let's bring in the jury, please.

11             (Whereupon, the jury entered the courtroom.)

12             THE COURT:  Good morning, ladies and gentlemen.

13   Please have a seat.

14        Ladies and gentlemen of the jury, you've now heard all

15   the evidence in this case, and I will now instruct you on the

16   law that you must apply.

17        I want you to understand that each of you are going to

18   have your own individual printed copy of these final jury

19   instructions that I'm about to give you orally, which means

20   you don't need to take excessive notes unless you just want

21   to.  To be honest, I would rather you listen to me as I give

22   them to you orally, understanding you'll have your own printed

23   copy to refer back to once you retire to deliberate.

24        It's your duty, ladies and gentlemen, to follow the law

25   as I give it to you.  On the other hand, and as I have said,

1    you, the jury, are the sole judges of the facts in this case.

2    Do not consider any statement that I have made over the course

3    of the trial or that I may make in the course of these

4    instructions that the Court has any opinion about the facts in

5    this case.

6        You are about to hear closing arguments from the

7    attorneys from both sides.  Statements and arguments of the

8    attorneys are not evidence, and statements and arguments of

9    the attorneys are not instructions on the law.  They are

10   intended only to assist you, the jury, in understanding the

11   evidence and the parties' competing contentions.

12       A verdict form has been prepared for you, and you'll take

13   this verdict form to the jury room during your deliberations.

14   And when you've reached a unanimous agreement as to your

15   verdict, you'll have your foreperson fill in the blanks in the

16   verdict form reflecting those unanimous decisions, date the

17   form, and your foreperson will sign it on behalf of the jury.

18   And when that's done, you should notify the Court Security

19   Officer that you've reached a verdict.

20       Answer the questions in the verdict form from the facts

21   as you find them to be.  Do not decide who you think should

22   win this case, ladies and gentlemen, and then answer the

23   questions to reach that result.  Remember, your answers and

24   your verdict must be unanimous.

25       Now, in determining whether any fact has been proven in

1    this case, you may, unless otherwise instructed, consider the

2    testimony of all the witnesses, regardless of who may have

3    called them; you may consider any stipulations of the parties;

4    and you may consider all the exhibits that have been received

5    into evidence during the course of the trial, regardless of

6    who may have presented or introduced them.

7        Ladies and gentlemen, you are the sole judges of the

8    credibility of all the witnesses and the weight and effect to

9    give to all of the evidence.  In deciding the facts in this

10   case, you may have to decide which testimony to believe and

11   which testimony not to believe.  You alone are to determine

12   the questions of credibility or truthfulness of the witnesses.

13       In weighing the testimony of the witnesses, you may

14   consider a witness' manner and demeanor on the witness stand,

15   any feelings or interest that they may have in the case, any

16   prejudice or bias about the case that the witness may have,

17   and the consistency or inconsistency of their testimony,

18   considered in the light of the circumstances.  Has the witness

19   been contradicted by other evidence?  Has he or she made

20   statements at other times and at other places contrary to what

21   they said on the witness stand?  You, ladies and gentlemen,

22   must give the testimony of each witness the amount of

23   credibility and weight that you alone think it deserves.

24       You must also keep in mind that a simple mistake does not

25   necessarily mean that a witness is not telling the truth.  You

1    must consider whether any misstatement was an intentional

2    falsehood or a simple lapse in memory, and what significance

3    should be attached to that testimony.

4        As I've told you before, the attorneys in this case are

5    advocates for their competing parties.  They have a duty to

6    object when they believe evidence is offered that should not

7    be admitted under the rules of the Court.

8        When the Court sustained an objection to a question

9    addressed to a witness, you must disregard the question

10   entirely, and you may draw no inference from its wording or

11   speculate about what the witness would have said if he or she

12   had been permitted to answer the question.  On the other hand,

13   if the objection was overruled, then you may treat the

14   question and the answer just as you would any other question

15   and answer as though the objection had never been made.

16       Now, by allowing testimony or other evidence to be

17   introduced over the objection of an attorney, the Court did

18   not indicate any opinion as to the weight or effect of that

19   evidence.  Again, that's a decision that's left solely to you,

20   the jury.

21       Now, at times during the course of this trial, ladies and

22   gentlemen, it's been necessary for the Court to talk to the

23   lawyers outside of your hearing, either at the bench privately

24   or by talking to them when you are on recess outside of the

25   courtroom.  This happens because during trials there are

1    things that arise that do not involve the jury.  You should

2    not speculate about what was said during any discussions that

3    took place outside of your presence.

4         Now, there are two types of evidence that you may

5    consider in properly finding the truth as to the facts in this

6    case.  One is direct evidence such as the testimony of an

7    eyewitness, and the other is indirect or circumstantial

8    evidence, that is, the proof of a chain of circumstances that

9    indicates the existence or non-existence of certain other

10   facts.  As a general rule, the law makes no distinction

11   between direct or circumstantial evidence, but simply requires

12   that you find the facts based on the evidence presented, both

13   direct and circumstantial.

14        Now, the parties may have agreed or stipulated to some

15   facts in this case, and when lawyers on both sides of the case

16   stipulate as to the existence of a fact, you must, unless

17   otherwise instructed, accept the stipulation as evidence and

18   regard the fact as proven.

19        Also, while you should consider only the evidence in this

20   case, you are permitted to draw such reasonable inferences

21   from the testimony and the exhibits as you feel are justified

22   in the light of common experience.  Let me say that another

23   way, ladies and gentlemen.  You may make deductions and you

24   may reach conclusions that reason and common sense lead you to

25   draw from the facts that have been established by the

1    testimony and the evidence in this case.  However, you should

2    not base your decisions on any evidence not presented by the

3    parties during the trial of this case, including your own

4    personal experiences with any of the products that were at

5    issue in this case.

6         Now, unless I instruct you otherwise, you may properly

7    determine that the testimony of a single witness may be

8    sufficient to prove any fact, even if a greater number of

9    witnesses may have testified to the contrary, if after

10   considering all of the evidence you believe that single

11   witness.

12        When knowledge of a technical subject may be helpful to

13   the jury, a person who has special training or experience in

14   that technical field, we call them an expert witness, is

15   permitted to state his or her opinions on those technical

16   matters to the jury.  However, ladies and gentlemen, you are

17   not required to accept those opinions.  As with any other

18   witness, it is solely up to you whether to rely upon the

19   testimony of a witness, whether a fact witness or an expert

20   witness, or whether not to rely upon that testimony.

21        Also, certain exhibits have been shown to you during the

22   trial which were illustrations.  We call these types of

23   exhibits demonstrative exhibits or sometimes simply

24   demonstratives.  Demonstrative exhibits are a party's

25   depiction, picture, or model to describe something involved in

1194

1   the trial.  If your recollection of the evidence differs from

2   these demonstratives, you should rely on your recollection.

3   Demonstrative exhibits are sometimes called jury aides, and

4   demonstrative exhibits, ladies and gentlemen, are not

5   evidence, but the witness' testimony concerning a

6   demonstrative is evidence.  These demonstrative exhibits are

7   not going to be available to you to view or consider during

8   your deliberations.

9       Now, in any legal action, facts must be proven by a

10  required amount of evidence known as the burden of proof.  The

11  burden of proof in this case is on the Plaintiff for some

12  issues and on the Defendant for other issues.  And there are

13  two burdens of proof that you will apply in this case.  The

14  first is the preponderance of the evidence; the second is

15  clear and convincing evidence.

16      Now, the Plaintiff in this case, United Services

17  Automobile Association, which you've heard throughout the

18  trial referred to as USAA or simply as the Plaintiff, USAA has

19  the burden of proving patent infringement by a preponderance

20  of the evidence.  USAA also has the burden of proving willful

21  patent infringement by a preponderance of the evidence.  And

22  USAA has the burden of proving damages for any patent

23  infringement by a preponderance of the evidence.

24      A preponderance of the evidence means evidence that

25  persuades you that a claim is more probably true than not true

1    and is sometimes talked about as being the greater weight and

2    degree of credible testimony.

3        Now, the Defendant in this case, PNC Bank, N.A., which

4    you've heard referred to throughout the trial simply as PNC or

5    as the Defendant, PNC has the burden of proving invalidity of

6    USAA's patent claims by clear and convincing evidence.  Clear

7    and convincing evidence means evidence that produces in your

8    mind an abiding conviction that the truth of the party's

9    factual contentions are highly probable.

10       Now, although proof to an absolute certainty is not

11   required, the clear and convincing evidence standard requires

12   a greater degree of persuasion than is necessary for the

13   preponderance of the evidence standard.  If proof establishes

14   in your mind, ladies and gentlemen, an abiding conviction in

15   the truth of the matter, the clear and convincing evidence

16   standard has been met.

17       Now, as I've previously told you, these two burdens of

18   proof are not in any way to be confused with a separate burden

19   of proof called beyond a reasonable doubt, which is the burden

20   of proof applied in a criminal case and which has no

21   application whatsoever in a civil case such as this.  Beyond a

22   reasonable doubt is a higher burden of proof than both the

23   preponderance of the evidence standard and the clear and

24   convincing evidence standard.

25       Now, as I did at the beginning of the case, I'm going to

1    first give you a summary of each side's contentions, and I'll

2    then provide you with detailed instructions on what each side

3    must prove to win on each of its contentions.

4        As I previously told you, this is an action for patent

5    infringement.  USAA contends that PNC infringes certain claims

6    of the patents-in-suit.  Remember, there are four

7    patents-in-suit:  U.S. Patent No. 10,482,432, which you've

8    heard referred to as the '432 Patent; U.S. Patent No.

9    10,013,681, which you've heard referred to as the '681 Patent;

10   U.S. Patent number 10,013,605, which you've heard to referred

11   to as the '605 Patent; and U.S. Patent No. 8,977,571, which

12   you've heard referred to as the '571 or the '571 Patent.  And

13   I'll remind you you have a copy of each of these patents in

14   your juror notebooks.

15       USAA, ladies and gentlemen, the Plaintiff, contends that

16   PNC, the Defendant, infringes the following claims of the

17   patents-in-suit:  Claims 1, 3, 5, and 21 of the '432 Patent;

18   claims 12, 13, 22, 26, and 30 of the '681 Patent; and claims

19   12, 13, and 22 of the '605 Patent; together with claims 1, 2,

20   9, 12, and 13 of the '571 Patent.  These are the asserted

21   claims.

22       USAA contends that PNC has infringed the asserted claims

23   by making, using, selling, importing, or offering for sale the

24   PNC Mobile Deposit System.  And I'll refer to this as the

25   accused product.

1        USAA further alleges that PNC's infringement of the

2   asserted patents was willful.  USAA contends that it is

3   entitled to money damages in the form of a reasonable royalty

4   for PNC's infringement, and USAA has the burden to prove each

5   of these issues by a preponderance of the evidence.

6        The Defendant PNC denies that it infringes any of these

7   asserted claims.  PNC denies that it makes, uses, offers for

8   sale, sells, or imports any accused product that infringes any

9   of the asserted claims.  PNC also denies that any alleged

10  infringement was willful.  PNC also denies that it owes USAA

11  any money damages.

12       PNC further contends that the asserted claims of the

13  patents-in-suit are invalid for failure to satisfy the written

14  description and enablement requirements.  Invalidity, ladies

15  and gentlemen, is a defense to infringement.  PNC has the

16  burden of proving invalidity by clear and convincing evidence.

17       Now, invalidity and infringement are separate and

18  distinct issues, and your job is to decide whether PNC has

19  infringed any of the asserted claims and whether those claims

20  are invalid.  If you decide that any of the asserted claims

21  have been infringed and those claims are not invalid, then

22  you'll need to decide the amount of money damages, if any, to

23  be awarded to USAA to compensate it for that infringement.

24       If you decide that there was any infringement and that it

25  was willful, that decision as to willfulness should not affect

1   any damages that you award.  The Court will take willfulness

2   into account later.  It should not impact your damages award

3   in any way.

4        Now, before you can decide many of the issues in this

5   case, you need to understand the role of the patent claims.

6   The patent claims are those numbered sentences at the end of

7   each patent.

8        The claims are important, ladies and gentlemen, because

9   it's the words of the claims that define what a patent covers.

10  The figures and the text in the rest of the patent provide a

11  description and/or examples of the invention, and they provide

12  a context for the claims, but it is the claims themselves that

13  define the breadth of the patent's coverage.  Each claim is

14  effectively treated as if it were a separate patent, and each

15  claim may cover more or may cover less than another claim.

16  Accordingly, what a patent covers depends in turn on what each

17  of its claims covers.

18       You will first need to understand what each claim covers

19  in order to decide whether or not there is infringement of the

20  claim and to decide whether or not the claim is invalid.  Now,

21  the law says that it's my role to define the terms of the

22  claims and it's your role to apply my definitions to the

23  issues that you are asked to decide in this case.

24       Therefore, as I explained to you at the start of the

25  case, I have determined already the meanings of the claims,

1   and I've provided to you my definitions of certain claim

2   terms.  And these definitions can be found in your juror

3   notebooks, and you are free to refer to them at any time.

4       You must accept, ladies and gentlemen, my definitions of

5   those words in the claims as being correct.  It's your job to

6   take these definitions and apply them to the issues that you

7   are deciding, including the issues of infringement and

8   invalidity.  You should disregard any evidence presented

9   during the trial that contradicts or is inconsistent with

10  these constructions and definitions that the Court has given

11  you.

12      Now, for any claim limitations or language that I have

13  not construed--that is, limitation or language that I have not

14  interpreted or defined--you are to use and apply the plain and

15  ordinary meaning of those limitations or language as

16  understood by one of ordinary skill in the art, which is to

17  say, in the field of the technology of the patent at the time

18  of the alleged invention.

19      The meaning of the words of the patent claims must be the

20  same when deciding both infringement and when deciding

21  invalidity, and you've been provided, as I noted, with copies

22  of the asserted patents in your juror notebooks and you've

23  been provided with the Court's definitions of certain claim

24  language in your juror notebooks and you are free to refer to

25  those throughout your deliberations.

1          Now, several times in these instructions, I have referred

2     to or will make reference to a person of ordinary skill in the

3     field of the invention, or a person of ordinary skill in the

4     art.  In deciding the level of ordinary skill in the field,

5     you should consider all the evidence introduced at the trial,

6     including but not limited to:  (1) the levels of education and

7     experience of the inventor or other persons actively working

8     in the field; (2) the types of problems encountered in the

9     field; (3) previous solutions to those problems; (4) the

10    rapidity with which the innovations are made; and (5) the

11    sophistication of the technology.

12         Now, the claims are intended to define in words the

13    boundaries of the inventor's rights.  Only the claims of the

14    patent can be infringed.  Neither the written description nor

15    the drawings of the patent can be infringed.  Each claim must

16    be considered individually.

17         I'll now explain how a claim defines what it covers.

18         A claim, ladies and gentlemen, sets forth in words a set

19    of requirements.  Each claim sets forth its requirements in a

20    single sentence.  If a product satisfies each of these

21    requirements, then it is covered by the claim.

22         There can be several claims in a patent.  Each claim may

23    be narrower or broader than another claim by setting forth

24    more or fewer requirements.  The coverage of a patent is

25    assessed on a claim-by-claim basis.

1201

1    In patent law, the requirements of a claim are often

2    referred to as the claim elements or the claim limitations.

3    And when a product meets all the requirements of a claim, the

4    claim is said to cover that product and that product is said

5    to fall within the scope of that claim.  In other words, a

6    claim covers a product where each of the claim elements or

7    limitations is present in that product.  If a product is

8    missing even one limitation or element of a claim, the product

9    is not covered by the claim.  And if the product is not

10   covered by the claim, the product cannot infringe that claim.

11   Now, the beginning portion or preamble of a claim often

12   uses the word 'comprising'.  The word 'comprising', when used

13   in the preamble of a patent claim, means including but not

14   limited to, or containing but not limited to.  When comprising

15   is used in the preamble, if you decide that an accused product

16   includes all of the requirements of that claim, the claim is

17   infringed, and this is true even if the accused product

18   contains additional or other elements.

19   For example, a claim to a table comprising a tabletop,

20   legs, and glue, would be infringed by a table that includes a

21   tabletop, legs, and glue, even if a table also contains other

22   structures, such as leaves to expand the size of the tabletop

23   or wheels to go on the ends of the legs.

24   Now, claims 1 and 9 of the '571 Patent are in a special

25   form called means-plus-function format.  These claims do not

1    cover all the structures that could perform the functions set

2    out in the claim.  Instead, they cover a structure or set of

3    structures that perform that function and that is either

4    identical or equivalent to the structures described in the

5    patent for performing the function.  The issue of whether two

6    structures are identical or equivalent is for you to decide.

7         This case also involves two types of patent

8    claims--independent claims and dependent claims.  In this

9    case, claim 1 of the '432 Patent and claims 12 and 30 of the

10   '681 Patent, and claim 12 of the '605 Patent, and claims 1 and

11   9 of the '751 [sic] Patent are independent claims.  Claims 3,

12   5, and 21 of the '432 Patent, claims 13, 22, and 26 of the

13   '681 Patent, and claims 13 and 22 of the '605 Patent, together

14   with claims 2, 12, and 13 of the '571 Patent, are dependent

15   patent claims.

16        An independent claim, ladies and gentlemen, sets forth

17   all the requirements that must be met in order to be covered

18   by that claim.  It is not necessary to look at any other claim

19   to determine what an independent claim covers.

20        However, a dependent claim does not itself recite all the

21   requirements of the claim, but refers to another claim for

22   some of its requirements.  In this way, the claim depends on

23   another claim, and the dependent claim incorporates all the

24   requirements of the claim to which it refers or, said another

25   way, from which it depends, and then the dependent claim adds

1    its own additional requirements.

2         So to determine what a dependent claim covers, it's

3    necessary to look at both the dependent claim itself and any

4    other claim or claims to which it refers or from which it

5    depends.  A product that meets all the requirements of both

6    the dependent claim and the claim or claims to which it refers

7    or from which it depends is covered by that dependent claim.

8         Now, if a person or a corporation makes, uses, sells, or

9    offers to sell within the United States, or imports into the

10   United States what is covered by a patent claim without the

11   patentholder's permission, that person or corporation is said

12   to infringe the patent.

13        In reaching your decision on infringement, keep in mind

14   that only the claims of a patent can be infringed.  You must

15   compare the asserted patent claims, as I have construed them

16   for you, to the accused product, to determine whether or not

17   there is infringement.  This is the only correct comparison.

18        And you should not compare the accused product with any

19   of the specific examples set out in the patent with the prior

20   art or with USAA's own products in reaching your decision on

21   infringement.  Again, in deciding infringement, the only

22   correct comparison is between the accused product of PNC and

23   the limitations and elements of the claims as the Court has

24   construed them, the asserted claims.

25        You must reach your decision as to each assertion of

1204

1    infringement based on my instructions about the meaning and

2    scope of the claims, the legal requirements for infringement,

3    and the evidence presented to you by both of the parties

4    during the course of this trial.

5         I'll now instruct you on the specific rules that you must

6    follow to determine whether USAA has proven that PNC has

7    directly infringed one or more of the patent claims involved

8    in this case.

9         A patent can be directly infringed even if the alleged

10   direct infringer did not have knowledge of the patent and

11   without the direct infringer knowing that what it did was

12   infringement of the claim.  A patent may also be directly

13   infringed even though the accused direct infringer believed in

14   good faith that what it did was not infringement of the

15   patent.  Infringement does not require proof that a party

16   copied its product from the asserted claims.

17        Now, you must determine separately for each asserted

18   claim whether or not there is infringement.  However, if you

19   find that an independent claim on which other claims depend is

20   not infringed, there cannot be infringement of any independent

21   claim -- excuse me, any dependent claim that refers directly

22   or indirectly to that independent claim.

23        On the other hand, if you find that an independent claim

24   has been infringed, you must still decide separately whether

25   the product meets the additional requirements of any claims

1    that depend from that independent claim--that is, whether

2    those claims have also been infringed.  Again, a dependent

3    claim includes all the requirements of any claims to which it

4    refers or from which it depends plus the additional

5    requirements of the dependent claim itself.

6         Now, in order to prove direct infringement of a patent

7    claim, USAA, the Plaintiff, must show by a preponderance of

8    the evidence that the accused product includes each and every

9    limitation of the claim, either literally or under the

10   doctrine of equivalents.  In determining whether the accused

11   product directly infringes a patent claim in this case, you

12   must compare the accused product with each and every one of

13   the requirements or limitations of that claim to determine

14   whether the accused product contains each and every

15   requirement or limitation recited in the claim.  An accused

16   product infringes a claim if it is reasonably capable of

17   satisfying the claim elements, even though it may also be

18   capable of non-infringing modes of operation.

19        A claim requirement is literally present if it exists in

20   an accused product just as it is described in the claim

21   language, either as I have explained that language to you or,

22   if I did not explain it, as would be understood by its plain

23   and ordinary meaning of one of ordinary skill in the art.  If

24   an accused product omits any element recited in a claim, then

25   you must find that the product in question does not literally

1    infringe that claim.

2        So long as an accused product has each and every one of

3    the claim requirements, infringement of that claim is shown,

4    even if the product contains additional features or elements

5    not required by the claims.

6        In this case PNC, the Defendant, is accused of direct

7    infringement.  PNC asserts that it has not directly infringed

8    the patents-in-suit because it did not provide all the

9    components necessary to make, sell, offer for sale, or import

10   an infringing product, because another party provided one or

11   more of the components necessary to infringe, such as a

12   handheld mobile device.

13       If you find that PNC provided all the components

14   necessary to infringe, or that the components provided for

15   another party or are attributable to PNC, then PNC directly

16   infringed.  You may find that the components provided by

17   another party are attributable to PNC if you find that PNC

18   exercised direction or control over another party when the

19   other party provided and used such components.

20       If you do not find that each element of a claim is

21   literally met, then you may still find infringement if you

22   find that each element is met under the doctrine of

23   equivalents.  If a person makes, uses, sells, or offers to

24   sell within the United States, or imports into the United

25   States, a product that does not meet all of the elements or

1    limitations of a claim and, thus, does not literally infringe

2    the claim, there can still be direct infringement if that

3    product or method satisfies that claim under the doctrine of

4    equivalents.

5         Under the doctrine of equivalents, ladies and gentlemen,

6    the accused product infringes a claim if it contains elements

7    or limitations corresponding to each and every element or

8    limitation of the claim that is equivalent to, even though not

9    literally met by, the accused product.

10        You may find that an accused product is equivalent to an

11   element or limitation of a claim that is not met literally if

12   a person having ordinary skill in the field of the technology

13   of the patent would have considered the differences between

14   them to be insubstantial, or would have found that the accused

15   product performs substantially the same function in

16   substantially the same way to achieve substantially the same

17   result as the element or limitation of the claim.  In order

18   for the structure or action to be considered interchangeable,

19   the structure or action must have been known at the time of

20   the alleged infringement to a person having ordinary skill in

21   the field of the technology of the patent.  Interchangeability

22   at the present time is not sufficient.

23        Now, in order to prove direct infringement under the

24   doctrine of equivalents, USAA must prove by a preponderance of

25   the evidence that each claim element or limitation not

1208

1   literally present in the accused product -- excuse me.  Let me

2   start that again.

3         In order to prove direct infringement under the doctrine

4   of equivalents, USAA must prove by a preponderance of the

5   evidence that for each claim limitation or element not

6   literally present in the accused product, the equivalent of

7   that claim element or limitation is present.

8         USAA also contends that PNC has willfully infringed the

9   patents-in-suit.  If you decide that PNC has infringed, you

10  must go on to address the issue of whether or not that

11  infringement was willful.  USAA has the burden of proving

12  willful infringement by a preponderance of the evidence.  You

13  may not determine that infringement was willful just because

14  PNC knew of the asserted patents and infringed them.  You may

15  find that PNC willfully infringed if you find that PNC

16  deliberately or intentionally infringed the asserted patents.

17        You may find that PNC's actions were willful if PNC acted

18  in reckless or callous disregard of or with indifference to

19  the rights of USAA.  A defendant is indifferent to the rights

20  of another when it proceeds in disregard of a high or

21  excessive danger of infringement that is known to it or was

22  apparent to a reasonable person in its position.

23        To determine whether PNC acted willfully, consider all

24  the facts and assess PNC's knowledge at the time of the

25  challenged conduct.  Facts that may be considered include

1    whether or not PNC reasonably believed that it did not

2    infringe or that the asserted patents were invalid.  You may

3    find that PNC's actions were deliberate or intentional if PNC

4    was willfully blind to USAA's patent rights.

5        Now, your determination of willfulness, ladies and

6    gentlemen, should incorporate the totality of the

7    circumstances based on the evidence presented throughout this

8    trial.  Willfulness can be established by circumstantial

9    evidence.  Now, if you decide that any infringement was

10   willful, that decision should not affect any damages award

11   that you will make.  Again, the Court will take willfulness

12   into account later.

13       I'll now instruct you on the rules that you must follow

14   in deciding whether or not PNC has proven that any asserted

15   claims of the asserted patents are invalid.  An issued United

16   States patent is accorded a presumption of validity based on

17   the presumption that the U.S. Patent and Trademark Office,

18   which you've heard called throughout the trial the PTO, or

19   sometimes you've heard it called simply the Patent Office,

20   acted correctly in issuing the patent.  This presumption of

21   validity extends to all issued United States patents.

22       Now, in order to overcome this presumption, PNC, the

23   Defendant, must establish by clear and convincing evidence

24   that a claim is invalid.  Like infringement, ladies and

25   gentlemen, invalidity is determined on a claim-by-claim basis,

1    and you must determine separately for each claim whether that

2    claim is invalid.  If one claim of a patent is invalid, this

3    does not mean that any other claim is necessarily invalid.

4         Claims are to be construed in the same way for

5    determining infringement as for determining invalidity, and

6    you must apply the claim language consistently and in the same

7    manner for issues of infringement as for issues of invalidity.

8    In making your determination as to invalidity, you should

9    consider each claim separately.

10        Now, PNC contends that the asserted claims of the

11   patents-in-suit are invalid for failure to satisfy the written

12   description requirement.  As I previously explained, to obtain

13   a patent, one must first file an application with the U.S.

14   Patent and Trademark Office, or the PTO.  The process of

15   obtaining a patent is called patent prosecution.  And the

16   application submitted to the PTO includes within it what is

17   called a specification.

18        The specification is required to contain a written

19   description of the claimed invention telling what the

20   invention is, how it works, how to make it, and how to use it.

21   The written description requirement is designed to ensure that

22   the inventor was in possession of the full scope of the

23   claimed invention as of the patent's priority date.

24        Now, to succeed on its claims of lack of adequate written

25   description as to the patents-in-suit, PNC must show by clear

1    and convincing evidence that a person having ordinary skill in

2    the field reading the patent specification as of the priority

3    date of the patent would not have understood that the

4    specification describes the full scope of the invention as it

5    is claimed in the claims of that patent.  If the patent claims

6    lack adequate written description, then the claim is invalid.

7         In deciding whether the patents-in-suit satisfy the

8    written description requirement, you must consider the

9    description from the viewpoint of a person having ordinary

10   skill in the field of the technology of the patent as of the

11   filing date of the patents-in-suit.  The specification, ladies

12   and gentlemen, must describe the full scope of the claimed

13   invention, including each element thereof, either expressly or

14   inherently.  A claimed element is disclosed inherently if a

15   person having ordinary skill in the field as of the priority

16   date would have understood that the element is necessarily

17   present in what the specification discloses.

18        The written description does not have to be in the exact

19   words of the claim.  The requirement may be satisfied by any

20   combination of the words, structures, figures, diagrams,

21   formulas, et cetera, contained in the patent specification.

22   Adequate written description does not require either examples

23   or an actual reduction to practice of the claimed invention.

24        However, a mere wish or plan for obtaining the claimed

25   invention is not adequate written description.  Rather, the

1   level of disclosure required depends on a variety of factors,

2   such as the existing knowledge in the particular field, the

3   scope and content of the prior art, the maturity of the

4   science or technology, and other considerations appropriate to

5   the subject matter.  The issue of written description is

6   decided on a claim-by-claim basis, not as to the entire patent

7   or groups of patents.

8       Now, another way that a patent can be invalid is if it

9   fails to disclose sufficient information to enable or teach

10  persons of ordinary skill in the field of the invention, as of

11  the effective filing date, to make and use the full scope of

12  the claimed invention without undue experimentation.  This

13  requirement is known as the enablement requirement, and the

14  defendant in this case, PNC, contends that the asserted claims

15  of the asserted patents are invalid for lack of enablement.

16  If a patent claim is not enabled, ladies and gentlemen, it is

17  invalid.

18      To consider whether a patent complies with the enablement

19  requirement, you must keep in mind that patents are written

20  for persons of ordinary skill in the field of the invention.

21  Thus, a patent need not expressly state information that

22  persons of ordinary skill would be likely to know or could

23  obtain without undue experimentation.

24      Factors that you may consider in determining whether

25  persons of ordinary skill in the field of the invention would

1    require undue experimentation to make and use the full scope

2    of the claimed invention include:

3         1.   The quantity of experimentation necessary and whether

4    that experimentation involves only known or commonly used

5    techniques.  The question of undue experimentation is a matter

6    of degree.  Even extensive experimentation does not

7    necessarily make the experiments unduly extensive where the

8    experiments are routine, such as repetition of known or

9    commonly used techniques.  But permissible experimentation is

10   not without bounds.

11        2.   The amount of direction or guidance disclosed in the

12   patent.

13        3.   The presence or absence of working examples in the

14   patent.

15        4.   The nature of the invention.

16        5.   The state of the prior art.

17        6.   The relative skill of those in the art.

18        7.   The predictability of the art; and

19        8.   The breadth of the claims.

20        Now, no one of these factors alone is dispositive.

21   Rather, you must make your decision about whether or not the

22   degree of experimentation required is undue based on all of

23   the evidence presented to you.  You should weigh these factors

24   and determine whether or not, in the context of this invention

25   and the state of the art at the time of the effective filing

1    date, a person having ordinary skill would need to experiment

2    unduly to make and use the full scope of the claimed

3    invention.

4        If you find that PNC has infringed any valid claims of

5    the asserted patents, you must then consider what amount of

6    damages, if any, to award to USAA.

7        I'm now going to instruct you about the measure of

8    damages, but by instructing you on damages, ladies and

9    gentlemen, I am not suggesting which party should win this

10   case on any issue.  If you find that PNC has not infringed any

11   valid claim of the patents-in-suit, then USAA is not entitled

12   to any patent damages.

13       USAA has the burden to establish the amount of its

14   damages by a preponderance of the evidence.  In other words,

15   you should award only those damages that USAA establishes that

16   it more likely than not suffered as a result of PNC's

17   infringement.  Now, while USAA is not required to prove the

18   amount of its damages with mathematical precision, it must

19   prove them with reasonable certainty.  USAA is not entitled to

20   damages that are remote or that are only speculative.

21       The damages that you award, if any, must be adequate to

22   compensate USAA for any infringement that you may find.  You

23   must not award USAA more damages than are adequate to

24   compensate it for the infringement.  And you must also not

25   include any amount for the purpose of punishing PNC or for

1    setting an example.

2        I'll now instruct you about how to calculate reasonable

3    royalty damages.

4        A royalty is a payment made to a patentholder in exchange

5    for the right to make, use, or sell the claimed invention.  A

6    reasonable royalty is the amount of royalty payment that a

7    patentholder and an alleged infringer would have agreed to in

8    a hypothetical negotiation taking place at a time prior to

9    when the infringement first began.

10       In considering this hypothetical negotiation, you should

11   focus on the expectations of the patentholder and the alleged

12   infringer and would they have -- what they would have been had

13   they entered into an agreement at that time, and had they

14   acted reasonably in their negotiations.  In determining this,

15   you must assume that both parties believed the patent was

16   valid and infringed and that both parties were willing to

17   enter into an agreement.

18       The reasonable royalty you determine must be a royalty

19   that would have resulted from the hypothetical negotiation and

20   not simply a royalty that either party would have preferred.

21   Evidence of things that happened after infringement first

22   began can be considered in evaluating the reasonable royalty

23   only to the extent that the evidence aids in assessing what

24   royalty would have resulted from a hypothetical negotiation.

25       Although evidence of the actual profits an alleged

1   infringer made may be used to determine the anticipated

2   profits at the time of the hypothetical negotiation, the

3   royalty may not be limited or increased based on the actual

4   profits the alleged infringer made.

5       The law requires that any royalty awarded to USAA

6   correspond to the value the alleged inventions

7   within -- correspond to the value of the alleged inventions

8   within the accused product, as distinct from other unpatented

9   features of the accused product.  And this is particularly

10  true where the accused product has multiple features and

11  multiple components not covered by the patent, or where the

12  accused product works in conjunction with other non-patented

13  items.

14      If unpatented features contribute to the accused product,

15  you must apportion that value to exclude any value

16  attributable to unpatented features.  You must determine an

17  appropriate royalty rate and an appropriate royalty base that

18  reflect the value attributable to the patented invention

19  alone.

20      In determining the reasonable royalty, ladies and

21  gentlemen, you should consider all the facts known and

22  available to the parties at the time infringement began.

23      Some of the kinds of factors that you may consider in

24  making your determination are:

25      1.  The royalties received by the patentee for the

1    licensing of the patents-in-suit proving or tending to prove

2    an established royalty.

3         2.   The rates paid by the licensee for the use of other

4    patents comparable to the patent-in-suit.  Comparable license

5    agreements include those covering the use of the claimed

6    invention or similar technology.

7         34.  The nature and scope of the license as exclusive or

8    non-exclusive or as restricted or unrestricted --

9    non-restricted in terms of territory or with respect to whom

10   the manufactured product may be sold.

11        4.   The licensor's established policy and marketing

12   program to maintain its patent exclusivity by not licensing

13   others to use the invention or by granting licenses under

14   special conditions designed to preserve that exclusivity.

15        5.   The commercial relationship between the licensor and

16   licensee, such as whether they are competitors in the same

17   territory in the same line of business.

18        6.   The effect of selling the patented specialty in

19   promoting sales of other products of the licensee, the

20   existing value of the invention to the licensor as a generator

21   of sales of his non-patented items, and the extent of such

22   derivative or convoyed sales.

23        7.   The duration of the patent and the term of the

24   license.

25        8.   The established profitability of the product made

1    under the patents, its commercial success, and its current

2    popularity.

3        9.   The utility and advantages of the patented property

4    over the old modes or devices, if any, that had been used for

5    working out similar results.

6       10.   The nature of the patented invention, the character

7    of the commercial embodiment of it as owned and produced by

8    the licensor and the benefits to those who have used the

9    invention.

10      11.   The extent to which the infringer has made use of

11   the invention and any evidence probative of the value of that

12   use.

13      12.   The portion of the profit or of the selling price

14   that may be customary in the particular business or in

15   comparable businesses to allow for the use of the invention or

16   analogous inventions.

17      13.   The portion of the realizable profits that should be

18   credited to the invention as distinguished from non-patented

19   elements, the manufacturing process, business risks, or

20   significant features or improvements added by the infringer.

21      14.   The opinion and testimony of qualified experts; and

22      15.   The amount that a licensor (such as the patentee)

23   and a licensee (such as the infringer) would have agreed upon

24   at the time the infringement began if both had been trying

25   reasonably and voluntarily to reach an agreement; that is, the

1219

1  amount which a prudent licensee--who desired as a business

2  proposition to obtain a license to the patented

3  invention--would have been willing to pay as a royalty and yet

4  be able to make a reasonable profit and which amount would

5  have been acceptable to a prudent patentee who was willing to

6  grant a license.

7       You may have heard these factors referred to during the

8  trial as the *Georgia-Pacific* factors.  Please understand, no

9  one of these factors is dispositive, and you can and should

10 consider all the evidence that's been presented to you in this

11 case on each of these factors.  You may also consider any

12 other factors which, in your mind, would have increased or

13 decreased the royalty the alleged infringer would have been

14 willing to pay and the patentholder would have been willing to

15 accept, acting as normally prudent business people.

16      In determining a reasonable royalty, you may also

17 consider evidence concerning the availability and cost of

18 acceptable non-infringing substitutes or alternatives to the

19 patented invention.  An acceptable substitute or alternative

20 must be a product that does not infringe the patent, and as a

21 part of USAA having the burden to prove its damages, USAA has

22 the responsibility to show there were no acceptable

23 non-infringing substitutes.

24      For a substitute or alternative to be an acceptable

25 non-infringing substitute or alternative, it must have been

1220

```
 1    available to be used during the period of infringement.  A

 2    substitute or alternative that infringes other patents held by

 3    the Plaintiff cannot be used by the Defendant as a

 4    non-infringing substitute or alternative.

 5         In calculating damages, ladies and gentlemen, you must

 6    consider whether or not USAA or its licensees marked the

 7    products that practice the asserted patents by placing on or

 8    within those patents the word 'patent' or Pat. and the

 9    asserted patent numbers.  If you find USAA or its licensees

10    failed to properly mark their respective products, then you

11    may only award damages to USAA for infringement that occurred

12    after the date that USAA gave actually notice to PNC that USAA

13    believed PNC was infringing the asserted patents.  It will be

14    up to you to decide when such notice occurred.

15         Now, with these instructions, ladies and gentlemen, we'll

16    proceed to hear closing arguments from the attorneys in this

17    case.

18         The Plaintiff may now present its first closing argument

19    to the jury.  Would you like a warning on your time, Mr. Bunt?

20         MR. BUNT:  Yes, Your Honor.  May Mr. Sheasby and I

21    have a warning when we have used 20 minutes of our time?

22         THE COURT:  I'll warn you when 20 minutes been used.

23    You may proceed.

24         MR. BUNT:  May it please the Court.

25         Good morning, ladies and gentlemen.  On behalf of USAA,
```

1    I'd like to thank you for your time and your service here this

2    past week.  I know that many of you have had to travel a long

3    distance to get here, and I've watched and I've seen how

4    everybody has concentrated so hard on all the evidence that's

5    come in.  So thank you very much for that and for your

6    service.

7        Some of you-all may remember many years ago there was a

8    book that came out that was very popular, and it was called,

9    All I Really Need to Know, I Learned in Kindergarten.  And in

10   that book the author said that most of the important wisdom

11   came not from the top of the graduate school mountain, but

12   from the sand pile and Sunday School.  And some of those

13   important lessons, those basic values that he talked about in

14   that book included the play fair and don't take things that

15   aren't yours.

16       When our founders enshrined our jury trial system into

17   the Constitution, they understood that the wisdom that regular

18   folks could provide to disputes like this one would be

19   instrumental to our system of justice.

20       Now, during deliberations, I would like for you to

21   consider what you have heard from PNC in this courtroom.

22       At a very high level, this is what they have said.

23   First, they claim they don't infringe, but if they do, it

24   doesn't matter because USAA's patents are invalid.  But if you

25   reject that, then they don't owe very much money.  It's kind

1      of like somebody taking your lawn mower and saying, I didn't

2      steal your lawn mower.  But if I did, it was broken when I

3      stole it; and even if I did steal it, it's not worth that much

4      money to begin with.  Those kinds of positions call into

5      question the credibility of the people taking them.

6          Now, as Judge Gilstrap just instructed you and you're

7      going to have that instruction in your binder when you go back

8      in to deliberations, that you, the jurors, are the sole judges

9      of the credibility of all the witnesses and the weight and the

10     effect of all of the evidence.  And I think that we can all

11     agree that taking one position out in the world and then

12     taking a different position in the courtroom after you've been

13     sued is not a fair position, and we saw that happen time and

14     time again this week from PNC.

15         For example, you heard Mr. Trebilcock, PNC's vice

16     president, he was asked if he had seen USAA's mobile app.  And

17     he said on more than one occasion, I would confirm again I did

18     not see the app.

19         What did we find when we got access to PNC's internal

20     records?  We found this email from Mr. Trebilcock to Mr.

21     Thomas Kunz talking about the USAA app, and the first line in

22     that email said, I've seen the app, I've seen the USAA app.

23     And Mr. Trebilcock was directly involved in PNC's subsequent

24     decision to launch its own MRDC product.

25         Credibility, ladies and gentlemen.

1    You've heard PNC's counsel state in opening statements

2    that PNC didn't believe that it infringed then or now.

3    But what did you hear from their witnesses?  You heard

4    testimony from four of them.  Ms. Larrimer was asked, have you

5    done anything at all to investigate whether there is merit to

6    USAA's claims.  Her response was, I have not.

7    Mr. Goodstein was asked, did anyone at PNC do anything

8    whatsoever to investigate whether it was using the

9    intellectual property of USAA?  His response, I do not know of

10   anyone.

11   Mr. Trebilcock, do you know if anyone at PNC did anything

12   to see if PNC was clear to offer mobile deposit without

13   infringing patents?  His response, I don't recall.

14   Mr. Kunz, did you take any steps to try to avoid

15   infringing upon the USAA patents?  I did not.

16   Does that sound like to you like they believed that they

17   did not infringe?

18   Judge Gilstrap has also instructed you that you may

19   consider -- in weighing the testimony of the witnesses, you

20   may consider a witness' manner and demeanor on the witness

21   stand.

22   I would like you the consider what did PNC's infringement

23   expert Doctor Bovik's demeanor suggest to you?  You recall

24   that when Mr. Lantier was asking him questions on direct

25   examination and on redirect examination, he was able to

1    provide smooth, well-rehearsed answers.  But on

2    cross-examination, he refused to answer any questions

3    directly, and he dragged out every response.

4        Now, I'm betting you're not going to hear a whole lot

5    about Doctor Bovik's testimony when PNC stands up here to

6    argue today.  But I will say that when he finally answered

7    questions about infringement, he admitted that every single

8    one of the monitoring criteria listed in the '571 Patent were

9    present in PNC's system software.

10       Ladies and gentlemen, what did you hear about damages?

11   Well, Mr. Kunz was asked, why did PNC decide to offer a remote

12   mobile deposit application?  His response, it's a convenience

13   for our customers.  That's all.  It's just a convenience.

14       Ladies and gentlemen, you saw exhibits, and one of those

15   you'll have a chance to pull back up in your deliberations,

16   it's Plaintiff's Exhibit No. 43, and that is a shareholder

17   statement that Mr. Bill Demchak gave publicly to his

18   investors.  He is the PNC chief executive officer.  And he

19   told the folks, his inventors, that PNC saved $3.88 every time

20   a customer deposited a check by mobile deposit versus a

21   deposit with a bank teller.

22       And what did Ms. Larrimer, PNC's corporate rep, say about

23   that testimony?  She said that when he presented that $3.88

24   figure, he was being truthful.  And she went on to say, he's

25   always truthful.

1225

1     Now, recall Mr. Demchak was not -- he was not telling his

2  investors that this was a convenience.  He was telling them,

3  and I'm sure they were very glad to hear this, that this was a

4  huge savings for the bank.  And it was a huge savings because,

5  as you will recall, there have been 105.8 million mobile

6  deposit transactions during the damages period.  And it wasn't

7  just about channel costs, the savings from shifting deposits

8  from tellers to mobile service; it was also about the branch

9  cost savings that Mr. Kennedy spoke with you about a few days

10 ago.

11    As Jim Rohr, the former PNC CEO, said, by migrating

12 routine service transactions to other channels, and, and,

13 optimizing the number of branches, we expect savings in the

14 hundreds of millions of dollars.  This is not just a

15 convenience for their customers.

16    Mr. Stone also suggested to you in his opening statement

17 that PNC didn't know anything about these patents, but we know

18 from the evidence you've heard, and you'll see this at PX 196,

19 PX 195, PX 197 and 198, that our patents were listed so that

20 anyone who went to the app could see them.  As you'll see in

21 that highlighted spot, USAA's Deposit@Mobile may be covered by

22 one or more of the following patents, and you'll see '571,

23 you'll see the '681, you'll see the '605.  And we know that

24 PNC was looking at our app.

25    You'll also recall, you heard testimony from Mr. Tom

1   Kunz, senior vice president, that he learned about USAA's

2   mobile remote deposit patents back in 2017.  Did they reach

3   out to USAA before using our property?  No.

4       PNC even tried to make it sound like USAA was in the

5   wrong for not telling PNC sooner that you can't use somebody

6   else's property.  You'll recall, though, testimony from Mr.

7   Wilkinson, who gave consistent testimony on direct and

8   redirect and I'll leave it to you to judge his credibility, I

9   think he was a very credible witness, he testified that they

10  sent a letter to PNC right after the lawsuit asking PNC to

11  take a license, and PNC declined.  Credibility, ladies and

12  gentlemen.  Credibility is crucial, and PNC has lost a great

13  deal of it over the last five days.

14      Mr. Sheasby is going to finish our closing arguments.

15  But before I sit down, I want to just say thank you again for

16  your service this week.  We appreciate it, and we look forward

17  to your verdict.

18          MR. SHEASBY:  Good morning, ladies and gentlemen of

19  the jury.  Like Mr. Bunt, I want to thank you for your

20  sacrifice.  I know it's time, it's exhaustion, and I know it

21  has financial consequences, but I hope you can understand how

22  incredibly important this case is to USAA.

23      Mr. Huynh, can we have slide 18, please?

24      USAA serves our military.  We are owned by military

25  members, retired military members, and their family.  We spent

1    significant resources to create a technology that has

2    transformed our business and has transformed commercial

3    banking.   In 2006, we launched a commercial platform that

4    could accept the type of devices our members had at the time,

5    the type of devices our members would following have.

6         And I'm going to show you a lot of exhibits.   And in that

7    blue left-hand corner is a PX number.   And you can actually

8    ask for that PX number from Judge Gilstrap when you're in

9    deliberations.   And so I'm putting the PX number in blue for a

10   very particular reason--so you can see that what I'm saying is

11   in evidence.

12        And Mr. Wilkinson spoke about the fact that the system

13   from the beginning had the capability to handle the type of

14   devices its members would have, its members would have and

15   then have later on.   He spoke about the fact that scanners,

16   digital cameras, smartphones, all of them had the capability

17   to be used in our system because they had the fundamental

18   property of JPEG, which we built in our system from the

19   beginning.

20        PNC, outside of this litigation, acknowledged that our

21   designs were great ideas, and they said, we want it; USAA does

22   it again.   There's almost a sense of jealousy in what they're

23   saying, that this creation with our members' money they took.

24        And this is PX 150.

25        Outside of this litigation, they internally and secretly

1    rave about our technology.  They call us the industry leader

2    in mobile applications, the first to launch mobile deposit.

3    And in this case they say that Chuck Oakes and Bharat Prasad

4    and Chris Wilkinson had no idea what they're doing, couldn't

5    create anything of value, and what they did was worthless.

6         The first issue you'll be asked to decide is

7    infringement.  Infringement is based on the preponderance of

8    evidence, which means if one pebble, one pebble is in favor of

9    USAA, we prevail.  That is Judge Gilstrap's instructions, and

10   we are obligated to follow Judge Gilstrap's instructions.

11        Professor Thomas Conte.  And I'd like Professor Conte to

12   stand now.  He did a detailed analysis and concluded that

13   every single claim of the asserted patents were infringed.

14        Thank you, Professor Conte.

15        The infringement can be both literal and under the

16   doctrine of equivalents, which means if there are even

17   insubstantial differences between PNC's system and our claims,

18   it's irrelevant.  They still are liable under the law.  If

19   they do something equivalent or only insubstantially

20   different, they are still liable under the law.  That is Judge

21   Gilstrap's instructions.

22        The examination of Professor Bovik was very, very

23   difficult, but ultimately what we established is a concession

24   that he was not meaningfully disputing infringement.  He

25   conceded that every single element of the claims of the '571

1   Patent were present in PNC's design.  These are his words

2   admitting it under oath.

3        As to the '432 Patent, he conceded every single

4   limitation except in the beginning he disputed whether PNC

5   checks for errors.  After a very difficult cross-examination,

6   he admitted under oath, based on PNC's own documents, PX 0303,

7   that PNC does check for errors.

8        The '681 and '605 Patent, he presented an argument in

9   which he said that the PNC system doesn't present pictures

10  after they're taken.  One of the most powerful tools you have

11  is common sense.  Professor Conte showed you the source code

12  and the source code definitively establishes that the front

13  and back of the check are presented to the user after they are

14  captured.

15       PNC also had an argument in which they tried to avoid

16  responsibility for their conduct and said their customers are

17  responsible for this conduct.  That is not the law; it's an

18  irresponsible argument.  Judge Gilstrap has made clear that if

19  PNC exercises direction or control over the users' devices,

20  they are responsible.  And, of course, they exercise direction

21  and control.  As Mr. Prasad explained, the design of the

22  downloaded application allows you to control the phone and

23  control the deposit process.

24       And Doctor Bovik also admitted under oath that PNC builds

25  a system.

1           Can we go to slide 34, please, Mr. Huynh?

2           The next issue I would like to discuss with you is

3       validity.  PNC has the sole burden to prove by clear and

4       convincing evidence that every single claim that has been

5       asserted against them is invalid.  And clear and convincing

6       evidence is substantially greater evidence than the evidence

7       that we must show to prove infringement.

8           There is a presumption of validity that extends to our

9       patents because of their careful examination by the Patent

10      Office.  Invalidity must be determined on a claim-by-claim

11      basis.  Professor Kia showed you one claim in his analysis of

12      validity.  He ignored Judge Gilstrap's instructions, he did

13      not perform a claim-by-claim analysis, and PNC's counsel will

14      also not perform a claim-by-claim analysis as Judge Gilstrap

15      requires them to do so.

16          This distraction as to when we launched our commercial

17      iPhone app, which you heard so much about in opening and which

18      they talked to Mr. Prasad about at length, is irrelevant to

19      the question of validity.  Judge Gilstrap's instructions make

20      this absolutely clear.  There is no requirement of actual

21      reduction to practice of the claimed invention.  The patent

22      law does not require you to build your invention and launch it

23      commercially.  Any suggestion to the contrary was a gigantic

24      distraction designed to confuse the clear liability of PNC.

25          The criticism that Mr. Oakes, who is not here anymore,

1    and Mr. Prasad, and Mr. Wilkinson were incompetent and

2    couldn't get things to work, is unjust and inaccurate.  USAA

3    treats its obligations to its members seriously, and it

4    doesn't release products until they meet the lofty standards

5    of USAA.  That is not the standard for enablement or written

6    description.  You will see no reference to commercial products

7    or commercial success or commercial standards in Judge

8    Gilstrap's instructions.

9              THE COURT:  20 minutes have been used.

10             MR. SHEASBY:  The Patent Office approved each of our

11   claims.

12       PNC's expert, Doctor Kia, admitted he did not follow the

13   rules, but he did admit something very important.  He conceded

14   on cross-examination that the presence or absence of a

15   commercial embodiment is irrelevant, irrelevant to validity.

16   No physical product is necessary for validity.  He conceded it

17   under oath.

18       And he conceded that in 2006, he could have built our

19   system even though he had never built a mobile remote deposit

20   capture.  And if you remember, he resisted mightily conceding

21   this, even though he had said it under oath at his deposition.

22   But he was ultimately required to admit it.

23       Mr. Oakes spoke about the fact that what the patents are

24   are blueprints.  And if you look at the patents, you will see

25   the detailed blueprints that are present in them.

1    Mr. Prasad spoke about the fact that there is detailed

2    descriptions of how to use digital cameras.  If you go to PX 3

3    at column 7, lines 50 through 65, and the columns are the left

4    and right-hand side of the page, you can see the little

5    numbers, you can look for yourself and see the detailed

6    instructions about digital cameras.

7    Every single design that we list in our patent, PNC has

8    present in its product.  They say our system could not work or

9    they couldn't know how to use our system from our patents.

10   The exact design in our patent we found in PNC's system.  They

11   said there's no disclosure of mobile devices.  Mobile phones

12   are not required.  There's no disclosure of handheld devices

13   in our patent.

14   Doctor Kia was forced to admit under oath that if you go

15   to figure 3 of the '605 Patent, you will find a detailed

16   description of what he admits is a handheld self-contained

17   device with its own processor.  It's in the patents.

18   Mr. Prasad spoke about the fact that they expressly wrote

19   into the patents the use of PDAs.  You can find this at PX 2,

20   which is the '605 Patent, at 8, 27 through 54.

21   The next issue I want to discuss with you is willful

22   infringement.  When you think about the extraordinary

23   standards that we are held to as citizens of this country in

24   terms of when there's even minor violations, the strict

25   consequences we face.  This is not a minor violation.  We

1    filed our patent applications, we publicly announced their

2    existence, they were publicly -- the first of our family was

3    granted in January of '21 before PNC lost its original system.

4    We are only seeking damages from 2016 forward.

5         2016 is when we marked our patents.  PNC's response to

6    this is to suggest, oh, well it's not our fault; we didn't

7    know about the patents before you sued us.  In 2017, they

8    admitted under oath they knew about the patents.

9         In addition, they try to blame vendors.  Oh, we just

10   bought something off the shelf; it's not our fault.  But they

11   admit that in 2016 and '17 when we started seeking damages in

12   this case, they built their own system, and they did nothing

13   to investigate whether there was infringement.

14        Let's go to slide 59.

15        This version 4.20.1 is a gigantic distraction.  It is

16   nothing to do with liability in this case.  It will not be

17   part of the damages in this case.  They try to use it to

18   suggest that, oh, our patented technology was not very

19   valuable because we could have done something else.  But to be

20   able to make that argument, they must show that that something

21   else doesn't infringe our other patents.

22        There are three patents that Professor Conte presented to

23   you, ladies and gentlemen of the jury, and that stated

24   expressly that PNC does not avoid infringement by these

25   patents.  He said it and he concluded it.  And you can look at

1234

1    those patents and you can look at the claims.

2        Doctor Bovik conceded it as well.  He is not stating that

3    those patents are non-infringing alternatives.  They are

4    covered by our other patents.

5        A lot of families that are big have two cars.  If a

6    criminal breaks into one of your cars and you bring process

7    against them, the argument that that criminal could have

8    broken into another one of your cars and therefore they should

9    not be liable is absurd.

10       Both of these properties are ours.  The 4.20.1 is covered

11   by our other property.  They cannot escape our technology.

12   They need our technology.

13       And the last issue I want to talk about is damages.  They

14   give us a story in which they say, oh, we would never have

15   used your technology if you would have just come to us in

16   2016.  They've made over $600 million from mobile remote

17   deposit capture.  They've generated billions and billions of

18   dollars in deposits.  And as part of the hypothetical

19   negotiation, they get to keep $30 million of the money they

20   made by infringing our patents.

21       Ladies and gentlemen, I will have one opportunity to

22   speak with you again.  I appreciate and thank you for your

23   patience.

24           THE COURT:  Defendant may now present its closing

25   argument to the jury.

1      MS. SMITH:  May it please the Court, Your Honor.

2      THE COURT:  Would you like a warning on your time,

3  Ms. Smith?

4      MS. SMITH:  No, thank you, Your Honor.

5      THE COURT:  Please proceed.

6      MS. SMITH:  Thank you.

7  Now, ladies and gentlemen, good morning.  I am going to

8  join Mr. Bunt and Mr. Sheasby as well as the Court in thanking

9  you for your sacrifice.  I know, quite frankly, when we all

10  came together on Monday, some of you were sitting out there

11  hoping that your number wasn't called probably.  But it's

12  been -- and I can't lie, it's been a long week, but we

13  appreciate your attention and we appreciate your long days.

14      On behalf of myself, Mr. Stone, Mr. Lantier, and PNC, all

15  the folks at PNC, along with Ms. Larrimer, we appreciate your

16  time.

17      Now, Mr. Stone is going to take the lion's share of the

18  Defendant's close this morning, but some of you have seen me

19  sitting at the table taking notes, and I was the first person

20  that spoke with you on Monday.  So I thought it would be

21  appropriate for me to take just a precious few minutes and

22  review some of what we've heard this week.

23      Now, you've probably noticed that the parties, we haven't

24  agreed upon much in this case.  I take issue that they're

25  asking that USAA is asking for $300 million and that that in

1    any way compares to something we'd see on a playground.  But

2    we do agree on this:  We do agree that this case comes down to

3    credibility.

4         Now, I wrote this down.  Mr. Sheasby said in his opening

5    statement, he said, PNC's executives, they made a fatal--his

6    word--fatal decision, they decided to take what USAA had

7    created so they could compete with USAA.  We all heard that.

8    So what I'm going to do for a few minutes is I'm going to test

9    that with you.  I'm going to compare that to the actual

10   evidence we've heard in this courtroom.

11        Ladies and gentlemen, PNC took you back over a decade,

12   years before USAA's patents ever issued.  We saw technology

13   changing, we saw apps coming out in all different parts of the

14   society, including banking.  Banks were coming up with new

15   ways to serve their customers, big banks, small banks alike.

16   And customers began depositing their checks on their mobile

17   phones across many, many banks.

18        PNC was no different.  We heard that PNC launched a

19   mobile app back in 2011.  And let's keep in mind, that's four

20   years before the first USAA patent issued.  It was an app to

21   serve its customers.  PNC offered that app for 10 years.  They

22   offered it for a decade.

23        But I think when we're talking about credibility, it's

24   important to look at what those folks at USAA were doing

25   around that time.  They were watching the industry.  We heard

1    from Mr. Wilkinson on the stand that USAA was monitoring its

2    competitors, that it monitored PNC specifically.  Mr.

3    Wilkinson didn't want to use my words.  He wanted to call it

4    benchmarking, but we all know what that meant.

5         Now, those USAA patents, they eventually issued, but only

6    after PNC customers had been depositing checks on their phone

7    with the PNC app for every day, every month, and every year

8    for four years.

9         So let's take a look at credibility and what the folks at

10   USAA did when they got their patents.  Did they come to PNC?

11   No.  Did they send a letter?  No.  No phone call.  What did

12   they do?  They kept watching.  They kept waiting and watching.

13        So what else was USAA doing other than watching PNC and

14   the others?  Well, Mr. Sheasby told us a little bit about

15   this.  He said, oh, my goodness, there was significant press

16   coverage about USAA, articles were written about our

17   groundbreaking technology.

18        Well, we know a little bit more about that from Mr.

19   Wilkinson, don't we?  We heard from Mr. Wilkinson and USAA's

20   own documents that every one of those articles, every one of

21   those articles that Mr. Sheasby showed you, was part of USAA's

22   strategic plan--their word--to pitch the media.  I asked Mr.

23   Wilkinson, and he agreed you got to consider the source.  You

24   got to consider the source when these articles are being

25   paraded around.

1       And we now know that the big news, the news about their

2   technology was a strategic communication plan, a plan hatched

3   by a branch of USAA called the CLO.  And Mr. Wilkinson

4   clarified that for us, that's their lawyers.  It stood for the

5   chief legal office.

6       So we go on down the road, and PNC saw the news.  They

7   didn't know the lawyers were pitching it, but they saw the

8   news, they saw the article, and we heard a lot about this

9   article.  It was from the American Banker.  And PNC learned

10  from that article that USAA was going around to banks and

11  reaching out and asking banks to license its technology.  Was

12  PNC one of them?  No.  We've heard no evidence that USAA

13  approached PNC.

14      So I'd submit that PNC did what was reasonable, what's

15  believable.  They did what you might expect.  They went to the

16  company that made their app, and that company was called NCR.

17  And, you know, I saw something that Mr. Bunt put -- put

18  another slide of four of the PNC bankers on the screen, and

19  they took a little criticism.  Remember Ms. Larrimer took the

20  stand and, you know, she was accused of not knowing anything

21  about patents and she was made to kind of read patents on the

22  fly.  She's a banker.

23      What PNC did is they wrote a letter to the off-the-shelf

24  company that they bought their software from.  And what did

25  NCR say?  They said, we stand behind our product; there's no

1    problem with USAA.

2         So we fast forward to September of 2020, and USAA files

3    its suit.  And, again, let's keep this in perspective.

4    September of 2020 is after PNC had been openly, openly and

5    publicly offering its mobile app to its customer for nine

6    years, five years after USAA's patents issued.

7         Now, ladies and gentlemen, I would suggest to you that

8    the best test of credibility as to PNC, it's what happens

9    next.  So PNC begins to investigate.  PNC tries to understand

10   what's being accused and what's being claimed.  And as I said,

11   we didn't do that with bankers, we hired experts, they hired

12   lawyers, we certainly didn't task bankers with doing a patent

13   or legal investigation.

14        But at the same time, the folks at PNC determined that

15   they wanted to avoid this dispute altogether, so how did they

16   do that?  They disabled and they removed the two features that

17   were accused.  They took out the features that USAA was

18   accusing; took them out.  And that came at a cost.  It wasn't

19   an easy decision.  It came at a cost, a cost of over $10

20   million, I believe is the testimony you heard.

21        So let's go back to credibility.  Let's go back to Mr.

22   Bunt's comments about credibility again.

23        USAA makes the allegations, and PNC takes out the accused

24   features.  What's PNC's reward?  What's USAA do next?  Well,

25   this is, quite frankly, ladies and gentlemen, where it gets

1    really interesting because things begin to change in about day

2    two of this trial.

3         So what we heard and what we heard from the Court is that

4    this case is about four patents, and you just heard the Court

5    give you instructions about four patents.  But when we started

6    sharing with you-all, the jury, that we'd taken out was

7    accused in those four patents, well, what happened next?

8         Well, the Plaintiff said, well, if you didn't infringe

9    literally, there's this thing about -- called DOE, and we got

10   close enough.  But if you didn't infringe these patents

11   literally and -- and we didn't get close enough, you know,

12   we've got this stack of a hundred other patents.  They were

13   real proud of that big stack of patents.  We've got this stack

14   of a hundred other patents and we're going to pluck three out

15   and you infringe those.

16        So we begin again.  These three were a little bit

17   different because USAA didn't tell you what those patents were

18   about, they didn't tell you what PNC supposedly did wrong.

19   They just pulled three patents out of the stack and said --

20   put them on a slide and said they infringe and nothing more.

21        The case is about believability, as Mr. Bunt told you.

22        So Mr. Stone's going to visit with you in a minute, but I

23   want to talk about USAA.  We've heard a lot about their early

24   beginnings, and I respect that story.  I have military in my

25   family.  I respect that story.  You heard they were formed

1    back in 1922.  You heard 25 men, generals, came together to

2    form an insurance company.

3         But you've got to wonder, I mean, you've got to wonder if

4    this is what they had in mind.  Is this what they had in mind?

5    Do you think honorable men like that in a million years

6    envisioned a time where USAA would go from insurance to

7    banking, and they'd go from competing in the marketplace to

8    pulling those patents off of that stack and competing in the

9    courthouse?  I'd submit no.

10        Thank you, Your Honor.

11        Mr. Stone?

12             THE COURT:  Mr. Stone, would you like a warning on

13   your time?

14             MR. STONE:  At seven minutes, please, if I might,

15   Your Honor.  Thank you.

16             THE COURT:  I'll warn you when you have seven

17   minutes remaining.  Please proceed.

18             MR. STONE:  Good morning, ladies and gentlemen, and

19   let me join with the others in thanking you for your time.  It

20   has been a big commitment on your part, and we very much

21   appreciate it.

22        I want to start by reminding you of something I said in

23   my opening, if I might.  I said you would hear from USAA

24   talking about all there is to do in a mobile remote deposit

25   capture system.  They would use the phrase MRDC again and

 1    again.

 2         And I asked you, if you would, to, please, every time,

 3    stop and ask yourself, but this is not about remote deposit;

 4    it's about two features and four patents.  And those two

 5    features are linked to the four patents because we know, once

 6    you take those features out, those four patents are not

 7    infringed.

 8         And this is a case, you heard it in Judge Gilstrap's

 9    instructions, where we have to decide, did these two features,

10    when they were in the app, the original app, did they

11    infringe?  And we have to ask ourselves, what were they worth?

12    If we get that far and you find the infringement, what were

13    these two features worth, not what is all of remote deposit

14    worth.  PNC is still doing remote deposit.  Every benefit its

15    customers receive, every bit of benefit the bank receives,

16    it's still receiving.  Deposits continue with 4.20.1, and

17    4.20.1 does not infringe the patents in this case.

18         Let's talk for just a minute about infringement and why

19    it doesn't infringe and why the original app does not

20    infringe.

21         Now, the original app had in it the feature where you

22    take the photo, take the photo, show the photo, and show to

23    photo.  And the original app in 2016 added the feature of

24    auto-capture.  Remember, for five years PNC didn't have

25    auto-capture, but it added the feature in 2016.  So the two

1   features that were taken out when PNC were sued, they were

2   there in that original app from the time that USAA actually

3   marked its patents in accordance with the law.  And I'm going

4   to come back to that.  But those features were there.

5        So why did PNC not infringe?  Well, if we remember the

6   example I gave you, you have to satisfy each and every element

7   of a claim.  If you talk about sports equipment that is made

8   of leather, it wouldn't just be a soccer ball and a football.

9   You could throw a baseball in there and a saddle, too.  And if

10  you said stitched together, well, you still have a baseball

11  and you still have a saddle.

12       Now, if you said filled with compressed air, getting to

13  the third element, the saddle and the baseball go away.  And

14  it's only when we get to round and not oblong that we realize

15  that every element you add narrows the claims, and a football

16  is no longer covered by the same patent that would apply to a

17  soccer ball.

18       Now, why does that matter here?  Because here there are a

19  lot of elements in each of the claims.  Mr. Sheasby was

20  showing you yesterday, when he was examining Doctor Vellturo,

21  he was showing you how long the claims are and how many

22  elements they have.  Well, each of the claims, as Doctor Bovik

23  went through, each of the claims of the patents asserted in

24  this case have an element, have a requirement, that is not

25  found in PNC's product.

1244

1    For example, we talked about this morning, we heard about
2  checking for errors.  Where does the checking for errors
3  occur?  Where does the computer look at what has been
4  submitted and decide whether it can accept it or there's an
5  error and it has to be redone?  It's at a big computer system
6  in Greenfield, Virginia.

7    Now, the consumer, the user has to be told that.  PNC's
8  customers get a message from those computers on their phone
9  that tells them there's an error, a message which is exactly
10  what was on the slide Mr. Sheasby put up.  A message back is
11  not checking for errors any more than when I'm driving home
12  after the end of a day of working, I call my wife to check to
13  see whether I should pick something up at the store, and she
14  either tells me yes or no.  I get the message back, but the
15  checking occurs wherever she is at the time.

16    So that element of the '432 Patent is not satisfied.

17    Now, both of the '681 and '605 Patents require the photos
18  be taken and then shown.  But PNC's patent was different.  And
19  this applies to each and every one of the asserted claims.
20  The patent is different.  What's that mean?  It means the
21  lawyers for USAA, when they were drafting these claims and
22  writing out their details, chose one way to try to get a claim
23  from the Patent Office, and those words matter, and those
24  limitations matter.

25    And then there's another limitation that cuts across all

 1    of these patents, all of the patents filed in 2006, as well as

 2    the '571 Patent.  They require that there be the use of a

 3    mobile phone.  And I'm going to come to the instructions on

 4    this in a moment.  They require there to be the use of a

 5    mobile phone.  PNC doesn't provide mobile phones to its

 6    customers.  It's not PNC's phones that are used.  It's phones

 7    that the customers have purchased, whether they purchased them

 8    at the Verizon store or the AT&T store or Sprint or some place

 9    else.  It's the customer's phone, and that means it's the

10    customer who decides do I want to download the app, do I want

11    to remotely deposit my check.

12        And for purposes of the '571 Patent, most importantly,

13    who decides if I want to take manual capture or auto-capture?

14    Because the '571 Patent is the auto-capture patent.  And you

15    see here in the instructions, you see in the last sentence of

16    the instructions, components provided by another party, that's

17    the customer, are attributable to PNC if you find that PNC

18    exercised direction or control over that other party.

19        So what's that mean?  Did PNC tell its customer, you have

20    to do manual capture, you have to do auto-capture?  No.  The

21    customer decided.  It's the customer who had control.  PNC

22    gave them the option; customer made the choice.  That's the

23    law in your instructions that you will have with you in the

24    jury room.

25        Well, what does that mean?  It means that the original

1    app that PNC released was not infringing any of these four

2    patents.

3         Now, here's the letter or here's the news article in the

4    American Banker that Ms. Smith talked to you about, and she

5    talked to you about the contact between PNC and its vendor,

6    NCR.  And here's the instruction that you're going -- the

7    verdict form, the question that you're going to be asked:  Did

8    PNC willfully infringe?

9         They didn't have any reason to think they had a problem

10   because they knew as a result of that American Banker article

11   that USAA was contacting banks, lots of banks that it thought

12   infringed.  PNC wasn't contacted.  It's vendor said, you don't

13   have an issue.

14        And so what -- where does USAA go then?  They say, well,

15   when they were developing their app way back in 2011, they

16   took a screenshot of what was on the internet and what you

17   could get by looking at their website.  They took a screenshot

18   of our interface, and they copied it.  They didn't show you

19   anything in PNC's app that you could have copied from that

20   picture.  It's a picture of the interface.  It had their logo

21   on it.  They -- you can look at that document.  There is

22   nothing in there.  That document that you were shown by Mr.

23   Sheasby, you can look at.  There's nothing in there that is

24   source code.  There is nothing in there that tells you how to

25   make it work.  There is nothing in there that goes through the

1    list of how things work.  And they didn't even have any of the

2    four patents in this case at the time.

3        Sometimes I think about the question of willful, do I

4    intentionally or willfully go out and do something, do I

5    intend to take something.  At that point in time, they didn't

6    even have these patents.  At that point in time, PNC was

7    developing its own app, its own way, and it couldn't have

8    taken anything from that photograph that's on that document,

9    which they blow, frankly, way out of proportion.

10       They had every reason to think USAA was not going to

11   watch and wait, watch and wait.  They had reason to expect if

12   USAA thought, while it was watching PNC, that it saw PNC do

13   something wrong, they would come say something.

14       I mean, you were asked about drilling rigs on your land,

15   and if somebody puts a drilling rig on your land, would you

16   just sit there and watch and wait, and watch and wait?  Or

17   would you get up, go out of your house, walk over to where

18   they are, and say, this is my land, you should please take

19   your drilling rig off.  But they didn't do that.  They didn't

20   act the way you would expect somebody to act, the way we have

21   every reason to expect other people to treat us.  There was no

22   willful infringement.

23       We do have this issue.  It comes back in funny ways,

24   because we began to hear in the course of this case, well, we

25   think 4.20.1 is maybe not a non-infringing alternative.  Well,

1    the instructions that you have been given are quite clear.  It

2    was the burden of USAA to come prove that 4.20.1 infringes one

3    of the patents in this case.  Their burden, their burden.

4         And what did we see?  Well, we saw from Doctor Conte that

5    he said, I am not offering any opinion, no opinion, that

6    4.20.1 infringed any of those three patents.  In fact, it is

7    uncontested in this case that the '432, the '681, and the '605

8    are not infringed because the feature of showing the photo to

9    the customer before it is submitted to the bank has been taken

10   out.

11        Now, what about that auto-capture feature?  Well, as to

12   the auto-capture feature, what do we hear from USAA?  Well,

13   the code is still there.  They don't dispute that a customer

14   can't see the feature on their phone.  They don't dispute that

15   a customer can't use the feature on their phone.  They don't

16   dispute that the customer has any way to access the feature on

17   their phone.

18        Doctor Conte was pretty clear about that.  In fact, he

19   said in the default configuration, there's no infringement

20   either, in his view.  But USAA's lawyers have pushed harder.

21   They say, you shouldn't still have that software somewhere on

22   a computer.  Well, that software is in the world every place.

23   Would it make any difference in the world if you take the

24   software out of that computer and go put it on another

25   computer or just throw it away?  It's every place as we know

1    about so many things today.

2        It is not available to PNC's customers, and that's what

3    matters.  And you've heard from Doctor Bovik and you see

4    Doctor Conte has no opinion on it, but there's no infringement

5    with respect to auto-capture, either.  It's not available.  It

6    can't be used.

7        There's another issue, and Ms. Smith talked about it.

8    They came in and they started putting up on slides three other

9    patents.  They showed you the cover page of the three patents.

10   They showed you ribbons on those patents.  And they said,

11   well, we have three other patents from our pile that PNC

12   infringes.  But we know what they have to prove to prove

13   infringement, and we know the burden of proving infringement

14   is on them.  It's page 19 of your instructions.  They have

15   this burden.  They have to prove there's infringement of

16   anything they say is not a non-infringing alternative.

17       We know how Doctor Conte proves infringement.  He puts up

18   on the screen a chart like the one I've shown you where he

19   goes element by element, A through G or H, however many

20   elements, he has all those letters, and then he has a

21   description of what he thinks the element or limitation is,

22   and then he either puts a checkmark or an X..

23       He didn't show you a single chart for these three new

24   patents they pulled from the pile.  No charts, no proof, no

25   evidence, no infringement of these other patents.

1     That takes me to something I talked about with you in the

2   opening, which is what did PNC's lawyers learn and its experts

3   learn after this case was filed and it began to prepare its

4   defense, because you understand what happens in the lawsuit.

5     You start to take discovery.  You start to dig into

6   things.  You look at documents that USAA has in its files,

7   documents you've never seen before, documents that no one had

8   ever seen before.  You begin to look at those documents.  You

9   begin to see emails and internal presentations, and you

10   ultimately have the opportunity to take depositions of

11   witnesses and see what they will tell you when they're under

12   oath.

13     And what did PNC learn?  It learned that the enablement

14   requirement hadn't been satisfied.  Now, why does that matter?

15   Why does the enablement requirement matter?  Because we want

16   as a country and as we recognized in our Constitution, we want

17   to get patents to inventors for inventions, things that they

18   actually can make and use.  And we want them to describe it to

19   all of us in that patent how we could make it and use it.

20   That's the bargain between the government and us on the one

21   side and somebody who files for a patent on the other.

22     You can't rush in and get a patent on something you don't

23   know how to make it work because that's not fair to everybody

24   else who is trying to make the same thing work as well,

25   because lots of people are trying to make inventions and lots

```
1   of people were trying to make ways to deposit checks remotely
2   after the law changed and Check 21 came into effect.  Because
3   now all of a sudden you can use the image of a check instead
4   of a real check.  And that was an opportunity the change in
5   the law gave to a lot of people.  Companies were working on
6   that.  A fair race to see who can get there first is a race
7   where once you have one that will work--okay?--go file your
8   patent.
9       And Doctor Kia was asked about this.  Doctor Kia was
10  asked and Mr. Sheasby was making the point with Doctor Kia
11  sometimes it takes a long time to make something work.  Doctor
12  Kia said, yes, in his experience it had taken him years
13  sometimes to make something work.
14      And then I asked Doctor Kia, well, did you ever file for
15  a patent on any of the inventions you made before you knew how
16  to make it work, before you could describe to others how to
17  make it work?  And Doctor Kia said, no, I never did that.  It
18  took me a long time, but I waited until it was proper for me
19  to file a patent application.
20      USAA was in that race.  They were in that race to get to
21  the Patent Office, and they ran there before they knew how to
22  make it work.  And we know that because, well, here's the law.
23  The law says -- this is in your instructions.  The law says,
24  if a claim is not enabled, it is invalid.  That's the last
25  line.  And before that, it says, you have to be able to teach
```

1    persons of ordinary skill in the field, not persons of

2    extraordinary skill in the field like Doctor Bovik or Doctor

3    Kia, but you have to teach persons of ordinary skill when you

4    file your patent application how to make and use the full

5    scope of the claimed invention without undue experimentation.

6        And the full scope here is not we knew how to make it

7    work with scanners.  Right?  They knew how to make it work

8    with scanners.  None of us doubt that.  The full scope is,

9    because this is what they later claimed, did they know how to

10   make it work with mobile phones and mobile devices.  And the

11   answer is no..

12       They filed these two patent applications on October 31st

13   of 2006.  Well, let's just go five days earlier to an email

14   from the president of the bank, Michael Luby, and he says, we

15   should figure out how to make it work.  And there he's talking

16   about digital cameras.  And then he goes on to say, what about

17   a phone?  And you heard evidence in this case that they tested

18   phones in early 2007 and they didn't work and they didn't know

19   how to make them work.

20       And this document would be of interest to you, is DX

21   1124, and you can ask for it.

22       And then later in May of 2007, they decided, let's do

23   some research.  And you heard from Mr. Prasad that he said,

24   well, that was sort of commercial.  That was a business

25   document.  But what we know is it was research they have to

1   do.  You can call it any kind of research you want.  This is

2   something that they didn't yet know how to make it work.

3       And how do we know that?  Because the words go with the

4   testimony:  We're going to research the viability to take

5   check deposits via cellular camera phones.  And viability

6   means, is it possible?  And that is what they did next.  And

7   they didn't, as we know, they didn't have a working prototype

8   until September of 2008.

9       THE COURT:  Seven minutes remaining.

10       MR. STONE:  Thank you, Your Honor.

11       And with respect to the auto-capture, they didn't do

12   their testing until 2012.  Same problem.  They filed their

13   application in 2009.  And as Mr. Bueche said, you saw his

14   testimony, we didn't disclose in our applications the

15   algorithms that we were using.

16       So with respect to the verdict form you're going to be

17   asked about each of these claims.  But Doctor Kia was

18   quite clear about this:  Each of these claims from the 2006

19   applications for the '432 and '681 and '605 are all the same.

20   None of them were enabled because nothing in the applications

21   taught somebody how to make it work because at the time they

22   filed USAA didn't know how to make it work.

23       And the same issue arises with the '571, or the

24   auto-capture patent.  They filed it as an idea, not as an

25   invention, and they jumped the gun and got a head start on

1    everybody else out there trying to make inventions.

2         And with respect to written description, you also heard

3    about that from Doctor Kia.  He said, somebody reading the two

4    applications in 2006 would not have known the claimed

5    invention's for mobile phones or mobile devices because those

6    words are not there as something you could use to take a check

7    image that you then could deposit.  And you heard them talk

8    about things like these were paradigm shifts and it changed

9    the whole ball game and so on.

10        So why did they race?  Why were they in such a hurry to

11   get there?  What was going on at USAA that they decided that

12   it was okay for them to get a head start on everybody else?

13   Well, Mr. Kennedy gave us insight into that because he came in

14   and said, well, we have a patent now that, if we sit on this

15   patent and watch and wait, we will see PNC's customers make

16   105,800,000 deposits and that's going to add up to a lot of

17   money, no matter which way you cut it.

18        There is an issue about whether he used the right damages

19   period, and that's the marking requirement that Judge Gilstrap

20   has instructed you on and you have that requirement, they have

21   to mark it.  And they claim to have marked it by putting it on

22   their website.  But the first website document that we saw in

23   this case was when we saw a real copy of a website, a

24   screenshot or a print job, that was PX 926, and it was dated

25   June 3rd of 2019.

1    Now, if you know, as USAA knew, that you have to mark if

2    you want to recover damages, if you were marking and it was

3    actually on your website, you would take a picture of it.  You

4    would have a screenshot or a printout of the website.  You

5    wouldn't just come in and say, as Mr. Wilkinson said, I don't

6    know who was in charge of the website back then and I haven't

7    talked to that person, but I've seen some internal code of

8    ours that I think means we would have marked our website

9    sooner.

10    Does that make sense?  You know you have to mark.  You

11    know you have to be able to prove you marked.  Would you not

12    have evidence that all you have to do is push a button to

13    print the screen?  Would you not have that evidence?  Why

14    isn't that evidence here?  You should look at the damages

15    period Mr. Kennedy talked about and you should move it up to

16    June 2019 because that's the earliest it possibly would have

17    started.

18    But there's really more than that because, had they just

19    come to PNC back in 2016 when they say it started, PNC would

20    have done exactly what it did, exactly what Ms. Larrimer told

21    you they would have done:  They would have taken out those two

22    features.  Why wouldn't you, especially if you heard from

23    USAA, if you don't take them out in 2020, we're going to sue

24    you and in 2021 we are going to ask you for $300 million?

25    We know how much auto-capture is worth.  We can look at

1   the damages analysis that was done by Doctor Vellturo.  But

2   first we can even look at what the people at -- USAA'S

3   customers were saying about their auto-capture:  It's the

4   worst feature I've ever used.

5       Okay.  So what are these two features worth?  Because

6   these are the ones that matter.  Well, there's a couple of

7   ways to look at it, but if we step back for a minute, we know

8   that today checks account for only 15 percent of the deposits,

9   we know that only nine percent of the accounts at PNC use

10  mobile deposit, checks are going out of vogue, things are

11  changing, people are transferring money in other ways, checks

12  are not as important as they used to be.

13      But more than that, we know what it costs to take out

14  those features.  You heard that from Doctor Vellturo.  Take

15  everything into account, employees, impact on the business,

16  cost of the software programmers and engineers, $10.5 million.

17  We know that number.

18      We also know, and this is one of the factors for you to

19  consider, we also know what others paid on a per-transaction

20  basis.  We know that PNC paid NCR 12 cents a transaction.

21      We know that Bremer, once you account for it having

22  gotten a license to far more patents than are at issue here,

23  we know, as Doctor Vellturo walked you through his analysis,

24  that the Bremer agreement is really equal to 3 cents per

25  deposit for the four patents here.

1    We know that there were offers made to SunCoast and

2  Dollar by USAA at 6 cents.

3    And we know that Mr. Kennedy somehow thinks that, despite

4  these other licenses, it's all the way up to $3.07 a

5  transaction.

6         THE COURT:  Mr. Stone, your time has expired.

7         MR. STONE:  Thank you very much, Your Honor.  I

8  appreciate it.

9         THE COURT:  Mr. Sheasby, Plaintiff has 13 minutes

10  and 17 seconds left.  Would you like any warning on your final

11  time?

12         MR. SHEASBY:  I would, Your Honor.  I would like a

13  warning at seven minutes.

14         THE COURT:  I'll warn you when you have seven

15  minutes remaining.

16         MR. SHEASBY:  And also one minute.

17         THE COURT:  All right.

18         MR. STONE:  Your Honor, on my clock I had myself at

19  40 minutes, and I started right when Ms. Smith started.  So I

20  did have a different count on that.

21         THE COURT:  I counted Ms. Smith's time against your

22  40 minutes.

23         MR. STONE:  No, so did I, Your Honor.  Thank you.

24         THE COURT:  All right.  Mr. Sheasby, you may present

25  Plaintiff's final closing.

1    MR. SHEASBY:  Can we have slide 70, Mr. Huynh.

2    Credibility and common sense.  Counsel for PNC just told

3  you, for example, they don't infringe because there's no error

4  checking on the mobile device.  That is the exact opposite of

5  what Doctor Bovik said under oath.  The exact opposite.

6    Slide 73.

7    This childish argument that they do, take, show, take,

8  show, as opposed to take, take, show, show, is completely

9  contrary to the law of the doctrine of equivalents, and it

10  also ignores the fact that our patent shows exactly what they

11  concede they do--take, show, take, show.  You can find it in

12  the '605 Patent.  Doctor Bovik resisted, but he ultimately had

13  to admit it.

14    Can I have slide 76, please, Mr. Huynh?

15    PNC's attempt to blame its customers is improper as a

16  matter of law.  PNC controls the system.  PNC's app is what

17  controls whether the checks can be deposited.

18    Let's have slide 77.

19    Doctor Bovik admitted its PNC system.

20    Slide 76.  78, excuse me, Mr. Huynh.

21    Doctor Conte's testimony was undisputed that the system

22  that PNC makes is a system that PNC controls.  Doctor Bovik

23  said nothing different.  PNC is in control of its system.

24    Let's go to validity, slide 20.

25    We raced and we cheated the Patent Office is what you

1    just heard from PNC.  Their internal documents say we are the

2    leader and that we were the first.

3          I'd like Mr. Wilkinson and Mr. Prasad to stand up right

4    now.

5          The suggestion that we cheated the Patent Office, that

6    our system did not work, requires you to conclude that Mr.

7    Wilkinson and Mr. Prasad and Chuck Oakes are liars.

8          Thank you.

9          Let's go to slide 96.

10         Chuck Oakes, who has passed, made clear in his original

11   email the system had the capability to work with digital

12   cameras.

13         Let's go to slide 97.

14         Bharat Prasad under oath showed you evidence that the

15   system worked with digital cameras.

16         Let's go to slide 98.

17         Chris Wilkinson, non-commissioned officer in the United

18   States Air Force and a 24-year veteran of USAA, told you the

19   system worked.  And they are asking you to conclude he's a

20   liar.

21         Let's go to slide 82.

22         Commercial systems are not the requirement for

23   enablement.  Extensive experimentation occurs and that does

24   not make a patent not enabled.

25         Let's go to slide 89.

1     This fiction that because we waited until our members

2     could use and enjoy mobile systems that somehow we didn't

3     enable our patent is the exact opposite of what Doctor Kia

4     said under oath.

5          Let's go to slide 90.

6          Doctor Kia conceded he had never even built a mobile

7     remote deposit capture system, and he could have built the

8     system.

9          Let's go to slide 92.

10         The algorithms that are necessary to build the system are

11    in the patent.  You can look at the figures.  And Mr. Prasad

12    testified under oath that they were present.

13         Let's go to slide 51.

14         Not only did we build the system, the algorithms to

15    deposit checks, we actually presented the design of

16    smartphones and integrated devices, and Mr. Prasad testified

17    that these are the exact devices that are used in USAA's

18    system today.  And you can see this in figure 3.

19         Let's go to slide 99.

20         This is a document that Defendants showed you.  It's

21    called a BIR brief.  It's a business document.  And Mr. Prasad

22    testified under oath what the state of the system was at the

23    time this business document was presented.  That's talking

24    about viability, the system worked with digital cameras.

25              THE COURT:  Seven minutes remaining.

1        MR. SHEASBY:  Let's go to slide 108.

2        These are the three patents that PNC chose to infringe

3   and is trying to confuse the jury about because it relates to

4   an infringement of a product that is not in this case, and

5   there was a representation that Professor Conte, who showed

6   you over a hundred slides and spoke for an hour and a half,

7   didn't conclude that these three patents cover PNC's new

8   4.20.1 system.

9        This is his testimony under oath:  "Now, this alternative

10  does not avoid infringement.  USAA owns other patents in the

11  2006 family, the '598, the '638, and the '136.  And they do

12  not require any of the auto-capture, retake photo screens, or

13  keypad entries that PNC claims it removed from the system."

14       It may have gone quickly, and there's a reason for it.

15  Their paid expert conceded it as well.  They broke into one

16  car in 2006 and they broke into our other car in 2021.  In

17  either instance, the consequences are the same.

18       Let's go to slide 110.

19       The suggestion that we haven't shown you the claims of

20  the patents that cover the 4.20.1 system is false.  We showed

21  them to Doctor Vellturo, who was saying how the 4.20.1 was a

22  non-infringing alternative.  They claim that because they

23  removed auto-capture and presenting photos, they have no

24  obligations to us anymore, our technology is worthless.  But

25  our other patent claims don't require those features because

1    what the patents show is that we invented auto-capture.  We

2    invented mobile remote deposit capture.

3         Let's go to slide 121.

4         I want to talk to you about damages.  The words of the

5    claim define our invention.  The claim is not on a single

6    feature or showing a picture; the claim is the entire

7    language.  Doctor Vellturo's argument that he can pick out

8    individual features and suggest that's the value of the claim

9    absolutely contradicts the express instructions that Judge

10   Gilstrap gave you.

11        Let's go to slide 138.  138.

12        Once again, Mr. Wilkinson explained to you that beginning

13   in 2006 [sic] as our patents issued, we marked with them.

14   They are calling Mr. Wilkinson a liar.

15        Let's go to slide 115.

16        Damages are for the use made of the invention by the

17   infringer.  That's the measure of damages.  We know the

18   measure of damages.  900,000 per month infringing accounts,

19   105 million infringing deposits, $55 billion in infringement.

20   We know how much they save, at least $3.88 per act of

21   infringement.  How much are we seeking?  $3.04.  Every time

22   they break the law, we get -- they get to keep 60 -- more than

23   60 cents, more than 70 cents, and that has added up to close

24   to $30 million that they get to keep.  Ms. Smith asked about

25   what their reward is for breaking the law?  The reward is

1    keeping $30 million for their improper conduct.

2        118.

3        Mr. Kennedy analyzed and concluded that there were $604

4    million in profits that were generated from the use of the

5    infringing system.  $604 million.  And we're seeking 304

6    million of that.

7        I want to talk a bit about the agreements.  There was

8    some significant omissions of information on this slide that

9    was shown to you by counsel.  First, the PNC/NCR agreement.

10   It's not an agreement for patent rights.  And Doctor Vellturo

11   testified under oath that he wouldn't know how much they would

12   have to pay if PNC actually had patent rights, which they

13   don't because we have them.

14       This suggestion that auto-capture was not important,

15   their own witness testified under oath that auto-capture was

16   essential for their product.

17       The Wells Fargo agreement, I will not restate the number

18   in a public forum, but we know the significant amount of money

19   Wells Fargo paid USAA.  They paid that money after two patent

20   families were presented to Wells Fargo.  Those are the exact

21   same two patent families that are at issue in this case.

22       The Bremer and Assurant licenses, they were not for 3

23   cents.  You see the numbers of what they were for on a

24   per-transaction basis.  These were voluntary agreements.

25   People who did not act illegally, people who did not break the

1  law.  And they have nothing to do with PNC, which is a

2  dramatically larger bank with dramatically different

3  design -- dramatically different benefits.

4          THE COURT:  One minute remaining.

5          MR. SHEASBY:  Let's go to slide 148.  Actually,

6  let's go to slide 143.

7      PNC says they don't use, they are shocked that they are

8  being accused of infringement.  They use a system that they

9  knew was infringing.

10      Let's take down the slides.

11      If you go to the verdict form, you will be asked if there

12  are any claims that are infringed.  If you conclude there are,

13  there is liability.

14      Ladies and gentlemen of the jury, our board is generals

15  and admirals who have made the decision that we are not going

16  to allow a company like PNC to take our members' technology

17  and money.  It is the founders' intent that this be in your

18  hands.

19      Ladies and gentlemen of the jury, this is in your hands.

20  Thank you.

21          THE COURT:  All right, ladies and gentlemen.  I'd

22  like to provide you with a few final instructions before you

23  begin your deliberations.

24      You must perform your duty as jurors without bias or

25  prejudice as to any party.  The law does not permit you to be

1    controlled by sympathy, prejudice, or public opinion.  All

2    parties expect that you will carefully and impartially

3    consider all the evidence and follow the law as I have given

4    it to you and reach a just verdict regardless of the

5    consequences.

6        Answer each question in the verdict based on the facts as

7    you find them to be.  Follow the instructions that the Court

8    has given you on the law.  Again, do not decide who you think

9    should win this case and answer the questions to reach that

10   result.  Let me remind you once more, your answers to the

11   questions in the verdict form must be unanimous.

12       You should consider and decide this case as a dispute

13   between persons of equal standing in the community, equal

14   worth, and holding the same or similar stations in life.  This

15   is true in patent cases between corporations, partnerships, or

16   individuals.

17       A patent owner is entitled to protect his rights under

18   the laws of the United States, and this includes bringing a

19   suit in a U.S. district court for money damages for

20   infringement.  The law recognizes no distinction among types

21   of parties, and all corporations, partnerships, and other

22   organizations stand equal before the law, regardless of their

23   size and regardless of who owns them, and they are to be

24   treated as equals.

25       Now, when you retire to the jury room to deliberate on

1    your verdict, as I've told you, you will each have a printed

2    copy of these final jury instructions that I'm giving you.

3         If during your deliberations you desire to review any of

4    the exhibits which the Court has admitted into evidence over

5    the course of the trial, you should advise me by a written

6    note delivered to the Court Security Officer, signed by your

7    foreperson, and I will then send that exhibit or those

8    exhibits to you.

9         Once you retire, you should first select your foreperson

10   and then conduct your deliberations.  And if you recess at any

11   time during your deliberations, follow all the instructions

12   that I've given you about your conduct during the trial.

13        After you have reached a verdict, your foreperson should

14   answer the questions in the verdict form reflecting your

15   unanimous answers, date the verdict form, sign it as the

16   foreperson of the jury, and then notify the Court Security

17   Officer.  Do not reveal your answers until such time as you

18   are discharged by me, and you must never disclose to anyone,

19   not even to me, your numerical division on any unanswered

20   question.

21        Any notes that you've taken over the course of the trial

22   are aids to your memory only.  If your memory differs from

23   your notes, rely on your memory and not your notes.  The notes

24   are not evidence.  And a juror who has not taken notes should

25   rely on his or her own independent recollection of the

1    evidence and not be unduly influenced by the notes of other

2    jurors.  Notes are not entitled to any greater weight than the

3    recollection or impression of each juror about the evidence.

4        If you want to communicate with me at any time during

5    your deliberations, you should give a message or question,

6    written and signed by your foreperson, to the Court Security

7    Officer who will bring it to me, and I will then respond as

8    promptly as possible, either in writing or by having you

9    brought back into the courtroom where I can address you

10   orally.  And I will always first disclose to the attorneys in

11   the case your question and my response before I answer any

12   question.

13       After you have reached a verdict and the Court has

14   accepted that verdict and discharged you as jurors, at that

15   time you will be free to discuss your service in this case

16   with anyone that you choose to.  By the same token, ladies and

17   gentlemen, at that time you'll be just as free not to discuss

18   your service in this case as you choose to.  At that point in

19   time that decision will be yours and yours alone.

20       I'm now going to hand eight printed copies of these final

21   jury instructions and one clean copy of the verdict form to

22   the Court Security Officer, who will deliver these to you in

23   the jury room.

24       Ladies and gentlemen of the jury, you may now retire to

25   the jury room to deliberate on your verdict.

1      (Whereupon, the jury left the courtroom.)

2          THE COURT:  Counsel, awaiting either a question from

3  the jury or a return of their verdict, we stand in recess.

4          MR. SHEASBY:  Thank you, Your Honor.

5                  (Jury deliberates.)

6          THE COURT:  Be seated, please.

7      Counsel, I've received the following note from the jury.

8  I'll read it and then I have a Xerox copy for each of the

9  parties.  After I've read it, you can approach and get a copy.

10     The note is dated today, and reads as follows:  "We would

11  like to see these exhibits:  PX 0157, PDX 1.29, PX 0150,

12  PX 0097, PX 0109, DDX 7.19."  And it's signed by Ms. O'Dell,

13  who is Juror No. 3, I believe, so I assume she is our

14  foreperson.

15     I am going to mark this note with a '1' in the upper

16  right-hand corner to identify it as the first note from the

17  jury.  I'm going to hand the original note to the Courtroom

18  Deputy, and I'm going to hand the Courtroom Deputy two copies

19  two Xerox copies of the note.  Somebody from either side can

20  come forward and get a copy for each side to look at.

21     While I was waiting on everybody to assemble, I've

22  composed a preliminary written response.  I'm going read it to

23  you and then I'll be glad to take any comments.

24     "Members of the jury, in response to your request, I'm

25  sending you the following exhibits:  PX 0157 PX 0150, PX 0097,

1    PX 0109.  You also asked for PDX 1.29 and DDX 7.19.  These are

2    demonstratives and are not evidence and I cannot send these to

3    you.  You'll have to rely on your memories of the testimony

4    that was given while these were used with witnesses."  Dated

5    and signed by me.

6         And I'm assuming from the identification in their note

7    that those are, in fact, demonstratives.

8         I'm going to go off the record for a minute.  I suggest

9    that while we're off the record, that a representative of each

10   side meet with the Courtroom Deputy and let's make sure that

11   there's no doubt about which numbered exhibits these are and

12   that we have the right ones, and then I'll take any comments

13   on the record from the parties before I send the exhibits into

14   the jury.

15        Let's go off the record.

16                    (Pause in proceedings.)

17        THE COURT:  All right.  Let's go back on the record.

18        Representatives of the two parties have worked with the

19   Courtroom Deputy to identify the requested exhibits while we

20   were off the record.

21        Are there any objections from either party to the Court

22   sending those four exhibits to the jury with the note that I

23   read to you?

24        MR. BUNT:  Not from the Plaintiff, Your Honor.

25        MS. SMITH:  Not from the Defendant, Your Honor.

```
 1          THE COURT:  All right.  Would you hand me those
 2   actual exhibits, Ms. Brunson?  And I'll put this signed note
 3   with it in response, and I'll hand them to Mr. Latham, the
 4   Courtroom Deputy, and ask him -- the Court Security Officer, I
 5   should say, and ask him to deliver them to the jury.
 6       All right, counsel.  Awaiting either another note or the
 7   return of a verdict, we stand in recess.
 8                    (Deliberations continue.)
 9          THE COURT:  Please be seated.
10       We received a second note from the jury.  I'll read the
11   note into the record and, as before, I have a copy for each
12   side to pick up from the Courtroom Deputy, a Xerox copy, after
13   I've read it into the record.
14       "We would like to view the following exhibits:  DDX 9.15
15   DDX 9.21 DDX 15.20, PTX 0150, PX 1377, PX 0107, PX 0136,
16   PX 0196, PX 0926, PX 1154, PX 0097, PX 1711, PX 1762, PX
17   0195."  And this is also signed by Ms. O'Dell, Juror No. 3, as
18   the foreperson.
19       I'll hand the Courtroom Deputy a copy for each side, if
20   you want to come forward and receive it, and I'll mark the
21   original note in the upper right-hand corner for
22   identification as '2', and I'll deliver the original note to
23   the Courtroom Deputy.
24       This looks like basically the same exercise we just went
25   through, even though there is a longer list of exhibits here.
```

1      I've prepared the following response in light of this

2    second note.  I'll read it to you and then I'll take your

3    comments.

4      "Members of the jury, in response to your question, I'm

5    sending you the following exhibits:  PX 1377, PX 0107,

6    PX 0136, PX 0196, PX 0926, PX 1154, PX 0097, PX 1711, PX 1762,

7    PX 0195.  You also asked for DDX 9.15, DDX 9.21, and

8    DDX 15.20.  These are demonstratives and are not evidence and

9    I cannot send these to you.  You will have to rely on your

10   memories of the testimony that was giving while these were

11   used with witnesses.  Also I have previously sent you PX 0150,

12   so it is already in your possession."

13     That is the Court's intended responsive note.  I'll note

14   that this PX 0150 was in the first note.  It's already been

15   sent back to them.

16     Other than making sure we get the right exhibits out of

17   the box of exhibits and that they're sent back, does anybody

18   have either an objection a question or a problem with pulling

19   these exhibits and sending them back?

20         MR. BUNT:  No objection from Plaintiff, Your Honor.

21         MS. SMITH:  None from Defendant, Your Honor.

22         THE COURT:  Already.  Why don't Ms. Smith and

23   Mr. Bunt, why don't you come forward and with the Courtroom

24   Deputy make sure we get the right exhibits.  And once you've

25   physically got them pulled, I'll take them and put this

1   written response with them and deliver them to the Court

2   Security Officer with directions that they be delivered to

3   the jury.

4                    (Pause in proceedings.)

5           THE COURT:  Let's go back on the record.

6        The Court's proposed response to note No. 2 is as

7   follows:  "Members of the jury, in response to your request,

8   I'm sending you the following exhibits:  PX 1377, PX 0107,

9   PX 0136, PX 0196, PX 0926, PX 1154, PX 1762, PX 0195.  You

10  also asked for DDX 9.15, DDX 9.21 and DDX 15.20.  These are

11  demonstratives and are not evidence and I cannot send these to

12  you.  You will have to rely on your memories of the testimony

13  that was given while these were used with witnesses.  Also I

14  have previously sent you PX 0150 and PX 0097, so these

15  exhibits are already in your possession.  Additionally,

16  PX 1711 was never used as an exhibit during the trial and is

17  not something I can send to you."

18       Anybody have a problem or an objection to that response?

19           MR. BUNT:  No objection from USAA.

20           MS. SMITH:  None from Defendant, Your Honor.

21           THE COURT:  All right.  Then I'll execute and sign

22  the written response, I'll put it with these identified

23  exhibits that have been pulled, and I'll hand these to the

24  Court Security Officer with directions to deliver the same to

25  the jury.

1273

1    All right.  Pending either another note or the return of

2  a verdict, we'll stand in recess.

3              (Deliberations continue.)

4        THE COURT:  Be seated, please.

5        Counsel, I've received the following note from the jury:

6  "We have reached a verdict."  And it's signed by Ms. Lisa

7  O'Dell, Juror No. 3, who appears to be our foreperson.  It is

8  dated with today's date.  And I will hand it marked for

9  identification with a '3' to the Courtroom Deputy.

10        Let's bring in the jury, please.

11              (Whereupon, the jury entered the courtroom.)

12        THE COURT:  Please be seated, ladies and gentlemen.

13        Ms. O'Dell, I understand that you're the foreperson of

14  the jury.  Is that correct?

15        THE PRESIDING OFFICER:  Yes, sir.

16        THE COURT:  Has the jury reached a verdict?

17        THE PRESIDING OFFICER:  Yes, sir.

18        THE COURT:  Would you hand the completed verdict

19  form to the Court Security Officer who will bring it to me?

20        Ladies and gentlemen of the jury, I'm going to announce

21  the verdict into the record.  I want you the listen very

22  carefully as I do that, because after I've announced the

23  verdict, I'm going to poll the members of the jury to make

24  sure that this is, in fact, the unanimous verdict of all eight

25  members of the jury.

1       Turning to the verdict form and beginning on page 4 where

2   question 1 is situated, "Did USAA, the Plaintiff, prove by a

3   preponderance of the evidence that PNC, the Defendant,

4   infringed any of the asserted claims?" the jury's answer is

5   "Yes."

6       Turning to page 5 where question 2 is situated, "Did PNC,

7   the Defendant, prove by clear and convincing evidence that any

8   of the following asserted claims are invalid?" with regard to

9   each of the claims itemized as a part of question 2 on page 5,

10  the jury in every instance answered "No."

11      Turning to question 3 on page 6 of the verdict form, "Did

12  USAA, the Plaintiff, prove by a preponderance of the evidence

13  that PNC, the Defendant, willfully infringed any of the

14  asserted claims that you found were infringed?" the jury's

15  answer is "Yes."

16      Turning next to page 7 of the verdict form where question

17  4 is situated, "What sum of money if paid now in cash has

18  USAA, the Plaintiff, proven by a preponderance of the evidence

19  would compensate it for its damages for infringement?" the

20  jury's answer is "$218,450,000."

21      Turning to page 8, the final page of the verdict form, I

22  find it is dated with today's date, May the 13th, 2022, and it

23  is signed by Ms. Lisa O'Dell as foreperson of the jury.

24      Ladies and gentlemen of the jury, let me poll you to

25  ensure this is the unanimous verdict of all eight members of

1275

1    the jury.  If this is your verdict as I have read it, would

2    you please stand up?  Thank you.  Please be seated.

3         Let the record reflect that all eight members of the jury

4    immediately rose and stood in response to the Court's question

5    to poll the jury.

6         Having polled the jury, the Court finds that this is the

7    unanimous verdict of all eight members of the jury.  The Court

8    accepts the jury's verdict.  The Court delivers the original

9    verdict form as executed to the Courtroom Deputy.

10        Ladies and gentlemen, this now completes the trial of

11   this case.  From the very beginning I have instructed you time

12   and time again about not communicating or discussing this case

13   with anyone in any way.  I am releasing you from that

14   instruction.  I'm releasing you from all the instructions and

15   requirements that have been placed on you while you have

16   served as jurors in this case, and I am discharging you from

17   your position as jurors in this case.  That means, ladies and

18   gentlemen, you're free to talk about this in any way with

19   anybody that you want to.  It also means you're completely

20   free not to talk about it with anybody in any way.  That

21   decision is 100 percent yours and yours alone.

22        Also, ladies and gentlemen, you may find this

23   interesting.  This is my 100th jury trial since I've been on

24   the bench, and as I have with every jury trial where I've

25   received and accepted the jury's verdict, I ask the jury for a

1   favor and I'm going to ask you for a favor, and that is,

2   before you leave, I'd like you to go back to the jury room and

3   now that you have been discharged, I'd like to come into the

4   jury room and I'd like to shake each hand, I'd like to look

5   each person in the eye, and I'd like to tell you thank you for

6   the service that you've rendered, the sacrifice that you've

7   borne, and the public service that you have tendered as a part

8   of this jury.  I think what you've done warrants that, I think

9   it's that important, and if you would give me that honor, I

10  promise I won't keep you--it's Friday afternoon and

11  everybody's ready to go--but if you would give me that honor,

12  I'd like to thank you personally, each one individually,

13  before you leave because I think the service that you've

14  rendered to our country by being jurors in this case is that

15  significant and it warrants that kind of special attention.

16      That completes the trial of this case, ladies and

17  gentlemen.  If you'll do me that favor, I'll see you in the

18  jury room.

19      Counsel, you are excused.

20          (The proceedings were concluded at 4:48 p.m.)

21

22

23

24

25

1        I HEREBY CERTIFY THAT THE FOREGOING IS A

2     CORRECT TRANSCRIPT FROM THE RECORD OF

3     PROCEEDINGS IN THE ABOVE-ENTITLED MATTER.

4     I FURTHER CERTIFY THAT THE TRANSCRIPT FEES

5     FORMAT COMPLY WITH THOSE PRESCRIBED BY THE

6     COURT AND THE JUDICIAL CONFERENCE OF THE

7     UNITED STATES.

8

9     S/Shawn McRoberts              05/13/2022

10    _____DATE_____
      SHAWN McROBERTS, RMR, CRR
11    FEDERAL OFFICIAL COURT REPORTER

12

13

14

15

16

17

18

19

20

21

22

23

24

25